# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| **NORTH CAROLINA STATE CONFERENCE OF THE NAACP, CHAPEL HILL – CARRBORO NAACP, GREENSBORO NAACP, HIGH POINT NAACP, MOORE COUNTY NAACP, STOKES COUNTY BRANCH OF THE NAACP, WINSTON SALEM – FORSYTH COUNTY NAACP** )<br><br>Plaintiffs, )<br><br>v. )<br><br>**ROY ASBERRY COOPER III**, in his official capacity as the Governor of North Carolina; **JOSHUA MALCOM**, in his official capacity as Chair of the North Carolina State Board of Elections; **KEN RAYMOND**, in his official capacity as Secretary of the North Carolina State Board of Elections; **STELLA ANDERSON, DAMON CIRCOSTA, ROBERT CORDLE, STACY EGGERS IV, JAY HEMPHILL, VALERIE JOHNSON**, and **JOHN LEWIS**, in their official capacities as members of the North Carolina State Board of Elections, )<br><br>Defendants. ) | **COMPLAINT**<br><br>CASE NO. _____ |

## INTRODUCTION

1.  "It is beyond dispute that 'voting is of the most fundamental significance under our constitutional structure.' . . . 'Other rights, even the most basic, are illusory if the right to vote is undermined.'" *North Carolina State Conference of the NAACP v. McCrory*, 831 F.3d 204, 241 (4th Cir. 2016) (citations omitted), *cert. denied* 137 S. Ct. 1399 (2017). Ignoring that unequivocal promise—set forth in a case invalidating a North Carolina election law just twenty-nine months ago—the North Carolina General Assembly is at it again. The United States Court

of Appeals for the Fourth Circuit held that the State's last attempt at imposing a voter photo identification requirement was enacted with "discriminatory intent," "target[ing] African Americans with almost surgical precision," and "impos[ing] cures for problems that did not exist." *Id.* at 214. And furthermore nothing in the legislative record or the State's experience in recent years has called out for the need for a photo identification requirement for voting. Nevertheless, on December 5, 2018, the General Assembly passed Senate Bill 824 ("S.B. 824"), which re-imposes an unconstitutionally burdensome and discriminatory voter photo ID requirement. Following a veto by Governor Roy Cooper, the General Assembly overrode the veto, and S.B. 824 is now codified in Session Law ("SL") 2018-144. North Carolina's voters will be required to show photo ID to vote beginning in just a few months.

2. The newly enacted photo ID requirement suffers from the same flaws as the prior version (set forth in House Bill 589 ("H.B. 589") and codified at SL 2013-381). Both were the product of rushed legislative processes. Both were based on pretextual justifications, making changes to the voting process when there was nothing wrong in the first place that necessitated a photo ID requirement. And both carve out classes of identification or otherwise impose onerous rules that will have a disproportionate impact on minority citizens' ability to participate in the political process.

3. The Fourth Circuit, in deeming H.B. 589 unconstitutional, noted that the General Assembly's rush and abuse of the legislative process illustrated ill intent. The process for passing S.B. 824 was even hastier. For instance, the Senate Rules Committee allowed for twenty minutes of public comment on the 2013 voter ID law. In 2018, the committee heard a mere four minutes. H.B. 589 languished in the Senate's Rules Committee for months before being considered and then passed in the Senate within three days. For S.B. 824, the 2018 General

2

Assembly managed to repeat this three-day review-and-ratify scheme in both the House and the Senate.

4.     There is not now, and never has been, any demonstrated need for voter photo identification in North Carolina.  After the 2016 election, the North Carolina State Board of Elections ("SBOE") conducted an extensive study and found that only *one* fraudulent vote might have been prevented by a requirement to present photo identification before in-person voting.  The previously released 2013 report by the SBOE likewise found that between 2000 and 2012, out of nearly 40 million votes cast, only two cases of in-person voter fraud were referred to a district attorney.  S.B. 824's history and the results of analyses performed by SBOE clearly show that there is no justification for a bill whose implementation will cost North Carolina residents an estimated $17 million over five years—let alone the justification necessary to inflict disproportionate burden on  minority citizens' right to ballot access.

5.     S.B. 824 imposes substantial burdens on voters.  For one, S.B. 824 requires registered voters to show one of a limited number of photo identification cards in order to cast a ballot and have it counted in a North Carolina election.  This requirement will disproportionately injure African American and Latino voters, who are less likely than other members of the electorate to possess the required forms of identification and who also face disproportionate burdens in obtaining such identification.  As a result, African American and Latino voters are more likely than other North Carolina voters to have their votes denied, diluted, or abridged by S.B. 824.  And as just one example of its continued disregard, the legislature discussed and then again excluded public assistances IDs (which are disproportionately possessed by voters of color) as a form of qualifying ID (a decision the courts warned was problematic in the last go-around).  Furthermore, by expanding the number of poll observers and the grounds for which *any* voter can challenge

ballots, S.B. 824 increases the likelihood of voter harassment and imposes a substantial and unlawful burden on the right to vote. The General Assembly passed these measures despite evidence of significant voter intimidation, including during the 2012 and 2016 elections, as well as the recent 2018 elections.

6. These are not minor inconveniences or issues in North Carolina, particularly given the State's history—both distant and modern—with regard to minority disenfranchisement. To the contrary, North Carolina's well-documented history of discriminatory practices in restricting voting rights makes these impediments even more concerning. As a result of this troubling history, prior to the Supreme Court's decision in *Shelby County v. Holder*, 133 S. Ct. 2612 (2013), forty-one North Carolina counties were covered jurisdictions under the Voting Rights Act of 1965 and subject to federal preclearance requirements. Over the past thirty years, the Department of Justice has objected more than sixty times to changes in North Carolina voting laws.

7. The provisions of S.B. 824—both independently and cumulatively—violate Section 2 of the Voting Rights Act, 42 U.S.C. § 1973. The limitations that the bill imposes on the right to vote have a disparate impact on African Americans and Latinos, and, in interaction with existing societal and economic conditions, result in denying African Americans and Latinos equal and meaningful access to the political process. The ultimate result of these provisions is the effective denial of the franchise and dilution of minority voting strength.

8. The provisions of S.B. 824 also violate the Fourteenth and Fifteenth Amendments of the United States Constitution. These provisions impose discriminatory and unlawful burdens on the right to vote that are not justified by any legitimate or compelling state interest. Although North Carolina legislators attempted to justify S.B. 824 by pointing to concerns

of voter fraud, the facts before the legislature established that voter fraud is not a significant problem in North Carolina and, even if it were, the provisions in S.B. 824 are neither appropriately nor narrowly tailored to address that problem. Concerns of actual or perceived voter fraud also do not justify the restrictions imposed here.

