# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

NORTH CAROLINA STATE CONFERENCE
OF THE NAACP, *et al.*,

        *Plaintiffs*,

     v.

ROY ASBERRY COOPER III, in his official
capacity as the Governor of North Carolina,
*et al.*,

        *Defendants*.

No. 1:18-cv-01034

---

# MEMORANDUM OF LAW IN SUPPORT OF
# <u>PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION</u>[*]

---

[*] This memorandum exceeds the page limits set forth in Civil LR 7.3. The parties have filed a consent joint motion to expand the page limits for this memorandum supporting Plaintiffs' motion for a preliminary injunction and Defendants' memorandum in response to the motion. ECF No. 70.

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ....................................................................... iv

INTRODUCTION ................................................................................... 1

BACKGROUND ..................................................................................... 3

I.  North Carolina's History of Discrimination Against Minority Voters ........................ 3

    A. North Carolina's Legacy of Voter Suppression ..................................................... 3

    B. North Carolina's Recent Pattern and Practice of Discrimination Against Minority Voters ..................................................... 5

    C. North Carolina's History of Discriminatory Voter ID Laws ................................. 6

        1. House Bill 589 ("HB 589") ............................................................... 6

        2. Senate Bill 824 ("SB 824") .............................................................. 9

            a. The Racially-Gerrymandered Supermajority Puts a Voter ID Constitutional Amendment on the 2018 Ballot ............................. 9

            b. After Losing in the 2018 Elections, the Lame-Duck Supermajority Rams Through Implementing Legislation for the Voter ID Constitutional Amendment in the Form of SB 824 ............................................................... 10

    D. SB 824 Basically Reenacts the Discriminatory Voter ID Law Already Struck Down By the Fourth Circuit ................................. 13

SUMMARY OF ARGUMENT ................................................................. 16

STANDARD OF REVIEW ...................................................................... 19

ARGUMENT ......................................................................................... 19

I.  PLAINTIFFS HAVE A STRONG LIKELIHOOD OF SUCCESS ON THE MERITS ................................................................. 19

    A. SB 824 Violates Section 2 Because It Was Motivated By A Discriminatory Purpose ............................................. 19

        1. Under *Arlington Heights*, Intentional Discrimination Can Be Proven Based on Historical Discrimination, the Sequence of Events Leading to Enactment, Procedural Irregularities, Legislative History, and Disproportionate Impact ......................... 19

        2. The *Arlington Heights* Factors Show That North Carolina Enacted SB 824 With Racially Discriminatory Intent ................................. 22

            a. North Carolina Has a Long History of Discriminating Against Blacks and Latinos ................................. 22

Case 1:18-cv-01034-LCB-LPA   Document 73   Filed 09/17/19   Page 2 of 59

b.  Numerous Procedural Irregularities Accompanied the Passage
of SB 824 ................................................................................. 24

c.  The Purported Non-Discriminatory Purpose of North
Carolina's Voter ID Constitutional Amendment and SB 824
Was Pretextual and False ........................................................ 25

d.  SB 824 Will Disproportionately Deny Blacks and Latinos the
Right to Vote ............................................................................ 29

e.  No Rational Justification Can Support the Voter ID
Requirement in SB 824—It Is The Quintessential Example of a
Law That Is "Unexplainable on Grounds Other Than Race" .............. 36

B.  SB 824 Separately Violates Section 2's Results Standard .................................. 38

1.  SB 824 Will Disparately and Substantially Deny and Abridge
Black and Latino Voters' Ability to Vote ....................................... 39

2.  The Disparate Burden of S. 824 on Black and Latino Voters is
Clearly Linked to the Effects of Past Discrimination in Voting,
Education, Employment, and Health and Other Areas ................................. 40

3.  Other Factors Identified in the 1982 Senate Report on Voting
Rights Act Amendments Confirm that the Substantial Racially
Disproportionate Burdens Imposed by SB 824 Violate Section 2 .................. 42

a.  Racially Polarized Voting Is Prevalent in North Carolina
Elections ................................................................................. 42

b.  Blacks and Latinos Are Consistently Underrepresented in
Public Office in North Carolina ................................................. 43

c.  The Policy Underlying SB 824 Is "Tenuous" and Needlessly
Impairs the Voting Rights of Blacks and Latinos ........................... 45

C.  SB 824 Cannot Be Implemented In a Manner That Satisfies the
Voting Rights Act in Time for the March 2020 Elections ................................... 47

II.  THE OTHER PRELIMINARY INJUNCTION FACTORS FAVOR A
PRELIMINARY INJUNCTION ............................................................. 48

CONCLUSION ......................................................................................... 50

Case 1:18-cv-01034-LCB-LPA   Document 73   Filed 09/17/19   Page 3 of 59

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Chisom v. Roemer*,
501 U.S. 380 (1991) ....................................................................................... 19, 38

*Common Cause v. Lewis*,
18 CVS 014001 (Wake Cty. Super. Ct. Sept. 3, 2019) .................................. 22, 26, 27

*Covington v. North Carolina*,
316 F.R.D. 117 (M.D.N.C. 2016) ............................................................. 6, 22, 26, 27

*Elrod v. Burns*,
427 U.S. 347 (1976) ................................................................................................ 49

*Garza v. Cty. of Los Angeles*,
918 F.2d 763 (9th Cir. 1990) .............................................................................. 19, 20

*Gaston Cty. v. United States*,
395 U.S. 285 (1969) .................................................................................................. 5

*Gingles v. Edmiston*,
590 F. Supp. 345 (E.D.N.C. 1984) ......................................................................... 40

*Harris v. McCrory*,
159 F. Supp. 3d 600 (M.D.N.C. 2016) ................................................................. 6, 22

*Holmes v. Moore*,
Civ. Action No. 18 CVS 15292 (Wake County, General Court of Justice
Superior Court Division) ........................................................................................ 30

*Hunter v. Underwood*,
471 U.S. 222 (1985) ................................................................................................ 21

*League of United Latin American Citizens v. Perry (LULAC)*,
548 U.S. 399 (2006) .................................................................................... 40, 42, 43

*League of Women Voters of N.C. v. North Carolina*,
769 F.3d 224 (4th Cir. 2014) ............................................................................*passim*

*Lee v. Virginia State Board of Elections*,
843 F.3d 592 (4th Cir. 2016) .................................................................................. 39

iv

*N.C. State Conference of the NAACP v. McCrory,*
    182 F. Supp. 3d 320 (M.D.N.C. 2016) ............................................................7, 45

*N.C. State Conference of the NAACP* v. *McCrory,*
    831 F.3d 204 (4th Cir. 2016) .......................................................*passim*

*Newsom ex rel. Newsom v. Albemarle Cty. Sch. Bd.,*
    354 F.3d 249 (4th Cir. 2003) ................................................................ 50

*Reynolds v. Sims,*
    377 U.S. 533 (1964) .......................................................................... 49

*Rucho v. Common Cause,*
    139 S. Ct. 2484 (2019) ...................................................21, 27, 36, 37

*Shannon v. Jacobowitz,*
    301 F. Supp. 2d 249 (N.D.N.Y. 2003) ................................................ 49

*Shelby County* v. *Holder,*
    570 U.S. 529 (2013) ...........................................................................6, 22

*Taylor v. Louisiana,*
    419 U.S. 522 (1975) .......................................................................... 50

*Thornburg v. Gingles,*
    478 U.S. 30 (1986) ...........................................................5, 17, 18, 42

*United States v. Charleston Cty.,*
    316 F. Supp. 2d 268 (D.S.C. 2003) ................................................... 20

*United States v. Charleston Cty.,*
    365 F.3d 341 (4th Cir. 2004) ............................................................. 19

*United States v. City of Cambridge,*
    799 F.2d 137 (4th Cir. 1986) ............................................................. 49

*United States v. North Carolina,*
    No. 13-cv-861 (M.D.N.C. 2016) ........................................................ 43

*Veasey v. Abbott,*
    830 F.3d 216 (5th Cir. 2016) ........................................................24, 35

*Village of Arlington Heights v. Metro. Hous. Dev. Corp.,*
    429 U.S. 252 (1977) ...........................................................*passim*

Case 1:18-cv-01034-LCB-LPA   Document 73   Filed 09/17/19   Page 5 of 59

*Washington v. Davis*,
  426 U.S. 229 (1976) ............................................................................... 25

*Williams v. Salerno*,
  792 F.2d 323 (2d Cir. 1986) .................................................................. 49

*Winter v. Natural Res. Def. Council, Inc.*,
  555 U.S. 7 (2008) ............................................................................19, 50

## Constitution & Statutes

U.S. Constitution
  Art. I, §§ 2, 4.............................................................................................. 5
  Amend. XIV......................................................................................... 2, 3
  Amend. XV ........................................................................................... 2, 3

2 U.S.C. §§ 2a, 2c ..................................................................................... 5

52 U.S.C. § 10301(a) ...........................................................................18, 38

Voting Rights Act of 1965, Pub. L. No. 89-110, 79 Stat. 437
  § 2....................................................................................................*passim*
  § 5..................................................................................................5, 6, 8

2013 N.C. Sess. Laws 381 § 2.2 ............................................................... 7

2013 N.C. Sess. Laws 381 §§ 2.9 & 11.1 ................................................ 15

2018 N.C. Sess. Laws 112 ....................................................................... 16

2018 N.C. Sess. Laws 144 § 1.1.(a) ....................................................12, 33

2018 N.C. Sess. Laws 144 § 1.4A............................................................ 36

2018 N.C. Sess. Laws 144 §§ 3.3 & 3.1(c) .............................................. 15

Act of June 22, 2015, 2015 N.C. Sess. Laws 103 § 8(a)-(h) ..................... 8

N.C.G.S § 20-37.7 .................................................................................... 33

## Other Authorities

Eric Anderson, *Race and Politics in North Carolina, 1872-1901: The Black
  Second* (1981) ........................................................................................ 4

vi

Ned Barnett, *North Carolina Governor Vetoes Voter Photo ID Bill*,
Reuters, June 23, 2011 ................................................................ 6

Michael Kent Curtis, *Race as a Tool in the Struggle for Political Mastery:*
*North Carolina's Redemption Revisited 1870-1905 and 2011-2013*, 33
Law & Ineq. 53 (2015) ................................................................ 4

David Daley, *The Secret Files of the Master of Modern Republican*
*Gerrymandering*, The New Yorker (Sept. 6, 2019)................................3, 27

Robert N. Hunter Jr., *Racial Gerrymandering and the Voting Rights Act in*
*North Carolina*, 9 Campbell L. Rev. 255 (1987) ........................................ 4

J. Morgan Kousser, *The Shaping of Southern Politics: Suffrage Restriction*
*and the Establishment of the One-Party South, 1880-1910* (1974)............................. 4

Douglas M. Orr Jr., *The Persistence of the Gerrymander in North Carolina*
*Congressional Redistricting*, 9 S.E. Geogr. 39 (1969) ................................. 4

Richard H. Pildes, *Democracy, Anti-Democracy, and the Cannon*, 17
Const. Comm. 295 (2000). ........................................................... 4

Post-Election Audit Report, April 21, 2017, General Election 2016, North
Carolina State Board of Elections.............................................. 13

Stuart Shapiro & Deanna Moran, *The Burden of Voter Identification Laws:*
*The Case of North Carolina*, 42 T. Marshall L. Rev. 123 (2017) ............................. 31

Michael Weiss, *Republican Gerrymander Whiz Had Wider Influence Than*
*Was Known*, N.Y. Times (Sept. 10, 2019) ................................................ 2

