# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

NORTH CAROLINA STATE CONFERENCE
OF THE NAACP, *et al.*,

           *Plaintiffs*,

      v.

ROY ASBERRY COOPER III, in his official
capacity as the Governor of North Carolina,
*et al.*,

           *Defendants*.

No. 1:18-cv-01034

## AMENDED MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION[*]

---

[*] This amended memorandum exceeds the word limits set forth in Civil LR 7.3. On September 30, 2019, the court granted Plaintiffs leave to file an amended memorandum in support of their motion for preliminary injunction of up to 9,600 words in length. ECF No. 86.

# TABLE OF CONTENTS

**Table of Contents**................................................................................................ii

TABLE OF AUTHORITIES.....................................................................................iv

BACKGROUND .........................................................................................................2

I.   North Carolina's History of Discrimination .......................................................2

   A. Legacy of Voter Suppression ..........................................................................2

   B. Recent Pattern of Discrimination ...................................................................3

   C. Discriminatory Voter ID Laws........................................................................4

      1. House Bill 589 ...........................................................................................4

      2. Senate Bill 824 ..........................................................................................6

         a. Racially-Gerrymandered Supermajority Proposes a Voter ID
            Constitutional Amendment .............................................................6

         b. Lame-Duck Supermajority Rams Through Implementing
            Legislation.......................................................................................7

II.  SB824 Basically Reenacts the Voter ID Law Struck Down By the Fourth Circuit ......9

SUMMARY OF ARGUMENT.................................................................................11

STANDARD OF REVIEW.......................................................................................13

ARGUMENT.............................................................................................................14

I.   PLAINTIFFS HAVE A STRONG LIKELIHOOD OF SUCCESS ............................14

   A. Courts Apply *Arlington Heights* Factors in Assessing Racial Intent.....................14

   B. North Carolina Enacted SB824 With Racially Discriminatory Intent ..................16

      1. North Carolina Has a Long History of Discriminating Against
         Blacks and Latinos......................................................................................16

      2. Numerous Procedural Irregularities Accompanied the Passage of
         SB824..........................................................................................................17

      3. The "Anti-Fraud" Rationale Was Pretextual ...................................................18

      4. SB824 Will Disproportionately Deny Blacks and Latinos the
         Right to Vote...............................................................................................21

      5. SB824 Has the Same Disproportionately Negative Impact on
         Black and Latino Voters as HB589 .............................................................21

         a. SB824's Modestly Expanded List of Acceptable IDs Does Not
            Ameliorate Its Discriminatory Impact or Intent...........................................23

b.  The "Reasonable Impediment" Process Does Not Lessen
SB824's Racially Discriminatory Impact or Intent......................25

6.  SB824 Is The Quintessential Example of a Law "Unexplainable
on Grounds Other Than Race".........................................................26

C.  SB824 Violates Section 2's Results Standard........................................27

1.  SB824 Will Disparately and Substantially Deny and Abridge
Black and Latino Voters' Right to Vote...........................................28

2.  The Disparate Burden of SB824 on Black and Latino Voters is
Linked to the Effects of Past Discrimination....................................28

3.  Other Relevant Factors Confirm that the Substantial Racially
Disproportionate Burdens Imposed by SB824 Violate Section 2 ..................30

a.  Racially Polarized Voting Is Prevalent in North Carolina
Elections.....................................................................................30

b.  Blacks and Latinos Are Consistently Underrepresented in
Public Office in North Carolina...................................................30

c.  The Policy Underlying SB824 Is "Tenuous" and Needlessly
Impairs the Voting Rights of Blacks and Latinos.........................31

D.  SB824 Cannot Be Implemented In a Manner That Satisfies the
Voting Rights Act in Time for the March 2020 Elections ....................33

II. THE OTHER PRELIMINARY INJUNCTION FACTORS FAVOR A
PRELIMINARY INJUNCTION ...............................................................34

CONCLUSION ............................................................................................35

iii

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Chisom v. Roemer,*
    501 U.S. 380 (1991) ........................................................................... 27

*Common Cause v. Lewis,*
    18 CVS 014001 (Wake Cty. Super. Ct. Sept. 3, 2019) ................................ 19

*Covington v. North Carolina,*
    316 F.R.D. 117 (M.D.N.C. 2016) ........................................................... 3

*Elrod v. Burns,*
    427 U.S. 347 (1976) ........................................................................... 34

*Garza v. Cty. of Los Angeles,*
    918 F.2d 763 (9th Cir. 1990) ................................................................ 14

*Gingles v. Edmiston,*
    590 F. Supp. 345 (E.D.N.C. 1984) ......................................................... 28

*Gomillion v. Lightfoot,*
    364 U.S. 339 (1960) ........................................................................... 26

*Holmes v. Moore,*
    Civ. Action No. 18 CVS 15292 (Wake County, General Court of Justice
    Superior Court Division) ...................................................................... 22

*Harris v. McCrory,*
    159 F. Supp. 3d 600 (M.D.N.C. 2016) ..................................................... 3

*Hunt v. Cromartie,*
    526 U.S. 541 (1999) ........................................................................... 15

*Hunter v. Underwood,*
    471 U.S. 222 (1985) ........................................................................... 15

*League of United Latin American Citizens v. Perry (LULAC),*
    548 U.S. 399 (2006) ...................................................................... 2, 29, 30

*League of Women Voters of N.C. ("LWV") v. North Carolina,*
    769 F.3d 224 (4th Cir. 2014) .......................................................... *passim*

*Lee v. Virginia State Board of Elections*,
843 F.3d 592 (4th Cir. 2016) ............................................................... 28

*N.C. State Conference of the NAACP* v. *McCrory*,
831 F.3d 204 (4th Cir. 2016) ...................................................*passim*

*N.C. State Conference of the NAACP v. McCrory*,
182 F. Supp. 3d 320 (M.D.N.C. 2016) ............................................ 5, 23

*Newsom ex rel. Newsom v. Albemarle Cty. Sch. Bd.*,
354 F.3d 249 (4th Cir. 2003) ............................................................ 34

*Reynolds v. Sims*,
377 U.S. 533 (1964) ........................................................................ 34

*Rucho v. Common Cause*,
139 S. Ct. 2484 (2019) ............................................................... 15, 26

*Shelby County* v. *Holder*,
570 U.S. 529 (2013) .......................................................................... 4

*Taylor v. Louisiana*,
419 U.S. 522 (1975) ........................................................................ 34

*Thornburg v. Gingles*,
478 U.S. 30 (1986) ................................................................. 3, 13, 30

*United States v. City of Cambridge*,
799 F.2d 137 (4th Cir. 1986) ............................................................ 34

*United States v. Charleston Cty.*,
365 F.3d 341 (4th Cir. 2004) ............................................................ 14

*United States v. Charleston Cty.*,
316 F. Supp. 2d 268 (D.S.C. 2003) ................................................... 14

*United States v. North Carolina*,
No. 13-cv-861 (M.D.N.C. 2016) ........................................................ 30

*Veasey v. Abbott*,
830 F.3d 216 (5th Cir. 2016) ............................................................ 17

*Village of Arlington Heights v. Metro. Hous. Dev. Corp.*,
429 U.S. 252 (1977) ....................................................................*passim*

*Washington v. Davis*,
    426 U.S. 229 (1976) .................................................................................... 19

*Williams v. Salerno*,
    792 F.2d 323 (2d Cir. 1986) ........................................................................ 34

*Winter v. Natural Res. Def. Council, Inc.*,
    555 U.S. 7 (2008) ........................................................................................ 14

**Constitution & Statutes**

U.S. Constitution
    Amend. XIV ........................................................................................... 1, 27
    Amend. XV ............................................................................................. 1, 27

52 U.S.C. § 10301 .......................................................................................... 27

Voting Rights Act of 1965, Pub. L. No. 89-110, 79 Stat. 437
    § 2 ............................................................................................... *passim*
    § 5 ..................................................................................................... 3, 4, 5

2013 N.C. Sess. Laws 381 § 2.2 ...................................................................... 4

2013 N.C. Sess. Laws 381 §§ 2.9 & 11.1 ...................................................... 11

2018 N.C. Sess. Laws 144 § 1.1.(a) .............................................................. 24

2018 N.C. Sess. Laws 144 § 1.4A ................................................................. 26

2018 N.C. Sess. Laws 144 §§ 3.3 & 3.1(c) ................................................... 11

N.C.G.S § 20-37.7 ......................................................................................... 24

**Other Authorities**

Ned Barnett, *North Carolina Governor Vetoes Voter Photo ID Bill*,
    Reuters, June 23, 2011 ................................................................................. 4

