# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
### CIVIL ACTION NO. 1:18-cv-01034

| | | |
|---|---|---|
| NORTH CAROLINA STATE CONFERENCE OF THE NAACP, et al. | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | **DEFENDANTS' RESPONSE IN** |
| | ) | **OPPOSITION TO PLAINTIFFS'** |
| ROY ASBERRY COOPER III, in his official capacity as the Governor of North Carolina; et al. | ) ) ) | **MOTION FOR PRELIMINARY INJUNCTION** |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

## INDEX

INTRODUCTION .................................................................................................... 1

STATEMENT OF FACTS ...................................................................................... 3

     A.    Constitutional Amendment ................................................................. 3

     B.    SB824's Provisions ............................................................................ 4

     C.    Critical Differences from the Prior Voter ID Law ............................ 7

LEGAL STANDARD ........................................................................................... 10

ARGUMENT ......................................................................................................... 11

I.     PLAINTIFFS ARE NOT LIKELY TO SUCCEED ON THE MERITS. .............. 12

     A.    Plaintiffs' Discriminatory Intent Claim Likely Fails. ..................... 12

           1.    Historical Background ........................................................... 12

           2.    Sequence of Events ............................................................... 13

           3.    Departures from normal procedural sequence ...................... 16

           4.    The legislative history of the decision ................................. 22

           5.    Any racially disproportionate impact .................................... 24

                  *i.*    *Any impact is minimized by the law's ameliorative provisions.* ........................................... 24

                  *ii.*    *Controlling precedent holds that similar laws do not impose discriminatory impacts.* ........................... 26

                  *iii.*    *McCrory is distinguishable in many ways.* ............... 29

     B.    Plaintiffs' Disparate Results Claim Likely Fails. ............................ 32

     C.    SBOE Is Implementing SB824 in an Appropriate Manner to Inform the Public, Avoid Voter Confusion, and Ensure Even Application. ....................................................................................... 33

        D.     Plaintiffs Offer no Merits Argument for a Constitutional Violation. ........................................................................................ 35

II.    THE PUBLIC INTEREST, HARM ANALYSIS, AND EQUITIES WEIGH AGAINST AN INJUNCTION. ............................................................................. 36

CONCLUSION ................................................................................................................ 38

CERTIFICATE OF WORD COUNT ............................................................................. 39

CERTIFICATE OF SERVICE ........................................................................................ 40

# TABLE OF CASES AND AUTHORITIES

**Cases:**                                                                                           **Page(s)**

*Abbott v. Perez*, 138 S. Ct. 2305 (2018) ............................................................................. 12

*Anderson v. Celebrezze*, 460 U.S. 780 (1983) .................................................................... 35

*Burdick v. Takushi*, 504 U.S. 428 (1992) .......................................................................... 35

*Covington v. North Carolina*, 316 F.R.D. 117 (M.D.N.C. 2016),
    *aff'd* 137 S. Ct. 2211 (2017) ........................................................................................ 12

*Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181 (2008).............................. 2, 7, 14, 27

*Frank v. Walker*, 768 F.3d 744 (7th Cir. 2014) .................................................................. 28

*Greater Birmingham Ministries v. Merrill*, 284 F. Supp. 3d 1253 (N.D. Ala. 2018) ....... 29

*Harris v. McCrory*, 159 F. Supp. 3d 600 (M.D.N.C. 2016),
    *aff'd* 137 S. Ct. 1455 (2017) ........................................................................................ 12

*Hunter v. Underwood*, 471 U.S. 222 (1985) ...................................................................... 12

*Lee v. Va. State Bd. of Elections*, 843 F.3d 592 (4th Cir. 2016).................................. Passim

*N.C. State Conf. of NAACP v. McCrory*, 831 F.3d 204 (4th Cir. 2016).................... Passim

*New Motor Vehicle Bd. v. Orrin W. Fox Co.*, 434 U.S. 1345 (1977)........................... 36, 37

*Real Truth About Obama, Inc.* v. *F.E.C.*, 575 F.3d 342 (4th Cir. 2010),
    *vacated on other grounds*, 559 U.S. 1089 (2010).................................................... 11, 36

*South Carolina v. United States*, 898 F. Supp. 2d................................................ 15, 28, 29

*Veasey v. Abbott*, 830 F.3d 216 (5th Cir. 2016) ................................................................ 18

*Veasey v. Abbott*, 888 F.3d 792 (5th Cir. 2018) ................................................................ 28

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252 (1977)....... 12, 13, 17

*W. Pocahontas Props. Ltd. P'ship*, 918 F.3d 353 (4th Cir. 2019) ................................... 10

*Winter v. NRDC, Inc.*, 555 U.S. 7 (2008) ....................................................................... 11

**Statutes & Regulations:**

42 U.S.C. § 15483 ............................................................................................................ 2

08 N.C. Admin. Code 17.0101(b) ............................................................................ 9, 26

08 N.C. Admin. Code 17.0107(a) ................................................................................. 27

08 N.C. Admin. Code 17.0109 ..................................................................................... 10

S.C. Code Ann. § 7-5-675 ............................................................................................ 15

S.C. Code Ann. § 7-13-710 .......................................................................................... 16

S.C. Code Ann. § 7-13-710(E) ..................................................................................... 15

S.C. Code Ann. § 7-13-710(D)(1)(b) ........................................................................... 16

**Constitutional Amendments:**

N.C. Const., Art. II ....................................................................................................... 16

N.C. Const., Art. II. §§ 9, 11, 22(1) ............................................................................. 21

N.C. Const., Art. II, § 21 ............................................................................................. 16

N.C. Const., Art. II, § 22(1) ......................................................................................... 17

N.C. Const., Art. II, § 22(1)-(6) ................................................................................... 17

N.C. Const., Art. II, § 23 ............................................................................................. 16

N.C. Const., Art. VI, §§ 2(4), 3(2) ............................................................................ 2, 4

**Other Authorities:**

House Bill 351 ....................................................................................................................... 14

House Bill 589 ................................................................................................................ 8, 9, 13

House Bill 1092 ................................................................................................................. 3

Senate Bill 824 ........................................................................................................... Passim

UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
CIVIL ACTION NO. 1:18-cv-01034

| | | |
|---|---|---|
| NORTH CAROLINA STATE CONFERENCE OF THE NAACP, et al. | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | |
| ROY ASBERRY COOPER III, in his official capacity as the Governor of North Carolina; et al. | ) ) ) ) | **DEFENDANTS' RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** |
| Defendants. | ) ) | |
| _____ | ) | |

Defendants Damon Circosta, Stella E. Anderson, David C. Black, Ken Raymond, and Jefferson Carmon III, in their official capacities as members of the North Carolina State Board of Elections ("SBOE"), oppose Plaintiffs' motion for a preliminary injunction prohibiting enforcement of NC Session Law 2018-144, or Senate Bill 824 ("SB824"), as amended by Session Laws 2019-4 and 2019-22.[1] **Exhibits 1-3.**

Plaintiffs have failed to show that they are likely to succeed in proving that SB824 was enacted with discriminatory intent, or in a manner that disproportionately burdens minority voters. The Court should deny Plaintiffs' motion.

## INTRODUCTION

States' interests in "deterring and detecting voter fraud[,]" in pursuit of election modernization, and "in safeguarding voter confidence" expressed through photographic

---

[1] To simplify otherwise lengthy citations, this brief cites to the law under challenge by citing to SB824.

voter ID statutes are "unquestionably relevant to the State's interest in protecting the integrity and reliability of the electoral process." *Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181, 191 (2008) (plurality op.). At the federal level, the Help America Vote Act ("HAVA"), 42 U.S.C. § 15483, requires identification for certain voters, and "Congress believes that photo identification is one effective method of establishing a voter's qualification to vote[.]" *Id.* at 193. At the state level, "States employ different methods of identifying eligible voters at the polls . . . ; and in recent years an increasing number of States have relied primarily on photo identification." *Id.* at 197.

