# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

|  |  |
|---|---|
| NORTH CAROLINA STATE CONFERENCE OF THE NAACP, *et al.*,<br><br>        *Plaintiffs*,<br><br>     v.<br><br>ROY ASBERRY COOPER III, in his official capacity as the Governor of North Carolina, *et al.*,<br><br>        *Defendants*. | No. 1:18-cv-01034 |

# REPLY IN SUPPORT OF
# PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION[*]

---

[*] This reply brief exceeds the word limits set forth in Civil LR 7.3. On September 30, 2019, the court granted Plaintiffs leave to file a reply in support of their motion for preliminary injunction of up to 4,800 words in length. ECF No. 86.

i

US 167075138v5

## TABLE OF CONTENTS

TABLE OF CONTENTS ............................................................................1

TABLE OF AUTHORITIES .................................. **Error! Bookmark not defined.**

I.    SB824 Likely Violates Section 2 of the VRA ..................................................5

    A.    Historical Background..........................................................................5

    B.    The Process of Passing SB824 Reeks of Discriminatory Intent...........7

    C.    SB824 Would Create Discriminatory Impact .....................................12

    D.    SB824 Is Not Distinguishable From the Voter ID Provisions of SB589 ..........................................................................................................16

    E.    Defendants' Reliance on Other States' Laws is Misplaced ................17

II.    SB824 Likely Violates the Results Prong ....................................................19

III.    A Preliminary Injunction Is Necessary To Prevent Irreparable Harm to Plaintiffs and Minority Voters in North Carolina..........................................21

CONCLUSION ......................................................................................................22

US 167075138v5

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Chamber of Commerce of U.S. v. Edmondson*,
  594 F.3d 742 (10th Cir. 2010) ...................................................................22

*League of Women Voters of N.C. v. North Carolina*,
  769 F.3d 224 (4th Cir. 2014) ..............................................................18, 19, 21, 22

*Lee v. Virginia State Board of Elections*,
  843 F.3d 592 (4th Cir. 2016) ...........................................................19, 20

*N.C. State Conf. of NAACP v. McCrory*,
  831 F.3d 204 (4th Cir. 2016) ................................................................. *passim*

*Newsom ex rel. Newsom v. Albemarle Cty. Sch. Bd.*,
  354 F.3d 249 (4th Cir. 2003) ...................................................................22

*Scott v. Roberts*,
  612 F.3 1279, 1297 (11th Cir. 2010) ...................................................22

*Shannon v. Jacobowitz*,
  301 F. Supp. 2d 249 (N.D.N.Y. 2003) ...................................................21

*Thornburg v. Gingles*,
  478 U.S. 30 (1986) ...................................................................................21

*United States v. City of Cambridge*,
  799 F.2d 137 (4th Cir. 1986) ...................................................................21

*Veasey v. Abbot*,
  830 F.3d 216 (5th Cir. 2016) ...................................................................12

**Statutes**

52 U.S.C. § 10301(b) .................................................................................18

US 167075138v5

## INTRODUCTION

Plaintiffs presented this Court with extensive evidence that SB824 is the product of racially discriminatory intent by the majority party in the North Carolina General Assembly, which sought to preserve its legislative advantage by deterring Black and Latino[1] voters, who tend to support the other party, from voting. In essence, the Assembly sought to take away Blacks' and Latinos' opportunities to make their voices heard because they were about to exercise them. This was the same motivation that led the Fourth Circuit to find that North Carolina's last effort to impose a voter identification requirement constituted impermissible racial discrimination. *N.C. State Conf. of NAACP v. McCrory*, 831 F.3d 204, 233 (4th Cir. 2016). The record further demonstrates that Blacks and Latinos disproportionately lack the photo identification needed to vote under SB824 and that the law therefore imposes additional and unnecessary burdens that both hinder and prevent them from casting ballots. For these reasons, SB824 violates both the Voting Rights Act and the Constitution.

