IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

NORTH CAROLINA STATE CONFERENCE*
OF THE NAACP, et al.,          *
                               *  Case No. 1:18CV1034
          Plaintiffs,          *
                               *
vs.                            *  Winston-Salem, North Carolina
                               *  December 3, 2019
ROY ASBERRY COOPER, III, in his*  9:30
official capacity as the       *
Governor of North Carolina,    *
et al.,                        *
                               *
          Defendants.          *
********************************

**EXPEDITED TRANSCRIPT**
**ORAL ARGUMENT ON PRELIMINARY INJUNCTION MOTION**
BEFORE THE HONORABLE LORETTA C. BIGGS
UNITED STATES DISTRICT JUDGE

Lori Russell, RMR, CRR
Official Court Reporter
United States District Court
P.O. Box 20593
Winston-Salem, North Carolina 27120

1   **APPEARANCES:**

2   **For the Plaintiffs:**     **IRVING L. JOYNER, ESQUIRE**
                                      Post Office Box 374

3                                         Cary, NC 27512

4                                         **JOHN C. ULIN, ESQUIRE**
                                      **JAMES W. COOPER, ESQUIRE**

5                                         **JEREMY C. KARPATKIN, ESQUIRE**
                                      **PRESTON SMITH, ESQUIRE**

6                                         Arnold & Porter Kaye Scholer, LLP
                                      601 Massachusetts Avenue, NW

7                                         Washington, DC 20001-3743

8                                         **CAITLIN SWAIN-MCSURELY, ESQUIRE**
                                      **PENDA D. HAIR, ESQUIRE**

9                                         **KATHLEEN ROBLEZ, ESQUIRE**
                                      Forward Justice

10                                       400 W. Main Street, Suite 203
                                      Durham, NC 27701

11

12   For the Defendants:     **OLGA E. VYSOTSKAYA DE BRITO, ESQUIRE**
                                      **PAUL M. COX, ESQUIRE**

13                                       North Carolina Department of Justice
                                      Post Office Box 629

14                                       Raleigh, NC 27602

15

16

17

18

19

20

21

22

23

24

25

# P R O C E E D I N G S

1

2          **THE COURT:**  Madam Clerk, if you would call this matter

3    for the Court, please.

4          **THE CLERK:**  Yes, ma'am.

5       Calling case 1:18CV1034, North Carolina State Conference of

6    the NAACP, et al., versus Cooper, et al.

7          **THE COURT:**  Good morning.

8       (Simultaneous response from counsel.)

9          **THE COURT:**  I understand we have had a switch of

10   tables based on the number of attorneys that are present for

11   the Plaintiffs.

12      Mr. Joyner, I understand that you're going to make

13   introductions.  Is that correct?

14          **MR. JOYNER:**  That's correct, Your Honor.

15          **THE COURT:**  All right.  Let me hear from you, sir.

16          **MR. JOYNER:**  Okay.  Good morning, Judge Biggs.

17          **THE COURT:**  Good morning.

18          **MR. JOYNER:**  Good to be in your courtroom again --

19          **THE COURT:**  Yes, sir.

20          **MR. JOYNER:**  -- as always.

21      I'm Irving Joyner, for the record; and along with our

22   cocounsels, we represent the North Carolina NAACP, the State

23   Conference of the NAACP, and six of its local branches.

24      At this hearing, we seek to obtain a preliminary injunction

25   to prevent the imposition of the voter ID requirement in

 1  North Carolina, which violates Section 2 of the 1965 Voting

 2  Rights Act and the Fourteenth and Fifteen Amendments to the

 3  Constitution.

 4     Your Honor, I want to just introduce counsel to you.

 5  Beginning on the end, Jeremy Karpatkin of Arnold Palmer --

 6  Porter.  I'm thinking about the drink.

 7          **THE COURT:**  Now, I'm happy for you to introduce them,

 8  but if it would be easier -- you've got a lot of counsel over

 9  there.  If it would be easier for you to stand and tell me who

10  you are and who you're with, that would be helpful.

11          **MR. JOYNER:**  Okay.

12          **THE COURT:**  All right.

13          **MR. KARPATKIN:**  Jeremy Karpatkin with Arnold & Porter

14  for Plaintiffs the North Carolina Conference of the NAACP.

15          **THE COURT:**  Thank you, sir.

16          **PRESTON SMITH:**  Good morning, Your Honor.  Preston

17  Smith from Arnold & Porter.

18          **THE COURT:**  Good morning.

19          **MS. ROBLEZ:**  Good morning, Your Honor.  Kathleen

20  Roblez from Forward Justice.

21          **THE COURT:**  Yes.

22          **MS. HAIR:**  Good morning.  Penda Hair from Forward

23  Justice for the Plaintiffs.

24          MR. COOPER:  Good morning, Your Honor.  James Cooper

25  from Arnold & Porter.

1          **THE COURT:**  Yes.

2          **MS. SWAIN:**  Good morning, Your Honor.  Caitlin Swain

3   from Forward Justice.

4          **MR. ULIN:**  Good morning, Your Honor.  John Ulin from

5   Arnold & Porter, proudly representing the NAACP Plaintiffs here

6   this morning.

7          **THE COURT:**  Yes.

8          **MR. JOYNER:**  Your Honor, our Plaintiffs are here as

9   well and are seated in the gallery.  Representing the State

10  Conference of the NAACP is Dr. T. Anthony Spearman, who is

11  here; representing the Greensboro branch of the NAACP, Reverend

12  Cardes Brown; representing the High Point NAACP is James Adams;

13  and the Moore County branch, Linda Watkins-McSurely; and

14  Dr. Gregory Hairston of the Stokes County NAACP; and Reverend

15  Carlisle of the Winston-Salem/Forsyth branch of the NAACP; and

16  President Anna Richards of the Chapel Hill-Carrboro NAACP; and

17  we have also Armenta Eaton, who is one of the former plaintiffs

18  in the *McCrory* case and the daughter of Rosanell Eaton.

19      With the Court's approval, the presentation from the

20  Plaintiffs' side will probably consume most of the morning; and

21  following arguments from the State, then we will have some

22  rebuttal as well.  But the presentation on behalf of the

23  Plaintiffs will be made by Attorney Swain-McSurely and John --

24  Attorney John Ulin.  Attorney Swain will discuss the intent

25  components of our case and then Attorney Ulin will discuss the

1  effects component of the case and we're going to start off with

2  some opening --

3          **THE COURT:**  Before you do an opening, what I would

4  like is for -- to allow the other side to introduce their

5  counsel and then I'm going to tell you how the -- we're going

6  to proceed from this point forward.

7          **MR. JOYNER:**  That's fine, Your Honor.

8          **THE COURT:**  All right.  Thank you, Mr. Joyner.

9     Yes.

10         **MS. VYSOTSKAYA:**  Your Honor, my name is Olga

11  Vysotskaya.  I'm a Special Deputy Attorney General of the

12  North Carolina Department of Justice.  My cocounsel, my

13  colleague, is Mr. Paul Cox.  He also works for the Department

14  of Justice.  And we both represent the Defendants here, the

15  North Carolina State Board of Elections and the officials who

16  were sued in their official capacities as well.

17     And seated next to us is the acting general counsel for the

18  State Board of Elections, Katelyn Love.

19     We are willing to take whatever instructions the Court

20  gives us as far as how the presentations will go.

21         **THE COURT:**  Tell me your last name again, please.

22         **MS. VYSOTSKAYA:**  My name is Vysotskaya, my last name.

23  Vysotskaya.

24         **THE COURT:**  All right.  Thank you.  Thank you so very

25  much.

1    **MS. VYSOTSKAYA:**  Just generally, Your Honor, we have

2    divided our presentations, but we will take whatever directions

3    the Court will give us.  It was my intent to talk about

4    discriminatory intent and my cocounsel was going to talk about

5    the effects.  But whatever the Court will order us to do.

6         **THE COURT:**  All right.  Thank you.

7         What I believe would be most helpful to the Court is for us

8    to follow the pattern of the showing that is required for a

9    preliminary injunction; and I would like to divide up the

10   arguments into the Section 2 claims, as well as -- and the

11   constitutional claims with respect to the merits.

12        What I think I would like to do is hear from each side with

13   respect to the merits before we go forward on the irreparable

14   harm, the public interest, and the balance of the equities.  I

15   leave it up to each side how you wish to present this to me,

16   but I am telling you what I believe this Court needs in order

17   to rule in the way that I need to rule on the case.

18        I will tell you, to the Plaintiffs, I have not foreclosed

19   the possibility or potential of testimony -- oral testimony.  I

20   did not have enough information for me to make a determination

21   if that would be helpful.  What might be helpful as you go

22   through your discussion, identify those areas in which it is

23   that you would like to give testimony and what you forecast

24   that testimony would show.  That will help the Court make the

25   determination of whether or not that is possible.

1        Now, I understand that my order indicated that this

2   particular day in this hearing would be oral argument.  I have

3   also noted the number of conflicts that you have shared with

4   the Court.  However, this case, as can be seen from those who

5   are interested in this courtroom, is a very important case.  It

6   is your priority right now and so the Court will make the

7   determination on whether or not it would be helpful to the

8   Court to hear oral testimony.

9        All right.  Now, I cut you off, Mr. Joyner.  I'm going to

10  allow you to continue.

11       I will say one other thing.  I have read the briefs, I have

12  read much of the case law associated with those briefs, and I

13  have read most of the expert -- but it would be helpful as you

14  go through your argument to point the Court to specific

15  evidence in the record that will support the positions that you

16  are arguing to the Court.

17       With that said, Mr. Joyner, yes, sir, what would you like

18  to share with me?

19            **MR. JOYNER:**  Thank you, Your Honor, for those

20  instructions.  I'm just going to turn it over to Attorney Ulin

21  and we'll go into the format that you suggested.

22            **THE COURT:**  All right.  Thank you so much.

23            **MR. ULIN:**  Thank you, Your Honor.

24       And thank you, Mr. Joyner.

25       Your Honor, we will follow your direction and take on the

1  preliminary injunction factors in order beginning, as you
2  suggested, with the question of likelihood of success on the
3  merits.

4      We come before the Court on a motion to enjoin the
5  implementation of Senate Bill 824, North Carolina's latest
6  photo voter ID law, because it violates Section 2 of the Voting
7  Rights Act and the Fourteenth and Fifteenth Amendments.  SB824
8  is a racially-motivated voter suppression law.  It's intended
9  to prevent people from voting and that's exactly what it does.

10     Principal questions before this Court are who did the
11 General Assembly intend to prevent or deter from voting and who
12 is actually prevented and deterred; and the answers to those
13 questions are the same:  Black and Latino voters in
14 North Carolina.

15     My colleague, Caitlin Swain, will address how the evidence
16 before this Court demonstrates that the General Assembly
17 enacted SB824 with the intent to entrench the majority party by
18 deterring black and Latino voters, among others, who tend to
19 support the other party from voting.

20     I will then follow and address how the evidence
21 demonstrates that SB824 interacts with social and historical
22 conditions in North Carolina to cause discrimination in such a
23 way as to deprive minority voters of an equal opportunity to
24 participate in the political process, and I will also explain
25 why the new voter ID law cannot be implemented in the three

1   months -- and that's all there is -- left between today and the

2   March 2020 North Carolina primaries without violating the

3   voting rights of minority voters.

4       In these ways we'll demonstrate that Plaintiff has shown a

5   likelihood of success on the merits of their discriminatory

6   intent claim under Section 2 of the Voting Rights Act, and on

7   the coextensive Fourteenth and Fifteenth Amendment claims, and

8   also on the discriminatory results claim under Section 2.

9       We'll conclude then, as Your Honor suggested, at a later

10  portion of the hearing by addressing the other preliminary

11  injunction factors.

12          **THE COURT:**  Let me ask you this question:  Why did you

13  wait eight months to bring your preliminary injunction motion?

14          **MR. ULIN:**  Your Honor, the voter ID law in

15  North Carolina was suspended for 2019.

16          **THE COURT:**  I do understand that.  But by virtue of

17  bringing it at this time, do you not put the other side at a

18  disadvantage?  I suspect -- and I have not heard their

19  evidence, but I'm sure they have done substantial efforts

20  toward preparing for the launch of this.  So I don't really

21  understand why you waited so long to bring this preliminary

22  injunction motion.

23          **MR. ULIN:**  A couple of points, Your Honor.

24      First of all, in terms of waiting, as it were, to bring the

25  motion, we're seeking to enjoin the first implementation of the

1    law.  The motion would have been --

2            **THE COURT:**  I understand, in March.

3            **MR. ULIN:**  -- filed earlier had the intended rollout

4    of the law in 2019 actually proceeded, but that was suspended.

5    Therefore, we felt it was important to take time to develop a

6    full record and the full record is one of the things that

7    distinguishes this case from other cases involving voter --

8    challenges to voter identification laws, to develop the

9    evidence that would demonstrate to this Court both why the law

10   was enacted with discriminatory intent, why the law has a

11   discriminatory effect, and why the so-called ameliorative

12   provisions incorporated in the law don't remedy either the

13   discriminatory intent or the discriminatory impact.

14       And it took quite some time to amass that record which is

15   now before Your Honor and we believe it was important to take

16   that time.  And the State afforded us, by virtue of suspending

17   the law for 2019, the opportunity to make that record and bring

18   the matter before the Court in a manner that's sufficiently

19   timely to get this case resolved before the implementation of

20   the law in 2020.

21       With respect to the State's preparations, that's going to

22   be an important aspect of our argument and I would just offer

23   the Court two points.  One is -- and I will go into this in

24   some detail and there is evidence in the record that will

25   support the points that I'm making.

1       The State's efforts at implementation of the law slowed

2   dramatically and many of them were suspended entirely when the

3   2019 -- when the legislature earlier in 2019 passed a bill

4   suspending voter ID for this year, pushing the implementation

5   to March of next year.  That's, in fact, a significant reason

6   why we'll argue later today that the law can't possibly be

7   implemented in the next three months, because the State and the

8   SBOE have not undertaken the steps necessary to implement it in

9   an orderly fashion and to inform the public and educate

10  election officials.  And that can't be accomplished in a

11  three-month time period.

12      Your Honor asked the question about the State making

13  efforts to implement the law.  We will argue that a lot of

14  those steps in fact have not been taken, have been deferred,

15  are works in progress, and will leave insufficient time for --

16  for implementation.

17      The other point I would make is the SBOE's executive

18  director, in her declaration before the Court, indicated that

19  we have until at least December 31st -- and the Court can test

20  the bounds of what that means -- before she would need to make

21  changes to the State's information systems affecting -- State's

22  information -- State's collection information systems that she

23  claims would be necessary to implement voter ID.

24      In other words, what I'm saying is even the State's own

25  witness has suggested there is sufficient time for the Court to

1   digest the information that's been submitted to you throughout

2   the fall, come to a decision by -- during the month of

3   December -- whether that's a -- whether that's an initial

4   decision or your full opinion will remain to be seen -- and

5   still have SBOE react in a way that allows them to stand down

6   on implementing the voter ID if the Court finds, as we believe

7   the evidence will demonstrate to you, that this law can't be

8   implemented because it violates the Voting Rights Act and the

9   federal Constitution.

10          **THE COURT:**  All right.  Before you proceed, I did ask

11  this -- I want to give the other side an opportunity to speak

12  to that issue.

13      I know that is a part of your presentation and would

14  generally come later, but I want to give you that opportunity

15  to speak to that issue, if you wish to at this time.

16          **MS. VYSOTSKAYA:**  Yes, Your Honor.  Thank you.

17      That delay of eight months that Your Honor have referenced

18  earlier is one important factor why we believe the Court should

19  deny the request for preliminary injunction in this case.  The

20  State has started undertaking significant -- has started taking

21  significant steps towards implementation of SB824.

22      Those steps included holding two seminars per each county

23  in North Carolina, educating voters and the local officials on

24  the requirements of the voter ID law.  Those seminars have been

25  conducted already and -- and so that step has been done.

1        The State already has prepared and mailed about 700,000

2   mailings to those voters that may lack DMV-issued IDs and

3   notified those voters about voter ID requirements and told

4   those voters how to obtain the voter IDs that are necessary for

5   voting if they lack them.

6        The State is in the process this week -- the mailings are

7   already at the mailers -- mailing vendor facility for all the

8   mailings to go to all residences in North Carolina that would

9   inform everybody about the requirements of the voter ID law.

10  Those are printed, at the mailers now.  They will be mailed

11  today or at some point later this week.

12       The State has developed a number of temporary rules

13  regarding the voter ID requirement.  The State has started

14  issuing free voter ID cards to the voters in North Carolina,

15  multiple other steps that we could talk about.

16       But there were multiple steps that have been undertaken by

17  the State Board to prepare for this; and if those efforts are

18  halted right now and if they're later, let's say, reinstated

19  and the law is reinstated, the voters will be harmed, the State

20  Board will be harmed, part of the voter educational campaign

21  will not take place.

22       So we believe that question that Your Honor asked is very

23  important question in determining whether a preliminary

24  injunction should issue and weighs against Plaintiffs'

25  position.

1    I don't know, Your Honor, if you would like me to respond

2  to the beginning --

3         **THE COURT:**  Nothing further.  I just did not want to

4  not allow you the opportunity to respond to that specific

5  question that I asked.

6         **MS. VYSOTSKAYA:**  Thank you.

7         **THE COURT:**  All right.  Thank you.

8    Yes, sir.  I apologize for interrupting you.  If you would

9  proceed.

10        **MR. ULIN:**  You need not apologize to me, Your Honor.

11        **THE COURT:**  Yes.

12        **MR. ULIN:**  I have nothing to add to my introduction

13 and we'll take up some of the points made by opposing counsel

14 when they arise in the course of our argument, particularly

15 about the rushed implementation of SB824 and how that can't

16 possibly go forward without infringing the voting rights of

17 black and Latino voters throughout the state of North Carolina,

18 and the critical importance of preserving those rights,

19 notwithstanding any of the interim efforts that the State has

20 begun but as to which it has quite a long way to go yet in

21 attempting to implement that law in the incredibly short period

22 of time that's left.

23    So without further ado, I'm going to turn the microphone to

24 my colleague, Ms. Swain, who will address the issue of the

25 State's enactment of this law with racially discriminatory

1   intent.

2          **MS. SWAIN:**  Good morning, Your Honor.

3          **THE COURT:**  Good morning.

4          **MS. SWAIN:**  Again, my name is Caitlin Swain with

5   Forward Justice representing the North Carolina NAACP

6   plaintiffs.  I will be reviewing this morning the overwhelming

7   evidence in support of Plaintiffs' likelihood of success as to

8   the racial intent claim under Section 2 of the Voting Rights

9   Act.

10      As Your Honor knows, we are here in Winston-Salem today

11  under a challenge to SB824, a law passed in December 2018, just

12  over a year ago, which will require otherwise eligible

13  required -- registered voters in North Carolina to show one of

14  a limited number of photo identification cards in order to cast

15  a ballot and have it counted in North Carolina elections in

16  2020.

17      Plaintiffs contend that SB824 is independently and fatally

18  infected by the same race -- racially discriminatory intent as

19  its predecessor bill, HB589.  That law was struck down by the

20  Fourth Circuit in the controlling case here, *North Carolina*

21  *NAACP v. McCrory.*

22      In *McCrory*, the Fourth Circuit found that the 2013 General

23  Assembly enacted 589, including its photo identification

24  requirement, with racial intent, in contravention of the

25  protections of the U.S. Constitution and Section 2 of the

1  Voting Rights Act.  The Court held there that the evidence

2  unmistakably revealed that the General Assembly used HB589 to

3  entrench itself.  It did so by targeting voters based on race

4  and it targeted African American voters with almost surgical

5  precision.

6      Before reviewing the *Arlington Heights* factors and some of

7  the key evidence that we think will be helpful for Your Honor

8  to note I think that is in the record, I want to highlight four

9  points which I believe go to the heart of Plaintiffs' intent

10  case and show that racial intent motivated, at least in part,

11  the General Assembly's enactment of SB824, which is our burden.

12      First, voter ID passed in 2018 did not emerge in a vacuum.

13  There is an unbroken line between SB824 and the last

14  decades-long sequence of illegal actions taken by the

15  Republican-controlled General Assembly to entrench its own

16  power, including HB589.  The systematic official efforts by

17  this State and these decision-makers to depress and suppress

18  the voting power and participation of a surging African

19  American electorate just when African Americans, in tandem with

20  an emerging Latino electorate in this state, were beginning to

21  exercise that power matters.  These actions are indisputably

22  highly relevant to this Court's consideration of the

23  decision-makers' motivations in enacting SB824.

24      Second, the Assembly stated rationales reveal pretext.  The

25  record shows that this General Assembly had no legitimate

1  actual nonracial explanation to justify SB824's enactments and

2  the Defendants have not proffered one.  In *McCrory,* the Fourth

3  Circuit ruled that the legislators tried unsuccessfully to,

4  quote, conceal the true motivation by purporting to cure

5  problems that do not exist.

6      In 2018, recycled bare statements by legislative leadership

7  asserting that the motivation for SB824 is, quote, prevention

8  of voter fraud or the promotion of voter confidence, must be

9  weighed against volumes of the State's own meticulously

10  produced bipartisan evidence, including new evidence that was

11  before the legislature in 2018, demonstrating the opposite.

12      Facts outweigh fiction.  The evidence before the Assembly

13  was that voter impersonation is so vanishingly rare that it is

14  a statistical zero in this state.  The General Assembly's

15  assertions are more than suspect under those facts.  They

16  reveal a lie and once again conceal another motive.

17      Third, the constitutional amendment in this case, Your

18  Honor, does not break the through line.  The record does not

19  show that the constitutional amendment represented an effort to

20  abide by judicial rulings but, rather, to circumvent them.  The

21  enactment of SB824 features troubling new indicia of intent in

22  the sequence of events preceding it, which I'm going to walk

23  through shortly; and the North Carolina General Assembly

24  leadership never accepted the *McCrory* holding, admitted it was

25  their intent to circumvent that ruling, then immediately and

 1   persistently acted to do so.

 2       Fourth and finally, SB824 fatally fails to remedy racially

 3   disparate impacts and reenacts the core discriminatory

 4   provisions of 589.  Black and Latino voters will bear the

 5   results of this legislative action more heavily than white

 6   voters in this state.

 7       I turn now to the legal standard for the racial intent

 8   analysis under Section 2 and I will move through this quickly

 9   and, Your Honor, please tell me to move along if you would like

10   me to.

11       A facially neutral election law like the one at issue here

12   constitutes intentional race discrimination where

13   circumstantial and direct evidence of intent show the law's

14   impermissible purpose.  In instructing courts to consider the

15   broader context surrounding the passage of legislation, the

16   court in *McCrory* recognized, and under *Arlington Heights* it's

17   clear, that outright admissions of impermissible racial

18   motivation are infrequent and plaintiffs often must rely on

19   other evidence.

20       Racial intent is a question of fact requiring a sensitive

21   and comprehensive analysis of the evidence, including

22   credibility determinations, and the drawing of legitimate

23   inferences from scrutiny of the record evidence; and analysis

24   of intentional discrimination requires looking at the broad

25   context and process of decision-making.

1    As Your Honor has already shared, if you determine that

2    additional live testimony would support the Court's fact

3    finding, we are prepared and ready to bring live witnesses; and

4    I will try as I move through to forecast some of the evidence

5    as you suggest that would potentially be -- that we would

6    potentially be bringing forward.

7    A few other facts that I think are key in this case to an

8    intent analysis:  First, racial discriminatory intent need not

9    be the sole or primary factor, just a motivating factor, behind

10   an enactment.  It's not the same as a racial animus.  It may be

11   present -- and this is under the *McCrory* precedent.  It may be

12   present where decision-makers engage in the intentional

13   targeting of a particular race's access to the franchise

14   because its members vote for a particular party in a

15   predictable manner even absent any evidence of race-based

16   hatred and it is no defense that racial discrimination may be

17   done for partisan aims.

18   To assess the evidence of intent, the Court applies the

19   framework provided by the traditional *Arlington Heights*

20   factors.  I've listed them here on this demonstrative.  I am

21   hoping this demonstrative is going to serve to illuminate as I

22   go through some of the key points that I'm making and I will

23   direct Your Honor as I continue forward to what -- the

24   underlying exhibits that are referenced.

25   Those five factors here -- the historical background

1  preceding the law, the sequence of events leading to the

2  passage of the bill, departures from substantive or procedural

3  practice, legislative history, and whether the decision bears

4  more heavily on certain racial groups -- are going to be the

5  framework that I'm going to use to walk briefly through key

6  evidence in Plaintiffs' case.

7      At the conclusion of determining whether there is a racial

8  intent that is a motivating purpose, of course there is a

9  burden shift.  In this holistic -- after this holistic review,

10  the burden shifts to the law's defenders to demonstrate that

11  the law would have been enacted without this factor under

12  *Hunter v. Underwood.*  When determining if this burden has been

13  met, courts must be mindful under the *McCrory* precedent that

14  racial discrimination is not just another competing

15  consideration.  Courts must scrutinize the actual nonracial

16  motivations to determine whether they alone can justify the

17  legislature's choices.  We submit here, Your Honor, that that

18  is not the case.

19      I'll begin briefly with a historical background preceding

20  the law; and in some instances, there is just no contest

21  between the two parties.  This is one of them.  The State does

22  not contest the long, sordid history of racial discrimination

23  in this state because they cannot.  As found by the Court of

24  Appeals, every stratagem ever devised for race-based voter

25  suppression has been used to diminish black voting power in

1 North Carolina.

2     Professor Jim Leloudis of UNC Chapel Hill has submitted an

3 extensive report to Your Honor and you'll see here in the

4 demonstrative just a short example -- a short illustration of

5 the Civil War to disenfranchisement period, of cyclical

6 increase in black voter participation met by immediate efforts

7 to disenfranchise, then a similar very small effort in the Jim

8 Crow period; and then you'll see it moves us up to the Civil

9 Rights movement and aftermath, which is the most recent history

10 that we find ourselves in today.

11     The efforts in this state to disenfranchise black voters

12 wiped out black political power for the majority of

13 North Carolina's history and resulted in enduring social and

14 economic disparities by race, which Your Honor is familiar with

15 and is in the record.

