**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

───────────────

**No. 19-2273**

───────────────

NORTH CAROLINA STATE CONFERENCE OF THE NAACP; CHAPEL HILL-CARRBORO NAACP; GREENSBORO NAACP; HIGH POINT NAACP; MOORE COUNTY NAACP; STOKES COUNTY BRANCH OF THE NAACP; WINSTON SALEM-FORSYTH COUNTY NAACP,

            Plaintiffs - Appellees,

        v.

PHILIP E. BERGER, in his official capacity as President Pro Tempore of the North Carolina Senate; TIMOTHY K. MOORE, in his official capacity as Speaker of the North Carolina House of Representatives,

            Appellants,


KEN RAYMOND, in his official capacity as a member of the North Carolina State Board of Elections; STELLA ANDERSON, in her official capacity as Secretary of the North Carolina State Board of Elections; DAMON CIRCOSTA, in his official capacity as Chair of the North Carolina State Board of Elections; JEFFERSON CARMON, in his official capacity as a member of the North Carolina State Board of Elections; DAVID C. BLACK, in his official capacity as a member of the North Carolina State Board of Elections,

            Defendants - Appellees.

───────────────

Appeal from the United States District Court for the Middle District of North Carolina, at Greensboro.  Loretta C. Biggs, District Judge.  (1:18-cv-01034-LCB)

───────────────

Argued:  May 27, 2020                              Decided:  August 14, 2020

───────────────

Before HARRIS, RICHARDSON, and QUATTLEBAUM, Circuit Judges.

———————————

Vacated and remanded by published opinion. Judge Quattlebaum wrote the opinion, in which Judge Richardson joined. Judge Harris wrote a dissent.

———————————

**ARGUED:** David Henry Thompson, COOPER & KIRK PLLC, Washington, D.C., for Appellants. Stephen K. Wirth, ARNOLD & PORTER KAYE SCHOLER LLP, Washington, D.C.; Paul Mason Cox, NORTH CAROLINA DEPARTMENT OF JUSTICE, Raleigh, North Carolina, for Appellees. **ON BRIEF:** Peter A. Patterson, Nicole J. Moss, Haley N. Proctor, Nicole Frazer Reaves, COOPER & KIRK PLLC, Washington, D.C.; Nathan A. Huff, PHELPS DUNBAR LLP, Raleigh, North Carolina, for Appellants. Joshua H. Stein, Attorney General, Olga E. Vyotskaya de Brito, Special Deputy Attorney General, NORTH CAROLINA DEPARTMENT OF JUSTICE, Raleigh, North Carolina, for State Board Appellees. Irving Joyner, Cary, North Carolina; Penda D. Hair, Washington, D.C., Caitlin A. Swain, FORWARD JUSTICE, Durham, North Carolina; John C. Ulin, Los Angeles, California, James W. Cooper, Jeremy C. Karpatkin, Andrew T. Tutt, Jacob Zionce, ARNOLD & PORTER KAYE SCHOLER LLP, Washington, D.C., for Appellees North Carolina State Conference of the NAACP, Chapel Hill-Carrboro NAACP, Greensboro NAACP, High Point NAACP, Moore County NAACP, Stokes County Branch of the NAACP, and Winston Salem-Forsyth County NAACP.

———————————

2

QUATTLEBAUM, Circuit Judge:

Philip E. Berger, President Pro Tempore of the North Carolina Senate, and Timothy K. Moore, Speaker of the North Carolina House of Representatives, appeal the district court's denial of their renewed motion to intervene in an action brought by North Carolina State Conference of the NAACP, Chapel Hill-Carrboro NAACP, Greensboro NAACP, High Point NAACP, Moore County NAACP, Stokes County Branch of the NAACP and the Winston Salem-Forsyth County NAACP (collectively, the "NAACP"). For the reasons set forth below, we vacate the district court's order denying the motion and remand for further consideration consistent with this opinion.

## I.

On December 6, 2018, after being referred to several committees and going through amendments and readings in both the House and Senate, the North Carolina General Assembly ratified Senate Bill 824, titled "An Act to Implement the Constitutional Amendment Requiring Photographic Identification to Vote" ("S.B. 824"), which established, *inter alia*, photographic voter identification requirements for elections in North Carolina. The bill was presented to Governor Roy Asberry Cooper, III, that same day. On December 14, 2018, Governor Cooper vetoed the bill. On December 18, 2018, the Senate voted to override the veto, and the next day, the House voted similarly. Thus, on December 19, 2018, S.B. 824 was enacted as North Carolina Session Law 2018-144.

On December 20, 2018, the NAACP sued Governor Cooper; the Chair of the North Carolina Board of Elections; the Secretary of the North Carolina State Board of Elections;

3

and seven other members of the North Carolina State Board of Elections[1] (the "State Defendants") challenging the validity of S.B. 824. In its complaint, the NAACP contends that S.B. 824 has a disparate impact on African American and Latino citizens of North Carolina in violation of Section 2 of the Voting Rights Act of 1965, 42 U.S.C. § 1973, as well as the Fourteenth and Fifteenth Amendments of the United States Constitution. The NAACP sought, among other relief, a declaration that the challenged provisions of S.B. 824 violate Section 2 of the Voting Rights Act and the Fourteenth and Fifteenth Amendments, and an injunction against the implementation of the provisions of S.B. 824 that impose voter-identification requirements.

Relevant here, in challenging S.B. 824, the NAACP sued the Governor (who publicly opposed the bill) and the State Board (which is composed of members appointed by the Governor). The NAACP did not sue the North Carolina General Assembly, any of its general members, or any other proponents of the bill. As a result, the parties defending the bill were parties with an historical opposition to the bill or entities under the indirect control of such parties. Further, the Attorney General tasked to represent those defendants has a similar history of opposing the bill under challenge.

On January 14, 2019, Berger and Moore (the "Proposed Intervenors") moved under Federal Rule of Civil Procedure 24 to intervene on behalf of the North Carolina General Assembly to oppose the NAACP's challenges to S.B. 824. Seeking to intervene as a matter

---

[1] Because the State Board was reconstituted to consist of five governor-appointed members after the complaint was filed, those members were substituted as parties to the action in the district court as reflected in the district court's order.

4

of right under Rule 24(a) and, alternatively, permissively under Rule 24(b), the Proposed Intervenors argued that state law, specifically N.C. Gen. Stat. § 1-72.2(a) and (b), expresses the public policy of the State of North Carolina that the President Pro Tempore of the Senate and the Speaker of the House represent the State of North Carolina in defense of its statutes. They further argued that the statute provides they have standing as agents of the State of North Carolina in such actions and requests that federal courts permit their intervention to adequately represent the State and General Assembly's interests in statutes, like S.B. 824, whose constitutionality is challenged. The State Defendants neither consented nor objected to the motion to intervene while the NAACP opposed the request to intervene as of right or permissively. (J.A. 371.)

On June 3, 2019, the district court denied the motion to intervene, largely concluding that the State Defendants were required by provisions of the North Carolina Constitution and other North Carolina statutes to defend the State, that the State Defendants had not abdicated their responsibility to defend S.B 824, and that, accordingly, the Proposed Intervenors failed to demonstrate the requisite "strong showing of inadequacy" to overcome the presumption of adequate representation by the State Defendants. The district court's denial was without prejudice to the motion being renewed if the Proposed Intervenors could show that the State Defendants no longer intended to defend the lawsuit and the requirements for intervention were otherwise satisfied. While denying the motion to intervene, the district court allowed the Proposed Intervenors to participate in the action by filing amicus curiae briefs.

5

On July 19, 2019, the Proposed Intervenors filed a renewed motion to intervene, arguing that it was apparent that the State Defendants would not fully defend S.B. 824. On September 17, 2019, after the State Defendants filed opposition papers, the Proposed Intervenors moved to ascertain the status of their renewed motion, noting that they had not been a part of discovery and initial planning of the S.B. 824 litigation, and informing the district court that, if their renewed motion was not ruled on by September 23, 2019, they planned to appeal the "de facto denial" of their motion and/or file a mandamus petition with the Fourth Circuit. (J.A. 778.)

On September 23, 2019, the Proposed Intervenors, having received no ruling from the court, noticed the appeal seeking review of a "de facto" denial of their renewed motion to intervene (No. 19-2048) and petitioned for a writ of mandamus directing the district court to permit intervention (No. 19-2056). The NAACP moved to dismiss the appeal. On October 8, 2019, we denied the mandamus petition and granted the motion to dismiss the interlocutory appeal, concluding that we lacked appellate jurisdiction based on the record at the time.

On November 7, 2019, the district court denied the renewed motion. The court concluded that its previous Rule 24 analysis, as set forth in its June 3 order, remained undisturbed and declined to revisit its rulings from that order. It then evaluated the Proposed Intervenors' new allegations determining they did not involve any new evidence that the State Defendants had declined to defend the lawsuit. The district court thus denied the "Renewed Motion to Intervene" with prejudice and reiterated that the Proposed Intervenors were permitted to participate in the action by filing amicus curiae briefs.

6

On November 11, 2019, the Proposed Intervenors filed a notice of appeal from the order denying their renewed motion to intervene. (J.A. 3248.)

## II.

Before we address the merits of the appeal, we must first consider several threshold matters.

## A.

The NAACP argues that the Proposed Intervenors' failure to appeal the denial of their initial motion to intervene divests us of appellate jurisdiction to consider this appeal. In response, the Proposed Intervenors argue we have jurisdiction to review the denial of the renewed motion to intervene which merged with the order denying their initial motion to intervene.

We may exercise jurisdiction only over final orders and certain interlocutory and collateral orders. *See* 28 U.S.C. §§ 1291; 1292; *Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541, 545 (1949). The denial of a motion to intervene under Rule 24 is treated as a final judgment that is appealable. *See Sharp Farms v. Speaks*, 917 F.3d 276, 289 (4th Cir. 2019); *Bridges v. Dep't of Maryland State Police*, 441 F.3d 197, 207 (4th Cir. 2006). Once the district court enters the order denying intervention, a party has 30 days to file a notice of appeal from that order and may not await final judgment in the underlying action to do so. *Sharp Farms, 917 F.3d at 289*; *see also* 28 U.S.C. § 2107(a); Fed. R. App. P. 4(a)(1)(A).

Thus, we must determine whether the district court's June 3, 2019 order, which denied the initial motion to intervene without prejudice and indicated that the Proposed

Intervenors would be able to renew their motion if the circumstances changed, should be regarded as an appealable final order.

In this inquiry, we are guided by the Supreme Court's decision in *Stringfellow v. Concerned Neighbors in Action*, 480 U.S. 370 (1987). There, the district court denied a nonprofit's motion to intervene as of right but granted the motion for permissive intervention subject to conditions. *Stringfellow*, 480 U.S. at 373. After the nonprofit appealed challenging the conditions of the permissive intervention, the Supreme Court addressed the question of "whether a district court order granting permissive intervention but denying intervention as of right is immediately appealable." *Id.* at 372. The Supreme Court held that a grant of intervention was not an immediately appealable collateral order because the district court did not outright deny the motion to intervene. *See id.* at 375-376. Thus, the intervenor retained the power to appeal any final judgment and, as a result, could then challenge the conditions of the permissive intervention imposed by the lower court. *Id.* Therefore, the Supreme Court held that it could not "conclude that [the proposed intervenor's] interests will be 'irretrievably lost in the absence of an immediate appeal.'" *Stringfellow*, 480 U.S. at 376 (quoting *Richardson-Merrell Inc. v. Koller*, 472 U.S. 424, 431 (1985)).

