**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 20-1092

NORTH CAROLINA STATE CONFERENCE OF THE NAACP; CHAPEL HILL-CARRBORO NAACP; GREENSBORO NAACP; HIGH POINT NAACP; MOORE COUNTY NAACP; STOKES COUNTY BRANCH OF THE NAACP; WINSTON SALEM – FORSYTH COUNTY NAACP,

Plaintiffs - Appellees,

v.

KEN RAYMOND, in his official capacity as a member of the North Carolina State Board of Elections; STELLA E. ANDERSON, in her official capacity as Secretary of the North Carolina State Board of Elections; DAMON CIRCOSTA, in his official capacity as Chair of the North Carolina State Board of Elections; JEFFERSON CARMON, in his official capacity as a member of the North Carolina State Board of Elections; DAVID C. BLACK, in his official capacity as a member of the North Carolina State Board of Elections,

Defendants - Appellants,

PHILIP E. BERGER, in his official capacity as President Pro Tempore of the North Carolina Senate, and TIMOTHY K. MOORE, in his official capacity as Speaker of the North Carolina House of Representatives,

Intervenors.

------------------------------

DEMOCRACY NORTH CAROLINA; ROY COOPER; NATIONAL REDISTRICTING FOUNDATION,

Amici Supporting Appellees.

Appeal from the United States District Court for the Middle District of North Carolina, at Greensboro. Loretta C. Biggs, District Judge. (1:18-cv-01034-LCB-LPA)

—————————————

Argued: September 11, 2020                    Decided: December 2, 2020

—————————————

Before HARRIS, RICHARDSON, and QUATTLEBAUM, Circuit Judges.

—————————————

Reversed by published opinion. Judge Richardson wrote the opinion, in which Judge Harris and Judge Quattlebaum joined.

—————————————

**ARGUED:** Olga E.V. de Brito, NORTH CAROLINA DEPARTMENT OF JUSTICE, Raleigh, North Carolina, for Appellants. David Henry Thompson, COOPER & KIRK PLLC, Washington, D.C., for Intervenors. John Charles Ulin, TROYGOULD PC, Los Angeles, California, for Appellees. **ON BRIEF:** Joshua H. Stein, Attorney General, Paul M. Cox, Special Deputy Attorney General, NORTH CAROLINA DEPARTMENT OF JUSTICE, Raleigh, North Carolina, for Appellants. Irving Joyner, Cary, North Carolina; Penda D. Hair, Washington, D.C., Caitlin A. Swain, Kathleen Roblez, FORWARD JUSTICE, Durham, North Carolina; Andrew T. Tutt, James W. Cooper, Jeremy C. Karpatkin, Stephen K. Wirth, Jacob Zionce, Thomas La Voy, ARNOLD & PORTER KAYE SCHOLER LLP, Washington, D.C., for Appellees. Peter A. Patterson, Nicole J. Moss, COOPER & KIRK PLLC, Washington, D.C.; Nathan A. Huff, PHELPS DUNBAR LLP, Raleigh, North Carolina, for Intervenors. Marc E. Elias, Aria C. Branch, Washington, D.C., Abha Khanna, PERKINS COIE LLP, Seattle, Washington, for Amicus National Redistricting Foundation. Sean Morales-Doyle, Myrna Pérez, NYU SCHOOL OF LAW, New York, New York; Nathaniel B. Edmonds, Washington, D.C., Aaron Charfoos, Chicago, Illinois, Jane H. Yoon, New York, New York, Steven A. Marenberg, PAUL HASTINGS LLP, Los Angeles, California, for Amicus Democracy North Carolina. Robert E. Harrington, Adam K. Doerr, Erik R. Zimmerman, Travis S. Hinman, ROBINSON, BRADSHAW & HINSON, P.A., Charlotte, North Carolina, for Amicus Governor Roy Cooper.

2

RICHARDSON, Circuit Judge:

This case challenges the constitutionality of a 2018 North Carolina law requiring voters to present photographic identification ("2018 Voter-ID Law"). This law was passed after this Court found that North Carolina acted with racially discriminatory intent in enacting a 2013 omnibus voting law ("2013 Omnibus Law"), which included a voter-ID requirement. *See N.C. State Conf. of the NAACP v. McCrory*, 831 F.3d 204, 215 (4th Cir. 2016). The Challengers allege that the 2018 Voter-ID Law was enacted with the same discriminatory intent as the 2013 Omnibus Law. And the district court preliminarily agreed, finding that the Challengers were likely to succeed on the merits of their constitutional claims and issuing a preliminary injunction against the law's enforcement. *See N.C. State Conf. of the NAACP v. Cooper*, 430 F. Supp. 3d 15, 54 (M.D.N.C. 2019). We must determine whether this was an abuse of discretion.

The outcome hinges on the answer to a simple question: How much does the past matter? To the district court, the North Carolina General Assembly's recent discriminatory past was effectively dispositive of the Challengers' claims here. But the Supreme Court directs differently. *See Abbott v. Perez*, 138 S. Ct. 2305, 2324 (2018). A legislature's past acts do not condemn the acts of a later legislature, which we must presume acts in good faith. *Id.* So because we find that the district court improperly disregarded this principle by reversing the burden of proof and failing to apply the presumption of legislative good faith, we reverse.

3

## I.    Background

From 1965 until the summer of 2013, North Carolina was one of several states required to obtain federal permission under the Voting Rights Act before enacting any voting law.  Obtaining that permission required a state to present persuasive evidence that the proposed state law had neither the purpose nor effect of "diminishing the ability of any citizens" to vote "on account of race or color."  52 U.S.C. § 10304; *see South Carolina v. United States*, 898 F. Supp. 2d 30, 33 (D.D.C. 2012).