9.      Plaintiffs request that the Court find the challenged provisions of S.B. 824 to be unlawful under Section 2 of the Voting Rights Act and the Fourteenth and Fifteenth Amendments to the U.S. Constitution. Plaintiffs also request that the Court enter declaratory and injunctive relief preventing defendants from implementing or enforcing the challenged provisions of S.B. 824 and retaining jurisdiction under Section 3(c) of the Voting Rights Act, 42 U.S.C. § 1973 to require preclearance of all changes to voting procedures statewide.

## JURISDICTION & VENUE

10.      This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1343, and 1357, and 42 U.S.C. §§ 1983, 1988, 1973, and 1973j.

11.      This Court has personal jurisdiction over the defendants, all of whom are either elected officials in North Carolina or are board members, officers, or employees of SBOE. All of the defendants work and reside in the State of North Carolina.

12.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b). Among other things, a substantial portion of the violations and harms complained of herein occurred, or will occur, in this District.

13.      This Court has authority to issue declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201 and 2202.

## THE PARTIES

14. Plaintiff NORTH CAROLINA STATE CONFERENCE OF THE NAACP ("North Carolina NAACP") is a nonpartisan, nonprofit organization composed of over 100 branches and 20,000 individual members throughout the State of North Carolina. The North Carolina NAACP has members who are citizens and registered voters in each of the State's one hundred counties and in the forty-one counties previously covered by the Voting Rights Act. Many of those members will be directly impacted and harmed by the unlawful provisions of S.B. 824. The fundamental mission of the North Carolina NAACP is the advancement and improvement of the political, educational, social, and economic status of minority groups; the elimination of racial prejudice; the publicizing of adverse effects of racial and ethnic discrimination; and the initiation of lawful action to secure the elimination of racial bias. In furtherance of this mission, the North Carolina NAACP advocates to ensure that the interests of racial minorities are represented on the local, state, and national legislative bodies by representatives who share the community's interests, values, and beliefs and who will be accountable to the community. The North Carolina NAACP encourages and facilitates nonpartisan voter registration drives by its chapters to promote civic participation. The North Carolina NAACP currently maintains its headquarters in Raleigh, North Carolina.

15. The North Carolina NAACP has standing to challenge S.B. 824 on behalf of its members, who include African American and Latino voters in North Carolina. The North Carolina NAACP has members who will be directly impacted and harmed by the unlawful provisions of S.B. 824. Many of those members will be effectively denied the right to vote or otherwise deprived of meaningful access to the political process as a result of the challenged provisions of S.B. 824 or will have their voting strength diluted. The challenged provisions of

S.B. 824 will also impose substantial costs and undue burdens on the right to vote for those and other members.

16. The North Carolina NAACP also has standing to challenge S.B. 824 on its own behalf. The North Carolina NAACP will be forced to divert time, money, and resources from their other activities in order to expend more time and attention assisting North Carolina citizens who are burdened by the new provisions of S.B. 824. The law thus adversely impacts the North Carolina NAACP's overall operations.

17. Plaintiffs CHAPEL HILL – CARRBORO NAACP, GREENSBORO NAACP, HIGH POINT NAACP, MOORE COUNTY NAACP, STOKES COUNTY BRANCH OF THE NAACP, WINSTON SALEM – FORSYTH COUNTY NAACP (the "Local Branches") are each units of the NAACP, and share in the mission of the North Carolina NAACP. In furtherance of that mission, the Local Branches each engage in efforts to promote the right to vote, including through voter registration drives, efforts to encourage civic engagement by youth, and Get Out the Vote drives, among other voter protection and voter-education activities.

18. The Local Branches have standing to challenge S.B. 824 on behalf of their members, who include African American and Latino voters in North Carolina. The Local Branches have members who will be directly impacted and harmed by the unlawful provisions of S.B. 824. Those members will be effectively denied the right to vote or otherwise deprived of meaningful access to the political process as a result of S.B. 824 or will have their voting strength diluted. S.B. 824 will also impose substantial costs and undue burdens on the right to vote for those and other members.

19. The Local Branches also have standing to challenge S.B. 824 on their own behalf. The Local Branches will be forced to divert time, money, and resources from their other

activities in order to expend more time and attention assisting North Carolina citizens who are burdened by the new provisions of S.B. 824. The law thus adversely impacts the Local Branches' overall operations.

20.     Defendant ROY ASBERRY COOPER III is the Governor of North Carolina, and is being sued only in his official capacity. In that capacity, he is responsible for faithfully executing and enforcing the laws of North Carolina, including S.B. 824. In particular, Defendant COOPER is responsible for appointing the members of SBOE and, in certain circumstances, has the power to remove certain members of SBOE. Defendant COOPER also receives recommendations from SBOE relative to the conduct and administration of the primaries and elections in North Carolina. In light of his duties, there is a special relation between Defendant COOPER and S.B. 824.

21.     Defendant JOSHUA MALCOM is the Chair of the North Carolina SBOE, and is being sued in his official capacity. The SBOE is charged with administering the election laws of the State of North Carolina. In light of his duties, there is a special relation between Defendant MALCOM and S.B. 824.

22.     Defendant KEN RAYMOND is the Secretary of the North Carolina SBOE, and is being sued in his official capacity. The SBOE is charged with administering the election laws of the State of North Carolina. In light of his duties, there is a special relation between Defendant RAYMOND and S.B. 824.

23.     Defendants STELLA ANDERSON, DAMON CIRCOSTA, ROBERT CORDLE, STACY EGGERS IV, JAY HEMPHILL, VALERIE JOHNSON, and JOHN LEWIS ("the Members") are members of the North Carolina SBOE, and are being sued in their official capacities. In light of their duties, there is a special relation between the Members and S.B. 824.

## FACTUAL BACKGROUND

### I.    North Carolina's History of Discriminatory Voting Practices Before 2013

24.    Federal courts have repeatedly recognized North Carolina's history of voting-related discrimination. The Department of Justice has also lodged over sixty objections to changes to voting laws in North Carolina under Section 5 of the Voting Rights Act.

25.    In one of the Supreme Court's leading cases on the Voting Rights Act—*Thornburgh v. Gingles*, 478 U.S. 30 (1985)—the Court accepted a lower court's factual findings that a history of racial discrimination in North Carolina had resulted in a lower socioeconomic status for most African Americans in the State; that North Carolina had a history of voting-related discrimination; that the State had used voting and electoral procedures that lessened the opportunity of African American voters to elect candidates of their choice; that political campaigns in North Carolina had used racial appeals; that African Americans had rarely been elected to office in the State; and that voting was racially polarized in certain districts.

26.    The turnout rate among African American voters in North Carolina, which has significantly lagged behind that of white voters as recently as the 2004 general election, surpassed that of white voters in the 2008 and 2012 general elections. While African American voter turnout fell slightly in 2016, it reached its highest recorded point for midterms during the 2018 elections.

27.    Voter registration and turnout rates among Latino voters in North Carolina both continue to lag significantly behind that of white voters in recent elections. It is estimated that only half of eligible Latino citizens in North Carolina are registered to vote.