# INTRODUCTION

By this motion, Plaintiffs seek a preliminary injunction prohibiting the enforcement of a North Carolina law that requires photo voter ID and vastly increases the number of authorized poll observers—Senate Bill 824 ("SB 824")—because it violates the Fourteenth and Fifteenth Amendments and Section 2 of the Voting Rights Act ("VRA") by discriminating against Black and Latino voters. This is not the first time in recent years that a court has been asked to resolve this issue, and the historical context matters. Despite literally zero evidence that in-person voter fraud is a problem in this State, this is the third time this decade that North Carolina's General Assembly has enacted a voter ID law purporting to prevent it. A 2011 law was vetoed because it was discriminatory and would have disenfranchised voters. House Bill 589 ("HB 589"), was enacted in 2013 and was struck down by the Fourth Circuit, which found that it *intentionally discriminated* against voters of color. *N.C. State Conference of the NAACP* v. *McCrory*, 831 F.3d 204, 229 (4th Cir. 2016). The court of appeals called it "the most restrictive voting law North Carolina has seen since the era of Jim Crow" and said it "target[ed] African Americans" for voter suppression "with almost surgical precision." *Id.*

The law now before the Court—SB 824—is a barely disguised duplicate of HB 589, carries the same discriminatory intent as its predecessor, and likewise fails to remedy its racially disparate impacts. It is intended, like HB 589 before it, to suppress the Black and Latino vote, just as those voters were achieving near parity with white registration and turnout rates and otherwise emerging as major political forces. *See id.* at 214. "'In essence, . . . the State took away [minority voters'] opportunity because [they] were about to exercise

1

it." *Id.* at 214-15 (citing *League of United Latin American Citizens v. Perry (LULAC)*, 548 U.S. 399, 440 (2006)) (alterations in original). As the Supreme Court and Fourth Circuit have held, "[t]his bears the mark of intentional discrimination." *Id.* at 215 (citing *LULAC*). Applying clear and governing Fourth Circuit precedents requires a finding that SB 824 likely violates both the intent and results prongs of Section 2, as well as the Fourteenth and Fifteenth Amendments to the United States Constitution, in essentially the same way that HB 589 did. Indeed, General Assembly leaders, including Senate President Pro Tempore Phil Berger, House Speaker Tim Moore, and lead House sponsor David Lewis—all of whom were instrumental in enacting HB 589—never accepted the Fourth Circuit's holding in *McCrory* and made clear their intention to work around it. *See infra* Background I.C.2.a; Exhibit 1, Prelim. Expert Rep. of Allan Lichtman ("Lichtman Rep.") at 10.

And then there is the looming presence of Republican strategist, Dr. Thomas Hofeller, who has recently gained notoriety for his work in the field of racial gerrymandering. In North Carolina, the General Assembly relied on Dr. Hofeller's analysis as the basis for illegally gerrymandered House and Senate maps that a state court struck down earlier this month, "concluding that he had used racial statistics to shape his maps despite public claims to the contrary." Michael Weiss, *Republican Gerrymander Whiz Had Wider Influence Than Was Known*, N.Y. Times (Sept. 10, 2019). And newly discovered evidence suggests a much broader problem. As the *New York Times* has reported, is now apparent that "[m]ore than any other state, North Carolina was shaped politically by Mr. Hofeller's talents. A trove of files [reviewed by the paper's reporters] shows his involvement in virtually every aspect of the State Legislature's effort to promote and

2

defend Republican control." And "[r]ace was a [a] constant of Mr. Hofeller's work in the state. . . ." *Id.* Of critical import to this case, while the evidence is still emerging, it appears likely that his use of race to shape North Carolina election laws to preserve Republican advantage also infected the General Assembly's efforts to craft voter ID laws. See David Daley, *The Secret Files of the Master of Modern Republican Gerrymandering*, The New Yorker (Sept. 6, 2019) (Hofeller "intensively researched the impact of the state's voter-I.D. laws" on racial minorities.).[2]

SB 824 likely violates § 2 of the Voting Rights Act (VRA) and the Fourteenth and Fifteenth Amendments to the United States Constitution. Moreover, North Carolina cannot possibly implement SB 824 in a nondiscriminatory way in the short time the State has given itself to implement the law (and has given its voters to procure identification that meets its requirements). At minimum, a preliminary injunction should issue delaying the law's implementation until after the March 2020 elections to prevent the unlawful disparate impact that will arise out of its hasty implementation.

## BACKGROUND

### I. North Carolina's History of Discrimination Against Minority Voters

#### A. North Carolina's Legacy of Voter Suppression

North Carolina has a sordid history of slavery, "Jim Crow," and modern race discrimination. *See* Exhibit 2, Prelim. Expert Rep. of James Leloudis ("Leloudis Rep.") at 3-43; Exhibit 3, Decl. of Rep. Henry M. Michaux, Jr. ("Michaux Decl.") ¶¶ 29-30. North

---

[2] Plaintiffs do not presently have access to Hofeller's files, which are not yet in the public record, and therefore do not yet know his full role. But what little evidence Plaintiffs' have seen of Mr. Hofeller's involvement raises troubling questions centrally relevant here.

3

Carolina is unique among the States for its radical, centuries-long effort to marginalize minority voters—an effort that has continued into the present day. *See McCrory*, 831 F.3d at 223 ("Unquestionably, North Carolina has a long history of race discrimination generally and race-based vote suppression in particular. While we recognize its limited weight. . . North Carolina's pre-1965 history of pernicious discrimination informs our inquiry."); Leloudis Rep. at 4-72. Through the strict segregation of the races, including the criminalization of interracial marriage, the murder of hundreds of Blacks by lynching, and sustained de jure and de facto discrimination in hiring and education, North Carolina whites engaged in persistent efforts to preserve white supremacy for over a hundred years. *See id.* at 17-45. At the same time, through every stratagem ever devised for voter suppression, including the poll tax, the literacy test, the Grandfather Clause, the white primary, the racial gerrymander, byzantine election procedures, and unabated intimidation and threats of violence, North Carolina whites sought to strip Blacks of effective political participation. *See id.* at 4-5, 14-17; 44-58; Exhibit 4, Prelim. Expert Rep. of Barry Burden ("Burden Rep.") at 7-9, 10-17.[3]

North Carolina persisted in discrimination against minority voters throughout the

---

[3] *See* Eric Anderson, *Race and Politics in North Carolina, 1872-1901: The Black Second* 3-5, 274 (1981); Michael Kent Curtis, *Race as a Tool in the Struggle for Political Mastery: North Carolina's Redemption Revisited 1870-1905 and 2011-2013,* 33 Law & Ineq. 53, 71, 78-79, 82-83 (2015); Robert N. Hunter Jr., *Racial Gerrymandering and the Voting Rights Act in North Carolina,* 9 Campbell L. Rev. 255, 270 (1987); J. Morgan Kousser, *The Shaping of Southern Politics: Suffrage Restriction and the Establishment of the One-Party South, 1880-1910,* at 15, 42, 48, 72-74, 241 (1974); Douglas M. Orr Jr., *The Persistence of the Gerrymander in North Carolina Congressional Redistricting,* 9 S.E. Geogr. 39, 43 (1969); Richard H. Pildes, *Democracy, Anti-Democracy, and the Cannon,* 17 Const. Comm. 295, 302 (2000).

4

Twentieth Century. North Carolina's literacy test was eliminated only in 1965 by the enactment of the VRA, though it has not been repealed by the State. *Gaston Cty. v. United States*, 395 U.S. 285, 286-87 (1969); *see* Lichtman Rep. at 4, 19-20. The landmark VRA case *Thornburg v. Gingles*, 478 U.S. 30 (1986), describes North Carolina's long history of "racially polarized voting" "official discrimination in voting matters, education, housing, employment, and health services" and "the persistence of campaign appeals to racial prejudice." *Id.* at 80. Over the past 54 years, private parties have brought 50 lawsuits against the State for racial discrimination in voting laws and practices in violation of Section 2 of the VRA and the U.S. Justice Department objected to more than 60 regressive election law changes under Section 5. *See* Burden Rep. at 9.

## B. North Carolina's Recent Pattern and Practice of Discrimination Against Minority Voters

In this decade, North Carolina's General Assembly has repeatedly and brazenly violated the VRA and the Constitution, zealously pursuing the goal of minimizing political influence of Black and Latino voters and maximizing political power of non-Hispanic whites.

In the last four years, Federal courts have repeatedly found that North Carolina has engaged in unlawful racial gerrymandering. Following the 2010 census the North Carolina legislature redrew its own legislative maps (*i.e.*, the State House of Representatives and Senate), N.C. Const. art. II, §§ 3, 5, and its congressional maps (i.e. the U.S. House of Representatives), U.S. Const. art. I, §§ 2, 4; 2 U.S.C. §§ 2a, 2c. Federal courts ultimately concluded that *all three maps* included unlawful, intentional racial gerrymanders. *See*

5

*Harris v. McCrory*, 159 F. Supp. 3d 600, 607 (M.D.N.C. 2016), *aff'd* 137 S. Ct. 1455 (2017) (striking down U.S. House Maps as unlawful racial gerrymanders); *Covington v. North Carolina*, 316 F.R.D. 117 (M.D.N.C. 2016), *aff'd* 137 S. Ct. 2211 (2017) (striking down State House and Senate maps as unlawful racial gerrymanders).

## C. North Carolina's History of Discriminatory Voter ID Laws

In 2011 the North Carolina General Assembly passed its first photo ID law. The Governor vetoed the law, stating that it would "unnecessarily and unfairly disenfranchise many eligible and legitimate voters." Ned Barnett, *North Carolina Governor Vetoes Voter Photo ID Bill*, Reuters, June 23, 2011, http://bit.ly/2kkMICw.

### 1. House Bill 589 ("HB 589")

Less than two years later the General Assembly tried again, with House Bill 589 ("HB 589"). When it was introduced in the spring of 2013, HB 589 proposed certain, limited requirements related to voter identification and absentee voting, which all passed the House. *McCrory*, 831 F.3d at 227; *see infra* tbl.1. But that changed in late June 2013, when the Supreme Court struck down the coverage formula for Section 5 of the Voting Rights Act. *See Shelby County* v. *Holder*, 570 U.S. 529 (2013). As of that date, North Carolina no longer needed to preclear changes in its election laws with the U.S. Department of Justice. *Id.* This fundamental change came at a time when "African Americans were poised to act as a major electoral force" in the State. *McCrory*, 831 F.3d at 214.

After *Shelby County*, the General Assembly swiftly moved to limit permissible forms of identification, eliminating as qualifying ID those forms the legislature knew were disproportionately used by Blacks and young voters, including state university IDs,

community college IDs, and IDs that were issued as part of a government public assistance program. *See* An Act To Restore Confidence In Government of 2013 ("HB 589"), 2013 N.C. Sess. Laws 381 § 2.2.[4] Additionally, the new version of HB 589 reduced or eliminated procedures—including same-day registration, out-of-precinct voting, early voting, and pre-registration—that had been specifically introduced to increase voter participation and which were disproportionately used by voters of color as compared to white voters. *McCrory*, 831 F.3d at 215-16. Efforts to amend the law to expand the list of permissible IDs were rejected. *Id.* at 216, 218.

Private parties and the Department of Justice immediately challenged the law, asserting that HB 589 impermissibly discriminated against minority voters. *N.C. State Conference of the NAACP v. McCrory*, 182 F. Supp. 3d 320, 348 (M.D.N.C. 2016). The Fourth Circuit invalidated HB 589's voter ID requirements, because they "were enacted with racially discriminatory intent in violation of the Equal Protection Clause of the 14th Amendment and § 2 of the Voting Rights Act." *McCrory*, 831 F.3d at 219. As proof of the Legislature's discriminatory intent, the court cited two key facts. First, the Legislature had used racial data to construct a list of permissible voter IDs that would disproportionately impact Black voters. *Id.* at 216. Second, HB 589 "impose[d] cures for problems that did not exist" (in-person voter fraud) and "inapt remedies for the problems assertedly justifying them." *Id.* at 214. With respect to tailoring, specifically, HB 589's requirements were not even reasonably calculated to achieve the State's stated objectives

_____
[4] The Act is also known by its short title: the Voter Information Verification Act..

7

of identifying voters and combating fraud.  *See id.* at 235-36.  The list of permissible IDs excluded perfectly reliable forms of ID, such as state-issued benefits program IDs held disproportionately by Blacks, while imposing no requirements on absentee ballots, a form of voting used disproportionately by whites.  *Id.* at 235-36.  All of this, the Court concluded, showed that the Legislature would not have passed HB 589 but for its disproportionate impact on Blacks.  *Id.* at 233.