David Daley, *The Secret Files of the Master of Modern Republican
    Gerrymandering*, The New Yorker (Sept. 6, 2019) ................................. 2, 19

Post-Election Audit Report, April 21, 2017, General Election 2016, North
    Carolina State Board of Elections ................................................................ 8

Stuart Shapiro & Deanna Moran, *The Burden of Voter Identification Laws:
    The Case of North Carolina*, 42 T. Marshall L. Rev. 123 (2017) .............. 22

Michael Weiss, *Republican Gerrymander Whiz Had Wider Influence Than Was Known*, N.Y. Times (Sept. 10, 2019 .................................................................... 19

Case 1:18-cv-01034-LCB-LPA   Document 91   Filed 10/09/19   Page 7 of 46

# TABLE OF ABBREVIATIONS

| | |
|---|---|
| Burden Rep. | Preliminary Expert Report of Barry Burden |
| CBOE | County Board of Elections |
| DMV | Department of Motor Vehicles |
| DOJ | United States Department of Justice |
| Fellman Decl. | Declaration of Kate Fellman |
| HB589 | House Bill 589 |
| Herron Rep. | Preliminary Expert Report of Michael C. Herron |
| Leloudis Rep. | Preliminary Expert Report of James Leloudis |
| Lichtman Rep. | Preliminary Expert Report of Allan Lichtman |
| McKissick Decl. | Declaration of Senator Floyd B. McKissick, Jr. |
| Michaux Decl. | Declaration of Representative Henry M. Michaux, Jr. |
| Minnite Rep. | Preliminary Expert Report of Lorraine Minnite |
| Morey Decl. | Declaration of Representative Marcia Helen Morey |
| Patterson Decl. | Declaration of Courtney Patterson |
| Quinn Aff. | Affidavit of Kevin Quinn |
| Reives Decl. | Declaration of Representative Robert T. Reives II |
| RID | Reasonable Impediment Declaration |
| Spearman Decl. | Declaration of Reverend T. Anthony Spearman |
| SB824 | Senate Bill 824 |
| SBOE | North Carolina State Board of Elections |
| Van Duyn Decl. | Declaration of Senator Teresa Van Duyn |

VRA                              Voting Rights Act

# INTRODUCTION

Plaintiffs seek a preliminary injunction prohibiting enforcement of North Carolina Senate Bill 824, which requires photo voter ID and vastly increases the number of authorized poll observers, because it violates Section 2 of the Voting Rights Act and the Fourteenth and Fifteenth Amendments by discriminating against Black and Latino voters. Despite zero evidence that voter impersonation is a problem, this is the third time this decade that North Carolina's General Assembly has enacted a voter ID law purporting to prevent it. A 2011 law was vetoed because it was discriminatory. House Bill 589 ("HB589"), was enacted in 2013 and invalidated by the Fourth Circuit for encompassing *intentional racial discrimination. N.C. State Conference of the NAACP* v. *McCrory*, 831 F.3d 204, 229 (4th Cir. 2016). That court found it "the most restrictive voting law North Carolina has seen since the era of Jim Crow" that "target[ed] African Americans with almost surgical precision." *Id.*

SB824 is a barely disguised duplicate of HB589, carries the same discriminatory intent, and fails to remedy its racially disparate impacts. General Assembly leaders, including Senate President Phil Berger, House Speaker Tim Moore, and lead House sponsor David Lewis—all of whom were instrumental in enacting HB589—never accepted the *McCrory* holding and made clear their intention to circumvent it. *See infra* Background I.C.2.a; Exhibit 1, Lichtman Rep. at 9-10. SB824 is intended, like HB589, to suppress Black and Latino voting, just as those voters were achieving near parity with white registration and turnout rates and otherwise emerging as major political forces. *McCrory*, 831 F.3d at 214. "'In essence, ... the State took away [minority voters'] opportunity

1

because [they] were about to exercise it…. [T]his bears the mark of intentional discrimination." *Id.* at 214-15 (citing *League of United Latin American Citizens v. Perry (LULAC)*, 548 U.S. 399, 440 (2006)) (alterations in original) .

Moreover, emerging evidence suggests that SB824 is another aspect of the legislative majority's coordinated effort to preserve its political position by deliberately disenfranchising Black and Latino voters. The files of Thomas Hofeller, a consultant whose research on racial voting patterns in North Carolina informed all aspects of this racially-motivated maneuvering, apparently reveal his involvement with the campaign to institute voter ID, as well. *See* David Daley, *The Secret Files of the Master of Modern Republican Gerrymandering*, The New Yorker (Sept. 6, 2019), http://bit.ly/35eVgxv. Plaintiffs here are seeking production of Hofeller's entire files and will present any relevant evidence to the Court whenever it becomes available.

SB824 likely violates Section 2 and the Constitution. Moreover, North Carolina cannot possibly implement it in a nondiscriminatory way in the four months the State has allowed. The court should, at least, preliminarily enjoin the law until after March 2020 elections.

## BACKGROUND

### I. North Carolina's History of Discrimination

#### A. Legacy of Voter Suppression

North Carolina's dark history includes slavery, "Jim Crow," and modern race discrimination. *See* Exhibit 2, Leloudis Rep. at 3-43; Exhibit 3, Michaux Decl. ¶¶29-30. Through strict segregation, including widespread lynching, and sustained official and

2

unofficial discrimination, North Carolina engaged in persistent efforts to preserve white supremacy for over a century. *See* Leloudis Rep. at 17-45. And North Carolina whites sought to strip Blacks of effective political participation by every stratagem ever devised for voter suppression, including poll taxes, literacy tests, Grandfather Clauses, white primaries, racial gerrymandering, byzantine election procedures, and unabated intimidation and (threats of) violence. *See id.* at 4-5, 14-17; 44-58; Exhibit 4, Burden Rep. at 7-9, 10-17.

North Carolina's literacy test was blocked in 1965 only because of the VRA, and has never been repealed. *See* Lichtman Rep. at 4, 19-20. In *Thornburg v. Gingles*, 478 U.S. 30 (1986), the Supreme Court detailed the State's long history of "racially polarized voting," "official discrimination in voting" and public services, and persistent "campaign appeals to racial prejudice." *Id.* at 80. And since the passage of the VRA, private parties have brought 50 lawsuits against the State for racial discrimination in voting in violation of Section 2, and the DOJ objected to more than 60 election law changes under Section 5. *See* Burden Rep. at 9.

## B. Recent Pattern of Discrimination

In this decade, the General Assembly has repeatedly violated the VRA and the Constitution in its redistricting efforts. Following the 2010 census, the Assembly redrew State House, State Senate, and federal congressional districts. Federal courts concluded that *all three maps* included intentional racial gerrymanders. *See Harris v. McCrory*, 159 F. Supp. 3d 600, 607 (M.D.N.C. 2016), *aff'd* 137 S. Ct. 1455 (2017) (congressional maps); *Covington v. North Carolina*, 316 F.R.D. 117 (M.D.N.C. 2016), *aff'd* 137 S. Ct. 2211

3

(2017) (state legislative maps).

## C. Discriminatory Voter ID Laws

In 2011 the North Carolina General Assembly passed its first photo voter ID law. The Governor vetoed it, stating that it would "unnecessarily and unfairly disenfranchise many eligible and legitimate voters." Ned Barnett, *North Carolina Governor Vetoes Voter Photo ID Bill*, Reuters, June 23, 2011, http://bit.ly/2kkMICw.

### 1. House Bill 589

As introduced in spring 2013, HB589 proposed limited requirements for voter identification and absentee voting. *McCrory*, 831 F.3d at 227; *see infra* tbl.1. But in June 2013, the Supreme Court struck down the coverage formula for Section 5 of the VRA in *Shelby County* v. *Holder*, 570 U.S. 529 (2013), meaning North Carolina no longer needed to preclear voting changes with DOJ. This fundamental change came when "African Americans were poised to act as a major electoral force" in the State. *McCrory*, 831 F.3d at 214.