In keeping with these aims, the NC Constitution now requires that "voters offering to vote in person shall present photographic identification before voting," and mandates the General Assembly to "enact general laws governing the requirements" of this constitutional provision, "which may include exceptions." N.C. Const., Art. VI, §§ 2(4), 3(2). Accordingly, the General Assembly enacted a statute implementing this constitutional command which contains exceptions and accommodations designed to ensure that "all registered voters will be allowed to vote with or without a photo ID card." SB824, sec. 1.5.(a)(10). Because SB824 does not deny, abridge, or significantly burden any voter's right to vote, Plaintiffs' motion for a preliminary injunction should be denied; they have shown no likelihood of success on the merits.

The equities also disfavor the issuance of a preliminary injunction at this critical stage of SB824's implementation. An injunction would interfere with SBOE's outreach to voters who may lack IDs; halt the education of voters, local boards of elections, and

2

pollworkers; prevent the issuance of free voter IDs; and halt the implementation of all the other features of SB824 that have been crafted to help voters comply with the law. Further, an injunction would contravene the will of NC voters, who ratified the constitutional requirement for voter ID in the 2018 statewide election.

## STATEMENT OF FACTS

A.    <u>Constitutional Amendment</u>

In June 2018, the General Assembly approved the placement of six constitutional amendments on the November 2018 general election ballot, one of which called for imposing a requirement to show photo identification when voting in person. 2018 N.C. Sess. Laws 128, House Bill 1092 ("HB1092"). **Exhibit 4**. There was a robust public debate on these amendments, including a widely publicized campaign by the amendments' opponents commonly referred to as "Nix All Six."[2] **Exhibit 5**, Ford T p 57. On November 8, 2018, two constitutional amendments were defeated at the polls, and four were approved by the voters. **Exhibit 6**. The photo ID constitutional amendment passed with 55% of the electorate voting in favor of the measure. **Exhibit 7**.

Pursuant to this referendum, the Constitution of NC was amended by adding two new subsections to read:

> Voters offering to vote in person shall present photographic
> identification before voting. The General Assembly *shall enact*
> general laws governing the requirements of such photographic

---

[2] Melissa Boughton, N.C. Policy Watch, "Faith leaders call for congregations to 'nix all six' constitutional amendments," Nov. 1, 2018, http://pulse.ncpolicywatch.org/2018/11/01/faith-leaders-call-for-congregations-to-nix-all-six-constitutional-amendments/ (retrieved on October 28, 2019)

identification, which may include exceptions.

N.C. Const., Art. VI §§ 2(4), 3(2) (emphasis added). Accordingly, in December 2018, the General Assembly enacted SB824, which is the implementing legislation that requires voter ID for in-person voting, with exceptions.

      B.      <u>SB824's Provisions</u>

In broad terms, SB824 identifies the categories of photo IDs permitted for in-person and absentee voting, authorizes the issuance of free photo IDs, provides a number of exceptions to the photo ID requirement, mandates that SBOE engage in a variety of voter outreach and other implementation activities, and, funds the statute's implementation.

Under SB824, a voter may vote, in-person or by absentee ballot, if he or she presents one of the following IDs:

- NC driver's license
- NC nonoperator's ID
- Passport
- NC voter ID
- Tribal ID
- Approved Student ID issued by private and public colleges, universities and community colleges
- Approved State, local government, and charter school employee ID
- Driver's license and nonoperator's ID issued by another state, for newly registered voters
- Military ID
- Veterans ID

SB824, sec. 1.2(a), § 163A-1145.1(a). Military, veterans, and tribal IDs may be presented even if the card has no expiration or issuance date. *Id.* § 163A-1145.1(a)(2). Moreover, if a voter is sixty-five years old or older, an expired ID is accepted as long as it was unexpired on the voter's sixty-fifth birthday. *Id.* § 163A-1145.1(a)(3). The remaining IDs may be

4

presented if they are unexpired or have been expired for one year or less.

The number of approved student and employer IDs under SB824 continues to increase. **Exhibit 8** (Bell Aff. ¶¶ 29–33.) Under SB824's original text, a limited number of educational institutions and government agencies had their IDs approved under fairly rigorous requirements. (*Id.* ¶ 30 & Ex. P.) On June 3, 2019, the legislature amended the law to make this approval process less stringent. N.C. Sess. Law 2019-22. Academic institutions and public employers that either did not apply before, or had their IDs rejected, may now apply for their IDs to be approved for use in voting. (*Id.* **Exhibit 8** Bell Aff. ¶¶ 32–33.)

SB824 also authorizes and funds the issuance of free voter IDs through two mechanisms. First, SB824 requires the county boards of elections to "issue without charge voter photo identification cards upon request to registered voters." SB824, sec. 1.1.(a). A voter need not present any documentation to obtain a voter ID from a county board. The voter must merely provide his or her name, date of birth, and the last four digits of the voter's social security number. *See id.* § 163A-869.1(d)(1). SB824 funds that mandate. *Id.*, sec. 4.(b).

Second, SB824 enables all eligible individuals over the age of 17 to receive a free NC non-operator ID card that can be used for voting. *Id.*, sec. 1.3.(a). The State must also provide the documents necessary to obtain a DMV ID, free of charge, if the voter does not have a copy of those documents. *Id.* § 161-10(a)(8). SB824 serves to fund the expenses related to this form of free ID as well. *Id.*, sec. 4.(a).

5

In addition to authorizing multiple forms of photo IDs and mandating free IDs, SB824 is designed to accommodate all registered voters. The law contains several provisions that ameliorate any burden the law could otherwise impose on voters who lack photo IDs.

SB824 exempts eligible voters from the photo ID requirement under three circumstances. No photo ID is required when a voter:

- Is a victim of natural disaster;

- Has religious objections to being photographed; or,

- Has a reasonable impediment that prevents a voter from presenting a photo ID. Reasonable impediments include: the inability to obtain photo identification due to lack of transportation, disability or illness, lack of birth certificate or other underlying documents required, work schedule, or family responsibilities; lost or stolen photo identification; photo identification applied for but not yet received; or, any "other" reasonable impediment.

SB824, sec. 1.2.(a), § 163A-1145.1(d). The reasonable impediment provision dramatically expands the universe of available exceptions. Given the broad availability of exceptions, the National Conference of State Legislatures categorizes SB824 as a "non-strict, non-photo ID" law, which places the law in a category that is less strict than the laws of 19 other states. Wendy Underhill, Nat'l Conf. of State Legis., "Voter Identification Requirements," Jan. 17, 2019, http://www.ncsl.org/research/elections-and-campaigns/voter-id.aspx (last visited Oct. 28, 2019).

6

Even though the reasonable impediment exception accommodates nearly all conceivable voters who may lack a photo ID, SB824 alternatively allows a registered voter without an acceptable form of photo ID to cast a provisional ballot and later return to the county board to bring an acceptable form of ID no later than the day before the canvass, which occurs ten days after the election. SB824, sec. 1.2.(a), § 163A-1145.1(c). SBOE is required to provide a provisional ballot voter with an information sheet on the deadline to return to the county board. *Id.*

In keeping with these ameliorative provisions, the law instructs SBOE to inform voters, through education materials that are distributed to voters and on posters at early voting sites and precinct polling locations on election day, that "[a]ll registered voters will be allowed to vote with or without a photo ID card." SB824, sec. 1.5(a).(10).