Instead of engaging with the factual record, Defendants invite the Court to "miss[] the forest in carefully surveying the many trees," and view SB824 absent its historical context. *McCrory*, 831 F.3d at 214. They press illusory distinctions between SB824 and HB589, when Plaintiffs have demonstrated that the two laws

---

[1] The term "Latino" in this brief is intended to refer to Latinx, Hispanic, and Latino voters.

3

were part of an unbroken effort to use voter identification requirements to protect partisan gains by disadvantaging Black and Latino voters. They suggest the Assembly's history of adjudicated racial discrimination in this decade, as well as the racially gerrymandered Assembly's proposal of the voter ID constitutional amendment, can be ignored because voters adopted that amendment. This argument fails: voters neither severed the link between this law and other discriminatory laws nor authorized the Assembly to pass a discriminatory bill in the guise of implementing legislation.

Defendants do not, and cannot, dispute that the Assembly presented no new evidence that in-person voter impersonation fraud has ever been a problem in North Carolina and no evidence that it will ever be in the future. Evidence in support of this recycled "voter fraud" rationale for photo ID, already found pretextual by the Fourth Circuit, simply does not exist in North Carolina. Defendants themselves investigated and certified as such to the Assembly, demonstrating that the miniscule incidence of voter impersonation is so small as to amount to a statistical zero. Minnite Rep. at 23-24, 33-35. It just does not happen.

Defendants speculate that the availability of free ID cards and the Reasonable Impediment Declaration ("RID") eliminate the demonstrable disparate impact that SB824 imposes on Black and Latino voters. But the evidence reveals that these so-called ameliorative provisions are (1) are essentially unknown by voters; (2) will not

4

have any material impact on the disparate numbers of Black and Latino voters who lack qualifying ID; and, (3) critically, add to the burdens minority voters face in casting their ballots, thereby abridging their right to vote in that manner. Exhibit A, Expert Report of Matthew Barreto ("Barret Rep.") 29-30. The evidence further confirms that SB824 cannot be implemented in a manner that would satisfy the VRA in the two months that remain before absentee ballots for the March primary must be issued. For all of these reasons, Plaintiffs are likely to succeed on their claims and the Court should enter a preliminary injunction and suspend implementation of SB824 pending trial.

## I. SB824 Likely Violates Section 2 of the VRA

### A. Historical Background

While Defendants acknowledge that SB824 follows on the heels of a "long history of race discrimination generally and race-based voter suppression in particular," they urge the court to view the law in isolation from its historical context. Defendants' Response in Opposition, ECF No. 97 ("Opp.") 12-13 (citing *McCrory*, 831 F.3d at 223). This mistakes the law. SB824 cannot be divorced from this state's official history of discrimination or the recent spate of discriminatory actions by the Assembly, all aimed at making it more difficult for minority voters to make their voices heard.

5

Since Republicans took control of the legislature in 2011, the Assembly has repeatedly violated the VRA and the Constitution as it sought to minimize the political influence of Blacks and Latinos while maximizing the power of non-Hispanic whites. The decade began with the Assembly attempting and failing to pass its first voter ID law, HB351, in 2011. That same year, the Assembly engineered one of the most extensive racial gerrymanders ever encountered by the federal courts and also racially gerrymandered the State's congressional districts. With African Americans "poised to act as a major electoral force" in the State (and the lifting of VRA's pre-clearance requirements) the Assembly passed HB589, which the Fourth Circuit struck down for discriminating against and targeting Black voters "with almost surgical precision." *McCrory*, 831 F.3d at 214, 229. Thereafter, in an effort to preserve their racial gerrymander, Assembly leaders lied to a federal court about the speed at which they could craft remedial maps, thereby maintaining the supermajority that allowed them to put voter ID on the ballot and pass SB824. The decade is ending with the Assembly enacting SB824 and SB325, which created voter ID and restricted early voting, as the General Assembly attempted to do in HB589. Memorandum of Law in Support of Preliminary Injunction, ECF No. 73 ("Memo.") 9-11.