16     While fragile, important gains were made after the passage

17 of the Voting Rights Act.  During this period, though, 50

18 lawsuits were filed against the State to protect African

19 American voting rights; and under Section 5, preclearance, the

20 Department of Justice objected to more than 60 election law

21 changes.

22     I turn now to the sequence of events leading up to the

23 challenged decision, which is also a story about the recent

24 history in this state.  North Carolina's history of racial

25 discrimination and voting is not just in the past.  This decade

1  in North Carolina shows a remarkably brazen record of racial

2  discrimination by the North Carolina General Assembly and this

3  recent history is essential to the sequence of events leading

4  up to the ultimate passage of SB824.

5       Since the turn of the decade when Republicans gained

6  control of both chambers for the first time in nearly a

7  century, the North Carolina General Assembly has repeatedly

8  violated the Constitution and the Voting Rights Act.

9       First, in 2011 the legislature enacted three redistricting

10 plans following the 2010 census.  This was the State House, the

11 State Senate, and federal congressional districts.  They then

12 in 2013 adopted -- I'm sorry.  At the same time -- I want to

13 make sure I get this right for Your Honor.  At the same time,

14 in 2011, the General Assembly made its first attempt at passing

15 a photo voter ID law.  That law was vetoed by Then-Governor

16 Beverly Perdue, who found it to have racially discriminatory

17 effects.

18      2013 also brought forth HB589, passed directly on the heels

19 of the June *Shelby* decision, just as North Carolina was freed

20 from DOJ preclearance oversight.  Lawsuits followed; and as the

21 decades progressed, the federal courts then found that all of

22 these acts by the North Carolina General Assembly illegally

23 violated the Constitution by discriminating against black

24 voters.

25      And you'll see this here on the slide.  In 2016, the Fourth

1  Circuit issued its decision in *North Carolina NAACP v. McCrory*.

2      In 2017, a three-judge panel in *Harris v. McCrory* found

3  that the congressional maps constituted an illegal racial

4  gerrymander.  Likewise, in 2017 in *Covington v. North Carolina,*

5  a different three-judge court found that the State House and

6  Senate maps each constituted illegal racial gerrymanders.

7      I turn the Court's attention briefly back to the *McCrory*

8  decision.  In that case, the Fourth Circuit identified that

9  only a few months ago in that decision, only a few months ago,

10 a three-judge court addressed a redistricting plan adopted by

11 the same General Assembly that enacted HB589.  The Court held

12 there that race was the predominant motive in drawing two

13 congressional districts in violation of Equal Protection

14 Clause.  And this is the key quote from the *McCrory* decision:

15 Contrary to the District Court's suggestion, a holding that a

16 legislature impermissibly relied on race certainly provides

17 relevant evidence as to whether race motivated other election

18 legislation passed by the same legislatures.

19     I turn now to the second element of the sequence of events,

20 the context in North Carolina that incentivized these racially

21 discriminatory laws.  Key to understanding the motivations of

22 the Republican majority in the General Assembly is this

23 dramatic shift from roughly 2004 to 2018 in North Carolina's

24 relative white voting strength, as opposed to black and Latino

25 voting strength, a fact also uncontested by the State.

1    Since roughly 2004, this state witnessed an unprecedented

2  growth of voter registration and political participation by

3  black voters.  Of the 1.46 million voters on North Carolina's

4  voter roll between 2000 and 2012, 35 percent were African

5  Americans, even though they only constituted 20 percent of the

6  voting age population in 2000.  By 2008, African American

7  registration rates rose to 94.9 percent of the African American

8  voting age population, as compared with 90.7 percent of whites.

9  Saying this another way, for the two elections -- 2008 and 2012

10  general elections, African American voter participation rates

11  exceeded the whites' voter participation rates for the first

12  time in modern history in this state.

13    That context matters, and the trends in this major shift in

14  relative voting strength by race continue when we examine the

15  period that took place between 589 and the passage of SB824.

16  So that is between 2004 and 2018.

17    I won't belabor this because Your Honor has it in front of

18  you, but I do want to note the dramatic shifts here as analyzed

19  by American University's professor, Dr. Lichtman, who submitted

20  an extensive report for Your Honor.

21    The percentage of registered voters in North Carolina who

22  identify as white plunged during this period, from 77.9 percent

23  in January 2004 to 69.1 percent in June 2008, and you'll see it

24  here on the Table 11.  In contrast, the percentage of

25  registered African American voters in North Carolina rose from

1  19.4 percent in January 2004 to 22.1 percent in June 2018, an

2  increase of almost 14 percent in black voter strength.

3       However, the most striking increase during this period,

4  which is essential to understanding the context that this

5  decision was made in, was an increase in minority registrants

6  who identified as mixed race, Latino, Asian or American Indian.

7  The percentage of registered "other" minorities in this state

8  soared from 2.8 percent in January 2004 to 8.8 percent in

9  June 2018.  This represents an increase of 214 percent in voter

10 strength for this nonwhite group.

11      This change in white versus nonwhite voting strength

12 interacts with an uncontested reality about the voting context

13 in North Carolina where the State admits that, first, there is

14 extreme racially polarized voting in this state which persists

15 today; and, second, race is a better predictor of voting

16 behavior in North Carolina today than any other salient

17 characteristic, that is, sex, age, education, and income, and

18 even better than party affiliation or registration.

19      In this context, the Republican majority could preserve and

20 expand its power by depressing and suppressing the voting

21 strength of African Americans and other people of color through

22 racial gerrymanders and through vote denial.  That is the

23 political payoff for racial discrimination in voting.  That

24 context and that potential payoff continue to exist, and the

25 incentive to engage in racial discrimination had even increased

 1    by the time the North Carolina General Assembly designed its

 2    two-step process to pass a new version of photo voter ID, which

 3    is what I will turn to now.

 4        This third element of the sequence of events is important.

 5    It is the connection drawn by the General Assembly's leaders

 6    themselves between HB589, the *McCrory* decision, and the

 7    decision to propose a voter ID constitutional amendment, and

 8    the ultimate passage of 824.

 9        Plaintiffs -- and I should be clear, Your Honor.

10    Plaintiffs do not contend that the Fourth Circuit's finding of

11    racial intent in 589 automatically carried forward into SB824.

12    Rather, we have shown through the evidence, including the

13    legislative leaders' own statements, that the legislators'

14    racial intent did not change between the enactment of 589 and

15    the enactment of SB824.

16        Immediately after the Fourth Circuit's decision striking

17    down 589, Senate Leader Phil Berger and House Speaker Tim Moore

18    issued a statement calling it a politically motivated ruling by

19    three partisan Democrats.  They were defiant, not repentant,

20    after being found to violate the law based on racial intent.

21    The General Assembly leaders first publicly revealed the

22    constitutional amendment strategy on the same day the Supreme

23    Court announced its denial to review the decision.  That's

24    May 15th, 2017.

25        As described in the Raleigh *News & Observer,* within hours

1  of the release of the Supreme Court's cert denial, the

2  North Carolina Republican party leaders were calling for a new

3  law that would incorporate some of the same ideas, but they

4  wanted to package the same ideas in a manner that they thought

5  could withstand judicial review.  They were not looking to

6  eliminate racial intent.  They were trying to repackage it

7  within a constitutional amendment.

8      By July 2017, media reported that State legislators are now

9  working on another voter ID bill that would be taken to voters

10 as a constitutional amendment.  This local reporting was

11 confirmed by Representative David Lewis, who is the chairperson

12 of the Elections committee and the key -- the key legislator in

13 this case who links at -- HB589 to SB824.

14     David Lewis stated that the purpose of the constitutional

15 amendment was -- and I quote -- to mute future court

16 challenges.  Significantly, Lewis, as the chair of the House

17 Elections committee, was also the General Assembly's key point

18 person on all election-related issues, including the

19 gerrymanders themselves.

20     A year later, in June 2018, when the General Assembly took

21 up the proposal of a constitutional amendment, Representative

22 Lewis explained his support of the amendment by stating, "I

23 think the judge was wrong," referring to the Court of Appeals

24 decision on HB589, and opining, "I think we would have won that

25 case if it had gone to the Supreme Court."

1       Finally, in a direct statement connecting the General

2   Assembly's motivation for the constitutional amendment to the

3   racially-motivated HB589, Lewis explained, "The reason we are

4   asking voters if they want to do this or not is, frankly, we

5   think we passed a good law before."

6       To be clear, this statement in 2018 by the leading GOP

7   sponsor of a constitutional amendment and sponsor of SB824 that

8   the law the Fourth Circuit found to be unconstitutional and in

9   violation of the Voting Rights Act because it discriminated on

10  the basis of race was a good law.

11      All of these North Carolina General Assembly leaders from

12  the issuance of the *McCrory* decision to the enactment of the

13  statutes proposing the constitutional amendment show that SB824

14  was developed not to cure the flaws in 589 that rendered it

15  discriminatory but to pass essentially the same law and render

16  it immune from judicial review.

17      A few other points that I want to just highlight about the

18  constitutional amendment and I'm happy -- we'll be happy to

19  speak more about this later in the presentation, if helpful.

20  The amendment provides no blank check, voter stamp of approval

21  in support of the discrimination of SB824.

22      Other circumstances of the constitutional amendment's

23  passage do matter here.  It was passed by a supermajority

24  obtained by maps found to be the most extensive racial

25  gerrymander seen by a federal court.  In a highly unusual

1  process, it included no blueprint of implementing legislation

2  for voter's approval.  Voters could only vote for what was

3  before them.  They were not voting for 824.

4      And the amendment too suffered from its own infirmities in

5  its rushed process.  Five other constitutional amendments

6  simultaneously were considered and placed on the ballot.

7  Though there was no policy reason to wait -- to do it at this

8  time, the amendment was passed at the very end of the

9  legislative session forcing rushed deliberation and a rushed

10  voter education period as well.

11      Also worth noting, racial polarization and voting on the

12  amendment itself has been identified in this record where

13  African American voters overwhelmingly opposed the amendment.

14      Finally, prior to the constitutional amendment, there were

15  misleading statements made by legislative leadership regarding

16  exceptions that might be considered.  For example, House

17  Speaker Tim Moore stated in 2018 that he could support a voter

18  ID law that included nonphoto forms of ID.  Yet in the adoption

19  of the implementing SB824, he opposed an amendment that would

20  allow use of nonphoto IDs; and the law's enacted does not allow

21  for nonphoto IDs.

22      I turn now to the fourth element of the sequence of events

23  that the legislators -- that show that the legislature's

24  actions in 2018 were possible only because in 2017 the General

25  Assembly leaders delayed implementation of remedial maps

1  through providing what a state court in 2019 determined were

2  likely misrepresentations and falsities to the *Covington* court.

3      Plaintiffs contend that this action, as well as the

4  revelation that their redistricting expert, Dr. Thomas

5  Hofeller, secretly used racial data in constructing the

6  proposed remedial districts, is relevant both to credibility

7  determinations and to inferences that this Court can make about

8  race.  This delay of the remedial maps for the racial

9  gerrymander of the General Assembly preserved the Republican

10  party's supermajority and therefore permitted it to pass --

11  place a constitutional amendment on the ballot.  Under the

12  North Carolina Constitution, that act required a three-fifths

13  majority.

14      Second, the supermajority enabled the General Assembly to

15  rush through a complex proposal, consideration, passage, and

16  veto override of SB824 all in the waning days of the lame-duck

17  session after the ill-gotten supermajority was lost in the 2018

18  election under new court-imposed districts, but before the new

19  legislature duly elected, without a veto-proof majority, was

20  seated.

21      This is key to understanding the departures from normal

22  procedural sequence that can be considered in this case.  The

23  legislature's choice to act during the final month of its

24  supermajority, just as in *McCrory*, strongly suggested an

25  attempt to avoid in-depth scrutiny.

1    Instead of waiting for a duly-elected legislature to be

2  seated, the General Assembly engaged in a procedure that

3  reflected what declarant Tomas Lopez, executive director of

4  Democracy North Carolina, has submitted testimony before the

5  Court was a rushed and opaque process which reflected a

6  legislative body that lacked the representative legitimacy and

7  perspective to address this critical issue.

8    Just a few key points on this, Your Honor.  SB824 was filed

9  almost exactly one year ago on the first Tuesday following

10  Thanksgiving and was passed the following Thursday.

11  Legislators, both longstanding and new members of the House and

12  Senate, have provided compelling testimony to this Court that

13  this was not a thoughtful or considered process and that it had

14  significant irregularities.

15    We have provided testimony from Senator Van Duyn,

16  Representative Reives, Representative Michaux, Senator

17  McKissick, Representative Morey; and the Court also has before

18  it testimony from Senator Harrison, Representative Woodard, and

19  Senator Clark.  The deposition of Senator Joel Ford and the

20  declaration of Reverend T. Anthony Spearman and Tomas Lopez,

21  executive director of Democracy North Carolina, reveal the

22  same.

23    The process here was characterized by a lack of public

24  debate and mixed signals and deception on public comment, which

25  restricted the ability for critics to voice opinions.  In the

 1  process to rush to get it done while the General Assembly still

 2  had its supermajority, the legislature did not bring in

 3  experts.  They rush a third reading to stifle imminent

 4  amendments that were prepared by the minority party.

 5      And I'll just make -- note one more point here.  A

 6  legislature need not break its own rules to engage in unusual

 7  procedures.  The legislative history -- and I am coming to the

 8  close of the *Arlington Heights* factors, Your Honor.  The

 9  legislative history of SB824 shows that it was developed and

10  promoted by the same North Carolina General Assembly leadership

11  caucus -- virtually the same General Assembly leadership caucus

12  that enacted HB589.

13      As Table 1 here shows, a majority of those Republicans

14  voting on the 2018 bill were the same as those who voted to

15  enact HB589 under the 2013 post-*Shelby* bill.  Of course, this

16  is -- it is not our burden to show that it is the exact same

17  decision-makers, but this does have a bearing in understanding

18  the continuous lying between the enactments that were taking

19  place all in a very short period of time.

20      That leadership caucus carried forward the knowledge of the

21  data on the absence of voter impersonation fraud as found in

22  *McCrory*, the knowledge of the race-based possession of

23  disparities, the knowledge of the *McCrory* holding and its

24  findings, and the knowledge of the payoff of vote denial or

25  abridgement by race in the highly racially polarized voting

1  context of North Carolina.

2      Indeed, the General Assembly in 2013, which enacted one of

3  the largest restrictions of the franchise in modern

4  North Carolina history after, quote, receiving data indicating

5  that African Americans would be the voters most significantly

6  affected, that race data was still in hand when the

7  North Carolina General Assembly took steps to enact SB824.  It

8  was exhaustively detailed in the *McCrory* decision and widely

9  published.

10     And while the State may suggest that it's relevant to the

11  Court's analysis that the General Assembly did not request data

12  based on race in this enactment, this point misses the import

13  of the *McCrory* court; that is, the decision did not argue that

14  the request of data itself was suspect but, rather, that what

15  the legislature did once it obtained that data was the indicia

16  of intent.  The fact that here the legislature did not publicly

17  request new racial data after having the previous data in hand

18  in an effort to seek to address the impact by race is confusing

19  at the least and ultimately, we believe, is suspect.

20     Here again, as our experts have found, the provisions

21  ultimately adopted by the North Carolina General Assembly under

22  SB824 reveal an effort to create the appearance of addressing

23  factors identified by the Court of Appeals as indicia of racial

24  intent but the practical preservation and enhancement of the

25  core elements and discriminatory impact of 589 as amended by

1   836.

2       As my colleague, John Ulin, will discuss, the new

3   inclusion, if preapproved, of certain student and employer IDs,

4   the new County Board of Elections-issued IDs, and the slight

5   changes to the reasonable impediment declaration process

6   focused on by Defendants do not significantly change the impact

7   of SB824 or undermine the overall racial intent and impact with

8   the law.

9       The acceptance of some apparently ameliorative amendments

10  offered by a minority party is not dispositive in an intent

11  finding.  For example, this was also the case in *McCrory*.  And

12  here it does not tell the whole story.  In the hurried

13  consideration of SB824, the North Carolina General Assembly

14  rejected significant efforts to ameliorate the racial intent of

15  the bill.  They either voted them down, tabled or otherwise

16  rejected them.

17      I'll bring the Court's attention to a few.  They rejected

18  high school student ID inclusion in House Amendment 3.  They

19  rejected federally issued IDs in Senate Amendment 9.  They

20  rejected -- and this is critical for the Plaintiffs' case --

21  federal and state public assistance IDs, an indicia of intent

22  that the *McCrory* court found to be highly suspect.  They

23  rejected an amendment that proposed a cure for provisional

24  ballots at polling places by receiving the signature of two

25  witnesses who could attest to the voter's identity, which was

1   initially passed in committee but was subsequently removed; and

2   in an earlier version of SB824, the State Board of Elections

3   would have been required to coordinate with local media and

4   provide –– disseminate information in Spanish and other

5   languages under the law.  That was ultimately removed.

6       Finally, two key points about what the legislature did not

7   do.  They rejected the minority party's commonsense request to

8   accept an amendment to delay the rollout period of a new photo

9   voter ID requirement in North Carolina to beyond the immediate

10  pressing presidential election.  So this amendment would have

11  allowed for a soft rollout period during the 2020 election and

12  delay the full implementation until 2021 of the law.

13      And the legislature rejected an amendment to restore the

14  last Saturday of early voting, a day that the legislature had

15  eliminated in another bill passed in the same session, SB325.

16          **THE COURT:**  Let me ask this question:  If they had

17  included the public assistance IDs ––

18          **MS. SWAIN:**  Yes, Your Honor.

19          **THE COURT:**  –– would we be here?

20      **MS. SWAIN:**  I would rely on our expert's testimony to

21  this point, Your Honor, and I can direct you to his deposition

22  in this case.  This is Dr. Allan Lichtman.

23      What Dr. Lichtman shows is that the public assistance ID

24  rejection has a significant impact on the overall difference in

25  racial disparities, but it does not –– but the addition of

1  public assistance IDs alone would not dramatically change the

2  racial impact of this law given the other choices that the

3  General Assembly took.  It is one important indicia of the

4  decision-making that this General Assembly took, but it's not

5  the only one, and it must be considered within the context of

6  the "totality of the circumstances" analysis both under the

7  intent standard and under an intensely localized view of the

8  electoral system under the results standard.

9      And I will -- I am close to concluding my remarks here and

10  I think that this may -- this may also illuminate another

11  aspect of the choice that was not just a continuation of what

12  the General Assembly did in HB589 but was, in fact, a

13  restriction that the 2018 General Assembly chose to make in

14  2018.

15      As Your Honor can see, SB824, in addition to embracing the

16  previous exclusion of both public assistance IDs and federal

17  government IDs, it changed the new expiration date limit from

18  one year to four years.  This expiration date limit goes to DMV

19  IDs, passports, out-of-state IDs, and tribal IDs; and the only

20  exception to this rule is that voters who are 65 or older can

21  use expired IDs so long as the ID was valid on the voter's 65th

22  birthday.

23      My counsel is identifying for me that there is a mistake in

24  how I've just phrased this and I want to make sure I've gotten

25  it right for you, Your Honor.

1    The limit was changed from four years to one year.  That is

2 an important distinction.

3    The General Assembly also excluded learner's permits and

4 provisional licenses in this law, which were previously

5 accepted under -- at 589.

6         **THE COURT:**  Why is that relevant?

7         **MS. SWAIN:**  Your Honor, what the data shows -- and

8 this is detailed, again, in Dr. Lichtman's report -- is that

9 learner's permits and provisional licenses are

10 disproportionately possessed by African Americans in the state

11 of North Carolina.

12    And I want to note one more thing as to the expiration date

13 65-year-old expansion.  So this was -- this is an exception for

14 65 and older, which on its face appears to be ameliorative; but

15 I want to note for Your Honor that while 24.2 percent of the

16 white voting age population in North Carolina is 65 years or

17 older, only 16.1 percent of the black population in

18 North Carolina is 65 or older and, in addition, only 5 percent

19 of Latinos in North Carolina are 65 or older.  So as the --

20 what the evidence shows again is that this exception

21 disproportionately benefits white voters, as opposed to African

22 American and Latino voters.

23    Finally, the legislative record demonstrates a continuation

24 of the clearly pretextual antifraud rationale already rejected

25 in *McCrory*, which my colleague is going to cover in more

1  detail.  Numerous legislators asserted that the law was needed

2  to address in-person voter fraud, but no evidence of in-person

3  voter fraud was presented during the consideration of either

4  the constitutional amendment or SB824 that was of significance.

5  Bill proponents allege that a photo voter ID law was needed to

6  restore voter confidence in the state election system, but

7  again provided no evidence that confidence was lacking or that

8  photo voter ID would increase public confidence.

9        **THE COURT:**  Doesn't *Crawford* say that's okay?

10        **MS. SWAIN:**  Your Honor, *Crawford* -- Plaintiffs do not

11  dispute that it could be a legitimate interest for the State

12  under -- for the reasoning expressed in *Crawford* to express an

13  interest in preventing voter fraud or in addressing election

14  security issues, but that must be the actual interest of the

15  State, and it must have -- there must be evidence to support

16  that that is the interest.  In this case, the overwhelming

17  evidence shows that that assertion once again was pretextual.

18      In closing, Your Honor, the degree of disproportionate

19  impact of official action, which is the final factor of an

20  *Arlington Heights* analysis, here I want to make two important

21  points before allowing my colleague to address in detail the

22  disparate impact of this law.

23      The General Assembly knew that its decision would bear more

24  heavily on African American voters than white voters and they

25  knew it because they already had in their possession previous

 1  studies that demonstrated dramatic disparities.  They had a
 2  January 2013 SBOE matching study.  They had an April 2013 SBOE
 3  matching study and this shows voters who are unmatched --
 4  registered voters in North Carolina who do not possess a DMV
 5  ID.  And my colleague is going to speak more about some of the
 6  distinctions there.
 7       And, finally, they had 20 -- they had the exhaustive record
 8  of *McCrory*, which detailed in more close examination the --
 9  what the difference -- differences would be in possession rates
10  in the state.
11       My colleague, John Ulin, will lay out the numerous
12  consistent studies showing racial disparities of SB824 in more
13  detail in his presentation; but in summary, Your Honor,
14  Plaintiffs contend that SB824 must be enjoined as to its racial
15  intent under Section 2 in the Constitution, and I look forward
16  and am happy to answer any questions from the Court.
17            **THE COURT:**  Thank you.
18            **MS. SWAIN:**  Thank you.
19            **THE COURT:**  Let me ask one question of you before you
20  sit down.  Now, there were other provisions other than the
21  photo ID provision that you argue make this discriminatory.
22            **MS. SWAIN:**  Yes, Your Honor.
23            **THE COURT:**  You haven't mentioned them today and you
24  barely mentioned them in your brief.
25            **MS. SWAIN:**  Yes, Your Honor.

1    **THE COURT:**  What is the Court to do with that?  And

2  those two provisions are the increased number of poll workers

3  and the increased number of people who can challenge ballots.

4    **MS. SWAIN:**  Yes, Your Honor.  I will address this as

5  to the intent claim and then I will allow my colleague to

6  address it as to the results claim.

7    As to the intent claim, we believe that both of those

8  decisions have a bearing on the Court's finding as to racially

9  discriminatory intent.  What we've provided in the record is

10  specific instance -- is specific evidence demonstrating that

11  the increase in poll observers and the increase -- the

12  expansion in the ability for voters to challenge based on photo

13  voter ID will have an intimidation effect on voters.

14    Of course, we understand that that argument could be -- we

15  have not briefed it thoroughly for the Court as to the

16  March 2020 primary, which is a -- which is going to be a less

17  high turnout election; but it's our contention that in the

18  ultimate November election, a general election where you are

19  going to see -- where we -- the prediction is that we're going

20  to see some of the largest turnout in this state, that that

21  provision in -- those new provisions and interaction with the

22  photo voter ID requirement will have a cumulative effect as to

23  the racial discriminatory impact because it adds the

24  possibility and potential for voter intimidation.

25    **THE COURT:**  All right.  Thank you.

1          **MS. SWAIN:**  Thank you, Your Honor.

2          **THE COURT:**  Yes, sir.

3          **MR. ULIN:**  Thank you, Your Honor.

4     I'm going to turn now to the Section 2 discriminatory

5 results claim.  The Supreme Court and the Fourth Circuit have

6 held that a claim under Section 2 of the Voting Rights Act can

7 be established by proof of discriminatory results alone.  The

8 key question is to whether the challenged voting practice

9 interacts with social and historical conditions in the

10 jurisdiction in a way that denies or abridges minority voting

11 rights.  The statute explains that Section 2 is violated when a

12 challenged practice results in members of a protected class

13 having less opportunity than white voters to participate in a

14 political process and elect candidates of their choice.

15     In the vote denial context, like this case, the Fourth

16 Circuit has distilled a two-part test for Section 2 results

17 claims.  The first element is that the Court should examine

18 whether the challenged law imposes a discriminatory burden on a

19 protected class and then, second, the Court inquires into

20 whether that discriminatory burden is in part caused or caused

21 by or linked with social or historical conditions that have or

22 currently produce discrimination against members of that

23 protected class.  And that's in the *League of Women Voters*

24 *versus North Carolina* case from the Fourth Circuit in 2014.

25 Plaintiffs have shown -- presented evidence to this Court

1  showing that they meet both elements of relief from the voters'

2  standard.

3      In support of the first element, the burden on a protected

4  case, the Plaintiffs have provided this Court with multiple

5  sources of evidence that North Carolina's black and Latino

6  voters disproportionately lack the IDs needed to vote under

7  SB824.  The law therefore imposes a discriminatory burden on

8  their ability to vote and threatens to disenfranchise many

9  voters entirely, and that discriminatory burden satisfies both

10  the first element of our claim under the Section 2 results

11  standard and the fifth factor of the *Arlington Heights* analysis

12  that supports our discriminatory intent claim under both

13  Section 2 of the Voting Rights Act and the Fourteenth and

14  Fifteenth Amendments.

15      The point was clear to the Fourth Circuit when it decided

16  the *McCrory* case three years ago.  The Court of Appeals noted

17  that the record below in that case had established that black

18  voters disproportionately lacked the types of ID required to

19  vote under the former voter ID law as the District Court

20  actually had made that finding.  The discriminatory impact was

21  sufficient in *McCrory* to support Plaintiffs' successful

22  discriminatory intent claim and the evidence before the Court

23  in support of this motion demonstrates there's no reason to

24  believe those circumstances have changed.