*Stringfellow*, while different from this case in that it involved granting intervention with conditions, nevertheless teaches that we should examine the orders here to see if they outright denied the motion and if the Proposed Intervenors' interests will be irretrievably lost absent an immediate appeal. Looking first at the June 3, 2019 order, we first note the district court denied the motion to intervene without prejudice. Not every denial of a motion

8

to intervene "without prejudice" necessarily lacks sufficient conclusiveness to warrant immediate review. *See Rhode Island v. U.S. E.P.A.*, 378 F.3d 19, 26 (1st Cir. 2004); *see also Bing v. Brivo Systems, LLC*, 959 F.3d 605, 611(4th Cir 2020) (considering the district court's opinion in light of the entire record in determining that an order dismissing a complaint without prejudice is a final, appealable order). But, in addition to being without prejudice, the order here invited a renewed motion upon changed circumstances. Because of these provisions, the June 3 order did not outright deny the motion to intervene and lacked the conclusiveness needed to trigger immediate review. Accordingly, the June 3 order was not a final appealable order.

In contrast, the November 7, 2019 order was an outright denial of the motion to intervene. Unlike the June 3 order, it was with prejudice. And in denying the renewed motion to intervene, the district court referred to its analysis from the June 3 order indicating that it remained in effect. It then addressed and rejected additional arguments from the Proposed Intervenors arising from what they claimed to be new facts and circumstances. These terms make clear the November 7 order, including its analysis from the June 3 order, was sufficiently conclusive for appellate review. *See Hodgson v. United Mine Workers of Am.*, 473 F.2d 118, 126–27 (D.C. Cir. 1972) ("We are satisfied that the June 20 order…constituted a fresh evaluation of the intervention application, well within the discretionary power of the District Court to make, and amenable to review on the merits by this court."). Accordingly, we have jurisdiction under 28 U.S.C. § 1291.

9

B.

Next, as it did before the district court, the NAACP argues the Proposed Intervenors

lack Article III standing to intervene. The NAACP maintains that invalidating S.B. 824

would not cause the General Assembly any cognizable injury. It further alleges that a state

statute, in this case N.C. Gen. Stat. § 1-72.2, could not confer Article III standing on a state

legislature.[2]

An Article III court must have jurisdiction to reach the merits of a case. "One

essential aspect of this requirement is that any person invoking the power of a federal court

must demonstrate standing to do so." *Hollingsworth v. Perry*, 570 U.S. 693, 704 (2013). A

litigant must prove that he has (1) suffered a concrete and particularized injury, that (2) is

fairly traceable to the challenged conduct, and (3) is likely to be redressed by a favorable

decision. *Id.* (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–561 (1992)). While

most standing questions consider whether a plaintiff has satisfied the requirement in

initially filing suit, Article III requires that an "'actual controversy' persist throughout all

stages of litigation." *Hollingsworth*, 570 U.S. at 705 (quoting *Already, LLC v. Nike, Inc.*,

568 U.S. 85, 90–91 (2013)). The standing requirement therefore "must be met by persons

seeking appellate review, just as it must be met by persons appearing in courts of first

---

[2] Below, in addressing this argument, the district court noted that the NAACP failed
to cite, nor did it independently find, a Fourth Circuit case holding that an intervenor-
defendant must also establish Article III standing. Given an apparent "silence on the issue
by the Fourth Circuit," the district court declined to impose a standing requirement on the
Proposed Intervenors. (J.A. 372.)

instance." *Arizonans for Official English v. Arizona*, 520 U.S. 43, 64 (1997); *see also Virginia House of Delegates v. Bethune-Hill*, 139 S. Ct. 1945, 1950–51(2019).[3]

Critical to the standing inquiry is N.C. Gen. Stat. § 1-72.2. The statute provides that, as to any action in federal court in which the validity or constitutionality of an act of the General Assembly or a provision of the North Carolina Constitution is challenged, "[i]t is the public policy of the State of North Carolina that…the General Assembly, jointly through the Speaker of the House of Representatives and the President Pro Tempore of the Senate, constitutes the legislative branch of the State of North Carolina; the Governor constitutes the executive branch of the State of North Carolina; that, when the State of North Carolina is named as a defendant in such cases, *both* the General Assembly and the Governor constitute the State of North Carolina…." N.C. Gen. Stat. § 1-72.2(a) (emphasis added). It goes on to request that a federal court presiding over an action where the State of North Carolina is a named party allow both the legislative branch and the executive branch of the State of North Carolina to participate as a party in such an action. *Id.* The statute then addresses standing. The "Speaker of the House of Representatives and the President Pro Tempore of the Senate, as agents of the State, … shall jointly have standing to intervene on behalf of the General Assembly as a party in any judicial proceeding

---

[3] The Supreme Court's *Town of Chester. v. Laroe Estates, Inc.*, 137 S. Ct. 1645, 1648 (2017) decision indicates that a litigant seeking to intervene of right need only to meet the requirements of Article III if pursuing relief not requested by a party. Proposed Intervenors argue that, under that decision, they need not establish standing since they are seeking the same relief as the State Defendants. But we need not resolve that question because, whether required or not, the Proposed Intervenors have established standing.

11

challenging a North Carolina statute or provision of the North Carolina Constitution." N.C. Gen. Stat. § 1-72.2(b).

To be sure, neither this nor any other state statute automatically establishes Article III standing. That is an issue for the federal courts to decide. But by the same token, the statute must inform our understanding and analysis of the standing issue presented here. That is particularly true given the Supreme Court's consistent instructions that a state has standing to defend constitutional challenges to its laws and to select its agents for doing so.

In *Virginia House of Delegates v. Bethune-Hill*, 139 S. Ct. 1945 (2019), the Supreme Court addressed whether the Virginia House of Delegates and its Speaker had, as intervenors, standing to appeal to defend Virginia's redistricting plan after the Commonwealth of Virginia conveyed it would not file an appeal to the Supreme Court.[4] The Commonwealth moved to dismiss the House's appeal for lack of standing. The Supreme Court granted that motion and dismissed the appeal. The Court held that the "House, as a single chamber of a bicameral legislature, has no standing to appeal the invalidation of the redistricting plan separately from the State of which it is a part." *Bethune-Hill*, 139 S. Ct. at 1950. But while holding that the House lacked standing there, *Bethune-Hill* also emphasized "a State has standing to defend the constitutionality of its statute." *Id.* at 1951 (citation omitted). And "a State must be able to designate agents to represent it in federal court" and "if the State had designated [a legislative branch] to

---

[4] We recognize that the district court did not have the benefit of *Bethune-Hill* at the time of the June 3 order.

12

represent its interests . . . the [legislative branch] could stand in for the State." *Id.* (citation omitted).

The Supreme Court's guidance in *Bethune-Hill* is consistent with its earlier decision in *Hollingsworth*. There, the Court held that "the Speaker and the President, in their official capacities, could vindicate that interest in federal court on the legislature's behalf," noting that "a State has a cognizable interest 'in the continued enforceability' of its laws that is harmed by a judicial decision declaring a state law unconstitutional." *Hollingsworth*, 570 U.S. at 709-710 (citations omitted). And the Court further provided that "[t]o vindicate that interest or any other, a State must be able to designate agents to represent it in federal court," because a state is a political corporate body that can only act through its agents. *Id.* (citing *Poindexter v. Greenhow*, 114 U.S. 270, 288 (1885)). "That agent is typically the State's attorney general. But state law may provide for other officials to speak for the State in federal court . . . ." *Hollingsworth*, 570 U.S.at 710.

Further, the Proposed Intervenors represent the entirety of the bicameral legislative branch in North Carolina which makes this matter comparable to *Arizona State Legislature v. Arizona Independent Redistricting Commission*, 135 S.Ct. 2652 (2015). In that case, the Court recognized the Arizona legislature's standing to challenge a ballot initiative threatening its authority over redistricting. *See also Arizonans for Official English v. Arizona*, 520 U.S. 43, 65 (1997) ("We have recognized that state legislators have standing to contest a decision holding a state statute unconstitutional if state law authorizes legislators to represent the State's interests.").

13

Our colleague in dissent points out that in *Bethune-Hill*, *Hollingsworth* and *Arizonans for Official English*, the state representative was no longer defending the state or declined to appeal an adverse ruling. That distinction, to the dissent, means those decisions have little bearing here. But while those decisions emphasized the principle that a state must be able to designate its agents to represent it in federal court, none limited that principle to situations where the initial agent no longer was participating in the defense or declined to appeal an adverse ruling. More specifically, Justice Ginsburg, in *Bethune-Hill,* reiterated the Court's earlier holding that a state must be able to designate agents for representation in federal court and wrote "if the State had designated [a legislative branch] to represent its interests . . . the [legislative branch] could stand in for the State." *Bethune-Hill*, 139 S. Ct. at 1951. But in so stating, the Court did not limit intervention to such scenarios where a state representative was no longer a part of the lawsuit. We decline to impose a limitation to these Supreme Court decisions not imposed by the Court.

Based on N.C. Gen. Stat. § 1-72.2 and the Supreme Court decisions described above, we find that the Proposed Intervenors have established Article III standing for the purposes of intervention before the district court.

## C.

Next, while the State Defendants take no position on whether the Legislative Intervenors should be allowed to intervene before the district court, they assert N.C. Gen. Stat. § 1-72.2(a) violates North Carolina's express guarantee of separation of powers. The NAACP asserts the same in challenging the statute as an unconstitutional usurpation of and the hinderance to the power of the Executive branch. They insist that, under the North

14

Carolina Constitution, only the Executive branch can enforce North Carolina's laws. The Legislative Intervenors, in response, claim that they are only defending the challenged statute, not enforcing it, which does not run afoul of the North Carolina Constitution.

Having considered the arguments, we agree with the Proposed Intervenors. Of course, "[t]he legislative, executive, and supreme judicial powers of the State government shall be forever separate and distinct from each other." N.C. CONST. art. I, § 6. And the state's "Governor shall take care that the laws be faithfully executed." N.C. CONST. art. III, § 5(4); *see Cooper v. Berger*, 822 S.E.2d 286, 289–90 (N.C. 2018) (noting the Governor's important responsibility in "ensuring that [North Carolina's] laws are properly enforced."). But that does not preclude the participation of the Proposed Intervenors in a court action challenging the validity or constitutionality of an act of the General Assembly in accordance with statutory provisions. N.C. Gen. Stat. § 1-72.2(a); *see also* N.C. Gen. Stat. § 120-32.6 ("Whenever the validity or constitutionality of an act of the General Assembly or a provision of the Constitution of North Carolina is the subject of an action in any State or federal court, the Speaker of the House of Representatives and the President Pro Tempore of the Senate, as agents of the State through the General Assembly, shall be necessary parties and shall be deemed to be a client of the Attorney General for purposes of that action as a matter of law and pursuant to Section 7(2) of Article III of the North Carolina Constitution."). Execution of the law and defense of a challenged act are different acts. The Proposed Intervenors are not seeking to act on behalf of the Executive branch nor would any intervention, if granted, permit them to do so. In fact, obstructing the legislative branch from performing its role in defending the duly enacted legislation might violate

15

separation of powers principles. *See generally United States v. Windsor*, 570 U.S. 744, 762

(2013) (addressing separation-of-powers principles). Thus, we reject the arguments of the

NAACP and the State Defendants that § 1-72.2 infringes on the powers of the Executive

Branch in violation of the North Carolina Constitution's separation of powers provisions.[5]

## III.

With these threshold matters addressed, we turn to the merits of the district court's

denial of the Proposed Intervenors' motion to intervene. We review the denial of a motion

for intervention for abuse of discretion. *In re Sierra Club*, 945 F.2d 776, 779 (4th Cir.