While under that preclearance regime, the General Assembly introduced a voter-ID bill in 2011.  The bill passed both chambers, but the Governor vetoed it.  In the spring of 2013, the General Assembly tried again.  In preparation, at various points in 2012 and 2013, the General Assembly requested information on the use of voting practices by race.  *See N.C. State Conf. of the NAACP v. McCrory*, 182 F. Supp. 3d 320, 489 (M.D.N.C. 2016).  While the General Assembly considered the new voter-ID bill, the Supreme Court rejected the Voting Rights Act's coverage formula that had required that North Carolina obtain preclearance.  *See Shelby Cnty. v. Holder*, 570 U.S. 529, 537 (2013).

Freed of the preclearance requirement, the General Assembly expanded the proposed voter-ID bill into "omnibus legislation" that included a "number of voting restrictions."  *McCrory*, 831 F.3d at 216–18.  The omnibus bill passed along party lines, and the Governor signed it into law.  *Id.* at 218.

In a challenge to this 2013 Omnibus Law, we enjoined five of its voting restrictions: (1) the elimination of preregistration; (2) the elimination of out-of-precinct provisional voting; (3) the elimination of same-day registration; (4) the reduction of the time for early

4

voting; and (5) the requirement of a photo ID to vote. *Id.* at 242. Reversing the district court, we found that each of these restrictions had been unlawfully enacted with racially discriminatory intent. *Id.* at 215. Those five restrictions "unmistakably" reflected the General Assembly's motivation to "entrench itself . . . by targeting voters who, based on race, were unlikely to vote for the majority party," *id.* at 233, and did so with "almost surgical precision" using the data on voting practices, *id.* at 214. We noted that after *Shelby County* the General Assembly expanded the bill's restrictions and amended the voter-ID provision to exclude "many of the alternative photo IDs used by African Americans," retaining "only the kinds of IDs that white North Carolinians were more likely to possess." *Id.* at 216. The Supreme Court denied certiorari. *North Carolina v. N.C. State Conf. of the NAACP*, 137 S. Ct. 1399 (2017).

## A.    The enactment of the 2018 Voter-ID Law

After we enjoined the 2013 Omnibus Law, legislative leaders called for a new voter-ID law. The General Assembly first asked the voters to approve a voter-ID amendment to the North Carolina Constitution. 2018 N.C. Sess. Laws 128.[1] The amendment required that all voters in North Carolina "offering to vote in person [] present photographic identification before voting" and directed that the General Assembly "shall enact general laws governing the requirements of such photographic identification, which may include

---

[1] The North Carolina Constitution allows the legislature to place amendments on the ballot by a three-fifths vote of each chamber. N.C. CONST. art. XIII, § 4.

exceptions."  N.C. CONST. art VI, § 2(4).  Fifty-five percent of the voters approved the constitutional amendment.

In that same election, the Republicans lost their supermajorities in both chambers of the General Assembly.  During the lame-duck term following the election, the General Assembly enacted the 2018 Voter-ID Law.  Its stated purpose was "to implement the constitutional amendment requiring photographic identification to vote."  2018 N.C. Sess. Laws 144.  After the Governor vetoed the law, both chambers voted to override the veto and enact the law.

## B.    The 2018 Voter-ID Law's provisions

Subject to exceptions, the 2018 Voter-ID Law requires North Carolinian voters to produce photographic identification to vote in person or by absentee ballot.  2018 N.C. Sess. Laws 144, § 1.2(a).  The law at first listed ten forms of authorized ID:

1.  North Carolina driver's licenses;
2.  Other nontemporary IDs issued by the Division of Motor Vehicles;
3.  United States passports;
4.  North Carolina voter photo ID cards;
5.  Tribal enrollment cards issued by state- or federally recognized tribes;
6.  Certain student IDs issued by post-secondary institutions;
7.  Certain employee IDs issued by a state or local government entity;
8.  Out-of-state driver's licenses and nonoperator IDs (if the voter is newly registered);
9.  Military IDs; and
10. Veterans IDs.

*Cooper*, 430 F. Supp. 3d at 36 (footnote omitted) (citing 2018 N.C. Sess. Laws 144, § 1.2(a)).  Military and veteran IDs qualify "regardless of whether the identification contains a printed expiration or issuance date."  § 1.2(a).  All other forms of ID must be "valid and unexpired" or expired for less than one year (except that voters over the age of

6

sixty-five may use an expired ID so long as it was unexpired on their sixty-fifth birthday). *Id.*

To mitigate any hardships, the 2018 Voter-ID Law establishes three ways to vote for those lacking a qualifying ID. First, registered voters may obtain a free voter-photo-ID card by visiting their county board of elections. § 1.1(a). These IDs are also available during one-stop early voting, where one can get a free ID and vote the same day. *See id.*; N.C. GEN. STAT. §§ 163-227.2(b), 163-227.6(a). No documentation is needed to get the free ID: voters must simply provide their name, date of birth, and last four digits of their social security number. § 1.1(a). Second, if registered voters show up to the polls without a qualifying ID, they may fill out a provisional ballot. § 1.2(a). Their vote will be counted if they present an ID—including a new voter-photo-ID card—to the elections board no later than the day before the election is canvassed. *Id.* Last, three groups of people are exempted from the photo-ID requirement: (1) people with religious objections; (2) survivors of recent natural disasters who cannot present a qualifying ID because of that natural disaster; and (3) people with a "reasonable impediment" to obtaining or presenting a qualifying ID. *Id.* Voters in these groups may cast a provisional ballot if they complete an affidavit that affirms their identity and gives their reason for not presenting a qualifying ID. *Id.* Their votes must count unless the five-member bipartisan county board of elections unanimously finds that there are "grounds to believe the affidavit is false." *Id.*; *see also Cooper*, 430 F. Supp. 3d at 40 (citing 08 N.C. ADMIN. CODE 17.0101(b)). The law includes a list of qualifying "reasonable impediments," including having lost or stolen identification, having applied for but not yet received proper identification, and being unable to obtain

7

identification because of disability, illness, work schedule, family responsibilities, or a lack of transportation or documentation. § 1.2(a). But the law also includes a catch-all provision that allows voting without a photo ID for any "other reasonable impediment" to obtaining or presenting a qualifying ID. *Id.*

In addition to imposing a voter-ID requirement, the 2018 Voter-ID Law permits each political party in North Carolina "to designate up to 100 additional at-large observers who are residents of the State who may attend any voting place in the State." § 3.3. It also expands the grounds on which ballots can be challenged to include when "[t]he registered voter does not present photo identification in accordance with [the 2018 Voter-ID Law]." § 3.1(c).