28.    Numerous counties in North Carolina were previously "covered" jurisdictions under Section 4(b) of the Voting Rights Act, 42 U.S.C. § 1973. In particular, North

9

Carolina counties were previously covered by Section 4(b)'s coverage formula based on a history of racial discrimination in voting; thus those counties were required to obtain preclearance from the United States Department of Justice before making changes to their voting procedures. Under that system, those forty-one North Carolina counties had sought preclearance for many voting-related changes.

29. Between 1980 and 2013, the Attorney General interposed objections under Section 5 of the Voting Rights Act to at least sixty submissions consisting of some 155 discrete voting changes in North Carolina, finding that either the State or one of the covered political subdivisions within the State had failed to show that the proposed changes would not have the purpose or effect of denying or abridging the right to vote on account of race or color or membership in a language minority group.

30. Between 1982 and 2006, plaintiffs secured favorable outcomes in fifty-five lawsuits brought against governmental units in North Carolina under Section 2 of the Voting Rights Act. Ten of these lawsuits resulted in reported judicial decisions; forty-five were settled favorably without a reported decision.

31. In 2011, the majority party of the North Carolina General Assembly, led by Representative David Lewis (who continues to chair the House Committee on Elections and Ethics Law today and who shepherded S.B. 824 through the legislative process during the most recent special session) enacted state legislative maps that were ultimately struck down by the federal courts as unconstitutional for containing one of the "largest racial gerrymanders ever encountered by a federal court." *Covington v. North Carolina*, 270 F. Supp. 3d 881, 884 316 (M.D.N.C. 2017), *aff'd* 137 S. Ct. 2211 (2017) (per curiam).

## II.    Legislative History of H.B. 589, Predecessor Bill to S.B. 824

32.    On June 25, 2013, the U.S. Supreme Court decided *Shelby County v. Holder*, striking down as unconstitutional Section 4(b) of the Voting Rights Act. Section 4(b) had provided a formula to identify state and local jurisdictions that had a history of racial discrimination in voting and thus were subject to preclearance requirements under the Voting Rights Act.  In light of the Supreme Court's decision, the forty-one North Carolina counties previously covered by the Voting Rights Act were relieved of their obligation to seek federal preclearance before changing their voting laws, and thus, any statewide voting law changes were similarly relieved of preclearance.

33.    Following the decision, the North Carolina General Assembly moved to expand a version of H.B. 589 that had been filed before *Shelby County* to push forward new impediments to voting and to roll back voter protections.  In particular, Senator Tom Apodaca—Chairman of the Senate Rules Committee—stated that "[n]ow we can go ahead with the full bill," referring to a range of new restrictions on the franchise.

34.    On July 23, 2013—less than one month after the Supreme Court issued its ruling in *Shelby County* and four days before the end of the legislative session—North Carolina lawmakers added an armada of amendments to H.B. 589, vastly expanding the bill's reach.

35.    These amendments included, among others: reductions in early voting; the elimination of same-day registration; a provision that explicitly prevented county boards of election from counting "out-of-precinct" provisional ballots; the elimination of discretion for county boards of elections to direct that polls remain open for an additional hour on Election Day; the elimination of pre-registration for sixteen- and seventeen-year olds; the elimination of flexibility for county boards of election to open early-voting sites at different hours within a

11

county; the elimination of straight party ticket voting; the expansion of the number of poll observers and the numbers of people who can challenge ballots; and new regulations that made it more difficult to add satellite polling sites for the elderly or voters with disabilities.

36.     The amendments were all added over the course of three days leading up to the close of the legislative session: July 23, 24, and 25. On July 25, the Senate passed this expanded version of H.B. 589. Hours later, the House followed suit. And on July 26, during the waning hours of the last day of the legislative session, the House and Senate leaders signed the bill in preparation for its delivery to then-Governor Pat McCrory.

37.     Although the North Carolina legislature moved rapidly to enact H.B. 589 through, lawmakers had previously heard extensive commentary from the public about the disproportionate impact the proposed legislation would have on the voting rights of African Americans.

38.     At public hearings in March and April of 2013, numerous individuals and organizations detailed how a provision requiring voters to have photo identification would disproportionately affect the voting ability of African Americans and other minorities. A representative of the North Carolina Justice Center testified that "African Americans are more than three times as likely as whites to not have a government-issued ID." The ACLU of North Carolina told lawmakers that "while African Americans make up 22 percent of the active registered voters in North Carolina, they are 31 percent of the registered voters identified as not having a valid state-issued government ID."

39.     Proponents of H.B. 589, on the other hand, claimed that "[p]oor and minority voters do not lack photo ID because they cannot apply for government assistance without a photo ID." Other proponents of the bill—with no supporting information—warned that "illegals"

Case 1:18-cv-01034   Document 1   Filed 12/20/18   Page 12 of 37

would perpetrate fraud and "steal from us," and posited a "vast left-wing conspiracy… working to pad the voter rolls with as many non-citizens as possible."

40.    At the public hearings on H.B. 589, opponents of the bill pointed out the dearth of evidence of voter fraud in North Carolina, noting that "the State Board of Elections reports that from 2000 to 2010, only two cases of voter fraud by impersonation were referred to the District Attorney for prosecution." The General Assembly had that information before it when it enacted H.B. 589.

41.    Lacking evidence of actual voter fraud, proponents of the bill relied on their own suspicions, based largely on personal anecdotes, that fraud was rampant in the State. For example, one speaker in favor of H.B. 589 cited as evidence of potential voter fraud "a TV story of a blond woman in San Diego" who discovered that "an illegal had his photo made onto her credit card."

42.    Indeed, even legislators in favor of H.B. 589 had to admit that voter fraud was not the major motivation behind the bill. "There is some voter fraud, but that's not the primary reason for doing this," said Thom Tillis, the House Speaker at the time.

43.    On August 12, 2013, Governor Pat McCrory signed H.B. 589 into law, and North Carolina became one of the first states to pass more restrictive voting laws in the wake of the Supreme Court's decision in *Shelby County*. One leading election law scholar described H.B. 589 as "probably the most suppressive voting measure passed in the United States in decades."

## III.    Invalidation of H.B. 589

44.    The North Carolina NAACP, the United States Department of Justice, and a number of other organizational and individual plaintiffs immediately challenged H.B. 589,

including its photo identification requirement for in-person voters, under Section 2 of the Voting Rights Act and the Fourteenth and Fifteenth Amendments to the Constitution.

45.     On June 18, 2015, just weeks before trial was set to begin, the legislature passed H.B. 836, which made two changes to the photo ID requirement.  First, it amended the requirement to permit the use of expired DMV ID if the expiration date is no more than four years before the date on which it is presented for voting.  Second, it added a provision permitting a voter who does not present qualifying ID "due to a reasonable impediment that prevents the voter from obtaining photo identification" to have her vote counted under specified circumstances.

46.     In response to that eleventh-hour development, the court bifurcated proceedings by limiting the scope of the July 2015 trial to plaintiffs' challenges to the non-ID related provisions of H.B. 589, and delayed consideration of plaintiffs' challenge to the photo ID requirement to a later date.  The defendants subsequently moved to dismiss plaintiffs' challenge on grounds that the changes in H.B. 836 mooted the photo ID challenge, which the district court denied.