Moreover, the court noted North Carolina has a long history of racially polarized voting, which provided a "political payoff for legislators who seek to dilute or limit the minority vote."  *Id.* at 222.  The rise in Black voter registration and turnout during the period in which North Carolina was covered by Section 5 of the Voting Rights Act led to a concomitant rise in Black voting power and a threat to the majority party in the General Assembly, which was not the preference of Black voters.  That threat, in turn, motivated the legislative majority to entrench itself through discriminatory voting laws and to restrict Black access to the franchise because Black voters supported a different political party.  *Id.* at 223.  Indeed, the court found that the law "target[ted] African Americans with almost surgical precision."  *Id.* at 214.

On the eve of trial, the General Assembly modified HB 589 to include a so-called "reasonable impediment" exception that would allow a voter to cast a provisional ballot if she swore under oath that a reasonable impediment prevented her from obtaining a qualifying ID.  Act of June 22, 2015, 2015 N.C. Sess. Laws 103 § 8(a)-(h).  But the Fourth Circuit concluded that the "reasonable impediment" provision was not an adequate remedy for HB 589's racially discriminatory intent, because it did not eliminate the burdens the

8

law placed on Black voters, or negate the invidious intent of the Legislature that enacted it.  *McCrory*, 831 F.3d at 240-41.

## 2. Senate Bill 824 ("SB 824")

### a. The Racially-Gerrymandered Supermajority Puts a Voter ID Constitutional Amendment on the 2018 Ballot

The North Carolina General Assembly's unlawful racial gerrymander in 2011 allowed North Carolina republicans to transform their majority in the State legislature into a *supermajority* that made them unaccountable to Black voters.  They maintained their supermajority in all three elections that took place with the gerrymandered maps: 2012, 2014, and 2016.  Once 2018 elections took place under the remedial maps for the racial gerrymander, the GOP lost its supermajority.

The General Assembly that resulted from the 2016 election took legislative action that would not have been possible without its supermajority.  *See* Exhibit 5, Decl. of Sen. Floyd B. McKissick, Jr. ("McKissick Decl.") ¶¶ 22-29; Exhibit 6, Decl. of Rep. Robert T. Reives II ("Reives Decl.") ¶ 13.  To start, in late June 2018, Republicans placed a constitutional amendment on the November 2018 ballot mandating photo voter identification for voting at the polls.  An Act To Amend the North Carolina Constitution to Require Photo Identification to Vote in Person ("HB 1092"), 2017 N.C. Sess. Laws 128 § 2.2.  Statements by legislators, including the principal House sponsor, made clear that the purpose of the constitutional amendment was to "withstand the inevitable challenges that will come from the left" and to "mute future court challenges."  Lichtman Rep. at 11. Representative John Blust, in floor debate, defended the constitutional amendment to

9

protect it from judicial challenge. Blust stated that a constitutional amendment is required "so that the North Carolina Supreme Court can't simply get rid of it by saying 'Oh, the legislature just added an additional qualification to vote. It wasn't in our constitution, therefore, that law is null and void.'" *Id.*

The General Assembly can put a constitutional amendment on an upcoming election ballot only "if three-fifths of all the members of each house . . . adopt an act submitting the proposal to the qualified voters of the State for their ratification or rejection." *See* N.C Const. art. XIII, § 4. The amendment passed the racially gerrymandered House and Senate on essentially party-line votes that would have failed without the GOP supermajority. *See* HB 1092 Legislative History, https://bit.ly/2kP7XMO; *see also* McKissick Decl. ¶¶ 22-29; Reives Decl. ¶ 13. The amendment was placed on the ballot without requiring the Governor's signature and approved in the November 2018 general election.

### b. After Losing in the 2018 Elections, the Lame-Duck Supermajority Rams Through Implementing Legislation for the Voter ID Constitutional Amendment in the Form of SB 824

Republicans lost their House and Senate supermajorities in the 2018 elections. But rather than allow the newly-elected legislature to implement a voter ID law to carry out the State's Voter ID constitutional amendment, the lame-duck General Assembly reconvened to rush a bill to the floor. After the Select Committee on Elections approved the bill, the Senate had less than 24 hours to review it before floor debate the next day. SB 824 Legislative History, https://bit.ly/2lXb31u; *see also* Exhibit 7, Decl. of Sen. Teresa Van Duyn ("Van Duyn Decl.") ¶¶ 21-27. Senators were forced to learn what was in the bill in the span of a day, with no time to consult the county boards of elections, the state board,

10

election experts, or the public.  *See* Lichtman Rep. at 71-74. The House similarly failed to give adequate notice, circulating SB 824's proposed language only the night before it was to be debated.  *See id.*  In total, SB 824 underwent a mere five legislative days of review in chamber or committee.  *See* SB 824 Legislative History, https://bit.ly/2lXb31u.

At its first meeting, the House Committee on Elections and Ethics Law refused to allow for any public comment during its discussion of SB 824, despite multiple requests made by committee members on behalf of the public—including representatives of the NAACP—who were in attendance to comment.   Exhibit 8, Decl. of Rev. T. Anthony Spearman ("Spearman Decl.") ¶ 34.  The Committee scheduled a meeting the next morning to continue its discussion of SB 824, but that morning, members of the public, including representatives of the NAACP, arrived at the meeting room only to find that the meeting had been abruptly rescheduled for several hours later.  *Id.* ¶ 35.  When reconvened later that day, the Chair announced, without any prior notice, that the committee would hear comment from members of the public for one-minute each.  *Id.*  By that time, some individuals who had sought to comment, including representatives of the NAACP, were no longer available.  *Id.*

During the December 5, 2018 debate on the House floor, Speaker of the House Tim Moore declared, in a notable moment of candid disclosure, that SB 824 was the culmination of a "long road bringing voter ID to North Carolina."  *See* N.C. House Floor Debate Audio, Dec. 5, 2019, at 2:28:54, https://bit.ly/2kOL3VQ.  In his capacity as Chair of the House Rules Committee, Moore was one of the leaders of the 2013 General Assembly who drafted the unconstitutional HB 589 and shepherded it through the legislative process.

11

Just as it had in 2013, the Legislature rejected an amendment to permit voters to use state or federal public assistance ID, SB 824 Amendment No. A13: ABK-145-V-2, a choice the Fourth Circuit specifically referenced as evidence of the discriminatory intent motivating HB 589. *See McCrory*, 831 F.3d at 236; 2018 N.C. Sess. Laws 144 § 1.1.(a). Other proposed amendments designed to ameliorate the impact on minority voters and those lacking qualifying ID included amendments to allow one-stop absentee voting (also known as early voting) on the Saturday before Election Day (SB 824 Amendment No. A8: ABK-125-V-1), to limit the circumstances in which a reasonable impediment provisional ballot cast at the polls would not be counted (SB 824 Amendment No. A6: ATC-203-V-1), and to allow voters to use a high school ID (SB 824 Amendment No. A3: ABK-147-V-6). The lame-duck supermajority tabled each of them. Exhibit 9, Decl. of Rep. Marcia Helen Morey ("Morey Decl.") ¶ 16.

The General Assembly sent SB 824 to Governor Cooper on December 6, 2018. On December 14, 2018, the Governor vetoed the bill noting that "the fundamental flaw in the bill is its sinister and cynical origins: It was designed to suppress the rights of minority, poor and elderly voters. The cost of disenfranchising those voters or any citizens is too high, and the risk of taking away the fundamental right to vote is too great, for this law to take effect." *See* Governor Roy Cooper Objections and Veto Message for SB 824, Dec. 14, 2018, http://bit.ly/2miGNi5. Wasting no time, the lame-duck Senate on December 18 voted 33-12 to override; the House followed the next day by a vote of 72-40. SB 824 Legislative History, https://bit.ly/2lXb31u.

The General Assembly passed SB 824 in the face of data from the Executive

12

Director of the State Board of Elections showing that impersonation voter fraud is not a problem in North Carolina. After the 2016 election, the North Carolina State Board of Elections ("SBOE") conducted an audit and found that only one case of voter impersonation might have been prevented by a requirement to present photo identification before in-person voting. *See* Lichtman Rep. at 107; *see* Exhibit 10, Prelim. Expert Rep. of Lorraine Minnite ("Minnite Rep.") at 33; Post-Election Audit Report, April 21, 2017, General Election 2016, North Carolina State Board of Elections, at 2, https://bit.ly/2pMZMkO. The previously released 2013 report by the SBOE likewise found that between 2000 and 2012, out of nearly 40 million votes cast, only two cases of voter impersonation were referred to a district attorney. Minnite Rep. at 24.

Many of the same legislators who voted in favor of HB 589 voted in favor of SB 824. *See* Lichtman Rep. at 12, tbl.1. Similarly many of the same legislative leaders who created and championed HB 589—such as Senate President Pro Tempore Berger, Speaker Moore, Chairman Lewis, Representative Michael Speciale, and Representative Harry Warren—were also instrumental in the enactment of SB 824 and in enacting North Carolina's racially gerrymandered maps.

**D. SB 824 Basically Reenacts the Discriminatory Voter ID Law Already Struck Down By the Fourth Circuit**

As demonstrated in the table below, SB 824 is largely the same as the photo ID law enacted as part of HB 589—the law that the Fourth Circuit held to be "the most restrictive voting law North Carolina has seen since the era of Jim Crow." *McCrory*, 831 F.3d at 229.

13

| | COMPARISON OF VOTER PHOTO IDENTIFICATION BILLS, NORTH CAROLINA GENERAL ASSEMBLY, S.L. 2018-144 & 2013 H. 589 BILLS | | |
|---|---|---|---|
| **ID TYPE** | **HOUSE PASSED PRE-*SHELBY*** | **ENACTED, UNCONSTITU-TIONAL POST-*SHELBY* + 2015 AMENDMENTS** | **ENACTED S.L. 2018-144** |
| Driver's License, or Learner's Permit | Yes, includes Learner's permits and provisional licenses | **Limited**, must be unexpired **four years or less** unless voter is 70+ years old and was unexpired on 70th birthday; includes learner's permits and provisional licenses | **Limited**, must be unexpired **one year or less** unless voter is 65+ years old and was unexpired on 65th birthday; does not include Learner's permits or provisional licenses; replaces seized licenses |
| Non-Operator's DMV-issued ID | Yes | Free to registered voters who certify need; same expiration requirements as for drivers licenses, above | Free to persons over 17; same expiration requirements as for drivers licenses, above |
| US Passport | Yes | **Limited**, same expiration rules as for DMV IDs | **Limited**, same expiration rules as for DMV IDs |
| Tribal ID | Yes | **Limited,** same expiration rules as for DMV IDs | **Limited**, same expiration rules as for DMV IDs |
| Military or Veteran ID | Yes | Yes, no expiration requirement | Yes, no expiration requirement |
| CBOE Issued Free Voter ID Card | No | No | Yes, same expiration rules as for DMV IDs |
| Out-Of-State Driver's License | Yes | **Limited**, only if registered within 90 days of election, and meets expiration rules for in-state DMV IDs | **Limited**, only if registered within 90 days of election, and meets expiration rules for in-state DMV IDs |
| Higher Ed ID | **Limited**, UNC constituents, community colleges | **No** | **Limited**, if meets state requirements, and expiration rules for DMV IDs; includes private institutions; rollout period to 2020 |
| State or Local Govt Employee ID | Yes | **No** | **Limited**, if meets state requirements, and expiration rules for DMV IDs |
| Federal Govt Employee ID | Yes | **No** | **No** |
| Public Assistance ID | Yes | **No** | **No** |
| US Naturalization Certificate | **No** | **No** | **No** |
| Fireman, EMS, hospital, law enforcement ID | Yes | **No** | **No** |

Table 1.  Comparison of SB 824 and HB 589
Lichtman Rep. tbl.8

14

The General Assembly did not package all of its 2018 voter suppression provisions in one bill as they did with HB 589. Instead, it reenacted provisions of HB 589 in two bills, also restricting early voting in SB 325.