After *Shelby*, the Assembly swiftly moved to adopt a strict voter ID law that disqualified IDs it knew were disproportionately possessed by Blacks. 2013 N.C. Sess. Laws 381 §2.2.[2] The new version of HB589 also reduced or eliminated procedures that had been specifically introduced to increase voter participation and were disproportionately used by voters of color. *McCrory*, 831 F.3d at 215-16. Proposed amendments to expand the list of permissible IDs were rejected. *Id.* at 216, 218.

---

[2] The law was also known as the Voter Information Verification Act.

4

Private parties and DOJ challenged the law. *N.C. State Conference of the NAACP v. McCrory*, 182 F. Supp. 3d 320, 348 (M.D.N.C. 2016). The Fourth Circuit invalidated HB589's voter ID requirements because they "were enacted with racially discriminatory intent in violation of the Equal Protection Clause of the 14th Amendment and § 2 of the [VRA]." *McCrory*, 831 F.3d at 219. Among facts pointing to discriminatory intent, the Assembly used racial data to construct a list of permissible voter IDs that would disproportionately impact Black voters, "impose[d] cures for problems that did not exist," and asserted "inapt remedies for the problems assertedly justifying them." *Id.* at 216, 214. The Court concluded that the Assembly would not have passed HB589 but for its disproportionate impact on Blacks. *Id.* at 238.

The Fourth Circuit took note of North Carolina's long history of racially polarized voting, which provided a "political payoff for legislators who seek to dilute or limit the minority vote." *Id.* at 222. The rise in Black voter registration and turnout while North Carolina was covered by Section 5 led to a rise in Black voting power and a threat to the majority party in the Assembly, which was not preferred by Blacks. That threat motivated the legislative majority to entrench itself by restricting Black access to the franchise. *Id.* at 223. The court found that the law "target[ted] African Americans with almost surgical precision." *Id.* at 214.

On the eve of trial, the Assembly modified HB589 to allow a voter to cast a provisional ballot if she swore under oath that a "reasonable impediment" prevented her from obtaining a qualifying ID. *McCrory*, 831 F.3d at 240. The "reasonable impediment" provision was not an adequate remedy for HB589's racially discriminatory intent because

it did not eliminate the burdens the law imposed on Black voters or negate the Assembly's invidious intent.  *Id.* at 240-41.

### 2.  Senate Bill 824

#### a.  Racially-Gerrymandered Supermajority Proposes a Voter ID Constitutional Amendment

The Assembly's unconstitutional racial gerrymander allowed North Carolina Republicans to transform their legislative majority into a *supermajority* that made them unaccountable to Black voters.  They maintained their supermajority until the 2018 elections occurred under remedial maps.

The Assembly that resulted from the 2016 elections took action that would not have been possible without its supermajority.  *See* Exhibit 5, McKissick Decl. ¶¶22-29; Exhibit 6, Reives Decl. ¶13.  In late June 2018, it placed a constitutional amendment on the November ballot mandating photo voter identification for voting at the polls.  2017 N.C. Sess. Laws 128 §2.2 ("HB1092").  Statements by legislative leadership made clear that the purpose of the constitutional amendment was to "mute future court challenges."  Lichtman Rep. at 11.

Proposing a constitutional amendment requires a three-fifths vote in each House. *See* N.C Const. art. XIII, §4.  The amendment, which was ratified in the November 2018 general election, passed on essentially party-line votes and would not have been placed on the ballot without the GOP supermajority.  *See* HB1092 Legislative History, https://bit.ly/2kP7XMO; McKissick Decl. ¶¶22-29; Reives Decl. ¶13.

### b. Lame-Duck Supermajority Rams Through Implementing Legislation

After Republicans lost their supermajorities in November 2018, the Assembly reconvened to rush a voter ID bill to the floor. After the Select Committee on Elections approved the bill, the Senate had less than 24 hours to review it before floor debate. SB824 Legislative History, https://bit.ly/2lXb31u; *see also* Exhibit 7, Van Duyn Decl. ¶¶21-27. Senators had little to no time to consult CBOEs, SBOE, election experts, or the public. *See* Lichtman Rep. at 71-74. The House circulated SB824's proposed language the night before it was to be debated. *See id.* SB824 underwent a mere five legislative days of review in chamber or committee. *See* SB824 Legislative History, https://bit.ly/2lXb31u.

At its first meeting, the relevant House committee refused to allow any public comment, despite requests made by committee members on behalf of the public—including representatives of the NAACP—who were in attendance. Exhibit 8, Spearman Decl. ¶34. The committee scheduled a meeting the next morning, but the meeting was rescheduled without prior notice. When the committee reconvened later that day, the Chair announced that public comment was limited to one-minute per speaker. *Id.* By that time, some who sought to speak, including NAACP representatives, were no longer available. *Id.*

During House floor debate, Speaker Moore declared that SB824 was the culmination of a "long road bringing voter ID to North Carolina." *See* N.C. House Floor Debate Audio, Dec. 5, 2019, at 2:28:54, https://bit.ly/2kOL3VQ. The Speaker had been one of the leaders of the 2013 Assembly who drafted the unconstitutional HB589 and shepherded it through the legislative process.

7

The Assembly knew that SBOE data showed that hundreds of thousands of registered voters lacked qualifying photo ID and that minority voters were overrepresented in that population.  McKissick Decl. ¶14; Exhibit 9, Morey Decl. ¶¶ 12-13.  Just as in 2013, the Assembly rejected an amendment to permit voters to use public assistance IDs, a choice the Fourth Circuit specifically identified as evidence of  discriminatory intent.  *See McCrory*, 831 F.3d at 236.  Other amendments designed to ameliorate the impact on those lacking qualifying ID were proposed, but promptly tabled.  Morey Decl. ¶16.

The Assembly sent SB824 to Governor Cooper on December 6, 2018 and he vetoed it, noting:  "It was designed to suppress the rights of minority, poor and elderly voters." *See* Governor's Veto Message for SB824, Dec. 14, 2018, http://bit.ly/2miGNi5.  On December 18, the lame-duck Senate voted to override; the House followed the next day.  SB824 Legislative History, https://bit.ly/2lXb31u.

The Assembly passed SB824 notwithstanding data from SBOE that voter impersonation fraud is not a problem in North Carolina.  After the 2016 election, SBOE conducted an audit and found that only one case of voter impersonation might have been prevented by a photo ID requirement for in-person voting.  *See* Lichtman Rep. 107; Exhibit 10, Minnite Rep. at 33; Post-Election Audit Report, April 21, 2017, General Election 2016, SBOE, at 2, https://bit.ly/2pMZMkO.  A 2013 report by SBOE likewise found that between 2000 and 2012, out of nearly 40 million votes cast, only two cases of voter impersonation were referred to a district attorney.  Minnite Rep. at 24.

Many of the same legislators who voted in favor of HB589 voted for SB824.  *See* Lichtman Rep. at 12, tbl.1.  Similarly, many of the same legislative leaders who

8

championed HB589—such as Senate President Berger, Speaker Moore, Chairman Lewis, and Representatives Michael Speciale and Harry Warren—were instrumental in enacting SB824.

## II. SB824 Basically Reenacts the Voter ID Law Struck Down By the Fourth Circuit

As demonstrated in the table below, SB824 is largely the same photo ID law enacted as part of HB589, which the Fourth Circuit found was "the most restrictive voting law North Carolina has seen since the era of Jim Crow." *McCrory*, 831 F.3d at 229.