SB824 further requires SBOE to conduct "an aggressive voter education program concerning the provisions" of the law. *Id.*, sec. 1.5. This program includes offering at least two public seminars in each county to educate voters of the requirements of the law; mailing a notification of the law's requirements to all voters who do not have a DMV-issued ID; mailing a notification of the voter ID requirement to all residences in NC twice before the 2020 primary, and twice again before the 2020 general election; and conducting trainings of county boards and precinct officials to ensure uniform implementation. *Id.*, sec. 1.5.(a).

C.     Critical Differences from the Prior Voter ID Law

Plaintiffs spend much of their brief seeking to draw parallels between SB824 and a

7

prior law that included a different voter ID requirement, N.C. Sess. Law 2013-381, *as amended by* N.C. Sess. Law 2015-103 ("HB589"). **Exhibit 9**. The Fourth Circuit invalided that law, finding that it intentionally discriminated against black voters. *N.C. State Conf. of NAACP v. McCrory*, 831 F.3d 204, 233 (4th Cir. 2016). However, there are important distinctions between these two laws.

First, under the prior law, county boards did not issue free IDs, and before obtaining a free ID from the DMV, a voter had to fill out a form declaring that he or she was registered to vote but had no other valid ID. Moreover, the DMV had to confirm voter registration. HB589, sec. 3.1.

Second, the prior law was amended just weeks before the trial challenging its constitutionality to add a reasonable impediment exception. *McCrory*, 831 F.3d at 219; *see* **Exhibit 9 -** N.C. Sess. Laws 2015-103, sec. 8.(d). The prior law's reasonable impediment exception allowed a ballot to be counted only if the voter produced some form of ID, by either: (1) presenting photo ID by noon of the day prior to the election canvass; or (2) presenting a voter registration card, a current utility bill, bank statement, government check, paycheck, or other government document showing name and address, or providing the last four digits of the voter's social security number and date of birth. N.C. Sess. Law 2015-103, sec. 8.(e). The law also permitted any county voter to challenge another voter's reasonable impediment. *Id.* § 163-182.1B(b). It further permitted a county board to reject a reasonable impediment ballot if there existed grounds to believe the person's reasonable impediment affidavit was false, but also for such undefined and vague reasons as the

8

affidavit was "nonsensical" or "merely denigrated" the voter ID requirement. *Id.* § 163-182.1B(a)(1), **Exhibit 10**, Strach T pp. 50-51, 55. The board could reject such a ballot on a simple majority (*i.e.*, party-line) vote. (**Exhibit 8,** Bell Aff. Ex. B at 29.)[3]

In contrast, from its inception, SB824 contained a much broader reasonable exception provision. **Exhibit 11**. After the voter submits a reasonable impediment form at the polls, no additional documentation is required. A reasonable impediment ballot "shall" be counted "unless the county board has grounds to believe the [reasonable impediment form] is false," and for no other reason. SB824, sec. 1.2.(a), § 163A-1145.1(e). To reject a ballot on these grounds, the five-member, bipartisan county board must vote unanimously. 08 N.C. Admin. Code 17.0101(b); **Exhibit 8** Bell Aff. ¶ 9 & Ex. A at 21. Further, no voter challenges are permitted for reasonable impediment ballots.

Third, the new law expands the types of IDs that are acceptable for voting. The prior law, for example, did not permit the use of student or government employee IDs. *See* HB589, sec. 2.1. It also did not provide the one-year grace period for expired IDs. *See id.*

Fourth, and perhaps most importantly, unlike the prior law, SB824 is not an "omnibus" election law that may be condemned as discriminatory due to a "panoply" of tools used to target African Americans' preferred voting practices with "surgical precision." *McCrory*, 831 F.3d at 215, 231. Instead, SB824 is focused on implementing

---

[3] Even under that more stringent reasonable impediment requirement, only a small number of submitted ballots were not counted in the one election conducted under the prior law. Additionally, the record does not show that the ballots that were not counted were cast by eligible voters. **Exhibit 10**, Strach T pp 52-55.

the voter ID requirement of the state constitution. Unlike the prior law, SB824 does not curtail early voting, or eliminate same-day registration, out-of-precinct voting, and preregistration, which are disproportionately used by minority voters. *See id.* at 219.

Fifth, there is no evidence that the General Assembly requested and used racial data in SB824's enactment process. Before enacting the prior law, "the legislature requested and received racial data as to usage of the practices changed by the proposed law." *Id.* at 216. With respect to the prior law, "with race data in hand, the legislature amended the bill to exclude many of the alternative photo IDs used by African Americans." *Id.*

Sixth, SB824's photo ID requirement extends to absentee voters. The Fourth Circuit found that the racial data considered by the legislature in 2013 "revealed that African Americans did not disproportionately use absentee voting; whites did. [The prior law] drastically restricted all of these other forms of access to the franchise, but exempted absentee voting from the photo ID requirement." *Id.* at 230. In contrast, SB824 requires absentee voters to present similar types of photo IDs or to execute the same reasonable impediment declaration as in-person voters. SB824, secs. 1.2.(d), (e); 08 N.C. Admin. Code 17.0109.

In sum, the differences between SB824 and the prior law are considerable.

## LEGAL STANDARD

"A preliminary injunction is 'an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief' and may never be awarded 'as of right.'" *Mt. Valley Pipeline, LLC v. W. Pocahontas Props. Ltd. P'ship*, 918 F.3d 353,

366 (4th Cir. 2019) (citing *Winter v. NRDC, Inc.*, 555 U.S. 7 at 22, 24 (2008)).  The test

for the issuance of a preliminary injunction turns on the balance of the four *Winter* factors:

likelihood of success on the merits; irreparable harm in the absence of an injunction;

equities to the parties; and, the public interest.

Plaintiffs have the burden of proof on each factor.  *Winter*, 555 U.S. at 20.

Additionally, a plaintiff must show that success on the merits is likely "regardless of

whether the balance of hardships weighs in his favor." *The Real Truth About Obama, Inc.*

v. *F.E.C.,* 575 F.3d 342, 346 (4th Cir. 2010), *vacated on other grounds*, 559 U.S. 1089

(2010).   This burden requires more than simply showing that "grave or serious questions

are presented."  *Id*. at 347.

## ARGUMENT

This lawsuit does not challenge NC's photo ID constitutional amendment; and the

State has a legitimate interest in implementing that constitutional mandate under *Crawford*.

This Court must determine whether, in carrying out the will of the voters, the General

Assembly crafted a law that discriminates against black and Hispanic voters in violation of

the Voting Rights Act (VRA) or the Constitution of the United States.  More specifically,

this Court must evaluate whether the substance of SB824, including its exceptions, and the

circumstances surrounding its enactment likely prove discriminatory intent.  Further, the

Court must determine whether the law likely denies or abridges the right to vote on the

basis of race.  On both measures, the answer is no.

11

## I.    PLAINTIFFS ARE NOT LIKELY TO SUCCEED ON THE MERITS.

### A.    Plaintiffs' Discriminatory Intent Claim Likely Fails.

Discriminatory intent must be apparent from all "circumstantial and direct evidence of intent as may be available." *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266 (1977). This analysis ordinarily involves a review of a nonexhaustive list of factors, including "[t]he historical background" of the law; "[t]he specific sequence of events leading up to" the law's enactment; "[d]epartures from normal procedural sequence"; the legislative history of the decision; and, the racially disproportionate "impact of the official action." *Id.* at 266–67.

"Whenever a challenger claims that a state law was enacted with discriminatory intent, the burden of proof lies with the challenger, not the State." *Abbott v. Perez*, 138 S. Ct. 2305, 2324 (2018). Only when "racial discrimination is shown to have been a 'substantial' or 'motivating' factor behind enactment of the law, the burden shifts to the law's defenders to demonstrate that the law would have been enacted without this factor." *Hunter v. Underwood*, 471 U.S. 222, 228 (1985).