Defendants cannot deny the relevance of this sequence of events to SB824's intent. Nor does the passage of a voter ID constitutional amendment, which was

6

placed on the ballot by the same legislature that repeatedly sought to abridge minority voting rights, sever SB824 from the Assembly's troubling history.

**B. The Process of Passing SB824 Evinces Discriminatory Intent**

As Defendants admit, SB824 is only the latest chapter in the Assembly's continuing effort to pass a voter ID law—there were no "changes in legislative policy preferences leading to the enactment of SB824." Opp.14. And, at the time of enactment, legislators admitted that the purpose of the constitutional amendment—which SB824 purports to implement—was to "mute future court challenges." Memo.9-10. Representative Lewis, an architect of HB589, made the link between HB589 and SB824 abundantly clear a week before final passage of the constitutional amendment in June 2018: "The reason we are asking voters if they want to do this or not is, frankly, we think we passed a good law before." Memo.23. Tellingly, legislative leadership never renounced their previous discriminatory intent and failed to remedy provisions in HB589 that the Fourth Circuit found suspect and indicative of race discrimination. Those provisions included the refusal to accept public assistance IDs, which was simply carried over into SB824. Lichtman Rep. 101-05.

Contrary to Defendants' claim that changes in the composition of Assembly membership refute racially discriminatory intent, Opp.13, many of the same legislators who enacted SB824 voted in favor of HB589 and the same key leaders championed both bills. "[T]he fundamental composition of the leadership caucus of

7

the GOP remained the same." Exhibit B, McKissick Supplemental Declaration ("McKissick Supp.") ℙ6; *see* Memo.13; Lichtman Rep. 12. What is more, "[i]t was commonly and well-known that this GOP leadership continued to have ultimate decision-making authority over the construction and passage of SB824." McKissick Supp. ℙ6.

Defendants claim that "there is no evidence that the General Assembly requested and used racial data in SB824's enactment process." Opp.10. But SB824's drafters did not need new racial data; they had the racial data they used to enact HB589. Defendants' argument depends on the false premise that the Assembly's leadership needed *new* data because they somehow unlearned what they already knew.

Defendants' attempt to characterize the legislative process as "normal" improperly seeks to isolate the lame-duck period from the entire sequence of events that culminated in SB824. That sequence began at least as long ago as the illegal passage of HB589, which was found racially discriminatory in the *McCrory* decision, *see* 831 F.3d at 227-228, and the proposal of a constitutional amendment to insulate a new voter ID law from judicial review. *See* Memo.9-10. The enactment of SB824 cannot be separated from that history.

That said, even focusing only on the lame-duck session reveals procedural departures to thwart opponents' committee testimony, a rushed third reading to stifle imminent amendments and other unusual procedures. Exhibit C, Rebuttal Report

8

of Allan J. Lichtman ("Lichtman Supp.") 17-20. Like HB589, SB824 was the product of a limited hearing and debate process that "strongly suggest[ed] an attempt to avoid in-depth scrutiny." *McCrory*, 831 F.3d at 228; Memo.24.[2] Defendants allege that the process "complied with constitutional and parliamentary requirements." Opp.16. But procedural irregularity is not the same as illegality; "a legislature need not break its own rules to engage in unusual procedures." *McCrory*, 831 F.3d at 228. Assembly leadership rushed SB824 through with just five legislative days of debate, so that it could be passed with sufficient time for the legislative supermajority, which was obtained through racial gerrymandering, to override the governor's inevitable veto. They knew only too well that the supermajority would be lost when the new legislature, elected under remedial maps, took office and the opportunity to pass discriminatory voter ID legislation would be gone.