25      Professor Matthew Barreto of UCLA conducted a survey of

1   eligible North Carolina voters to determine the effects of

2   SB824 on the current voter population.  Professor Barreto's

3   survey asked voters whether they possessed any of the forms of

4   qualifying ID listed in SB824.  It was not limited to the

5   DMV-issued forms of ID.

6       The survey revealed that 12.4 percent of black voters lack

7   a qualifying ID with a photograph that still resembles them, as

8   SB824 requires, and 16.7 percent of Latinos lack such

9   identification.  When compared with white voters, black voters

10  were therefore more than twice as likely to lack a qualifying

11  ID and Latinos were more than 2.7 times as likely as whites to

12  lack qualifying ID.

13      Professor Barreto's analysis is consistent with statistics

14  provided by Professor Allan Lichtman of American University.

15  Professor Lichtman presented statistics from the Survey of the

16  Performance of American Elections, SPAE, which is a respected

17  independent survey that's used by political scientists.

18      SPAE recorded data on the possession of unexpired driver's

19  licenses, passports, and military and tribal IDs, as well

20  in-state student IDs and in-state state or local government IDs

21  for voters in the state of North Carolina; and the SPAE data

22  revealed that whereas only 4.1 percent of white voters did not

23  possess any one of the listed IDs, fully 15.1 percent of black

24  voters lacked any one of those forms of ID.  And that evidence

25  obviously confirms the disparities found in *McCrory* and also

1  suggested by Professor Barreto.

2      Professor Michael Herron, Dartmouth College, has presented

3  this Court with similar evidence based on an analysis of the

4  State's own data, which is similar to the data that was before

5  the court in *McCrory*.

6      In September, the State produced its list of registered

7  voters who do not possess a valid driver's license or

8  state-issued photo ID card that can be used to satisfy the

9  requirements of SB824.  Professor Herron analyzed the

10  composition of the no-match list, as it's called, by race and

11  determined that, while 4.9 percent of non-Hispanic white

12  registered voters do not possess one of those two most common

13  forms of ID used to satisfy SB824, 10.6 percent of black

14  registered voters and 11.1 percent of Hispanic registered

15  voters do not possess one of those forms of ID.

16      The State's data therefore confirms the findings elsewhere

17  that black and Latino voters in North Carolina are more than

18  twice as likely to lack qualifying ID under SB824 than white

19  voters.

20      Now, Defendants argue that this no-match list doesn't

21  present an accurate picture because it's intended to be

22  overinclusive and it's used to inform voters that they may need

23  to take some action to assure that they have an ID that's

24  necessary to vote under SB824.

25      Even if that's true, Professor Herron's analysis of the

1   no-match list yields results consistent with the analyses of

2   other data in the record submitted by Professors Lichtman and

3   Barreto, and the conclusions of the Fourth Circuit in *McCrory*,

4   which in turn were based on expert reports from Professor

5   Charles Stewart of MIT and Professor Kevin Quinn of UC

6   Berkeley.

7       It's also worth noting that SBOE Executive Director Karen

8   Brinson Bell told this Court in her declaration that after the

9   State sent notices to more than 617,000 voters on their

10  no-match list, only 167 people wrote to indicate that they

11  either had an ID or that the letter had gone to somebody who

12  was deceased and therefore didn't get to receive it.

13      The State points to three factors that it contends

14  ameliorates these disparities in ID possession, but none of

15  them eliminates the disparate impact that the Fourth Circuit

16  recognized.

17      First, Defendants point to the list of various types of

18  identification that can be used to satisfy SB824, which is more

19  extensive than just DMV-issued IDs, but that argument doesn't

20  get them anywhere.

21      Professor Barreto surveyed eligible voters about whether

22  they possessed any of the forms of identification found -- and

23  found that blacks and Latinos disproportionately lacked any

24  form of qualifying ID.  Professor Lichtman presented SPAE

25  evidence that analyzed possession of a wide range of IDs not

1  limited to DMV-issued IDs and all of -- excuse me.  All of the

2  experts noted that the DMV-issued IDs are the most common forms

3  of ID used to satisfy SB824.

4      The disparity in possession of driver's licenses and

5  state-issued photo IDs was therefore sufficient in itself for

6  the Fourth Circuit to conclude that the former voter ID law

7  violated Section 2 and this collection of evidence is

8  sufficient to allow this Court to reach the same conclusion.

9      Defendants also point to the recent approval of student IDs

10 or additional student IDs as an example of the expanded range

11 of IDs that voters can use under SB824.  And while the State

12 has recently approved 12 additional universities' IDs,

13 Professor Barreto's survey asked respondents about whether they

14 possessed student IDs; and he still found the significant

15 disparities in qualifying ID ownership among white, black, and

16 Latino voters that I reported earlier.

17     It's also worth noting that even after the approval of

18 additional student IDs only 40 percent of eligible colleges and

19 universities, roughly 50 out of 126, have their IDs approved

20 for use under SB824 and only 12 of 57 community colleges have

21 their IDs approved.  And the numbers are far worse for eligible

22 public employer IDs.

23     If North Carolina were actually serious about expanding the

24 range of qualified IDs, it would have done what Virginia did

25 and authorized the use of all student IDs and all public

1    employer IDs and private employer IDs and public -- excuse

2    me -- and -- I'm sorry -- the public assistance IDs that are

3    not eligible in North Carolina but are eligible to be used in

4    Virginia.

5        But regardless, the evidence before the Court is that the

6    inclusion of student IDs in SB824's potentially qualifying --

7    list of potentially qualifying IDs has not relieved the

8    discriminatory impact of the law on black and Latino voters.

9        Defendants next point to the fact that voters who lack ID

10   can obtain free IDs from the Department of Motor Vehicles or

11   from their local County Board of Elections.  And while free IDs

12   may be available, the Court should look at whether the free ID

13   program is actually having any effect on the disparities in ID

14   ownership.

15       Now, Ms. Brinson Bell tells us that in the first six months

16   of the CBOE ID program, from April to October of 2019, only

17   1,700 IDs have been issued.  Even if they were all issued to

18   black and Latino voters -- and no evidence suggests that --

19   that would hardly make a dent in the disparities in ID

20   ownership.  So with three months left to go before the first

21   election in which SB824 would apply, it's impossible to believe

22   that free IDs will meaningfully affect the racially

23   discriminatory impact of the new voter ID law.

24       Our experts explain why the free ID provision will not

25   ameliorate those disparities.  At the most basic level, if

1   voters know about SB824 -- and many do not -- they do not know

2   how the law operates.  Professor Barreto reports that voters he

3   surveyed lack qualifying IDs over -- who lack qualifying IDs

4   overwhelmingly and wrongly believe that they actually possess

5   qualifying IDs.  Of course, those people won't seek free IDs.

6        And a majority of people who -- of voters -- excuse me.

7   The majority of all voters have never heard of the CBOE free

8   voter IDs and the numbers were even higher for those who lack

9   qualifying ID.  Voters are obviously not seeking free IDs that

10  they don't know exist; and even among voters who say they have

11  heard of free North Carolina voter ID cards, a significant

12  majority don't know that they're available at the County Board

13  of Elections or wrongly believe that they can obtain them at

14  the DMV or somewhere else.

15       And even when voters know that they can obtain free ID from

16  the CBOE or the Department of Motor Vehicles, the very step of

17  acquiring an ID that they don't need, except to comply with

18  SB824, is an additional burden on voters who lack ID, who are

19  disproportionately black and Latino.  It's a burden that

20  wrongly assumes that people plan for voting months in advance

21  and it's one that communicates to voters who lack ID that the

22  State is putting obstacles in the way of their ability to vote

23  and does not want them to vote, which, as Ms. Swain argued

24  earlier, is actually true in this instance.

25       For these reasons and others, Professors Burden and

1  Lichtman opine that voters without ID are not likely to use the

2  free ID provisions in a way that reduces the racial disparities

3  created by SB824 in terms of who the law prevents from voting,

4  even to add.  And even those who do obtain free IDs will still

5  have had to jump through hoops just to exercise their

6  fundamental right to vote.

7      Finally, the State suggests that SB824's reasonable

8  impediment declaration will enable all voters to cast at least

9  a provisional ballot even if they lack a qualifying ID, but

10  this argument suffers from some of the same flaws as the one

11  about free ID provisions.

12      First, Professor Barreto reports that a significant

13  majority of voters he surveyed who do not have qualifying ID

14  believe that voters who lack ID will not be permitted to vote

15  under SB824.  Among blacks and Latinos who lack qualifying ID,

16  a majority would skip voting if they learned they did not have

17  a qualifying ID, and roughly three-quarters of voters who lack

18  qualifying ID were simply unaware of SB824s reasonable

19  impediment provision.  Obviously, voters who stay away from the

20  polls because they lack qualifying ID will not avail themselves

21  of the reasonable impediment option and that's a huge point.

22  Professor Lichtman estimates in his rebuttal report that SB824

23  will deter over 100,000 voters from coming to the polls, and

24  those voters are disproportionately black and Latino.

25      Of course, completing the reasonable impediment declaration

1   is also an additional burden on voting in itself and one that

2   falls disproportionately on blacks and Latinos, who more

3   frequently lack qualifying ID.  The result is a polling place

4   with two lines:  One for voters who possess qualifying ID,

5   which is disproportionately white, and one for voters who lack

6   qualifying ID, which is disproportionately black and Latino.

7        Moreover, the State's suggestion that the reasonable

8   impediment declaration can be used by any voter to state any

9   reason for not having a photo ID is simply not supported by the

10  language of SB824 or the State's own educational materials.

11  SB824 lists seven recognized reasonable impediments to being

12  able to present a qualifying ID.  The very existence of that

13  list indicates that the catchall "other reasonable impediment"

14  option cannot have been intended to allow voters to offer any

15  excuse at all for not presenting an ID.

16       Section 1.2(h) of the law specifically allowed voters to

17  state as a reasonable impediment that they were not aware of

18  the photo ID requirement, but only in 2019 elections.  So

19  beginning in 2020, that specific impediment is no longer

20  available -- I apologize -- nor is the statement telling

21  election officials or voters that they can offer any excuse at

22  all for not presenting an ID.  On the contrary, the State is

23  contacting voters without DMV-issued IDs to ensure they have

24  qualifying IDs to present and did not indicate in training

25  materials that Ms. Brinson Bell submitted to this Court that

1    any excuse goes.

2        Overall, SB824's reasonable impediment declaration is

3    substantially similar to the one in HB589, which was before the

4    court in *McCrory*.  The court there found that it did not cure

5    the disparate impact created by the disproportionate lack of

6    qualifying IDs among black voters.  That conclusion was

7    doubtlessly formed by North Carolina's experience in the

8    March 2016 primary election where black reasonable impediment

9    votes were disproportionately likely to be discounted, as

10   Democracy North Carolina noted in a report that's attached to

11   the declaration of Tomas Lopez, which has been submitted to

12   Your Honor.  34 percent of provisional votes that were thrown

13   out in the 2016 primary were cast by black voters.  Yet the

14   population that cast any -- cast any ballot or participated in

15   that election was only 19 percent black.

16       The Democracy North Carolina report noted slow and

17   inconsistent application of the reasonable impediment

18   declaration provision in the March 2016 primary, with minority

19   voters more likely not to have their ballots counted.  The

20   standards for what qualified as a reasonable impediment were

21   ambiguous and the law put too much discretion in poll workers

22   and CBOE officials.

23       And while the State argues that SB824 cures that issue by

24   making falsity the only ground for rejecting a stated

25   impediment, even the question of falsity leaves ambiguity.  For

```
 1  example, what if a voter has access to some transportation but
 2  doesn't believe that she can use it to get to the CBOE to
 3  obtain an ID?  Can she say she lacks transportation?  That's
 4  actually the situation of voter Jeanette Dumas, who described
 5  it in the declaration that she submitted in support of this
 6  motion.
 7       In sum, the evidence before this Court shows that
 8  Plaintiffs are likely to succeed in proving that SB824 has a
 9  discriminatory impact on black and Latino voters' ability to
10  exercise their voting rights and that that impact is not cured
11  or meaningfully affected by the so-called ameliorative
12  provisions of the new voter law.
13       Now, having shown that discriminatory impact, the second
14  element of the (unintelligible).
15           COURT REPORTER:  I'm sorry.  You're going to have to
16  say that again.
17           MR. ULIN:  Absolutely.  My apologies.  It's a
18  professional hazard and tendency that I have to speed up, so I
19  will try to slow it down.
20       Having shown discriminatory impact, the second element of
21  the Section 2 claim under League of Women Voters is
22  demonstrating that it results from the interaction of that
23  law -- of the challenged law with historical or social
24  conditions in the jurisdiction that cause discrimination, and a
25  few initial points on this second element.
```

1       First, the Fourth Circuit indicates that it should be

2  analyzed using the so-called Senate Factors which were outlined

3  in the Senate report that accompanied the amended Section 2 in

4  1982 and have been endorsed by the Supreme Court in the *Gingles*

5  decision as the proper way to analyze a Section 2 claim.

6       Second, the "Senate Factors" analysis is intensely

7  localized, as the Fourth Circuit acknowledged in the *League of*

8  *Women Voters* case.  Similar laws may be written or implemented

9  differently in different jurisdictions, and the history and

10  social conditions of each jurisdiction can result in similar

11  laws having different effects.  What's important is a searching

12  and practical inquiry into the experience of voters and

13  election workers in the specific jurisdiction.

14       And, finally, the *League of Women Voters* standard focuses

15  on the interaction of a law with social and historical

16  conditions in a jurisdiction, but it's not solely a focus on

17  historical conditions.  Rather, the current local conditions

18  that cause discrimination are equally critical to the analysis.

19       Professor Barry Burden of the University of Wisconsin

20  synthesized most of the evidence that supports Plaintiffs'

21  analysis of the Senate Factors in support of their Section 2

22  claim.  Professor Burden applied the Senate Factors through the

23  lens of what he calls the calculus of voting.  Put simply,

24  Professor Burden informed the Court that voter participation

25  depends on a cost-benefit analysis.  Costs to include the

 1  effort to become educated about an election and the candidates,

 2  as well administrative and other barriers to registering and

 3  casting a ballot.  The benefits include seeing preferred

 4  candidates win and the perception that government is responsive

 5  to one's interests.

 6      Professor Burden discussed how increasing the

 7  administrative costs to voting even marginally, including by

 8  changing polling hours or by not providing some sample ballots,

 9  has negative effects on minority voting.  He further told this

10  Court that SB824's voter ID requirement imposes just the sort

11  of additional administrative costs that will predictably deter

12  minority voting in North Carolina.

13      Among other factors, voters must present ID which minority

14  voters disproportionally do not have.  Those who do not have ID

15  must take the time and make the effort to obtain them, often

16  making multiple trips to government offices; and voters who

17  appear at the polls without an ID may only vote provisional and

18  must fill out an additional form in order to do so.  These

19  costs all fall disproportionately on North Carolina's voters of

20  color who, as Dr. Burden demonstrates, are already susceptible

21  to being disproportionately burdened by additional

22  administrative purpose.

23      Turning to the Senate Factors, we begin with the first

24  factor:  The history of official voting-related discrimination.

25  The history of post-Reconstruction disenfranchisement of black

1   voters in North Carolina, as detailed in the report of

2   Professor James Leloudis of the University of North Carolina

3   and digested by Professor Barry Burden at pages 8 to 10 of his

4   report, that history contributed to the underrepresentation of

5   minority voters and their interests in North Carolina

6   government that has only improved since the enactment of the

7   federal Voting Rights Act.

8       Without reviewing the entire history, there are a few

9   points worth noting.  Some of the well-known disenfranchising

10  devices used in North Carolina included poll taxes, literacy

11  tests, and grandfather clauses, all of which the Voting Rights

12  Act was specifically intended to eliminate, but SB824 has

13  elements of each.

14      It operates like a poll tax because voters without ID must

15  invest time and money to travel to government offices to obtain

16  IDs that they don't need, except under -- to vote under SB824.

17      It operates like a literacy test because it requires voters

18  without ID to navigate additional legal requirements and fill

19  out forms, including the reasonable impediment declaration that

20  many find difficult to understand.

21      And, finally, it operates like a grandfather clause by

22  allowing voters over age 65, as well as military voters, who

23  are disproportionately likely to be white, to use expired IDs

24  more broadly than voters under age 65, who are

25  disproportionately likely to be black or Latino.

1        In this way, the law provides benefits to white voters that
2    are denied to black and Latino voters.
3        It's also worth noting that while it's not -- while it's
4    not enforced, North Carolina's literacy test is still enshrined
5    in the state Constitution.  More importantly, the General
6    Assembly considered a bill to remove it in 2013, but the bill
7    was defeated by the same Assembly that passed the former voter
8    ID law in a decision that sent a clear message to black voters
9    about whether the State's legislature represented their
10   interests.
11       Factor 2:  Racially polarized voting.  Racially polarized
12   voting is a well-established feature of the political map in
13   North Carolina.  As the State's own expert in *McCrory* noted,
14   race is the single most reliable factor in determining how a
15   North Carolina voter will vote.  The Supreme Court recognized
16   that the tendency of black and white North Carolina voters to
17   support different candidates in its 1986 decision in *Thornburg*
18   *versus Gingles* and the Fourth Circuit found that racially
19   polarized voting was still prevalent 30 years later when it
20   handed down its decision in *McCrory*.  The court emphasized that
21   racially polarized voting was what created the incentive for
22   the Republican legislature to enact voting legislation that
23   diminishes black and Latino voting strength.
24       Defendants do not dispute the presence of racially
25   polarized voting in North Carolina, which is amply supported by

 1  the expert reports of Professors Lichtman, Burden, and Barreto.

 2  Looking to recent statewide races, Plaintiffs' experts note

 3  that in each of the presidential elections in -- general

 4  elections in North Carolina from 2000 to 2016 the gap between

 5  black and white support for Democratic nominees was roughly

 6  60 percent or more.  That far exceeds the disparities for

 7  demographic groups based on income, sex or education.

 8      Racial polarization was also present in midterm elections

 9  in this decade and thus extends beyond the presidential races.

10  And Professor Burden reported that it's visible in contested

11  presidential primaries where it can't be explained as a

12  partisan divide.  For example, in 2008, President Obama was the

13  clear choice of black Democrats, whereas white Democrats

14  preferred Hillary Clinton; and in 2016, Secretary Clinton was

15  the choice of black Democrats in North Carolina, while Bernie

16  Sanders was the choice of white Democrats.

17      Finally, Professors Barreto and Lichtman provide evidence

18  that racially polarized voting patterns have also emerged

19  between white and Latino voters in this state as the latter

20  have become more active in politics over the last decade.

21      Factor 3:  Voting practices that enhance the opportunity

22  for discrimination.  As the Fourth Circuit noted in the *League*

23  *of Women Voters* decision, the sorts of vote-denying practices

24  challenged in that case, and also here, were largely prevented

25  by the preclearance requirements of the Voting Rights Act under

1  the old Section 4 and Section 5.

2      But North Carolina moved quickly after the Supreme Court

3  gutted the preclearance regime in the *Shelby County* decision in

4  2013 and passed new restrictions.  SB589 adopted a photo ID

5  requirement, eliminated same-day registration, reduced the

6  early voting period, and ended out-of-precinct ballots.  In

7  *McCrory*, the Fourth Circuit held that SB589 and all of these

8  provisions were motivated by race discrimination, that is, by a

9  desire to preserve the legislative majority by imposing burdens

10  on minority voters who tend to vote for the other party.

11      The General Assembly drew up racially gerrymandered maps

12  for state and federal legislative districts in this decade,

13  which were later thrown out as unconstitutional in two separate

14  lawsuits.  The maps were intended to entrench majority power in

15  the legislature by reducing minority voting strength, and they

16  had the result of rendering the Assembly unrepresentative of

17  the interests of black and Latino voters.

18      More recently, the court in *Common Cause versus Lewis* found

19  in 2019 that the Assembly had lied to other courts about its

20  use of racial statistics to ensure that the legislative maps

21  created districts favorable to Republican candidates, and the

22  purpose of the lying was to preserve the advantages of the

23  racially gerrymandered maps for as long as possible at the

24  expense of representing the interests of black and Latino

25  voters.

1    In addition, although the State has a rapidly growing

2   Latino population that now comprises 11 percent of the State's

3   entire population and approaches 20 percent in some counties,

4   there's no requirement that ballots or election materials be

5   made available in Spanish, and they frequently are not

6   available even in the counties with the highest Latino

7   populations.

8    In SB824 itself, Democracy North Carolina ED Tomas Lopez

9   notes that the original version of the law required educational

10   materials to be created in Spanish for the benefit of

11   North Carolina's Latino voters, but that language was

12   eliminated from the final version of the law, and SBOE and

13   county officials are therefore not required to provide Spanish

14   language materials, which only increases the discriminatory

15   burden of the law on Latino voters.

16    Factor 5:  Effects of discrimination that hinder the

17   ability of minorities to participate in the political process.

18   So the Defendants do not and cannot contest the effects of

19   discrimination on North Carolina blacks and Latinos in critical

20   outcomes.  Specifically, blacks and Latinos in this state

21   generally earn lower incomes and suffer higher rates of

22   unemployment and poverty than white residents.  Black and

23   Latino students show lower rights of educational achievement,

24   and they ultimately reach lower rates of educational

25   attainment, which Professor Burden notes is the single biggest

1   factor in determining whether an individual person votes.

2       Blacks and Latinos are also subject to worse health

3   outcomes and unequal treatment in the criminal justice system.

4   They suffer higher rates of incarceration, which can affect

5   their ability to vote.  Felon disenfranchisement effects three

6   times more blacks than whites; and minorities are subjected to

7   more traffic stops in North Carolina, which can result in a

8   loss of a driver's license, the most common form of ID used to

9   satisfy SB824.  Overall, Professor Burden notes that negative

10  experiences with the criminal justice system decrease

11  participation in the political process, including voter

12  turnout.

13      Together these discriminatory outcomes combine to increase

14  the costs of voting for black and Latino voters who have fewer

15  resources than white voters to navigate the requirements of

16  SB824 and other voting laws and diminish the perceived benefits

17  of voting because government is not delivering equally for

18  black and Latino voters in areas such as education, healthcare,

19  and criminal justice.

20      Factor 7:  The extent of minority election to public

21  office.  So Professor Burden informs this Court that only one

22  black candidate has ever been elected to statewide office in

23  North Carolina and the state has never elected a black United

24  States senator.  Following Reconstruction, the General Assembly

25  had no black members until 1968 and North Carolina sent no

1    blacks to Congress until 1992.  And while blacks now occupy

2    Assembly seats in rough proportion to their numbers in the

3    overall population, Professor Burden informs the Court that

4    that that phenomenon is vulnerable.

5        Black voter turnout increases have tracked increases in

6    representation among elected officials, but that has only

7    happened in the aftermath of the passage of the Voting Rights

8    Act.  And that trend suggests that laws like SB824, which deter

9    minority participation, will result in less success for

10   minority candidates, which will in turn decrease the perceived

11   benefits of voting for black voters and ultimately their

12   propensity to vote.

13       The record is more stark for Latinos.  North Carolina has

14   never elected a Latino to statewide office, to Congress, to the

15   United States Senate or to the General Assembly.  Well, Tom

16   Apodaca actually sits in the Assembly, but he's indicated that

17   he doesn't consider himself Hispanic.  And even if he is, that

18   would raise the total number of Hispanic -- Latino

19   representatives ever elected to one.

20       The absence of Latino (unintelligible).

21           **COURT REPORTER:**  I'm sorry.  Can you repeat that

22   again?

23           **MR. ULIN:**  Absolutely.

24       The absence of Latino electoral success tends to reduce the

25   perceived benefits of voting for Latinos and as a result to

 1  make Latinos more vulnerable to be deterred from voting by a

 2  voter suppression law like SB824.

 3      The Senate report also includes two unenumerated factors,

 4  both of which support Plaintiffs' Section 2 claim here.  The

 5  first is a lack of responsiveness by elected officials.  The

 6  Court's analysis of Senate Factor 5, the effects of

 7  discrimination in ways that hinder minority political

 8  participation, is highly relevant here.

 9      Specifically, disparate educational outcomes result from

10  disparities in the quality of public schools.  Disparate

11  healthcare outcomes result from the quality of public hospitals

12  and medical services for blacks and Latinos, and disparate

13  treatment by the criminal justice system is directly related to

14  whether government is responsive to minority voters.  In each

15  of these areas, the government's lack of responsiveness to

16  minority voters in education, healthcare, and criminal justice

17  affects both the incentives for blacks and Latinos to

18  participate in the political process and the resources they

19  will have to be able to participate successfully.

20      Recent efforts to roll back legal provisions and funding to

21  alleviate racial and ethnic disparities that were identified by

22  both Professors Burden and Leloudis also reflect a state

23  government that is not responsive to minority interests.  That

24  communicates a clear message to minority voters about the

25  benefits of participating in the political process.

1    Professor Burden focused particularly on the repeal of the

2    Racial Justice Act, which was intended to ameliorate

3    discriminatory conditions in the criminal justice system.

4    Discriminatory voting-related enactments like HB589 and the

5    racial gerrymanders of both state and federal electoral

6    districts further communicate the message that government is

7    not responsive to minority interests.

8    And Professor Burden has provided evidence of specific

9    nonresponsiveness to Latino interests.  Here again, he noted

10   the failure to provide Spanish language voting materials in

11   ballots even in the most heavily Latino North Carolina counties

12   and the General Assembly's decision to remove the requirement

13   that educational materials be provided in Spanish from SB824.

14   He also discussed the social science research that shows that

15   North Carolina County Boards of Elections respond more quickly

16   to e-mail from white-named fictional voters than to e-mails

17   from Latino-named fictional voters.

18   Finally, and the second unenumerated factor, the stated

19   rationales for SB824 are plainly tenuous.  The principal

20   rationale offered by sponsors for the voter ID law is the

21   prevention of fraud, but voter ID does not address all forms of

22   election fraud.  It only reaches voter impersonation, that is,

23   a person trying to vote as someone else.