1991). But while our appellate review of district court rulings on the intervention is

deferential, part of our responsibility is to ensure intervention decisions not based on

incorrect legal principles. *See Stuart v. Huff*, 706 F.3d 345, 349–50 (4th Cir. 2013); *see

also Feller v. Brock*, 802 F.2d 722, 729-30 (4th Cir. 1986) (finding that denial of

intervention as of right to apple pickers was reversible error and admitting intervenors as

parties-defendant); *Hill v. W. Elec. Co. Inc.*, 672 F.2d 381, 385–86, 392 (4th Cir.

1982)(remanding action for proper consideration of the motion for permissive intervention

because the district court did not properly apply legal standards).

Using that standard, we address the requirements for intervention. Intervention in a

federal action is governed by Federal Rule of Civil Procedure 24. The Rule allows for two

---

[5] In responding to the NAACP's separation of powers arguments, we see nothing in the statute that requires a resolution be passed by the General Assembly in order for the Proposed Intervenors to intervene in this lawsuit. Thus, the Proposed Intervenors should not be faulted for not obtaining "authorization" to intervene.

16

types of intervention: intervention as a matter of right under subsection (a) and permissive intervention under subsection (b). The Proposed Intervenors first claim that they are entitled to intervene as a matter of right. They alternatively claim they should be able to intervene permissively.

A.

Rule 24(a)(2) allows intervention as of right when the movant claims an interest "relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest," unless the movant's interest is adequately represented by existing parties. Fed.R.Civ.P. 24(a)(2). There are three requirements for intervention as of right. "[T]he moving party must show that (1) it has an interest in the subject matter of the action, (2) disposition of the action may practically impair or impede the movant's ability to protect that interest, and (3) that interest is not adequately represented by the existing parties." *Newport News Shipbuilding and Drydock Co. v. Peninsula Shipbuilders' Ass'n,* 646 F.2d 117, 120 (4th Cir.1981). We will consider each of these requirements.

1.

Starting with the first requirement,[6] a party seeking to intervene must have "an interest relating to the property or transaction that is the subject of the action. . . ."

---

[6] Of course, timeliness of the motion is a "cardinal consideration" of whether to permit intervention and must be considered as an initial matter. *See Houston Gen. Ins. Co. v. Moore,* 193 F.3d 838, 839 (4th Cir. 1999) (citation omitted). To determine if a motion to intervene is sufficiently timely, the trial court should assess (1) "how far the underlying suit has progressed," (2) the "prejudice any resulting delay might cause the other parties"

17

Fed.R.Civ.P 24(a)(2). In determining that the Proposed Intervenors lacked a sufficient interest, the district court held, "because the State Defendants in this action are presently defending the challenged legislation and have expressed no intention to do otherwise, Proposed Intervenors have failed to demonstrate that they have a significantly protectable interest in likewise defending the constitutionality of S.B. 824 sufficient to warrant a right to intervene under Rule 24(a)(2)." (J.A. 378.) Thus, the district court based its decision that the Proposed Intervenors did not establish a protectable interest on the fact that the State Defendants had not abdicated their responsibility to defend S.B. 824.

In support of this proposition, the district court cited several district court decisions holding individual legislators do not have a sufficient protectable interest to intervene in litigation over statutes for which they voted. But that is not what we have here. The Proposed Intervenors rely not only on their general position as legislators, but on N.C. Gen. Stat. § 1-72.2. Under that statute, as noted above, it is the policy of the State of North Carolina that "both the General Assembly and the Governor constitute the State of North Carolina. . . ." N.C. Gen. Stat. § 1-72.2(a). And subsection (b) provides the "Speaker of the House of Representatives and the President Pro Tempore of the Senate, as agents of the State, … shall jointly have standing to intervene on behalf of the General Assembly as a party in any judicial proceeding challenging a North Carolina statute or provision of the

---

and (3) "why the movant was tardy in filing its motion." *Alt. v. U.S. E.P.A.*, 758 F.3d 588, 591 (4th Cir. 2014). The Proposed Intervenors did not delay in filing the renewed motion to intervene after their initial motion was denied, and it was filed relatively early in the case. From the arguments, this issue is not in dispute on appeal and we see no need to further address it here.

18

North Carolina Constitution." N.C. Gen. Stat. § 1-72.2(b). Finally, under N.C. Gen. Stat. §120-32.6 (b), "[w]henever the validity or constitutionality of an act of the General Assembly or a provision of the Constitution of North Carolina is the subject of an action in any State or federal court, the Speaker of the House of Representatives and the President Pro Tempore of the Senate, as agents of the State through the General Assembly, shall be necessary parties. . . ."

Importantly, these statutes do not limit the role of the General Assembly to instances where the executive branch declines to defend or participate in the action. Of course, as the district court noted, § 1-72.2 only requests that a federal court allow the legislative branch to participate. The requirements of Rule 24(a)(2) must still be satisfied. However, in applying those Rule 24 principles, courts should not disregard the statute of a separate sovereign that expresses the state's and the Legislature's interest and role in the litigation. In other words, while these North Carolina statutes do not mandate the federal intervention, they set forth the nature of the legislative branch's interests, and § 1-72.2 has done so, in some form, since 2013.

The presence of these statutes distinguishes this case from those cited by the district court. And we see no requirement elsewhere that the Attorney General must decline to defend the lawsuit in order to trigger a protectable interest on the part of the Proposed Intervenors. Thus, the district court's decision to that effect was in error.

In determining that the Proposed Intervenors lacked a sufficient interest in the S.B. 824 litigation, the district court also found the Proposed Intervenors' reliance on the Supreme Court case *Karcher v. May*, 484 U.S. 72 (1987), misplaced. The district court

19

reasoned that the issue before the Supreme Court there was whether public officials, who participated as intervenors in their official capacities, could continue to appeal an adverse judgment after leaving office—an issue, the district court indicated, that is not present here. Respectfully, the district court reads *Karcher* too narrowly. *Karcher* also confirmed that "[t]he authority to pursue the lawsuit on behalf of the legislature belongs to those who succeeded [the legislators] in office." *Id.* at 77. Although the issues presented here may not be identical to those presented there, *Karcher* reiterates the role that active legislators play in defending a lawsuit depending on a particular state's law, which is an issue relevant to the interests asserted by the Proposed Intervenors.

Further, *Bethune-Hill*, while primarily a standing case, informs our analysis of whether the Proposed Intervenors have a sufficient interest under Rule 24(a)(2). As we noted earlier, *Bethune-Hill* confirmed that "a State must be able to designate agents to represent it in federal court" and "if the State had designated [a legislative branch] to represent its interests . . . the [legislative branch] could stand in for the State." *Bethune-Hill*, 139 S. Ct. at 1951.

*Karcher* and *Bethune-Hill*, along with *Hollingsworth* and *Arizona State Legislature*,[7] indicate that the determination of the sufficiency of the interests of the Proposed Intervenors in this litigation requires a careful consideration of N.C. Gen. Stat. §1-72.2(a). The district court erred in not doing so. Although it cited the statute in full, its

---

[7] Although these decisions primarily focus on standing, the issues presented overlap with the question of the movant's interests in the litigation under Rule 24(a)(2). *See generally Hollingsworth v. Perry,* 570 U.S. 693, 709 (2013) (noting the legislature's authority to represent the state's interests).

20

only discussion of it in relation to the question of the Proposed Intervenors' interests was mentioning how the statute only requested that a federal court allow intervention. We remand the case to the district court to more fully consider the North Carolina statute in the analysis of the Proposed Intervenors' interest in the litigation—with particular attention to the Supreme Court's instructions that the state may choose its agents to defend its statutes in federal court and the North Carolina statutes seeming to do so here.

2.

Next, the district court briefly addressed Rule 24(a)'s second requirement in responding to the Proposed Intervenors' contention that disposition of this case would practically impair or impede their ability to protect their interest absent intervention. But because it concluded that the Proposed Intervenors failed to demonstrate a significant protectable interest sufficient to warrant intervention as of right, the district court necessarily determined they could not show this case threatens to impair any such interests. Having determined that remand is needed to address the Proposed Intervenors' alleged protectable interest, remand is also necessary to address this second requirement.

If, on remand, the Proposed Intervenors have presented a significantly protectable interest, the district court must then determine whether the movant "is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest. . . ." Fed.R.Civ.P 24(a)(2). The focus of the requirement is on whether the proposed intervenor would suffer a "*practical* disadvantage or impediment" if not permitted to intervene. *Newport News Shipbuilding & Drydock Co.*, 646 F.2d at 121 (emphasis added). Thus, the rule does not require the showing of impairment or

21

impediment of only a legal nature. *See Francis v. Chamber of Commerce of U. S.*, 481 F.2d 192, 195 (4th Cir. 1973); *see also Utah Ass'n of Ctys. v. Clinton*, 255 F.3d 1246, 1253 (10th Cir. 2001) (noting "the court is not limited to consequences of a strictly legal nature" and that the "would-be intervenor must show only that impairment of its substantial legal interest is possible. . . ."). In *Francis*, this Court noted that:

> Prior to the 1966 amendment of Rule 24, the rule was that a party could not intervene under 24(a) unless it might be bound by the judgment in the pending action. The term bound was interpreted to mean bound in the *res judicata* sense. The Rule now requires only that the "disposition of the action may as a practical matter impair or impede his (the applicant's) ability to protect that interest." This was designed to liberalize the right to intervene in federal actions.

*Francis*, 481 F.2d at 195 n.8; *see also* 7C Wright & Miller, Federal Practice and Procedure, § 1908.2 (3d ed.) ("It generally is agreed that in determining whether disposition of the action will impede or impair the movant's ability to protect its interest the question must be put in practical terms rather than in legal terms."). Thus, it is possible that "this practical disadvantage or impediment" would not be "significantly relieved by allowing the [proposed intervenors] to participate as amicus in the district court proceeding." *Newport News Shipbuilding & Drydock Co.*, 646 F.2d at 121; *see also Feller*, 802 F.2d at 730 ("Participation by the intervenors as amicus curiae is not sufficient to protect against these practical impairments.").

The Proposed Intervenors argue the time-sensitive nature of the case; the adequacy of the State Defendants' defense of the constitutionality of S.B. 824; and their interest in engaging in discovery, presenting experts and participating in motions practice, all evidence risks to the protection of their interests. The district court did not consider these

22

issues because it determined that the Proposed Intervenors lacked a sufficient interest under Rule 24(a). But we have concluded that determination to be inadequate and remanded the case for further consideration. Because the Proposed Intervenors may have interests which may be practically impaired if not permitted to intervene in the action before the district court, we conclude that remand is necessary on this issue as well.

3.

Finally, we turn to the adequate representation requirement for intervention as of right. Beginning with the standard for assessing the adequacy of the existing parties to protect the movant's interests, the district court initially acknowledged that a would-be intervenor generally bears a minimal burden of showing inadequacy of representation by an existing party citing *Trbovich v. United Mine Workers*, 404 U.S. 528 (1971). But the district court also applied a presumption of adequacy from *Commonwealth of Virginia v. Westinghouse* 542 F.2d 214, 216 (4th Cir. 1976) that arises when a party seeking intervention has the same ultimate objective as a party to the suit. Under that presumption, the proposed intervenor must establish one of three factors—adversity of interest, collusion or nonfeasance—to overcome this presumption and meet the inadequacy requirement. The district court identified those three factors and attempted to apply them in its order.