## C.    The current lawsuit

The day after the 2018 Voter-ID Law was enacted, the Challengers sued the members of the North Carolina State Board of Elections ("Defendants") and the Governor of North Carolina[2] in their official capacities. The complaint challenged three provisions of the law—the voter-ID requirements, the increase in the number of poll observers, and the expansion of reasons for challenging a ballot. According to the Challengers, these provisions violated § 2 of the Voting Rights Act and the Fourteenth and Fifteenth Amendments because they had been enacted with racially discriminatory intent.

More than nine months after filing suit, the Challengers first requested that the district court enter a preliminary injunction against enforcement of the challenged

---

[2] Governor Cooper was dismissed from the lawsuit as an improper defendant.

8

provisions. After a hearing, the district court granted the preliminary injunction for the voter-ID and ballot-challenge provisions after finding that the Challengers were likely to succeed on their constitutional claims. *Cooper*, 430 F. Supp. 3d at 53–54. Defendants appealed, and we have jurisdiction under 28 U.S.C. § 1292(a)(1).

### D. Standing

To bring this suit, the Challengers—chapters of the NAACP—require some form of organizational standing. The district court found that the Challenger organizations have standing to sue on their own behalf because "they will need to divert resources away from their planned voter-engagement efforts to respond to S.B. 824's requirements." *Cooper*, 430 F. Supp. 3d at 24 n.3.

When an action "perceptibly impair[s]" an organization's ability to carry out its mission and "consequent[ly] drain[s] . . . the organization's resources," "there can be no question that the organization has suffered injury in fact." *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982). After the district court ruled in this case, we clarified that the *Havens Realty* standard is not met simply because an organization makes a "unilateral and uncompelled" choice to shift its resources away from its primary objective to address a government action. *CASA de Maryland, Inc. v. Trump*, 971 F.3d 220, 238 (4th Cir. 2020). We need not consider the effect of that decision on the Challengers' standing to sue on their own behalf, however, because the Challengers in any event have standing on a representational theory. An organizational plaintiff may sue on behalf of its members if: (1) its members would have standing if they sued individually; (2) the interests the lawsuit seeks to raise "are germane to the organization's purpose"; and (3) the claims and

9

type of relief asserted in the complaint do not require the individual members' participation in the lawsuit. *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977). The Challengers meet those requirements.

Three days before oral argument, however, the Challengers moved to dismiss this appeal as moot based on developments in a parallel case in state court. In early 2020, the North Carolina Court of Appeals reversed a state trial court and ordered that the 2018 Voter-ID Law be preliminarily enjoined. *Holmes v. Moore*, 840 S.E.2d 244, 266–67 (N.C. Ct. App. 2020). The trial court entered that injunction in early August 2020 and set trial for April 2021. Based on this state-court injunction, the Challengers allege "[n]either party can win any effective relief by winning this appeal" because the state-court preliminary injunction restrains the same conduct as the federal preliminary injunction and will remain in place until the federal district court enters a final judgment. Appellants' Motion to Dismiss as Moot 6.

But improbability and impossibility are not the same thing. A suit becomes moot, and we lose jurisdiction, "when it is *impossible* for a court to grant any effectual relief whatever to the prevailing party." *Chafin v. Chafin*, 568 U.S. 165, 172 (2013) (emphasis added) (internal citations omitted). "As long as the parties have a concrete interest, however small, in the outcome of the litigation, the case is not moot." *Id.* A *final* state-court judgment that the 2018 Voter-ID Law violates the North Carolina state constitution *might* make relief in this federal appeal impossible. *See Nationwide Mut. Ins. Co. v. Burke*, 897 F.2d 734, 739 (4th Cir. 1990). But neither the federal nor state court has ruled on the merits. *Cf. California v. Azar*, 911 F.3d 558, 569 (9th Cir. 2018).

10

The federal trial on the merits was recently continued from its originally scheduled date in January 2021, so it is not clear that the federal district court will issue a final judgment before the trial in state court. We decline to presume that the state and federal trial dates will not continue to change or that, even if the federal trial occurs first, the federal court will issue a final ruling on the merits before the state court. Nor do we presume that the state court will find in the Challengers' favor and issue a permanent injunction. So the present appeal may well matter, and the case is not moot. *See Chafin*, 568 U.S. at 172.

## II.  Discussion

We review the district court's preliminary injunction for an abuse of discretion. *Quince Orchard Valley Citizens Ass'n, Inc. v. Hodel*, 872 F.2d 75, 78 (4th Cir. 1989). "A district court abuses its discretion 'by applying an incorrect preliminary injunction standard, by resting its decision on a clearly erroneous finding of a material fact, or by misapprehending the law with respect to underlying issues in litigation.'" *Id.* (quoting *Goldie's Bookstore v. Super. Ct. of State of Cal.*, 739 F.2d 466, 470 (9th Cir. 1984)). We review factual findings for clear error and legal conclusions de novo. *Pashby v. Delia*, 709 F.3d 307, 319 (4th Cir. 2013) (citing *Dewhurst v. Century Aluminum Co.*, 649 F.3d 287, 290 (4th Cir. 2011)).