47.     The district court conducted a trial in July 2015 and a separate trial in January 2016, which dealt with the amended photo ID requirement.

48.     On April 25, 2016, the district court entered judgment in favor of the defendants. Plaintiffs appealed to the United States Court of Appeals for the Fourth Circuit, which expedited briefing and argument.

49.     On July 29, 2016, the Fourth Circuit reversed the district court's decision and held that the challenged provisions of H.B. 589 were "enacted with racially discriminatory intent," thus violating the Equal Protection Clause of the Fourteenth Amendment and Section 2 of

the Voting Rights Act. The Court of Appeals noted that H.B. 589 represented "the most restrictive voting law North Carolina has seen since the era of Jim Crow."

50. The Fourth Circuit took note of the fact that, prior to and during the debate on H.B. 589, the General Assembly "requested and received a breakdown by race of DMV-issued ID ownership." The data showed that African Americans disproportionately lacked DMV-issued IDs. In particular, emails from the legislature made clear its desire to obtain data that would allow it to discriminate on the basis of race.

51. An email from Representative Harry Warren's staff asked the Executive Director of the SBOE Gary Bartlett for a list of voters registered in North Carolina, to determine "a list of voters who have neither a NC Driver's License nor a NC Identification Card." The email requested that the information be broken down into categories by "all possible demographics that [the Executive Director of the State Board of Electors] typically captures," including party affiliation, ethnicity, age, and gender.

**From:** Shara Graham (Rep. Harry Warren) [mailto:Warrenhla@ncleg.net] **On Behalf Of** Rep. Harry Warren
**Sent:** Tuesday, March 05, 2013 9:56 AM
**To:** Bartlett, Gary
**Cc:** Rep. Tom Murry; Rep. David Lewis; Rep. Ruth Samuelson
**Subject:** Request

Director Bartlett,

My colleagues and I are currently drafting legislation addressing the North Carolina voting process and would like to request some statistical information from your office.

-We would like to have a cross matching of the registered voters in NC with the Department of Motor Vehicles to determine a list of voters who have neither a NC Driver's License nor a NC Identification Card. We would prefer to have this listed by counties, if possible.

-In addition, we would need to have that subset broken down into different categories within each county by all possible demographics that your department typically captures (party affiliation, ethnicity, age, gender, etc.).

-It would be necessary to know the number of one-stop voters and provisional voters within those groupings as well

52. Another email from Andrew Moretz to Jonathan Pruitt of the University of North Carolina titled "Request from Representative - Quick Turnaround," indicated that he was

"asked by a State Representative about the number of Student ID cards that are created and the % of those who are African American." He asked for a turnaround of that information in "2 hours or less."

> **From:** "Andrew G. Moretz" <agmoretz@northcarolina.edu>
> **Date:** April 24, 2013, 11:44:20 AM EDT
> **To:** "Jonathan C. Pruitt" <jpruitt@northcarolina.edu>
> **Cc:** "Willis, Jennifer Herrera" <jenwillis@unc.edu>
> **Subject: Request from Representative - Quick Turnaround**
>
> I was asked by a State Representative about the number of Student ID cards that are created and the % of those who are African American. He needs it in 2 hours or less.

53.     The General Assembly similarly requested and received a breakdown by race of absentee voting, early voting, same-day registration, and provisional voting. The data revealed that African Americans disproportionately use early voting, same-day registration, and out-of-precinct voting. The data also showed that white voters disproportionately use absentee voting.

54.     After receiving this information, the General Assembly drafted H.B. 589, enacted as SL 2013-381, which "drastically restricted" early voting, same-day registration, and provisional voting, but then *exempted* absentee voting from the photo ID requirement.

55.     The Fourth Circuit summarized this sequence of events: "In sum, relying on this racial data, the General Assembly enacted legislation restricting all—and only—practices disproportionately used by African Americans."

56.     After analyzing the record from both trials, the Fourth Circuit found that the North Carolina legislature's new provisions (including the photo ID requirement) targeted African American voters with "almost surgical precision," while the state simultaneously offered meager justifications for these actions. The Fourth Circuit held that these justifications "cannot and do not

16

conceal the State's true motivations" and thus concluded that the North Carolina General Assembly enacted the challenged provisions of the law with discriminatory intent.

57. Later that day, the district court entered an injunction enjoining "Defendants…their officers, agents, servants, employees, and attorneys…from implementing [H.B. 589]'s requirements for photo ID and changes to early voting, same-day registration, out-of-precinct voting, and preregistration," with the law in effect prior to H.B. 589's enactment back "in full force." North Carolina State Conf. of NAACP v. McCrory, No. 1:13-CV-00658, ECF No. 455 (M.D.N.C. Jul. 29, 2016).

58. In May 2017, the United States Supreme Court denied the defendants' petition for certiorari. When the Supreme Court denied certiorari in *NAACP v. McCrory*, the Court ended the General Assembly's efforts to rehabilitate its unconstitutional voter suppression law. However, the General Assembly continued to engage in unconstitutional overreach, attempting to gain control over the State's electoral system.

## IV.    Renewed Efforts to Impose a Photo ID Requirement in 2018

59. Following the Fourth Circuit's 2016 ruling, the SBOE—North Carolina's highest authority on voting matters—confirmed that in-person voter fraud posed no threat to the State's elections. In 2017, the SBOE released an extensive audit of potential voter fraud in the 2016 elections. In it, SBOE concluded that a voter ID law could have prevented only *one improper vote* statewide, despite voters casting nearly *4.8 million votes* in the election. (The only voter impersonation attempt by an in-person voter was a woman who cast a vote on behalf of her recently deceased mother, alleging that her mother had fervently wanted to be able to cast a vote for then-candidate Donald Trump. Prosecutors declined to charge the voter.) Other than this single case of voter fraud, the SBOE has not identified any other instances of in-person voter fraud in the State

17

since the General Assembly's last unjustified attempt to pass photo identification restriction on the right to vote.

60.    Despite these evidentiary findings, the General Assembly nonetheless continued to push for ID restrictions on voters' access to the polls.

61.    In a July 2018 special session, the General Assembly passed H.B. 1092, which approved the placement of a proposed constitutional amendment on the November 2018 general election ballot regarding voter ID.

62.    The General Assembly's approved ballot measure to amend the North Carolina Constitution was threadbare.  The ballot summary stated simply that the amendment would require voters to show photographic identification before in-person voting.  Specifically, the measure would require only in-person voters "to show photographic identification to a poll-worker before [they] can vote in person" and empowered the legislature to "make laws providing the details of acceptable and unacceptable forms of photographic identification" as well as to define the exceptions to those requirements.