SB 824 requires that in-person voters present one of a limited number of forms of qualifying photographic identification. *See supra* tbl.1; Lichtman Rep. tbl.8. Notably, like HB 589 before it, SB 824 *excludes* public assistances IDs (which are disproportionately possessed by voters of color) as a form of qualifying ID, a feature of HB 589 that the Fourth Circuit explicitly identified as problematic when striking down that law's voter ID requirement, *see McCrory*, 831 F.3d at 227-28.

In addition to its voter ID restrictions, SB 824 dramatically expands the number of poll observers permitted on election day, and expands the grounds for challenges to ballots by any voter in the county to encompass the new voter ID requirements. 2018 N.C. Sess. Laws 144 §§ 3.3 & 3.1(c). Under these provisions, which parallel provisions included in HB 589, any voter in the county may challenge another voter's eligibility based on the voter's non-compliance with the new photo ID requirements; and the chair of each political party may appoint up to 100 additional poll observers who can go to any polling place in the State. Expansions to challenges and increase in poll observers were also included in HB 589. 2013 N.C. Sess. Laws 381 §§ 2.9 & 11.1. Poll observers and challengers have a long-standing use in North Carolina as a means of intimidating minority voters from exercising the franchise. *See* Leloudis Rep. at 61-63 (describing event during 2012 election in which "self-appointed watchdogs in Wake County petitioned [unsuccessfully] to have more than 500 voters, most of them people of color, removed from the registration rolls"

15

and "a similar episode during Reconstruction, when a group of whites in the same county challenged 150 newly freed Black voters on grounds that they had registered fraudulently.").

In SB 325, the General Assembly placed restrictions on early voting similar to those that the Fourth Circuit found to be targeted at Black voters in *McCrory*. SB 325, enacted the same month that the General Assembly passed HB 1092 to place the voter ID constitutional amendment on the November 2018 ballot, was styled the "Uniform & Expanded Early Voting Act." 2018 N.C. Sess. Laws 112. Among other things, SB 325 eliminated the last Saturday of early voting, known to the General Assembly as a voting day disproportionately used by Black voters, *see* McKissick Decl. ¶ 20, and imposed uniform voting hours and polling places for early voters.

## SUMMARY OF ARGUMENT

The Fourth Circuit previously found that HB 589—an omnibus voter suppression law nearly identical in its photo ID requirement to SB 824—was the product of intentional race discrimination against Blacks. *N.C. State Conference of NAACP v. McCrory*, 831 F.3d 204, 229 (4th Cir. 2016).

SB 824 carries forward the same racially discriminatory intent as its predecessor. No relevant facts have changed that would warrant a different result than the result the Fourth Circuit reached in *McCrory*. North Carolina's history of race discrimination—both in the distant past and very recently—still requires the Court to apply especially careful review to the General Assembly's motives. The same process irregularities that accompanied North Carolina's previous attempt to enact a Voter ID law cloud SB 824's

16

enactment, along with similarly troubling statements from individual legislators. And there remains no evidence whatsoever that in-person or impersonation voter fraud is a problem in North Carolina, casting severe doubt on the motives behind SB 824. Most important of all, key deficiencies the Fourth Circuit identified in HB 589—for example, that it *excluded* public assistance IDs (which are disproportionately possessed by voters of color)—have been carried forward into SB 824.

If anything, the circumstances surrounding the enactment of SB 824 are more troubling than those that surrounded the enactment of HB 589. A supermajority Republican legislature—the product of an electoral map that a federal court struck down as a racial gerrymander—used its supermajority to insert a Voter ID constitutional amendment into North Carolina's constitution in an effort to circumvent the *McCrory* ruling and protect a new voter ID law from court invalidation. It then passed SB 824 as implementing legislation for that amendment (over the Governor's veto) in the lame-duck session just before its ouster. Most troubling of all, confronted with a Fourth Circuit decision that identified key discriminatory provisions in North Carolina's previous voter ID law, the General Assembly chose to enact a new voter ID law that contains many of *those same discriminatory provisions*. The conclusion is unmistakable: SB 824 is infected with the same discriminatory animus that infected its predecessor.

SB 824 also violates the VRA because of its racially discriminatory result. The VRA bars states from enacting laws that have racially discriminatory results; proof of intent to discriminate is not required. *Thornburg v. Gingles*, 478 U.S. 30, 43-44 (1986). When determining whether a law has an unlawful discriminatory result, courts look to whether

17

the "totality of the circumstances" shows the challenged law results in denying a racial or language minority an equal opportunity to participate in the political process. *See* 52 U.S.C. § 10301(a); *Gingles*, 478 U.S. at 46. Because SB 824 will disproportionately deny Blacks and Latino voters the right to vote—and this denial results from the interaction of the policy and disadvantages from a long history of racial discrimination in voting, education, and other areas—SB 824 violates the VRA.

At minimum, North Carolina's rushed implementation of SB 824 will cause the racially discriminatory results the VRA prohibits. North Carolina is attempting to implement a new Voter ID requirement only a little over a year after its passage, in March 2020. With less than five months left prior to the start of early voting, North Carolina has not engaged in meaningful voter education efforts to ensure voters know about the forms of ID they need to obtain, nor has it adequately trained election personnel in how to administer the new law. The lack of public education about the new requirement leaves voters with insufficient time to learn how to obtain an acceptable ID and to take the steps needed to do so. College students will not know whether their IDs are acceptable until November at the earliest, with few weeks left to obtain an alternative acceptable ID. The result will almost surely be the disparate denial of the right to vote to thousands of Black and Latino voters because of the chaos and confusion arising from North Carolina's hasty effort to put SB 824 into effect. At minimum, SB 824 cannot be put into effect in a manner that will satisfy the VRA in time for the upcoming elections in March 2020.

The Court should grant a preliminary injunction.

## STANDARD OF REVIEW

To win a preliminary injunction, plaintiffs must demonstrate that (1) they are "likely to succeed on the merits"; (2) they "will likely suffer irreparable harm absent an injunction"; (3) "the balance of hardships weighs in their favor"; and (4) "the injunction is in the public interest." *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 236 (4th Cir. 2014). "In each case, courts 'must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief.'" *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008) (citation omitted). Plaintiffs readily meet these requirements.

## ARGUMENT

### I.   PLAINTIFFS HAVE A STRONG LIKELIHOOD OF SUCCESS ON THE MERITS

#### A.   SB 824 Violates Section 2 Because It Was Motivated By A Discriminatory Purpose

##### 1.   Under *Arlington Heights*, Intentional Discrimination Can Be Proven Based on Historical Discrimination, the Sequence of Events Leading to Enactment, Procedural Irregularities, Legislative History, and Disproportionate Impact

"[T]he Voting Rights Act can be violated by both intentional discrimination . . . and facially neutral . . . schemes that have the effect of diluting minority votes." *Garza v. Cty. of Los Angeles*, 918 F.2d 763, 766 (9th Cir. 1990); *see United States v. Charleston Cty.*, 365 F.3d 341, 345 (4th Cir. 2004). SB 824 violates Section 2 both because it was enacted with discriminatory purpose and because it will have a discriminatory result. *See Chisom v. Roemer*, 501 U.S. 380, 394 & n.21 (1991).

19

The Section 2 standard for determining discriminatory intent tracks that used in constitutional claims of intentional racial discrimination. *See McCrory*, 831 F.3d at 220-21; *United States v. Charleston Cty.*, 316 F. Supp. 2d 268, 272 n.3 (D.S.C. 2003), *aff'd*, 365 F.3d 341, 345 (4th Cir. 2004). A facially neutral election law or practice constitutes intentional race discrimination where "circumstantial and direct evidence of intent" shows that the law had an impermissible purpose. *McCrory*, 831 F.3d at 220 (quoting *Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266 (1977)). Discriminatory intent need not be the "sole" or "primary" factor, just "*a* motivating factor." *Id.* (quoting *Arlington Heights*, 429 U.S. at 265-66).

It bears emphasis that discriminatory intent is not the same thing as racial animus. *Garza*, 918 F.2d at 778-79 & n.1 (Kozinski, J., concurring and dissenting in part). "[I]ntentionally targeting a particular race's access to the franchise because its members vote for a particular party, in a predictable manner, constitutes discriminatory purpose[,] . . . even absent any evidence of race-based hatred . . . ." *McCrory*, 831 F.3d at 222-23; *see id.* at 233 ("Our conclusion does not mean, and we do not suggest, that any member of the General Assembly harbored racial hatred or animosity toward any minority group.").

In assessing evidence of intent, courts apply the *Arlington Heights* standard which directs them to consider the following non-exhaustive list of factors: (1) "[t]he historical background of the [challenged] decision"; (2) "[t]he specific sequence of events leading up to the challenged decision"; (3) whether there were "[d]epartures from normal procedural sequence"; (4) the legislative history of the decision; and (5) the degree of disproportionate "impact of the official action—whether it bears more heavily on one race than another."

20

*Id.* at 220-21 (quoting *Arlington Heights*, 429 U.S. at 266-67). Laws "that are race neutral on their face but are unexplainable on grounds other than race, are of course presumptively invalid." *Rucho v. Common Cause*, 139 S. Ct. 2484, 2496 (2019).

"In instructing courts to consider the broader context surrounding the passage of legislation, the [Fourth Circuit] has recognized that '[o]utright admissions of impermissible racial motivation are infrequent and plaintiffs often must rely upon other evidence.'" *McCrory*, 831 F.3d at 221 (quoting *Hunt v. Cromartie*, 526 U.S. 541, 553 (1999)). "In a vote denial case such as the one here, where the plaintiffs allege that the legislature imposed barriers to minority voting, this holistic approach is particularly important, for '[d]iscrimination today is more subtle than the visible methods used in 1965.'" *Id.* at 221 (quoting H.R. Rep. No. 109-478, at 6 (2006)).

"Once racial discrimination is shown to have been a 'substantial' or 'motivating' factor behind enactment of the law, the burden shifts to the law's defenders to demonstrate that the law would have been enacted without this factor." *Hunter v. Underwood*, 471 U.S. 222, 228 (1985). "When determining if this burden has been met, courts must be mindful that 'racial discrimination is not just another competing consideration.'" *McCrory*, 831 F.3d at 221 (quoting *Arlington Heights*, 429 U.S. at 265-66). "[C]ourts must scrutinize the legislature's actual non-racial motivations to determine whether they alone can justify the legislature's choices." *Id.* "A historical pattern of laws producing discriminatory results provides important context for determining whether the same decisionmaking body has also enacted a law with discriminatory purpose." *Id.* at 223-24. And it is no defense that racial discrimination may be "done for partisan ends." *Id.* at 233.