9

| COMPARISON OF VOTER PHOTO IDENTIFICATION BILLS, NORTH CAROLINA GENERAL ASSEMBLY | | | |
|---|---|---|---|
| **ID TYPE** | **HOUSE PASSED PRE-*SHELBY*** | **HB589** | **SB824** |
| Driver's License, or Learner's Permit | Yes, includes Learner's permits and provisional licenses | **Limited**, must be unexpired **four years or less** unless voter is over 70 and was unexpired on 70th birthday; includes learner's permits and provisional licenses | **Limited**, must be unexpired **one year or less** unless voter is over 65 and was unexpired on 65th birthday; does not include learner's permits or provisional licenses; replaces seized licenses |
| Non-Operator's DMV-issued ID | Yes | Free to registered voters who certify need; same expiration requirements as for drivers licenses | Free to persons over 17; same expiration requirements as for drivers licenses |
| US Passport | Yes | **Limited**, same expiration rules as for DMV IDs | **Limited**, same expiration rules as for DMV IDs |
| Tribal ID | Yes | **Limited,** same expiration rules as for DMV IDs | **Limited**, same expiration rules as for DMV IDs |
| Military or Veteran ID | Yes | Yes, no expiration requirement | Yes, no expiration requirement |
| CBOE Issued Free Voter ID Card | No | No | Yes, same expiration rules as for DMV IDs |
| Out-Of-State Driver's License | Yes | **Limited**, only if registered within 90 days of election, and meets expiration rules for in-state DMV IDs | **Limited**, only if registered within 90 days of election, and meets expiration rules for in-state DMV IDs |
| Higher Ed ID | **Limited**, UNC constituents, community colleges | **No** | **Limited**, if meets state requirements, and expiration rules for DMV IDs; includes private institutions; rollout period to 2020 |
| State or Local Govt Employee ID | Yes | **No** | **Limited**, if meets state requirements, and expiration rules for DMV IDs |
| Federal Govt Employee ID | Yes | **No** | **No** |
| Public Assistance ID | Yes | **No** | **No** |
| US Naturalization Certificate | **No** | **No** | **No** |
| Fireman, EMS, hospital, law enforcement ID | Yes | **No** | **No** |

Lichtman Rep. tbl.8.

SB824 requires that voters present one of a limited number of qualifying photo IDs. *See supra* tbl.1; Lichtman Rep. tbl.8. Like HB589, SB824 *excludes* public assistances IDs (disproportionately possessed by voters of color), a feature of HB589 that the Fourth Circuit identified as especially problematic. *See McCrory*, 831 F.3d at 227-28.

SB824 also dramatically expands the number of poll observers and the grounds for challenges (to encompass the voter ID requirements). 2018 N.C. Sess. Laws 144 §§3.3 & 3.1(c). Expansions to challenges and increases in poll observers were also included in HB589. 2013 N.C. Sess. Laws 381 §§2.9 & 11.1. Poll observers and challengers have long been used in North Carolina to intimidate minority voters. *See* Leloudis Rep. at 61-63 (during 2012 election "self-appointed watchdogs ... petitioned to have more than 500 voters, most of them people of color, removed from the registration rolls," similar to Reconstruction-era voter intimidation).

The Assembly did not package all its 2018 voter suppression provisions into one bill, as it had in 2013. It reenacted HB589 in two bills. SB325 placed restrictions on early voting similar to those that the Fourth Circuit found targeted Black voters in *McCrory*. The Assembly enacted SB325 the same month it passed the voter ID constitutional amendment ballot measure. Among other things, SB325 eliminated the last Saturday of early voting, known to the Assembly as a day disproportionately used by Black voters, *see* McKissick Decl. ¶ 20, and imposed uniform voting hours and polling places for early voters.

## SUMMARY OF ARGUMENT

The Fourth Circuit previously found that HB589—an omnibus voter suppression law nearly identical in its photo ID requirement to SB824—was the product of intentional

11

race discrimination against Blacks. *McCrory*, 831 F.3d at 229. SB824 carries forward the same racially discriminatory intent as its predecessor. No relevant facts have changed that would warrant a different result from *McCrory*. North Carolina's history of race discrimination—both distant and very recent—still requires the Court to apply especially careful review to the Assembly's motives. The same process irregularities that accompanied HB589 cloud SB824, with similarly troubling statements from individual legislators. And there remains no evidence that voter impersonation fraud is a problem in North Carolina, casting severe doubt on the motives behind SB824, especially when the Assembly knew voters lacking qualifying ID were disproportionately racial minorities.

And SB824 presents its own troubling legislative history. A supermajority resulting from an unlawful racial gerrymander used its special powers to propose a voter ID constitutional amendment in order to circumvent *McCrory* and protect a new voter ID law from judicial challenge. It then passed SB824 as implementing legislation (over the Governor's veto) in a special lame-duck session just before its ouster. Confronted with a Fourth Circuit decision that identified key discriminatory provisions in the previous voter ID law, the Assembly enacted a new law containing most of *those same discriminatory provisions*. The conclusion is unmistakable: SB824 is infected with the same discriminatory intent that infected HB589.

SB824 also violates the VRA because of its racially discriminatory result. The VRA bars states from enacting laws that have racially discriminatory results; proof of intent to discriminate is not required. *Gingles*, 478 U.S. at 43-44. Because SB824 will disproportionately deny Black and Latino voters the right to vote—and this denial results

from interaction of the ID requirement with disadvantages of racial discrimination in voting, education, and other areas—SB824 violates the VRA.

At minimum, North Carolina's rushed implementation of SB824 will cause the racially discriminatory results the VRA prohibits. North Carolina is attempting to implement a new Voter ID requirement only a little over a year after its passage. With roughly four months left until the start of early voting, North Carolina has not engaged in meaningful efforts to educate voters about SB824; nor has it adequately trained election personnel in how to administer the law. The result will surely be the disparate denial of the right to vote to thousands of Black and Latino voters, in violation of the VRA, because of the confusion resulting from the State's hasty implementation of the voter ID law.

The Court should grant a preliminary injunction.

## STANDARD OF REVIEW

To win a preliminary injunction, plaintiffs must demonstrate that: (1) they are "likely to succeed on the merits"; (2) they "will likely suffer irreparable harm absent an injunction"; (3) "the balance of hardships weighs in their favor"; and (4) "the injunction is in the public interest." *League of Women Voters of N.C. ("LWV") v. North Carolina*, 769 F.3d 224, 236 (4th Cir. 2014). "In each case, courts 'must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief.'" *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008) (citation omitted).

**ARGUMENT**

## I.  PLAINTIFFS HAVE A STRONG LIKELIHOOD OF SUCCESS

### A.  Courts Apply *Arlington Heights* Factors in Assessing Racial Intent

A facially neutral election law or practice constitutes intentional race discrimination where "circumstantial and direct evidence of intent" shows that the law had an impermissible purpose. *McCrory*, 831 F.3d at 220 (quoting *Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266 (1977)). *See also United States v. Charleston Cty.*, 316 F. Supp. 2d 268, 272 n.3 (D.S.C. 2003), *aff'd*, 365 F.3d 341, 345 (4th Cir. 2004). Discriminatory intent need not be the "sole" or "primary" factor, just "*a* motivating factor.*" McCrory*, 831 F.3d at 220 (quoting *Arlington Heights* at 265-66).

Discriminatory intent is not the same thing as racial animus. *Garza v. Cty. of Los Angeles*, 918 F.2d 763, 778-79 & n.1 (9th Cir. 1990) (Kozinski, J., concurring and dissenting in part). "[I]ntentionally targeting a particular race's access to the franchise because its members vote for a particular party, in a predictable manner, constitutes discriminatory purpose[,] ... even absent any evidence of race-based hatred ...." *See McCrory*, 831 F.3d at 222-23.

In assessing evidence of intent, courts apply the *Arlington Heights* standard, considering a non-exhaustive list of factors: (1) "[t]he historical background of the [challenged] decision"; (2) "[t]he specific sequence of events leading up to the challenged decision"; (3) whether there were "[d]epartures from normal procedural sequence"; (4) the legislative history of the decision; and (5) the degree of disproportionate "impact of the official action—whether it bears more heavily on one race than another." *Id.* at 220-21

(quoting *Arlington Heights*, 429 U.S. at 266-67). Laws "that are race neutral on their face but are unexplainable on grounds other than race, are of course presumptively invalid." *Rucho v. Common Cause*, 139 S. Ct. 2484, 2496 (2019).

The Fourth Circuit "has recognized that '[o]utright admissions of impermissible racial motivation are infrequent and plaintiffs often must rely upon other evidence.'" *McCrory*, 831 F.3d at 221 (quoting *Hunt v. Cromartie*, 526 U.S. 541, 553 (1999)). "[W]here the plaintiffs allege that the legislature imposed barriers to minority voting, this holistic approach is particularly important, for '[d]iscrimination today is more subtle than the visible methods used in 1965.'" *Id.* at 221 (quoting H.R. Rep. No. 109-478, at 6 (2006)).