### 1.    Historical Background

"Unquestionably, North Carolina has a long history of race discrimination generally and race-based vote suppression in particular." *McCrory*, 831 F.3d at 223. That history contains "shameful" chapters related to race. *Id.* Additionally, courts in the past decade have concluded that considerations of race have predominated in North Carolina's redistricting process. *Harris v. McCrory*, 159 F. Supp. 3d 600 (M.D.N.C. 2016), *aff'd* 137

12

S. Ct. 1455 (2017); *Covington v. North Carolina*, 316 F.R.D. 117 (M.D.N.C. 2016), *aff'd* 137 S. Ct. 2211 (2017).

Defendants do not dispute the Fourth Circuit's recounting in *McCrory* of North Carolina's history of race-based discrimination. But importantly, here, Plaintiffs fail to show that this history of past discrimination infects the enactment of SB824. The composition of the General Assembly that enacted the law was different from the body that enacted HB589, the legislature expressed its commitment to passing the kind of photo ID law that survives judicial scrutiny, SB824 garnered bipartisan support, and the law now contains provisions for free IDs and accommodations for voters without IDs that it did not contain in the past. *See infra* pp. 14–15; **Exhibit 12** Lichtman T pp 60-63. Even taking the State's history of discrimination into account, the remaining factors of the *Arlington Heights* analysis suggest that SB824 does not carry forward that troubling history.

### 2. Sequence of Events

The Supreme Court in *Arlington Heights* described how a specific sequence of events may shed a light on a discriminatory purpose. The plaintiffs in *Arlington Heights* challenged a village's denial of a request to rezone certain land to permit the construction of multiple-family, racially integrated housing. The Court reasoned that "if the property involved here always had been zoned [multiple-family] but suddenly was changed to [single-family] when the town learned of MHDC's plans to erect integrated housing," such change would raise suspicions of discriminatory intent. *Arlington Heights*, 429 U.S. at 267.

There are no similar suspicious changes in legislative policy preferences leading to the enactment of SB824. While photographic voter ID is the subject of national debate, see **Exhibit 13** pp ii-iii, the trend throughout the United States has been towards adoption of photo ID requirements for voting. **Exhibit 14** pp 1, 3 (as of January 2019, a total of 35 states had laws requiring voters to show some form of ID, and 17 of those states had a photographic ID requirement); *see also Crawford*, 553 U.S. at 197.

In 2011, Democratic Governor Bev Perdue vetoed House Bill 351, NC's first bill passed by the legislature that required a government-issued photo ID in order to vote in person.[4] The General Assembly failed to override that veto, but it has since sought to implement a photo ID law. While the previous efforts failed—one due to the State's internal political processes, and the other because the General Assembly requested and used racial data to effectuate its preferred policy—the legislative preference to implement a voter ID law has been consistent for a number of years leading up to SB824.

Moreover, neither the VRA nor the Constitution requires states to wait for the specific type of fraud the law seeks to address to impact an election before enacting voter ID legislation. States are justified in preventing voter fraud and preserving voter confidence in elections, even when "there was limited evidence of voter fraud." *Lee v. Va. State Bd. of Elections*, 843 F.3d 592, 606 n.* (4th Cir. 2016).[5]

---

[4] https://www.ncleg.gov/Sessions/2011/h351Veto/govsig.pdf.

[5] In *Lee*, the Fourth Circuit cited some individual examples of fraud that supported the state's justifications in addressing fraud and voter confidence. *Lee*, 843 F.3d at 606 n.*. Similarly, North Carolina was subject to "fraud, impropriety and irregularities" in the 2018

14

In SB824, the legislature largely sought to emulate South Carolina's photographic voter ID law, which has survived judicial scrutiny and has been described as lenient. **Exhibit 15,** T(11/26/18) p 52, T(11/28/18) pp 4, 5. The stated purposes of both laws are similar: South Carolina seeks "to confirm the person presenting himself to vote is the elector on the poll list[,]" S.C. Code Ann. § 7-13-710(E), while SB824 seeks "to confirm the person presenting to vote is the registered voter on the voter registration records[,]" SB824, sec. 1.2.(a). Those articulated state interests are clear and undeniable after *Crawford*. However, because of its legislative history, SB824 is also intended "to implement the constitutional amendment requiring photographic identification to vote." SB824, Title. NC's express goal of enacting a constitutionally mandated voter ID statute, in a manner that meets judicial scrutiny after *McCrory*, is a legitimate state interest that is borne by the legislative record. Contrary to Plaintiffs' suggestion regarding efforts to avoid judicial intervention against the law, DE 91 at 6, 17; **Exhibit 12** Lichtman T pp 71-80), a legislature *should* strive to enact legislation that abides by legal precedent.

SB824 compares favorably to South Carolina's in substance, as well. Both states have enabled the issuance of free voter IDs at county boards of elections, and DMV offices. *See South Carolina v. United States*, 898 F. Supp. 2d 30, 32 (D.D.C. 2012); S.C. Code Ann. § 7-5-675; SB824, secs. 1.1.(a), 1.3.(a). Likewise, the reasonable impediment provision of both laws is nearly identical, and both require that reasonable impediment

---

General Election for the 9th Congressional District. **Exhibit 16**. SB824's voter identification requirement for absentee voters addresses this type of fraud and should boost public confidence in the State's efforts to root out election fraud.

ballots be counted unless a county board determines that there are grounds to believe the form is false. S.C. Code Ann. § 7-13-710(D)(1)(b); SB824, sec. 1.2.(a), § 163A-1145.1(e). The National Conference of State Legislatures categorizes SB824 and South Carolina's laws as among the most lenient voter ID laws in the country, due in large part to the similar reasonable impediment laws in those states. *See* **Exhibit 14** p. 4 n.5. In fact, SB824 is less burdensome than the South Carolina law after which it was patterned, because SB824 has a more expansive list of permissible photo IDs, including government employee IDs, tribal IDs, VA IDs, and university and community college student and employee IDs. *Compare* SB824, sec. 1.2.(a), *with* S.C. Code Ann. § 7-13-710; DE 76-3 at 6. In summary, SB824 was patterned after South Carolina's law that has withstood scrutiny following a sequence of legislative events that does not support a finding of discriminatory intent.

### 3. Departures from normal procedural sequence

The process of SB824's enactment complied with constitutional and parliamentary requirements. **Exhibit 17** (Goldsmith Aff. ¶ 35). In NC, in order to become law, a bill must comply with the following procedural and form requirements contained in the Constitution:

- It must pass three separate readings in each chamber. N.C. Const., Art. II, §§ (1)-(6). The only constitutional requirement that regulates the speed with which the General Assembly may enact legislation relates to revenue bills. N.C. Const., Art. II, § 23.

- The bill must contain the following phrase "The General Assembly of North

Carolina enacts:" . N.C. Const., Art. II, § 21.

- The bill must be signed by the presiding officers of each chamber. N.C. Const., Art. II, § 22(1)-(6))

- Most public bills must be submitted to the Governor for approval or veto. (N.C. Const., Sec. 22(1) and (7)). If the Governor vetoes the bill, it still becomes law if three-fifth of the members in each chamber agree to pass the bill by "veto override." N.C. Const., Art. II, § 22(1).

(**Exhibit 17** Goldsmith Aff. ¶¶ 7-33).

A facial review of SB824 demonstrates that its enactment met all applicable procedural constitutional requirements. The first page contains the phrase "The General Assembly of North Carolina enacts:". The last page reflects that the bill was duly ratified on December 6, 2018, and that the bill became law over the objections of the Governor on December 19, 2018. **Exhibits 17**(Goldsmith Aff. ¶ 7); **17-A.**

Courts additionally review whether, in the totality of the circumstances, any drastic departures from the normal procedural sequence of events leading to enactment of a statute suggest racially discriminatory intent. *Arlington Heights*, 429 U.S. at 267. Although Plaintiffs complain of "numerous procedural irregularities[,]" they point only to a "rushed process" and their desire to have more hearings and speakers at those hearings. DE 91 at 26. That does not establish drastic procedural deviations.