The legislature rejected amendments that were intended to ameliorate SB824's discriminatory effects. Among those were proposals to allow voters to use federal government IDs and another to permit use of public assistance photo IDs, the

---

[2] Defendants and Amici rely on statements from Joel Ford about this rushed process, Opp.21, Amicus.33. Yet those statements are factually incorrect—Ford's claim that Senator McKissick or other Democrats were supporting of SB824 is false McKissick Supp. ¶ 4. Senator Ford's claim that the Democratic Caucus "intentionally chose not to take [the] opportunity" to debate SB824 as part of a litigation strategy is also false. Ford was not a member of the Democratic caucus at the time of the vote, and therefore would not be privy to Democratic strategy, and his claims are rebutted by statements from Senator McKissick and the legislative record. McKissick Supp. ¶ 5.

US 167075138v5

exclusion of which the Fourth Circuit specifically identified as strong evidence of discriminatory intent. *McCrory*, 831 F.3d at 236. The defense of that decision smacks of pretext. Opp.23. While some public assistance IDs, as Defendants point out, may not have photographs, many North Carolina agencies place photographs on their IDs. Public housing agencies in North Carolina, for instance, have issued photo ID for years.[3] Exhibit D, Declaration of Kathleen Roblez i-ii. Moreover, it is very likely that other agencies serving vulnerable voters would have added photos to their IDs if doing so would have enabled their clients to vote.

Defendants' argument that allowing public assistance ID would make voting too complicated is implausible and clearly pretextual, because SB824 already creates a laundry list of eligible IDs, with varying conditions on their acceptability. Memo.14. Indeed, the Legislature did not offer confusion as a rationale for rejecting public assistance IDs. Representative Lewis gave a different reason—that the State did not control public assistance IDs. ECF No. 97-16, at 101-102. Lewis's concern is likewise implausible—the State does not control the distribution of student IDs, out-of-state licenses, and federal IDs, all of which are permitted under at least some circumstances under SB824. The real reason for excluding state and federal public assistance ID's is obvious, and was identified in *McCrory*: they are

---

[3] Despite statements to the contrary by amici, the record makes unambiguously clear that this amendment only included public assistance IDs containing photos. *See* Lichtman Supp. 14-15.

US 167075138v5

disproportionately held by minority voters, while other forms of ID are disproportionately held by white voters. 831 F.3d at 227-228.

The pretexts for rejecting public assistance IDs parallel the legislature's overall pretextual justification for the constitutional amendment and SB824. There is a total absence of impersonation voter fraud in North Carolina.[4] *See* Memo.12-13; 16-17; 25-26; 37; 45-46. Defendants point to the fact that a Republican operative fraudulently harvested absentee ballots in the 2018 General Election for the 9th Congressional District, Opp.14-15 n.5, but that fraudulent behavior would not have been prevented by a voter ID bill. SB824 is "too narrow to combat" the fraud Defendants now state is indicative of a problem. *McCrory*, 831 F.3d at 235.

Defendants argue, in the alternative, that the State is not required "to wait for the specific type of fraud the law seeks to address to impact an election before enacting voter ID legislation." Opp.14. But that is irrelevant because just as there is no evidence that voter impersonation *is* a problem in North Carolina, there was never any evidence that voter impersonation *would become* a problem in North Carolina. Even if preventing voter fraud can be a legitimate interest for creating a voter ID law, *see* Opp.2, 11-15; Amicus.18 (citing *Crawford v. Marion Cty. Election*

---

[4] Amici's report from Ken Block that purports to identify instances of voting in North Carolina and another state is irrelevant to because (i) neither Block nor amici explain or suggest that SB824 would address this alleged "duplicate voting"; (ii) Block concedes that his report does not provide proof of voter fraud, Block Report at 4, and (iii) the Block analyses were performed after enactment of SB824, and thus constitute a post-hoc justification. *See* Lichtman Supp. 16.

US 167075138v5

*Bd.*, 553 U.S. 181, 191-197 (2008)), the fact that the so-called legitimate purpose is mere pretext here is an important factor when considering intent under the Voting Rights Act. *See McCrory*, 831 F.3d at 214-15; *Veasey v. Abbot*, 830 F.3d 216, 237 (5th Cir. 2016).