24   As Plaintiffs' expert Lorraine Minnite indicated in her

25   report, she's studied the issue and found that voter

1  impersonation is not a problem in North Carolina and never has

2  been.  The State's own audit of the 2016 election confirmed

3  that voter impersonation was not an issue in that year and

4  that's hardly surprising given that it's a felony with a

5  significant potential jail term and the benefit of the crime is

6  to increase a candidate's vote total by one.

7      Even in the face of this evidence, the State continues to

8  argue that fraud prevention is a true rationale for SB824.

9  They point to the prosecution of individuals accused of double

10 voting in North Carolina and other states, and to the absentee

11 ballot harvesting scandal that affected last year's

12 congressional elections.

13     But double voting is not addressed by voter ID laws and

14 SB824 would not address the absentee ballot harvesting in which

15 voters allow other people to complete their ballots in the

16 mistaken belief that they're filling out ballots consistently

17 with the voter's wishes.  Voters who allow their ballots to be

18 harvested would presumably allow the harvesters or provide the

19 harvesters with whatever is needed to assure that the ballot

20 can be submitted and counted.

21     Now, although SB824 sponsors sold it as a fraud prevention

22 measure, Defendants now argue that the law promotes voter

23 confidence.  But Professor Burden indicates that academic

24 research shows voter ID laws have no influence on voter

25 confidence in the electoral system.  Actually, Tomas Lopez and

1  Kate Fellman report in their declarations before this Court

2  that voter ID actually decreases confidence in the electoral

3  system, especially among black and Latino voters who see the

4  General Assembly acting deliberately to deter or prevent them

5  from voting and to impose greater burdens on their exercise of

6  their fundamental rights.  Finally, Professor Burden testified

7  that false claims of voter fraud, like the ones that

8  accompanied SB824, are damaging to voter confidence, especially

9  when made by elected officials.

10     For all these reasons, Defendants' voter confidence

11  rationale is plainly pretextual and unsupported by the evidence

12  before this Court.

13     Defendants also claim that SB824's purpose was to fulfill

14  the voter mandate in the voter ID constitutional amendment.

15  But voters surely did not mandate a discriminatory voter ID law

16  that violates the Voting Rights Act as SB824 does.  They did

17  not mandate any particular law and certainly did not mandate

18  SB824 and all of its provisions.  Ultimately, the voters can be

19  presumed not to have mandated an illegal enactment.  Because

20  SB824 violates Section 2, Defendants cannot credibly argue that

21  this law is necessary to fulfill the mandate of the voter ID

22  constitutional amendment.

23     SB824 is also tenuous because it's burdensome

24  unnecessarily.  The law imposes unnecessary limits on the types

25  of IDs that qualify at polls.  And whereas Virginia authorized

1  the use of all college and university IDs, all public employer

2  and private employer IDs, all public assistance IDs state and

3  federal, North Carolina limited the types of student and public

4  employer IDs that could be used.  And we've been through the

5  statistics on the numbers of eligible schools that remain

6  unapproved, but that number is roughly 60 percent of the

7  eligible schools did not even apply for their student IDs to be

8  qualified for use at the polls.

9      North Carolina, as the Court is aware, does not permit the

10  use of public assistance IDs or private employer IDs, and the

11  refusal to accept public assistance IDs was a fact that the

12  Fourth Circuit emphasized in holding that HB589 was designed to

13  deter black voting with surgical precision, and yet the same

14  exclusion persists in SB824.

15      And Defendants' explanations for not including public

16  assistance IDs make little sense.  At the time of passage, they

17  argued that the State did not control issuance of all public

18  assistance IDs and therefore they couldn't be accepted; but

19  that's also true of military IDs, passports, and many public

20  employer and student IDs, all of which are accepted.

21      Now they note that not all public assistance IDs have

22  photographs, but that explanation begs the question of why the

23  State could not simply authorize the use of those public

24  assistance IDs that do bear paragraphs.

25      SB824 also contains Byzantine and unnecessary rules

1  governing the use of expired IDs.  If identifying voters is the

2  rationale for voter ID, it's hard to see why expired IDs cannot

3  serve that purpose.  After all, SB824 separately requires that

4  qualifying IDs have a picture that resembles the voter, but the

5  General Assembly still saw fit to include complicated rules for

6  whom may use an expired ID at the polls and for how long.

7      And, finally, SB824 represents a radical change for

8  North Carolina, which has never required any form of ID at the

9  polls in the past.  Such an abrupt change in longstanding

10  policy with respect to voters also indicates that the policy

11  behind the law is tenuous and offered as a mask for a law that

12  discriminates against blacks and Latinos.

13      Viewing the Senate Factors through the lens of the calculus

14  of voting, Professor Burden described how minority voters in

15  North Carolina experienced higher costs of voting and perceived

16  fewer benefits even without SB824.  Adding a voter

17  identification law with demonstrated racially discriminatory

18  effects to the mix only adds to the costs and diminishes the

19  perceived benefits of voting in a way that discourages minority

20  participation and results in voters of color having an even

21  more unequal ability to participate in the political process,

22  and it does so without any bona fide purpose to justify the

23  incursion on Plaintiffs' fundamental rights.

24      Plaintiffs therefore satisfied both elements of the Section

25  2 vote denial claim as stated in the *League of Women Voters*

1  case and we've demonstrated that upon likelihood of success on

2  that claim it provides an independent basis for this Court to

3  issue a preliminary injunction.

4      And before I conclude, Your Honor, we want to focus on the

5  timeline in which the State plans to implement voter ID under

6  SB824 and that timeline makes matters far worse.

7      North Carolina's primary elections are scheduled for

8  March 3rd, 2020, three months from today.  That's the total

9  amount of time remaining for implementation of the law,

10 training of election officials and workers who are charged with

11 administering its requirements, and educating the public.  With

12 three months to go, a lot of work remains to be done and the

13 State actually has less than three months to roll out the new

14 voter ID requirements.  Early voting for the 2020 primary

15 begins on February 12th, about 10 weeks from now, and absentee

16 voting begins on January 13th, a little over a month from now.

17     With those deadlines in mind, the Court should note that

18 the State essentially stopped much of its implementation of

19 SB824 last summer when the General Assembly decided to postpone

20 the introduction of voter ID until 2020.

21     SBOE Director Karen Brinson Bell states in her declaration

22 that the State deferred critical tasks like state and county

23 election official and poll worker training until after the

24 canvass for the November 2019 municipal elections, which

25 occurred about two weeks ago.

1       The idea of rolling out a voter ID law in roughly three
2   months is essentially unheard of.  Defendants know that well.
3   When North Carolina adopted its first voter ID law in 2013, the
4   General Assembly allowed more than two years for training and
5   voter education and other implementation tasks before the law
6   was first implemented in March 2016.  Virginia similarly
7   allowed roughly 20 months after enacting its photo voter ID law
8   before it was enforced at polls in the November 2014 election.
9       SB824 itself originally would not have required voters to
10  show photo ID for roughly nine months after its enactment and
11  the requirement would not have been applied in a general
12  election for roughly 10 months in most jurisdiction -- and in
13  most jurisdictions for 11 months.  The rollout of SB824 was
14  intended to occur in 2019, a low turnout municipal election
15  year.  That would have given officials the opportunity for a
16  test run before enforcing voter ID during a high turnout
17  presidential contest in 2020 when the governorship and other
18  statewide offices and the United States Senate seat are all on
19  the ballot.
20      And the law permitted voters to cast a provisional ballot
21  in 2019 if they completed a truthful declaration stating that
22  they were unaware of the photo voter ID requirement.  That
23  option is no longer available for 2020 elections.
24      Now, Defendants seem to implement SB824 in less than three
25  months.  The result, as several witnesses have told this Court,

1  will be confusion at the polls, and the denial and abridgement

2  of the voting rights of black and Latino voters, in violation

3  of Section 2.  We know from the work done by Professor Barreto

4  and the review of published literature by Professor Lichtman,

5  as well as analyses of the State's own data by Professors

6  Herron and Quinn, that black and Latino voters

7  disproportionately lack the qualifying identification necessary

8  to vote.

9       The State argues that those disparities will be cured by

10 the availability of free ID cards from the DMV and CBOEs, as

11 well as the reasonable impediment declaration, as we discussed.

12 But even if that were true -- and we obviously dispute it, as

13 we did earlier this morning -- there are some serious problems

14 with the argument from the perspective of eliminating those

15 disparities within the next three months.  It's just not going

16 to happen.

17      With respect to the free IDs, SBOE Director Bell tells us

18 that only 1,700 were issued in the first six months they were

19 available.  Even if that pace were to double in the next three

20 months, fewer than 4,000 free IDs will be issued between now

21 and March 3rd, and that will make no appreciable difference in

22 the disproportionate numbers of black and Latino voters who

23 lack qualifying ID.

24      The low numbers of free ID reveal a more fundamental

25 problem with rushed implementation.  Voters don't know about

1    SB824 generally or its free ID or reasonable impediment

2    declaration provisions, and there is not enough time to educate

3    them between now and March 3rd or the earlier dates for early

4    voting and absentee balloting.

5        Tomas Lopez, who is the executive director at Democracy

6    North Carolina, tells the Court in his declaration that callers

7    to an election protection hotline that they ran had many

8    questions about the voter ID law.  They didn't understand what

9    IDs qualified or how the law operated, and they were not aware

10    of the existence of a reasonable impediment declaration or that

11    they might be able to vote without an ID.  He believes that

12    there's not sufficient time to fill in the gaps in voter

13    knowledge in the next three months.

14        Mr. Lopez also detailed research done by Democracy North

15    Carolina that showed HB589's voter ID provisions had a

16    disparate impact on black voters, who, again, comprised

17    34 percent of those whose ballots were not counted because of

18    issues with photo ID, but roughly -- but only roughly

19    20 percent of all those who voted in the March 16

20    presidential -- 2016 presidential primaries.

21        Mr. Lopez noted that reasonable impediment declarations

22    were often not provided to voters who should have received them

23    and that inconsistent standards were applied with respect to

24    whether reasonable impediment declarations were counted.  In

25    other words, even with more than two years for voter education

1  and training of election officials and poll workers, the former

2  ID law still had a discriminatory effect on minority voters.

3  Mr. Lopez believes that similar results are likely, especially

4  if the State rushes to implement SB824 in three months.

5      And he identifies other aspects of SB824 that are likely to

6  result in discrimination against black and Latino voters if

7  rushed implementation proceeds.  For example, only 51 of 120

8  eligible colleges and universities have even applied to have

9  their student IDs approved for voting and at least 70 of those

10 institutions will not have qualifying student IDs for the March

11 elections; and among communities colleges, only 13 of the

12 roughly 57 have applied to have their IDs approved, meaning

13 that more than three-quarters of community colleges will not

14 have qualifying IDs.  And those student populations, especially

15 at the community colleges, are heavily black and Latino.

16     Kate Fellman, who is executive director of You Can Vote,

17 which educates, registers, and empowers voters to navigate the

18 voting process, details similar problems with rushed

19 implementation of SB824.  She recalled that even after the

20 Fourth Circuit struck down HB589 many voters were still

21 confused about whether they had to show ID at the polls.

22     Ms. Fellman identifies common misconceptions that voters

23 have reported about SB824.  Specifically, voters wrongly

24 believe that they cannot register to vote or cast a ballot

25 without a photo ID with a current address.  They are confused

1  about whether the same REAL ID that will be required for air

2  travel in October 2020 is also required to vote in the state of

3  North Carolina a month later.  Many voters who You Can Vote

4  assisted wrongly believed that voter ID was required in 2019

5  elections, including in the special elections in congressional

6  Districts 3 and 9.

7      Especially given the confusion among voters, Ms. Fellman

8  expressed concern about the State's failure to roll out a mass

9  communication effort about SB824.  She noted that State

10  educational efforts had been limited.  SBOE seminars held prior

11  to September 2019 were sparsely attended and based on

12  incomplete information about how the law would operate.

13      Professor Matt Barreto reported that voters he surveyed

14  were -- overwhelmingly had never heard of the SBOE seminars,

15  let alone attended one.

16      Now Ms. Fellman believes there is not enough time to

17  educate voters before the March primaries.  She also notes that

18  rushed implementation would require County Boards to

19  familiarize themselves with SB824's requirements, train staff,

20  and recruit and train poll workers in the new requirements of

21  the law, develop and administrator free voter ID programs, and

22  educate the public about the law, including by outreach to

23  voters who lack qualifying ID.  That sort of rollout takes

24  years, if it's even possible.

25      Ms. Fellman notes that legislative changes to voting hours

1    and the continuous changes with regard to the final Saturday

2    before election day, as well as changes in poll sites, are

3    likely to add to the confusion that a hastily implemented voter

4    ID law will create.

5        And she describes the distrust that SB824's changes create

6    among underserved voters.  The law diminishes their confidence

7    in the electoral system and their desire to participate.

8    Underserved voters of color see the law as directed at

9    preventing them from voting and develop the sense that their

10   vote does not matter, which can cause them to give up on the

11   process.  Like Tomas Lopez, Ms. Fellman believes that rushed

12   implementation of the law without regard for the concerns of

13   minority voters is likely to lead to exactly this response by

14   black and Latino voters.

15       Durham's mayor, Steve Schewel, is also concerned about

16   rushed implementation.  In his declaration, Mayor Schewel

17   testifies about a program he runs in Durham to help 46,000

18   residents of that city whose driver's licenses or state IDs

19   have been suspended or revoked to get them restored.  Despite

20   Mayor Schewel's involvement with the license restoration

21   project, he indicated to the Court that he was unaware of

22   SB824's free ID provisions until he was contacted by

23   Plaintiffs' counsel in this case last month.  He believes it is

24   impossible to educate 46,000 Durham residents with suspended or

25   revoked licenses about the free ID option between now and the

1  March 2020 primaries.

2      Of course, it's not just Plaintiffs' witnesses whose

3  declarations provide evidence that rushed implementation of

4  SB824 will have a discriminatory impact on black and Latino

5  voters that violate Section 2.  SBOE's own executive director

6  indicates that numerous key aspects of the SB824 rollout are

7  still in process, as she puts it, even at this late date.

8  Training sessions for CBOE staff are something Ms. Bell

9  indicates the State will be rolling out and she admits that

10  that training did not continue in the second half of 2019.

11      Other critical aspects of the rollout that have not yet

12  happened include providing training materials for CBOEs to use

13  with poll workers, offering free IDs at sites other than CBOE

14  offices, updating voter registration forms, absentee ballot

15  request forms, and absentee ballot return envelopes which now

16  must accommodate a photocopy of the voter's identification

17  card.  Nor has the State issued a form reasonable impediment

18  declaration or regulations for administering the RID process or

19  training materials about the process.  In short, Ms. Bell

20  concedes that three months before election day the rollout of

21  SB824 is still very much a work in progress.

22      And other evidence confirms that rushing to implement SB824

23  by March 3rd will leave voters confused about the law and what

24  it requires.  Professor Barreto's survey results reveal that a

25  majority of black and Latino voters are not aware of SB824's

1    voter ID requirements.  They are frequently mistaken about

2    whether they possess qualifying ID and are overwhelming

3    uninformed about whether they can vote without presenting an ID

4    and whether the law provides for a reasonable impediment

5    declaration or free IDs for voters who lack other forms of

6    qualifying ID.

7        These survey results are consistent with Professor Burden's

8    opinion that the on-again, off-again nature of voter ID in

9    2019, coupled with numerous aspects of SB824's implementation

10   that are still in process, including a reasonable impediment

11   declaration form itself, are likely to result in both voter

12   confusion about the law and its requirements, and errors by

13   poll workers and election officials.  Professor Burden opines

14   that this confusion is likely to create challenges for and to

15   deter voters with fewer resources to navigate the electoral

16   system who are disproportionately black and Latino.

17       In sum, the rushed implementation of SB824 in March 2020

18   would have at least three predictable effects:

19       First, it will assure that the free voter ID and reasonable

20   impediment provisions of SB824 have no material effect on the

21   disparities in qualifying ID ownership among black, white, and

22   Latino voters before the law goes into effect.

23       Second, it will deter minority voting by communicating the

24   clear message that State officials are moving forward with

25   voter ID without regard for how it affects black and Latino

1  voters.

2      And, third, it will result in black and Latino voters

3  disproportionately facing heavier burdens in order to cast

4  their ballots, whether those burdens consist of obtaining new

5  IDs they don't need except to satisfy SB824, having to fill out

6  forms at the polling place that white voters disproportionately

7  do not have to fill out or educating themselves about the

8  evolving requirements of the new law when the State has not

9  done enough to inform them.

10     In all of these ways, implementing SB824 in March 2020

11 would create confusion and likely violate Section 2 of the

12 Voting Rights Act by disproportionately burdening black and

13 Latino voters in the exercise of their fundamental rights to

14 vote; and at the very least, this Court should enjoin the

15 implementation of SB824 in North Carolina's March 2020

16 primaries.

17     So I have an apology that applies directly to you, Your

18 Honor.  I stated in my argument that only -- excuse me -- only

19 one -- there has only been one African American elected to

20 statewide office in the state of North Carolina.  I understand

21 from cocounsel that the Court of Appeals are statewide offices

22 and, in fact, Your Honor was elected as a Court of Appeals

23 justice.  With regard to the statewide offices in the Executive

24 Branch, it remains true that only one African American has ever

25 been elected to any of those offices in the history of this

1  state.  But for obvious reasons, we wanted to correct the

2  record on that.

3      **THE COURT:**  Now, neither of you pointed out to me

4  witnesses that you believe would be helpful to the Court that

5  you -- that you would wish to present testimony from.  So if I

6  could hear from you on that point.

7      **MR. ULIN:**  Briefly, Your Honor.  I think that we could

8  make a fairly streamlined presentation of evidence to this

9  Court; and obviously, we're willing to bring any of our

10  declarants to this courtroom to testify, if that's Your Honor's

11  wish.

12      **THE COURT:**  All right.  I'm not asking for this.  You

13  asked for it.

14      **MR. ULIN:**  Understood.

15      **THE COURT:**  All right.  You indicated that there were

16  eight witnesses that you wanted to present testimony through,

17  and I'm asking you who are these eight witnesses and how do you

18  believe it would help the Court in its determination.

19      **MR. ULIN:**  So let me focus on five witnesses, if I

20  may.

21      **THE COURT:**  All right.

22      **MR. ULIN:**  The first two are expert witnesses.  One is

23  Professor Allan Lichtman from American University and Professor

24  Lichtman really has comprehensively digested the evidence and

25  data surrounding principally the racial discriminatory intent

1   that can be discerned from the evidence that, you know,
2   infected the legislature's enactment of SB824.  So Professor
3   Lichtman would be the first of those.  That's the testimony
4   that he would provide, Your Honor, giving you a comprehensive
5   evidentiary basis for the discriminatory intent Section 2
6   claim, which, as we've noted, is coextensive with the
7   constitutional claims.
8        The second witness would be Professor Barry Burden from the
9   University of Wisconsin.
10       And I would note Professor Lichtman has testified in a
11  number of voter ID cases on similar issues, including in the
12  *McCrory* case where he gave testimony on that very subject he's
13  referring to, HB589.
14       Professor Barry Burden from the University of Wisconsin
15  would testify about the calculus of voting, and how the
16  additional burdens imposed by SB824 and its voter ID
17  requirements would have a racially discriminatory impact on
18  black and Latino voters that violates Section 2 under the
19  results standard and would synthesize the evidence in ways that
20  we think would be very helpful to Your Honor.  Professor Burden
21  has similarly presented testimony on these issues in other
22  courts, including in the *McCrory* case.
23       Among the factual witnesses that we think would be helpful
24  to present to Your Honor would be both Kate Fellman and Tomas
25  Lopez, who I cited extensively in my arguments:  Kate Fellman,

1  the executive director of You Can Vote, and Tomas Lopez, the

2  executive director of Democracy North Carolina.

3      Democracy North Carolina has done some extensive studies,

4  which are -- some of which are in the report before Your Honor,

5  about the impact of the voter ID laws on black and Latino

6  voters, the experiences that -- and lessons that can be derived

7  from the 2016 primary election, which was the only election

8  that ever happened in this state in which a photo voter ID was

9  required at the polls; and we believe that he might very

10  helpfully illuminate some of the points that I've just gone

11  through about why the rushed implementation of this law would

12  result in a denial of minority voting rights.

13      Kate Fellman would testify on similar issues, but her work

14  has been through You Can Vote, has principally been with

15  providing direct services to voters.  Therefore, we believe she

16  could bring that perspective and that on-the-ground efforts

17  about the actual impacts of the law generally, but especially

18  of its rushed implementation, to light that -- clearly in a way

19  that it would inform Your Honor and allow you to evaluate the

20  strength and credibility of the evidence.

21      And -- so I said five and I should have said six.  The

22  other two would be Reverend T. Anthony Spearman, who is the

23  chair of the statewide NAACP in North Carolina -- and Reverend

24  Spearman would testify both about the effects of SB824 on the

25  members of the NAACP, both his organization and the constituent

1  branches, in terms of its effect on their voting rights.  He
2  would also testify about his own experiences in the
3  North Carolina legislature during the period in which -- the
4  very truncated period in which SB824 was considered and passed.
5      And State Senator -- State Senator Floyd McKissick --
6  Judge, I wanted to make sure I got the first name right as a
7  person I have not had the pleasure yet of meeting -- who in
8  his -- who was also active, present, and vocal during the
9  period during which SB824 was considered at the legislature and
10 can shed light both on that process, as well as on some of the
11 evidence that Plaintiffs have -- excuse me -- Defendants have
12 provided in opposition to our arguments about the truncated
13 process and how it's indicative of the racially discriminatory
14 intent.
15      THE COURT:  And that's information in addition to what
16 they've already provided in their declarations?
17      MR. ULIN:  I think it chiefly consists of information
18 that is in -- of what is in their declarations, but we also
19 feel that having that live testimony would allow them to expand
20 beyond what they put in the declarations, would allow
21 Your Honor to ask questions and derive information that because
22 of time or space constraints are not contained in those
23 declarations, and would also allow you to make judgments about
24 the strength and quality of the evidence that is sort of
25 uniquely in the role -- in your role as a district judge, allow

1 you to weigh and evaluate the strength of evidence and

2 credibility of witnesses in a matter that would bolster the

3 opinion you would ultimately prepare.

4       **THE COURT:**  All right.  Thank you.

5    We're going to take a 10-minute recess; and when we resume,

6 I'll hear from you with respect to the Section 2 issue.

7    (A morning recess was taken from 11:53 a.m. until 12:13

8 p.m.; all parties present.)

9       **THE COURT:**  Let me say I owe you all an apology.  I

10 thought it was 11:00.  I was halfway through our break when I

11 realized this is 12:00.  So we are going to recess, but I do

12 want to ask Plaintiffs a question before we do that.

13    You talk about *McCrory* and *McCrory* involved a number of

14 issues.  This is one of those isolated issues.  So when we talk

15 about the surgical precision with which *McCrory* was concerned

16 about, how does that translate to this situation when we are

17 only talking about one -- this one isolated provision and how

18 should the Court consider that information in light of *McCrory*?

19       **MR. ULIN:**  Your Honor, I'll try to briefly address

20 your question in the context of the results claim; and then if

21 Ms. Swain has anything to add on intent, we'd ask the Court's

22 indulgence on that.

23    So with regard to the results claim, the *McCrory* court,

24 while it did consider multiple provisions of an omnibus bill,

25 did focus analysis specifically on the voter ID law and the

1  impact of that voter ID law, and focused on evidence, some of

2  which is repeated similarly here and some of which has been

3  enhanced beyond what was presented in the *McCrory* case.

4       **THE COURT:** Walk we through that.

5       **MR. ULIN:** The *McCrory* case, excuse me, analyzed

6  issues like the disparate impact of the law, the list of

7  available IDs and whether those IDs were indicative of a law

8  that created a disparate impact on minority voters.  It focused

9  on the reasonable impediment declaration and whether that cured

10 the disparities that the evidence, both there and here,

11 demonstrate.

12     I think our answer, at least with respect to the results

13 claim -- and I do want to allow Ms. Swain to address the intent

14 claim -- is that, yes, *McCrory* was a case about an omnibus

15 bill, but it did focus -- the Fourth Circuit did engage in

16 focused, targeted analysis of the voter ID law and found that

17 that law had sufficient discriminatory impact to sustain the

18 discriminatory intent claim was affected by discriminatory

19 intent, and that is discriminatory intent that relates both to

20 voter ID, as well as to the other provisions of *McCrory*.  But

21 then it's also reflected in numerous other contemporaneous --

22      **THE COURT:** But the discriminatory intent was the

23 collection of these various provisions and how they surgically

24 removed --

25      **MR. ULIN:** So two points, and then I do want to allow

1  Ms. Swain to address the question.

2      **THE COURT:**  All right.

3      **MR. ULIN:**  One, one of the manners in which the

4  legislature surgically removed black voters from the electoral

5  in sufficient numbers was to impose a voter ID law that they

6  knew, based on evidence that was before the legislature, would

7  disproportionately burden black voters.

8      And, secondly, I would -- the only point that Your Honor

9  makes that I guess I would take issue with there is the notion

10 that the discriminatory intent is the variety of provisions in

11 the HB589 bill.  That's a manifestation of the discriminatory

12 intent.

13     The discriminatory intent reflected in a number of actions

14 by the North Carolina legislature in the period from at least

15 2011 and perhaps 2013 through 2018 is an intent to entrench the

16 Republican majority by diminishing the voting strength of black

17 and Latino voters because of their race; and that has been

18 manifested in a number of ways, including in the voter ID

19 provision of 589 and this voter ID bill and in numerous other

20 provisions of 589 that the court found discriminatory and in

21 the racial gerrymandering that the court engaged in in 2011 and

22 in the passage of a photo voter ID constitutional amendment

23 that was intended to insulate the legislature's considerations

24 of a new discriminatory photo voter ID law after it had been

25 told that what it did the first time around was the infamous

1  methodical race discrimination.

2      Having made those points, I would -- I'm happy to answer

3  any questions Your Honor has for me, but I would like to allow

4  Ms. Swain to speak.

5          **THE COURT:**  All right.  Yes, ma'am.

6          **MS. SWAIN:**  Thank you, Your Honor.  Two brief points

7  in addition to what my colleague has just shared.

8      What Mr. Ulin focused on is the motivation, and the

9  motivation -- and the Fourth Circuit's findings as to

10 motivation and as to how the *Arlington Heights* factors

11 encompass that motivation is important here.