Yet the court concluded its adequacy analysis by holding "Proposed Intervenors have failed to sustain their burden of demonstrating the requisite '*strong showing of inadequacy*' to overcome the presumption of adequate representation by State Defendants and their counsel, the Attorney General." J.A. 386 (emphasis added). In using the phrase "strong showing of inadequacy," the district court added a heightened burden to overcome

23

the *Westinghouse* presumption. In imposing that heightened burden, it cited our decision in *Stuart v. Huff*, 706 F.3d 345 (4th Cir. 2013), which requires intervenors to "mount a strong showing of inadequacy" where defendants are represented by a government agency. *Stuart*, 706 F.3d at 352.

Although it was appropriate for the district court to apply the *Westinghouse* presumption since the Proposed Intervenors and the State Defendants appear to seek the same ultimate objective—the defense of S.B 824[8]—the district court erred in demanding that the Proposed Intervenors overcome that presumption by the heightened standard of a "strong showing." *See cf. Trbovich v. United Mine Workers*, 404 U.S. 528 (1971). That heightened standard from *Stuart* does not apply here.

In *Stuart*, abortion-services providers sued state officials over a North Carolina statute restricting abortions. A group of pro-life medical professionals and others sought to intervene claiming the state defendants would not adequately protect their interests. Thus, we addressed whether "to permit private persons and entities to intervene in the

---

[8] The Proposed Intervenors also argue the *Westinghouse* presumption does not apply here due to the presence of N.C. Gen. Stat. § 1-72.2. It is true that neither *Westinghouse* nor other cases in our Circuit where this presumption has been applied involve a state statute like § 1-72.2. Through that statute, North Carolina, a separate sovereign—through the democratic process—has expressly provided that it is its public policy that the Proposed Intervenors represent it in litigation over the constitutionality of its laws. While the statute should not and does not automatically satisfy the Rule 24(a) intervention requirements, we find the Proposed Intervenors' contention that they should not have to show adversity of interest, collusion or nonfeasance to overcome a presumption of adequacy in its efforts to establish those requirements persuasive. Such a heightened burden makes sense in the traditional case of private parties seeking to intervene. But in this situation, imposing the presumption in the face of a statute like the one adopted by the State of North Carolina risks conflict in our federal system of government. Even so, our holding in *Westinghouse* is broad and, despite our concerns, we are constrained to follow it here.

24

government's defense of a statute. . . ." *Stuart*, 706 F.3d at 351. We held that, in such a situation, "the putative intervenor must mount a strong showing of inadequacy" in the context of those private persons and entities on the basis of government entities' duty to represent the people in public litigation matters. *Id.* at 352.

Importantly, we explained two primary reasons for requiring a "strong showing" of inadequacy. First, we noted that "[i]t is after all the government that, through the democratic process, gains familiarity with the matters of public concern that lead to the statute's passage in the first place." *Id.* at 351. And second, we noted that "to permit private persons and entities to intervene in the government's defense of a statute upon only a nominal showing would greatly complicate the government's job." *Id.* These reasons make clear the strong showing standard imposed by *Stuart* was for situations where private litigants seek to intervene in the government's defense.

Of course, this is not a case where a member of the public is seeking to intervene in the government's defense. The Proposed Intervenors here, like the State Defendants, are representatives of the State of North Carolina. In fact, they have been designated by that State as its agents for purposes of defending the constitutionality of North Carolina's laws. As such, the reasons set forth in *Stuart* for requiring a strong showing of inadequacy are not present. Thus, we conclude the *Stuart* presumption does not apply where another governmental branch, at least where authorized to do so by state statute, seeks intervention. And for that reason, we remand the case to the district court to determine, pursuant to *Westinghouse*, whether the Proposed Intervenors are able to rebut the presumption of

25

adequacy by establishing either adversity of interest,[9] collusion or nonfeasance. They are not required, however, to meet *Stuart's* heightened standard of a "strong showing" to rebut the presumption.

The dissent, in concluding a heightened burden should apply, relies heavily on the Seventh Circuit's decision in *Planned Parenthood of Wisconsin, Inc. v. Kaul*, 942 F.3d 793 (7th Cir. 2019). And *Kaul* does, in fact, impose a heightened burden—one requiring a proposed intervenor to establish gross negligence or bad faith—to overcome the presumption of adequacy that circuit applied when a state attorney general was defending the constitutionality of a law. *Id.* at 799. But with all due respect to the dissent and our sister circuit, we find the burden *Kaul* applied too far removed from the text of Rule 24 to be persuasive. After all, the Rule itself imposes no presumption. In our view, any judicially created presumption should be undertaken with care. And we respectfully disagree with our colleague's suggestion that *Kaul* aligns with our *Stuart* decision. In our view, following *Kaul* would extend *Stuart* beyond its context of a private citizen seeking to intervene to defend the constitutionality of a state law.

But if the Proposed Intervenors need not satisfy the heightened standard of a strong showing, what is the proper standard? To answer that question, we return to *Westinghouse*.

---

[9] As we recognized in *Stuart*, the "conventional proposition that where the existing party and proposed intervenor seek divergent objectives, there is less reason to presume that the party (government agency or otherwise) will adequately represent the intervenor." *Stuart*, 706 F.3d at 352. We followed that "[i]n such circumstances, it is perfectly sensible to require a more modest showing of inadequacy before granting intervention of right since an existing party is not likely to adequately represent the interests of another with whom it is at cross purposes in the first instance." *Id.*

26

There, we indicated the standard for establishing inadequacy generally was the "minimal burden" set forth by the Supreme Court in *Trbovich*. As already noted, we then indicated that if the proposed intervenor seeks the same ultimate relief as an existing party, the proposed intervenor must show either adversity of interest, collusion or malfeasance. But while our *Westinghouse* decision indicates that a proposed intervenor seeking the same ultimate relief as an existing party must show one of those three factors, it does not hold or even suggest any change from the minimal burden of establishing those factors. Thus, on remand, the district court should evaluate whether the Proposed Intervenors have established adversity of interest, collusion or malfeasance using the "minimal burden" standard of *Trbovich*. *Trbovich*, 404 U.S. at 538, n. 10 (noting that the requirement of Rule 24 is satisfied if the applicant shows that representation of his interest may be inadequate and noting that the burden of making that showing is minimal); *Westinghouse*, 542 F.2d at 216 ("appellant's burden of showing an inadequacy of representation is minimal").

Finally, the Proposed Intervenors point to certain facts and evidence to support their contention that the State Defendants may not adequately represent the Proposed Intervenors' interests. Particularly, they point to the State Defendants' defense of this suit and litigation decisions, as well as the State Defendants' actions in a parallel case in the state court—*Holmes v. Moore*, No 18-cv-15292 (N.C. Super. Ct.), and the history predating the litigation such as Governor and Attorney General's opposition to voter ID. We are careful to note that the district court is afforded discretion in the Rule 24(a) analysis. It is not our job as the appellate court to lightly second guess the manner in which the district court weighs the evidence in conducting an adequacy analysis. But, at a minimum, it is our

job to ensure that the proper standard is applied. On remand, using the standard outlined above, the district court should consider all of the evidence presented by the parties, as well as the North Carolina statutes cited above.[10] In enacting those statutes, the State of North Carolina has expressed its desire for the Proposed Intervenors to represent it in litigation like the case before us. Implicit in that expression is the state's belief that, without the involvement of the Proposed Intervenors, it will not be adequately represented.

The dissent concludes the North Carolina statutes should not be considered in the adequacy analysis. While we respect that differing opinion, we disagree with the view that the state law and policy cannot be considered as part of both the adequacy and interest elements of Rule 24(a)(2). There are countless examples in the law where the same fact or facts apply to multiple legal issues. That is all we have here. The fact that the policy expressed in the statutes is pertinent to the interest analysis should have no bearing on whether it should also be considered in the adequacy analysis.

---

[10] We note that the pertinent inquiry is whether the Proposed Intervenors can establish either collusion, nonfeasance or adversity of interest. To the extent not considered by the district court before, we think it would be appropriate for the district court to consider the public comments of the Governor and Attorney General about the prior and current voter ID laws, as well as the status of the related litigation and the parties' role therein. In addition, evidence related to the intervention question has developed since the issuance of the district court's order and may also be relevant. We, of course, do not have the full record of those developments but are aware of concerns about the State Defendants' alleged failure to name or call experts in connection with the preliminary injunction hearing, as well as the Governor's filing of an amicus brief in the related appeal (No. 20-1092) of the district court's preliminary injunction order. Without expressing any weight, we feel that these issues should be considered on remand.

Moreover, the dissent's analysis on the relevance of the North Carolina statutes to the adequacy analysis suggests that we have held that the statutes require that the Proposed Intervenors' motion be granted. Dissenting Op. *at 50* ("[I]f an aspiring legislative intervenor can meet both the interest element *and* the adequacy element whenever state law announces a policy preference for multiple representatives, then a district court may be subjected routinely to the 'intractable procedural mess that would result from the extraordinary step of allowing a single entity, even a state, to have two independent parties simultaneously representing it.'")  To be clear, these statutes should not and do not automatically satisfy the Rule 24(a) intervention requirements. But they do bear on the adequacy analysis.

B.

Last, the district court also denied the Proposed Intervenors' alternative request for permissive intervention. "Permissive Intervention" contemplates intervention upon timely application "when an applicant's claim or defense and the main action have a question of law or fact in common." *See Newport News Shipbuilding & Drydock Co.*, 646 F.2d 117, 119 n.1. "If intervention of right is not warranted, a court may still allow an applicant to intervene permissively under Rule 24(b), although in that case the court must consider 'whether the intervention will unduly delay or prejudice the adjudication of the original parties' rights.'" *Stuart*, 706 F.3d at 349 (quoting Fed.R.Civ.P 24(b)(3)).

Of note, the district court expressed concern with the potential for delays which could result with the addition of Proposed Intervenors as parties to the action, and that inclusion of the Proposed Intervenors would place additional burdens on the court and

29

cause the NAACP prejudice. We do not disregard these concerns, and we acknowledge that our appellate review is deferential because "Rule 24's requirements are based on dynamics that develop in the trial court. . . ." *Stuart*, 706 F.3d at 350. The trial court, in its broad discretion, is thus in the best position to exercise its judgment in evaluating those requirements. We also recognize that district courts must make many trial management decisions in managing dockets. *See id.* We in no way question the district court in carrying out those important duties. But "[w]hile the efficient administration of justice is always an important consideration, fundamental fairness to every litigant is an even greater concern." *Columbus-Am. Discovery Grp. v. Atl. Mut. Ins. Co.*, 974 F.2d 450, 470 (4th Cir. 1992). And "liberal intervention is desirable to dispose of as much of a controversy 'involving as many apparently concerned persons as is compatible with efficiency and due process.'" *Feller*, 802 F.2d 722, 729 (4th Cir. 1986) (quoting *Nuesse v. Camp*, 385 F.2d 694, 700 (D.C. Cir. 1967)).

In denying permissive intervention, the district court did not address N.C. Gen. Stat. §§ 1-72.2(a) and (b) and 120-32.6. Given the import of those statutes as discussed above, it should have. Again, without suggesting an outcome or the weight the statutes should be afforded, we remand the case for consideration of the permissive intervention request in light of the above.

## IV.

For the above-stated reasons, the district court's order denying the Proposed Intervenors' motion for intervention under Rule 24 is

*VACATED AND REMANDED.*

31

PAMELA HARRIS, Circuit Judge, dissenting:

North Carolina's Attorney General is charged by statute with representing the interests of the State of North Carolina in cases that challenge the validity and enforcement of state law. Consistent with that statutory duty, the Attorney General currently is in court – two courts, state and federal – defending the constitutionality of S.B. 824. Indeed, our own court soon will hear the Attorney General's appeal from the district court's decision to preliminarily enjoin the enforcement of S.B. 824.