Obtaining a preliminary injunction requires the Challengers to establish that (1) they are likely to succeed on the merits of their claim, (2) they are likely to suffer irreparable harm without an injunction, (3) the balance of equities tilts in their favor, and (4) issuing an injunction is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). To prevail on the merits of their constitutional challenges, these Challengers

11

had to prove that the 2018 Voter-ID Law was passed with discriminatory intent and has an actual discriminatory impact. *McCrory*, 831 F.3d at 231; *see also Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265 (1977); *Irby v. Va. State Bd. of Elections*, 889 F.2d 1352, 1355 (4th Cir. 1989).

In its only precedent that addresses the constitutionality of a voter-ID law, the Supreme Court held that Indiana's voter-ID law was constitutional. *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 194–97, 200–04 (2008) (plurality). It reasoned that the minimal burdens imposed on voters who lacked a qualifying ID to comply with the law were outweighed by the state's legitimate interests in preventing voter fraud, election modernization, and safeguarding voter confidence. *Id.* But the plaintiffs there did not allege that the law had been passed with racially discriminatory intent. So although *Crawford* lays down important principles for evaluating the burdens and benefits of voter-ID laws, it does not directly answer the discriminatory-intent issue before us.

Determining whether a statute was enacted with discriminatory intent is a factual question involving a two-step process. *Hunt v. Cromartie*, 526 U.S. 541, 549 (1999). First, the Challengers bear the burden of showing that racial discrimination was a "'substantial' or 'motivating' factor behind enactment of the law." *Hunter v. Underwood*, 471 U.S. 222, 228 (1985). Satisfying that burden requires looking at the four factors from the Supreme Court's *Arlington Heights* decision: (1) historical background; (2) the specific sequence of events leading to the law's enactment, including any departures from the normal legislative process; (3) the law's legislative history; and (4) whether the law "bears more heavily on one race than another." *Arlington Heights*, 429 U.S. at 265–69. And in doing

12

so, the district court *must* afford the state legislature a "presumption" of good faith. *Abbott*, 138 S. Ct. at 2324. For "a finding of past discrimination" neither shifts the "allocation of the burden of proof" nor removes the "presumption of legislative good faith." *Id.*; *see also City of Mobile v. Bolden*, 446 U.S. 55, 74 (1980) ("[P]ast discrimination cannot, in the manner of original sin, condemn governmental action that is not itself unlawful."); *McCrory*, 831 F.3d at 241 (finding that we cannot "freeze North Carolina election law in place" as it existed before the 2013 Omnibus Law).

Only if the Challengers meet their burden to show discriminatory intent do we turn to the second step. There "the burden shifts to the law's defenders to demonstrate that the law would have been enacted without" racial discrimination. *Hunter*, 471 U.S. at 228. It is only then that judicial deference to the legislature "is no longer justified." *Arlington Heights*, 429 U.S. at 265–66. Without deference and with the burden placed firmly on the legislature, a district court at the second step must "scrutinize the legislature's *actual* non-racial motivations to determine whether they *alone* can justify the legislature's choices." *McCrory*, 831 F.3d at 221.

The district court here considered the General Assembly's discriminatory intent in passing the 2013 Omnibus Law to be effectively dispositive of its intent in passing the 2018 Voter-ID Law. In doing so, it improperly flipped the burden of proof at the first step of its analysis and failed to give effect to the Supreme Court's presumption of legislative good faith. These errors fatally infected its finding of discriminatory intent. And when that finding crumbles, the preliminary injunction falls with it.

13

## A.    Burden-shifting and the presumption of good faith

*Abbott* could not be more clear in allocating the burden of proof and applying the presumption of good faith.  Yet the district court failed to hold the Challengers to their burden of proving the General Assembly's discriminatory intent.  And it failed to apply— or even mention—the presumption of legislative good faith to which the General Assembly was entitled.  *See Abbott*, 138 S. Ct. at 2324–25.  Instead, based on our decision in *McCrory*, the court forced the General Assembly to "bear the risk of nonpersuasion with respect to intent."  *Cooper*, 430 F. Supp. 3d at 32 (quoting *United States v. Fordice*, 505 U.S. 717, 747 (1992) (Thomas, J., concurring)).  This was an unmistakable error.

We first note that this case is much like *Abbott*.  There, a three-judge panel found that the 2013 Texas Legislature had acted with discriminatory intent in passing a new redistricting plan after its 2011 plan was denied preclearance under the Voting Rights Act. *Abbott*, 138 S. Ct. at 2318.  The panel first stated that the burden was on the challengers but then flipped it based on *who* passed the 2013 law:  a Legislature with "substantially similar" membership and the "same leadership" that passed the flawed 2011 plan.  *Perez v. Abbott*, 274 F. Supp. 3d 624, 645–46, 648 n.37 (W.D. Tex. 2017).  Because *who* passed both plans remained the same, the court "flip[ped] the evidentiary burden on its head," requiring Texas to show that the 2013 Legislature had "purged the 'taint'" of the unlawful 2011 plan.  *Abbott*, 138 S. Ct. at 2324–25.  The Supreme Court reversed this "fundamentally flawed" analysis.  *Id.* at 2326.  The district court had erred because it had "reversed the burden of proof [and] [] imposed on the State the obligation of proving that the 2013 Legislature had experienced a true 'change of heart.'"  *Id.* at 2325 (quoting *Perez*,

14

274 F. Supp. 3d at 649). Its finding of discriminatory intent had "relied overwhelmingly on what it perceived to be the 2013 Legislature's duty to show that it had purged the bad intent of its predecessor." *Id.* at 2326 n.18. What was relevant was "the intent of the 2013 Legislature." *Id.* at 2327. And that legislature was to be afforded "the presumption of legislative good faith" and not condemned based on prior bad acts. *Id.* at 2324. Turning to the evidence presented, the Supreme Court found it "plainly insufficient" to overcome this presumption and meet the plaintiffs' burden. *Id.* at 2327.