63.    The ballot measure, like H.B. 589, explicitly exempted non-in-person absentee voters, who are disproportionately white, from constitutional voter ID requirements, and the measure did not provide an estimate of the cost of enactment.  Indeed, studies confirmed that voter support decreased after voters read a more detailed explanation of the proposed amendment—information that was not ultimately provided to them on the ballot.

64.    In November 2018, the measure (as quoted above) passed with the support of approximately 55 percent of voters.

## V. Hasty Implementation of the Constitutional Amendment

65.     In November 2018, the lame-duck General Assembly immediately took steps to pass legislation implementing the voter identification amendment.  The General Assembly called a special session in the final days of the Republican veto-proof majority; one of the major items for business was passing a new version of its 2013 voter identification law.

66.     S.B. 824 was introduced in the Senate on November 27, 2018.  By the morning of November 29, the bill had already passed through two committees and was approved by the whole of the Senate.  Very little time was permitted for public questions or comments, and what time was given was provided with insufficient or no notice to the public that there would be an opportunity for public comment.

67.     At its first committee meeting in the House, the House Committee on Elections and Ethics Law refused to allow for *any* public comment during its discussion of S.B. 824, despite multiple requests made by committee members on behalf of the public—including representatives of the North Carolina NAACP—who were in attendance to comment. As the Committee recessed, it scheduled a meeting the next morning to continue its discussion of S.B. 824.  That morning, members of the public, including representatives of the North Carolina NAACP, arrived at the Committee meeting room only to find that the meeting had been abruptly rescheduled for several hours later.  When the Committee reconvened later that day, the Chair announced, without any prior notice, that the Committee would hear comment from members of the public for one-minute each.  By that time, some individuals who had sought to comment, including representatives of the North Carolina NAACP, were no longer available.

68.     During the House Committee on Elections and Ethics Law meeting on S.B. 824, Rep. Henry "Mickey" Michaux voiced strong opposition to the bill, arguing that the

General Assembly demonstrated no evidence of voter fraud and that the only purpose of the bill was to suppress the votes of people of color.

69.     S.B. 824 took the same breakneck pace through the House of Representatives.  Although it entered the chamber on November 29, it was not referred to committee until December 4.  Again, it passed through two committees and the whole body *within two days*.

70.     The rushed process contrasted sharply with assurances from proponents of the bill that the proposed voter identification law would be subject to deliberation and in-depth review.  Rep. David Lewis, a sponsor of an early draft of S.B. 824 and its chief backer in the House—as well as the chief proponent of H.B. 589—promised that the General Assembly's review and debate process would "not be rushed in any way" in a statement before the Senate formally took up review of the bill.

71.     Instead, key details were left unresolved in the rush to a vote.  For instance, a legislative staff estimate found that it would cost the State $17 million over five years to implement the voter ID requirement set forth in S.B. 824.  The cost estimate was not complete until after the bill had already passed out of the Senate.

72.     In total, S.B. 824 underwent a mere five days of review in chamber or committee.  On information and belief, this breakneck process was intended to prevent detailed scrutiny of the bill's lack of justification.  Almost no time was set aside for discussion or comment; the General Assembly did not take time to consider any new information or evidence either justifying or demonstrating the lack of justification for S.B. 824's restrictions on the right to vote.

73.     During the December 5, 2018 debate on the House floor, Speaker of the House Tim Moore declared, in a notable moment of candid disclosure, that S.B. 824 was the

culmination of a "long road bringing voter ID to North Carolina," and that he had "worked on this bill since, really, since 2003, when [he] first came here as a member of the House." In his capacity as Chair of the House Rules Committee, Moore was one of the leaders of the 2013 General Assembly who drafted the unconstitutional H.B. 589 and shepherded it through the legislative process to enactment.

74. Representatives in opposition to the bill argued that the ID requirement would create unnecessary obstacles for legitimate voters and disproportionately affect African American and other minority voters access to the ballot.

75. During the limited floor debate on S.B. 824, several members of the legislature pointed out the similarities between S.B. 824 and its predecessor bill, H.B. 589, and indicated that they were aware that the same racially discriminatory intent animated both bills. In response, one backer of both S.B. 824 and H.B. 589, Rep. Speciale, retorted, "Race is the refuge of scoundrels when they have no debate."

76. The final vote on the bill was 67-40 in the House, and 25-7 in the Senate.

77. Significantly, although the lame-duck General Assembly convened itself in a final "special session" under the guise of passing legislation implementing emergency hurricane relief and the multiple constitutional amendments approved by voters in the November 2018 election, the constitutional amendment related to photo ID contained no time requirement for passage of implementing legislation. The General Assembly did not find it necessary to advance *any* of the other constitutional amendments' implementing legislation, abandoning that pretext in favor of carrying out the General Assembly's "long road" effort to pass a strict voter identification law.

21

78.     The General Assembly sent S.B. 824 to Governor Cooper on December 6,
2018.  On December 14, 2018, the Governor vetoed the bill, stating that "the proposed law puts
up barriers to voting that will trap honest voters in confusion and discourage them with new
rules."  He also observed that "the fundamental flaw of the bill is its sinister and cynical origins:
It was designed to suppress the rights of minority, poor and elderly voters."

79.     The General Assembly wasted no time voting to override the veto.  The
Senate supported an override on December 18, 2018 by a vote of 33-12; the House of
Representatives followed the next day by a vote of 72-40.

## VI.     S.B. 824, Like H.B. 589, Is a Minority Voter Suppression Measure

80.     S.B. 824 is a strict voter identification law that requires voters to present
one of several approved forms of photographic identification in order to vote in-person, or to attach
a copy of that identification to an absentee ballot application.  In addition, S.B. 824 dramatically
expands the number of poll observers permitted on election day, and makes many more people
eligible to challenge ballots.  These provisions, separately and together, will have a
disproportionately negative impact on minority voters.

81.     Like its unconstitutional predecessor, S.B. 824 places significant
restrictions on North Carolinians' right to vote without providing any benefits to election security,
and is unjustified by any other legitimate or compelling state interest.

82.     S.B. 824 requires that in-person voters present one of a limited number of
forms of qualifying photographic identification: (1) North Carolina driver's license; (2) North
Carolina non-driver ID; (3) U.S. passport; (4) North Carolina voter photo ID; (5) tribal enrollment
card; (6) qualifying student ID from a North Carolina state or private college or university; (7)
qualifying North Carolina state or local government employee ID card; (8) out-of-state driver's

license or non-driver ID, but only if the individual's voter registration was within 90 days of the election; (9) military ID; or (10) veteran ID card. Only voters over age sixty-five are permitted to present expired identification—and only if the identification was unexpired on the voter's sixty-fifth birthday.

83. While many minority voters have qualifying voter IDs, the group of citizens who are eligible to vote but who lack qualifying identification is disproportionately comprised of African American and Latino citizens.