21

## 2. The *Arlington Heights* Factors Show That North Carolina Enacted SB 824 With Racially Discriminatory Intent

### a. North Carolina Has a Long History of Discriminating Against Blacks and Latinos

The "historical background" in North Carolina generally, and leading up to SB 824 specifically, strongly supports a finding of discriminatory intent. *See McCrory*, 831 F.3d at 223-27. As the Fourth Circuit documented, North Carolina has a long history of official race discrimination from slavery through the "Jim Crow" era and decades of systematic efforts to disenfranchise Black voters that led to the passage of the Voting Rights Act and to the Justice Department filing over 60 objections to racially discriminatory election laws during the period that the State was required to submit voting changes for preclearance. *McCrory*, 831 F. 3d at 223-27. That history, coupled with the State's actions since the Supreme Court eliminated the pre-clearance requirement in *Shelby County v. Holder*, 570 U.S. 529 (2013), weighs strongly in favor of a finding of racially discriminatory intent.

In the six years since *Shelby County*, three federal courts have held that the North Carolina legislature engaged in intentional race discrimination to advance its political goals, two in the context of racial gerrymandering of legislative districts, *Harris v. McCrory*, 159 F. Supp. 3d 600 (M.D.N.C. 2016), *aff'd sub nom. Cooper v. Harris*, 137 S. Ct. 1455 (2017); *Covington v. North Carolina*, 316 F.R.D. 117 (M.D.N.C. 2016), aff'd, 137 S. Ct. 2211 (2017), and the Fourth Circuit holding that the State's earlier voter ID law—HB 589—had a racially discriminatory purpose, *McCrory*, 831 F.3d. at 233. And just this month, another court threw out the State's 2017 legislative maps as an unconstitutional partisan gerrymander, *see* Judgment, *Common Cause v. Lewis*, 18 CVS 014001 (Wake Cty.

22

Super. Ct. Sept. 3, 2019), in a decision that can only be viewed through the lens of racial discrimination. Lichtman Rep. at 15-17. After all, the State's own expert in *McCrory*, a then lesser-known strategist, Thomas Hofeller, conceded that, "in North Carolina, . . . race is a better predictor for voting Democratic than party registration." *McCrory*, 831 F. 3d at 225. As Professor Barry Burden noted, "these recent cases demonstrate that in the post-*Shelby* environment, the state legislature has acted repeatedly to alter the North Carolina election system in ways that disproportionately dilute or deny the votes of minority residents relative to whites and in furtherance of partisan gain and enrichment." Burden Rep. at 13.[5]

Against this backdrop, the enactment of SB 824 must be viewed as yet another effort to do the same. Michaux Decl. ¶ 19. The legislature used its supermajority—the product of an electoral map that a federal court struck down as a racial gerrymander—to insert a Voter ID constitutional amendment into North Carolina's constitution in an effort to circumvent the *McCrory* ruling and "mute future court challenges." Lichtman Rep. at 9-11. As Representative David Lewis, Chair of the 2018 House Committee on Elections and Ethics Law (and a principal backer of HB 589) stated: "The reason we are asking voters if they want to do this or not is, frankly, we think we passed a good law before." *Id.* at 10.

---

[5] During the same time period, North Carolina's racially gerrymandered legislature refused to adopt a measure to remove the literacy test from the state constitution and further acted to diminish the voting power of Black citizens by imposing a statewide uniform voting hours requirement that reduced early voting time and eliminating Saturday early voting, which are frequently used by minority voters. Lichtman Rep. at 4, 19-20.

23

### b. Numerous Procedural Irregularities Accompanied the Passage of SB 824

The "specific sequence of events leading up to" SB 824's enactment is also strong evidence of discriminatory intent. *See Arlington Heights*, 429 U.S. at 267. SB 824 was enacted with the same sort of "rushed . . . legislative process" and lack of debate that accompanied the passage of HB 589, which the Fourth Circuit held showed discriminatory intent in the earlier voter ID law's enactment. *McCrory*, 831 F.3d at 227; *see Veasey v. Abbott*, 830 F.3d 216, 238 (5th Cir. 2016) (noting that "cutting debate short to enable a three-day passage through the Senate" weighed in favor of discriminatory intent). In *McCrory*, the Fourth Circuit noted that the General Assembly's three-day process of passing HB 589 "strongly suggest[ed] an attempt to avoid in-depth scrutiny." 831 F.3d at 228. SB 824 underwent a mere five days of legislative review, in chamber or committee. The General Assembly held only three hearings on the bill and gave preference to speakers who supported SB 824, when it allowed public comment at all. At one hearing there was testimony from just five people, who each had one minute each to speak. *See* Spearman Decl. ¶ 35.

Other aspects of the process further point to discriminatory intent. SB 824 was passed by a General Assembly with a Republican supermajority that was obtained by holding the 2016 election using maps that a federal court held to be racially gerrymandered to advantage Republican candidates. *See* McKissick Decl. ¶¶ 22-29; Van Duyn Decl. ¶¶ 15-18; Spearman Decl. ¶¶ 14-15. The General Assembly passed SB 824 during the lame-duck period in 2018—following an election in which Republicans lost their

24

legislative supermajority.  Michaux Decl. ¶ 14.  The racially gerrymandered Republican supermajority then overrode the Governor's veto as one of its last official acts.

### c.  The Purported Non-Discriminatory Purpose of North Carolina's Voter ID Constitutional Amendment and SB 824 Was Pretextual and False

Voter impersonation is not a problem in North Carolina, and it never has been. Minnite Rep. at 20–35.  The General Assembly was informed that the State's own investigations revealed less than *a handful* of  instances of possible in person voter impersonation in North Carolina in the last *twenty years*, a period in which over *40 million* votes have been cast.  *See* McKissick Decl. ¶¶ 17-18; Lichtman Rep. at 105-08 (describing results of SBOE Audits of 2013 and 2017 and General Assembly awareness of same); *see also* Minnite Rep. at 23-24 (describing results of SBOE audit from 2000 - 2012); *id.* at 24 (describing potential in-person voter fraud from 2013-2014); *id.* at 33-35 (describing SBOE analysis of voter fraud in 2016).  Nonetheless, confronted with this unrebutted evidence, members of the General Assembly continued to insist that combatting in person voter fraud was SB 824's chief aim, and that such voter fraud is a significant problem in North Carolina.  *See* Lichtman Rep. at 105-08; Van Duyn Decl. ¶¶ 21-27; McKissick Decl. ¶¶ 17; Michaux Decl. ¶¶ 4, 23. A legislature's insistence on a rationale for legislation that defies all evidence is powerful evidence that the stated reason is a pretext.  Under these circumstances, the best evidence of the legislation's true purpose is its actual effect, *i.e.*, disproportionately disenfranchising Black and Latino voters to preserve Republican electoral strength.  *Washington v. Davis*, 426 U.S. 229, 242 (1976); *see also id.* at 253

(Stevens, J., concurring) ("Frequently the most probative evidence of intent will be objective evidence of what actually happened."); *McCrory*, 831 F.3d at 220.

The Legislature's credibility in this case is especially strained by evidence developed in separate litigation that the Republican supermajority preserved its power by misrepresenting its ability to redraw legislative maps to allow special elections to occur in 2017 and stating falsely that the database used to draw curative maps contained no information about voters' race. In *Covington v. North Carolina*, 316 F.R.D. 117 (M.D.N.C. 2016), *aff'd*, 137 S. Ct. 2211 (2017), a three-judge panel held that 28 majority-Black districts in North Carolina's House and Senate redistricting plans constituted unconstitutional racial gerrymanders and ordered that curative maps be drawn. In a subsequent decision, the panel stated that the case was among the largest racial gerrymanders ever encountered by a federal court. 270 F. Supp. 3d 881, 884 (M.D.N.C. 2017).

As found by a three-judge panel in *Common Cause v. Lewis*, 18 CVS 014001 (Wake Cty. Super. Ct. Sept. 3, 2019), House and Senate leaders' response to the federal court's order to cure the gerrymander allowed them to preserve their supermajority status, which they lost in elections in November 2018. Among other things, they (or lawyers working at their behest) represented to the *Covington* court and their Democratic colleagues that curative maps could not be drawn prior to August 2017, when, in fact, they had been substantially drawn by the General Assembly majority's redistricting consultant, Dr. Hofeller, in June of 2017. *See* Judgment at 284-91, *Common Cause v. Lewis*, *supra*. In addition, during legislative debate, Republican map drawers in both the House and Senate

26

stated that race was not a consideration in drawing maps. They even adopted criteria for drawing the maps prohibiting consideration of race. In fact, however, Dr. Hofeller's files did contain race information about voters. *See* Lichtman Rep. at 14-17 (detailing the General Assembly's misrepresentations about its 2017 redistricting plan); *see also* McKissick Decl. ¶¶ 25-26, Reives Decl. ¶¶ 6-7, 14, and Van Duyn Decl. ¶¶ 10-11 (describing intersection between racial and partisan gerrymandering, the Hofeller files, and entrenchment of Republican power through denial of voting opportunities to Black and Latino voters). The North Carolina three-judge court in the *Common Cause* case found the Legislative Defendants assertions "highly improbable," was "troubled" by representations made by Legislative Defendants or attorneys working on their behalf in the *Covington* case and to General Assembly colleagues, and "specifically" found that "Dr. Hofeller's intent and actions" "are attributable in full to Legislative Defendants." Judgment at 290-91, *Common Cause v. Lewis*, *supra*.

Additional information about Dr. Hofeller's work on behalf of North Carolina Republicans is under seal in the Wake County Superior Court. That said, the above-referenced credibility issues are compounded by recent press reports that Dr. Hofeller's files contained not only detailed information about voters' race, but also analysis of voters' likelihood to possess forms of photo ID that could be used to vote, with a particular focus on Black and Latino voters. In addition, press reports suggest that he and Republican legislators deliberately divided the campus of North Carolina A&T State University in half to create safe Republican seats by reducing Black voting strength. Daley, *supra*.

27

Similarly, numerous legislators made statements showing that SB 824 was supported by the same motives that led them to enact HB 589. Rather than disassociate themselves from the discredited HB 589, legislators denounced the Fourth Circuit and praised the bill that violated the Constitution and the VRA. House Speaker Tim Moore and Senate Leader Phil Berger disparaged *McCrory* as a decision "by three partisan Democrats." Moore later stated that the decision reflected "a more liberal bent." Rep. David Lewis stated in 2018 of *McCrory*: "I think (the Judge) was wrong." Lichtman Rep. at 10. Immediately following *McCrory,* Moore and Berger posted a statement asserting that they "will continue fighting to protect the integrity of our elections by implementing the commonsense requirement to show a photo ID when we vote." *Id.* Indeed, proponents of voter ID began work on the new legislation immediately after the Supreme Court refused to review the Fourth Circuit's decision in *McCrory*. Legislative leaders did not hide their ongoing support for HB 589. Referring to HB 589, Representative Harry Warren stated that "this last voter ID we passed required reasonable photo IDs." *Id.* Prior to final passage of the Constitutional amendment, Chairman Lewis stated "we think we passed a good law before." *Id*

In sum, the same legislative leaders who championed HB 589—Senate President Pro Tempore Berger, Speaker Moore, Chairman Lewis, Representative Speciale, and Representative Warren—were also central to the enactment of the voter ID constitutional amendment initiative, SB 824, and the veto override (as well as the adoption of North Carolina's racially gerrymandered legislative maps). The new voter ID law's legislative sponsors never asserted that SB 824 had different purposes than HB 589. Nor did they

28

express an intention to address the discriminatory effects identified by the Fourth Circuit. When it came time to vote, the same legislators who had voted to enact the racially-discriminatory HB 589 also supported SB 824. All Republicans who voted for HB 589 and who remained in the legislature in 2018 also voted for the voter ID constitutional amendment, SB 824 and the veto override. Lichtman Rep. at 11-12 & tbl.1.