"Once racial discrimination is shown to have been a 'substantial' or 'motivating' factor, the burden shifts to the law's defenders to demonstrate that the law would have been enacted without this factor." *Hunter v. Underwood*, 471 U.S. 222, 228 (1985). "When determining if this burden has been met, courts must be mindful that 'racial discrimination is not just another competing consideration.'" *McCrory*, 831 F.3d at 221 (quoting *Arlington Heights*, 429 U.S. at 265-66). "[C]ourts must scrutinize the legislature's actual non-racial motivations to determine whether they alone can justify the legislature's choices." *Id.* "A historical pattern of laws producing discriminatory results provides important context for determining whether the same decisionmaking body has also enacted a law with discriminatory purpose." *Id.* at 223-24. And it is no defense that racial discrimination may be "done for partisan ends." *Id.* at 233.

### B. North Carolina Enacted SB824 With Racially Discriminatory Intent

#### 1. North Carolina Has a Long History of Discriminating Against Blacks and Latinos

North Carolina has a long history of official race discrimination from slavery through "Jim Crow" and decades of systematic efforts to disenfranchise Black voters that led to the passage of the VRA. During the pre-clearance era, DOJ filed over 60 objections to racially discriminatory election laws. *McCrory*, 831 F. 3d at 223-27. That history, coupled with the State's actions since *Shelby* eliminated the pre-clearance requirement, weighs strongly in favor of finding racially discriminatory intent.

In the six years since *Shelby*, three federal courts have held that the General Assembly engaged in intentional race discrimination to advance political goals—in *McCrory* and the two cases finding racial gerrymandering of legislative and congressional districts. *See supra* Background, § I.B. The State's own expert in *McCrory*, Thomas Hofeller, conceded that, "in North Carolina, ... race is a better predictor for voting Democratic than party registration." *McCrory*, 831 F. 3d at 225. As Professor Barry Burden noted, "these recent cases demonstrate that in the post-*Shelby* environment, the state legislature has acted repeatedly to alter the North Carolina election system in ways that disproportionately dilute or deny the votes of minority residents relative to whites and in furtherance of partisan gain and enrichment." Burden Rep. at 13.[3]

---

[3] During the same time period, North Carolina's racially gerrymandered Assembly refused to adopt a measure to remove the literacy test from the state constitution and further acted to diminish the voting power of Black citizens by imposing a statewide uniform voting hours requirement that reduced early voting time and eliminated Saturday early voting, which are frequently used by minority voters. Lichtman Rep. at 4, 19-20.

16

Against this backdrop, the enactment of SB824 must be viewed as another such effort. Michaux Decl. ¶19. The Assembly used its gerrymandered supermajority status to propose a Voter ID constitutional amendment that would circumvent *McCrory* and "mute future court challenges." Lichtman Rep. at 9-11. As Representative David Lewis, Chair of the 2018 House Committee on Elections (and a principal backer of HB589) stated: "The reason we are asking voters if they want to do this or not is, frankly, we think we passed a good law before." *Id.* at 10.

## 2. Numerous Procedural Irregularities Accompanied the Passage of SB824

The "specific sequence of events leading up to" SB824's enactment is also strong evidence of discriminatory intent. *See Arlington Heights*, 429 U.S. at 267. SB824 was enacted with the same sort of "rushed ... legislative process" and lack of debate that accompanied the passage of HB589, which the Fourth Circuit held showed discriminatory intent. *McCrory*, 831 F.3d at 227; *see Veasey v. Abbott*, 830 F.3d 216, 238 (5th Cir. 2016) ("cutting debate short" supported a finding of discriminatory intent). In *McCrory*, the Fourth Circuit noted that the General Assembly's three-day process "strongly suggest[ed] an attempt to avoid in-depth scrutiny." 831 F.3d at 228. SB824 underwent a mere five days of legislative review. The Assembly held only three hearings and gave preference to speakers who supported SB824, when it allowed any public comment. *See* Spearman Decl. ¶35.

Additionally, SB824 was passed by a supermajority obtained by using maps that a federal court held to be racially gerrymandered. *See* McKissick Decl. ¶¶22-29; Van Duyn Decl. ¶¶15-18; Spearman Decl. ¶¶14-15. The Assembly passed SB824 during the lame-

duck period in 2018—following an election in which Republicans lost their legislative supermajority, Michaux Decl. ¶14, and overrode the Governor's veto as one of its last official acts.

### 3. The "Anti-Fraud" Rationale Was Pretextual

Voter impersonation has never been a problem in North Carolina. Minnite Rep. at 20-35. The Assembly was informed that the State's own investigations revealed fewer than three instances of *possible* voter impersonation in North Carolina in the last *twenty years*, a period in which over *40 million* votes have been cast. *See* McKissick Decl. ¶¶17-18; Lichtman Rep. at 105-08 (legislators' awareness of SBOE Audits of 2013 and 2017); *see also* Minnite Rep. at 23-24, 33-35 (this rate of voter impersonation amounts to statistical zero). Nonetheless, confronted with this unrebutted evidence, members of the Assembly continued to insist that voter impersonation fraud is a significant problem in North Carolina and that combatting it was SB824's chief aim. *See* Lichtman Rep. at 105-08; Van Duyn Decl. ¶¶21-27; McKissick Decl. ¶17; Michaux Decl. ¶¶4, 23. A legislature's insistence on a rationale that defies all facts is powerful evidence that the stated reason is a pretext. Under these circumstances, the best evidence of the legislation's true purpose is its actual effect, *i.e.*, disproportionately disenfranchising Black and Latino voters. *Washington v. Davis*, 426 U.S. 229, 242 (1976); *see also id.* at 253 (Stevens, J., concurring) ("Frequently the most probative evidence of intent will be objective evidence of what actually happened."); *McCrory*, 831 F.3d at 220.[4]

---

[4] All other rationales offered by legislators were also pretextual. Lichtman Report at 20.

The credibility of legislators' assertions of non-discriminatory purpose is further strained by new evidence from files of their longtime consultant, Dr. Thomas Hofeller. The Assembly relied on Hofeller for the racially-gerrymandered district maps invalidated in *Covington* and for the partisan-gerrymandered maps a state court recently invalidated, "concluding that he had used racial statistics to shape his maps despite public claims to the contrary." Michael Weiss, *Republican Gerrymander Whiz Had Wider Influence Than Was Known*, N.Y. Times (Sept. 10, 2019), https://nyti.ms/2Motc1Y. The court in *Common Cause v. Lewis*, 18 CVS 014001 (Wake Cty. Super. Ct. Sept. 3, 2019), Judgment at 284-91, noted that legislative leaders misled the *Covington* court when they denied using Hofeller's race-based districting maps, found their denials "highly improbable," and was "troubled" by representations made by their attorneys. Newly discovered evidence suggests that "[m]ore than any other state, North Carolina was shaped politically by Mr. Hofeller," who engineered "virtually every aspect of the State Legislature's effort to promote and defend Republican control," with "[r]ace … [a] constant of Mr. Hofeller's work in the state." *Id.* While evidence is still emerging, Hofeller's use of race to craft voter ID laws appears likely. *See Secret Files*, The New Yorker, *supra*. Plaintiffs in this case have asked the *Lewis* court to release Hofeller's files publicly and also plan to request them in discovery here. Should they obtain Hofeller's files, Plaintiffs will promptly present any relevant evidence to this Court.

Floor debate revealed that SB824 was supported by the same motives that underlay HB589. Rather than disassociate themselves from that discredited law, legislators denounced the Fourth Circuit and praised the bill that violated the Constitution and the

VRA. Speaker Moore and Senate Leader Berger disparaged *McCrory* as a decision "by three partisan Democrats." Moore later stated that the decision reflected "a more liberal bent." Rep. Lewis stated in 2018 of *McCrory*: "I think (the Judge) was wrong." Lichtman Rep. at 10. Immediately following *McCrory,* Moore and Berger posted a statement asserting that they "will continue fighting to protect the integrity of our elections by implementing the commonsense requirement to show a photo ID when we vote." *Id.* Indeed, proponents of voter ID began work on the new legislation immediately after the Supreme Court denied *certiorari* in *McCrory*. Legislative leaders did not hide their continued support for HB589. Representative Warren stated that "this last voter ID we passed required reasonable photo IDs." *Id.* Prior to final passage of the constitutional amendment, Lewis stated "we think we passed a good law before." *Id*

In sum, the same legislative leaders who championed HB589 were central to the enactment of HB1092 (the voter ID constitutional amendment initiative), SB824, and the veto override (as well as North Carolina's racially gerrymandered legislative maps). The new voter ID law's legislative sponsors never asserted that SB824 had different purposes than HB589. Nor did they express an intention to address the discriminatory effects identified by the Fourth Circuit. All Republicans who voted for HB589 and remained in the Assembly in 2018 also voted for the voter ID constitutional amendment, SB824, and the veto override. Lichtman Rep. at 11-12 & tbl.1.