The Fifth Circuit's analysis of this factor in a voter ID case is instructive. There, the Texas legislature "subjected [the voter ID bill] to radical departures from normal

procedures[,]" which included at least 7 detailed "unprecedented" variations from the normal legislative process that included suspension of two-thirds rule on the number of votes required, passing the law without a verified fiscal note contrary to prohibition on doing so due to a $27 million budget shortfall; and other drastic variations from normal procedure. *Veasey v. Abbott*, 830 F.3d 216, 237-38 (5th Cir. 2016).

Likewise, *McCrory* emphasized the many procedural abnormalities of the prior voter ID law's enactment process:

- That a much more modest voter ID bill just "sat" for a prolonged period of time: "[f]or the next two months, no public debates were had, no public amendments made, and no action taken on the bill" until *Shelby* was decided;

- That the prior law's size inexplicably swelled from 16 to 54 pages right after *Shelby* decision;

- That the day after *Shelby*, the Chairman of the Senate Rules Committee announced that the General Assembly would now pass an "omnibus" election bill;

- That this new "omnibus" bill was "rushed" through the legislature with "one day for a public hearing, two days in the Senate, and two hours in the House;"

- That "[t]he House voted on concurrence in the Senate's version, rather than sending the bill to a committee[;]"

- That "the House had no opportunity to offer its own amendments before the up-or-down vote on the legislation;" and,

18

- That the "vote proceeded on strict party lines."

831 F.3d at 227–28. Collectively, these factors constituted indicia of abnormality.

The procedural enactment of SB824 does not lead to such a conclusion. Instead, the procedure was consistent with the normal legislative process:

- On November 6, 2018, North Carolinians approved the Constitutional Amendment that requires photographic ID for in-person voting. **Exhibit 7**;

- On November 26, 2018, SB824 was debated in the Joint Legislative Oversight Committee;

- The transcript of the debate reveals that "a draft of implementing legislation [] was released to Members early last week." **Exhibit 15,** T(11/26/18) p 2; **Exhibit 5,** T p 68 ("Drafts were circulated with plenty of time ['several days, if not a week, before the legislation came before a vote on the floor '] "for legislators to review and consider them");

- On November 27, 2018, SB824 was filed in the North Carolina Senate with bipartisan sponsorship. **Exhibit 11**;

- After filing, SB824 received its first reading and was referred to the Select Committee on Elections with a re-referral to the Rules and Operations of the Senate;

- SB824 received a favorable report from the Select Committee on Elections and the bill was re-referred to the Rules and Operations of the Senate Committee;

19

- On November 28, SB824 received a favorable report from the Rules and Operations of the Senate Committee. SB824 was placed on the calendar and debated. Eleven amendments were offered: six were adopted, four were tabled, and one was withdrawn. The amended bill passed second reading;

- On November 29, SB824 passed third reading in the Senate, the amendments were ordered engrossed and the bill was sent to the House;

- The House received SB824 November 29. It was read the first time and was referred to the Committee on Elections and Ethics Law;

- On December 4, two committee substitutes were submitted and referred to the Committee on Elections and Ethics Law, and then placed on the calendar for December 5, 2018;

- On December 5, the House took up SB824. Twelve amendments were offered. Seven were adopted, one was withdrawn, and five failed. The bill, as amended, passed its second and third reading, the amendments were ordered engrossed and it was sent to the Senate for concurrence; and,

- On December 6, the Senate took up SB824 for concurrence. The motion to concur passed, and the bill was ordered enrolled, and ratified by both chambers.

**Exhibits 17, 17-B**. Public stakeholders, both those in favor and opposing SB824, were allowed to sign up and speak during the hearings. Representatives supporting and opposing SB824 were likewise permitted to voice their opinions. **Exhibit 15**, T(11/26/18),

20

T(11/28/18), T(12/3/18), T(12/5/18) pp 45-171, T(12/6/18).

In summary, between November 26, 2018 and December 6, 2018, SB824 received several committee referrals, was publicly debated, was amended multiple times in each legislative chamber, passed through the process of three required readings in each chamber, and was ratified. It was then presented to the Governor and was vetoed on December 2018. On December 19, the General Assembly overrode the Governor's veto. **Exhibits 17, 17-A, 17-B**.

Plaintiffs suggest that the debate was not long enough and was limited. DE 91 at 26. However, the a Democratic co-sponsor of SB824, former Senator Joel Ford, testified that the limitation on the length of the debate was due to a "Democratic senate caucus strategy" to limit debate in order to prepare for a legal challenge of SB824. **Exhibit 5**, T pp 18, 69–71. And the pace of SB824's enactment was neither a departure from any constitutional or parliamentary rules, nor "unprecedented." **Exhibit 17** (Goldsmith Aff ¶35); DE 76-4 at 13–14.

Plaintiffs also argue that the mere fact that SB824 was passed, and the Governor's veto was overridden, during the lame-duck session suggests discrimination. DE 91 at 26. Yet, the General Assembly's legislative action during a lame-duck session is neither prohibited by the NC Constitution, nor any NC statute. N.C. Const., Art. II. §§ 9, 11, 22(1). That activity is legitimate and common. DE 76-4 at 5–15; **Exhibit 5**, T pp 52–53. Although Plaintiffs also complain that the acting legislature was unconstitutionally gerrymandered, they point to no federal decision holding that a state legislature is barred from legislating

21

before curative map-making periods are completed.  SB824's procedural sequence reveals no discriminatory departures.

### 4.  The legislative history of the decision

SB824's legislative history also weighs in favor of validity.  As part of that history, the Fourth Circuit reviews whether a voter ID legislation had any support of the opposing party.  *Lee*, 843 F.3d at 603. ("While there was a substantial party split on the vote enacting the law, two non-Republicans (one Democrat and one Independent) voted for the measure as well.")  While largely opposed by Democrats, SB824 nevertheless had bipartisan support at the outset, and through each important stage of the lawmaking process. **Exhibits 11, 5, 18**.

The Bill was co-sponsored by a Democrat.  **Exhibit 11**.  On November 29, 2018, two Senate Democrats voted for the Senate version of SB824.[6] **Exhibit 19**.  On December 5, 2018, two House Democrats voted for the House version of SB824.  **Exhibit 20**.  One Democrat voted in favor of a motion to concur.  **Exhibit 21**.  Likewise, a veto override was achieved with some Democratic support in both legislative chambers.  **Exhibits 22, 23**. Moreover, multiple amendments offered by Democratic legislators were adopted. **Exhibits 24, 17-B,** S.J. pp 384-385, H.J. pp 480-481.

The rejected amendments, likewise, evidence no discriminatory intent.  One of these amendments—delaying the start date for county boards of elections to issue free voter

---

[6] *McCrory* cited favorably the fact that a pre-*Shelby* voter ID bill had some bipartisan support, since "[f]ive House Democrats joined all present Republicans in voting for the voter-ID bill."  *McCrory*, 831 F.3d at 227.

22

IDs—would have increased the burden on voters without ID.  Further, the intended effect of another (delaying the rollout of SB824) was later given effect by Session Law 2019-2.  The rest of the rejected amendments would not have significantly changed SB824's impact on any group of voters, given the reasonable impediment provision in the law.