### C.  SB824 Would Create Discriminatory Impact

Defendants devote considerable ink to disputing Plaintiffs' evidence that SB824 has a disparate impact on Blacks and Latinos.  They complain that the evidence focuses exclusively on drivers' licenses and DMV-issued identification, which are the two most common forms of ID used as voter ID, and also criticize Plaintiffs' analysis of the State's own list of voters who lack DMV-issued identification, which is disproportionately populated by Blacks and Latinos, because that list is intended to be overinclusive.  But Defendants do not, and cannot, deny the racial disparity in ID possession in North Carolina.  Indeed, Amici's expert has conceded this point in the state court litigation—Black and Latino North Carolinians possess qualifying IDs less often than whites.  *See* Memo.29-37 (discussing evidence of disparate impact).

In reply to these arguments, Plaintiffs submit the Declaration of Professor Matthew Barreto, a political scientist at UCLA.  Professor Barreto has conducted a survey of eligible North Carolina voters to evaluate, *inter alia*, the rates at which voters of different races possess any of the forms of identification that satisfy

US 167075138v5

SB824's requirements. His survey reveals that whereas 93.9% of white voters in North Carolina possess qualifying identification with a photograph that still resembles them, as SB824 requires, only 87.6% of Blacks and 83.3% of Latinos possess such identification. Blacks are thus over 2 times more likely than whites to lack qualifying identification and Latinos are over 2.7 times as likely as whites to lack qualifying ID. Barreto Rep. 19. Professor Barreto's survey thus addresses Defendants' stated concerns and confirms the facts presented by Professors Herron, Lichtman, Burden, and Quinn—and the state's own match lists and analysis— SB824 disproportionately burdens Black and Latino voters, who lack the identification needed to vote more often than white voters. *See generally* Exhibit E, Supplemental Report of Michael C. Herron.

Nor can Defendants credibly argue that the availability of free CBOE IDs will decrease the possession disparity going forward. As Professor Barreto explained, voters who lack qualifying ID are largely unaware of the CBOE IDs or where to obtain them and do not know that they are free. Barreto Rep. 26-27. Moreover, respondents indicated that they face significant burdens in obtaining free IDs, including traveling to the CBOE, finding child care, and taking time off from work and those burdens fall more heavily on Black and Latino voters. *Id.* 29-30; *see* Burden Rep. 25; Memo.33-34. Declarations of affected North Carolina voters further support Barreto's findings that African-Americans voters often lack required

US 167075138v5

forms of ID under SB824, are unaware that the ID they do possess is insufficient, and face significant burdens in obtaining a new ID.  *See* Exhibit F, Declaration of Alice Carter; Exhibit G, Declaration of Jeanette Dumas; Exhibit H, Declaration of Chrysten Pickney; Exhibit I, Declaration of Erin Thompson; *see also* Exhibit J, Declaration of Steve Schewel (describing the difficulty of educating the thousands of protentional voters in Durham who likely lack qualifying photo ID due to suspension or revocation of their driver's license.).  Imposing those obstacles to voting, in itself, disproportionately abridges Blacks' and Latinos right to vote, in violation of the VRA.

Moreover, in the twenty-four weeks between May 1, 2019 and October 21, 2019, the state only issued 1,720 new IDs.  ECF No. 97-9 ¶ 16.  Even if the state doubles its current issuance rate between now and the March 3, 2020 election, including over the holiday season, the state will only have issued approximately 4,400 free IDs.  In a state with 6.8 million registered voters and millions more eligible voters, even if CBOEs issued all 4,400 free IDs to Black or Latino voters and none to white voters, it would scarcely make a dent in the racial disparities imposed by SB824.

Defendants also overstate the significance of SB824's reasonable impediment declaration (RID).  Opp.6; 8-9; 26.  Defendants apparently argue that, under the RID's "other" category, a voter can offer any explanation for not having an ID and

US 167075138v5

cast a provisional ballot, so long as the statement is not false. *Id.* at 6; 9. But nothing in the law nor the legislative history of SB824 supports Defendants' claim that any stated reason for not having an ID will be deemed acceptable under the RID. SB824 enumerated acceptable impediments and place an explicit sunset on the ability to indicate that the voter does not have an ID because they were unaware of the law, which was to be a valid impediment for 2019 elections and not for 2020 and beyond. *See* Exhibit K, Excerpt from Deposition of Barry Burden; SB824, Sec. 1.2(h).