12     But important in understanding the finding as to surgical

13 precision in this case was that the Fourth Circuit in that

14 instance looked at two sets of choices that the General

15 Assembly made pre- and post-*Shelby County.*

16     The -- prior to the *Shelby County* decision coming out, the

17 General Assembly in North Carolina had proposed a pre-*Shelby*

18 photo voter ID law.  When the Fourth Circuit considered the

19 question of intent, it not only identified that there was a

20 surgical precision in the choices the General Assembly made in

21 terms of adding new impediments to the path for black and

22 Latino voters in the state of North Carolina -- their ultimate

23 finding only went to African American voters -- but they also

24 paid particular attention to the choices the General Assembly

25 made as to which IDs to include and exclude pre- and

1    post-*Shelby* as to the photo voter ID provision itself and other

2    components of the photo ID provision itself.

3        So it wasn't as though the -- the decision itself doesn't

4    just go to the omnibus nature.  It goes to the intent that

5    animated choices around the photo ID law itself.

6            **THE COURT:**  All right.

7            **MS. SWAIN:**  Thank you, Your Honor.

8            **THE COURT:**  We are going to take a recess.  Why don't

9    we resume at 1:30 rather than 2:00.  Court is recessed until

10   1:30.

11       (A noon recess was taken from 12:20 p.m. until 1:30 p.m.;

12   all parties present.)

13           **THE COURT:**  Before I hear from the State, let me ask

14   this question:  While under a Section 2 claim you must, of

15   course, show -- I mean you need not show discriminatory intent,

16   only impact.  However, under a Section 2 claim if you show

17   discriminatory intent, need you also show discriminatory

18   impact?

19           **MS. SWAIN:**  Your Honor, I will draw your attention to

20   the *Arlington Heights* factors.  The fifth *Arlington Heights*

21   factor, which goes to the relative circumstantial and direct

22   evidence bearing on a finding of racial intent, asks whether or

23   not the action bears more heavily on one race than another.  So

24   the foreseeable impact of a law does bear on the intent

25   finding.  The two are interlinked.

1          **THE COURT:**  Okay.  I understand.

2      Now, is there anything further you would like to argue with

3   respect to either of your claims, the Section 2 or the

4   Fourteenth -- constitutional claims?

5          **MS. SWAIN:**  Your Honor, absent reserving opportunity

6   to provide rebuttal, we have no further argument to make.

7          **THE COURT:**  All right.  Thank you.

8          **MS. SWAIN:**  Thank you.

9          **THE COURT:**  At this point let me hear from the State.

10         **MR. COX:**  Thank you, Your Honor.

11     Before we went to lunch, Your Honor mentioned that she'd

12  like to hear first from the State about the Section 2 impact.

13  Is that the way you would like to proceed or would you like to

14  have the intent element discussed first, then the effects?

15         **THE COURT:**  I'm going to leave it to you to do it as

16  you see fit based on the arguments that I've heard.

17         **MR. COX:**  Your Honor, then I will pick it up where we

18  left off, which is the any alleged discriminatory effects from

19  the law.

20         **THE COURT:**  All right.

21         **MR. COX:**  And I'm Paul Cox with the Attorney General's

22  office representing the State defendants, for the record.

23     So first off, as an initial matter, I will address

24  Your Honor's question.  I believe that under Section 2 -- I

25  think the intent claim is a separate claim from the Section 2

1   results claim.  The Section 2 results claim is based upon the

2   language of Section 2(a), which says, you know, any requirement

3   on voting which results in the denial or abridgement of the

4   right of a citizen to vote.  So it is focused on results.  So

5   that claim really is a results-focused claim.

6        The intent claims under the *Arlington Heights* factor brings

7   in results or discriminatory impacts into that analysis under

8   the *Arlington Heights* factor, but I would stress that our

9   contention is that they're different analyses.  One is the

10  intent analysis.  The Section 2 claim, the results claim, is an

11  effects only analysis.

12          **THE COURT:**  All right.  Thank you.

13          **MR. COX:**  In sum, Your Honor, SB824 permits every

14  voter to cast a vote and to have that vote counted; and for

15  that reason, it does not deny or abridge the right to vote for

16  any protected class, as Section 2 requires.

17       I'll bring Your Honor's attention to the *Lee* case, *Lee*

18  *versus Virginia State Board of Elections*, the Fourth Circuit

19  decision from 2016.  In that case, it was a Section 2 results

20  test case; and there's been discussion about the two

21  elements -- the two modes of analysis for a Section 2 claim.

22  First is looking at the actual effects -- any discriminatory

23  effects and the second part is the complex *Gingles* multifactor

24  analysis that goes along with that.

25       Now, the Fourth Circuit in *Lee* held that you don't actually

1  have to reach the complex *Gingles* factor if you determine that

2  there is no considerable discriminatory impact from the law.

3  So it is our contention that the *Gingles* factors actually do

4  not need to be reached by the Court because the law at issue

5  here is fairly indistinguishable from the law that the Fourth

6  Circuit was looking at in the *Lee* case.

7      And I'll go through the -- the provisions of the law that

8  are similar, how the North Carolina law actually is more voter

9  friendly in certain ways than the Virginia law, and address

10  some of the questions that have been raised and the new

11  arguments that have been raised thus far this morning.

12          **THE COURT:**  All right.

13          **MR. COX:**  So under SB824, there are ten different

14  types of ID that are available to be used in voting.  There is

15  the North Carolina driver's license, the nonoperator ID issued

16  by the DMV, the U.S. passport, North Carolina voter ID that's

17  issued by the County Boards of Elections, a tribal ID which can

18  be issued by a federally recognized or state recognized tribe,

19  any student or public employer ID that's been approved for use

20  by the State Board of Elections pursuant to the law, and any

21  driver's license or nonoperator ID that's been issued by

22  another state as long as it's new voters that have just moved

23  into the state very recently; and, finally, military IDs and

24  veteran IDs are available to be used.

25      Now, it is true that in the *Lee* case there were a couple

other categories of IDs -- or I should say there were
categories of IDs that didn't have to go through the approval
process.  As Mr. Ulin pointed out, the student and employer ID
provisions, I believe, did not have to go through the separate
approval process as they do in North Carolina.

Nonetheless, we view that as a fairly minor difference when
looking at the totality of the law here and especially when you
consider the fact that in the *Lee* case the court did not really
focus on the broad range of IDs that are available to be used.
The Court's analysis in the effects analysis was really focused
on the provisions that ameliorated any effects that a law would
have on people who lacked ID, and I think that that's really
important here too.

In the Virginia law, much like in the North Carolina law,
there were free voter IDs available from the County Boards of
Elections.  Unlike the Virginia law, North Carolina law
actually has a very ample, reasonable impediment exception.  If
a voter showed up in Virginia without an ID, they could cast a
provisional ballot, but they could not sign a reasonable
impediment affidavit and automatically have that vote counted
as long as they didn't say something false on the affidavit.
The Virginia law actually required the citizen to still come
back either in person, by fax, e-mail or mail with a copy of
their ID before I believe it's the Friday after voting.  So
there was --

 1         **THE COURT:**  Before you go further, though, I want you

 2   to talk to me about the types of ID that were allowed in *Lee*

 3   that have not been allowed in North Carolina.

 4         **MR. COX:**  I believe, Your Honor, that the court did

 5   not focus much on it and I haven't gone back to look at the

 6   exact text of the statute.  But from the text of the decision

 7   itself, it appears that there were student IDs and employer IDs

 8   that were automatically allowed to be used.  So, in other

 9   words, they did not have to go through an approval process with

10   the State Board of Elections.

11         **THE COURT:**  Do you know whether or not public

12   assistance IDs were allowed?

13         **MR. COX:**  That I don't know.

14         **THE COURT:**  All right.  Go ahead.

15         **MR. COX:**  If my colleague finds that, we will update

16   the record.

17         **THE COURT:**  All right.  Thank you.

18         **MR. COX:**  One thing I want to correct in the record is

19   the idea that in North Carolina learner's permits and

20   provisional licenses --

21         **THE COURT:**  Oh, let me ask one more question.  I also

22   want to know were all state and federal IDs allowed that had

23   photographs and --

24         **MR. COX:**  I believe that's right.  I believe that is

25   the case in Virginia and I will correct myself if my colleague

 1  finds --

 2          **THE COURT:**  Which is not the case in this law.

 3          **MR. COX:**  That's not the case in North Carolina.

 4  That's right, Your Honor.

 5          **THE COURT:**  All right.

 6          **MR. COX:**  But, again, the focus of the court in the

 7  *Lee* case was on the provisions that address anybody who lacked

 8  an ID.  So they held -- the court held that because anybody who

 9  lacks an ID can easily get one from their County Board of

10  Elections and they could cure their provisional ballot by

11  returning to the Board of Elections with their ID, the court

12  held that those provisions would -- would not create any

13  discriminatory impact on anybody who lacks an ID; and because

14  the provisions under North Carolina law are even more friendly

15  for voters when it comes to correcting -- when it comes to

16  addressing voters who lack ID, we believe that the *Lee* case is

17  fairly indistinguishable from the law at issue here.

18          **THE COURT:**  Well, I'm not sure I agree with that.  I

19  would like to know -- if you're going to make that kind of

20  comparison, I would like to know exactly what the IDs were in

21  *Lee* versus here, because if they -- if it's a wide breadth, I

22  can see why the focus was different.  Here we have a

23  substantial number of IDs that are not allowed.  So if you're

24  going to make that comparison, we need to -- we need to compare

25  apples to apples.

1    I don't want to stop you.  You're --

2         MR. COX:  No.  I do want to answer the Court's

3    question.  The case, as I mentioned, is not very detailed on

4    the types of IDs that are available.  What it does say on the

5    first page of the opinion is "that a broad range of photo

6    identification satisfies the photo identification requirement,

7    including publicly and privately issued forms of identification

8    whether current or recently expired."  And as -- the

9    North Carolina law allows recently expired IDs and it gives

10   that one-year grace period.

11        THE COURT:  You might go back to the District Court

12   case where the findings were actually made about those IDs, but

13   I don't want to stop you.  I want you to go ahead.

14        MR. COX:  Yes, Your Honor.  We will endeavor to answer

15   your question for sure.

16        THE COURT:  Yes.

17        MR. COX:  One thing I do want to correct is that the

18   Plaintiffs, both in their argument and the supplemental report

19   issued with their reply brief by their expert

20   Professor Lichtman, interprets the photo ID law in

21   North Carolina as not allowing learner's permits and

22   provisional licenses.  Now, that is not the way the State Board

23   interprets the law and that is what matters here.  We believe

24   the State Board has the correct interpretation of the law.

25        What has caused the confusion, I believe, is that in the

1  prior version of a photo ID law there was a specific spelling

2  out of driver's licenses, learner's permits, and provisional

3  licenses; but in the new law, what it does is it says driver's

4  license and the next line it includes nontemporary --

5  nontemporary identification issued by the DMV.  So that's the

6  difference is what -- the new law is subsuming provisional

7  licenses and learner's permits within that provision for

8  nontemporary identification.

9        **THE COURT:**  So that's why that language was struck

10  through in the bill?

11        **MR. COX:**  That's right, because it still addresses,

12  still incorporates the same IDs that the Plaintiffs believe

13  have been lost.  It just does it in a different way.

14      We believe that reading is correct because when it says

15  "nontemporary identification issued by the DMV" -- there's a

16  specific form of identification that the DMV issues that they

17  call a temporary license and that temporary license is issued

18  pursuant to General Statute 20-7(f)(5) and that is when the DMV

19  issues a temporary driving certificate that is valid for 60

20  days and that's when an applicant applies to renew their

21  license by mail or by online form.

22      So that's the way the State Board and that's the way that

23  we read the statute, as allowing for these nontemporary forms

24  of identification, such as learner's permits and provisional

25  licenses, to be used.

1    Now, I also mention that, you know, there's been allusion

2  to the student and employer IDs.  That list has grown; and for

3  the Court's information and ease of reference to the list of

4  student and employer IDs, I would like to hand up a

5  comprehensive list of all those IDs that have been approved.

6    If I may approach, Your Honor?

7          **THE COURT:**  You may.  Have you shared that with --

8          **MR. COX:**  It is just a compilation of the lists that

9  are on the State Board's website.

10          **THE COURT:**  Oh, I see.

11    (Document handed to the Court.)

12          **THE COURT:**  And does it include the learner's permits?

13          **MR. COX:**  This is just student and employer IDs.

14          **THE COURT:**  Oh, just students and employer.  I see.

15  All right.

16          **MR. COX:**  The reason we wanted to hand that up is

17  because the way it exists in the form on the website is there

18  are three separate lists because there were three stages of

19  approval that the State Board went through.

20    As the law was originally written, it was fairly strict and

21  difficult to gain approval for a university or employer ID.

22  When it -- so during the first round of approvals, a number of

23  university and employer IDs were rejected because they didn't

24  meet the language of SB824.

25    In response, the legislature changed the law and made it

1  easier to apply for and get approval of student and employer

2  IDs; and that has led to, for example, all the UNC constituent

3  institutions being approved, a number of HBCUs and, you know,

4  additional community colleges and universities, for example.

5      So I'd also like to address the issue of the disparity in

6  the possession of IDs.  To be candid with the Court, we don't

7  dispute that there may be a disparity in the possession of the

8  IDs that are available to be used for voting.  What -- what we

9  caution the Court to be careful about is how that -- how that

10 is quantified -- how the disparity is quantified and how great

11 the disparity is.

12     The Plaintiffs have put forward a -- a report in their

13 reply brief from Professor Barreto that conducted a survey to

14 determine how many voters lacked ID in North Carolina and I

15 just want to make a couple points about that survey.

16     To the extent that it is to be relied upon, it should only

17 be relied upon where Professor Barreto surveys registered

18 voters.  A number of the data points and tables that he

19 includes in that report address the entire population of people

20 who could become eligible to vote if they registered; but what

21 is relevant here is registered voters, of course, because

22 you're not actually eligible to show up and vote unless you're

23 a registered voter.  So -- and we don't -- we have no way of

24 knowing if you include the larger universe of North Carolinians

25 who could be eligible to vote what percentage of those actually

1  would register and show up to vote at the next election.  So

2  the better way to look at that, we believe, is through

3  registered voters.

4      Another thing that I want to bring to the Court's attention

5  is that Professor Barreto also included a number of questions

6  that we believe misleads a little bit about what the -- what

7  the law is going to require of voters.  So, for example, he

8  asked voters whether the photo on their license matches the way

9  they look right now.  And the State Board has a -- an extensive

10  rule that addresses this that is designed to not make it so

11  that you have to have an exact match.  And he actually uses the

12  "exact match" phrase in his report, but an exact match is not

13  required.

14      The rule that the State Board promulgated to carry out this

15  provision of the law is -- says that the ID must have any

16  reasonable resemblance to the voter, and the State Board has

17  gone through and has extensive rules to address the "reasonable

18  resemblance" requirement.  Those rules are actually --

19  actually, Your Honor, if it would be all right, I would like to

20  hand up some materials that might be easier for you to turn to

21  as I make my presentation.

22          **THE COURT:**  That's fine.

23          **MR. COX:**  These are simply the filings that we made in

24  response to the preliminary injunction motion just tabbed for

25  your ease of finding them.

1              **THE COURT:**  All right.  Thank you.

2          (Documents handed to the Court.)

3              **THE COURT:**  And what should I be looking at at this

4    point?

5              **MR. COX:**  If you could turn to the smaller booklet.

6    It's the Bell affidavit and then Exhibit C of the Bell

7    affidavit.

8              **THE COURT:**  If you would identify the documents

9    because the Plaintiffs are going to have to find those same

10   documents.  You didn't provide this to the Plaintiff.

11             **MR. COX:**  This is Document No. 97-9.  It's the rules

12   that are on the North Carolina Administrative Code on the

13   Office of Administrative Hearings website.  So they're public

14   records.

15         So 8 NCAC 17.0101 goes through --

16             **THE COURT:**  Wait just a minute.  What tab am I looking

17   at?

18             **MR. COX:**  My apologies, Your Honor.  Tab C of the Bell

19   affidavit.

20             **THE COURT:**  All right.

21             **MR. ULIN:**  Your Honor, may we have counsel give us the

22   page number that we can refer to from his filing?

23             **THE COURT:**  That would be great.

24             **MR. COX:**  This is ECF 97-9 and it's the first page --

25   it's -- oh.  Sorry.  Page 108 of 195.

1        So the relevant provision is subsection (c)(3) and (c)

2    reads:  "The election official shall inspect any photo

3    identification provided by the person presenting to vote and

4    shall determine the following:" -- and then sub (3) -- "that

5    the photograph appearing on the photo identification bears any

6    reasonable resemblance to the person presenting to vote.  The

7    election official shall make this determination based on the

8    totality of the circumstances, construing all evidence, along

9    with any explanation or documentation voluntarily proffered by

10   the person presenting to vote, in the light most favorable to

11   that person.  Perceived differences" -- this is critical -- "of

12   the following features shall not be grounds for the election

13   official to find that the photograph appearing on the photo

14   identification does not bear any reasonable resemblance to the

15   person presenting to vote...."

16       And it goes through a number of factors that would be

17   common -- would commonly result in a photograph not looking the

18   same as the person who presents to vote, such as change in

19   weight, change in hair features and styling, including hairline

20   length, color, change in facial hair, cosmetics, and tattooing.

21   And the list goes on.

22       But the reason I bring these out is because the Plaintiffs

23   in their survey -- Dr. Barreto's survey surveyed respondents to

24   determine whether their photo ID had changed for any of these

25   reasons, but under the law and under the rules that have been

1  written and the way that the State Board is having the County

2  Boards enforce this, those differences should not be counted to

3  disallow someone's photo ID.

4      The second provision of this I want to bring Your Honor's

5  attention to is subsection (4), which talks about the name.

6  And, again, Dr. Barreto goes through whether a respondent to a

7  survey may have a slightly different name than what appears on

8  the license, and here the State Board has -- has a similar

9  provision stating that the name should -- does not have to be

10  an exact match to the name appearing on the voter registration

11  record and there should be a totality of circumstances and

12  considered in the light most favorable to the voter, and the

13  standard for them to apply is the name on the photo

14  identification shall be considered substantially equivalent to

15  the name appearing on the registration record.

16      And it goes through a number of examples of when -- very

17  common examples of when you might have some discrepancy that

18  should not be used to disallow that ID.  So, for example,

19  someone who has a three-word name or three-name full names,

20  such as Mary Beth Smith versus Beth Smith.  It goes on.  Other

21  examples including nicknames or variations on names, such as

22  Bill versus William; initials in the full name, A. B. Sanchez

23  versus Aaron B. Sanchez; a former name, including maiden names,

24  which are certainly going to arise.  So, you know, this goes --

25  and typographical errors.  Your Honor can see that there are a

1  number of ways that the State Board is interpreting this law to

2  ensure that it is not too strictly construed to disallow photo

3  IDs that are presented to them by voters.

4      Then the final provision of the "reasonable resemblance"

5  provision that I want to bring to the Court's attention is that

6  even if an election official determines that there is not any

7  reasonable resemblance on the photograph, it's not that

8  precinct worker that makes the determination that the ID cannot

9  be used.  The precinct worker has to actually formally

10  challenge that ID.  They go through a challenge process and

11  that challenge has to be adjudicated by the election judges

12  that are at the precinct.

13      And Your Honor may know that election judges in

14  North Carolina are nominated and appointed -- well, they're

15  nominated by the county parties, the major parties, Democratic

16  and Republican parties; and the County Board appoints them to

17  appear at the precincts.  It's a set of three judges.  The

18  Governor's party has -- it's the Governor's party has two,

19  right?  Okay.  The Governor's party is allowed to have two

20  versus one of the opposing party.  It's not required that it be

21  that way, but in a typical example, you have at least opposing

22  party judges.  The reason I bring this up is because a decision

23  there is no reasonable resemblance on a photo ID has to be

24  unanimous by that bipartisan panel of election judges.

25      So to sum all this up, there are numerous provisions that

1  the State Board has written into the rules that try to protect

2  a voter from any sort of one-off election official deciding

3  they don't want to accept that ID.  So yet another reason to

4  take Professor Barreto's conclusions and analysis with a grain

5  of salt, especially when they relate to extraneous reasons that

6  someone's ID may not be allowed in his view.

7      (Pause in the proceedings.)

8          **MR. COX:**  I'm going to have my colleague explain the

9  Virginia requirements so we can address the questions by the

10  Court.

11          **THE COURT:**  That would be wonderful.  Thank you.

12          **MS. VYSOTSKAYA:**  Your Honor, I think the answer to

13  your question is yes, that the student ID, as long as it has a

14  photograph, is allowed under Virginia law and also public

15  assistance IDs, I believe, under my interpretation of that

16  statute, is allowed as well.  Your Honor has access actually to

17  that statute.  It is included as one of our exhibits.  It's a

18  summary of that statute, rather.  It's Exhibit 14 in your

19  Tab 14 and it is page 20 --

20          **THE COURT:**  In which booklet?

21          **MS. VYSOTSKAYA:**  The main book, Your Honor, the big

22  book that has our brief and number of exhibits attached to it.

23          **THE COURT:**  All right.

24          **MS. VYSOTSKAYA:**  It would be Exhibit 14 there.

25      But what I wanted to point out is that Virginia law, unlike

1  North Carolina law, is actually considered to be a strict,

2  nonphoto ID state.  North Carolina is considered to be a

3  nonstrict, nonphoto ID state.  The reason for that difference

4  is that in Virginia, in order for you to cure your ballot --

5  let's say you don't have one of the forms of IDs that are

6  allowed on the Virginia law, but you want to cast a vote.  You

7  are still allowed to cast a provisional vote; but in order for

8  your vote to count, you have to return to the register of state

9  office and you have to present your valid ID that is listed in

10  that statute within three days after the election is over.

11  There is nothing like a reasonable impediment provision that

12  Mr. Paul Cox was talking about a second ago.  That's why it's

13  considered to be a strict law, unlike North Carolina's.

14          **THE COURT:**  All right.  Thank you.  So will this give

15  me --

16          **MS. VYSOTSKAYA:**  If you --

17          **THE COURT:**  Where in here does it talk about the

18  Virginia law?

19          **MS. VYSOTSKAYA:**  Your Honor, it's in two different

20  places.

21          **THE COURT:**  All right.

22          **MS. VYSOTSKAYA:**  It's page -- if you look on page 3

23  out of 29 -- the designation should be at the very bottom --

24  there is a Table 1, Voter Identification Laws In Force, that

25  provides you the divisions that I was talking about.  Virginia

1  is in the first column, photo ID "Strict" column; and

2  North Carolina, if you would look to the next page, is on

3  nonphoto, "Non-Strict" category.

4      And then if you go towards the end of that exhibit, it will

5  be page 25.  And I apologize.  In my, at least, copy it looks

6  like it's cut up a little bit.  But it has the reference to the

7  statute that requires photo ID in Virginia.  It's statute

8  24.2-643(B) and it contains a description of all the photo --

9  of all the forms of IDs that are required.

10         **THE COURT:**  All right.  And who does -- who is this --

11  who is NCSL?

12         **MS. VYSOTSKAYA:**  That's a National Conference of State

13  Legislatures, a nonpartisan group that supplies support to all

14  the legislatures throughout the nation.

15         **THE COURT:**  All right.  But nowhere in here does it

16  describe the specific IDs that are allowed under Virginia law?

17         **MS. VYSOTSKAYA:**  On page 25 it does, Your Honor.  It

18  has a listing of the IDs that are allowed.

19         **THE COURT:**  I see.

20         **MS. VYSOTSKAYA:**  And one of them -- I think your

21  question was about a student ID.  What it says is that "valid

22  student ID card from within Virginia if it includes photo" is

23  considered to be appropriate.

24      And while it doesn't list specifically a public assistance

25  ID as a permitted form of ID, it would seem to be covered by a

1  provision that says "any other identification card issued by a

2  government agency of the Commonwealth...."

3          **THE COURT:**  Or the United States.

4          **MS. VYSOTSKAYA:**  Or the United States.

5          **THE COURT:**  And any "employee identification card

6  containing a photograph of the voter and issued by the employer

7  of the voter in the ordinary course of the employer's

8  business."

9      It has some very general provisions here.  All right.

10  Thank you.

11          **MR. COX:**  Thank you, Your Honor.

12      Now, turning away from the number of IDs that are available

13  under the law now to the provision for free photo IDs that are

14  offered.  There are two provisions that allow for the issuance

15  of free --

16          **THE COURT:**  Now, let me just back up.  We're just not

17  talking about number.  We're talking about how many people are

18  going to be excluded by those requirements.  So we're not just

19  talking about the number listed.

20          **MR. COX:**  Yes, Your Honor.  Yes, Your Honor.

21      So there are two different manners that a person can get a

22  free voter ID prior to voting in March.  One is through, as has

23  been mentioned before, county voters -- County Boards of

24  Elections.  Those are issued during the normal business hours

25  of County Boards of Elections.  The County Boards also have the

1  ability under rules that have been promulgated by the State

2  Board under 8 NCAC 17.0107 that allows the County Boards to

3  send out mobile teams to issue IDs at large gatherings or other

4  locations within the county to provide further IDs.  And then

5  the second manner is through the provision of the DMV

6  nonoperator ID or free nonoperator ID and that -- that

7  provision is available to anyone who can access the DMV.

8      I also want to clarify one issue that may be a source of

9  confusion arising from Mayor Schewel's affidavit.  That was the

10  Durham mayor who spoke about adults in his city who have lost

11  their license due to revocation or suspension.  There is a

12  provision in SB824 -- it's Section 1 3(a) of the Session Law --

13  that allows for automatic -- the DMV to automatically send such

14  a driver a replacement identification card that can be used for

15  voting when such a revoked or suspended license is turned in.

16  So -- so a little more context on that issue is important, we

17  believe, for the Court.

18      Now, turning from the free voter IDs that are available to

19  further implementation by the State Board, the Session Law also

20  directs the State Board to conduct a, quote, aggressive voter

21  outreach, unquote, campaign.  That's Section 1.5(a).