Notwithstanding the Attorney General's persistent efforts, the Proposed Intervenors – out of respect for their positions in the General Assembly, I will refer to them as the Leaders – seek to intervene in ongoing district court proceedings. If the Leaders have standing to intervene in that litigation, it is, as the majority explains, as agents of the State of North Carolina, designated by state law to represent the State's interest in the validity and enforcement of state law. But another designated agent of the State – the Attorney General – already is representing precisely that interest.

It follows that the Leaders have a right to intervene under Rule 24(a)(2) of the Federal Rules of Civil Procedure only if a federal court first finds that the Attorney General is inadequately representing the State's interest, in contravention of his statutory duty. In a recent – and unmistakably similar – case, the Seventh Circuit explained that such a finding would be "extraordinary." *Planned Parenthood of Wis., Inc. v. Kaul*, 942 F.3d 793, 801 (2019). I agree. And the district court's careful review of the Attorney General's litigation conduct persuades me that there is no basis to make such an extraordinary finding here. Because that leaves the Leaders with no right to intervene under Rule 24(a), and

32

because I believe the district court properly denied permissive intervention under Rule 24(b), I must respectfully dissent.

## I.

### A.

In my view, this is a straightforward case – or, at least, it should be.  To understand why, it may be helpful to clarify up front what this case is and is not about.

Crucially, this is not a case like those to which the majority looks for guidance – *Virginia House of Delegates v. Bethune-Hill*, 139 S. Ct. 1945 (2019), *Hollingsworth v. Perry*, 570 U.S. 693 (2013), and *Arizonans for Official English v. Arizona*, 520 U.S. 43 (1997) – in which a state representative, typically an attorney general, is no longer defending state law or has declined to appeal an adverse ruling.  As the majority explains, those circumstances present difficult questions about the standing of other entities to intervene and continue a case in the state attorney general's stead.  *See* Maj. Op. at 10–13.  But at bottom, the issue in those cases is whether *any* state representative will be permitted to defend a state's interest in the validity of its laws when that state's "default representative" has declined to do so.  *Kaul*, 942 F.3d at 800 (describing the mine run of cases where a legislature seeks to intervene "once the governmental defendant's default representative ha[s] dropped out of the case").

Here, by contrast, the State's "default representative" – the Attorney General – has *not* "dropped out of the case."  *Id.*  The Attorney General is charged, by North Carolina statute, with representing the State's interests in cases involving challenges to state law.

33

*See* N.C. Gen. Stat. § 114-2(1) ("[I]t shall be the duty of the Attorney General . . . to appear for the State . . . in any cause or matter, civil or criminal, in which the State may be a party or interested."); *see also Martin v. Thornburg*, 359 S.E.2d 472, 479 (N.C. 1987) (Attorney General has the duty to defend the interests of the State and its agencies). Consistent with that statutory duty, the Attorney General is very much in this case, defending the constitutionality of S.B. 824 in state and federal courts, including our own.

The Leaders argue – and the majority agrees, *see* Maj. Op. at 11–14 – that they have standing to intervene because state law has designated them, along with the Attorney General, to represent the interests of the State in federal court. *See* Reply Br. of Appellants at 10; *see also Bethune-Hill*, 139 S. Ct. at 1951 (where state law designates a legislative entity to "represent [the State's] interests," that entity may "stand in for the State"). But those are exactly the interests already represented by the Attorney General in this case. So, the unusual question presented here is whether a federal district court must allow not one but "*two* state entities . . . to speak on behalf of the State *at the same time*." *Kaul*, 942 F.3d at 800 (first emphasis added).

The answer to that question, all agree, is governed not by state law but by federal law: specifically, Rule 24(a)(2)'s criteria for intervention as of right. Though state law may "inform the Rule 24(a)(2) calculus," *id.* at 797, provisions like North Carolina's § 1-72.2 cannot "supplant the Federal Rules of Civil Procedure and make intervention automatic," *id.* And under Rule 24(a)(2) – again, this is not disputed – the Leaders have a right to intervene only if their "interest is not adequately represented by existing parties to

34

the litigation." *Stuart v. Huff*, 706 F.3d 345, 349 (4th Cir. 2013) (quoting *Teague v. Bakker*, 931 F.2d 259, 260–61 (4th Cir. 1991)); *see also* Fed. R. Civ. P. 24(a)(2).

So this is what we are left with: Proposed legislative intervenors who seek to represent the interests of a client – the State of North Carolina – already represented by the Attorney General, and so must face the "unenviable task of convincing a court that the Attorney General inadequately represents [the State], despite his statutory duty." *Kaul*, 942 F.3d at 801. That would be, as the Seventh Circuit has instructed, an "extraordinary finding." *Id.* Indeed, the Leaders have not identified a single case – and I have found none – in which a federal court has made such a finding, or otherwise held that a state legislative entity is entitled to intervene as of right under Rule 24(a)(2) to defend the state's interests where the state's executive branch is actively defending state law. Nothing about this case persuaded the district court that it should be the first, and I see no reason to disturb that good judgment.

## B.

### 1.

Although there is a decided paucity of case law supporting the Leaders' efforts to intervene in this case, we do have one very relevant precedent that weighs heavily against the Leaders' position: *Planned Parenthood of Wisconsin, Inc. v. Kaul*, 942 F.3d 793 (2019), a recent Seventh Circuit decision that explains why a state legislative entity is *not* entitled to intervene in the circumstances presented here. *Kaul* issued on the same day that the district court denied intervention, and so the court did not have the benefit of the

35

Seventh Circuit's reasoning when it ruled. But as it turns out, *Kaul* provides substantial support for the district court's findings.

In *Kaul*, Planned Parenthood of Wisconsin and a number of its employees sued Wisconsin's Attorney General and other state officials in federal court, seeking to enjoin the enforcement of certain state abortion regulations. *See id.* at 796. Rather than move to dismiss the complaint, the Wisconsin Attorney General filed an answer on behalf of the state defendants, denying the plaintiffs' allegation that the abortion regulations violated the Constitution. *See id.* Shortly after, the Wisconsin Legislature moved to intervene, hoping to have the complaint dismissed at the pleadings stage for failure to state a claim. *See id.* The district court in Wisconsin denied the motion. *See id.*

On appeal, in evaluating whether the Wisconsin Legislature was entitled to intervene as of right, the Seventh Circuit assumed that the Legislature had standing to intervene on the same theory that the Leaders advance here: as an agent of the State of Wisconsin, designated by state statute to represent Wisconsin's interest in the validity and enforcement of its laws. *See id.* at 798. The court questioned whether, as the majority suggests here, *see* Maj. Op. at 19–20, the Wisconsin Legislature could invoke that same state interest to satisfy the "interest" element of Rule 24(a)(2). *See Kaul*, 942 F.3d at 798. But ultimately, the court determined, it was unnecessary to decide that question. *See id*.

That was because the outcome in *Kaul* turned, as it does in this case, on whether the proposed legislative intervenors could satisfy the "adequacy" element of Rule 24(a)(2) – that is, whether the Wisconsin Legislature could show that no existing party to the litigation adequately represented the interest that it would seek to protect. *See id.* at 799. And in

36

considering the adequacy of the state's representation, the Seventh Circuit emphasized the key feature of *Kaul* that distinguishes it from *Bethune-Hill* and that makes it so similar to this case:  Consistent with his statutory duty, the Wisconsin Attorney General was actively defending Wisconsin's abortion regulations in federal court, and so he was already representing the same state interest in the validity and enforcement of state law that had been invoked by the Wisconsin Legislature.  *See id.* at 800–01.  Under those circumstances, the court explained, any finding of inadequacy would be "extraordinary," *id.* at 801, and could not be justified by what amounted to "quibbles" between the Wisconsin Legislature and the Wisconsin Attorney General over "litigation strategy," *id.* (internal quotation marks omitted).

Key to the *Kaul* court's "adequacy" analysis was a well-established presumption: that the Wisconsin Attorney General – having been charged by law with protecting the state's interest in the validity and enforcement of its abortion regulations, and having appeared in court to do so – was providing adequate representation.  *See id.* at 799–801. Just how strong that presumption should be was the subject of some debate:  The *Kaul* majority held that it could be rebutted only by a showing of "bad faith or gross negligence," *id.* at 801, while Judge Sykes, concurring, would have set the bar somewhat lower, "start[ing] from a presumption of adequate representation and put[ting] the intervenor to a heightened burden to show a concrete, substantive conflict or an actual divergence of interests to overcome it," *id.* at 810.

But for our purposes, what the *Kaul* court agreed upon is more important than what divided it:  A substantial presumption would govern, not the default rule applied in

37

*Trbovich v. United Mine Workers of America*, 404 U.S. 528, 538 n.10 (1972), under which showing inadequacy is described as a "minimal" burden. *See Kaul*, 942 F.3d at 799 (majority); *id.* at 810 (Sykes, J., concurring). And whatever the precise calibration of that presumption, it was strong enough, all agreed, that it could not be overcome by the Wisconsin Legislature's "political and policy differences with the Attorney General over abortion regulations," or by "disagreements about litigation strategy." *Id.* at 810 (Sykes, J., concurring); *see also id.* at 801 (majority opinion stating the same).

2.

*Kaul* is particularly instructive here because the Seventh Circuit's analysis aligns so substantially with our own approach to adequacy under Rule 24(a)(2). In *Stuart v. Huff*, 706 F.3d 345 (4th Cir. 2013), we considered a motion to intervene in a challenge to state abortion regulations – this time in North Carolina – where, as in *Kaul*, the state attorney general already was in court defending the regulations. *Id.* at 348. In *Stuart*, like the Seventh Circuit in *Kaul*, we applied a presumption of adequacy to the state attorney general's representation, though our presumption was based on our long-standing rule that "[w]hen the party seeking intervention has the same ultimate objective as a party to the suit," we will presume "that its interests are adequately represented" unless the party seeking intervention can show "adversity of interest, collusion, or non-feasance." *Id.* at

38

349 (alteration in original) (quoting *Virginia v. Westinghouse Elec. Corp.*, 542 F.2d 214, 216 (4th Cir. 1976)).[1]

The majority here emphasizes that the proposed intervenor in *Stuart* was a private party and not a state legislative entity. On that basis, it concludes that *Stuart*'s call for an especially "strong showing" of inadequacy, *id.* at 352, is inapplicable in this case. Maj. Op. at 25. Whether or not that is so – a question to which I will return in a moment – the majority's observation takes nothing away from the broader lesson that *Stuart* derived from *Westinghouse*: A presumption of adequacy arises *whenever* a proposed intervenor shares the same objective as an existing party, regardless of that existing party's identity. *See id.* at 351–54.