The district court here made the same mistake as the panel in *Abbott* without even trying to distinguish the Supreme Court's holding. Explaining that it is "'eminently reasonable to make the State bear the risk of non-persuasion with respect to intent' when the very same people who passed the old, unconstitutional law passed the new," *Cooper*, 430 F. Supp. 3d at 32, the district court noted that the General Assembly did not "try[] to cleanse the discriminatory taint," *id.* at 43, or "tak[e] steps to purge the taint of discriminatory intent," *id.* at 35. *See Veasey v. Abbott*, 888 F.3d 792, 801 (5th Cir. 2018) (reversing the district court for presuming that a new voter-ID law was "fatally infected" by the unconstitutional discrimination of a past voter-ID law that had been struck down). These were not merely "stray comments." *Abbott*, 138 S. Ct. at 2325. "On the contrary, they were central to the court's analysis," *id.*, for they made explicit the burden-shifting that the court engaged in while assessing the *Arlington Heights* factors.

The district court penalized the General Assembly because of who they were, instead of what they did. When discussing the sequence of events leading to the 2018 Voter-ID Law's enactment, the district court discounted the normalcy of the legislative

15

process to focus on *who* drafted and passed the law. *Cooper*, 430 F. Supp. 3d at 31. "[W]ho" drafted the 2018 Voter-ID Law was "many of the same legislative leaders who championed [the 2013 Omnibus Law]." *Id.* at 31–32 (citing the record). And *who* passed the 2018 Voter-ID Law was many of the same legislators who "had previously voted for [the 2013 Omnibus Law]." *Id.* at 31.

The question of *who* reared its head again in the court's discussion of the 2018 Voter-ID Law's legislative history. In that section, the district court emphasized that the General Assembly's positions had "remained virtually unchanged" between *McCrory* and the enactment of the 2018 Voter-ID Law. *Id.* at 33. And the court assumed that the racial data remained in the minds of the legislators: "[T]hey need not have had racial data in hand to still have it in mind." *Id.* at 34–35. By focusing on *who* passed the 2018 Voter-ID Law and requiring the General Assembly to purge the taint of the prior law, the district court flipped the burden and disregarded *Abbott*'s presumption.

The district court's *who* argument also overlooked the state constitutional amendment. Fifty-five percent of North Carolinian voters constitutionally required the enactment of a voter-ID law and designated to the General Assembly the task of enacting the law. N.C. CONST. art. VI, § 2(4). That constitutional amendment served as an independent intervening event between the General Assembly's passage of the 2013 Omnibus Law and its enactment of the 2018 Voter-ID Law. *See Abbott*, 138 S. Ct. at 2325 (noting that the plans the 2013 Texas Legislature had enacted "had been developed by the Texas court pursuant to instructions" from the Supreme Court). This constitutional amendment undercuts the district court's tenuous "who" argument. For after the

16

constitutional amendment, the people of North Carolina had interjected their voice into the process, mandating that the General Assembly pass a voter-ID law.

None of this suggests that the 2013 General Assembly's discriminatory intent in enacting the 2013 Omnibus Law is irrelevant.  *See Abbott*, 138 S. Ct. at 2327.  But the appropriate place to consider the 2013 Omnibus Law is under the "historical background" factor.  *See Arlington Heights*, 429 U.S. at 267; *see also Abbott*, 138 S. Ct. at 2325 (finding that the historical background leading to the law's enactment is but "'one evidentiary source' relevant to the question of intent" (quoting *Arlington Heights*, 429 U.S. at 267)). And yet the "historical background" section is the one part of the district court's discriminatory-intent analysis where the court did not discuss the 2013 Omnibus Law.

### B.    The remaining evidence

Once the proper burden and the presumption of good faith are applied, the Challengers fail to meet their burden of showing that the General Assembly acted with discriminatory intent in passing the 2018 Voter-ID Law.  *See Abbott*, 138 S. Ct. at 2327. While North Carolina's historical background favors finding discriminatory intent, *Cooper*, 430 F. Supp. 3d at 25 ("No one disputes that North Carolina 'has a long history of race discrimination generally and race-based vote suppression in particular.'" (quoting *McCrory*, 831 F.3d at 223)), the facts considered under the remaining *Arlington Heights* factors—the sequence of events leading to enactment, legislative history, and disparate impact—cannot support finding discriminatory intent.  We discuss each factor in turn.

17

### 1.     Sequence of events leading to enactment

The district court acknowledged that there were no procedural irregularities in the sequence of events leading to the enactment of the 2018 Voter-ID Law. *Cooper*, 430 F. Supp. 3d at 30. "[O]f course, a legislature need not break its own rules to engage in unusual procedures." *McCrory*, 831 F.3d at 228. But the remaining evidence of the legislative process otherwise fails to "spark suspicion" of impropriety in the 2018 Voter-ID Law's passage. *Arlington Heights*, 429 U.S. at 269.

The 2018 Voter-ID Law underwent five days of legislative debate and was permitted time for public comment. *Cooper*, 430 F. Supp. 3d at 31 (citing the record); *see Abbott*, 138 S. Ct. at 2328–29 ("[W]e do not see how the brevity of the legislative process can give rise to an inference of bad faith—and certainly not an inference that is strong enough to overcome the presumption of legislative good faith."). Twenty-four amendments were offered and thirteen, including several proposed by the law's opponents, were adopted. J.A. 2008–09, 2092–97. In all, the enactment was not the "abrupt" or "hurried" process that characterized the passage of the 2013 Omnibus Law. *See McCrory*, 831 F.3d at 228–29 (finding "compelling" evidence of discriminatory intent in the passage of omnibus legislation that was "the most restrictive voting law North Carolina has seen since the era of Jim Crow" because it was enacted right after *Shelby County* invalidated the preclearance regime, passed both chambers in three days, received only two hours of debate in the House, and provided House members with no chance to propose amendments); *see also Abbott*, 138 S. Ct. at 2329 (finding no suspicion of discriminatory intent from the use

18

of a legislative special session, which eliminated the need to comply with certain legislative rules).