84. There is no evidence that this burden on the right to vote is justified by any legitimate or compelling state interest. First and foremost, there is no evidence that in-person voter fraud poses any threat to North Carolina's elections. Thus, S.B. 824's restrictions on voters are a solution in search of a problem. Just as the reasons for H.B. 589 were pretextual, no new evidence has justified introducing voter ID requirements since the Fourth Circuit found H.B. 589 unconstitutional. To the contrary, studies have conclusively demonstrated that North Carolina does *not* have a problem with voter fraud that would be solved by voter ID laws. SBOE conducted an extensive study of the 2016 election, and found that, of nearly 5 million votes cast, only *one improper vote* could have been avoided with a voter ID law.

85. Furthermore, the argument that voter identification laws are justified by the need to combat election fraud is belied by the fact that S.B. 824 does little to address the form of election fraud North Carolina *does* have: *absentee ballot* election fraud, as seen during the recent 2018 election. In North Carolina's 9th Congressional District, voters claim that campaign operatives illegally harvested and altered their absentee ballots, in addition to alleged violations of vote counting security. Both SBOE and county prosecutors have been pursuing investigations into

23

these significant voting irregularities.  Voter identification laws do nothing to hinder those forms of election tampering.

86.    In addition to the burdensome and unjustified voter identification requirements in S.B. 824, the bill greatly increases the likelihood of voter harassment and imposes a substantial burden on the right to vote.  The bill permits the appointment of up to *200 more* at-large poll observers and permits any registered voters to challenge ballots at any polling place in their county.  The state legislature passed these measures despite evidence of significant voter intimidation in recent elections.  On information and belief, these changes will disproportionately suppress African American and Latino votes.

87.    Despite the lame-duck General Assembly's efforts to characterize S.B. 824 as a much-needed piece of legislation justified by the State's need to combat voter fraud, it remains clear that S.B. 824 is just the latest manifestation of determined efforts by a General Assembly that was born out of racial intent.  In the 2011 districting plan, the General Assembly set out to preserve its political power.  By enacting H.B. 589 in 2013, the General Assembly tried to suppress the votes of people of color.  And in 2018, the General Assembly is proving that it has never abandoned its racial intent to pass restrictive voting laws that suppress the minority vote.

88.    There is significant overlap between the legislators who voted in favor of H.B. 589 and those who voted in favor of S.B. 824.  Half of all senators and over a quarter of representatives who voted for S.B. 824 also voted for H.B. 589.  Only one legislator *switched* from a yea vote on H.B. 589 to a nay on S.B. 824 (which he publicly attributed to his belief that the newer voter ID restrictions were not strict enough.  He later changed to a yea vote to override the Governor's veto.  Similarly many of the same legislative leaders who created and championed H.B. 589—such as Senate President Pro Tempore Berger, Speaker Moore, Chairman Lewis,

Representative Speciale, and Representative Warren—were also instrumental in the enactment of S.B. 824.

## VII. The series of considered and rejected amendments to S.B. 824 illustrate the General Assembly's invidious attempt to disadvantage minority voters

89.     The General Assembly made clear its discriminatory intent when it considered—but rejected—a number of common sense amendments that would have improved inclusiveness for minority voters.

90.     Although the voter-approved constitutional amendment grants discretion to the General Assembly to make exemptions to the voter identification requirements, the General Assembly rejected several proposals intended to increase voter accessibility, especially for indigent and minority voters.

91.     Prior to *Shelby County*, public assistance IDs were considered an acceptable form of identification in proposed photo ID legislation.   Post-*Shelby County*, a much more stringent photo ID provision was adopted, which "retained only those types of photo ID disproportionately held by whites and excluded those disproportionately held by African Americans."   One such form of identification excluded by the 2013 legislature and disproportionately held by African Americans: public assistance IDs.

92.     The Fourth Circuit specifically identified the exclusion of public assistance IDs as discriminatory.  And the district court in the *McCrory* case found the "removal of public assistance IDs" particularly suspect, because "a reasonable legislator [would be] aware of the socioeconomic disparities endured by African Americans [and] could have surmised that African Americans would be more likely to possess this form of ID."

93. Not only did the prior district court opinion find that a reasonable legislature would have known that this exclusion would have a discriminatory impact, but it also explicitly reiterated that discriminatory impact in its conclusions.

94. In the S.B. 824 deliberation period, proposed Amendment 13 would have expanded the acceptable government-issued identification beyond only employee IDs to include *any* ID that was vetted and issued by a government agency. This would have allowed recipients of public assistance to use their state public assistance cards—which are subject to government scrutiny before issuance—to vote. The House rejected this amendment following the combined opposition of every Republican in the chamber.

95. Senator Paul Lowe introduced Amendment 7 in an effort to rectify the bill's failure to give low-frequency voters a greater opportunity to learn about the new ID requirements. Amendment 7 would have extended the unaware voter exception period, explained further below, to include the 2020 presidential election—an election where minority voters are more likely to be confronted by the ID requirement for the first time. The Senate voted to table the amendment along strictly partisan lines, and it was not included in the final bill.

## VIII. Even supposed concessions to lessen the impacts of the bill are illusory and will not meaningfully increase voters' access to IDs.

96. When a major hurdle to the right to vote is adopted, large-scale efforts to educate voters are necessary to prevent disenfranchisement.

97. In a veiled recognition of this difficulty, S.B. 824 includes a one-year exception allowing voters who lack an ID to participate in state elections if they attest to being unaware of the new voter requirements. But the General Assembly has only extended the reasonable impediment exception to apply for one year as it relates to voters who lack an ID to participate in state elections and attest (again under penalty of perjury) to being unaware of the

26

new voter requirements. This is a fig leaf: North Carolina has *no* major statewide general elections within the first year of the statute's implementation. In fact, in recent off-cycle years, only 11 percent of registered voters voted in 2015 and just 15 percent in 2017, demonstrating the inefficacy of that approach. Moreover, those voters who participate in off-cycle elections tend to be better educated and affluent, and more likely to have photo ID in the first place. Thus, the toothless one-year exception exhibits the General Assembly's invidious racial motivations by only educating the disproportionately white electorate who participates in a low-turnout, off year election.

98.     Long-term, voters lacking ID are not sufficiently protected by the "reasonable impediment" provision of the bill.

99.     In particular, the process extends and complicates the voting process, thus making it more time-consuming and intimidating. It requires prospective voters to fill out far more than just their ballots, namely a sworn affidavit, casting the specter of criminal retribution over citizens lacking ID who are more likely to be low-literacy, low-income, and already uncomfortable with significant government interaction. Furthermore, the process of filling out a ballot, an impediment form, and an affidavit increases voting time and will lead to significant delays, and resulting lines, at polling stations. Accordingly, the reasonable impediment procedure is a particularly ill-suited "exception" to voters lacking ID, who are more likely to be intimidated by participating in the voting process, and contributes to the overall chilling effect of S.B. 824 on voter participation.

100.     H.B. 836's late addition of the reasonable impediment process to H.B. 589 did not negate the racial intent and impact of that bill, and neither does it negate or mitigate the racial intent and impact of H.B. 589's successor, S.B. 824.