### d. SB 824 Will Disproportionately Deny Blacks and Latinos the Right to Vote

SB 824 disproportionately impacts Black and Latino voters just as HB 589 did and that impact weighs in favor of finding the General Assembly passed SB 824 with discriminatory intent. As the Fourth Circuit has explained, "[s]howing disproportionate impact," weighs in favor of finding discriminatory intent. *McCrory*, 831 F.3d at 231. SB 824 will have the same disproportionate impact on the ability of Blacks and Latinos to vote that HB 589 did.

SB 824 imposes significant burdens on North Carolina voters. All voters must determine whether they possess ID acceptable for voting purposes. *See* McKissick Decl. ¶¶ 32-36. Some North Carolina voters will avoid the polls because they fear they lack acceptable ID. *See* McKissick Decl. ¶¶ 34-36; Burden Rep. at 34-35; Lichtman Rep. at 36-37. Others will be disenfranchised because they lack acceptable ID and will be unable to obtain it. *See* McKissick Decl. ¶¶ 32-36; Burden Rep. at 26-29; Lichtman Rep. at 29-36. Still other North Carolina voters who do not possess an acceptable form of ID but nonetheless brave a trip to the polls will find themselves confronted with confused poll workers, long lines, and long waits to cast a reasonable impediment or provisional ballot,

29

if they are permitted to cast a ballot at all. *See* McKissick Decl. ¶¶ 32-36; Burden Rep. at 22-26; Lichtman Rep. at 33-36. These costs and burdens have a real deterrent effect on voters and result in disenfranchisement.

### i. SB 824 Has the Same Disproportionately Negative Impact on Black and Latino Voters as HB 589

The Fourth Circuit held that HB 589 "excluded many of the alternative photo IDs used by African Americans" and "retained only the kinds of IDs that white North Carolinians were more likely to possess." *McCrory*, 831 F.3d at 216. The same is true of SB 824. The lists of acceptable forms of ID under SB 824 and HB 589 are almost identical. In 2015, at least 5.9% of all North Carolina voters lacked acceptable photo ID under HB 589. *See* Aff. of Kevin Quinn ("Quinn Aff.") at 4-5, *Holmes v. Moore*, Civ. Action No. 18 CVS 15292 (Wake County, General Court of Justice Superior Court Division). And Black voters were more than twice as likely as white voters to lack qualifying IDs, based on SBOE analyses of voters who could not be matched to State DMV records. Burden Rep. at 27-28. An independent study by the Survey of the Performance of American Elections (SPAE) for North Carolina during the period 2012-2016 looked at possession rates of unexpired driver's licenses and passports, tribal IDs, military and veteran's IDs, in-state college and university IDs, and other in-state local or state government IDs. "Only 4.1 percent [of white people] lacked all of the included photo IDs, compared to 15.1 percent of African Americans for a disparity of 11.0 percentage points." Lichtman Rep. at 21-22.

All available data in the record indicates that the state of the world in 2019 is no different. *See* Quinn Aff. at 4-5. Those thousands of North Carolina voters who lack an

30

acceptable ID—disproportionately voters of color—must obtain one or risk losing the right to vote. And the burdens associated with attempting to obtain an ID are significant. According to one study, the cost for all North Carolina voters who lacked acceptable ID under HB 589 to obtain a DMV-issued ID—as measured in the time required to obtain necessary documentation, complete the requisite paperwork, and travel to and from DMV locations—was anywhere from $4.8 million to $9.0 million. Stuart Shapiro & Deanna Moran, *The Burden of Voter Identification Laws: The Case of North Carolina*, 42 T. Marshall L. Rev. 123, 153-54 (2017).

Moreover, early data confirms that Black and Latino voters, in fact, disproportionately lack the forms of identification needed to cast a ballot under SB 824. The State's own list of voters who do not possess a North Carolina driver's license or DMV-issued photo identification card, which was published last week, reveals significant disparities. According to the State's no-match list, required under Section 1.5(b) of SB 824, while 4.9% of white, Not Hispanic, registered voters do not possess one of these two most common forms of identification used to satisfy voter ID requirements, 10.6% of Black registered voters lack one of these forms of ID. Exhibit 11, Prelim. Expert Rep. of Michael C. Herron ("Herron Rep.") at 21, 25. Similarly, 11.1% of Hispanic registered voters are on the State's "no-match" list. *Id.* at 25. The actual impact of the law speaks volumes about the intent behind it.

Like HB 589, SB 824 excludes public assistance IDs from the acceptable list of IDs to satisfy the photo ID requirement. The Fourth Circuit recognized that excluding these types of IDs from the acceptable list of IDs "was 'suspect[]' because 'a reasonable

31

legislator [would be] aware of the socioeconomic disparities endured by African Americans [and] could have surmised that African Americans would be more likely to possess this form of ID.'" *McCrory*, 831 F.3d at 227-28 (quoting *N.C. State Conference of NAACP v. McCrory*, 182 F. Supp. 3d 320, 497 (M.D.N.C. 2016)). The disparity between white and Black rates of possession of qualifying ID is significantly less when accounting for possession rates of public assistance IDs. The SPAE survey results show that the disparity between Black and white ID possession went from 11.0% to just 5.2% when including public assistance IDs. *See* Lichtman Rep. at 22. Yet the General Assembly voted down an amendment to SB 824 that would have included public assistance IDs in the list of acceptable IDs. Lichtman Rep. at 101-02.

### ii. SB 824's Modestly Expanded List of Acceptable IDs Does Not Meaningfully Ameliorate Its Discriminatory Impact or Intent

SB 824 expands the list of acceptable IDs somewhat in comparison to HB 589, but none of those new ID's will materially affect the disproportionate burden the law imposes on voting access for Blacks and Latinos. For example, SB 824 states that *some* student IDs will be accepted. But making (some) student IDs a valid form of ID will affect so few voters that it does almost nothing to ameliorate SB 824's racially disproportionate effects. *See* McKissick Decl. ¶ 32. Moreover, it is impossible to tell which, if any, student IDs will qualify as proper ID in the upcoming elections. SB 824 imposes such a strenuous set of requirements on issuing institutions to have their IDs approved for voting that permitting these forms of ID is unlikely to significantly change SB 824's impact. Indeed, approximately 850 colleges, universities and state and local government employers are

eligible to have their photo IDs approved for voting, but in practice only 72 have thus far received approval from the State Board of Elections. *See* Burden Rep. at 22-23 (citing List of Student Identification Cards, Employee Identification Cards and Tribal Enrollment Cards Approved for Use as Photo Identification to Vote, https://bit.ly/2kf6uz8). IDs from several of the State's largest institutions, and Historically Black Colleges and Universities, including UNC Chapel Hill, East Carolina University, UNC Charlotte, UNC Greensboro, and UNC Wilmington, NC A&T State University, Fayetteville State University, and Winston Salem State University have not yet received approval. *Id.*

### iii. The Two Purportedly "Free" Forms of Voter ID Provided under SB 824 Do Not Alleviate Its Racially Discriminatory Impact or Intent

Two "free" forms of ID are purportedly available to any qualified voter. First, SB 824 requires county boards of elections to provide a new free voter ID. Voters seeking such an ID must apply in person at their county's board of elections office, must be a registered voter, and must provide their name, date of birth, and the last four digits of their Social Security Number. The law also allows the State Board of Elections to create additional requirements for voters seeking a free ID at their county board of elections. 2018 N.C. Sess. Laws 144 § 1.1.(a); Burden Rep. at 29. Second, voters may procure a "special identification card" from an office of the Department of Motor Vehicles. N.C.G.S § 20-37.7. The requirements for acquiring such an ID are "substantial and complex"—to do so, a voter must appear in person at a Department of Motor Vehicles office and provide (a) one document verifying age and identity, (b) one document proving the existence of a Social Security number, *and* (c) one document proving residency. Burden Rep. at 29.

33

These two purportedly "free" forms of voter ID do not alleviate the severe burdens SB 824 places on voters who lack qualifying ID. Burden Rep. at 21-30. The logistical challenges to obtaining a "free" ID are so significant that the option is illusory.

*First,* the DMV issued "free" ID is not a meaningful option for many voters. For some voters, obtaining the required documentation will be too costly, time consuming, or difficult. For other voters, just getting to the DMV may be an insurmountable challenge. *See, e.g.*, *McCrory*, 182 F. Supp. at 359-60. For other voters, finding the time away from family and work responsibilities to go to the DMV to procure the ID poses an insuperable obstacle. All of those barriers fall disproportionately on Black and Latino voters. Burden Rep. at 28-30.

*Second*, and for many of the same reasons, the "free" voter IDs issued by the County Boards of Elections ("CBOE") are also likely to be difficult for voters to obtain. CBOE offices are difficult for many voters to reach. *Id*. Many are inaccessible by public transportation. CBOE offices are also only open during limited hours, making them functionally inaccessible for many North Carolina voters whose work and family responsibilities mean that they cannot take the time necessary to make the trek. Just like the burdens on obtaining free ID at a DMV, the barriers to obtaining a free ID at a CBOE office are likely to fall disproportionately on Black and Latino voters. *See id.*; *see also* McKissick Decl. ¶ 33. The Legislature could have reduced this burden by requiring CBOE offices to open and issue voter IDs at least one Saturday before Election Day, but an amendment proposing that modest improvement was rejected without discussion. SB 824 Amendment No. A8: ABK-125-V-1.

34

### iv. The Availability of the "Reasonable Impediment" Option Does Not Lessen SB 824's Racially Discriminatory Impact or Intent

The reasonable impediment exception to SB 824 likewise does not cure the law's severe burdens on voters who lack ID. Burden Rep. at 23-26. Indeed, the Fourth Circuit addressed a voter ID law with a "reasonable impediment declaration" alternative in *McCrory* and nevertheless found that it violated Section 2 because it was enacted with racially discriminatory intent and harmed minority voters. *McCrory*, 830 F.3d at 219. SB 824's approach to reasonable impediment declarations is no better than HB 589's and is likely to reproduce many of the same disparities.

*First*, SB 824 makes the decision whether to accept a reasonable impediment declaration unacceptably arbitrary. *See* Burden Rep. at 23-26. And the State has yet to adopt a standard form for the declaration that it could use to train CBOE officials or poll workers. Burden Rep. at 35; Fellman Decl. ¶ 31. Experience during the March 2016 primary elections—the only elections in North Carolina in which photo ID was required to vote—show that election officials implemented HB 589—including its similar reasonable impediment processes—in an arbitrary and unequal manner that led to racially-disparate voter disenfranchisement. *Id.*; Lichtman Rep. at 29-37. The likelihood of similar problems in the implementation of SB 824's reasonable impediment exception is significantly greater. With roughly five months left until early voting begins, no mass public education about the new requirement has been conducted. County "forums" on the new law, conducted by SBOE staff, have been poorly publicized with minimal attendance and confusing presentations. County election officials were provided a basic outline of the new

35

requirement only in July of this year and likely will not have the time to train poll workers to implement the new law's requirements. Exhibit 12, Decl. of Courtney Patterson ("Patterson Decl.") ¶¶ 10-12; Exhibit 13, Decl. of Kate Fellman ("Fellman Decl.") ¶¶ 31-36.

*Second*, the reasonable impediment declaration is structured in a way that it is likely to deter eligible Black and Latino voters from using it. SB 824 requires that the reasonable impediment form include a "prominent statement that submitting fraudulently or falsely completed declarations is a Class I felony under Chapter 163A of the General Statutes." 2018 N.C. Sess. Laws 144 § 1.4A. Black and Latino voters are disproportionately likely to refuse "to sign the form out of concern that they do not fully understand it and could make a mistake that would subject him or her to prosecution." Burden Rep. at 25.