### 4. SB824 Will Disproportionately Deny Blacks and Latinos the Right to Vote

As the Fourth Circuit has explained, "[s]howing disproportionate impact," weighs in favor of finding discriminatory intent. *McCrory*, 831 F.3d at 231. SB824 will have the same disproportionate impact on the ability of Blacks and Latinos to vote that HB589 did.

SB824 imposes significant burdens on North Carolina voters. All voters must determine whether they possess qualifying ID under the law. *See* McKissick Decl. ¶¶32-36. Some North Carolina voters will avoid the polls because they fear they lack acceptable ID. *See* McKissick Decl. ¶¶34-36; Burden Rep. at 34-35; Lichtman Rep. at 36-37. Others will be disenfranchised because they lack qualifying ID and will be unable to obtain it. *See* McKissick Decl. ¶¶32-36; Burden Rep. at 26-29; Lichtman Rep. at 29-36. Still other voters, who lack qualifying ID, but brave a trip to the polls, will be confronted with confused poll workers, long lines, and long waits to cast reasonable impediment or provisional ballots, if they are permitted to vote at all. *See* McKissick Decl. ¶¶32-36; Burden Rep. at 22-26; Lichtman Rep. at 33-36.

### 5. SB824 Has the Same Disproportionately Negative Impact on Black and Latino Voters as HB589

HB589 "excluded many of the alternative photo IDs used by African Americans" and "retained only the kinds of IDs that white North Carolinians were more likely to possess." *McCrory*, 831 F.3d at 216. The same is true of SB824. The lists of acceptable forms of ID under SB824 and HB589 are almost identical. In 2015, at least 5.9% of all North Carolina voters lacked qualifying ID under HB589. *See* Quinn Aff. at 4-5, *filed in Holmes v. Moore*, Civ. Action No. 18 CVS 15292 (Wake County, General Court of Justice

Superior Court Division).  And Black voters were more than twice as likely as white voters to lack qualifying IDs, based on SBOE analyses of voters who could not be matched to DMV records.  Burden Rep. at 27-28.  An independent study of North Carolina from 2012-2016 looked at possession rates of unexpired driver's licenses and passports, tribal IDs, military and veteran's IDs, in-state college and university IDs, and other in-state local or state government IDs.  "Only 4.1 percent [of white people] lacked all of the included photo IDs, compared to 15.1 percent of African Americans for a disparity of 11.0 percentage points."  Lichtman Rep. at 21-22.

All available data indicates that 2019 is no different.  *See* Quinn Aff. at 4-5.  The thousands of North Carolina voters who lack qualifying ID—disproportionately Black and Latino—must obtain one or risk losing the right to vote.  And the burdens associated with attempting to get ID are significant.  *E.g.* Stuart Shapiro & Deanna Moran, *The Burden of Voter Identification Laws: The Case of North Carolina*, 42 T. Marshall L. Rev. 123, 153-54 (2017).

Moreover, early data confirms that Black and Latino voters, in fact, disproportionately lack the forms of identification needed to cast a ballot under SB824. The State's own list of voters who do not possess a North Carolina driver's license or DMV-issued photo identification card, published last month, reveals significant disparities. According to the State's "no-match list," while 4.9% of white, non-Hispanic, registered voters do not possess one of these forms of identification, 10.6% of Black registered voters and 11.1% of Hispanic registered voters lack one of them.  Exhibit 11, Herron Rep. at 21, 25.

Like HB589, SB824 excludes public assistance IDs.  The Fourth Circuit recognized that excluding public assistance IDs from the list of acceptable IDs "was 'suspect[]' because 'a reasonable legislator [would be] aware of the socioeconomic disparities endured by African Americans [and] could have surmised that African Americans would be more likely to possess this form of ID.'"  *McCrory*, 831 F.3d at 227-28 (quoting *N.C. State Conference of NAACP v. McCrory*, 182 F. Supp. 3d 320, 497 (M.D.N.C. 2016)).  Survey results showed that the gap between Black and white ID possession was cut in half when public assistance IDs were included.  *See* Lichtman Rep. at 22.  Yet the Assembly voted down an amendment to SB824 to allow public assistance IDs.  *Id.* at 101-02.

### a.  SB824's Modestly Expanded List of Acceptable IDs Does Not Ameliorate Its Discriminatory Impact or Intent

SB824 expands the list of acceptable IDs somewhat in comparison to HB589, but the new ID's will not materially affect the disproportionate burden the law imposes on Blacks and Latinos.  For example, *some* student and government employee IDs will be accepted.  But SB824 imposes such strenuous requirements on issuing institutions that these IDs are unlikely to significantly change its impact.  IDs from approximately 850 colleges, universities and government employers are eligible, but only 72 have received approval from SBOE.  *See* Burden Rep. at 22-23.  IDs from several large institutions and Historically Black Colleges and Universities have not been approved.  *Id.*

### i.  The Two "Free" Forms of Voter ID Do Not Alleviate Racially Discriminatory Impact or Intent

SB824 requires CBOEs to provide a new free voter ID to registered voters who apply in person at their offices and provide their name, date of birth, and the last four digits

of their Social Security Number. The law also allows SBOE to create additional requirements. 2018 N.C. Sess. Laws 144 §1.1.(a); Burden Rep. at 29. As with HB589, voters over age 17 may also procure a free "special identification card" from the DMV. N.C.G.S §20-37.7. The requirements for acquiring such an ID are "substantial and complex"—a voter must appear in person at a DMV office and provide (a) one document verifying age and identity, (b) one document proving a Social Security number, *and* (c) one document proving residency. Burden Rep. at 29.

Obtaining either form of "free" voter ID involves substantial time and travel costs, which are a burden to many voters. *Id.* at 29-30. In addition, gathering the documents required for the DMV-issued "free" ID will be too costly, time consuming, or difficult for many voters. *See, e.g.*, *McCrory*, 182 F. Supp. at 359-60. For others, time away from family and work to go to the DMV poses an insuperable obstacle. All of those barriers fall disproportionately on Black and Latino voters. Burden Rep. at 28-30.

"Free" voter IDs issued by CBOEs are also burdensome to obtain. CBOE offices are often difficult to reach. *Id.* Many are inaccessible by public transportation. CBOE offices are also only open during limited hours, making them functionally inaccessible to voters with work and family responsibilities. The barriers to obtaining a free CBOE ID will also fall disproportionately on Black and Latino voters. *See* Burden Rep. at 28-30; *accord* McKissick Decl. ¶33.

24

### b. The "Reasonable Impediment" Process Does Not Lessen SB824's Racially Discriminatory Impact or Intent

The reasonable impediment process does not cure the law's severe burdens on voters who lack ID. Burden Rep. at 23-26. Indeed, the Fourth Circuit addressed a voter ID law with a "reasonable impediment declaration" in *McCrory* and still found it was enacted with racially discriminatory intent and impermissibly harmed minority voters. *McCrory*, 830 F.3d at 219. SB824's approach to RIDs is no better than HB589's and will reproduce the same disparities.

SB824 makes the decision whether to accept an RID unacceptably arbitrary. *See* Burden Rep. at 23-26. With four months until early voting begins, the State has yet to adopt a form for the declaration that it could use to train CBOE officials or poll workers. Burden Rep. at 35; Exhibit 13, Fellman Decl. ¶31. Experience during the March 2016 primaries—the only elections in which photo ID was required—shows that election officials implemented HB589—including its RID process—in an arbitrary and unequal manner that led to racially-disparate voter disenfranchisement. Lichtman Rep. at 29-37. Similar problems in SB824's RID process are even more likely. No mass public education has been conducted. County "forums" on the new law, conducted by SBOE staff, have been poorly publicized, sparsely attended, and confusing. County election officials were provided a basic outline of the RID provision in July and will not have the time to train poll workers about its requirements. Exhibit 12, Patterson Decl. ¶¶10-12; Fellman Decl. ¶¶31-36.