Plaintiffs emphasize the exclusion of public assistance IDs from the list of qualified IDs to argue discriminatory intent.  DE 91 at 32; **Exhibit** 12 Lichtman T pp 134-140.  However, legislative history rebuts this argument.  In the debate over amendments seeking the inclusion of these IDs, concerns were raised that such IDs lack uniformity and that many lack photographs as required by the constitutional mandate.  **Exhibit 15**, T(11/28/18) p 19, T(12/3/18) pp 22-24, T(12/5/18) pp 100-102.   Those concerns are borne out by the record.   **Exhibits 25, 26**.   Moreover, the inclusion of more forms of voter ID will complicate the efforts of poll workers to administer the voter ID requirement. **Exhibit 27**, Patterson T pp 80-81.   Indeed, according to Plaintiff's own expert witness, the adoption of a public assistance ID amendment would have made little difference to a discriminatory intent analysis here.  **Exhibit 12** Lichtman T pp 134-150.

Finally, in making its determinations that the prior law was motivated by invidious racial discrimination, the Fourth Circuit noted that "prior to and during the limited debate on the expanded omnibus bill, members of the General Assembly requested and received a breakdown by race of" data related to the various voting practices at issue, and then, relying on that data, "drastically restricted" a number of voting practices that "African Americans disproportionately used."  *McCrory*, 831 F.3d at 230.  The legislative record

23

before this Court features no such evidence to support a finding of an invidious discriminatory purpose.

### 5. Any racially disproportionate impact

SB824 permits every voter to cast a vote, and have that vote counted. It therefore does not deny or abridge the right to vote for any protected class.

> #### i. Any impact is minimized by the law's ameliorative provisions.

By authorizing ten different types of photo IDs, SB824 makes it relatively simple to present ID at the polls. SB824, sec. 1.2.(a), § 163A-1145.1(a). In fact, the SBOE continues to approve new IDs from colleges, universities, and governmental employers. **Exhibit 8** (Bell Aff. ¶¶ 32–33.) Moreover, voters who lack one of these many forms of ID can obtain a voter ID card free of charge from their county board of elections. SB824, sec. 1.2.(a), § 163A-1145.1(a). County boards have been issuing these free IDs since May, and over 1,700 voters have already taken advantage of this service. **Exhibit 8** (Bell Aff. ¶ 16 & Ex. J.) It is reasonable to assume that the number of free IDs issued would only continue to rise during the approach to the election, when public interest, photo ID education, and the outreach campaign are at their heights.

Plaintiffs contend that there is a racial disparity in the rate at which voters currently possess the most common forms of ID that can be used for voting—IDs issued by the NC DMV. DE 91 at 22 (citing Herron Rep. at 21, 25). Plaintiffs' analysis is flawed. First, it ignores eight different additional types of ID that can be used that could reduce the disparity. **Exhibit 28** (Neesby Aff. ¶ 11.) Second, it relies on a list the SBOE created for

24

a photo ID notification mailing that expressly was not intended to show how many North Carolinians lacked DMV-issued ID. (*Id.* ¶ 10) By design, the list is overinclusive to inform voters of the photo ID requirement, not to answer a factual question posed by litigation. (*Id.*) Third, as Plaintiff's own expert admits, academic literature is ambiguous on whether disparities in ID possession rates lead to disparate results in voter participation, **Exhibits 29, 29-A, 29-B** (Burden T pp 39:2–18, 57:21–58:19, 64:21–65:10 & Ex. 4 at 6–7, 10, Ex. 6 at 1060–62), thereby undermining the conclusion that the ID requirement has discriminatory results.

More importantly, even assuming a disparity in the possession rate of IDs, Plaintiffs' argument on discriminatory results downplays the significance of the availability of free IDs from the DMV and county boards of elections, which reduce any significant burdens that would result from disparate rates of ID possession. In addressing the free IDs available at county boards of election, Plaintiffs contend that the distance voters would have to travel to county offices and time required to obtain the ID constitute burdens. DE 24. Yet, Plaintiffs offer to the Court no available analysis to establish whether voters identified by the SBOE who may not possess DMV-issued ID live any farther from the county board of elections than the average voter in the county. Plaintiffs' expert relies on a study produced by the plaintiffs in the state court challenge to SB824, which compares the average distance to the county board office, county-by-county. DE 91-4 at 29. However, that analysis is of limited value because it did not consider whether the distance

for black or Hispanic voters in any given county, or statewide for that matter, is greater than the distance required for white voters.

Most importantly, for voters who lack photo ID, the burden imposed by a photo identification requirement is minimized by the reasonable impediment provisions of SB824. Even if a voter fails to present ID at the polls, her vote counts if she merely attests to why she was unable to present ID. *See* SB824, sec. 1.2.(a), §§ 163A-1145.1(d)(2), (d1). A reasonable impediment ballot is presumptively valid, and may only be rejected if all five members of the bipartisan board unanimously agree that there are grounds to believe the affidavit is false. *Id.* § 163A-1145.1(e); 08 N.C. Admin. Code 17.0101(b). To quote Plaintiffs' expert, "As a result, all ballots cast using the reasonable impediment affidavit process are presumed to be counted, as the ballots are 'exceptions' to the regular provisional ballot process." DE 91-4 at 23.

> ii. *Controlling precedent holds that similar laws do not impose discriminatory impacts.*

The Fourth Circuit has upheld an even more burdensome process of voting without a required ID. In *Lee v. Virginia State Board of Elections*, 843 F.3d 599 (4th Cir. 2016), the Court concluded that Virginia's photo ID law did not impose unlawful burdens under VRA's § 2, because voters who did not present ID at the polls could cast a provisional ballot that would be counted if the voter sent a photocopy of their ID to their county board of elections by the third day after the election. *See id.* at 594, 600. By contrast, here, a voter who submits a truthful reasonable impediment affidavit along with her ballot does not have to do anything more: her vote will count. Accordingly, the court's conclusion in

26

*Lee* is applicable here: "Because, under [North Carolina's] election laws, every registered voter in [North Carolina] has the full ability to vote when election day arrives, [SB824] does not diminish the right of any member of the protected class to have an equal opportunity to participate in the political process and thus does not violate § 2." *Id.* at 600.

Moreover, with respect to the ease with which a voter could acquire a photo ID for voting, the Virginia law addressed in *Lee* is indistinguishable from the law here. Under Virginia's law, free photo IDs were available at local elections offices or at "mobile voter-ID stations." *Id.* at 595. The court noted, "[t]he Supreme Court has held . . . that this minor inconvenience of going to the registrar's office to obtain an ID does not impose a substantial burden." *Id.* at 600 (citing *Crawford*, 553 U.S. at 198). Similarly here, free photo IDs are available at all 100 county elections board offices in the state, and county boards can authorize staff to provide these IDs at other locations in the community. *See* 08 N.C. Admin. Code 17.0107(a); **Exhibit 8** (Bell Aff. ¶ 16). In fact, unlike Virginia's law, a NC voter does not even need to provide her address to obtain a free photo ID, and instead need only provide her name, birthdate, and last four digits of her social security number. *Compare Lee*, 843 F.3d at 595, *with* SB824, sec. 1.1.(a); 08 N.C. Admin. Code 17.0107(a).

*Lee* also acknowledged that black and white Virginians had disparate rates of ID possession, but rejected the proposition that this evidence necessarily leads to discriminatory results in violation of the VRA. The court distinguished "disparate inconveniences" from "the denial or abridgement of the right to vote," concluding that the

27

burdens Virginia imposes on voters to obtain a free ID are not sufficient to constitute a VRA violation. *Lee*, 843 F.3d at 600–01. This conclusion applies with even stronger force here as NC's reasonable impediment alternative makes it possible to vote without photo ID at all—something that was not possible in Virginia.

The application of *Lee* to the instant case would be consistent with numerous other cases where challenges to similar photo ID laws, based on theories of discriminatory burdens, were rejected:

- The Fifth Circuit reversed a preliminary injunction against Texas's photo ID law where the district court failed to account for ameliorative effect of that state's reasonable impediment alternative, which unlike North Carolina's law, still required the production of some form of ID. *Veasey v. Abbott*, 888 F.3d 792, 803 (5th Cir. 2018); *see id.* at 796–97.