As Professor Barreto explains, RID also does not cure the disparate impact because the overwhelming majority of voters who lack qualifying ID are unaware of the reasonable impediment declaration. Most believe that a voter without qualifying ID cannot vote and, among Black and Latino voters, most would not go to the polls to find out if they could cast a ballot, if they knew they did not have a qualifying ID. Barreto Rep. 19, 29; *see* Exhibit L, Declaration of Tomas Lopez ("Lopez Decl.). ¶ 33. Further, the record evidence in this jurisdiction shows that the prior implementation of RIDs in the March 2016 primary elections disproportionately burdened African-American voters: Although African-Americans made up only 23% of voters in that election, they represented 34% of those whose voices were silenced. See Lopez Decl. ¶ 17.

Implementation of the law has also been lackluster; County election officials only received an outline of the reasonable impediment process in July and will likely

US 167075138v5

not have time to train poll workers adequately prior to the law's implementation. The state has not yet even adopted a standard form for the reasonable impediment affidavit that could test Defendants' claim that the law will be incredibly broad. Memo.35-36; Burden Rep. at 35; Fellman Decl. ¶¶ 31-36; Patterson Decl. ¶¶ 31-36; Lopez Decl. ¶¶ 34-35. In sum, even if the reasonable impediment declaration were a panacea, as Defendants implausibly speculate, it still would not cure the disparities imposed by SB824 because voters do not know about it or how it operates and the State has not done enough to educate them and has run out of time to do so between now and March 3.

### D. SB824 Is Not Distinguishable From the Voter ID Provisions of SB589

Defendants argue that SB 824 is more lenient than HB589 and should therefore withstand VRA challenge. The purported distinctions are illusory.

Some of Defendants' distinctions are overstated—the voter ID provision in SB824 is similar to the provision in HB589 and, when combined with SB325, the two bills create a patchwork that makes changes that are substantially similar to HB589. Others are simply false. Defendants claim otherwise, but the Assembly had access to racial data in shaping this law. *Supra* at 8.

The rest of the differences Defendants point to are inconsequential. While Defendants do not dispute that most of the ID requirements are identical, they overstate the differences between the IDs permitted under HB589 and SB824.

US 167075138v5

Opp.9; *see also* Amicus.9. Some university students can now use their student ID, but the student ID approval process has been largely ineffective. Most community colleges—where the student population is 24% black and 7% Latino—have not had their IDs approved, some universities have still not had their IDs approved, and other universities have only had "special IDs" approved. Lopez Decl. ¶¶ 27-30. The same is true of employer IDs—fewer than 100 employers have had their IDs approved. SB824's provision permitting local government IDs has also proven inconsequential—of the state's 100 county governments, only 14 have had their county IDs approved, while a mere 12 of North Carolina's 532 incorporated municipalities have had their IDs approved for voting.[5] And SB824's list of permissible IDs also removed some IDs that were permitted under HB589, including learner's permits and some expired IDs for seniors. Lichtman Rep. at 40.

### E. Defendants' Reliance on Other States' Laws is Misplaced

Alternatively, Defendants try to insulate SB824 from judicial scrutiny by pointing to five cases where federal courts found that voter ID laws were upheld by the Courts. Opp.26-29. Defendants arguments fundamentally misunderstand the case-by-case "intensely local appraisal" required to satisfy the fact-intensive totality of the circumstances review of Section 2. 52 U.S.C. § 10301(b); *League of Women*

---

[5] The list of approved IDS is publicly available at the NCSBE website: https://www.ncsbe.gov/Voter-ID (last accessed Nov. 15, 2019).