22      So far what has happened is that the State Board has

23  conducted two public seminars in each county.  So that's 200

24  seminars.  That happened in the summer months.  So contrary to

25  what has been presented, it's not that the State Board put on

 1  halt all outreach and preparation efforts.  I will get to what
 2  I think the Plaintiffs are alluding to in a minute.
 3      But on these public seminars in each county, the
 4  outreach -- there's a voter outreach team at the State Board,
 5  and they're the ones that are responsible for these public
 6  seminars, and they've also been reaching out to civic
 7  organizations and conducting additional seminars even outside
 8  of what the law requires them to do.  And the State Board has
 9  also recommended to County Boards to host further seminars
10  between now and March.
11      Now, in July as well --
12          **THE COURT:**  You said recommended?
13          **MR. COX:**  That's right, Your Honor.
14          **THE COURT:**  Uh-huh.
15          **MR. COX:**  And that was through a numbered memo -- the
16  State Board's executive director issues directives and
17  information to the County Board directors via what they call
18  numbered memos.  And that's a phrase used in the statutes.
19  It's the official mode of communication by the State election
20  official, the executive director, to the County Boards.  And in
21  the latest numbered memo, which we intended to bring a copy of,
22  but it got lost in the shuffle -- we can provide it to the
23  Court following this hearing -- the executive director is
24  recommending to County Boards that they conduct such outreach
25  seminars now that the State Board has conducted two in each

1  county.

2      So also in the summer months, in July, the State Board held

3  a statewide conference.  The State Board conducts two statewide

4  conferences each year with County Board officials.  These

5  include the staff of the County Boards, as well as the

6  appointed political members of the County Boards.

7      And at that July conference, the -- well, the general

8  counsel sitting to my right conducted a presentation about the

9  upcoming photo ID requirement and we've included a copy of that

10 presentation along with the Bell affidavit that is in your

11 materials and that is at exhibit -- I believe it's Exhibit A.

12 Yeah, it's Exhibit A of the small notebook.  And I'd like to

13 bring Your Honor's attention to some of the presentation that

14 occurred.  And, again, this goes back to the summer.

15     And for cocounsels' information, it is Document 97-9 and

16 I'm on page 31 of 195.

17     For Your Honor, that's 31 of 195.  The docket number should

18 appear on your copy as well.

19             **THE COURT:**  All right.

20         **MR. COX:**  This is a brief presentation that the State

21 Board gave to County Boards on the -- carrying out the photo ID

22 provisions.  Of course, there was no photo ID requirement in

23 2019, so the State Board was very careful to make sure that the

24 County Boards knew that and would not be demanding any photo ID

25 because, as Your Honor may know, we just conducted statewide

1  municipal elections across the state over the last two months

2  in which there was no photo ID requirement.

3      Especially I would like to bring Your Honor's attention to

4  the reasonable impediment exceptions.

5          **THE COURT:**  Which is on page?

6          **MR. COX:**  That's on page 36 of 195.

7          **THE COURT:**  All right.

8          **MR. COX:**  And here it lists basically from the law

9  what the reasonable impediment exceptions are.  There's a list

10  of exceptions that the legislature has put into the law.  And

11  then finally under subsection D there, there's "other

12  reasonable impediment."  Any voter is allowed to offer their

13  own reason for why they had an impediment to bringing the photo

14  ID in person.

15      Now, the next page, on page 38, also I want to bring

16  Your Honor's attention to, which it -- it captures what the

17  State Board has codified in their rulemaking as well, which is

18  that the reasonable impediment that a voter offers for not

19  bringing an ID can only be rejected if the County Board has

20  grounds to believe that the affidavit is false.

21      So what this is saying is that -- and this is straight from

22  the law's text as well.  What this is saying is that if a voter

23  does not appear with an ID, they're going to be offered the

24  opportunity to fill out a reasonable impediment affidavit; and

25  that reasonable impediment affidavit will suffice and their

1    vote will count, unless the County Board has grounds to believe

2    that what they wrote in that affidavit is false.

3        Now, the State Board has added an additional layer of

4    protection on top of that in its rules, which is the next

5    sentence.  The "decision that the affidavit is false requires a

6    unanimous vote of" the County Board of Elections or a CBE, as

7    it writes there.

8        As Your Honor may know, the County Boards of Elections are

9    appointed by the political parties.  They are nominated by the

10   political parties and appointed by the Governor.  There

11   currently are three Democratic representatives and two

12   Republican representatives on each County Board of Elections.

13   It tends to follow that dynamic based upon the party of the

14   Governor.  They will have the majority of the appointments.

15   That is important because it's a bipartisan board that must

16   determine unanimously that there are grounds to disbelieve a

17   voter when they say they had a reasonable impediment.

18       **THE COURT:**  Suppose the voter says, "I do not believe

19   that the -- I don't have an ID because I don't believe that

20   this law is constitutional."

21       **MR. COX:**  Under the text of the law and the text of

22   the rule, the County Board would have to conclude that that is

23   a false statement and have grounds to believe that that's a

24   false statement.

25       **THE COURT:**  How would they do that?

1        **MR. COX:**  That is my point, Your Honor.  There's no --

2  there's no way -- the only way that they can reject it is if

3  they determine that it is a false statement and have grounds to

4  believe that.  And so -- so a statement like that, how would

5  you -- exactly, how would you determine that it's a falsehood.

6        In our read of the law, there has to be some grounds to

7  believe -- and this is the exact text -- that there is a

8  falsehood committed in that affidavit; and admittedly, it's

9  hard to conceive of how a County Board member would come up

10  with grounds to believe what the person said was false

11  unless -- I mean, we can come up with hypothetical situations

12  where the County Board member knows the person and says, "Oh,

13  they said they didn't have a car, but they do have a car."  But

14  then they have to get all four other members of the Board to

15  agree with them that's a falsehood.

16        So the point is the law has a very cabined allowance for

17  County Boards to reject reasonable impediments; and the

18  guidance that the State Board is providing to the County Boards

19  is just that, that there is one way to reject a reasonable

20  impediment affidavit, and the County Boards have to follow the

21  letter of the law that's written.

22        Now, there are other exceptions for providing photographic

23  ID in person.  One is that if the person was the victim of a

24  natural disaster within 100 days prior to the election or if

25  the person has a religious objection to being photographed,

1  they would, again, sign an affidavit representing that.  These

2  are all found in Section 1.2(a) of the SB824, the Session Law.

3     Now I'd like to respond directly to something that the

4  Plaintiffs have raised and that their expert Professor Barry

5  Burden has suggested in his supplement report that was attached

6  to the reply brief indicating that it's not clear to him at

7  least how a person's lack of awareness could be considered to

8  be a reasonable impediment affidavit.

9     And we can go through the same exercise we just recently

10 had, Your Honor.  There's no way I believe or we believe to

11 conclude that if someone says, "I didn't know I had to bring an

12 ID" -- there's no way to say -- I mean, we could think of

13 hypothetical examples, perhaps.  There's no way to say, that I

14 can think of, how a County Board unanimously can determine that

15 that person stating that they lacked awareness of photo ID is

16 false.  I mean, again, a bipartisan panel of five County Board

17 members would have to make that determination and have to make

18 it based upon grounds they believe that statement is false.

19     And, finally, the reasonable impediment provision we do

20 believe is very critical in this law and the reason it's very

21 critical, it is -- the law bolsters the idea that no person

22 should be turned away from the ballot box if they lack ID; and

23 the law actually directs the State Board in all of its

24 communications about the photo ID requirement to include the

25 following statement:  All registered voters will be allowed to

1  vote with or without a photo ID card.  And that's directly from

2  the Session Law.  That's Section 1.5(a)(10).

3      And the State Board is complying with that in including in

4  its outreach efforts that statement and making it clear to

5  voters that while there is a photo identification requirement,

6  it is not a strict requirement; that if you show up and you do

7  not have ID, you may vote.  And we just went through the ways

8  that your vote can count, most critically the reasonable

9  impediment exception.

10     I just touched on some of the ways that the State Board has

11  been conducting voter outreach and I'll just follow up on that

12  because I think it's important to understand where the State

13  Board is and what's to come.

14     First, we talked about the public seminars and the initial

15  training that took place in July of county officials.  In the

16  2019 municipal elections, the State Board had all County Boards

17  post informational fliers and posters that were in both English

18  and Spanish in every precinct and early voting polling

19  locations in the municipal elections alerting voters to the

20  fact that they would be required to present photo ID in the

21  upcoming election in 2020 with the exceptions we've discussed.

22     We've also discussed the mailing that has gone out to

23  approximately 700,000 voters who the State Board has determined

24  may not have a DMV-issued ID that could be used in voting

25  and --

1          **THE COURT:**   How did they make that determination?

2          **MR. COX:**   They did a matching analysis.   They took the

3   database of the DMV customers and those who actually have a

4   license or other form of ID that can be used issued by the DMV,

5   matched that against the voter registration file.   And the data

6   team -- the data scientists at the State Board can conduct a

7   matching analysis based upon unique identifiers between those

8   databases.   So, for example, social security number matches,

9   name and date of birth matches between the two databases to

10  determine -- first, you determine whether there is an exact

11  match between a person on one database and another database.

12  That person is not going to be sent a mailing under this rule.

13         After they do that, the State Board conducts a separate

14  matching analysis to take out any of those voters that were

15  matched with a DMV record whose DMV record is expired, except

16  for those who are over 65.   As Your Honor may know, if you're

17  over 65 and your ID expired before your 65th birthday, then

18  your ID can be used.   But -- so the State Board did that second

19  layer of matching, which is to take out the voters who exist in

20  the DMV system but have expired licenses.

21         So that's how those two lists combined resulted in the

22  mailing.

23         And I should also mention, Your Honor, the 700,000 list is

24  not a definitive list of how many people the State Board

25  believes do not have qualifying ID for a number of reasons:

1    One, it only addresses DMV-issued ID, of course.

2    Two, it took out all expired IDs for people under 65.  And

3  as you may know, the law allows expired IDs to be used as long

4  as they're not expired for more than one year.

5    There are also a number of complicated algorithms that can

6  be applied to that matching analysis that would take out false

7  matches or false results of people who -- who are on the list

8  of individuals who the State Board believes may not have an ID

9  issued by the DMV, but they actually do.  And this results from

10  slight differences in names.  It results from typographical

11  errors in names where matches don't -- or typographical errors

12  in social security numbers or dates of birth, that sort of

13  thing, where the match may not be exactly right.

14    And there are ways that a data professional can go about

15  trying to cull out that list to get to a more refined list, and

16  that is what happened in the earlier lists that the Plaintiffs

17  alluded to from the earlier litigation.  2013 and 2014 matching

18  exercises were done at a much more granular level.

19    But for this purpose, this was for the purpose of sending a

20  mailing out to North Carolina voters; and the State Board, I

21  believe in good judgment, determined that they should take an

22  approach that was going to guarantee that the list would be

23  overinclusive.  So that it's better to send an announcement

24  that a photo ID is required and you may not have a qualifying

25  photo ID to a person who actually does have a qualifying photo

1  idea than to neglect to notify a person who actually does not

2  have a qualifying ID.  So the list is designed to be

3  overinclusive.  But that mailing was sent out in September.

4       There is currently a mailing that's going out to every

5  residential address in North Carolina.  It's with the mail

6  house and should be going out in the next couple of days and

7  hitting mailboxes the next week.

8       Later in December, potentially hitting mailboxes in the

9  early part of January, there's going to be a subsequent

10 mailing.

11      The first mailing going out right now is a large flyer

12 format that provides general information about the photo ID

13 requirement.  The second mailing that's going out in

14 December/January will be a -- a more detailed booklet format

15 that discusses in more detail the requirements of the photo ID

16 law.

17      And then the Session Law also requires two additional

18 all-residence mailings to occur in 2020.  The State Board

19 currently is scheduling one to go out in February, so it would

20 occur before the March primary, and another one to go out

21 before the general election, so likely sometime in the summer

22 or early fall.

23      In addition to that, the State Board has put together press

24 kits to do outreach on its own to its media contacts and also

25 to give to the County Boards of Elections to do their own media

1  outreach to get the word out about photo ID requirements.

2      In the next few months, the State Board is going to be

3  conducting in-person and web-based trainings of County Boards.

4  That training will be recorded and then the County Boards will

5  then use that to train the poll workers who be working at the

6  polls in March.

7      I want to make one note that is important to recognize in

8  terms of election administration.  The State Board in its

9  judgment and particularly in the executive director's judgment,

10  who has been working in election administration for decades,

11  made the determination that it would not be a good idea to try

12  to train poll workers and do an entire voter outreach effort

13  before the photo ID requirements were going to be required in

14  the upcoming election.

15      So, in other words, we had elections in 2019 that did not

16  require photo ID.  They included two special congressional

17  elections.  As Your Honor will recall, there was a new election

18  order for the 9th Congressional District of North Carolina.

19  There was a new congressional election required in the 3rd

20  Congressional District due to the death of a congressman, and

21  then you had statewide municipal and county-level races that

22  occurred in this year.

23      None of those races required photo ID and the State Board

24  did not want to -- first, did not want to train poll workers

25  about photo ID because of fear that someone would be

1  erroneously required to show a photo ID and, the worst-case

2  scenario, would be disenfranchised because they didn't show a

3  photo ID when they didn't -- when they never needed to do so;

4  and, second, so that voters would not be confused about the

5  requirements for voting.

6      And so that was -- I think that may be part of what the

7  Plaintiffs were alluding to about a -- a sort of halt to

8  outreach efforts.  Certainly there was not the sort of

9  full-court press that the State Board is now engaging in when

10 upcoming elections were not going to be requiring photo ID.

11     As I mentioned, there are two statewide conferences the

12 State Board conducts.  One was -- the last one was conducted in

13 July.  The State Board is going to conduct another one in

14 February, so before the March primary.  All county election

15 officials should be represented at that conference where there

16 will be presentations in -- much more detailed presentations

17 about the photo ID requirements so those county officials can

18 go back to their locations and ensure that their poll workers

19 who they are training know how to enforce this law correctly.

20     And then, finally, the State Board is developing the

21 materials that are going to be used by the poll workers on

22 election day.  The State Board drafts and finalizes these

23 materials and distributes them to all precinct locations in all

24 County Boards.  They include quick reference guides for poll

25 workers.  There's a thing called a "Station Guide" that all

1    poll workers are familiar with.  They flip to the section on

2    photo ID if they have any question and it tells them exactly

3    what they're supposed to do.

4         So now turning back where I started, on the cases that have

5    addressed the photo ID requirements, and I mentioned the *Lee*

6    case.  We do believe it's hard to distinguish this case from

7    the *Lee* case, especially when you consider the fact that in

8    Virginia if you fail to bring an ID to the polls -- whether you

9    have an ID or not, if you fail to bring an ID to the polls, you

10   can't fill out a reasonable impediment affidavit.  You have to

11   cure that provisional ballot by sending in a copy of your ID or

12   appearing with a copy of your ID at the polls.  So we do

13   believe that in a way the North Carolina law is actually

14   less -- has less of an impact on voters because it is not quite

15   as strict.

16        In the Fifth Circuit case, the *Veasey versus Abbott* case,

17   from 2018, the Fifth Circuit reversed a preliminary injunction

18   against the law where the District Court failed to account for

19   the reasonable impediment exception.  Again, you know, the

20   court there found the reasonable impediment exception important

21   to analyzing the impacts on voters.

22        The Seventh Circuit looking at Wisconsin's photo ID in the

23   *Frank v. Walker* case, that was a case where Wisconsin law

24   allowed fewer IDs to be used than North Carolina does and like

25   the Virginia law required the voter to bring their IDs to the

1  Board of Elections afterwards if they failed to present it when
2  they're voting.

3      And then the South Carolina law was upheld in front of a
4  three-judge panel of the DC District Court in a Section 5 claim
5  under the Voting Rights Act, which is a little bit different;
6  but at the same time, it is focused on any discriminatory
7  results.  And the court determined that there were no
8  discriminatory results, honing in particularly on the
9  reasonable impediment exception, which is nearly identical to
10 North Carolina's reasonable impediment exception.  The court
11 held there that the South Carolina law, quote, might have posed
12 a problem for South Carolina's law under the strict effects
13 test under Section 5, but the sweeping reasonable impediment
14 provision eliminates any disproportionate effects or material
15 burden that South Carolina's voter ID law otherwise might have
16 caused.

17     And then, finally, the District Court in Alabama in the
18 *Greater Birmingham Ministries* case we cite looked at Alabama's
19 photo ID law and determined there was no discriminatory impact
20 under the Voting Rights Act.  That law, unlike North Carolina's
21 law, did not include a reasonable impediment provision.  It had
22 a similar set of IDs.

23     So finally a few words on the *McCrory* case.  The *McCrory*
24 case is -- is instructive in some regards, but obviously
25 distinguishable in others.

1     One is something Your Honor asked about earlier, which is

2  the Fourth Circuit's focus on the cumulative effects of the

3  provisions that were in the prior law.  You know, the court

4  used language like panoply of voting restrictions that

5  cumulatively resulted in disenfranchisement.  That's at 231.

6  And the court said, quote, the sheer number of restrictive

7  provisions in Session Law 2013-381 distinguishes this case from

8  others.

9     And there it was talking about distinguishing the case from

10 other cases where it was only the photo ID element that was at

11 issue, so, for example, the *Crawford* case, which the Defendants

12 brought up to the Fourth Circuit in the *McCrory* case.  The

13 *McCrory* court distinguished the prior law from what was at

14 issue in *Crawford* because in *Crawford* it was just a photo ID

15 law, unlike the one at issue in *McCrory*.

16     Now, other differences is that the prior law -- the new

17 law, with regards to the prior law, has additional IDs that can

18 be used, including the student/employer IDs that we've

19 discussed.  It also includes the one-year grace period for

20 expired IDs.

21     It's true that the prior law was amended late in the

22 litigation to allow expired IDs up to four years to be used,

23 but as far as I can tell, the Fourth Circuit didn't look at the

24 expiration date issue as relevant in any way and it may not

25 even have considered that.  The Fourth Circuit did not consider

1   the amendments as part of the actual law.  If Your Honor looks

2   at that decision, the amendments to the prior photo ID and

3   other voter restriction law occurred on the eve of trial; and

4   the way that the Fourth Circuit looked at that amendment was in

5   the remedial section of the analysis.

6       So the court looked at discriminatory intent of the

7   original law, determined that there is a violation of the

8   Voting Rights Act based upon an intent analysis, and then did a

9   separate analysis where it determined whether the amendment

10  remedied the violation that had already been found.

11      So we argue that the case that the Fourth Circuit was

12  looking at was not the same -- same idea as the law at issue

13  here.  The law at issue here is one package.  You're not --

14  you're not supposed to look at any provisions that might burden

15  voters and disregard any provisions that might ameliorate that

16  burden.  The sequence of events in the *McCrory* case

17  distinguishes that case from this one.

18          **THE COURT:**  So if it is found that the legislature

19  took the laws in *McCrory* and just split them up into different

20  laws, does that make it nondiscriminatory?  Just put them in

21  separate bills.

22          **MR. COX:**  No, Your Honor.

23          **THE COURT:**  You put voter education here, you put this

24  one in this bill, and you look at them in isolation?

25          **MR. COX:**  I believe, Your Honor, that you would -- you

1  know, a court could consider a number of laws together in the

2  same challenge to make a -- an argument about discriminatory

3  intent.  Certainly in that case all of them were packaged into

4  one law.  Here we don't have -- we don't have a series of laws

5  to gum together for the analysis, so we don't have that problem

6  to address.  Here we literally only have the photo ID

7  requirement.

8      So we -- we think that for that reason the panoply, as the

9  Fourth Circuit talked about, of laws that were found to have

10  targeted black voters with surgical precision is not

11  instructive to a simple photo ID law that other courts have

12  upheld in similar circumstances on their own.

13      **THE COURT:**  But in *McCrory*, you're talking about

14  principally the same legislators.  You're talking principally

15  about -- the laws may be slightly different.  They now have

16  been packaged in different places.  They are separate laws, as

17  opposed to all packaged together.  Does that make -- does that

18  remove some of the taint that was found in *McCrory*?

19      **MR. COX:**  Your Honor, certainly the provisions that

20  have changed in the law do remove any determination by the

21  Fourth Circuit that the photo ID provisions of the prior law

22  were -- resulted in discriminatory effects.

23      The -- in particular, the reasonable impediment provision

24  is very different in the very prior law.  In the prior law, it

25  wasn't just that a County Board of Elections could reject a

1  ballot that was provided under reasonable impediment if it was

2  found to be false.  That was one of the reasons.

3      There were two other reasons and those reasons gave the

4  County Board lots of authority to adjudicate those reasonable

5  impediment reasons:  For one, if the County Board determined

6  that the reason given was nonsensical or, two, that the reason

7  given, quote, merely denigrated the photo identification

8  requirement.

9      And we can think of a lot of reasons that a County Board

10  official would determine that, you know, a voter was

11  denigrating the requirement by not complying with the law.

12  Those -- those subjective determinations have been removed from

13  the current law and, in addition, the State Board has imposed

14  an unanimity requirement on the County Board of Elections that

15  did not -- that was not in force in the prior law.  So there

16  are these protections that guarantee that voters that go the

17  reasonable impediment route, as long as they don't demonstrably

18  lie on their affidavit, will have their vote counted.

19      There are a couple other provisions from the earlier law

20  that changed with respect to reasonable impediments.  In the

21  prior law, any voter could challenge someone's reasonable

22  impediment reasons; and, you know, that's a recipe for

23  shenanigans, of course.  If someone puts in a reasonable

24  impediment affidavit, they leave the voting location, and then

25  someone comes in and challenges that, they might or might not

1  learn that that challenge is taking place and be able to defend

2  themselves.  You know, they're supposed to be able to.  But,

3  you know, there's no such process of challenging someone's

4  reasonable impediment under the current law.

5      I mention also the change from the majority vote to a

6  unanimous decision by the bipartisan board.

7      And, finally, what is also important is that the prior

8  reasonable impediment provision still required the voter to

9  present some form of ID.  So you would fill out a reasonable

10 impediment affidavit, but you would still have to provide a --

11 the State Board calls it a HAVA document.  HAVA stands for the

12 Help America Vote Act.  You know, these are bank statements,

13 utility bills, things like that that would provide a

14 nonphotographic form of an ID that could be used to

15 substantiate your reasonable impediment affidavit.  The

16 alternative would be to provide your name, address, social

17 security number, and there might be another personal identifier

18 that you have to provide as well.

19     But, you know, that is not required at all in the new law.

20 What you put down in your reasonable impediment affidavit is

21 your reasons, you sign the affidavit, and then the County Board

22 must accept that affidavit, unless it has grounds to believe

23 unanimously that the affidavit is false.

24     Your Honor, I think that concludes my discussion on why we

25 believe the Session Law does not have a discriminatory effect

1   under the Section 2 analysis.  Unless Your Honor has questions,

2   I will turn it to my colleague, Ms. Vysotskaya, to discuss the

3   intent claim.

4               **THE COURT:**  All right.  Thank you.

5           **MR. COX:**  Thank you.

6           **MS. VYSOTSKAYA:**  I wanted -- before I talk about the

7   intent, I wanted to jump back to Your Honor's question about

8   *McCrory*, where you had a law that packaged multiple limitations

9   and restrictions on voting patterns and practices that were

10  used predominantly by African Americans.

11      And Your Honor asked, well, what if you have those pieces,

12  you know, packaged differently in different pieces of law?

13  Does this make the law that is on challenge today any less

14  discriminatory?  And the answer to that has to be of course it

15  would not make the question -- the law in question any less

16  discriminatory if Plaintiffs brought their challenge to several

17  laws in one single complaint.

18      Of course, they could not do that here because the

19  practices the *McCrory* court discussed have been enjoined and

20  are not currently present in North Carolina electoral statutes.

21  In *McCrory*, for example, as the Court pointed out, that -- oh.

22  And one big elephant *McCrory* really contained as well is the

23  General Assembly there requested racial data through their

24  expert and has then patterned the law using that racial data to

25  specifically restrict the types of practices that African

1  Americans used.  We don't have this here at all, but there is

2  no --

3      **THE COURT:**  How do you know -- you have many of the

4  same legislators.  How do you know that data wasn't -- they

5  knew what the data was, so how do you know that data wasn't

6  used?  Why wasn't that data used to move the age from 65 --

7  from 70 to 65 on the -- I mean, how do I know that wasn't based

8  on data?

9      **MS. VYSOTSKAYA:**  We know that because, Your Honor,

10  before you -- and we have submitted that to you -- we have the

11  legislative hearing transcripts.  It's one of the exhibits that

12  the Board has transmitted as part of its response to a motion

13  for preliminary injunction and what those legislative hearings

14  make patently clear is that the law was simply patterned after

15  the South Carolina law.  So the language is not taken from any

16  data.  The language is almost identical to the law that

17  South Carolina has passed and that has already passed judicial

18  scrutiny.

19      And, Your Honor, for example, November 28, 2018, Senate

20  debate, page 3 -- it's a huge book, but I could read what was

21  said during the presentation of the law.  Specifically, the

22  legislator stated, "We modeled this bill on South Carolina's

23  law because it has already been through federal scrutiny with a

24  judges' panel."  And that reference appears in several spots of

25  that legislative debate.  And if you compare the language of

1  the laws -- and my colleague has already, for example, referred

2  to a reasonable impediment provision -- it is nearly identical

3  to the law in North Carolina.

4      Also, very similar language appears in the section that

5  describes the purpose behind the North Carolina voter ID law

6  and the purpose -- it's going to be your Tab No. 1.  That's

7  just the voter ID law itself and on page 3 of that tab this--

8          **THE COURT:**  It's Tab No. 1 of which book?

9          **MS. VYSOTSKAYA:**  The big book, Your Honor.

10         **THE COURT:**  The large one.  All right.

11         **MS. VYSOTSKAYA:**  The purpose of the voter ID law is to

12 confirm that the person presenting to vote is the registered

13 voter on the voter registration records.  That is -- almost

14 identically traces the language in the South Carolina law.

15     I also did want to make a point about the legislature being

16 exactly the same.  According to Professor Lichtman and the

17 table that was presented to you -- I believe it was Table

18 No. 11 that was shown on the screen -- actually what that table

19 shows is that the composition of the legislature was different.