That, as the majority acknowledges, is precisely the situation here: The Leaders and the Attorney General share the objective of upholding the legality of S.B. 824. *See* Maj. Op. at 23. So under *Stuart*, as well as under *Kaul*, *Trbovich*'s "minimal" burden standard cannot apply. Rather, we must start our adequacy inquiry with the presumption that the Attorney General is providing adequate representation for the State's interests. And, just as in *Kaul*, whatever the precise weight of that presumption, it cannot be rebutted by a

---

[1] Nearly every circuit has adopted this rule, in one form or another. *See, e.g.*, *In re Thompson*, 965 F.2d 1136, 1142–43 (1st Cir. 1992), as amended (May 4, 1992); *Butler, Fitzgerald & Potter v. Sequa Corp.*, 250 F.3d 171, 180 (2d Cir. 2001); *Del. Valley Citizens' Council for Clean Air v. Pennsylvania*, 674 F.2d 970, 973 (3d Cir. 1982); *Baker v. Wade*, 743 F.2d 236, 240–41 (5th Cir. 1984); *United States v. Michigan*, 424 F.3d 438, 443–44 (6th Cir. 2005); *Kaul*, 942 F.3d at 799 (7th Cir. 2019); *FTC v. Johnson*, 800 F.3d 448, 452 (8th Cir. 2015); *Arakaki v. Cayetano*, 324 F.3d 1078, 1086 (9th Cir. 2003); *Tri-State Generation & Transmission Ass'n, Inc. v. N.M. Pub. Reg. Comm'n*, 787 F.3d 1068, 1072–73 (10th Cir. 2015); *Clark v. Putnam Cty.*, 168 F.3d 458, 461 (11th Cir. 1999); *Envt'l Def. Fund, Inc. v. Higginson*, 631 F.2d 738, 740 (D.C. Cir. 1979).

showing of "stronger, more specific interests" on the part of the Leaders, or by a "disagreement over how to approach the conduct of the litigation." *Stuart*, 706 F.3d at 353.

"Nor could it be any other way," as we explained in *Stuart*. *Id.* at 354. Absent a meaningful presumption of adequacy, federal courts would be required under Rule 24(a)(2) to arbitrate, de novo, the inevitable strategic disagreements that will arise even among parties who share the same ultimate objective, deciding which trial tactics do and do not amount to "adequate" representation. "To have such unremarkable divergences of view sow the seeds for intervention as of right risks generating endless squabbles at every juncture over how best to proceed." *Id.* All of that is true – as this case so perfectly illustrates – whether the proposed intervenors are private parties or legislative entities. To the extent the majority calls into question the wisdom of our standard presumption of adequacy, *see* Maj. Op. at 24 n.8, I worry that it is opening the door to "intractable procedural mess[es]" that will hamstring our district courts in their efforts to responsibly manage the proceedings before them, *Kaul*, 942 F.3d at 801.

## C.

In this case, the district court recognized that our precedent required it to presume that the Attorney General was an adequate representative of the State's interests in the validity and enforcement of S.B. 824. Having applied that presumption, the court found that the Leaders were not entitled to intervene under Rule 24(a)(2) because they had not shown the adversity of interest, collusion, or nonfeasance necessary for rebuttal. I see no reason to disturb that well-reasoned finding.

40

At this point, it is important to acknowledge our "necessarily limited" role in this appeal. *Stuart*, 706 F.3d at 350. We are not to decide whether, in our best view, the Leaders were entitled to intervene as a matter of right. That, our court has stressed, is an inquiry committed rightly to the broad discretion of the district courts. *See id.* 349–50. Instead, we may determine only whether the district court abused its discretion when it found that the Leaders were not so entitled. Previously, we have justified this deferential standard of review in light of the district court's "superior vantage point" for evaluating the conduct of the parties and the "profound implications" that intervention can have for trial-court proceedings. *Id.* at 350. With that deference to the district court's "on the scene" judgment layered atop the district court's thorough analysis, *id.*, it is apparent to me that there are no grounds to find an abuse of discretion here.

As the district court made clear at the outset of its opinion – and as I have emphasized already – this is a case in which the State's interests already are being defended by the Attorney General, who is charged under North Carolina law with the duty to defend state law in federal court. And it was apparent, in the district court's view, that the Attorney General was taking active steps to defend the lawsuit: The State Board, represented by the Attorney General, had "consistently denied all substantive allegations of unconstitutionality," moved to stay the suit on federalism grounds, and – at the time that the district court was writing – "recently filed an expansive brief opposing [the NAACP's] motion for preliminary injunction on the merits." *N.C. State Conf. of the NAACP v. Cooper*, No. 1:18CV1034, 2019 WL 5840845, at *3 (M.D.N.C. Nov. 7, 2019). In short, there was "nothing in the record to suggest" that the Attorney General had "abdicated" his

41

statutory duty to defend the State's interests in this case. *N.C. State Conf. of the NAACP v. Cooper*, 332 F.R.D. 161, 170 (M.D.N.C. 2019).

In arguing that the Attorney General is an inadequate representative of the State's interests in this case, the Leaders consistently have advanced two central arguments. First, they object to the way in which the Attorney General has chosen to defend S.B. 824, especially in a parallel state-court challenge, *Holmes v. Moore*, No. 18-cv-15292 (N.C. Super. Ct.). According to the Leaders, the Attorney General's conduct in this case and in *Holmes* demonstrates an "unwillingness to robustly defend S.B. 824," *Cooper*, 2019 WL 5840845, at *2, that amounts to "nonfeasance" sufficient to rebut the presumption of adequacy we first recognized in *Westinghouse*. In response to the Leaders' claims, the district court undertook a careful review of the Attorney General's litigation conduct in both cases, but found that the Attorney General simply had made reasonable litigation decisions with which the Leaders disagreed. *See Cooper*, 2019 WL 5840845, at *2–4; *cf. Stuart*, 706 F.3d at 355 (same). In view of our precedents, I can find no abuse of discretion in that judgment. Indeed, I believe it is entirely correct.

As the district court noted, the Leaders identified only the kind of garden-variety disagreements over litigation strategy that we and other courts consistently have found *insufficient* to rebut the presumption of adequacy, no matter that presumption's precise strength. *See Stuart*, 706 F.3d at 349; *see also Kaul*, 942 F.3d at 810–11 (Sykes, J., concurring). Illustrative is the Leaders' objection to the Attorney General's decision to move for the dismissal of only five of the six counts leveled against S.B. 824 in *Holmes* and to reserve a dispositive challenge to the remaining intentional-discrimination claim for

42

a later point in the proceedings.  The district court found the Leaders' objection wanting, in part because the Attorney General's decision ultimately was vindicated by the state court's ruling, which dismissed all five claims challenged by the Attorney General but denied the Leaders' separate motion to dismiss the intentional-discrimination claim.[2]  *See Stuart*, 706 F.3d at 354 (reasonableness of attorney general's litigation choices was shown in part by their success).  If it had had the benefit of *Kaul* at the time that it ruled, the district court might also have noted that the Leaders' objection was exactly the same as that pressed by the Wisconsin Legislature – unsuccessfully – before the Seventh Circuit.  *See Kaul*, 942 F.3d at 796, 801 (Legislature's objection to Wisconsin Attorney General's failure to move for dismissal and desire for "more aggressive litigation position" was insufficient to rebut presumption); *see also* Br. of Appellant Wisconsin Legislature at 33, *Kaul*, 942 F.3d 793 (No. 19-1835), 2019 WL 2317657 (arguing it was "inexplicable" that Wisconsin Attorney General had not moved to dismiss the complaint).

Similarly, the Leaders have purported to identify deficiencies in the Attorney General's approach to discovery in *Holmes* and his opposition to the NAACP's preliminary-injunction motion in this case.  Again, in their view, an adequate advocate would have assumed a more aggressive posture.  But in making their case for nonfeasance, the Leaders again mistake differences over trial tactics for inadequacy.  *Cf. Stuart*, 706 F.3d

---

[2]  Indeed, any attempt by the Attorney General to dismiss the intentional-discrimination claim at the pleadings stage seems sure to have been premature, given that the North Carolina Court of Appeals since has found that the plaintiffs are likely to succeed on that claim and has instructed the state trial court to enter a preliminary injunction.  *See Holmes v. Moore*, 840 S.E.2d 244, 265–66 (N.C. Ct. App. 2020).

43

at 353 (intensity of proposed intervenor's interest in litigation does not establish inadequacy). And, in any case, as the district court explained, the Attorney General's brief in opposition to the NAACP's motion for a preliminary injunction was "expansive," *Cooper*, 2019 WL 5840845, at *3, and a ramped-up approach to discovery in *Holmes* would have been duplicative of the Leaders' own efforts in that case, where they are named as defendants.

As I have emphasized, and as the majority recognizes, we owe substantial deference to the district court's factual determinations here. But even if I were to review this record de novo, I would come to the same conclusion as the district court. I cannot view the record in this case – a record that reflects that the Attorney General has successfully moved to dismiss the Governor as a party, vigorously opposed a preliminary injunction, and filed appeals in state and federal court – and come away crediting the Leaders' claims of nonfeasance.

That brings us to the Leaders' second argument, and the central theme of their briefing: the suggestion that the Attorney General is not mounting a sufficiently vigorous defense of S.B. 824 because he is opposed to voter-ID laws as a matter of public policy. According to the Leaders, as a state senator, the current Attorney General opposed passage of a prior voter-ID law, arguing that it curtailed the right of North Carolina citizens to vote. And after he became Attorney General, the Leaders emphasize, he moved to dismiss a petition for certiorari review of a decision by this court holding that same voter-ID law unconstitutional, acting on behalf of the incoming Governor. *See North Carolina v. N.C. State Conf. of the NAACP*, 137 S. Ct. 1399 (2017). Whether framed as an argument for

44

collusion or for adversity of interests, *cf. Stuart*, 706 F.3d at 349 (presumption of adequacy may be rebutted by showing of collusion or adversity of interest, as well as nonfeasance), the import of the Leaders' claim is the same: The Attorney General cannot be trusted to defend S.B. 824.

This is a startling accusation. The Attorney General has a statutory duty to represent and defend the State and its interests in this litigation. *See* N.C. Gen. Stat. § 114-2. And that is to say nothing of his ethical obligations, which require zealous representation of his client, *see* Revised Rules of Professional Conduct of the North Carolina State Bar, Rule 0.1[2] (preamble), and prohibit him from falsely assuring the district court that he is "meeting [his] duty to defend this action," J.A. 662; *see also* Revised Rules of Professional Conduct of the North Carolina State Bar, Rule 3.3 (candor to court). That the Attorney General may have expressed policy views at odds with S.B. 824 in the past is no ground for a federal court to infer that he would abdicate his official duty to the State. And to suggest otherwise does a disservice to the dignified work of government lawyers who each day put aside their own policy and political preferences to advocate dutifully on behalf of their government and the general public. *See Kaul*, 942 F.3d at 810–11 (Sykes, J., concurring) ("political and policy differences" between proposed legislative intervenor and state attorney general regarding law being challenged are "not enough to rebut the presumption of adequate representation").[3]

---

[3] In one particularly unfortunate moment at argument, the Leaders' counsel accused the Attorney General of "sabotage," referring to his decision, shortly after assuming office, to join the Governor in moving to dismiss a previously filed certiorari petition in a case

45

In any event, the district court found that there was no evidence in the record to support the Leaders' "conclusory speculation" that the Attorney General's policy preferences have left him without the proper "level of interest" or "incentive" to robustly litigate in defense of S.B. 824. *Cooper*, 332 F.R.D. at 170. Again, I find no abuse of the district court's broad discretion in that judgment. As we have explained, and as the district court recognized, a proposed intervenor may have a "stronger" or more "intense" interest in the validity of a law than an existing party, but that will not rebut the presumption of adequacy that arises from a shared objective. *Id.* at 171 (quoting *Stuart*, 706 F.3d at 353). And the Attorney General's failure to seek certiorari review as to a different voter-ID law, without more, does not indicate nonfeasance, let alone collusion. *See Stuart*, 706 F.3d at 353 (even with respect to same law, government official's decision not to appeal adverse decision does not demonstrate "inadequacy" of representation); *see also Saldano v. Roach*, 363 F.3d 545, 555 (5th Cir. 2004) (same).