The 2018 Voter-ID Law also enjoyed bipartisan support: four Democratic legislators joined their Republican colleagues in voting for the 2018 Voter-ID Law. J.A. 2081–89. One of those legislators—Senator Joel Ford, a Black Democrat—sponsored the bill. *Cooper*, 430 F. Supp. 3d at 31. But the district court discounted this bipartisanship in general, failing to even mention two of the Democrats who first voted for the bill. *See id.* Senator Ford, the district court explained, had later admitted that he considered switching parties while the 2018 Voter-ID Law was being drafted. *Id.* Relying on this "admission," the district court found it was "a bit misleading" to say that the 2018 Voter-ID Law had bipartisan support. *Id.*[3] But regardless of his unacted-upon musings, Senator Ford was a Black Democrat who sponsored the 2018 Voter-ID Law. His input in its drafting and his votes to pass the bill deserve at least the same weight as those of any other legislator— including the three other Democrats that voted for the bill—in the General Assembly in 2018. *See Lee v. Va. State Bd. of Elections*, 843 F.3d 592, 603 (4th Cir. 2016) (relying favorably on the votes of two non-Republicans—one Democrat and one Independent); *McCrory*, 831 F.3d at 227 (crediting the votes of five House Democrats that voted for the pre-*Shelby County* version of the 2013 Omnibus Law); *cf. South Carolina*, 898 F. Supp.

---

[3] One might question the relevance of bipartisanship in a discriminatory-intent analysis. Is political affiliation a reliable indicator of discriminatory intent? Is a minority legislator's support for a law irrelevant if he is a Republican or merely considered becoming a Republican? But, as both *McCrory* and *Lee* did before us, we consider bipartisanship.

2d at 44 (commenting favorably that changes to the law were led by two Republicans and one Democrat). Whatever one thinks of the weight of bipartisanship, the district court erred in discounting Senator Ford and ignoring the other supporting Democrats.

And finally, the district court again overlooked the state constitutional amendment as part of the sequence of events leading to the 2018 Voter-ID Law's enactment. There is no question that the voters of North Carolina constitutionally mandated that the legislature enact a voter-ID law. At the very least, this intervening event undermined the district court's inappropriate linking of the 2013 Omnibus Law and the 2018 Voter-ID Law.[4]

### 2. Legislative history

The district court also concluded that the 2018 Voter-ID Law's legislative history supported finding discriminatory intent. *Cooper*, 430 F. Supp. 3d at 35. In making that determination, the district court noted that Republican legislative leaders strongly opposed *McCrory*, remained committed to passing a voter-ID law that would withstand future court challenges, and did not change their positions, goals, or motivations between the passage of the 2013 Omnibus Law and the 2018 Voter-ID Law. *Id.* at 33.[5] But these findings

---

[4] The Governor's veto was overridden by supermajorities elected under racially gerrymandered maps. But this sheds little light on the motivations of those overriding legislators. At most the racially gerrymandered maps tell us about the motivations of the mapmakers and the legislators to whom they answered. They do not dictate a later General Assembly's intent in passing different legislation. *Cf. Greater Birmingham Ministries v. Sec'y of State for the State of Ala.*, 966 F.3d 1202, 1227 (11th Cir. 2020) ("[T]he statements Plaintiffs identify were not made about the law at issue in this case and thus do not evidence discriminatory intent behind it.").

[5] With respect to the 2013 Omnibus Law that was so critical to the district court's analysis, the court stated that the General Assembly requested and received racial voting (Continued)

impermissibly stemmed from the comments of a few individual legislators, *see McCrory*, 831 F.3d at 229, and relied too heavily on comments made by the bill's opponents, *see Fieger v. U.S. Att'y Gen.*, 542 F.3d 1111, 1119 (6th Cir. 2008). They also go against inferring "good faith" on the part of the legislature, which we are required to do: decrying a court opinion holding that you acted improperly in the past is not evidence that you have acted improperly again. *See Abbott*, 138 S. Ct. at 2324, 2327 (explaining that the legislature's stated objective of quickly bringing the litigation to a close "is entirely reasonable and certainly legitimate" when there "is no evidence that the Legislature's aim was to gain acceptance of plans that it knew were unlawful").

The district court makes hay out of the fact that a proposed amendment to include public-assistance IDs failed. *Cooper*, 430 F. Supp. 3d at 34 ("The decision not to include this form of identification in [the 2018 Voter-ID Law], despite the attention given to it in *McCrory*, is, as it was with [the 2013 Omnibus Law], particularly suspect.").[6] But the

---

data "[f]ollowing" the issuance of *Shelby County* in June 2013. *Cooper*, 430 F. Supp. 3d at 26. To support this timing, it cites our prior decision in *McCrory*, which we do not read as taking a position on the data receipt's timing. *See McCrory*, 831 F.3d at 216. Our review of the record suggests, at least preliminarily, that most of the racial voting data was requested and received by the General Assembly while North Carolina was subject to the preclearance regime. *See McCrory*, 182 F. Supp. 3d at 489; *see also* J.A. 52, 53. The *McCrory* district court only noted one email containing racial data about same-day voter registration—the subject of one of five voting restrictions enacted as part of the 2013 Omnibus Law—that a member of the General Assembly received after *Shelby County*, on the same day the House voted to pass the bill in July 2013. 182 F. Supp. 3d at 490.

[6] Several months after the district court's decision, the General Assembly amended the 2018 Voter-ID Law to include federal and state public-assistance IDs. 2020 N.C. Sess. 17.