27

101.    While S.B. 824 allows election officials to accept student IDs from approved colleges and universities, this still places burdensome requirements on the issuing institution.  In order for an institution's student IDs to qualify under the statute, institutions must maintain additional secure databases containing highly sensitive personal information for its students.  The statute further requires institutions to place high levels of security around its ID-printing devices, and the college's president has to make oaths under penalty of criminal prosecution and commit to answering invasive questions regarding immigration status.  S.B. 824 provides no funding to schools—public or private—to offset these costs.  Wealthier, whiter institutions will likely have little problem covering this unfunded mandate, as opposed to the greater difficulty the unfunded qualification requirements will pose for less affluent, public, and historically black colleges and universities.

102.    Similarly, the free voter registration identification cards that the bill calls on the State to provide will not adequately protect otherwise eligible voters who lack approved forms of identification.  Many of the individuals who lack a driver's license or other approved ID are indigent, live in rural areas where they may need to travel a significant distance to obtain any form of identification, and lack access to transportation.  All of these factors will hinder those individuals' ability to obtain even a free form of identification in the requisite timeframe, placing a racially discriminatory undue burden on their right to vote.

103.    Nor does the bill provide for sufficient voter education or poll worker training.  The timeline for putting the regulations into practice is even shorter than the timeline that was found to be unreasonably short in the case of H.B. 589; S.B. 824 provides for only a few months to get the new system up and running.  Indeed, the status of SBOE, charged with designing

and implementing such programs, is in flux; it is unclear whether a duly constituted SBOE will exist in time to carry out these duties.

104.    Lack of voter education and poll worker training will disproportionately impact minority voters, especially those who are indigent, live in rural areas, and who have completed less formal education.  Those individuals are unlikely to even find out about new voter ID requirements without a vigorous education campaign.  Those same people are also more susceptible to misunderstandings or problems on Election Day if poll workers are not sufficiently trained on the details of the new voter identification rules.

**CLAIMS FOR RELIEF**
**Count I - Section 2 of the Voting Rights Act**
**(42 U.S.C. § 1973)**

105.    Plaintiffs re-allege and incorporate all prior paragraphs of this Complaint.

106.    The provisions of S.B. 824 that impose voter-identification requirements, as well as the State's implementation of those provisions, will have disparate impact on African American and Latino citizens of North Carolina.

107.    On information and belief, the provisions of S.B. 824 that expand the number of poll observers and the numbers of people who can challenge ballots will have disparate impact on African American and Latino citizens of North Carolina.

108.    The provisions of S.B. 824 that impose voter-identification requirements, expand the number of poll observers, and increase the numbers of people who can challenge ballots, as well as the State's implementation of those provisions, will, independently and collectively, result in the denial or abridgment of the right to vote for African American and Latino citizens of North Carolina, and members of the Plaintiff organizations on account of race or color in violation of Section 2 of the Voting Rights Act.

109. The provisions of S.B. 824 that impose voter-identification requirements, expand the number of poll observers, and increase the numbers of people who can challenge ballots, as well as the State's implementation of those provisions, will, independently and collectively, result in the dilution of voting strength of African Americans and Latinos in North Carolina, including members of the Plaintiff organizations.

110. On information and belief, a disproportionate number of African Americans and Latinos in North Carolina currently lack the forms of identification required to vote by S.B 824 and will be disproportionately burdened and deterred by the processes established in S.B. 824 for voters who lack the required forms of identification. On information and belief, a disproportionate number of African Americans will be adversely impacted by the provisions of S.B. 824 that expand the number of poll observers and relax restrictions on the numbers and qualifications of people who can challenge ballots.

111. At the time of S.B. 824's enactment, the General Assembly had before it evidence that African Americans disproportionately lack the identification required to vote by S.B. 824. The General Assembly thus enacted the voter-identification requirement with the knowledge that such actions would affect racial minority voters disproportionately.

112. The provisions of S.B. 824 that impose voter-identification requirements, that expand the number of poll observers, and that loosen eligibility requirements for people who can challenge ballots, as well as the State's implementation of those provisions, will, independently and collectively, have a causal connection to the discriminatory impact of North Carolina's voting laws.

113. The provisions of S.B. 824 that impose voter-identification requirements, that expand the number of poll observers, and that loosen eligibility requirements for people who

30

can challenge ballots, as well as the State's implementation of those provisions, will, independently and collectively, interact with social and historical conditions in North Carolina—including racial disparities in areas such as housing, education, employment, income, health, and criminal justice—to deny African Americans and Latinos meaningful and equal access to the political process.

114.    Under the totality of the circumstances, the provisions of S.B. 824 that impose voter-identification requirements, that expand the number of poll observers and the number of people who can challenge ballots, as well as the State's implementation of those provisions, will result in the abridgement of the right to vote and dilution of minority voting strength and will, independently and collectively, deny African Americans and Latinos meaningful access to the political process.

115.    North Carolina has an established—and judicially recognized—history of voting-related discrimination on the basis of race and ethnicity.

116.    North Carolina has an established—and judicially recognized—history of racially polarized elections.

117.    North Carolina has an established—and judicially recognized—history of using voting practices or procedures that tend to enhance the opportunity for discrimination against minority groups and to lessen the opportunity for minority groups to elect candidates of their choice.

118.    North Carolina has an established—and judicially recognized—history of discrimination in education on the basis of race and ethnicity.

119.    Racial minorities in North Carolina bear the effects of past discrimination in areas such as education, employment, income, health, and criminal justice, which hinder the

31

ability of minorities to participate fully in the political process.  This history of discrimination causes North Carolina citizens who are members of racial minorities to have less access transportation and health care, and to be less educated, less well-housed, lower-paid, and more likely to have low literacy and to live in poverty than North Carolina's white citizens.

120.    Political campaigns in North Carolina have, on past occasions, used overt and subtle racial appeals in political ads issued during campaigns.

121.    Historically, some elected officials in North Carolina have demonstrated a lack of responsiveness to the particularized needs of minority communities.  This lack of responsiveness is demonstrated by observable racial disparities in areas such as housing, education, employment, income, health, and criminal justice.  Racial minorities in North Carolina also have insufficient political influence to ensure that their needs are considered and addressed by elected officials.

122.    S.B. 824 is the successor bill to H.B. 589, a piece of legislation that the Fourth Circuit described as suppressing the African American vote with "almost surgical precision."

123.    The stated policy rationales underlying S.B. 824 are identical to those underlying its predecessor, H.B. 589.  Those rationales are tenuous and unsupported by credible evidence.  The challenged provisions of S.B. 824, like their predecessor provisions in H.B. 589, are not necessary or appropriately tailored to the accomplishment of any legitimate or compelling state interest.

124.    The provisions of S.B. 824 that impose voter-identification requirements and that expand the number of poll observers and the numbers of people who can challenge ballots

were motivated by impermissible racially discriminatory intent in violation of Section 2 of the Voting Rights Act.