### e. No Rational Justification Can Support the Voter ID Requirement in SB 824—It Is The Quintessential Example of a Law That Is "Unexplainable on Grounds Other Than Race"

The Legislature's purported justification of SB 824 as an anti-fraud measure is so contrary to evidence that the passage of the legislation is "unexplainable on grounds other than race." *Rucho*, 139 S. Ct. at 2498. As the Supreme Court has repeatedly held, laws "that are race neutral on their face but are unexplainable on grounds other than race, are of course presumptively invalid." *Id.* Thus, long before *Arlington Heights*, in *Gomillion v. Lightfoot* the Supreme Court concluded that an "uncouth twenty-eight sided" municipal boundary line that excluded Black voters from city elections was so inexplicable in its design that it could not be the product of anything other than intentional race discrimination. 364 U.S. 339, 340 (1960).

36

SB 824 is the twenty-first century version of an "uncouth twenty-eight sided" district boundary. *Id.* Like HB 589 before it, neither bill solves a real problem afflicting North Carolina elections (which have never been shown to have a problem with in-person voter fraud). Nor would these bills effectively solve that problem even if there were a problem to solve. As the Fourth Circuit held, in the context of HB 589, SB 824 does not address an actual problem that has ever afflicted North Carolina elections. *McCrory*, 831 F.3d at 235-36. "[T]he State has failed to identify even a single individual who has ever been charged with committing in-person voter fraud in North Carolina." *Id.* And "the bipartisan State Board of Elections" has "expressed no concern about in-person voter fraud." *Id.* Moreover, SB 824 is too broad, enacting seemingly irrational restrictions unrelated to the goal of combating fraud. Minnite Rep. at 1. Just like in *McCrory*, the law still excludes as acceptable identification forms of state-issued ID—such as public assistance IDs—disproportionately held by Blacks. *McCrory*, 831 F.3d at 236.

Ultimately, SB 824, like HB 589, creates numerous needless obstacles to casting a ballot that *will not* have a discernable effect on voter fraud but *will* make it more costly and difficult to vote. Like HB 589 before it, SB 824 "elevates form over function, creating hoops through which certain citizens must jump with little discernable gain in deterrence of voter fraud." *Id.* at 236.

\* \* \*

In sum the *Arlington Heights* factors all support the conclusion that SB 824 was enacted with racially discriminatory intent. For that reason, Plaintiffs are likely to succeed on their Fourteenth Amendment, Fifteenth Amendment, and Section 2 intent claims.

37

**B. SB 824 Separately Violates Section 2's Results Standard**

While Plaintiffs have established above that North Carolina violated Section 2 of the Voting Rights Act by enacting SB 824 with racially discriminatory intent, a showing of discriminatory intent is not required to establish a claim. On the contrary, "Congress [has] made clear that a violation of § 2 c[an] be established by proof of discriminatory results alone." *Chisom v. Roemer*, 501 U.S. 380, 404 (1991); *accord League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 238-39 (4th Cir. 2014). What matters under Section 2 is whether a procedure or device is "imposed or applied . . . in a manner which *results* in a denial or abridgment" of the right to vote on account of race or color. 52 U.S.C. § 10301(a)) (emphasis added). That occurs when, "based on the totality of circumstances," minority voters "have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." *Id.* § 10301(b).

In its 2014 *League of Women Voters* decision preliminarily enjoining provisions of HB 589,[6] the Fourth Circuit set out two elements that govern vote denial claims under the "results" prong of Section 2:

> (i) it "imposes a discriminatory burden," meaning that "members of [a] protected class 'have less opportunity than other members of the electorate to participate in the political process . . .'"; and

> (ii) the disproportionate impact is "in part 'caused by or linked to "social and historical conditions" that have or currently produce discrimination against members of the protected class.'"

---

[6] Voter ID was not before the court in 2014 because its implementation was delayed to 2016.

38

769 F.3d at 240, 245 (citations omitted). SB 824's photo voter ID requirement is a textbook Section 2 violation under this standard. First, Blacks and Latinos disproportionately lack an ID acceptable under SB 824 and are disproportionately burdened in their ability to obtain such an ID. Second, overwhelming evidence leaves no doubt that this disparate burden is "in part caused by or linked to social and historical conditions that have or currently produce discrimination against members of the protected class." *Id.* at 245 (citations and internal quotation marks omitted).[7]

### 1. SB 824 Will Disparately and Substantially Deny and Abridge Black and Latino Voters' Ability to Vote

As explained above, *supra* Section I.A.2.d., (1) SB 824 will have the same disproportionately negative impact on Black and Latinos as HB 589, and (2) indeed increases the disproportionate burden on Blacks and Latinos in a key way by excluding learners permits from the list of eligible forms of identification. *See* S.L. 2018-144 Section 1.2(a) (containing list of acceptable forms of ID which does not include DMV-issued learner's permits or provisional license.) The State's own "no match" list reveals that Black voters are nearly twice as likely as white voters to lack a driver's license or state-issued photo ID—the two most prevalent forms of qualifying ID—and Latino voters are more than twice as likely. Herron Rep. at 21, 25; *see also* Quinn Aff. at 5 (finding that the

---

[7] The ruling in *Lee v. Virginia State Board of Elections*, 843 F.3d 592 (4th Cir. 2016) upholding Virginia's photo voter ID requirement under the "results" prong of Section 2, was founded on substantially different facts than those presenting here. Among other key facts, Virginia authorized a much broader range of photo IDs, including all government IDs (such as public assistance IDs), high school student IDs, all Virginia college IDs, and all employer IDs. Virginia also made the free ID available not just at registrar's offices but at "mobile voter-ID stations located throughout Virginia" and importantly, on election day. *Id.* at 595.

39

disparity of photo ID possession by race in 2015 is likely the same in 2019).  Because SB

824 disproportionately denies Blacks and Latinos the right to vote, it violates the Voting

Rights Act for that reason alone.

 2. **The Disparate Burden of S. 824 on Black and Latino Voters is Clearly Linked to the Effects of Past Discrimination in Voting, Education, Employment, and Health and Other Areas**

The legacy of race discrimination, both official and private, remains palpable in

North Carolina today.  The same lengthy history of racial discrimination with respect to

voting in North Carolina that supports a finding that the legislature again acted with

discriminatory intent when it enacted SB 824, *see McCrory*, 831 F.3d at 223-27, likewise

supports the conclusion that the voter ID law has a racially discriminatory impact that

violates Section 2, *see Gingles v. Edmiston*, 590 F. Supp. 345, 359-61 (E.D.N.C. 1984),

*aff'd.*, 478 U.S. 30 (1986).  Black and Latino voters who have borne the historical brunt of

the State's official discrimination today suffer the legacy of that discrimination in ways

that make them more vulnerable to the discriminatory effects of burdensome voting

regulations.  *See LULAC*, 548 U.S. at 440.

In North Carolina, Blacks "are disproportionately likely to move, be poor, less

educated, have less access to transportation, and experience poor health."  *McCrory*, 831

F.3d at 233 (internal citations omitted).  The Fourth Circuit has acknowledged that "[t]hese

socioeconomic disparities establish that no mere 'preference' led African Americans . . .

to disproportionately lack acceptable photo ID."  *Id.*  And the same is true for Latinos.  Nor

is there any evidence to suggest that anything has changed in the three years since *McCrory*

was decided.

40

"Numerous studies have shown that educational attainment is often the single best predictor of whether an individual votes." Burden Rep. at 15. "Education lowers the 'costs' of voting by providing language skills, direct information about the electoral process, and a sense of confidence of efficacy that facilitate participation even when the rules are changed." *Id.* And educational attainment at all ages differs significantly by race and ethnicity in North Carolina. *See id.* Among fourth graders, 80% of white students were deemed to meet 'basic' standards in 2017, whereas only 56% of Blacks and 57% of Latinos met those standards. *See id.* High school dropout rates for Blacks and Latinos in 2017-2018 were 1.5 to 2.0 times that of whites. *Id.* The Census Bureau's 2013-2017 American Community Survey showed that 33% of white North Carolinians held four-year college degrees, while only 20% of Blacks and 14% of Latinos held such degrees. *Id.*

Much like education, income and employment significantly affect voter participation. Individuals with lower household incomes are significantly less likely to vote because it is comparably more burdensome for them to make time to do so. A majority of states, for instance, require employers to give employees time off from work to vote. Most of those states also mandate that the employee must be paid for time taken to vote. North Carolina does neither. *Id.* at 16. North Carolina has produced significant disparities among white and Black and Latino in employment and poverty rates. *Id.* at 14-15.

Health outcomes significantly impact a person's ability to vote. For example, a disability makes the average person approximately 20 points less likely to vote, likely because it increases the burdens and costs associated with voting. *Id.* at 16. Like education and employment, North Carolina has significant disparities between Blacks, Latinos, and

41

whites with respect to health outcomes. On an array of official state health indicators that include such diverse measures as infant deaths, heart disease, and homicides, Blacks and Latinos routinely fare worse than whites. *Id.*

Disparate treatment by the criminal justice system also affects voter participation. One recent report indicates that laws that prohibit voting by inmates, parolees, and probationers disenfranchise over 43,000 Black residents, or 2.63% of the Black voting age population. *Id.* at 17. The disenfranchisement rate was only .79% for the rest of the population of the state (i.e., all non-Blacks). *Id.* Research shows that formerly incarcerated people are further discouraged from voting even after they are "off paper" due to the social stigma of a criminal record, financial consequences of incarceration, and lack of support from the state in reactivating their voting rights. *Id.*

### 3. Other Factors Identified in the 1982 Senate Report on Voting Rights Act Amendments Confirm that the Substantial Racially Disproportionate Burdens Imposed by SB 824 Violate Section 2

As explained by *LWV*, a series of objective factors spelled out in the 1982 Senate Judiciary Committee Majority Report, often referred to as the "Senate Factors," should be considered in assessing the two key elements. 769 F.3d. at 240. *See also Thornburg v. Gingles*, 478 U.S. 30, 44-45 (1986); *League of United Latin Am. Citizens v. Perry* (*LULAC*), 548 U.S. 399, 426 (2006). The "Senate Factors" analysis further supports the conclusion that SB 824 violates Section 2.

### a. Racially Polarized Voting Is Prevalent in North Carolina Elections

Four years ago, the SBOE admitted in federal court that racially polarized voting continues in North Carolina to this day. Since that admission, nothing has changed. In

42

*McCrory*, both the trial and appellate courts recognized not only that "racially polarized voting between African Americans and whites remains prevalent in North Carolina," but the "State admitted as much." *McCrory*, 831 F.3d at 225 (citing *McCrory*, 162 F. Supp. 3d at 429). In the SBOE's answer to the complaint in that case, they conceded that "past court decisions in the voting rights area speak for themselves and that racially polarized voting continues to exist in North Carolina." Answer, *United States v. North Carolina*, No. 13-cv-861 (M.D.N.C. 2016), ECF No. 19. In the four years since the SBOE's admission, North Carolina has seen continued racially polarized voting. *See* Lichtman Rep. at 47-63. The disparities between whites and Latinos are also striking. *Id.*

The disparities in voting between white and non-white voters "far exceed the disparities for other politically salient characteristics of voters, such as sex, age, education and income." Lichtman Rep. at 52. Because of this polarization "Republicans had much to gain in 2018 by attempting to reduce Black registration and voting relative to white registration and voting." *Id.* The polarization was so significant that "[n]o other demographic shift in registration and voting would have nearly the same impact on prospective political gain." *Id.*; *see McCrory*, 831 F.3d at 221-23, 225-26; *accord LULAC*, 548 U.S. at 427-28.