Also, SB824 requires that the reasonable impediment form include a "prominent statement that submitting fraudulently or falsely completed declarations is a Class I felony ...." 2018 N.C. Sess. Laws 144 §1.4A. Black and Latino voters are disproportionately likely to refuse "to sign the form out of concern that they do not fully understand it and could make a mistake that would subject him or her to prosecution." Burden Rep. at 25.

### 6. SB824 Is The Quintessential Example of a Law "Unexplainable on Grounds Other Than Race"

The Assembly's purported justification of SB824 as an anti-fraud measure is so contrary to evidence that it is "unexplainable on grounds other than race" and therefore "presumptively invalid." *Rucho*, 139 S. Ct. at 2496. In *Gomillion v. Lightfoot* the Supreme Court concluded that an "uncouth twenty-eight sided" boundary line that excluded Black voters from city elections was so inexplicable that it could not be anything other than intentional race discrimination. 364 U.S. 339, 340 (1960).

SB824 is the twenty-first century version of an "uncouth twenty-eight sided" district. *Id.* As the Fourth Circuit held in the context of HB589, SB824 does not address an actual problem that has ever afflicted North Carolina elections. *McCrory*, 831 F.3d at 235-36. "[T]he State has failed to identify even a single individual who has ever been charged with committing in-person voter fraud in North Carolina." *Id.* And "the bipartisan [SBOE]" has "expressed no concern about in-person voter fraud." *Id.* Moreover, SB824 is too broad, enacting seemingly irrational restrictions unrelated to the goal of combating fraud. Minnite Rep. at 1. Notably, the law still excludes IDs disproportionately held by Blacks. *Id.* More broadly, SB824, like HB589, creates numerous needless obstacles to

26

casting a ballot and thus "elevates form over function, creating hoops through which certain citizens must jump with little discernable gain in deterrence of voter fraud." *Id.* at 236.

The *Arlington Heights* factors all support finding that SB824 was enacted with racially discriminatory intent. Accordingly Plaintiffs are likely to succeed on their Section 2 intent, Fourteenth and Fifteenth Amendment claims.

### C. SB824 Violates Section 2's Results Standard

"Congress [has] made clear that a violation of §2 c[an] be established by proof of discriminatory results alone." *Chisom v. Roemer*, 501 U.S. 380, 404 (1991); *accord LWV*, 769 F.3d at 238-39. See 52 U.S.C. §10301(a), (b). The Fourth Circuit has identified two considerations that govern vote denial claims under Section 2's "results" prong:

> (i) a challenged law "imposes a discriminatory burden," meaning that "members of [a] protected class 'have less opportunity than other members of the electorate to participate in the political process ...'"; and

> (ii) the disproportionate impact is in part "caused by or linked to 'social and historical conditions' that have or currently produce discrimination against members of the protected class."

*LWV*, 769 F.3d at 240, 245 (citations omitted). SB824's photo voter ID requirement is a textbook Section 2 violation under this standard because Blacks and Latinos disproportionately lack qualifying ID, are disproportionately burdened in their ability to obtain ID, and this disparate burden is "in part caused by or linked to social and historical

conditions that have or currently produce discrimination against members of the protected class." *Id.* at 245 (citations and internal quotation marks omitted).[5]

## 1. SB824 Will Disparately and Substantially Deny and Abridge Black and Latino Voters' Right to Vote

As explained above, *supra* § I.B.5, (1) SB824 imposes the same disproportionately negative impact on Black and Latinos as HB589, and (2) indeed increases the disproportionate burden on Blacks and Latinos in a key way by excluding learners permits from the list of eligible forms of IDs and reducing the length of time one can use an expired ID by 3 years. *See* S.L. 2018-144 Section 1.2(a). The State's own "no match" list reveals that Black voters are nearly twice as likely as white voters to lack a driver's license or state-issued photo ID—the two most prevalent forms of qualifying ID—and Latino voters are more than twice as likely. Herron Rep. at 21, 25.

## 2. The Disparate Burden of SB824 on Black and Latino Voters is Linked to the Effects of Past Discrimination

The same history of racial discrimination in voting that supports a finding of discriminatory intent, *see McCrory*, 831 F.3d at 223-27, supports finding that SB824 produces a racially discriminatory result that violates Section 2, *see Gingles v. Edmiston*, 590 F. Supp. 345, 359-61 (E.D.N.C. 1984), *aff'd.*, 478 U.S. 30 (1986). Black voters who

---

[5] The ruling in *Lee v. Virginia State Board of Elections*, 843 F.3d 592 (4th Cir. 2016) upholding Virginia's photo voter ID requirement under the "results" prong of Section 2, was founded on substantially different facts than those presented here. Among other key facts, Virginia authorized a much broader range of photo IDs, including all government IDs (such as public assistance IDs), high school student IDs, all Virginia college IDs, and all employer IDs. Virginia also made the free ID available not just at registrar's offices but at "mobile voter-ID stations located throughout Virginia" and importantly, on election day. *Id.* at 595.

have borne the historical brunt of the State's official discrimination today suffer the legacy of that discrimination, rendering them more vulnerable to the discriminatory effects of burdensome voting regulations. *See LULAC*, 548 U.S. at 440.

In North Carolina, Blacks "are disproportionately likely to move, be poor, less educated, have less access to transportation, and experience poor health." *McCrory*, 831 F.3d at 233 (internal citations omitted). The Fourth Circuit has acknowledged that "[t]hese socioeconomic disparities establish that no mere 'preference' led African Americans ... to disproportionately lack acceptable photo ID." *Id.* The same is true for Latinos.

"Numerous studies have shown that educational attainment is often the single best predictor of whether an individual votes." Burden Rep. at 15. And educational attainment at all ages differs significantly by race and ethnicity in North Carolina. *See id.*

Much like education, income and employment significantly affect voter participation. A majority of states require employers to give time off from work to vote and most of those also mandate that the employee must be paid for that time. North Carolina does neither. *Id.* at 16. North Carolina has produced significant disparities among whites and Blacks and Latinos in employment and poverty rates. *Id.* at 14-15.

Health outcomes significantly impact a person's ability to vote. Like education and employment, North Carolina has significant racial disparities in health outcomes, with Blacks and Latinos routinely faring worse than whites. *Id.*

### 3. Other Relevant Factors Confirm that the Substantial Racially Disproportionate Burdens Imposed by SB824 Violate Section 2

As explained by *LWV*, objective factors from the 1982 Senate Judiciary Committee Majority Report (the "Senate Factors") should be considered in assessing the two key elements. 769 F.3d. at 240; *see also Gingles*, 478 U.S. at 44-45; *LULAC*, 548 U.S. at 426.

#### a. Racially Polarized Voting Is Prevalent in North Carolina Elections

Four years ago, SBOE admitted in federal court that racially polarized voting continues in North Carolina to this day. Answer, *United States v. North Carolina*, No. 13-cv-861 (M.D.N.C. 2015), ECF No. 19. In *McCrory*, the trial and appellate courts recognized that "racially polarized voting between African Americans and whites remains prevalent in North Carolina." 831 F.3d at 225 (citing *McCrory*, 162 F. Supp. 3d at 429); *see Gingles v. Edmiston*, 590 F. Supp. 345, 367-72 (E.D.N.C. 1984) (finding "persistent and severe" polarization in North Carolina elections in the 1970s and 1980s), *aff'd sub nom Thornburg v. Gingles*, 378 U.S. 30 (1986). Disparities between whites and Latinos are also striking. *See* Lichtman Rep. at 47-63.

#### b. Blacks and Latinos Are Consistently Underrepresented in Public Office in North Carolina

Blacks have had little success winning public office in North Carolina—despite the State having one of the largest Black populations in the nation. Only one Black person has ever been elected to any of North Carolina's nine statewide constitutional offices or two United States Senate seats in 225-years. Burden Rep. at 18. Between 1900 and 1968, there were no Black members of the Assembly. *Id.* As recently as 1989, Blacks, who make up over 20% of North Carolina's population, comprised only 8% of the state Senate and 11%

of the House.  *Id.*  Black representation in the Assembly first began to approach the Black percentage of the statewide population in 2014.  Between 1900 and 1992, no Black person was elected to Congress.  *Id.*

Latinos have generally not been elected in North Carolina.  No Latinos serve in the Assembly, even though the State's population is now roughly 9% Latino.  Nor have any Latinos ever been elected to statewide office.  Burden Rep. at 19.