- The Seventh Circuit upheld Wisconsin's photo ID law against a VRA discriminatory-results claim even though that law provided no reasonable impediment alternative, and in spite of evidence showing disparate rates of ID possession. *Frank v. Walker*, 768 F.3d 744, 752–53 (7th Cir. 2014).

- A three-judge panel of the District of D.C. upheld South Carolina's law, which has a nearly identical reasonable impediment provision, against a VRA discriminatory-effects challenge. *South Carolina v. United States*, 898 F. Supp. 2d at 38–43. The court held that disparate rates of ID possession and burdens associated with obtaining an ID "might have posed a problem for South

28

Carolina's law under the strict effects test of Section 5 of the Voting Rights Act," but "the sweeping reasonable impediment provision in [the law] eliminates any disproportionate effect or material burden that South Carolina's voter ID law otherwise might have caused." *Id.* at 40.

- A district court determined that Alabama's photo ID law had no discriminatory impact under a constitutional challenge, because the law provided free IDs. *Greater Birmingham Ministries v. Merrill*, 284 F. Supp. 3d 1253, 1277 (N.D. Ala. 2018). Alabama's law includes no reasonable impediment provision.

Accordingly, given that courts have upheld stricter photo ID laws under discriminatory-results claims, Plaintiffs here are unlikely to succeed on such a claim.

### iii.    *McCrory is distinguishable in many ways.*

*McCrory* does not bear the weight Plaintiffs place on it to support their claims of discriminatory impact. As discussed above, what distinguished the law at issue in *McCrory* was the "panoply" of voting restrictions that "cumulatively" resulted in disenfranchisement of black voters. *McCrory*, 831 F.3d at 231. The Court explained that "the sheer number of restrictive provisions in SL 2013–381 distinguishes this case from others." *Id.* at 232. In this critical way, the analysis of the burdens or discriminatory results of the current Photo ID Law is very different from the analysis of S.L. 2013-381 in *McCrory*. If anything, *McCrory*'s reliance on the cumulative impact of the various provisions of the prior law, along with the distinction the Court drew with cases like *Crawford* upholding photo ID on its own, suggests that SB824 is presumptively valid.

29

The value of the Fourth Circuit's analysis in *McCrory* regarding the burdens imposed by the photo ID requirements in the prior law is further diminished here given that the current photo ID requirements are much less stringent than those in the prior law.  As noted above, the current law expanded the types of IDs that may be used for voting, *supra* pp. 4-5, 9, 24, and the list of valid IDs continues to grow as the SBOE approves new student and public employer IDs in the coming weeks, **Exhibit 8** (Bell Aff. ¶¶ 32–33).

Additionally, it is likely that SB824's approval of several of these IDs will serve to benefit minority voters.  **Exhibits 30**, **Exhibit 8** (Bell Aff., Ex. O (many HBCUs had student and/or employee IDs approved)); DE 76-2 (Thornton Aff. ¶¶ 28, 31).  The current reasonable impediment process is also much less stringent, and guarantees that anyone can vote without a photo ID as long as they do not submit a false affidavit when voting. Plaintiffs' declarant Quinn disclosed that he was neither asked to opine, nor did he form an opinion on how reasonable impediment process may impact any theoretical burdens caused by ID requirement.  **Exhibit 32**, Quinn T pp 157-166.  Yet, this provision significantly blunts any burden that might otherwise be imposed by the law.

Contrary to Plaintiffs' suggestion, DE 91 at 25, *McCrory* did not address *this* reasonable impediment provision.  In fact, the discussion of the prior reasonable impediment provision in *McCrory* is off-topic here.  The Court first noted that the reasonable impediment provision was not part of the original law under challenge, but was added on the eve of trial. *McCrory*, 831 F.3d at 219.  Rather than considering whether that provision altered the analysis of the burdens imposed by the prior law, as it pertained to

30

VRA liability, the Court reviewed the reasonable impediment provision only in the context of what remedy was appropriate for the VRA violation that the Court had otherwise found. *Id.* at 240. After placing the burden *on the State defendants* to prove that the provision cured the discrimination found in the liability section of the opinion, the Court held that the reasonable impediment did not cure the intentional discrimination otherwise imposed by the law. *Id.*[7] In other words, the Court did not even treat that provision as part of the law under challenge.

Moreover, even if *McCrory* included a review of that provision as if it were part of the prior law under challenge, the reasonable impediment provision in the prior law was significantly more burdensome for four reasons:

(1)   The prior law granted county boards considerable discretion to reject a reasonable impediment that a board believed was "nonsensical" or "merely denigrated the photo identification requirement," as opposed to rejecting only those affidavits that were demonstrated to be false. *Compare* Sess. Law 2015-103, sec. 8.(e), § 163-182.1B(a)(1), *with* SB824, sec. 1.2.(a), § 163A-1145.1(e).

(2)   The prior law permitted any voter in the county to challenge a reasonable impediment affidavit and submit evidence against a fellow voter's reasons for

---

[7] This treatment of the reasonable impediment provision in the remedy analysis drew a partial dissent in an otherwise-unanimous decision. *McCrory*, 831 F.3d at 242–44 (Motz, J., dissenting in part). The majority decision held that the prior law should be enjoined despite the addition of the reasonable impediment provision. But Judge Motz believed that "by its terms, the exception totally excuses the discriminatory photo ID requirement." *Id.* at 243. She would have remanded for the district court to consider whether, in practice, the exception had remedied the discriminatory impact of the prior photo ID law. *Id.* at 244.

lacking ID before the county board, Sess. Law 2015-103, sec. 8.(e), § 163-182.1B(b), a process that does not exist under SB824.

(3)     The prior law allowed a county board to reject a reasonable impediment ballot on a simple majority vote, **Exhibit 8** (Bell Aff., Ex. B at 29), whereas under SB824 all five members of a bipartisan county board must agree unanimously that there are grounds to believe an affidavit is false before rejecting it, (*Id.* ¶ 9).

(4)     Finally, the prior law still required the voter to present some form of ID in addition to filling out the reasonable impediment form. *See* Sess. Law 2015-103, sec. 8.(e), § 163-182.1B(a)(2). Under current law, however, voters do not need to present any identification to have their reasonable impediment ballot counted.

In sum, SB824 features numerous forms of ID that are accepted; county elections boards are offering free IDs to all voters; and if a voter fails to bring ID to the polls but completes a truthful reasonable impediment form, her vote counts. Under these facts, it is difficult to read *Lee*—much less the various other cases cited above, *supra* pp. 28-29—and conclude that this law produces significant discriminatory results.

B.     Plaintiffs' Disparate Results Claim Likely Fails.

To succeed on a discriminatory results claim under section 2 of the VRA, a plaintiff must show that the challenged voting law "results in a denial or abridgement of the right to vote on account of race or color or because the person is a member of a language minority group ("the protected class")[,] such that, in the totality of circumstances, the political

32

process is not equally open to the protected class[,] in that its members have less opportunity than others to participate in the process and elect representatives of their choice." *Lee*, 843 F.3d at 599 (numbering omitted). A plaintiff "must make a greater showing of disproportionate impact" under a standalone discriminatory results claim than under a discriminatory intent claim. *McCrory*, 831 F.3d at 231 n.8.

At the same time, "[a] complex § 2 analysis is not necessary to resolve this issue" when "plaintiffs have simply failed to provide evidence that members of the protected class have less of an opportunity than others to participate in the political process." *Lee*, 843 F.3d at 600. For the reasons set forth in the analysis of potential discriminatory impacts above, *supra* pp. 24–32, Plaintiffs fail to make the initial showing that SB824 denies or abridges the votes of black or Hispanic voters. They are therefore unlikely to succeed on their standalone results-based claim.