US 167075138v5

*Voters of N.C. v. North Carolina*, 769 F.3d 224, 229 (4th Cir. 2014) (quoting *Thornburg v. Gingles*, 478 U.S. 30, 78 (1986)). Notwithstanding fundamental differences in the laws themselves, Wisconsin, Texas, South Carolina, and even Virginia – are not North Carolina. Those cases involved different laws, enacted by different legislatures, in different States, with different histories. None of those cases involved a law enacted by a legislature that had engaged in repeated flagrant acts of intentional race discrimination. None of those cases involved the reenactment of a voter ID law substantially similar to a law that was only recently found to be the product of intentional racial discrimination. None of those cases involved a law where the challengers could show concretely and unambiguously—as they can here—a drastic disparate impact on the basis of race. And none of those cases involved a state where ameliorative provisions had been tried and had been ineffective—in the 2016 primary, with a voter ID law and RID in place in North Carolina, the process was improperly implemented at the polls and thousands of voters were deterred from even going to the polls as a result of the voter ID law. *See* Burden Rep. 23-26; Lichtman Rep. 33-37; *see also* Exhibit M, Supplemental Report of Barry C. Burden 1-2. And, as Plaintiffs have shown, that deterring factor continues to loom large as a problem in North Carolina. Barreto Rep. 28-29; Lichtman Supp. 12.

18

The photo ID law at issue in *Lee v. Virginia State Board of Elections*, 843 F.3d 592 (4th Cir. 2016), for instance, materially differed from SB824. Virginia's legislature did not enact it in the aftermath of a prior voter ID law being thrown out as racially discriminatory or as part of a coordinated pattern of legislative enactments that were held to discriminate on the basis of race with respect to voting. Virginia had a history of requiring identification at the polls that dated back twenty years. It permitted a far broader range of photo IDs, including public assistance IDs, all Virginia college IDs, all photo IDs issued by Virginia state and political subdivisions, and all employer IDs issued in the ordinary course of business by Virginia employers. *Id.* at 581. Virginia also made free IDs easier to acquire through the use of "mobile voter-ID stations located throughout Virginia." *Id.* at 595. Perhaps most importantly, these mobile ID stations were available on election day. *Id.* In light of North Carolina's unique history, demographics, and socio-economic makeup, SB824 "stands nearly alone" in its likely disparate impact on minority voters. *See* Memo.46-47, Lichtman Rep. at 114-116. *Lee* cannot be read to be "binding precedent" in this case in the way amicus suggests. Amicus.2

## II.     SB824 Likely Violates the Results Prong

Plaintiffs have shown that SB824 will disparately and substantially deny and abridge Black and Latino voters' ability to vote. Memo.29-35; 39-40; *see also* McKissick Decl. ¶¶ 34-36; Burden Rep. at 22-35; Lichtman Rep. at 20-36. Despite

19

attempting to throw sand at the no-match analysis, Defendants make no serious challenge to the numerous studies and surveys that leave no doubt minorities have statistically significantly lower access to the acceptable DMV IDs and that types of DMV IDs more accessible to minorities (permits; expired and suspended licenses) were excluded, along with other types of more accessible ID, such as federal and state public assistance IDs and student and employer IDs unencumbered by a needless, onerous approval process. Defendants rest their lack of disparate access argument on unproven speculations about CBOE IDs and RID. For Defendants' speculations to come true, the pace of CBOE IDs would need suddenly to explode despite the funding of only one ID machine per county and extremely meager CBOE ID issuance thus far. This claim, as well as the optimism that substantially more voters compared to the 2016 primary will take advantage of the new, but hardly improved, RID is backed by no evidence whatsoever. Opp.33.

Defendants also do not contest any of the other factors relevant for assessing "results prong" cases. *Thornburg v. Gingles*, 478 U.S. 30, 44-45 (1986); *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 238-39 (4th Cir. 2014). While Plaintiffs submitted evidence that the disparate burden is clearly linked to the effects of past discrimination, Memo.40-42, Defendants do not dispute that record. Nor do Defendants dispute the fact that voting is racially polarized in North Carolina or that Black and Latinos are consistently underrepresented in North Carolina.