20 There is no information in that table about the Democratic

21 party's composition of the legislature at the time when SB824

22 was passed, but there is a percentage that is listed of those

23 Republicans who were present in the legislature during 2013

24 when the previous law was passed, so would have had access to

25 the data, and those who were in the legislature when SB824 was

1    passed.  And in the Senate, I believe the percentage was only

2    52 or so percent -- it was just slightly over 50 -- of the same

3    senators who sat --

4        **THE COURT:**  But the leaders of this whole effort were

5    a part of that legislature and are now a part of this law as

6    well, the leaders of that effort.

7        **MS. VYSOTSKAYA:**  That is correct, Your Honor.

8        **THE COURT:**  All right.

9        **MS. VYSOTSKAYA:**  The leaders were.

10        **THE COURT:**  All right.

11        **MS. VYSOTSKAYA:**  The percentages are different.  There

12    is a 52, I believe, or 53 or so that have remained and the --

13    from the Republican side and the others were different.  And

14    then we have about 60 -- slightly above 60 percent on the House

15    side as well.

16        While the leaders did remain, what they passed in this

17    legislation is quite different from the legislation that was

18    passed in SB824.  The content of the law itself -- and Mr. Cox

19    has already described it -- it contains a reasonable impediment

20    provision that is quite sweeping that was not the kind of

21    reasonable impediment provision that the legislature tried to

22    incorporate into a previous voter ID law on the eve of

23    litigation.  It's completely different.

24        It's also -- the reasonable impediment provision itself was

25    included into this voter ID law from the very beginning, unlike

1    in the previous iteration of the law.

2        The -- there are -- certain IDs were added that did not

3    appear in the previous iteration of the law and some of these

4    IDs will benefit African Americans at larger proportions than

5    the proportions that reside in North Carolina, for example, the

6    student ID -- student IDs.  We have about 12 HBCUs in

7    North Carolina and 10 of them were approved already for

8    presentation of their IDs as valid forms of IDs during the

9    elections in 2020.

10       Also, the public employment IDs, we have evidence here,

11   Your Honor, from OSHR in our booklet that shows that over

12   30 percent of the public employees working for the state of

13   North Carolina are African Americans.  That is also a higher

14   percentage than African Americans who reside in North Carolina

15   population and yet the legislature has incorporated those IDs

16   into at least --

17           **THE COURT:**  Tell me why they didn't incorporate the

18   public assistance.

19           **MS. VYSOTSKAYA:**  Your Honor, it also does appear in

20   the legislative record.  There were several concerns raised.

21   The one concern was that many public assistance IDs do not

22   contain a photograph.

23           **THE COURT:**  Could you not have had a provision on

24   those that contain photographs?

25           **MS. VYSOTSKAYA:**  It could have been --

1    **THE COURT:**  What did you do with the veterans and the

2  military?

3    **MS. VYSOTSKAYA:**  It -- those are -- so the veterans'

4  IDs --

5    **THE COURT:**  All have photographs?

6    **MS. VYSOTSKAYA:**  The ones that have photographs are

7  part of the IDs that are allowed in North Carolina.

8    It could have been -- there could have been amendment made

9  to the legislation that would have specified that only those

10  public IDs that -- public assistance IDs that contain

11  photographs are the kind of IDs that would be accepted, but

12  that specific type of amendment -- by the way, the

13  legislature -- the Republican side of the legislature expressed

14  specifically willingness to consider that kind of amendment if

15  it would have been presented -- it's cited in our brief -- and

16  that specific language was never presented.

17    The language of the amendment that was presented simply

18  refers to public assistance IDs and our record shows that a

19  Medicaid card does not have a photograph, for example.  A

20  Medicare card does not have a photograph.  A number of food

21  stamp type of identifications do not have a photograph.

22    Now, Plaintiffs did in their reply brief present evidence

23  that some public housing authorities issue IDs with

24  photographs, but that evidence also shows that every public

25  housing authority ID is different in format.  That was another

1  concern that was expressed by the legislature, that differences

2  in the formats may confuse the poll workers, may make the list

3  more confusing.

4      So those are the two concerns that were expressed during

5  the legislative debates and no specific limiting language was

6  presented.

7          **THE COURT:**  Why would a public assistance ID be any

8  more confusing to them than something they don't see on a

9  regular basis, like a tribal ID?  I'm just -- I feel like

10 excuses are being made and I don't really understand it.  I

11 just don't understand.

12         **MS. VYSOTSKAYA:**  So I'm not sure how to answer that

13 precise question.

14         **THE COURT:**  All right.

15         **MS. VYSOTSKAYA:**  I can only refer to the legislative

16 record in front of the Court and refer the Court to -- and we

17 cite that in our brief -- the specific places where the

18 concerns have been expressed about the fact that not all IDs

19 have photographs and that those that do are different.  And

20 also part of this legislative record is that not -- a narrower

21 amendment to SB824 was not presented by either Democratic

22 opponents, nor by Republicans.

23         **THE COURT:**  Thank you.  You've addressed it.

24         **MS. VYSOTSKAYA:**  Now, getting to -- Your Honor, to the

25 intent part.

1      **THE COURT:**  Yes.

2      **MS. VYSOTSKAYA:**  So I wanted to start -- before we

3   focus on *Arlington Heights* factors, I wanted to highlight to

4   the Court one thing that makes this law different from many

5   other laws that have been passed and that survived judicial

6   scrutiny and also from a prior VIVA attempt, prior voter ID law

7   attempt.

8      What we have here that is very unique is the fact that the

9   North Carolinians themselves have voted and passed the

10  constitutional amendment that specifically requires a

11  presentation of a photo ID in order to vote.  In November --

12  the constitution -- in November -- on November 8th in 2018, the

13  people of North Carolina have approved a constitutional

14  amendment and the Constitution now reads in two places as

15  follows:  "Voters offering to vote in person shall present

16  photographic identification before voting," period.  "The

17  General Assembly shall enact general laws governing the

18  requirement of such photographic identification, which may

19  include exceptions."  So the voters approved the requirement of

20  photo ID presentation.

21     **THE COURT:**  So do you -- are you suggesting that I

22  start -- if I'm going to look at the history and motivation of

23  our legislators, I start with the amendment?

24     **MS. VYSOTSKAYA:**  No, Your Honor.

25     **THE COURT:**  All right.

1   **MS. VYSOTSKAYA:**  And our brief has been quite honest

2   and fair on that point.  We did not quarrel in any way with the

3   judicial findings from *McCrory* or a number of other courts

4   which have acknowledged shameful history of discrimination in

5   the state of North Carolina that is linked to race.  That is

6   not the argument we have made.  That history is there and that

7   is one, I believe -- out of all *Arlington Heights* factors, that

8   is probably the weakest factor for our case.  What

9   constitutional -- and there are a number of laws that the

10  legislature has passed that has been found to be discriminatory

11  both by federal courts and by the state court, and some of them

12  are currently pending.  So we have that history.

13      What makes this different is that here the legislature did

14  propose that constitutional amendment among five different

15  other amendments.  Two amendments actually went down, people

16  didn't approve them.  But people provide a severance -- not a

17  severance, but the weakening of the historical factor that, in

18  all honesty, weighs against us.  The fact that the people have

19  required now a photo ID requirement severs or weakens that

20  historical point.

21      The fact that the legislature, while it was similar but was

22  different, that passed this voter ID law as well -- we just

23  talked about percentages and Professor Lichtman's table that

24  shows the legislature -- composition of the legislature was

25  different -- also weakens that past history as it connects or

1  as it relates to this voter ID law.

2     Once the constitutional amendment was passed, the

3  legislature had no -- no constitutional or statutory authority

4  to disregard what people told the legislature to do, which was

5  to enact voter ID laws.

6          **THE COURT:**  I don't think anybody in here has

7  suggested that that in and of itself violates anything.

8          **MS. VYSOTSKAYA:**  That's right, Your Honor.

9          **THE COURT:**  That's not being challenged.

10          **MS. VYSOTSKAYA:**  So what we have then next is we have

11  to look at the substance of the law itself and Mr. Cox

12  discussed it.  It's a law that has been considered to be one of

13  more lenient laws because it contains at least 10 different

14  types of IDs that are accepted for voting, because even those

15  people who do not possess these types of IDs would be allowed

16  to vote if they either -- either write or -- not write, cast,

17  rather, a provisional ballot and then return with the

18  communication within 10 days after the election to show a photo

19  ID and make the provisional ballot valid.  Or if they have a

20  reasonable impediment that prevented them from voting, they

21  could -- instead of casting a regular provisional ballot, they

22  could -- they could use a reasonable impediment provisional

23  ballot that does not require those voters to return and to --

24  to prove that they have a photo ID.  It allows them to cast a

25  ballot without any proof of having a photo ID.

1    Also, this law contains obviously what has been discussed,

2  provisions for free photo IDs.  The photo IDs could be issued

3  by two different methods.  DMV could issue free voter IDs to

4  North Carolina voters; and if a person does not have required

5  documents in order to receive a free ID from DMV, the State is

6  required to provide those documents to voters free of charge.

7    If the voter does not want to go through that procedure,

8  this law that has been enacted allows a voter to receive a free

9  voter ID from County Board of Education -- Elections, rather;

10  and in order to receive that type of voter ID, no documentation

11  presentation is required at all.  The voter is simply required

12  to provide his name, date of birth, and last four digits of

13  social security number, and the free ID would be issued.

14    So the type of ID that the legislature enacted after people

15  mandated the legislature to enact a law combined together

16  lessens the impact of history, while certainly, once again,

17  Your Honor, we acknowledge that it's one of our weaker factors

18  in *Arlington Heights* analysis.

19    Moving to -- moving to the next factor in *Arlington*

20  *Heights*, the courts usually look at the sequence of events that

21  led up to the enactment of the voter ID or the law that is

22  being challenged; and in this case, once again, we have a

23  constitutional amendment, a critical step that occurred leading

24  up to the enactment of the voter ID law.

25    But also there is a broader picture for the past, I don't

1  know, 10, 20 years.  There has been a nationwide trend for the

2  states to use a photo ID requirement as one way of verifying

3  the voters are who they say they are, and our evidence we

4  presented -- now, *Crawford* recognized that obviously itself,

5  that there is a trend for the states to now require photo IDs

6  of greater quantity.

7      But also Carter-Baker report, a golden standard that has

8  been cited in multiple court cases, including *Crawford*

9  itself -- and that would be your Exhibit No. 13 that was

10  submitted -- it talks about that growing nationwide trend and

11  it talks about the fact that photo IDs serve to increase the

12  voter confidence in the integrity of the elections because the

13  voters know that the presentation of a photo ID makes the fact

14  that the voter is the one who appears on the registration -- on

15  the voter registration more likely.

16      So there is that background, nationwide trend towards

17  adoption of more IDs; and more than 20 states now require photo

18  IDs in order for voters to vote.

19      North Carolina itself has made attempts to enact a voter ID

20  for the -- it hasn't started with *McCrory*.  It has started

21  with -- about -- in about 2011 or so when the legislature first

22  attempted to enact voter ID and Governor Perdue has vetoed

23  that.  The legislature did not override the veto.  So it

24  started way back, that attempt -- that effort, that legislative

25  priority for adoption of a photographic ID requirement.

1      There is nothing that suggests intent to discriminate based

2    on racial lines, the fact that the legislature had a preference

3    towards enactment of a photographic photo ID requirement.  In

4    fact, right before the legislature has enacted this voter ID

5    law, there have been patterns of fraud and impropriety in the

6    absentee vote as, of course, was well publicized in

7    congressional District 9.  And -- and this law, this voter ID

8    law actually includes a requirement for absentee voters to

9    provide a photographic ID when they return their ballots to the

10    Board.

11      So there is some evidence that at least in absentee -- in

12    absentee arena that there has been fraud and improprieties

13    occurring; and because of that, it is not unreasonable for a

14    legislature to enact the idea that would increase voter

15    confidence in the results of that -- of the elections.

16          **THE COURT:**  Was 824 -- was that a part of 824 in the

17    beginning or did that happen at a later time?  Was it amended

18    to include the absentee?

19          **MS. VYSOTSKAYA:**  I can check, Your Honor.  If it was

20    amended, it was -- it was amended during the process of

21    enactment.  It's within the body of that law, so it wasn't a

22    separate set of laws that came later.

23          **THE COURT:**  All right.

24          **MS. VYSOTSKAYA:**  And, Your Honor, while we're talking

25    about some absentee issues, really *Crawford* said -- *Crawford*

1    and *Lee* both said that the state does not have to wait for

2    voter fraud to occur before it enacts a voter ID, that the

3    state could use a voter ID in a manner and as a way of

4    preventing voter fraud from occurring.

5         And in *Lee*, actually the evidence of fraud was very

6    limited.  There is a footnote there that talks about several

7    instances of in-person fraud and that was all the evidence that

8    *Lee* court discussed and yet that voter ID law has not been

9    declared to be discriminatory.  It was an intent based on --

10        **THE COURT:**  But it didn't have the same history as

11   we're talking about here.

12        **MS. VYSOTSKAYA:**  Yes, Your Honor, I agree it did not.

13   So the history is -- the factor of history, getting back to

14   that first factor, is something different to North Carolina if

15   you compare that law to the Virginia law specifically.

16        **THE COURT:**  In *Lee*, not only did it not have the

17   history, it didn't -- it has a much more expansive list.  It

18   includes all federal IDs.  It includes all employer IDs.  So

19   it's a much more expansive list than that that we're looking at

20   here.

21        **MS. VYSOTSKAYA:**  The list itself, Your Honor, I agree

22   it is a more expansive list.

23        **THE COURT:**  The lack of history, as well as the

24   expansive list, to me, takes it out of my consideration.

25        **MS. VYSOTSKAYA:**  But I think what makes this law

1  unique and it is better if compared to Virginia's law in that

2  respect is that we have a reasonable impediment provision that

3  the Virginia law did not have.

4      So Virginia law actually did identify a disparity in the

5  rates of possessions of qualified IDs.  Even with all the lists

6  that they have, there were several percentage points that the

7  court itself discusses in the opinion where African American

8  voters were maybe 2 percent point, I believe, less likely to

9  have those qualifying IDs and the Virginia law would not have

10 allowed them to cast a reasonable impediment provision.  The

11 Virginia law would have required those folks to come back to

12 the register's office within three days after election and it

13 would have required them to present their IDs.

14     What we have here, while the list is more limited, voters

15 who do not have qualified IDs are still going to be permitted

16 to vote.  They would have to fill out either -- they would have

17 to fill out a reasonable impediment provision form.  So that

18 makes it better than the Virginia law that we have been

19 discussing.

20     Also, Your Honor, the other factor that *Arlington Heights*

21 and *McCrory* both discussed is the departures from normal

22 procedural sequence, and *McCrory* -- the departures that were

23 discussed by the court in *McCrory* were quite prominent.  The

24 court in *McCrory* talked about a much more modest voter ID law

25 sitting without any legislative action for months while --

1  while the legislature was awaiting for results of the *Shelby*

2  case.

3      As soon as *Shelby* case came, the law that was -- much more

4  modest law, that was previously about 16 pages long, swelled

5  into a 50-plus pages bill, the omnibus bill that we were all

6  just talking about where multiple practices by African

7  Americans, according to *McCrory*, were targeted with surgical

8  precision.  This is not what we have here.  So we don't have --

9  so there was that.

10     There was also -- that's a -- the departure from a regular

11 procedural sequence in *McCrory* was that House failed to send

12 the bill -- the omnibus bill to any committee hearing and

13 *McCrory* emphasized that, that was very unusual in terms of a

14 regular procedural process.

15     We have multiple committee hearings here both at Senate

16 level and at the House level, and Your Honor has evidence of

17 that in front of her.  Elections committee heard it.  There was

18 an Oversight Committee.  There were several committee hearings.

19     In *Veasey versus Abbott,* there were several unprecedented

20 procedural departures as well that the Court has looked at when

21 it found that law to be unlawful; and in that case, the

22 legislature actually suspended a two-thirds required vote on

23 the number of required votes in order to pass that legislation.

24 That was unprecedented and the court emphasized that.

25     And in *Veasey,* also the legislature -- that's a Texas case,

1  Your Honor, and in *Veasey,* the legislature also failed to

2  submit a fiscal note, even though the legislation specifically

3  required a submission of fiscal note for that case because

4  there was a huge budget shortcut that year in the state.  So

5  all of those things were looked at.

6      We have -- while it was -- and I'll give that to Plaintiff.

7  It was maybe a faster process maybe than it could have been,

8  but certainly not unprecedented for purposes of enacting laws.

9  The bill was presented -- the constitutional amendment was

10  passed on November 6th.  Twenty days later the bill was

11  presented and discussed in the Oversight Committee.  The

12  legislative hearing transcript makes it quite clear that the

13  bill was actually circulated to the legislative body, to the

14  Democrats and Republicans, a week before it was presented on

15  the floor.  The bill was filed actually in this case not just

16  by Republicans but also by a Democratic senator, Joel Ford.  It

17  was sponsored by him as well.  The bill received several Senate

18  committee hearings.  It was placed on the calendar.  It was

19  debated.

20      There were eleven amendments offered to the bill.  Many of

21  them were Democratic amendments and six amendments adopted,

22  including amendments that were proposed by -- by the declarant

23  of Plaintiffs, McKissick, who changed the bill in three

24  different ways in his amendments.  One way he changed it is

25  that natural disaster exception, for example, was moved from 60

1  days -- the national disaster had to occur 60 days prior to

2  elections to 100 days.  That was one of the amendments that was

3  accepted.  There was an amendment that increased the expiration

4  date on the voter -- on the free voter ID from being valid from

5  eight years to ten years.  That was one of the amendments that

6  was accepted and approved and is part of this bill now.

7      It also received several Senate committee hearings.  It was

8  placed on the calendar at the House.  It received several House

9  committee hearings, including the House Elections committee

10 hearing.  Twelve amendments were offered in the House.  Many of

11 them were Democratic amendments.  Seven, more than half, of

12 those amendments were adopted.

13     The legislature -- legislators on both sides were allowed

14 to speak.  The record is quite clear on that.  And several of

15 the declarants for Plaintiffs spoke at the hearing and many of

16 those praised the process.  For example -- I apologize, Your

17 Honor.  I need to find my place here.  For example, Senator

18 Woodard, Democratic senator, spoke and what he said -- and that

19 appears on the hearing date of November 28, 2018, during the

20 Senate floor debate during the second hearing, page 17 of that

21 transcript.  Senator Woodard said, "This bill isn't as

22 restrictive or burdensome as some of us feared and the second

23 draft is better than what the Oversight Committee saw on

24 Monday....We appreciate the dialogue and the 34 changes that

25 Senator Krawiec cited."

1    Similarly, Senator McKissick spoke and he spoke -- he spoke

2 multiple times.  But during the second reading, for example, on

3 November 28th -- and that appears on page 48 of November 28

4 Senate floor debate -- Senator McKissick said, "I think the

5 effort made to bring forth legislation that I see here today is

6 an earnest effort to try to expand it significantly beyond what

7 it was when the last voter ID bill came before us, which was

8 actually stricken down by the courts as being unconstitutional.

9 I appreciate the fact that this bill is far more broad and far

10 more expansive."

11    In the House, there are references also to Democratic

12 representatives thanking the fact that the leadership of the

13 General Assembly has reached across the aisle and that it

14 included the Democrats into the debate process.  There is also

15 an acknowledgment during the House debate that this law is much

16 different from the VIVA law that was enacted, that it's more

17 broad, that it's more expansive.

18    Plaintiffs have made an argument about the fact that this

19 law was passed during the lame-duck session.  We actually had a

20 motion to stay partially based on that ground at the very

21 beginning of this litigation because the state courts are

22 currently still deciding whether or not a gerrymandered

23 lame-duck legislature is entitled or can pass a constitutional

24 amendment as the one that we that have -- attempt here.

25    But Plaintiffs in this litigation don't even challenge the

1  constitutional amendment itself; and until the North Carolina

2  state courts or federal courts, if such challenge is ever

3  raised, decide that a legislature that is racially

4  gerrymandered and that is sitting in lame-duck session cannot

5  pass laws, we have to accept that it can.

6      And it has been passing laws in lame-duck sessions for a

7  long time and Senator Joel Ford talks about that, about the

8  fact that lame-duck sessions of the legislature have been

9  passing laws.  And he's talking about the fact that he

10  considered it to be his duty as a senator to enact legislation

11  even during the lame duck because he is -- he was still a

12  sitting senator and he still worked for the people at that

13  period of time.

14      I also believe that they cited several cases in their

15  amicus brief that support the proposition that malapportioned

16  legislatures can still pass laws and that it doesn't cast a

17  shade of discriminatory intent when such thing occurs.

18      The legislative history of this act is another factor that

19  the Court looks at, and one of the things that makes this law

20  different and somewhat similar to the *Lee* case is the fact that

21  this law had bipartisan support.  In *Lee*, the court cited the

22  fact that one Democrat and one Independent voted for that voter

23  ID measure.  We have actually in this law more than that.  The

24  bill was cosponsored by a Democrat.  Two Democratic senators

25  voted for it during the Senate part of the bill enactment.  Two

1  House Democrats voted for it.  One Democrat voted for the bill

2  when the bill was presented on a motion to concur after it

3  passed -- there was a House process and went back for

4  concurrence of two diverging bills.  The veto override itself

5  was achieved with some support from the Democrats in both

6  chambers.  That's one of the factors that *Lee* considered

7  important and that is a factor clearly that is present here on

8  the legislative history side.

9      The fact that amendments offered by Democrats were allowed

10  also place in favor of this law.  We talked about specific

11  amendments that were offered, for example, by

12  Senator McKissick.  There were others and that's included as

13  part of our presentation.  I think we have it -- we have some

14  examples cited in our brief.  But it's also Exhibit 17 of

15  the State defendants and Exhibit 17B specifically contains the

16  legislative history of Senate Bill 824 and it lists the

17  amendments that they passed.

18          **THE COURT:**  Of which book?

19          **MS. VYSOTSKAYA:**  It's the big book, Your Honor, and

20  it's Exhibit 17.  It would be Docket Entry 97-18 in the

21  electronic records and the exhibit that I was referring to

22  would be Exhibit 17B.

23      Also, the transcript of the debates itself shows which

24  different amendments were introduced by the Democratic Senators

25  and Representatives.

1      Here also, Your Honor, unlike in -- unlike in *McCrory*,

2  there is no evidence that this legislative body has requested

3  racial data.

4              **THE COURT:**  Has what now?

5              **MS. VYSOTSKAYA:**  Had requested racial data about the

6  types of IDs possessed by the minorities.  What -- instead, the

7  evidence that we have before us is that the law was patterned

8  after the South Carolina law and actually expanded on that

9  South Carolina law in terms of the IDs that were allowed.

10  South Carolina law does not allow public assistance IDs, for

11  example, either, but North Carolina has several additional

12  types of IDs that are allowed.  That came as part of amendments

13  process, et cetera.

14      And Mr. Cox has addressed -- I think he analyzed correctly

15  the fact that intent usually includes some of the burdens

16  analysis, so he talked about the burdens already.  I don't want

17  to repeat his analysis.

18      But the totality of these factors -- and I'm not saying

19  that all of the factors are perfect.  There are problems.  You

20  want to emphasize the biggest one, the history, I think, that

21  nobody can be blind to.  It's there and it shows some racial

22  tensions and history that is linked to voting that is -- in

23  North Carolina that is unique.

24      But the totality of the factors is what the Court has to

25  consider; and in the totality of all of these factors of how

1    the law was enacted and especially the kind of law that was

2    enacted, that allows wide range of IDs, that allows several

3    ameliorative measures, that provides several types of free

4    IDs -- in totality of all of that, we believe that Your Honor

5    should deny the preliminary injunction request that is based on

6    the suggestion that this law was based with discriminatory

7    intent.

8         **THE COURT:**  I have no questions.

9         **MS. VYSOTSKAYA:**  Thank you.

10        **THE COURT:**  Do you care to respond?

11        **MR. ULIN:**  Your Honor, I think we can -- if the Court

12   would indulge us a five-minute recess, it might allow us to

13   respond in a more orderly way.

14        **THE COURT:**  All right.  Let's take a 10-minute recess.

15        **MR. ULIN:**  Thank you, Your Honor.

16      (An afternoon recess was taken from 3:25 p.m. until

17   3:50 p.m.; all parties present.)

18        **THE COURT:**  Before I hear from Plaintiffs, there's one

19   more question that I'd like to ask Defendants.  In your brief,

20   you state that "Under *Anderson-Burdick* line of cases, courts

21   first determine whether the challenged legislation burdens a

22   constitutional right, and then scrutinize the degree of the

23   burden against the governmental interest....Plaintiffs waived

24   any claim that they are likely to succeed on that basis by

25   failing to present argument under this standard."  Explain.

1    **MR. COX:**  Yes, Your Honor.

2    When we were responding to Plaintiffs' brief supporting

3    their preliminary injunction motion, we found little to no

4    discussion of the constitutional standards that would govern

5    their constitutional claims.  The Plaintiffs would have to

6    present the *Anderson-Burdick* balancing framework and discuss

7    why either the law presents a severe burden and is therefore

8    subject to strict scrutiny or that the law presents a lessened

9    severe burden and therefore must be justified by the

10   governmental interests at issue.

11   The *Anderson-Burdick* framework is a sliding scale analysis,

12   as the Court may know.  Unless it's subject to strict scrutiny

13   and is a severe burden, the level of interest that must justify

14   the law slide to -- depending upon the level of burden.

15   So if it's a limited burden, as we would submit that this

16   is, the government interest that the Supreme Court announced in

17   *Crawford* -- again, *Crawford* was a sliding scale

18   *Anderson-Burdick* analysis -- the analysis of the *Crawford* court

19   would apply here and would not invalidate the law.

20        **THE COURT:**  All right.  Let me hear from you.

21        **MR. ULIN:**  Your Honor, our position is that on the

22   intent claim that the same proof that establishes

23   discriminatory intent in a vote denial case, which is what this

24   is, simultaneously establishes our Fourteenth and Fifteenth

25   Amendment causes of action; that the claims are coextensive.

 1  So the evidence of discriminatory intent that establishes that

 2  the legislature enacted SB824 intending to -- with intent to

 3  discriminate against black and Latino voters and the evidence

 4  that the law, in fact, had that impact under the *Arlington*

 5  *Heights* analysis and then, obviously, subsequently in our

 6  results case makes out everything we need to demonstrate to

 7  prove a claim of violation of the Fourteenth and Fifteenth

 8  Amendments.

 9      **THE COURT:**  All right.  I did not want that to go

10  unaddressed and that's why I asked that question.