In short, our precedent is clear: A proposed intervenor's intensity of conviction, armchair quarterbacking, and political bluster do not warrant what the Seventh Circuit rightly called the "extraordinary finding" that a state attorney general has failed to adequately represent his state's interests, notwithstanding a statutory duty to do so. *Kaul*, 942 F.3d at 801; *see also Stuart*, 706 F.3d at 353. The Leaders have failed to show anything

---

involving a different voter-ID law. The majority, of course, has not endorsed this over-heated rhetoric, and its judicious treatment of this case should make clear that federal courts are not a forum for airing political grievances. Changes in executive leadership regularly entail legitimate shifts in priorities for government lawyers, and though there may be some occasion where it will be necessary to look behind the official acts of government litigators and probe for improper purposes, I am certain that this is not that case.

46

more on this record, so no matter the ultimate effect of a state law that purports to designate them as additional representatives of the State's interests in federal court – a question the majority does not resolve – the Leaders have not established a right to intervene. Accordingly, I would affirm the district court's exercise of its discretion to deny intervention under Rule 24(a)(2).

### D.

My colleagues in the majority, of course, see this case differently. When it comes to the "adequacy" element of Rule 24(a)(2), the majority identifies two purported deficiencies in the district court's analysis that, in its view, necessitate a remand for the district court to consider anew whether the Attorney General is adequately representing the State. On both counts, I must disagree.

First, though the majority acknowledges that the Attorney General is entitled to a presumption of adequacy – and that the Leaders can overcome that presumption only by a showing of adversity of interest, collusion, or nonfeasance – it finds that the district court erred when, citing our decision in *Stuart*, it required the Leaders to make a "strong showing" of inadequacy. *See Cooper*, 332 F.R.D. at 169. In *Stuart*, we held that "a more exacting showing of inadequacy should be required where the proposed intervenor shares the same objective as a government party," like the Attorney General here, as opposed to a private litigant. 706 F.3d at 351. But the Leaders argue, and the majority agrees, that *Stuart*'s "strong showing" rule should govern only where, as in *Stuart*, the proposed intervenor is a private party and not, as here, a legislative entity seeking to provide additional representation of the State's interests.

47

The Seventh Circuit considered that very argument in *Kaul* and roundly rejected it. There, the Wisconsin Legislature, like the Leaders here, acknowledged that the Seventh Circuit's prior cases had granted a heightened presumption of adequacy when a government party shared the same objective as a would-be intervenor, but it pointed out that those cases only involved *private* would-be intervenors. *See Kaul*, 942 F.3d at 799. Again like the Leaders here, the Wisconsin Legislature argued that because it was a *government* intervenor seeking to represent the state's interests pursuant to state law, it should not be put to a heightened showing in order to rebut the presumption of adequacy. *See id.*

The Seventh Circuit disagreed. If anything, the *Kaul* court explained, the Wisconsin Legislature's identity as a government party cut the other way, justifying an especially strong presumption of adequacy. *See id.* at 801. A private party seeking to intervene can argue that, although it seeks the same objective as the state's existing representative, the state's interests – informed, as they must be, by the concerns of the general public – are not perfectly aligned with his or her more individualized interests. *See id.* But the legislature in *Kaul* – like the Leaders here – could not make that argument, because it was a governmental entity seeking to represent precisely the same state interest as the state attorney general already in the case: "The Legislature [went] further than sharing a goal with the Attorney General . . . and intend[ed] to represent the same client – the State of Wisconsin." *Id*. Under those circumstances, the Wisconsin Legislature would have a right to intervene only if the Wisconsin Attorney General – charged by state law with representing the same state interest the Legislature sought to advance – was inadequately

48

representing his own state.  Requiring a heightened showing of inadequacy to justify such an "extraordinary finding," the *Kaul* court concluded, was entirely appropriate.  *Id.*

I agree.  When the interest invoked by a proposed intervenor is represented already by a state executive-branch official designated for that purpose under state law, then it makes perfect sense to bring to bear an especially strong presumption of adequacy, putting the intervenor to a "heightened burden."  *See id.* at 810 (Sykes, J., concurring).  In all other contexts, we presume, under the longstanding and well-established presumption of regularity, that government officials properly discharge their official duties.  *See United States v. Chem. Found.*, 272 U.S. 1, 14–15 (1926).  Any would-be intervenor, even a state legislature, asking a federal court to find that a state attorney general has abdicated his statutory duty to defend his state's interests should be prepared to make a "strong showing" of adversity of interest, collusion, or nonfeasance.[4]

Second, the majority faults the district court for failing to consider in its adequacy analysis the state's public-policy judgment, reflected in North Carolina General Statutes § 1-72.2, that the Attorney General should not be the exclusive representative of North Carolina's interests in federal-court litigation.  *See* Maj. Op. at 27.  I agree with the majority that this "public policy" bears on the interest element of our Rule 24(a)(2) inquiry.  *See id.*

---

[4] In any event, even if I agreed with the majority that the district court erred by applying *Stuart*'s "strong showing" standard, that error would not necessitate remand.  As explained above, whatever the precise strength of the presumption of adequacy afforded to the Attorney General here, the Leaders have failed to rebut it.  And in those circumstances – where a district court, applying the proper standard, will surely reach the same result – remand is unnecessary.  *See Humphrey v. Humphrey*, 434 F.3d 243, 248 (4th Cir. 2006) (presumption in favor of remand is inapplicable "if the record permits only one resolution of the factual issue" (internal quotation marks omitted)).

49

at 20. But I cannot agree that the state's policy judgment should be double-counted and put toward satisfaction of Rule 24(a)(2)'s adequacy element as well as its interest element.

Again, the *Kaul* court considered and rejected precisely this approach. The problem, as the Seventh Circuit explained, is largely practical: Intervention under Rule 24(a)(2) is mandatory. *See Kaul*, 942 F.3d at 802. Thus, if an aspiring legislative intervenor can meet both the interest element *and* the adequacy element whenever state law announces a policy preference for multiple representatives, then a district court may be subjected routinely to the "intractable procedural mess that would result from the extraordinary step of allowing a single entity, even a state, to have two independent parties simultaneously representing it." *Id.* at 801. Even more, the *Kaul* court recognized, once opened, this Pandora's box promises to be difficult to cabin: If a state may tie the district court's hands under Rule 24(a)(2) by announcing a "public policy" to have two representatives in federal court, then why not three? Four? More? *See id.* at 802 (contemplating that "a state could even designate its individual legislators as agents and thereby flood a district court with a cacophony of voices all purporting to represent the state").[5]

---

[5] Indeed, the Leaders themselves appear to disavow the majority's approach, recognizing the problems it would create. Never have the Leaders argued before us that North Carolina law bears on the adequacy element, as opposed to the interest element, of Rule 24(a)(2). Instead, they assure us that we need not be concerned that state laws designating legislative agents as additional representatives in federal-court proceedings "will result in automatic intervention as of right by every legislative body in every case involving a challenge to a statute"; those laws may satisfy the interest prong, but the adequacy prong will remain an independent check and "foreclose intervention as of right in cases in which another party adequately represents the legislature's protectable interest." Br. of Appellants at 32 n.2.

50

I agree with the Seventh Circuit that we cannot allow our "respect [for] a state's autonomy as a sovereign" to render district courts "powerless to control litigation involving states." *Id.* To be clear, I do not question or otherwise diminish a sovereign state's authority to designate its preferred legal representative: If the General Assembly, in its considered judgment, believes that the Attorney General is not adequately representing the State in a given case, then it of course is free to remove the Attorney General from that case and substitute some other representative through the legislative process. But that state-law authority is distinct from the federal law – Rule 24(a)(2) – that governs the circumstances under which a federal court may be required to accommodate multiple representatives of a single state. Because I fear the "intractable procedural mess" that may result from the majority's decision, *id.* at 801, I must respectfully break from the majority on this point as well.

## II.

For the reasons I have given, I would affirm the district court's denial of intervention as of right under Rule 24(a)(2). In my view, the Leaders have not shown that the Attorney General is an inadequate representative of the state interests that he is charged by statute with defending. And even if that conclusion were debatable, I would find no abuse of discretion in the district court's finding to that effect. Because the Leaders must satisfy each element of Rule 24(a)(2) to establish a right to intervene, that is enough to dispose of the Leader's appeal from the denial of their motion to intervene as of right.

51

The majority, of course, takes a different approach. And in order to reach its contrary conclusion, it must address and resolve several additional issues. I will address only two of the most difficult issues here.

## A.

First is the question of the Leaders' Article III standing to intervene as of right.[6] Because I would affirm the district court's denial of intervention in any event, I may assume that the majority is correct, and that the Leaders have in fact established Article III standing. Even if they had not, in other words, I believe we still would be required to affirm the district court's denial of intervention, though on alternative grounds. Still, I have some doubts about the majority's analysis.

The majority's standing analysis turns on North Carolina General Statutes § 1-72.2, a recently enacted state-law provision that announces North Carolina's "public policy" in favor of the Leaders' participation in cases naming the State of North Carolina as a party.[7]

---

[6] Whether or not the Leaders had Article III standing to intervene in the district court, there is no question that they have standing to bring this appeal: The denial of a motion to intervene as of right is immediately appealable, *see Alt v. U.S. Envt'l Prot. Agency*, 758 F.3d 588, 590 (4th Cir. 2014), and we have jurisdiction because the alleged injury suffered by a disappointed would-be intervenor flows from the denial of intervention, *cf. CVLR Performance Horses, Inc. v. Wynne*, 792 F.3d 469, 475 (4th Cir. 2015) (final judgment does not moot pre-existing intervention appeal because appellate court may still offer remedy by ordering intervention).

[7] In full, North Carolina General Statutes § 1-72.2 provides:

(a) It is the public policy of the State of North Carolina that in any action in any North Carolina State court in which the validity or constitutionality of an act of the General Assembly or a provision of the North Carolina Constitution is challenged, the General Assembly, jointly through the

52

*See* N.C. Gen. Stat. § 1-72.2(a).  In my view, that complex provision raises as many questions as it answers.  First adopted in 2013, *see* 2013 N.C. Laws S.L. 2013-393, § 3, eff. Oct. 1, 2013, it has yet to be given an authoritative construction by North Carolina's courts on which we might rely.  And given its repeated references to cases – unlike this

---

Speaker of the House of Representatives and the President Pro Tempore of the Senate, constitutes the legislative branch of the State of North Carolina and the Governor constitutes the executive branch of the State of North Carolina, and when the State of North Carolina is named as a defendant in such cases, both the General Assembly and the Governor constitute the State of North Carolina.  It is the public policy of the State of North Carolina that in any action in any federal court in which the validity or constitutionality of an act of the General Assembly or a provision of the North Carolina Constitution is challenged, the General Assembly, jointly through the Speaker of the House of Representatives and the President Pro Tempore of the Senate, constitutes the legislative branch of the State of North Carolina; the Governor constitutes the executive branch of the State of North Carolina; that, when the State of North Carolina is named as a defendant in such cases, both the General Assembly and the Governor constitute the State of North Carolina; and that a federal court presiding over any such action where the State of North Carolina is a named party is requested to allow both the legislative branch and the executive branch of the State of North Carolina to participate in any such action as a party.

(b) The Speaker of the House of Representatives and the President Pro Tempore of the Senate, as agents of the State, by and through counsel of their choice, including private counsel, shall jointly have standing to intervene on behalf of the General Assembly as a party in any judicial proceeding challenging a North Carolina statute or provision of the North Carolina Constitution.  Intervention pursuant to this section shall be effected upon the filing of a notice of intervention of right in the trial or appellate court in which the matter is pending regardless of the stage of the proceeding.  Notwithstanding any other provision of law to the contrary, the participation of the Speaker of the House of Representatives and the President Pro Tempore of the Senate in any action, State or federal, as a party or otherwise, shall not constitute a waiver of legislative immunity or legislative privilege of any individual legislator or legislative officer or staff of the General Assembly.