21

district court did not consider the context in which that amendment failed.  While the 2018 Voter-ID Law was in the House, Representative Richardson introduced an amendment to include public-assistances IDs that were "issued by a branch, department, agency, or entity of the [] United States or this State for a government program of public assistance."  J.A. 2302.  Representative Lewis spoke in opposition.  J.A. 1761–63.  He articulated concerns that "we have no way to impose our standards on the Federal Government" and that "[t]here is no provision of this amendment that would even require the ID to have a picture."  J.A. 1761–62.  Representative Richardson "accept[ed] the justification [he] gave" for opposing the bill[7] and asked if he would be amendable to considering an amendment that only included public-assistance IDs issued by state agencies.  J.A. 1763.  Representative Lewis said that he would, and the two agreed to collaborate on such an amendment (though it never came to fruition).  J.A. 1763.  The House then voted, and the amendment failed.  J.A. 1764.  But this dialogue does nothing to suggest that the amendment failed due to discriminatory intent.

In any case, the district court erred in focusing on the public-assistance amendment.  For even if it passed, the proposed amendment seems to cover a null set.  As it would not have added any actual IDs to the list of qualifying IDs, it cannot be evidence of discriminatory intent.  Recall that each of the qualifying IDs must include a photograph.

---

[7] With the benefit of hindsight, we might conclude that while the amendment itself does not mention a photograph, its placement within the bill would have required public-assistance IDs to have a photograph.  But no legislator challenged Representative Lewis's contention.  *See* J.A. 1761–64.

22

*See* J.A. 1761–64.  The parties put forth evidence about the types of public-assistance IDs that do and do not have photographs.  The Defendants provided evidence that state public-assistance IDs do not include photographs.  *See* J.A. 2106–09.  The Challengers' lone counter was that several North Carolina housing authorities issue photo IDs to their residents.  *See* J.A. 2318–27.  But in North Carolina it appears that housing authorities are local government agencies—not state government agencies.  *See Huntley v. Pandya*, 534 S.E.2d 238, 239 (N.C. Ct. App. 2000).  And the proposed amendment only included public-assistance IDs issued by a federal or state entity.  J.A. 2302 ("An identification card issued by a branch, department, agency, or entity of the [] United States or this State for a government program of public assistance.").  Thus, as far as this record reveals, this proposed amendment would not cover any existing public-assistance IDs.  And the failure to adopt a meaningless amendment cannot support finding discriminatory intent.

The other amendment that the district court focused on—and discounted—addressed a concern we had with the 2013 Omnibus Law:  voter-ID for absentee ballots. *Cooper*, 430 F. Supp. 3d at 33–34.  In *McCrory*, we found the lack of an ID requirement for absentee voting suspect since absentee voting is disproportionately used by white voters and evidence of voting fraud is primarily related to absentee voting.  831 F.3d at 230, 235. Although the district court acknowledged that the 2018 Voter-ID Law "correct[s] this discrepancy," the court largely discounted the amendment and characterized the law's proponents as "reluctant" and "unconcerned about absentee voter fraud."  *Cooper*, 430 F. Supp. 3d at 34.  This is because, according to the district court, the initial law did not require an ID to vote absentee and the amendment was added after a significant absentee voting

23

scandal and in response to "intensifying public pressure." *Id.* Much like the district court's analysis of bipartisanship, the court acknowledges a significant difference between this law and the one in *McCrory* but then quickly discounts it. Again, the district court seems to be presuming bad faith by noting that the legislature was unconcerned with absentee-voting fraud in *McCrory* and surmising that they remained "unconcerned" here until a scandal forced their hand. That the legislature made this change should at least count for something.

The 2018 Voter-ID Law's legislative history is otherwise unremarkable. Nothing here suggests that the General Assembly used racial voting data to disproportionately target minority voters "with surgical precision." *McCrory*, 831 F.3d at 214, 216–17. And neither party nor the district court has brought to our attention any discriminatory remarks made by legislators during or about the legislation's passage.

### 3.    Impact of the official action

The district court also erred in evaluating the racial impact of the 2018 Voter-ID Law. *See Arlington Heights*, 429 U.S. at 564 (considering whether "[t]he impact of the official action[s] . . . 'bears more heavily on one race than another'" (quoting *Washington v. Davis*, 426 U.S. 229, 242 (1976))). In evaluating the impact of the 2018 Voter-ID Law, the district court failed to adequately consider its mitigating provisions.

We accept the district court's finding that minority voters disproportionately lack the types of ID required by the 2018 Voter-ID Law. But the 2018 Voter-ID Law contains three provisions that go "out of [their] way to make its impact as burden-free as possible." *Lee*, 843 F.3d at 603. First, the law provides for registered voters to receive free voter-ID

24

cards without the need for corroborating documentation. 2018 N.C. Sess. Laws 144, § 1.1(a). Second, registered voters who arrive to the polls without a qualifying ID may fill out a provisional ballot and their votes will be counted if they later produce a qualifying ID at the county elections board. § 1.2(a). Third, people with religious objections, survivors of recent natural disasters, and those with reasonable impediments may cast a provisional ballot after completing an affidavit that affirms their identity and their reason for not producing an ID. *Id.* Their votes must be counted unless the county board of elections "has grounds to believe the affidavit is false." *Id.*

The district court discounted the first of these mitigating features—free voter-ID cards—out of concern that minority voters would be more likely to have to spend time and money (though the IDs are free and require no documentation) to procure this alternative form of ID. *Cooper*, 430 F. Supp. 3d at 39. This argument suffers from two flaws. First, as the Supreme Court noted in *Crawford*, where it addressed a more restrictive voter-ID law,[8] "[f]or most voters who need them, the inconvenience of making a trip to the [DMV], gathering the required documents, and posing for a photograph surely does not qualify as a substantial burden on the right to vote, or even represent a significant increase over the usual burdens of voting." 553 U.S. at 198. And while the district court found that "the evidence in this case suggests otherwise," *Cooper*, 430 F. Supp. 3d at 39, at most, what the

---

[8] Indiana's voter-ID law required documentation to obtain a voter ID and did not include a reasonable impediment provision. *Crawford*, 553 U.S. at 185–86.