## Count II - Violation of the Fourteenth Amendment and 42 U.S.C. § 1983

125.    Plaintiffs re-allege and incorporate all prior paragraphs of this Complaint.

126.    The provisions of S.B. 824 that impose voter-identification requirements, that expand the number of poll observers and the number of people who can challenge ballots were enacted with the intention of suppressing the number of votes cast by African Americans and Latinos.

127.    The historical background of S.B. 824, its predecessor H.B. 589, the sequence of events leading up to the enactment of S.B. 824, and the surrounding legislative history indicate that race was a motivating factor in the law's enactment.

128.    At the time of S.B. 824's enactment, the General Assembly had before it evidence that a disproportionate number of African Americans lacked the identification required to vote by S.B. 824. The General Assembly enacted the voter-identification provisions with knowledge and intent that such provisions would affect African American voters disproportionately.

129.    The provisions of S.B. 824 that impose voter-identification requirements, that expand the number of poll observers and the number of people who can challenge ballots are not supported by a legitimate or compelling state interest.

130.    The provisions of S.B. 824 that impose voter-identification requirements, that expand the number of poll observers and the number of people who can challenge ballots are not appropriately tailored to accomplish any legitimate state interest.

33

131.    The provisions of S.B. 824 that impose voter-identification requirements, that expand the number of poll observers and the number of people who can challenge ballots impose real and substantial burdens on the right to vote.

132.    That burden will include, but is not limited to, the fact that voters will encounter longer lines, undue delay, be prevented from voting a regular ballot, and in some cases, may be completely discouraged from voting as a result of the enactment of the challenged provisions of S.B. 824.

133.    Even if the challenged provisions of S.B. 824 did serve a legitimate or compelling state interest, that interest would be outweighed by the substantial burdens the challenged provisions of S.B. 824 impose on the right to vote.

134.    In implementing and enforcing the provisions of S.B. 824, the Defendants will be acting under the color of state law.

135.    Defendants' actions in implementing and enforcing the provisions of S.B. 824 will deprive Plaintiffs and other individuals in North Carolina of rights, privileges, or immunities granted under the Fourteenth Amendment of the U.S. Constitution.

136.    In implementing and enforcing the provisions of S.B. 824, the Defendants will be discriminating against Plaintiffs and other individuals in North Carolina due to their race, or the racial composition of their membership, in violation of the Fourteenth Amendment of the U.S. Constitution.

### Count III - Violation of the Fifteenth Amendment and 42 U.S.C. § 1983

137.    Plaintiffs re-allege and incorporate all prior paragraphs of this Complaint.

138.    The provisions of S.B. 824 that impose voter-identification requirements, that expand the number of poll observers and the number of people who can challenge ballots will, independently and collectively, result in the denial or abridgment of the right to vote of African

34

American and Latino voters in North Carolina, including members of the Plaintiff organizations on account of race or color in violation of the Fifteenth Amendment to the U.S. Constitution.

139.    The provisions of S.B. 824 that impose voter-identification requirements, that expand the number of poll observers and the number of people who can challenge ballots were enacted with the intention of suppressing the number of votes cast by African Americans.

140.    The historical background of S.B. 824, its predecessor H.B. 589, the sequence of events leading up to the enactment of S.B. 824, and the surrounding legislative history indicate that race was a motivating factor in the law's enactment.

141.    At the time of S.B. 824's enactment, the General Assembly had before it evidence that a disproportionate number of African Americans lacked the identification required to vote by S.B. 824. The General Assembly enacted the voter-identification provisions with knowledge and intent that such provisions would affect African American voters disproportionately.

142.    The provisions of S.B. 824 that impose voter-identification requirements, that expand the number of poll observers and the number of people who can challenge ballots are not supported by a legitimate or compelling state interest.

143.    The provisions of S.B. 824 that impose voter-identification requirements, that expand the number of poll observers and the number of people who can challenge ballots are not appropriately tailored to accomplish any legitimate state interest.

144.    In implementing and enforcing the provisions of S.B. 824, the Defendants will be acting under the color of state law.

145.     Defendants' actions in implementing and enforcing the provisions of S.B. 824 will deprive Plaintiffs and other individuals in North Carolina of rights, privileges, or immunities granted under the Fifteenth Amendment to the U.S. Constitution.

146.     In implementing and enforcing the provisions of S.B. 824, the Defendants will be discriminating against Plaintiffs and other individuals in North Carolina due to their race, or the racial composition of their membership, in violation of the Fifteenth Amendment of the U.S. Constitution.

## PRAYER FOR RELIEF

147.     Whereby Plaintiffs request that the Court:

a.     Declare that the challenged provisions of S.B. 824 violate Section 2 of the Voting Rights Act and the Fourteenth and Fifteenth Amendments to the United States Constitution;

b.     Declare that Plaintiffs' rights will be irreparably harmed without injunctive or declaratory relief from this court;

c.     Enjoin Defendants from implementing, enforcing, or giving effect to the provisions of S.B. 824 that impose voter-identification requirements, expand the number of poll observers, or increase the numbers of people who can issue voter challenges;

d.     Retain jurisdiction under Section 3(c) of the Voting Rights Act for such time as the Court deems appropriate and decree that, during such period, no voting qualification or prerequisite to voting or standard, practice, or procedure with respect to voting different from that in force at the time this proceeding was commenced shall be enforced in the State unless and until the Court finds that such change does not have the purpose and will not have

36

the effect of denying or abridging the right to vote on account of race or color, or in contravention of the voting guarantees set forth in Section 1973b(f)(2) of the Voting Rights Act;

e. Award Plaintiffs their costs, disbursements, and reasonable attorneys' fees incurred in bringing this action pursuant to 42 U.S.C. § 1988; and

f. Grant such other relief as the Court considers just and appropriate.

DATED: December 20, 2018                    Respectfully submitted,

                                            By: */s/ Irving Joyner*

Penda D. Hair                               Irving Joyner (NC State Bar No. 7830)
  DC Bar No. 335133                         P.O. Box 374
FORWARD JUSTICE                             Cary, NC 27512
P.O. Box 42521                              Phone: (919) 319-8353
Washington D.C. 20015                       ijoyner@nccu.edu
Telephone: (202) 256-1976
                                            Daniel T. Donovan
Daryl V. Atkinson                             DC Bar No. 459680
  NC Bar No. 39030                          Susan M. Davies
Caitlin A. Swain                              DC Bar No. 1015133
  VA Bar No. 84515                          Michael A. Glick
Leah J. Kang                                  DC Bar No. 992053
  NC Bar No. 51735                          Paul E. Suitter
FORWARD JUSTICE                               DC Bar No. 1572868
400 W. Main Street                          Rebecca W. Forrestal
Suite 203                                     DC Bar No. 241077
Durham, NC 27701                            Grace C. Brier
Telephone: (919) 323-3889                     DC Bar No. 229796
                                            KIRKLAND & ELLIS LLP
                                            655 Fifteenth St., N.W.
                                            Washington, DC 20005
                                            Phone: (202) 879-5000