### b. Blacks and Latinos Are Consistently Underrepresented in Public Office in North Carolina

Blacks have had little success winning public office in North Carolina—despite the State having one of the largest Black populations in the nation. Only one Black person has ever been elected to any of North Carolina's nine statewide constitutional offices or two

43

United States Senate seats in the 225-year history of the State. Burden Rep. at 18. Between 1900 and 1968, there were no Black members of the General Assembly. *Id.* As recently as 1989, Blacks, who make up over 20% of North Carolina's population, comprised only 8% of the state Senate and 11% of the House. *Id.* Black representation in the General Assembly first began to approach the percentage of the statewide population that is Black in 2014, when North Carolina adopted its first voter ID law. *Id.* Between 1900 and 1992, there was not a single Black person elected to Congress or statewide office. *Id.*

Latinos, for their part, have generally not been elected in North Carolina. No Latinos serve in the General Assembly, even though the State's population is now roughly 9% Latino. Nor have any Latinos ever been elected to statewide office. Burden Rep. at 19.

Academic research has shown that Blacks and Latinos are more likely to vote when their state legislatures have larger percentages of Black and Latino representatives. North Carolina's history of underrepresentation of these groups has contributed to lower levels of electoral participation and the likelihood that adding burdens to the voting process will disproportionately deter Blacks and Latinos from voting because the perceived benefits are not as high as they would be if minority-preferred candidates enjoyed greater electoral success. Burden Rep. at 18-19.

44

### c. The Policy Underlying SB 824 Is "Tenuous" and Needlessly Impairs the Voting Rights of Blacks and Latinos

### i. North Carolina Has No Problem with Voter Impersonation Fraud

The principal rationale offered in support of passage of SB 824's voter ID requirement was the prevention of in-person voter impersonation. Lichtman Rep. at 105. But Defendants conducted two audits of elections in North Carolina from 2000-2016 including tens of millions of votes and they found a total of *three* cases of possible voter impersonation out of more than 40 million votes cast. *Id.* at 105-06. And not one case has ever been prosecuted. *See McCrory*, 182 F. Supp. 3d at 381 n.69, 441. The stated policy for the law was thus tenuous and pretextual.

During the debates on SB 824, legislative proponents of voter ID described the prevalence of voter fraud in North Carolina using a number of anecdotes, none of which were confirmed by the audits Defendants themselves subsequently conducted. For example, Senator Krawiec claimed that "in 2016, 498 people voted provisionally when they showed up to vote and were told that they had already voted. That's 498 people where somebody else had voted in their name." Lichtman Rep. at 107. But the SBOE's own audits, conducted in 2013 and 2017 and presented to the General Assembly, revealed a rate of voter impersonation in North Carolina—.000006% in the 2013 audit and .00004% in 2017—that amounts to statistical zero (*i.e.*, so infrequent that it rounds to zero) and certainly is not a *bona fide* rationale for legislative activity. *See* Minnite Rep. at 1; *see also* Lichtman Rep. at 105-06 (identifying only 3 cases of voter impersonation from 2000 to the present in North Carolina out of tens of millions of votes cast).

45

The absence of evidence of voter impersonation at the polls is consistent with evidence from other parts of the country. Officials defending the voter ID laws in Wisconsin and Pennsylvania were unable to identify any instances of in-person voter impersonation, even after conducting investigations intended to do exactly that. Lichtman Rep. at 108-10. In Minnesota, Wisconsin, and Maryland, post-election audits undertaken because of either close election results or accusations of voter fraud all failed to find a single instance of voter impersonation. *Id.*

### ii. SB 824 Does Not Bring North Carolina's Voter ID Laws into "Conformity with Other States Voter ID Laws"

While legislators justified SB 824 as bringing North Carolina into conformity with 34 other states, SB 824 is far more restrictive than the voter ID requirements in those states. During the 2018 debates on voter photo ID, a number of legislators expressed their desire to pass SB 824 so that North Carolina's election laws conformed with other states. Lichtman Rep. at 114 (collecting statements from Chairman Lewis, Representative McElraft, and Senator Krawiec). But in reality, SB 824 is far more restrictive than other state's with voter ID requirements. For example, many of these states do not have *photo* ID requirements, instead accepting readily available non-photo IDs such as a utility bill, bank statement, or paycheck. Lichtman Rep. at 114-15.

SB 824 falls outside the mainstream in two additional ways. First, for most acceptable forms of ID, SB 824 requires that the ID not be expired for more than a year. "Nearly every other state with a photo ID requirement either accepts expired IDs or have a longer grace period than one year." Lichtman Rep. at 116. Second, by excluding U.S.

government employee IDs, U.S. government certificates of naturalization, and public assistance IDs from its list of acceptable IDs, North Carolina "stands nearly alone" among states with a photo ID requirement.  Lichtman Rep. at 115.

**C. SB 824 Cannot Be Implemented In a Manner That Satisfies the Voting Rights Act in Time for the March 2020 Elections**

In addition to the extensive infirmities in SB 824 discussed above, it has become clear that North Carolina cannot possibly roll out its voter ID law in the less than five months that remain between now and the commencement of early voting in the primary election to be held beginning February 12, 2020, with absentee by mail voting beginning January 13.  The sort of rushed implementation that the State contemplates would very likely violate Section 2 for additional reasons because of the impact it would have on Black and Latino voters.  Voters have not been educated about the requirements of the new voter ID law, and county officials are unprepared to administer the new law.  *See* McKissick Decl. ¶ 34; Patterson Decl. ¶¶ 9-12; Fellman Decl. ¶¶ 15, 31, 37-40.  Due to the lack of a coordinated communication campaign by state and local election officials since SB 824's passage, after the photo ID requirement was postponed, voters also lack clear guidelines on when the photo ID requirement will go into effect and what forms of ID will be acceptable. Fellman ¶¶ 12-18. The SBOE has yet to publish the official form of Reasonable Impediment declaration.  Burden Rep. at 35;  Fellman Decl. ¶ 31.  And many voters have no way to know about free ID's.  The county boards have not previously been in the business of providing ID and there has been a lack of communication regarding the locations at which IDs will be provided by the county boards. Patterson Decl. ¶¶ 9-12.

47

Students are particularly vulnerable to disenfranchisement due to confusion about the law's requirements, in large part because student ID compliance under SB 824 is unsettled. *See* Letter from Kim Strach, March 15, 2019 (identifying only 72 of 850 institutions with approved forms of ID as of March 15, 2019), https://bit.ly/2meh0Y2. Fellman Decl. ¶¶ 25-26. Post-enactment changes required due to the rushed and haphazard manner in which SB 824 was originally enacted, *see* S.L. 2019-4 (postponing effective date of Voter ID); *see also* S.L. 2019-22 (revising the requirements for College, University and employer IDs) have only deepened confusion about the law's requirements. Fellman Decl. ¶ 21. Altogether, the rushed implementation timeline adds to confusion and chaos impacting the election process, where the implementation of photo ID and lack of communication will likely lead to longer lines and longer wait lines, and disproportionately impact Black and Hispanic voters, who have "fewer resources to navigate these administrative challenges and are more likely to be deterred from voting." Burden Rep. at 36.

The inevitable result of this rushed and confused rollout will be the disparate denial of the right to vote to Black and Latino voters. Because SB 824 cannot be implemented in a manner that assures compliance with the VRA in time for the 2020 elections, at minimum, the Court should enjoin its implementation until after those elections.

## II. THE OTHER PRELIMINARY INJUNCTION FACTORS FAVOR A PRELIMINARY INJUNCTION

All other factors support preliminary injunctive relief. *See LWV*, 769 F.3d at 247-48. Denial of the right to vote is *per se* irreparable injury, and the demonstrated risks of minority voter suppression far outweigh the tenuous risks of impersonation voter fraud that

48

are claimed to justify this unusually harsh and burdensome law.  The public interest favors entry of a preliminary injunction pending trial.  The balance of equities weighs in favor of preliminary injunctive relief.

**Plaintiffs will be irreparably harmed absent a preliminary injunction.**  The denial and abridgement of the constitutionally protected right to vote is, by definition, an irreparable injury that warrants injunctive relief.  The "right to vote freely for the candidate of one's choice is of the essence of a democratic society, and any restrictions on that right strike at the heart of representative government." *Reynolds v. Sims,* 377 U.S. 533, 555 (1964).  Preventing eligible voters like the members and constituents of the organizational plaintiffs from voting inflicts "harms that cannot be recompensed." *Shannon v. Jacobowitz,* 301 F. Supp. 2d 249, 258 (N.D.N.Y. 2003).  The deprivation of a constitutional right—including the unabridged right to vote—for any period of time constitutes irreparable injury. *See United States v. City of Cambridge*, 799 F.2d 137, 140 (4th Cir. 1986) (noting that "discriminatory [voting] procedures constitute the kind of serious violation of the Constitution … for which courts have granted immediate relief" and citing cases); *see also Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality opinion); *Williams v. Salerno*, 792 F.2d 323, 326 (2d Cir. 1986).

**The public interest and balance of equities tip sharply in favor of a preliminary injunction.**  The public interest and "balance of equities" also favor preliminary injunctive relief. *Winter,* 555 U.S. at 20.  North Carolina has no legitimate interest in enforcing an unconstitutional law, the public has a strong interest in exercising the right to vote, and administrative convenience cannot justify laws that impinge upon fundamental rights. *See*

49

*LWV*, 769 F.3d at 247-48; *see also Taylor v. Louisiana*, 419 U.S. 522, 535 (1975); *Newsom ex rel. Newsom v. Albemarle Cty. Sch. Bd.*, 354 F.3d 249, 261 (4th Cir. 2003).  The balance of the harms and public interest plainly favor granting the requested injunction.

## CONCLUSION

For the reasons set forth above, Plaintiffs request that this Court enter a preliminary injunction against the implementation of the provisions of SB 824 that impose voter-identification requirements, that expand the number of poll observers, and that loosen eligibility requirement for people who can challenge ballots in the March 2020 elections pending the outcome of a trial on the merits of plaintiffs' claims.

Dated: September 17, 2019                    Respectfully submitted,

By: */s/ Irving Joyner*                      By: */s/ Penda D. Hair*
Irving Joyner                                Penda D. Hair
NC State Bar No. 7830                        DC Bar No. 335133
P.O. Box 374                                 FORWARD JUSTICE
Cary, NC 27512                               P.O. Box 42521
Telephone: +1 919.319.8353                   Washington D.C. 20015
Email: ijoyner@nccu.edu                      Telephone: +1 202.256.1976
                                             Email: phair@forwardjustice.org

By: */s/ John C. Ulin*
John C. Ulin                                 Caitlin A. Swain
CA Bar No. 165524                            VA Bar No. 84515
James W. Cooper                              FORWARD JUSTICE
Jeremy C. Karpatkin*                         400 W Main Street, Suite 203
Andrew Tutt                                  Durham, NC 27701
ARNOLD & PORTER KAYE                         Telephone: +1 919.323.3889
SCHOLER LLP                                  Email: daryl@forwardjustice.org
601 Massachusetts Ave., NW                            cswain@forwardjustice.org
Washington, DC 20001-3743
Telephone: +1 213.243.4228
Email: John.Ulin@arnoldporter.com            * *Pro hac vice* motion forthcoming

*Counsel for Plaintiffs*

50

# CERTIFICATE OF PAGE COUNT

Pursuant to Local Rule 7.3(d)(1), the undersigned counsel hereby certifies that the foregoing Memorandum, including body, headings, and footnotes is a total of 50 pages.

/s/ John C. Ulin
John C. Ulin
Attorney for Plaintiffs

51

## CERTIFICATE OF SERVICE

I hereby certify that on this date I electronically filed the foregoing

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR**

**PRELIMINARY INJUNCTION** with the clerk of Court using the CM/ECF system

which will send notification of such to all counsel of record in this matter.

Dated: September 17, 2019

*/s/ John C. Ulin*
John C. Ulin
Attorney for Plaintiffs