Blacks and Latinos are more likely to vote when their state legislatures have larger percentages of Black and Latino representatives.  Adding burdens to voting will disproportionately deter Blacks and Latinos from voting because the perceived benefits are not as high as they would be if minority-preferred candidates enjoyed greater electoral success.  Burden Rep. at 18-19.

### c.  The Policy Underlying SB824 Is "Tenuous" and Needlessly Impairs the Voting Rights of Blacks and Latinos

### i.  North Carolina Has No Problem with Voter Impersonation

The anti-fraud rationale for SB 824's is illusory and pretextual.  Lichtman Rep. at 105; *see supra* § I.B.3. Defendants conducted two audits of elections in North Carolina from 2000-2016 including tens of millions of votes and they found a total of *three* cases of possible voter impersonation out of more than 40 million votes cast.  Lichtman Rep. at 105-06.  And not one case has ever been prosecuted.  *See McCrory*, 182 F. Supp. 3d at 381 n.69, 441.  SBOE's 2013 and 2017 audits, presented to the Assembly, revealed voter impersonation rates of.000006% and .00004% respectively.  That  amounts to statistical

zero (*i.e.*, so infrequent that it rounds to zero), hardly justification for the voter ID law.  *See* Minnite Rep. at 1

The absence of evidence of voter impersonation at the polls is consistent with evidence from other states.  Officials defending voter ID laws in Wisconsin and Pennsylvania were unable to identify any instances of  voter impersonation, even after conducting investigations intended to do exactly that.  Lichtman Rep. at 108-10.  In Minnesota, Wisconsin, and Maryland, post-election audits undertaken because of close election results or accusations of voter fraud all failed to find a single instance of voter impersonation.  *Id.*

### ii.  SB824 Does Not Bring North Carolina's Voter ID Laws into "Conformity with Other States Voter ID Laws"

While legislators justified SB824 as bringing North Carolina into conformity with 34 other states, Lichtman Rep. at 114, SB824 is far more restrictive than the voter ID requirements in those states.  For example, many of those states do not have *photo* ID requirements, instead accepting readily available non-photo IDs such as a utility bill, bank statement, or paycheck.  Lichtman Rep. at 114-15.

SB824 falls outside the mainstream in two additional ways.  SB824 requires that most acceptable forms of ID not be expired for more than a year.  "Nearly every other state with a photo ID requirement either accepts expired IDs or have a longer grace period than one year."  Lichtman Rep. at 116.  Second, by excluding U.S. government employee IDs, U.S. government certificates of naturalization, and public assistance IDs from its list of

acceptable IDs, North Carolina "stands nearly alone" among states with a photo ID requirement.  Lichtman Rep. at 115.

### D. SB824 Cannot Be Implemented In a Manner That Satisfies the Voting Rights Act in Time for the March 2020 Elections

North Carolina cannot possibly roll out its voter ID law in the four months that remain until commencement of early voting on February 12, 2020 and three months before absentee voting begins on January 13.  The sort of rushed implementation that the State contemplates would likely violate Section 2 for additional reasons because of the impact on Black and Latino voters.  Voters have not been educated about the requirements of the voter ID law, and county officials are unprepared to administer it.  *See* McKissick Decl. ¶34; Patterson Decl. ¶¶9-12; Fellman Decl. ¶¶15, 31, 37-40.  Due to the lack of a coordinated communication campaign by state and local election officials since SB824's passage, voters lack clear guidelines on when the photo ID requirement will go into effect and what forms of ID qualify.  Fellman ¶¶12-18.  SBOE has yet to publish the official form of RID.  Burden Rep. at 35; Fellman Decl. ¶31.  Many voters have no way to know about free ID's.  CBOEs have not previously provided IDs and communication has been lacking about the locations at which IDs will be available.  Patterson Decl. ¶¶9-12.  Students are particularly vulnerable to disenfranchisement due to confusion, in large part because student ID compliance under SB824 is unsettled.  *See* Letter from Kim Westbrook Strach, March 15, 2019, https://bit.ly/2meh0Y2 (identifying only 72 of 850 institutions with approved forms of ID as of March 15, 2019); Fellman Decl. ¶¶25-26.  Post-enactment changes required due to the rushed and haphazard manner in which SB824 was originally

enacted, *see* S.L. 2019-4 (postponing effective date of Voter ID); *see also* S.L. 2019-22 (revising the requirements for College, University and employer IDs) have only deepened confusion. Fellman Decl. ¶21. Altogether, the rushed implementation timeline will cause confusion and chaos, leading to longer lines and wait times, which disproportionately impact Black and Hispanic voters, who have "fewer resources to navigate these administrative challenges and are more likely to be deterred from voting." Burden Rep. at 36. The result will be the disparate denial of Black and Latino voting rights in violation of Section 2. Because SB824 cannot be implemented in a manner that assures compliance with the VRA in time for the 2020 elections, the Court should enjoin its implementation.

## II. THE OTHER PRELIMINARY INJUNCTION FACTORS FAVOR A PRELIMINARY INJUNCTION

**Plaintiffs will be irreparably harmed absent a preliminary injunction.** The denial and abridgement of the constitutionally protected right to vote is, by definition, an irreparable injury that warrants injunctive relief. *Reynolds v. Sims,* 377 U.S. 533, 555 (1964). The deprivation of a constitutional right—including the right to vote—for any period of time constitutes irreparable injury. *See United States v. City of Cambridge*, 799 F.2d 137, 140 (4th Cir. 1986); *see also Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality opinion); *Williams v. Salerno*, 792 F.2d 323, 326 (2d Cir. 1986).

**The public interest and balance of equities tip sharply in favor of a preliminary injunction.** North Carolina has no legitimate interest in enforcing an unconstitutional law or one that violates the VRA, the public has a strong interest in exercising the right to vote, and administrative convenience cannot justify laws that impinge upon fundamental rights.

*See LWV*, 769 F.3d at 247-48; *see also Taylor v. Louisiana*, 419 U.S. 522, 535 (1975);

*Newsom ex rel. Newsom v. Albemarle Cty. Sch. Bd.*, 354 F.3d 249, 261 (4th Cir. 2003).

## CONCLUSION

This Court should preliminarily enjoin the provisions of SB824 that impose voter-identification requirements, expand the number of poll observers, and expand the grounds for ballot challenges.

Dated: October 9, 2019

Respectfully submitted,

By: */s/ Irving Joyner*
Irving Joyner
NC State Bar No. 7830
P.O. Box 374
Cary, NC 27512
Telephone: +1 919.319.8353
Email: ijoyner@nccu.edu

By: */s/ Penda D. Hair*
Penda D. Hair
DC Bar No. 335133
FORWARD JUSTICE
P.O. Box 42521
Washington D.C. 20015
Telephone: +1 202.256.1976
Email: phair@forwardjustice.org

By: */s/ John C. Ulin*
John C. Ulin
CA Bar No. 165524
James W. Cooper
Jeremy C. Karpatkin*
Andrew Tutt
ARNOLD & PORTER KAYE
SCHOLER LLP
601 Massachusetts Ave., NW
Washington, DC 20001-3743
Telephone: +1 213.243.4228
Email: John.Ulin@arnoldporter.com

Caitlin A. Swain
VA Bar No. 84515
FORWARD JUSTICE
400 W Main Street, Suite 203
Durham, NC 27701
Telephone: +1 919.323.3889
Email: daryl@forwardjustice.org
           cswain@forwardjustice.org

* *Pro hac vice* motion forthcoming

*Counsel for Plaintiffs*

## CERTIFICATE OF WORD COUNT

Pursuant to Local Rule 7.3(d)(1), the undersigned counsel hereby certifies that the foregoing Memorandum, including body, headings, and footnotes is a total of 8,708 words.

/s/ John C. Ulin
John C. Ulin
Attorney for Plaintiffs

## CERTIFICATE OF SERVICE

I hereby certify that on this date I electronically filed the foregoing **AMENDED MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** with the clerk of Court using the CM/ECF system which will send notification of such to all counsel of record in this matter.

Dated: October 9, 2019

*/s/ John C. Ulin*
John C. Ulin
Attorney for Plaintiffs