C.     SBOE Is Implementing SB824 in an Appropriate Manner to Inform the Public, Avoid Voter Confusion, and Ensure Even Application.

In an argument not explicitly tied to a legal claim, Plaintiffs also contend that "North Carolina cannot possibly rollout its voter ID law in four months that remain until commencement of early voting on February 12, 2020," and therefore request an injunction. DE 91 at 33-34. That argument ignores implementing activities that have heretofore taken place. Therefore Plaintiffs' argument should be rejected.

SBOE "has already undertaken a series of actions to implement this law, and intends to undertake additional actions to implement the Photo ID Law." Bell Aff ¶ 6. Among other measures, the SBOE:

33

- conducted a statewide conference and training for county board members and staff from all 100 county boards, and provided guidance on reasonable impediment;

- is rolling out additional training to the county boards and their staff, following the currently ongoing municipal elections;

- promulgated rules and is continuing to update the rules on issuance of free IDs and the implementation of voter ID requirements at the polls and with absentee voting;

- conducted training for county boards on the issuance of free photo IDs authorized, and processed reimbursements for 74 counties for the printing equipment acquired pursuant to SB824;

- distributed a mass mailing to every registered voter who may not possess a DMV-issued IDs;

- will mail information about voter ID to every residential address in the State, once in early November and again in late December, and will distribute two additional statewide mailings between the primary and general election in 2020;

- created posters and informational handouts about photo IDs, in both English and Spanish, and provided them to the county boards to be posted in every precinct and one-stop early voting location during voting in 2019;

- created a webpage to inform the public about Photo ID, which can be found at ncsbe.gov/voter-id;

- distributed to all colleges and universities whose IDs have been approved an informational document to be provided to all students;

34

- approved the initial slate of student and employee IDs on March 15, 2019, and is currently accepting additional applications from institutions and entities whose IDs were not approved in March, now that the ID requirements have been relaxed;

- is developing additional voter ID training for county boards to be conducted prior to the times when the county boards train their pollworkers before the 2020 primary; and,

- has made and continues to make Statewide Elections Information Management System (SEIMS) adjustments related to the SB824's photo ID requirement

*Id.* ¶¶ 8–40.

Accordingly, Plaintiffs' "rushed implementation" argument fails to contemplate the full account of SBOE's efforts.

D.      Plaintiffs Offer no Merits Argument for a Constitutional Violation.

Plaintiffs reference the Fourteenth and Fifteenth Amendments to the United States Constitution twice: in the introduction and in the conclusory paragraph of their *Arlington Heights* discriminatory-intent discussion. DE 91 at 10, 36. They offer no analysis of purported constitutional violations under the sliding-scale standard established in *Anderson v. Celebrezze*, 460 U.S. 780, 788 (1983)) and *Burdick v. Takushi*, 504 U.S. 428, 434 (1992). Yet the *Anderson-Burdick* framework applies to claims that the law is "unconstitutional because it places an undue burden on the constitutionally protected right to vote." *Lee*, 843 F.3d at 604-05. Under the *Anderson-Burdick* line of cases, courts first determine whether the challenged legislation burdens a constitutional right, and then scrutinize the degree of

35

the burden against the governmental interest offered in support of the challenged legislation. Plaintiffs waived any claim that they are likely to succeed on that basis by failing to present argument under this standard.

## II. THE PUBLIC INTEREST, HARM ANALYSIS, AND EQUITIES WEIGH AGAINST AN INJUNCTION.

Plaintiffs must make a clear showing that they will likely be irreparably harmed absent preliminary relief. *The Real Truth About Obama, Inc.* v. *F.E.C.,* 575 F.3d at 347. An averment that the plaintiff's harm might simply outweigh the defendant's harm is insufficient. *Id.* The showing of irreparable injury is mandatory even if the plaintiff has already demonstrated a strong showing on the probability of success on the merits. *Id.* Moreover, the Court must give "particular regard" to the "public consequences" of any relief granted. *Id.* Plaintiffs fail to carry their burden on this irreparable harms and equities analysis.

First, "any time a State is enjoined by a Court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." *New Motor Vehicle Bd. v. Orrin W. Fox Co.,* 434 U.S. 1345, 1351 (1977) (Rehnquist, J., in chambers). Here, that injury is compounded by the fact that the voters mandated a photo ID requirement directly through a referendum that resulted in an amendment to the NC Constitution.

Second, granting the preliminary injunction and returning to the *status quo ante* would result in Defendants having to halt their SB824 implementing efforts that are well under way, and while approaching a critical time for a photo ID requirement to be smoothly administered in advance of the 2020 elections cycle. If SB824 is ultimately upheld against

36

the constitutional and statutory challenge, this halt of preparatory and educational activities directly harms the State's voters. The harms and equities therefore tilt the scales against an injunction.

Plaintiffs' own affiants Patterson and Fellman support the importance of a continued voter and pollworker outreach and education. Further, more time for education and training leads to less confusion among both election officials and voters. See **Exhibit 27**, T pp 60, 65; **Exhibit 31**, T pp 109, 111, 186-196. For example, Fellman believes that if the law is going to go into effect in March 2020, it would be best to continue voter education between now and then. See **Exhibit 31,** T pp 164, 165, 172-173. She believes that "voters really need consistency" and that "[i]t's best to give people consistent information and have consistent voting laws," because "[c]onsistency would be a really helpful thing to increase voter participation." *Id*. at pp 111, 115, 167.

An injunction could delay the statutorily required mailings to every household in NC, halt the training of pollworkers and county boards on photo ID, interfere with the process of approving public and educational institutions' photo IDs, and curtail SBOE's voter and community outreach on the photo ID requirements. **Exhibit 8** (Bell Aff. ¶ 41). If any injunction were later lifted, "it might not be possible to complete all educational and outreach activities that were required" by SB824. (*Id.*) The public will suffer the brunt of the SBOE's inability to complete all the requisite preparation required by the law. The Court should deny Plaintiffs' request on that additional ground as well.

## CONCLUSION

For these reasons, the Court should deny Plaintiffs' motion for preliminary injunction.

Respectfully submitted, this the 30th day of October 2019.

JOSHUA H. STEIN
Attorney General

*/s/* Olga E. Vysotskaya de Brito
Olga E. Vysotskaya de Brito
Special Deputy Attorney General
N.C. State Bar No. 31846
Email: ovysotskaya@ncdoj.gov

Amar Majmundar
Senior Deputy Attorney General
N.C. State Bar No. 24668
Email: amajmundar@ncdoj.gov

Paul M. Cox
Special Deputy Attorney General
N.C. State Bar No. 49146
Email: pcox@ncdoj.gov

N.C. Department of Justice
Post Office Box 629
Raleigh, NC 27602
Telephone: (919) 716-0185
Facsimile: (919) 716-6759
*Counsel for the SBOE Defendants*

## CERTIFICATE OF WORD COUNT

Pursuant to Local Rule 7.3(d)(1), the undersigned counsel hereby certifies that the foregoing Memorandum, including body, headings, and footnotes, contains 9,578 words as measured by Microsoft Word.

/s/ Olga E. Vysotskaya de Brito
Olga E. Vysotskaya de Brito
Special Deputy Attorney General

## CERTIFICATE OF SERVICE

I hereby certify that on this date I electronically filed the foregoing **DEFENDANTS'**

**RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY**

**INJUNCTION** with the clerk of Court using the CM/ECF system which will send

notification of such to all counsel of record in this matter.

This 30th day of October, 2019.

/s/ Olga E. Vysotskaya de Brito
Olga E. Vysotskaya de Brito
Special Deputy Attorney General