US 167075138v5

Opp.42-43. Defendants also do not contest that in-person voter impersonation is not a problem in North Carolina; at best, their attempts to provide a justification for the law are obfuscations that still admit to the lack of a problem. *Supra* at 11-12.

## III. A Preliminary Injunction Is Necessary To Prevent Irreparable Harm to Plaintiffs and Minority Voters in North Carolina

All of the other preliminary injunction factors support granting a preliminary injunction. Voters will most certainly face an irreparable "harm that cannot be recompensed" if SB824 is not enjoined, and the public interest and equities weigh in favor of granting a preliminary injunction. *Shannon v. Jacobowitz*, 301 F. Supp. 2d 249, 258 (N.D.N.Y. 2003); *see also United States v. City of Cambridge*, 799 F.2d 137, 140 (4th Cir. 1986) (noting that "discriminatory [voting] procedures constitute the kind of serious violation of the Constitution … for which courts have granted immediate relief" and citing cases). Defendants' only rejoinder, that the State suffers an irreparable injury "any time" it is enjoined "from effectuating statutes enacted by representatives of its people," strains credulity. Opp.36. Plaintiffs' sole citation for this principle is a passing, in-chambers statement that has not been adopted as law. To the contrary, courts across the country have held that a state does not have a legitimate interest in enforcing an unconstitutional law. See *LWV*, 769 F.3d at 247-48; *Newsom ex rel. Newsom v. Albemarle Cty. Sch. Bd.*, 354 F.3d 249, 261 (4th Cir. 2003); *Chamber of Commerce of U.S. v. Edmondson*, 594 F.3d 742, 771 (10th Cir. 2010); *Scott v. Roberts*, 612 F.3 1279, 1297 (11th Cir. 2010).

US 167075138v5

Nor is the fact that the State would have to halt its implementation of SB824 a compelling reason to not grant a preliminary injunction. If the law is likely illegal under the Voting Rights Act or Constitution, implementation *should* be halted. Continuing to implement such a discriminatory law would needlessly add to voter and poll worker confusion and could lead to voters not voting because they believe the discriminatory law is still in place.

## CONCLUSION

For the reasons set forth above, Plaintiffs request that this Court enter a preliminary injunction against the implementation of the provisions of SB824 that impose voter-identification requirements, that expand the number of poll observers, and that loosen eligibility requirement for people who can challenge ballots in the March 2020 elections pending the outcome of a trial on the merits of plaintiffs' claims.

US 167075138v5

Dated: November 15, 2019                    Respectfully submitted,

 By: */s/ Irving Joyner*　　　　　　　　      By: */s/ Penda D. Hair*　　　　　　
Irving Joyner                               Penda D. Hair
NC State Bar No. 7830                       DC Bar No. 335133
P.O. Box 374                                FORWARD JUSTICE
Cary, NC 27512                              P.O. Box 42521
Telephone: +1 919.319.8353                  Washington D.C. 20015
Email: ijoyner@nccu.edu                     Telephone: +1 202.256.1976
                                            Email: phair@forwardjustice.org


 By: */s/ John C. Ulin*　　　　　　　　
John C. Ulin                                Caitlin A. Swain
CA Bar No. 165524                           VA Bar No. 84515
James W. Cooper                             FORWARD JUSTICE
Jeremy C. Karpatkin*                        400 W Main Street, Suite 203
Andrew Tutt                                 Durham, NC 27701
ARNOLD & PORTER KAYE                        Telephone: +1 919.323.3889
SCHOLER LLP                                 Email: daryl@forwardjustice.org
601 Massachusetts Ave., NW                          cswain@forwardjustice.org
Washington, DC 20001-3743
Telephone: +1 213.243.4228
Email: John.Ulin@arnoldporter.com           * *Pro hac vice* motion forthcoming

*Counsel for Plaintiffs*

23

US 167075138v5