11      All right.  I will hear from you on rebuttal.

12      **MR. ULIN:**  Your Honor, the recess had its intended

13  effect, and my cocounsel were able to convince me that I have

14  only two points to make to Your Honor, but you may rest assured

15  that Ms. Swain has additional points.

16      **THE COURT:**  And let me point out we still have three

17  other factors, but those factors I think we can discuss pretty

18  quickly.

19      So, yes, sir, go ahead.

20      **MR. ULIN:**  So, first of all, I believe that many of

21  the points that I would have rebutted are points that we made

22  in our opening arguments to Your Honor and therefore are in the

23  record this morning and this afternoon as well.

24      **THE COURT:**  Yes.

25      **MR. ULIN:**  I would point to two things raised by

1  opposing counsel in their argument.  First was an argument

2  about what weight the Court should give to the survey evidence

3  presented from Dr. Matt Barreto from UCLA.  The first thing

4  that we heard was that the Court should only consider

5  Dr. Barreto's survey evidence and his report to the extent that

6  he reported on trends among registered voters, as opposed to --

7  and not to the extent that it reported on trends among eligible

8  voters.

9      But, of course, eligible voters are the folks who are

10 entitled to protection under the Voting Rights Act, not solely

11 registered voters; and the voter ID law has -- as the evidence

12 that we put before Your Honor, arguments we've made

13 demonstrates, there's a number of things that affect both

14 eligible and registered voters.  For one, it has a strong

15 deterrent effect that keeps people both away from the polls and

16 the evidence that we presented to Your Honor, keeps them from

17 registering to vote.

18     So we would submit that in considering the discriminatory

19 effects of the voter ID law, it's important for the Court to

20 consider both their effects on eligible voters and their

21 effects on -- on registered voters and their effects on

22 eligible voters.  That's particularly true when we consider

23 that this case is focused on the effects of the voter ID law on

24 black and Latino voters in North Carolina, and those are

25 populations which we have seen in recent elections have been

1    participating at much higher rates than we've ever seen before,

2    strongly suggesting that there are a lot of new voters in that

3    voter population.  For black folks, that has been a trend that

4    began around 2008, continued throughout this decade.  For

5    Latino voters, that trend appears to have begun around 2016 and

6    continued in 2018.

7        So the effect of a voter ID law on eligible voters is

8    highly relevant to the effect of that same law on black and

9    Latino voters in North Carolina when so many eligible voters

10   who had not presumably been registered and had not previously

11   participated given the turnout rates in this state are

12   participating for the first time in recent elections.

13       It's also notable in this regard that North Carolina is a

14   same-day registration state.  So the notion that someone is

15   ineligible, a voter who is not registered but won't be affected

16   by a voter ID law, is, frankly, not true because that person

17   could easily register on the same day and then simply go out

18   and vote.

19       So it's important for the Court to consider Dr. Barreto's

20   evidence both with respect to registered voters and with

21   respect to eligible voters.

22       We had argument, sorry, that Dr. Barreto's focus on the --

23   on these questions about photo match, that is, whether the

24   photo resembles the voter, misstated the standard in the law,

25   which counsel referred to and quoted the law as a "reasonable

1  resemblance" standard.

2      First of all, we would also -- as a preliminary matter, we

3  take issue with counsel's description of the "photo match"

4  requirement as an extraneous reason why someone might be turned

5  away from the polls under the voter ID law.  The voter ID law

6  requires there to be a photo match.  Now, admittedly, that's a

7  "reasonable resemblance" standard; but if the photo doesn't

8  reasonably resemble, then the ID doesn't qualify under SB824,

9  which is a significant aspect of what we've been here

10  discussing today.

11      But I'll read you Dr. Barreto's question in the survey:

12  "As you may be aware, the North Carolina photo ID law requires

13  an election board worker to verify that the picture on your ID

14  is a reasonable resemblance to your current appearance."  In

15  other words, Dr. Barreto used the exact same language in the

16  statute that counsel quoted in his survey on whether voters had

17  an ID that satisfied the "photo match" requirement of SB824.

18      The last point on Barreto is that counsel raised the issue

19  of Dr. Barreto asking questions about whether the name matched

20  perfectly as between the voter record and the identification,

21  and counsel pointed out that the statute actually doesn't

22  require or the SBOE guidance on the statute doesn't actually

23  require an exact name match.

24      The "name match" question was in a series of three or four

25  questions that Dr. Barreto included in his survey and explained

1    in his report to Your Honor.  It was designed to test whether

2    there were additional impediments not required by law that

3    might nonetheless interfere with the voter's ability to vote or

4    to have his or her ID accepted at the polling place and based

5    on experience both in North Carolina and other states in the

6    implementation of voter ID laws.

7        So Dr. Barreto asked that question advisedly and explained

8    in so many words to the Court about a factor that might not be

9    strictly required under the law but might yet be very

10   significant as relates to the impact of this law on someone's

11   ability to go into a polling place, have their ID accepted, and

12   cast a ballot.  Those are the points on Dr. Barreto.

13       The second point I want to raise is just an equal --

14   another point of factual correction and it relates to counsel's

15   description of what information that's reported on the website

16   of the National Conference of State Legislatures, NCSL.

17       Counsel referred to the NCSL -- and this is a point they

18   made in their briefing as well -- referred to the NCSL website

19   as indicating that Virginia, on the one hand, was a

20   strict/photo ID state; but on the other hand, North Carolina

21   was a nonstrict/photo ID state.  And, in fact, that's a

22   misstatement of what the NCSL website really says and we

23   clarified this for Your Honor in the supplemental expert report

24   of Professor Barry Burden and Professor Burden -- I think it's

25   easiest just to refer to Dr. Burden's report.

1        Professor Burden indicates that when you go on the NCSL

2  website and you hover over North Carolina on the map of states,

3  the description provided is that the North Carolina law is "no

4  document required to vote, a 2013 voter ID law has been struck

5  down."  And the state is also colored in gray, which on the

6  website indicates no document required to vote.  When -- and

7  that's because the table to which Plaintiffs refer or the

8  graphic which Plaintiffs refer refers to what the NCSL

9  indicates as laws in effect in 2019.  In other words, a

10  North Carolina regime where SB824 is not in effect because it

11  doesn't come into effect until 2020.

12        So the comparison being made between strict and nonstrict

13  is really one that has no bearing on this case because the NCSL

14  website is describing the difference between Virginia's voter

15  ID law and the state of play in North Carolina today when there

16  is no voter ID law in effect.  It's not comparing the two voter

17  ID laws and Dr. Burden made that clear in his supplemental

18  expert report, which was submitted in support of our reply

19  brief to Your Honor.

20        **THE COURT:**  All right.

21        **MR. ULIN:**  Unless Your Honor has questions, I'll let

22  Ms. Swain raise a few additional points.

23        **THE COURT:**  All right.  Yes, ma'am.

24        **MS. SWAIN:**  Yes, Your Honor.  A few key points.

25        First, I would like to just address briefly Defendants'

 1  position that the public assistance ID amendment that was

 2  offered went to nonphoto IDs and I would just direct the

 3  Court's attention to Dr. Lichtman's surrebuttal report at

 4  page 15 which details how the amendment, Amendment A13, was

 5  proposed as an addition to the version of the bill under

 6  consideration at the time.  That addition would go directly

 7  underneath a bill entitled "Requirement for Photo

 8  Identification to Vote in Person."  Just as military IDs or

 9  veteran IDs were listed there, this public assistance ID

10  amendment, by definition, in the statute would only go to

11  public assistance IDs that had photos on them.

12      So I think that the statute is very clear on that, though

13  we understand that this is a position that Plaintiff -- the

14  Defendants have brought forward.  We think that if you review

15  Dr. Lichtman's analysis and the legislative record, it's very

16  clear.

17      Secondly, Your Honor, we would like to note that the

18  Defendants do not dispute the disparity -- the racial disparity

19  in possession rates but rather the number, as they have shared

20  here today.  We believe that it -- to go back to one of the

21  questions that you asked earlier about the difference between

22  the proof under the *Arlington Heights* factors where you are --

23  where Plaintiffs may -- where the Court may need to consider

24  whether or not the provision bears more heavily on one race

25  versus another, I would just point Your Honor to the *McCrory*

1  decision where they -- where the Court of Appeals helpfully

2  lays out the difference between the burden required under

3  *Arlington Heights* and the burden required under a results

4  analysis.  We believe that this concession by Defendants and

5  just -- and what the record evidence shows meets that factor

6  that the law bears more heavily on African American and Latino

7  voters than it does on white voters.

8      Finally, just a couple more -- a few more points.  I'd like

9  to just draw the Court's attention to Courtney Patterson's

10 declaration, which is Exhibit 12 in Plaintiffs' preliminary

11 injunction motion, to paragraphs 9, 10, and 12, which go

12 directly to the July training and the experience of a County

13 Board of Elections member as to the training provided thus far

14 by the State.

15     And we also just want to note that while we understand that

16 the State is planning a February training for all County Board

17 of Elections members, the election schedule, as detailed in

18 Kate Fellman's declaration, Exhibit 13, begins January 13th

19 and -- and before when absentee ballots may begin to be

20 submitted; and February 13th, of course, is the first day of

21 early voting.

22     Finally, we would note that the constitutional amendment in

23 this case, which the Defendants I think today identified does

24 not sever the Court's ability to review its -- the previous

25 history, also does not itself have some additional bearing as

1   to the intent of the General Assembly that wipes clean their

2   motives.  I think that we covered this very extensively in our

3   opening remarks, but we'd be happy to speak additionally to why

4   the constitutional amendment does not weaken the case, as

5   Defendants have noted.  Plaintiffs do not need to separately

6   challenge the constitutional amendment or SB325, the amendment

7   that went to early voting hours and the Saturday day of -- last

8   Saturday of early voting, in order for the Court to identify

9   that evidence as relevant to the intent analysis.  It's -- I

10  think that that speaks for itself.

11      And, finally, Your Honor is correct that absentee ballots

12  and any photo voter ID requirement as to absentee ballots was

13  not included in either the constitutional amendment that was

14  originally proposed by Defendants in this case, nor was it

15  included in the original SB824 bill.  In fact, it was

16  explicitly rejected at the outset by David Lewis.  And I'm

17  happy to get a cite for you to the legislative record as to

18  that.  It was only after what Defendants have termed the

19  improprieties in Bladen County took place that that amendment

20  was ultimately accepted under national pressure.

21      And we'll just note again for the Court the specific

22  improprieties that the Defendants have identified here and that

23  we know to be the case in Bladen County was a form of election

24  fraud that would not be -- have -- voter ID has no relationship

25  to solving that problem.

1      I believe that that is all from Plaintiffs, except one last

2  point, which is the lame-duck session has one more aspect to it

3  that we think is important to bring to your attention; that is,

4  that the General Assembly during that period came back to

5  address two issues:  Hurricane relief and this constitutional

6  amendment.

7      On the day that SB824 was proposed, more than a thousand

8  North Carolinians came to the General Assembly, as Reverend

9  Spearman details in his declaration, to say, "Do not pass photo

10 voter ID during this lame-duck session.  Allow a duly-elected

11 General Assembly to pass it and concentrate instead on the real

12 issues that are before this state."  Those issues included the

13 hurricane relief and the national scrutiny that was coming out

14 around CD9.

15     Instead, the General Assembly made the choice to rush

16 through in a very compressed timeline the consideration of this

17 bill, and we believe that that in and of itself is an essential

18 component in understanding the pretext here.

19     Thank you, Your Honor.

20         **THE COURT:**  Thank you.

21     Anything further?  You don't have to.

22         **MR. COX:**  Understood, Your Honor.

23         **THE COURT:**  I will give you an opportunity.

24         **MR. COX:**  I will just make -- because there was no

25 discussion of the "poll observer" provision, I would just make

1   the point very briefly that even if the number of poll

2   observers that the parties can appoint statewide is increased

3   by the bill, the State's rules that govern the conduct of poll

4   observers has not changed.  And those rules are found in 0 --

5   excuse me -- 8 North Carolina Administrative Code 20.0101, and

6   it prescribes the conduct by poll observers pretty strictly and

7   holds that a chief judge can kick a poll observer out if that

8   poll observer is interfering with voters in any way.

9           **THE COURT:**  Thank you.

10      Now let me hear from Plaintiffs on the three additional

11  factors under preliminary injunction relief.

12          **MR. ULIN:**  Thank you, Your Honor.  And I think we can

13  be fairly brief on these points.

14          **THE COURT:**  Yes.

15          **MR. ULIN:**  So the very fact that we get to the

16  analysis of the other injunctive relief factors presumes -- and

17  I'm not suggesting Your Honor has reached this conclusion, but

18  the fact we get to this point in the analysis presumes

19  Plaintiffs have prevailed on their -- the first element,

20  establishing a likelihood of success on at least one of their

21  claims under the Voting Rights Act or the federal Constitution.

22  Therefore, the other three elements of the preliminary

23  injunction standard need to be analyzed in that light.

24      I'll turn first to the irreparable harm.  So the case law

25  which we've cited in our brief, including *Reynolds versus Sims*

1   and the Fourth Circuit's decision in *United States versus City*
2   *of Cambridge*, establish a well-known point:  That the loss of a
3   fundamental right in general and the right to vote in
4   particular is irreparable, irreparable for no matter how long a
5   period of time you lose it and particularly irreparable if you
6   lose it and it affects your ability to participate in an
7   election.
8        And that's exactly what we're talking about here, at least
9   enjoining this loss so that it doesn't affect the fundamental
10  rights of North Carolina's black and Latino voters in the
11  March 2020 elections.  That's especially true where, as here,
12  the loss of that fundamental right comes as the result of
13  intentional race discrimination by the General Assembly.
14       That's our point on irreparable harm.  We believe those
15  points establish irreparable harm and allow Plaintiffs, if they
16  have met their burden on likelihood of success, move on to the
17  other factors.
18       The next factor would be the balance of hardships or
19  balance of equities, depending how the Court articulates it.
20  Plaintiffs' hardships in this case are similar to their
21  irreparable harm.  Their hardships are the loss of the right to
22  vote and the ability to participate in the political process
23  and to choose leaders who are responsive to their interests,
24  unlike the General Assembly, which, as we have demonstrated,
25  has been significantly unresponsive, especially when it comes

1  to black and Latino voters' interests in the voting realm.

2      It's also that –– I'm sorry.  That hardship that Plaintiffs

3  suffer in addition to simply being deprived of their right to

4  vote is also the hardship of being subjected to intentional

5  race discrimination by a General Assembly that put its own

6  political interests above Plaintiffs' right to vote and receive

7  fair representation.  That's the Plaintiffs' side of the

8  ledger.  On the other side the ledger, the State of North

9  Carolina simply has no interest in enforcing a law that

10  violates the Voting Rights Act and/or the federal constitution.

11  Therefore, the balance of equities, assuming, again, that we

12  have established our likelihood of success on the merits, tips

13  heavily in favor of the issuance of an injunction.

14      Finally, the public interest.  And this argument is

15  similar.  The public interest is served by assuring that all

16  people have an equal opportunity to participate in the

17  political process and elect candidates of their choice.  The

18  public interest also lies in assuring that the General Assembly

19  does not engage in intentional race discrimination in the

20  enactment of voting laws or ever.

21      The Defendants make a series of arguments on these points

22  that essentially rest on their view that they will prevail on

23  the merits.  Again, if that's correct, we don't get to these

24  issues and therefore that's not the proper lens with which to

25  engage in this analysis of the other three preliminary

1  injunction factors, but I will focus on two of the arguments

2  they make.

3       They cite Chief Justice Roberts' in-chambers opinion for

4  the proposition that a state suffers harm whenever a law is

5  enjoined, but that's palpably untrue if that law is found to

6  have violated the Voting Rights Act or the federal constitution

7  because the state has no interest to be harmed.

8       And they argue that an injunction will disrupt their

9  implementation plans for SB824; but if there is a violation of

10 the Voting Rights Act and the Constitution proved in this case,

11 as we believe there has been, then those implementation plans

12 should be disrupted.

13      And the administrative convenience of rolling out a law

14 that violates the voting rights of people of color is simply

15 not a cognizable interest.  The notion that we should allow a

16 law that violates the Voting Rights Act to go into effect

17 because to do otherwise might create confusion among voters or

18 to do otherwise might interfere with the State Board of

19 Elections' implementation plans for that law is simply

20 incomprehensible.

21      So we close where we began.  The interests that compel this

22 Court to issue an injunction and strike down SB824 are the

23 interests of black and Latino voters in exercising their

24 fundamental right to vote and their interests in being free

25 from race discrimination by the General Assembly in the realm

1  of voting or in any realm; and assuming that's what the Court

2  finds, those interests find no match on the other side of the

3  ledger.

4      Thank you, Your Honor.

5          **THE COURT:**  Thank you.

6      Yes.

7          **MR. COX:**  Thank you, Your Honor.  Very briefly.

8      On the irreparable harm point, I'm going to make a point

9  that will sound like a technicality, but it's not.  Plaintiff

10  just argued that the Plaintiffs will be harmed because they

11  will not be able to vote or their vote will be infringed.  The

12  Plaintiffs here are organizations.  That sounds like a

13  technicality.  Organizations, obviously, can't vote.

14      But the reason I make that point is because the Plaintiffs

15  have brought forward no single voter who can prove that they

16  will not be able to cast a vote and have that vote counted

17  under SB824.  Because of the numerous provisions that we've

18  gone through today, especially the reasonable impediment

19  provision, they've not provided a single voter who can prove to

20  the Court that "I will not be able to cast a vote that will be

21  counted on election day."

22      So we would submit that the irreparable harm is not as

23  strong as Plaintiffs' counsel --

24          **THE COURT:**  What about those voters that would be

25  dissuaded?

1      **MR. COX:**  There is -- there is a harm to a voter who

2  would be dissuaded from voting because they may not understand

3  that they can comply with the requirements or that there is

4  some inconvenience; but I would just point the Court to the *Lee*

5  case, the *Crawford* case, the case out of the Seventh Circuit,

6  all those cases that have held that the requirements to comply

7  with a photo ID law that are consistent with the requirements

8  that are in SB824 are not -- are not significant burdens and

9  are mere inconveniences that a voter can comply with.

10      **THE COURT:**  Is it a mere inconvenience that you've got

11  to go to one, two or three places to figure out where you're

12  going to get the ID and you have to take time off from work?

13  They don't have jobs like you and me.  A lot of these voters

14  don't have those opportunities.  They don't have

15  transportation.  They don't have all of the convenience -- it

16  becomes a convenience if you've got a car.  It becomes a

17  convenience if you can take off any time.  So I reject this

18  idea that when we're talking about the right to vote and any

19  kind of interference with the right to vote that we consider

20  being unable to register, unable to get there are merely minor

21  inconveniences.

22      **MR. COX:**  I, of course, accept Your Honor's position

23  on that.  The -- I would just point to the numerous controlling

24  cases that discuss the -- certain burdens on the -- on being

25  able to cast a vote.  A burden on being able to cast a vote is

1  not necessarily an invalid burden and the courts recognize

2  this.  The courts recognize that states must conduct elections

3  based upon rules and any rule that you put up regarding

4  election is going to burden somebody's vote in some way.

5      And I would also note that the inconveniences that

6  Your Honor mentioned or the burdens that Your Honor mentioned

7  about complying with the law in order to get an ID to vote,

8  those inconveniences are addressed by the reasonable impediment

9  provision.  In fact, all of the issues that Your Honor

10  mentioned are listed explicitly in the reasonable impediment

11  reasons.  So a voter does not have to come up with her own

12  other reason, can simply check lack of transportation, could

13  not get off work, any of the other reasons that Your Honor

14  mentioned.  So the law has to be considered in its totality and

15  we would submit that the burdens are alleviated by the law's

16  provisions.

17      On the balance of harms -- I will address the balance of

18  harms and the public interest together, Your Honor.  The voters

19  of North Carolina in the 2018 election instructed their General

20  Assembly to require photographic identification for in-person

21  voting.  Certainly it is not just the fact that there is a

22  state law that is at issue.  It's the fact that the voters put

23  into their constitution a requirement that the General Assembly

24  impose a photo ID requirement.  So the public interest must be

25  weighed in light of the constitutional enactment by the voters.

1    And it does bear repeating that we are well into the

2  implementation of the photo ID law and the delay in getting to

3  the preliminary injunction hearing to have the Court consider

4  these matters should weigh into the analysis of the balance of

5  equities and the public interest at stake here certainly after

6  700,000 people have received a mailing, the State Board telling

7  them that if they don't have the right ID they need to go get

8  one or they can cast a reasonable impediment ballot, and the

9  information that's going out to every single residential

10  household in the next week or so informing them of the

11  requirement to bring photo ID, with exceptions.

12    I'll rest at that; but I will add, because I think it's

13  important for Your Honor to understand the election

14  administration challenges the State Board faces, it is the case

15  that we're in December prior to the first election that will be

16  requiring photo ID.  The State Board and the County Boards are

17  not just now starting to implement this law.  There are

18  trainings that are taking place with County Board members via

19  in-person and webinar over this month, and the County Boards

20  are likely going to initiate their poll worker training this

21  month.  There will be different stages of poll worker training

22  from the chief judges, the judges, and the precinct assistants

23  that appear at the polls.

24    So we are in the throes of rolling this out and we have

25  mentioned in the affidavit submitted by the executive director

1  that at the very latest -- from a technical perspective, at the

2  very latest, the State Board would need to know by the end of

3  December whether it should stop enforcing this law.

4      The reason for that is that there are changes that are

5  hard-coded into the Elections information systems that cannot

6  be undone when voting starts.  What voting starts, you cannot

7  make changes to the information system.  Once the information

8  system is loaded in with the coding for absentee ballots that

9  must have a photo ID, provisional ballots that are going to

10  address reasonable impediments, it's going to be difficult to

11  ignore those and carry out elections at the precinct level with

12  those elements.  And perhaps even more importantly, the

13  absentee ballots that get distributed in the second week of

14  January are going to instruct voters that they must enclose a

15  copy of their ID when they submit their ballot.

16      So we are -- we don't presume to tell the Court how quickly

17  it should rule, but the State Board is a little nervous now

18  about how quickly we are getting to its deadlines and when we

19  really do need to make sure that our poll workers are

20  conducting the election enforcing photo ID or not.

21      Thank you, Your Honor.

22          **THE COURT:**  Thank you.

23      I want to hear from you on voter confusion.  I'm not as

24  concerned about the training of poll workers.  I'm more

25  concerned about those mailings that have gone out and are

1  scheduled to go out and the voter confusion that could be

2  caused by that.  So if you would address that for me.

3       **MS. SWAIN:**  Yes, Your Honor.

4    I think this can be addressed very briefly.  The status quo

5  in North Carolina is that there is no photo voter ID.  When you

6  add a restriction that voters will face when they go to the

7  polls, it has a different impact than when you take that

8  restriction away.  So in this instance, there may be confusion

9  that could be caused by a mailing that's gone out that has

10  indicated that to a narrow -- to around 700,000 voters that you

11  need photo voter ID.  That could be corrected by a second

12  mailing that says you no longer need photo voter ID under the

13  laws of this state, as has been the case for most of this

14  state's history, except for one election cycle, March 2016.

15  You will come to the polls and use signature attestation under

16  penalty of perjury.

17       **THE COURT:**  Let me ask you if I were to allow

18  testimonial evidence, how long do you anticipate?  Is that a

19  day?  Is that two days?  What are we talking about?

20       **MS. SWAIN:**  Yes, Your Honor.

21    We believe that if you -- if it would be helpful for the

22  Court to hear from expert witnesses, that may take additional

23  time.  So our original estimate for the Court was going to be a

24  day, possibly a day and a half if you heard both from expert

25  witnesses and fact witnesses.  I believe with the scope of what

1   we've covered here today that we could significantly limit that

2   if it would be of help to the Court.

3        **THE COURT:**  All right.  Thank you.

4     Is there anything you care to say about that, about the

5   hearing of oral testimony?  I know you've got other things to

6   do.  That was in your brief.

7        **MR. COX:**  Your Honor, you make the point very

8   correctly that, you know, when the case calls, it is your

9   priority.

10    The only thing that -- I would just reiterate that time is

11  of the essence here.  If Your Honor does allow live testimony,

12  we just need it to happen sooner because the State Board needs

13  to know what it's supposed to do.

14       **MS. SWAIN:**  And if, Your Honor, I could briefly

15  address that.  We understand that time is of the essence and we

16  do not want further delay by adding in an additional step if

17  Your Honor does not believe that that's necessary.  We at this

18  point are neutral on the subject.  We are happy to provide fact

19  witnesses if it will be helpful.  We are also happy to rest on

20  the record.

21       **THE COURT:**  Now, your fact witnesses wouldn't be -- it

22  wouldn't be difficult for you to get your fact witnesses here.

23  What about your expert witnesses?

24       **MS. SWAIN:**  We -- I believe that our expert witnesses

25  would work with us, recognizing that their schedules are

 1  slightly more difficult because they are not in the state.  But

 2  of course, Your Honor, we would do everything that we could to

 3  coordinate that and make it happen as quickly as Your Honor is

 4  ready to hear them.

 5          **THE COURT:**  All right.  This is something that I do

 6  want to contemplate.  I want to absorb what we heard today and

 7  make a decision; and if I make that decision, I'll make it

 8  quickly.  But I will let you know either way pretty quickly.

 9      Anything further before we adjourn court today?

10          **MR. COX:**  No, Your Honor.

11          **MS. SWAIN:**  Nothing further from the Plaintiffs.

12  Thank you.

13          **THE COURT:**  All right.  Let us adjourn court.

14      (Proceedings concluded at 4:29 p.m.)

15

16                   **C E R T I F I C A T E**

17      I, LORI RUSSELL, RMR, CRR, United States District Court
    Reporter for the Middle District of North Carolina, DO HEREBY
18  CERTIFY:

19      That the foregoing is a true and correct transcript of the
    proceedings had in the within-entitled action; that I reported
20  the same in stenotype to the best of my ability and thereafter
    reduced same to typewriting through the use of Computer-Aided
21  Transcription.

22

23  _Lori Russell_

24  Lori Russell, RMR, CRR         Date: 12/9/19
    Official Court Reporter

25