53

one – in which "the State of North Carolina is a named party," it is not obvious to me that the state's public policy applies here. *Cf. Common Cause v. Lewis*, 956 F.3d 246, 250 n.2 (4th Cir. 2020) (noting that the State of North Carolina was named as a party when legislative defendants invoked authority under § 1-72.2).

Most important, while I have no doubt that state law reflects North Carolina's preference that both its executive and legislative branches be permitted to participate in certain federal-court litigation, I am less certain that § 1-72.2 effectuates the necessary designation of the Leaders as agents of the State. *See Bethune-Hill*, 139 S. Ct. at 1951–52. The Leaders argue, and the majority agrees, that they have standing to intervene because state law designates them as representatives of the interests of the State of North Carolina, thereby conferring on them the State's *own* standing to advance the *State*'s undisputed interest in defending the validity and enforcement of its laws. *See* Reply Br. of Appellants at 10; *see also Bethune-Hill*, 139 S. Ct. at 1951 (describing legislative entity authorized by state law to "stand in *for the State*" (emphasis added)); *Hollingsworth*, 570 U.S. at 710 (state law may provide for officials other than attorney general to "speak *for the State* in federal court" (emphasis added)). But the crucial subsection of § 1-72.2 – the one that expressly addresses the Leaders' "standing" to intervene – purports to bestow on the Leaders "standing to intervene *on behalf of the General Assembly*," not the State. N.C. Gen. Stat. § 1-72.2(b) (emphasis added). For purposes of the Leaders' theory of standing, that is a crucial distinction. *See Bethune-Hill*, 139 S. Ct. at 1951, 1953 (distinguishing legislative entity's standing to sue as representative of state from purported standing to sue in legislative capacity). And whatever the State's policy preferences, if it is unprepared to

54

designate the Leaders to speak *on its behalf* in federal court, then the Leaders cannot invoke

the State's own interest in the validity and enforcement of its laws to satisfy Article III's

standing requirements.  *Cf. id.* at 1952 (describing state that has granted its legislature

authority to represent the *state*'s interest in redistricting cases).[8]

## B.

I turn next to the majority's treatment of a second issue:  the nature of the Leaders'

interest under Rule 24(a)(2).  Again, for my purposes, I may assume that the majority is

correct, and that the Leaders have satisfied the interest element.  And, indeed, I am inclined

to agree with the majority on this point:  Even if § 1-72.2 is insufficient to designate the

Leaders as State agents for standing purposes, it reflects a state policy judgment about the

value of legislative participation, and that may be enough to bestow a "significantly

---

[8] At an earlier stage of this litigation, and before the Supreme Court's decision in *Bethune-Hill*, the Leaders advanced a different theory, arguing that they had standing not as agents of the State but as representatives of the distinct institutional interests of North Carolina's legislature.  As the case has progressed, the Leaders have relied on *Bethune-Hill* to focus on the argument they present to us now:  that they have standing because the State has designated them to represent its interests and "stand in for the State" in this litigation. Reply Br. of Appellants at 10 (quoting *Bethune Hill*, 139 S. Ct. at 1951).

Despite what I view as a decided lack of clarity as to the purported "designation" in § 1-72.2, this is the sounder approach.  The circumstances in which a "legislature as legislature" has Article III standing are few and far between.  And in no case has the Supreme Court recognized such standing when a legislature asserts an institutional interest in "the constitutionality of a concededly enacted [statute]."  *See Kaul*, 942 F.3d at 798 (alteration in original) (quoting *Bethune-Hill*, 139 S. Ct. at 1954); *cf. Ariz. State Leg. v. Ariz. Indep. Redistricting Comm'n*, 135 S. Ct. 2652, 2663 (2015) (recognizing distinct legislative interest in legislating, implicated where state law deprived legislature of power to enact redistricting plans).

55

protectable interest" in this litigation for purposes of Rule 24(a)(2).  *See Teague v. Bakker*, 931 F.2d 259, 261 (4th Cir. 1991).[9]

But because it is a matter of our jurisdiction, I feel compelled to note that I have serious doubts about whether the interest question – along with some others addressed by the majority – is properly before us at all.  The district court considered the nature of the Leaders' interest under Rule 24(a)(2) only in its *first* order denying intervention; the second order was expressly limited in scope to whether the Attorney General, in the time since the first order was entered, had declined to provide an adequate defense of S.B. 824.  As the majority recounts, however, the Leaders took no appeal from the district court's first order. In my view, the Leaders' decision not to file a timely appeal from that order divests us of jurisdiction to consider the issues it resolved.  *See Plain v. Murphy Family Farms*, 296 F.3d 975, 980 (10th Cir. 2002) ("If the district court denies [a] motion [to intervene], the proper procedure is to pursue an immediate appeal, and not to file repetitive motions pestering the district court.").

The Leaders argue, and the majority agrees, that because the district court's first order denying intervention was "without prejudice" – allowing for renewal of the motion

---

[9] I also agree with the majority's observation that the district court did not separately consider, at least at any meaningful length, the effect of § 1-72.2 on its "interest" analysis. Instead, the district court ran together two distinct questions:  whether the Leaders have a protectable interest under § 1-72.2 for purposes of Rule 24(a)(2) and whether that interest entitles them to intervene if it is represented already by the Attorney General.  But on my view of the case, the district court's shorthand is both understandable and harmless:  The Attorney General's presumptively adequate representation of the same interest invoked by the Leaders is the central feature of this case, and is by itself grounds for denying the motion to intervene as of right.

56

if in the future the Attorney General "in fact declined to defend the instant lawsuit," 332

F.R.D. at 173 – it did not constitute a final order, so that the Leaders had neither the ability

nor the obligation to take an immediate appeal.  But as to the question of whether the

Leaders had identified a protectable interest under Rule 24(a)(2), the district court's first

order clearly "signaled that it was finished," *Bing v. Brivo Sys., LLC*, 959 F.3d 605, 612

(4th Cir. 2020), and the court gave no "fresh evaluation" to that issue in its second order,

*Hodgson v. United Mine Workers of Am.*, 473 F.2d 118, 127 (D.C. Cir. 1972) (appeal of

second order denying intervention was timely because the district court considered issues

anew).  Under those circumstances, I would apply the familiar rule that "once a conclusive

resolution has been reached . . . a renewed motion for the same relief, or a belated request

for reconsideration, does not reopen the time for appeal."  *Fairley v. Fermaint*, 482 F.3d

897, 901 (7th Cir. 2007); *see also United States v. Boone*, 801 F. App'x 897, 904 (4th Cir.

2020) (Harris, J., concurring in the judgment) (same).  And because the Leaders did not

file this appeal until more than five months after the district court's first order denying

intervention, I suspect we lack jurisdiction to review the issues conclusively resolved by

that order.[10]

---

[10] *Stringfellow v. Concerned Neighbors in Action*, 480 U.S. 370 (1987), on which the majority relies, is not to the contrary.  In that case, despite the general rule that an order denying intervention is immediately appealable, *see Alt*, 758 F.3d at 590, the Supreme Court held that an intervenor could not challenge immediately the limiting conditions placed on its intervention because the district court had granted intervention, thereby permitting it to become a party to the proceedings.  *See Stringfellow*, 480 U.S. at 378–79.  Thus, the intervenor would be able to raise its challenges to the intervention conditions in a post-trial appeal; in the meantime, like any other party, it would have to live with the district court's interlocutory orders.  *See id.*

57

# III.

That leaves the Leaders' request for permissive intervention pursuant to Rule 24(b). Our review of a court order denying permissive intervention under Rule 24(b) is "particularly deferential, and a challenge to the court's discretionary decision to deny leave to intervene must demonstrate a *clear* abuse of discretion in denying the motion." *McHenry v. Comm'r*, 677 F.3d 214, 219 (4th Cir. 2012) (internal quotation marks omitted). The discretion afforded to district courts under Rule 24(b) is "even broader" than that given under Rule 24(a)(2), *R&G Mortg. Corp. v. Fed. Home Loan Mortg. Corp.*, 584 F.3d 1, 11 (1st Cir. 2009), in other words, and in my view, the district court acted well within its broad discretion here.

The district court's decision to deny permissive intervention – while allowing the Leaders to participate as amici – turned on two findings regarding the proceedings before it. First, the district court found that the addition of the Leaders as parties would result in unnecessary complications and delay, both in pretrial proceedings and at trial itself, jeopardizing the court's ability to reach final judgment in a timely manner. Second, the court concluded that intervention by the Leaders was likely to prejudice the plaintiffs, who would be required to address "dueling defendants" with multiple litigation strategies, all

---

Exactly the opposite happened here. The district court denied intervention outright, while acknowledging that circumstances might later change and provide support for a renewed motion to intervene. Had the Leaders filed an appeal from that order, we surely would have concluded that the district court was "finished" with the question of intervention on the record before it and proceeded to consider their arguments on the merits. Given that they failed to do so, however, I do not think we can reach those arguments now.

purporting to represent the same interest – that of the State of North Carolina.  *Cooper*, 332 F.R.D. at 172.  Those twin assessments are "quintessentially the province of the district courts," *Stuart*, 706 F.3d at 350 (quoting *United States v. Smith*, 452 F.3d 323, 332 (4th Cir. 2006)), and I can see no ground for concluding that they represent a "*clear* abuse of discretion," *McHenry*, 677 F.3d at 216.

Moreover, those findings are all that is required to justify a denial of permissive intervention under Rule 24(b)(3), which mandates the consideration of two – and only two – factors:  undue delay and prejudice to existing parties.  *See* Fed. R. Civ. P. 24(b)(3).  I have no quarrel with the idea that a district court also might consider federal-state comity, and a state's policy preference for having multiple representatives in federal court, when reviewing a motion for permissive intervention.  *Cf. Kaul*, 942 F.3d at 803 ("Permissive intervention allows the district court to consider a wide variety of factors, including the needs of federal-state comity . . . .").  But unnecessary delay and prejudice are the "core considerations" under Rule 24(b)(3).  *McHenry*, 677 F.3d at 225.  Once the district court found that the Leaders' intervention was likely to cause undue delay and prejudice the plaintiffs, it did not abuse its discretion by denying permissive intervention on that basis alone.

\*    \*    \*

Acting under statutory command, the Attorney General of North Carolina has represented the members of the State Board of Elections and defended their authority to enforce S.B. 824 from the outset of this case:  He has moved to dismiss certain of the plaintiffs' claims, sought to stay federal-court proceedings, and opposed a preliminary

59

injunction.  Even as we considered this appeal, district court proceedings have continued, and the district court docket reflects the Attorney General's clear intent to defend S.B. 824's constitutionality up to and including a post-election bench trial.  And a quick review of our own docket shows that the Attorney General actively is defending the law's constitutionality on appeal before us.

To resolve the issue at the core of this case, we need only decide whether the district court abused its discretion when it determined – twice – that the Attorney General and the non-partisan attorneys of the North Carolina Department of Justice are discharging their statutory duty to defend the State of North Carolina's interest in the validity and enforcement of its laws.  I see no abuse of discretion in that judgment; indeed, I agree with the district court that the Attorney General has not abdicated his statutory duties and continues to present a reasonable defense of S.B. 824.  With respect for the majority's contrary view, I must dissent.

60