25

cited evidence "suggests" is the same kind of minimal burden associated with obtaining a voter ID that the Supreme Court held insufficient to sustain a facial challenge in *Crawford*.

Second, eligible voters may engage in one-stop early voting (at their county board of elections office or an approved alternate site). N.C. GEN. STAT. §§ 163-227.2(b), 163-227.6(a). And the 2018 Voter-ID Law obligates each county board of elections to issue free photo-ID cards during one-stop early voting. 2018 N.C. Sess. Laws 144, § 1.1(a). So for those who vote early at their county board of elections, the marginal cost of obtaining a qualifying ID is negligible because they can obtain a free voter ID and vote in a single trip. Those voters must do no more than they did previously—show up to vote. *See Crawford*, 553 U.S. at 198.

The district court gave no weight to the 2018 Voter-ID Law's second mitigating provision—provisional voting that is 'cured' by later presenting a qualifying ID, including a newly obtained voter-ID card, to the county elections board. And the district court discounted the 2018 Voter-ID Law's third mitigating feature—the reasonable impediment exemption—as unlikely to be the "panacea[]" it is claimed to be. *Cooper*, 430 F. Supp. 3d at 41. The district court seemingly believed that even if every eligible voter in North Carolina should be able to vote under the letter of the 2018 Voter-ID Law, in practicality, poor enforcement of the law would prevent eligible voters from doing so. *Id.* But an inquiry into the legislature's intent in *enacting* a law should not credit disparate impact that may result from poor *enforcement* of that law. *See United States v. Chem. Found.*, 272 U.S. 1, 14–15 (1926) ("The presumption of regularity supports the official acts of public officers, and, in the absence of clear evidence to the contrary, courts presume that they

26

have properly discharged their official duties."); *cf. South Carolina*, 898 F. Supp. 2d at 44 (accepting that a reasonable-impediment provision would function as intended).

Indeed, the 2018 Voter-ID Law is more protective of the right to vote than other states' voter-ID laws that courts have approved. In *Lee v. Virginia State Board of Elections*, we upheld Virginia's voter-ID law that only included two of these mitigating features— free voter IDs available without corroborating documentation and provisional voting subject to 'cure.' 843 F.3d at 594. Likewise, in *South Carolina v. United States*, the District Court of the District of Columbia precleared South Carolina's voter-ID law that included a different combination of two mitigating features—free voter IDs available without corroborating documentation and a reasonable impediment procedure. 898 F. Supp. 2d at 32. And recently, the Eleventh Circuit, in *Greater Birmingham Ministries v. Secretary of State for the State of Alabama*, upheld Alabama's voter-ID law that included versions of two of the 2018 Voter-ID Law's mitigating features—free voter IDs that require corroborating documentation and provisional voting subject to 'cure.' 966 F.3d at 1213– 14. Given these cases, it is hard to say that the 2018 Voter-ID Law does not sufficiently go "out of its way to make its impact as burden-free as possible." *Lee*, 843 F.3d at 603.

Considering the evidence presented to the district court with the burden properly applied to the Challengers and the presumption of good faith afforded to the General Assembly, we cannot agree that the Challengers would likely carry their burden of proving that the General Assembly acted with discriminatory intent in passing the 2018 Voter-ID

27

Law.[9]  We do not reverse the district court because it weighed the evidence before it differently than we would.  Instead, we reverse because of the fundamental legal errors that permeate the opinion—the flipping of the burden of proof and the failure to provide the presumption of legislative good faith—that irrevocably affected its outcome.  We therefore hold that the district court abused its discretion in issuing the preliminary injunction.

*          *          *

We do not doubt, as we held in *McCrory* and as the State expressly acknowledges in this case, that there is a long and shameful history of race-based voter suppression in North Carolina.  *See McCrory*, 831 F.3d at 223.  But we made clear in *McCrory* that our holding did not "freeze North Carolina election law in place."  831 F.3d at 241.  The district court failed to adhere to our admonishment and the Supreme Court's unmistakable commands in *Abbott*.  Instead, it considered the North Carolina General Assembly's past conduct to bear so heavily on its later acts that it was virtually impossible for it to pass a

---

[9] Because our decision rests on the Challengers' failure to show a likelihood of success on the merits of their claims, we decline to consider the remaining preliminary-injunction requirements.  We do, however, find it prudent to mention two concerns about the district court's analysis of those factors.  First, because the district court found that the Challenger organizations had standing to bring this case on their own behalf, it analyzed the irreparable harm requirement with an eye towards whether the organizations themselves would suffer irreparable harm in the absence of an injunction.  *Cooper*, 430 F. Supp. 3d at 51.  Because we rest our standing holding on a representational theory, this factor should instead consider whether the voting members of the organizations would suffer irreparable harm in the absence of an injunction.

Second, the district court ignored the Challengers' nine-month delay in moving for a preliminary injunction after filing their complaint.  No matter if this delay would have been dispositive, the district court erred by ignoring it entirely.  *See Benisek v. Lamone*, 138 S. Ct. 1942, 1944 (2018); *Quince Orchard Valley Citizens Ass'n*, 872 F.2d at 80.

28

voter-ID law that meets constitutional muster.  In doing so, the district court improperly reversed the burden of proof and disregarded the presumption of legislative good faith. And the remaining evidence in the record fails to meet the Challengers' burden.  For these reasons, the district court abused its discretion in issuing the preliminary injunction.[10]  The judgment below is

REVERSED.

---

[10] The district court's opinion devotes little analysis to the 2018 Voter-ID Law's ballot-challenge provision, which it also enjoined.  *See Cooper*, 430 F. Supp. 3d at 42, 54. Upon reviewing the record, we do not find adequate grounds on which that portion of the injunction can stand independent of the photo-ID injunction.

29