**ON REHEARING EN BANC**

**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 19-2273

NORTH CAROLINA STATE CONFERENCE OF THE NAACP; CHAPEL HILL-CARRBORO NAACP; GREENSBORO NAACP; HIGH POINT NAACP; MOORE COUNTY NAACP; STOKES COUNTY BRANCH OF THE NAACP; WINSTON SALEM-FORSYTH COUNTY NAACP,

             Plaintiffs – Appellees,

      v.

PHILIP E. BERGER, in his official capacity as President Pro Tempore of the North Carolina Senate; TIMOTHY K. MOORE, in his official capacity as Speaker of the North Carolina House of Representatives,

             Appellants,

      and

KEN RAYMOND, in his official capacity as a member of the North Carolina State Board of Elections; STELLA ANDERSON, in her official capacity as Secretary of the North Carolina State Board of Elections; DAMON CIRCOSTA, in his official capacity as Chair of the North Carolina State Board of Elections; JEFFERSON CARMON III, in his official capacity as a member of the North Carolina State Board of Elections; DAVID C. BLACK, in his official capacity as a member of the North Carolina State Board of Elections,

             Defendants – Appellees.

Appeal from the United States District Court for the Middle District of North Carolina at Greensboro.  Loretta C. Biggs, District Judge.  (1:18-cv-01034-LCB-LPA)

Argued:  December 7, 2020                          Decided:  June 7, 2021

————————

Before GREGORY, Chief Judge, and WILKINSON, NIEMEYER, MOTZ, KING, AGEE, KEENAN, WYNN, DIAZ, FLOYD, THACKER, HARRIS, RICHARDSON, QUATTLEBAUM, and RUSHING, Circuit Judges.

————————

Affirmed by published opinion.  Judge Harris wrote the majority opinion, in which Chief Judge Gregory and Judges Motz, King, Keenan, Wynn, Diaz, Floyd, and Thacker joined. Judge Wilkinson wrote a dissenting opinion.  Judge Niemeyer wrote a dissenting opinion. Judge Quattlebaum wrote a dissenting opinion, in which Judges Niemeyer, Agee, Richardson, and Rushing joined.

————————

**ARGUED:**  Peter A. Patterson, COOPER & KIRK PLLC, Washington, D.C., for Appellants.   Stephen K. Wirth, ARNOLD & PORTER KAYE SCHOLER LLP, Washington, D.C.; James Wellner Doggett, NORTH CAROLINA DEPARTMENT OF JUSTICE, Raleigh, North Carolina, for Appellees.  **ON BRIEF:**  David H. Thompson, Nicole J. Moss, Haley N. Proctor, Nicole Frazer Reaves, COOPER & KIRK PLLC, Washington, D.C.; Nathan A. Huff, PHELPS DUNBAR LLP, Raleigh, North Carolina, for Appellants.  Joshua H. Stein, Attorney General, Olga E. Vysotskaya de Brito, Special Deputy Attorney General, Paul M. Cox, Special Deputy Attorney General, NORTH CAROLINA DEPARTMENT OF JUSTICE, Raleigh, North Carolina, for Appellees Damon Circosta, Stella E. Anderson, David C. Black, Ken Raymond, and Jefferson Carmon III.  Irving Joyner, Cary, North Carolina; Penda D. Hair, Washington, D.C., Caitlin A. Swain, FORWARD JUSTICE, Durham, North Carolina; John C. Ulin, Los Angeles, California, James W. Cooper, Jeremy C. Karpatkin, Andrew T. Tutt, Jacob Zionce, ARNOLD & PORTER KAYE SCHOLER LLP, Washington, D.C., for Appellees North Carolina State Conference of the NAACP, Chapel Hill-Carrboro NAACP, Greensboro NAACP, High Point NAACP, Moore County NAACP, Stokes County Branch of the NAACP, and Winston Salem-Forsyth County NAACP.

————————

2

PAMELA HARRIS, Circuit Judge:

In this appeal, we are asked to decide whether the leaders of the North Carolina House and Senate are entitled to intervene, on behalf of the State of North Carolina, in litigation over the constitutionality of the State's voter-ID law. What makes this case unusual is that North Carolina's Attorney General, appearing for the State Board of Elections, already is representing the State's interest in the validity of that law, actively defending its constitutionality in both state and federal court. Nevertheless, the legislative leaders have moved twice before the district court to intervene so that they *also* can speak for the State, insisting that this case requires not one but *two* representatives of the State's interest. Twice, the district court rejected these requests.

We see no abuse of discretion in that decision. At this point in the proceedings, the legislative leaders may assert only one interest in support of intervention: that of the State of North Carolina in defending its voter-ID law. It follows that they have a right to intervene under Rule 24(a)(2) of the Federal Rules of Civil Procedure only if a federal court first finds that the Attorney General is inadequately representing that same interest, in dereliction of his statutory duties – a finding that would be "extraordinary." *See Planned Parenthood of Wis., Inc. v. Kaul*, 942 F.3d 793, 801 (7th Cir. 2019). After reviewing the district court's careful evaluation of the Attorney General's litigation conduct, we are convinced that the court did not abuse its discretion in declining to make that extraordinary finding here. Because that is enough to preclude intervention as of right under Rule 24(a)(2), and because we similarly defer to the district court's judgment denying permissive intervention under Rule 24(b), we affirm the district court.

3

# I.

## A.

In December 2018, the North Carolina General Assembly passed Senate Bill 824, "An Act to Implement the Constitutional Amendment Requiring Photographic Identification to Vote" ("S.B. 824"). After the House and Senate overrode a veto by North Carolina Governor Roy Asberry Cooper III, S.B. 824 was enacted on December 19, 2018, as North Carolina Session Law 2018-144.

This new voter-ID law requires, subject to some exceptions, that individuals voting either in person or by absentee ballot present one of ten forms of authorized photographic identification. *See* 2018 N.C. Sess. Laws 144, § 1.2(a). To make that easier, the law charges county boards of elections with providing qualifying ID cards free of charge, and provides a mechanism for those without ID to vote by provisional ballot. *See id.* §§ 1.1(a), 1.2(a). Along with these voter-ID provisions, S.B. 824 also expands the number of partisan poll observers, as well as the grounds any individual voter can raise to challenge another voter's ballot. *See id.* §§ 3.1(c), 3.3.

On December 20, 2018 – the day after the law's enactment – the North Carolina State Conference of the NAACP and several of the state's local NAACP branches (collectively, "the NAACP") filed suit challenging S.B. 824. The complaint named as defendants Governor Cooper and several members of the North Carolina State Board of Elections (collectively, "the State Board"), all in their official capacities. The NAACP alleged that S.B. 824 has a disparate impact on African American and Latino residents of

4

North Carolina, resulting in "effective denial of the franchise and dilution of minority voting strength" in violation of Section 2 of the Voting Rights Act, 42 U.S.C. § 1973.  J.A. 30.  The complaint also alleged that several provisions of S.B. 824 intentionally discriminate against African American and Latino voters in violation of the Fourteenth and Fifteenth Amendments of the U.S. Constitution.  The NAACP requested declaratory relief and an injunction against the implementation of the challenged provisions.

**B.**

In this appeal, we consider two successive requests by North Carolina's legislative leaders to intervene to defend against the NAACP's challenge to S.B. 824.  The procedural history is complicated.  But it also is necessary to understand the posture of this appeal and the resulting limits on our jurisdiction, so we describe it in some detail.

1.

In January of 2019, Philip E. Berger, the President Pro Tempore of the North Carolina Senate, and Timothy K. Moore, the Speaker of the North Carolina House of Representatives, filed their first intervention motion, seeking to intervene on behalf of the North Carolina General Assembly to defend S.B. 824.  The state legislative leaders – whom we refer to as "the Leaders" – claimed entitlement to intervene as of right under Federal Rule of Civil Procedure 24(a)(2), and in the alternative asked for permission to intervene under Rule 24(b).  The NAACP opposed the motion, and the Governor and the State Board, through the Attorney General as counsel, took no position.

In this first motion, the Leaders purported to speak on behalf of the General Assembly, rather than the State of North Carolina as a whole.  That status, the Leaders

5

argued, gave them a protectable interest justifying intervention as of right under Rule 24(a)(2).  As the Leaders explained, a North Carolina statute, recently enacted, provides that they "jointly have standing to intervene *on behalf of the General Assembly* as a party in any judicial proceeding challenging a North Carolina statute," N.C. Gen. Stat. § 1-72.2(b) (emphasis added), and "request[s]" that federal courts permit participation by both the State's legislative and executive branches in cases challenging the validity of state law, *id.* § 1-72.2(a).  According to the Leaders, the General Assembly's "institutional interest in seeing that [its] enactments are not 'nullified'" thus satisfied Rule 24(a)(2)'s interest requirement.  J.A. 113–14 (quoting *Ariz. State Legis. v. Ariz. Indep. Redistricting Comm'n*, 576 U.S. 787, 803 (2015)).

Moreover, the Leaders continued, that interest was "not adequately represented" already by the existing defendants – the Governor and the State Board, through the Attorney General – for purposes of Rule 24(a)(2)'s adequacy prong.  Pointing to past statements opposing voter-ID laws by the Governor and Attorney General, as well as their activity in litigation over previous voter-ID laws in North Carolina, the Leaders claimed that the defendants "cannot be trusted to defend S.B. 824 in the same, rigorous manner as Proposed Intervenors – and very well might not defend the law at all."  J.A. 117.

The district court denied the Leaders' motion on June 3, 2019, finding that the Leaders did not meet the requirements for either mandatory or permissive intervention. *See N.C. State Conf. of the NAACP v. Cooper*, 332 F.R.D. 161, 171, 173 (M.D.N.C. 2019) ("*NAACP I*").  The court first rejected the NAACP's threshold argument that the Leaders lacked Article III standing.  Because the Leaders sought to intervene only as defendants,

6

the court concluded, and were not themselves invoking the court's jurisdiction, it was not incumbent on them to establish Article III standing. *See id.* at 165. Acknowledging that courts are divided on this question, the district court found no "Fourth Circuit case setting forth such a requirement" and so "decline[d] to impose" one itself. *Id.*

The court turned then to intervention as of right, for which a movant must demonstrate: "(1) an interest in the subject matter of the action; (2) that the protection of this interest would be impaired because of the action; and (3) that the applicant's interest is not adequately represented by existing parties to the litigation." *Id.* at 165 (quoting *Teague v. Bakker*, 931 F.2d 259, 260–61 (4th Cir. 1991)). The Leaders could not satisfy those requirements, the district court concluded, mostly because the existing defendants, through the Attorney General, already were actively defending S.B. 824.

As to the interest prong, the court held that, at least while the Governor and the State Board remained in the case, the Leaders did not have a significantly protectable interest in likewise defending the statute's legality. *Id.* at 168. The court distinguished cases in which state legislators were permitted to intervene in defense of a statute "[w]hen it became apparent that neither the [state] Attorney General nor the named defendants would defend the statute," *id.* at 167 (quoting *Karcher v. May*, 484 U.S. 72, 75 (1987)); here, by contrast, the state defendants, represented by the Attorney General, already were defending against the NAACP's challenge to S.B. 824. The court recognized North Carolina's "public policy" in favor of intervention by the Leaders to represent the interests of the General Assembly, *id.* at 166–67 (quoting N.C. Gen. Stat. § 1-72.2(a)), but explained that

7

intervention as of right under Rule 24(a)(2) remains subject to federal-law requirements, *see id.* at 167.

As to the adequacy prong, the district court held that because the Attorney General already was defending the lawsuit on behalf of the state defendants, the Leaders would be required to "mount a strong showing of inadequacy" to overcome a "presumption of adequate representation." *Id.* at 169 (quoting *Stuart v. Huff*, 706 F.3d 345, 352 (4th Cir. 2013)). The Leaders could not make that showing, the court concluded. The defendants already had moved to dismiss the NAACP's complaint, and there was no record evidence suggesting that the Governor, the State Board, or the Attorney General had abdicated their responsibility to defend the law. *See id.* at 169–71.

The court also denied the Leaders' request for permissive intervention under Federal Rule of Civil Procedure 24(b). *Id.* at 173. The intervention of additional defendants, the court found, would delay litigation of the case, "detract[ing] from, rather than enhanc[ing], the timely resolution, clarity, and focus" of the proceedings. *Id.* at 172. Moreover, the court found, intervention likely would prejudice the plaintiffs, requiring the NAACP to "address dueling defendants, purporting to all represent the interest of the State, along with their multiple litigation strategies." *Id.*

The district court entered its denial of the Leaders' motion without prejudice. *Id.* at 173. Clarifying its disposition, the court indicated that it would entertain a renewed request for intervention "should it become apparent during the litigation" that the state defendants, through the Attorney General, "no longer intend to defend this lawsuit." *Id.* Barring any such change in circumstances, however, the Leaders' participation would be limited to

8

amicus curiae briefs, which would allow the Leaders to bring to the court's attention any "unique contention" or argument not raised by the Attorney General.  *Id.*

The Leaders did not appeal the district court's order denying their motion to intervene.

2.

Instead, six weeks later, the Leaders filed their second, renewed motion for intervention, again seeking intervention both as of right and by permission.  The Leaders acknowledged that the court already had denied those requests.  But the court's order, the Leaders believed, was "not necessarily its final word on the matter," given its stated willingness to entertain a new motion if the Attorney General stopped defending the suit. J.A. 477.

Much of the Leaders' renewed case for intervention repeated arguments the district court already had rejected.  But the Leaders also made two new points especially relevant here.  First, the Leaders claimed that a recent Supreme Court decision, *Virginia House of Delegates v. Bethune-Hill*, 139 S. Ct. 1945 (2019), had "clarified" the precise nature of the interests they sought to represent in litigation over S.B. 824.  J.A. 485.  In *Bethune-Hill*, the Leaders explained, the Supreme Court confirmed that a state may designate the legislature to serve as the state's own agent in federal litigation; and in its state statutes, the Leaders continued, North Carolina had done just that, designating them, by virtue of their positions in the legislature, as representatives of the State of North Carolina's interest in the validity and enforcement of its laws.  The Leaders thus claimed, for the first time, to represent two different interests in defending S.B. 824:  the distinct interest of the General

9

Assembly, on which they had relied before, and now the interests of the State of North Carolina as well.

Second, the Leaders contended that the contingency the district court had envisioned in its first order had come to pass, because months of litigation in the district court and parallel state proceedings had made clear that the Attorney General was not vigorously defending S.B. 824. In the federal case, the Leaders argued, the Attorney General, though winning dismissal of the Governor from the case, had argued only for abstention on federalism grounds and failed to develop the factual record through expert reports. And in the state-court case, *Holmes v. Moore*, No. 18-CVS-15292 (N.C. Super. Ct.) – in which the Leaders, too, were named as defendants – the Attorney General had moved to dismiss too few of the complaint's counts and been insufficiently aggressive as to discovery and its opposition to a preliminary injunction. All told, the Leaders concluded, the Attorney General's performance showed that he could not be trusted to defend S.B. 824, clearing what they called the "minimal" hurdle of Rule 24(a)(2)'s adequacy prong. J.A. 491 (quoting *Trbovich v. United Mine Workers of Am.*, 404 U.S. 528, 538 n.10 (1972)).

Two months after this second motion to intervene, but before the district court had ruled on it, the Leaders sought to accelerate the process with a ruling from our court. On the theory that the district court had "de facto denied" their motion by not acting on it, the Leaders filed an interlocutory appeal and petitioned for a writ of mandamus. In October of 2019, we dismissed the appeal for lack of jurisdiction, given the absence of a ruling by the district court, and denied the mandamus petition.

10

A month later, the district court denied the Leaders' motion, finding that their renewed case for intervention was no more convincing than their first. *N.C. State Conf. of the NAACP v. Cooper*, No. 1:18CV1034, 2019 WL 5840845, at *1 (M.D.N.C. Nov. 7, 2019) ("*NAACP II*"). Crucially for our purposes, the court refused to revisit arguments made by the Leaders in their first motion and rejected by the court in its first order. Because the Leaders had not timely appealed its prior order, the district court held, that order "remain[ed] undisturbed" and its rulings had become "the law of this case." *Id.* at *1–2. The court's decision thus focused on whether the Leaders had "presented evidence, newly available, that speaks to the narrow exception outlined in its prior order": whether the Attorney General, on behalf of the State Board, had "in fact declined to defend" S.B. 824. *Id.* at *2.

First, however, the district court briefly addressed the Supreme Court's *Bethune-Hill* decision and reaffirmed its view that the Leaders had no protectable interest in defending S.B. 824 so long as the Attorney General was doing so. The court acknowledged that under *Bethune-Hill*, North Carolina undoubtedly has the "prerogative to 'designate agents to represent [it] in federal court.'" *Id.* at *2 n.3 (quoting *Bethune-Hill*, 139 S. Ct. at 1951). But the district court found it "far from clear" that North Carolina law in fact had authorized the Leaders to defend the State's interests in court alongside the State's Attorney General – who *was* expressly charged with "appear[ing] for the State." *Id.* (quoting N.C. Gen. Stat. § 114-2). So the question remained, the district court concluded, whether the Attorney General continued to provide an adequate defense of S.B. 824.

11

Surveying the new evidence cited by the Leaders, the district court determined that the State's interests already were adequately represented by the State Board and the Attorney General, precluding intervention as of right under Rule 24(a)(2).  In the federal court proceedings, the district court emphasized, the State Board consistently had denied any substantive allegation of unconstitutionality, had moved to dismiss the suit on federalism grounds, and had filed an "expansive" brief opposing the NAACP's request for a preliminary injunction.  *Id.* at *3.  And the story in the *Holmes* state-court litigation – to the extent it was relevant to the adequacy of the Attorney General's federal-court representation – was the same:  At most, the Leaders had identified "strategic disagreements" with the Attorney General, whose approach "fell well within the range of reasonable litigation strategies."  *Id.*

As for permissive intervention, the court found its earlier judgment prescient.  Since its last order, the court noted, the Leaders had "prematurely" filed a renewed motion to intervene, improperly appealed before any denial had been entered, and unsuccessfully sought the "extraordinary remedy of mandamus."  *Id.* at *4.  This litigation conduct confirmed that the Leaders' participation as parties would "unnecessarily complicate and delay" the progress of the case, and the court found no basis for reversing its earlier denial of permissive intervention.  *Id.*

3.

Immediately after this second order denying intervention – but five months after the first – the Leaders filed a notice of appeal to this court.  On appeal, the NAACP continued to oppose the Leaders' efforts to intervene.  The State Board, through the Attorney General,

12

again took no position on permissive intervention, but argued that intervention as of right is unnecessary because it is adequately representing any interest the Leaders may have in the case.

In August of 2020, a panel of this court held that the district court abused its discretion in denying the Leaders' renewed motion for intervention, vacated the district court's order, and remanded for reconsideration of the Leaders' request. *N.C. State Conf. of the NAACP v. Berger*, 970 F.3d 489 (4th Cir.), *reh'g en banc granted*, 825 F. App'x 122 (4th Cir. 2020) (mem.). Upon petitions for rehearing by the NAACP and the State Board, we vacated the panel opinion and now consider the case en banc.

There is one final turn in the procedural history of this case. In December of 2019 – while the Leaders' appeal from the district court's second order was pending – the district court ruled for the NAACP and preliminarily enjoined S.B. 824's enforcement. *See N.C. State Conf. of the NAACP v. Cooper*, 430 F. Supp. 3d 15, 54 (M.D.N.C. 2019). The State Board, represented by the Attorney General, promptly appealed that decision, and we allowed the Leaders to intervene in that appeal. In December of 2020 – while the question of intervention was under en banc reconsideration – we ruled for the State Board, holding that the district court had abused its discretion in issuing the preliminary injunction. *See N.C. State Conf. of the NAACP v. Raymond*, 981 F.3d 295, 311 (4th Cir. 2020). A district court trial on the merits, originally scheduled for January 2021, now has been postponed pending the resolution of this separate appeal regarding intervention.

13

## II.

We begin with the scope of our appellate jurisdiction. Given the course of proceedings in the district court, we conclude that we have power to review only those questions resolved in the district court's second order denying intervention, as that is the only final order timely appealed to this court.

Subject to certain exceptions not applicable here, 28 U.S.C. § 1291 authorizes us to review only "final decisions of the district courts." *Microsoft Corp. v. Baker*, 137 S. Ct. 1702, 1707 (2017) (quoting 28 U.S.C. § 1291). For the purposes of this final-judgment rule, a "district court's denial of a motion to intervene is 'treated as a final judgment that is appealable.'" *Sharp Farms v. Speaks*, 917 F.3d 276, 289 (4th Cir. 2019) (quoting *Bridges v. Dep't of Md. State Police*, 441 F.3d 197, 207 (4th Cir. 2006)). This designation makes sense: "[F]rom the perspective of a disappointed prospective intervenor, the denial of a motion to intervene is the end of the case," even as proceedings continue in the district court with the original parties. *Driftless Area Land Conservancy v. Huebsch*, 969 F.3d 742, 745 (7th Cir. 2020) (citation omitted). It follows that if a district court denies a motion to intervene, then a would-be intervenor must notice an appeal within 30 days of the entry of that final order. *See* 28 U.S.C. § 2107(a). If, on the other hand, no timely appeal is taken, then we will be left without jurisdiction to review the court's order. *See Sharp Farms*, 917 F.3d at 289 (noting that failure to timely appeal denial of intervention is jurisdictional).

That is just what happened here. The district court denied the Leaders' first motion to intervene on June 3, 2019. The Leaders did not appeal that order within 30 days of its

entry, so the district court's order became "final and conclusive" when the time to appeal expired. *See Old Dominion Tr. Co. v. First Nat'l Bank of Oxford*, 260 F. 22, 28 (4th Cir. 1919); *see also* 15B Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice & Procedure Jurisdiction § 3914.18 (2d ed. Oct. 2020 update) ("Failure to appeal denial of intervention upon entry of the order may forfeit the right to review . . . ."). And, critically, the Leaders' second and renewed motion to intervene does not save their failure to appeal the denial of the first. As appellate courts have recognized, "once a conclusive resolution has been reached[,] . . . a renewed motion for the same relief, or a belated request for reconsideration, does not reopen the time for appeal." *Fairley v. Fermaint*, 482 F.3d 897, 901 (7th Cir. 2007); *see also United States v. Boone*, 801 F. App'x 897, 904 (4th Cir. 2020) (Harris, J., concurring).

The Leaders dispute one and only one step in this straightforward analysis: According to the Leaders, even if orders denying intervention generally are final and appealable, the district court's first order was not, as it was entered "without prejudice." *See NAACP I*, 332 F.R.D. at 173. As the Leaders understand it, that without-prejudice dismissal expressly left open the possibility of further litigation, indicating that an amendment could cure any defect in their motion. It follows, they argue, that the district court's denial of intervention was not a final order under our case law – which means that they had neither the ability nor the obligation to take an immediate appeal.

That argument misreads both our precedent and the district court's order. We have dealt extensively with the finality of without-prejudice dismissals of complaints, and we agree with the Leaders that we may analogize to those cases here. But what those cases

15

stand for is the proposition that "[d]ismissals without prejudice . . . are *not* unambiguously non-final orders."  *Bing v. Brivo Sys., LLC*, 959 F.3d 605, 612 (4th Cir. 2020) (emphasis added).  Instead, we examine the finality and appealability of a without-prejudice dismissal "based on the specific facts of the case," considering such factors as whether amendment could cure the defects on which dismissal rests, what the "bottom-line effect" of the ruling is, and whether the district court "signaled that it was finished" with the issues before it. *Id.* at 610, 612 (quoting *Chao v. Rivendell Woods, Inc.*, 415 F.3d 342, 345 (4th Cir. 2005)).

Applied to the "specific facts of [this] case," *id.* at 610, those factors point decisively to a final and immediately appealable order.  The district court "signaled that it was finished" with the merits of the Leaders' first request for intervention, notwithstanding its styling of the denial as "without prejudice."  As the court itself later explained, the window left open in its initial order was a "narrow" one, available only if the State Board and Attorney General "in fact declined to defend" S.B. 824 in the future.  *NAACP II*, 2019 WL 5840845, at *2.  Because that contingency had not yet – and might never – come to pass, the Leaders could not then amend or correct their motion to change the result.  The bottom-line effect of the court's ruling was clear:  The Leaders were not entitled to intervene under then-current circumstances.  Under our precedent, that determination was final, and if the Leaders disagreed, then they were required to take a timely appeal.

That conclusion is consistent with the approach other circuits have taken in procedurally similar intervention appeals.  The Seventh Circuit, for instance, recently confronted an order much like the one at issue here:  a without-prejudice denial of a motion to intervene that expressly invited a renewed request if a "concrete, substantive conflict or

16

actual divergence of interests should emerge." *Driftless Area Land Conservancy*, 969 F.3d at 745. That denial, the court held, was an immediately appealable final order – "without prejudice" notwithstanding. *Id.* "The possibility of a new motion if circumstances change does not block an immediate appeal," the court explained, because "[t]he contingency that the judge has in mind might never arise." *Id.*

The Leaders rely on a different and earlier Seventh Circuit case, *United States v. City of Milwaukee*, 144 F.3d 524 (1998), in which the court deemed non-final a district court's without-prejudice denial of intervention. But that case, the Seventh Circuit explained in *Driftless Area Land Conservancy*, was very different: There, the denial rested on a "purely technical error" in the intervention motion – the failure to include a proposed pleading – that could be cured immediately. *See* 969 F.3d at 746 (discussing *Milwaukee*, 144 F.3d at 527–30). Cases like this one, by contrast – in which a district court denies intervention on the merits, but "without prejudice" in recognition that circumstances might change – are "not remotely analogous." *Id.* What matters for finality is not "the incantation of the words 'without prejudice,'" but "that the judge addressed the substantive merits of the intervention motion," not just a procedural flaw, and "conclusively denied" the motion. *Id.* at 745 (citation omitted).

And, again, the same rule holds even if – as here – would-be intervenors file a renewed motion to intervene, and then timely appeal the denial of that second motion. Under those circumstances, too, courts will not consider the merits of the initial denial, because that denial was not timely appealed. *See EPA v. City of Green Forest*, 921 F.2d 1394, 1401 (8th Cir. 1990) (concluding that court lacked jurisdiction over reasoning in

17

earlier order denying intervention because "the notice of appeal from the denial of the first motion to intervene was not until after nearly sixteen months"); *Whitewood v. Sec'y Pa. Dep't of Health*, 621 F. App'x 141, 144 (3d Cir. 2015) (reviewing only order denying amended motion to intervene). As the Eighth Circuit cogently explained, "[t]he denial of a second motion to intervene covering the same grounds as the first motion to intervene does not reset the clock for purposes of an appeal; holding otherwise would defeat the statutory timeliness requirement." *Smith v. SEECO, Inc.*, 922 F.3d 398, 404 (2019).

It is true, as the Leaders note, that there are some cases in which courts will review the merits of an initial denial of intervention, even when the putative intervenors have appealed only the denial of a second motion. But in each of those cases, the district court's second order denying intervention – the one appealed – itself made a "fresh evaluation" of the original intervention motion, so that the first order's reasoning and rulings merged into the second. *See Hodgson v. United Mine Workers of Am.*, 473 F.2d 118, 126–27 (D.C. Cir. 1972) (explaining that district court had exercised discretion to make a "fresh evaluation of the intervention application"); *see also*, *e.g.*, *Calvert Fire Ins. Co. v. Environs Dev. Corp.*, 601 F.2d 851, 857 n.3 (5th Cir. 1979) (explaining that district court had treated second intervention request as motion for reconsideration). Here, contrary to the Leaders' argument, there has been no wholesale merger. Instead, the district court expressly declined to reconsider its earlier analysis, evaluating only whether the Attorney General had become an inadequate representative of the Leaders' purported interest in the defense of S.B. 824.

18

Our jurisdiction in this appeal is correspondingly limited. We "start[] with the proposition that the original, unappealed order was correct when entered." *Devs. Sur. & Indem. Co. v. Archer W. Contractors, LLC*, 809 F. App'x 661, 664 (11th Cir. 2020) (quoting *Birmingham Fire Fighters Ass'n 117 v. Jefferson County*, 290 F.3d 1250, 1254 (11th Cir. 2002)). That means that we may not consider, on the Leaders' appeal from the district court's second order, issues put to rest in its first. Specifically, we cannot now review the Leaders' claim that they have a "protectable interest" under Rule 24(a)(2) in representing the General Assembly's "institutional interest" in enforcement of S.B. 824. The district court rejected that argument in its first order denying intervention, *see NAACP I*, 332 F.R.D. at 168; that determination was not appealed, and so the Leaders may not advance that interest here. Also outside the scope of our review is the related question of whether the Leaders must establish Article III standing to represent any purported interest under Rule 24(a)(2). *See Flying J, Inc. v. Van Hollen*, 578 F.3d 569, 571–72 (7th Cir. 2009) (discussing relationship between standing and Rule 24(a)(2)'s interest prong). The district court concluded, again in its first order, that because the Leaders sought to intervene as defendants rather than plaintiffs, they would not be held to Article III's requirements. *See NAACP I*, 332 F.R.D. at 165; *see also Bethune-Hill*, 139 S. Ct. at 1951 (suggesting that legislature participating in litigation only to defend state statute does not "invok[e] a court's

19

jurisdiction" and therefore need not demonstrate standing).  And again, on appeal of the district court's second order, we treat that determination as conclusive.[1]

In sum, our jurisdiction over this appeal is coextensive with the district court's narrow focus in its second order denying intervention – the only order on appeal.  We thus proceed to consider those issues, and only those issues, decided or "fresh[ly] evaluat[ed]," *see Hodgson*, 473 F.2d at 127, in that second order.  As a result, our emphasis, like the district court's, is on the application of Rule 24(a)(2)'s adequacy prong to the Attorney General's defense of S.B. 824.

### III.

As all parties agree, the intervention issue in this case is governed by federal law, and specifically by Federal Rule of Civil Procedure 24.  State law, like the North Carolina statutes relied upon by the Leaders for their interest in this litigation, may "inform" the application of Rule 24, but it does not "supplant" Rule 24 or its criteria for intervention. *See Planned Parenthood of Wis., Inc. v. Kaul*, 942 F.3d 793, 797 (7th Cir. 2019).

---

[1] Because this question does not bear on our own Article III jurisdiction to hear this appeal, we are under no obligation to resolve it.  Whether or not the Leaders needed or had standing to intervene in defense of S.B. 824, they clearly "have standing to appeal the denial of their intervention motion." *Doe v. Pub. Citizen*, 749 F.3d 246, 257 (4th Cir. 2014) (citation omitted).  The alleged injury suffered by a disappointed would-be intervenor flows from the denial of intervention itself, and it may be redressed by an order allowing intervention. *See CVLR Performance Horses, Inc. v. Wynne*, 792 F.3d 469, 475 (4th Cir. 2015) (final judgment does not moot pre-existing intervention appeal because appellate court still may offer remedy by ordering intervention); 15A Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice & Procedure Jurisdiction § 3902.1 (2d ed. Oct. 2020 update) ("Persons denied intervention in the trial court clearly have standing to appeal the denial of intervention . . . .").

20

Rule 24 provides two avenues for federal-court intervention, one mandatory and one discretionary. Intervention as of right is governed by Rule 24(a)(2), under which federal courts must permit intervention when, on timely request – a factor undisputed here – a proposed intervenor "can demonstrate '(1) an interest in the subject matter of the action; (2) that the protection of this interest would be impaired because of the action; and (3) that the applicant's interest is not adequately represented by existing parties to the litigation." *Stuart v. Huff*, 706 F.3d 345, 349 (4th Cir. 2013) (quoting *Teague v. Bakker*, 931 F.2d 259, 260–61 (4th Cir. 1991)). Importantly, all these requirements must be met before intervention is mandatory; a failure to meet any one will preclude intervention as of right. *See Virginia v. Westinghouse Elec. Corp.*, 542 F.2d 214, 216 (4th Cir. 1976). If that happens, then "a court may still allow an applicant to intervene permissively under Rule 24(b), although in that case the court must consider 'whether the intervention will unduly delay or prejudice the adjudication of the original parties' rights.'" *Stuart*, 705 F.3d at 349 (quoting Fed. R. Civ. P. 24(b)(3)).

As explained below, we conclude that the district court did not abuse its discretion in determining that the Leaders' purported interest in defending S.B. 824 on behalf of the State of North Carolina was adequately represented already by the State Board of Elections and Attorney General. That is enough to defeat the Leaders' claim to mandatory intervention. Accordingly, we need not consider whether the Leaders have satisfied Rule 24(a)(2)'s interest element under the theory addressed and rejected by the district court in its second order: that state law has designated them agents of the State's own undoubted interest in the validity of its laws. We may assume for purposes of this appeal, that is, that

21

state law has endowed the Leaders with a "significantly protectable interest" for purposes of Rule 24(a)(2), *see Teague*, 931 F.2d at 261; even so, they have no right to intervene in federal court under Rule 24(a)(2) because that same interest is adequately represented by existing parties to the litigation.[2]

As further detailed below, we also find no abuse of discretion in the district court's renewed consideration and denial of the Leaders' request for permissive intervention. Accordingly, we affirm the judgment of the district court.

## A.

Turning to the district court's application of Rule 24, we bear in mind two key features of this case. First is the "necessarily limited" scope of our appellate review. *See Stuart*, 706 F.3d at 350. "It is well settled that district court rulings on both types of intervention motions are to be reviewed for abuse of discretion" only. *Id.* at 349 (citation omitted). This deferential standard of review stems in part from the district court's "superior vantage point" for evaluating the parties' litigation conduct and whether an

---

[2] We must disagree with the principal dissent's suggestion that our inquiry into adequacy amounts to dicta. *See* Diss. Op. 61 n.3. It is true, as the dissent observes, that the district court rejected the Leaders' original claim to a protected Rule 24(a)(2) interest – based on the interests of the General Assembly – in its first order, which falls outside the scope of our appellate review. *See NAACP I*, 332 F.R.D. at 166–68. In its second order, however, which *is* on appeal, the district court considered the Leaders' separate claim to a Rule 24(a)(2) interest, this time as authorized agents of the State's interest in S.B. 824. *See NAACP II*, 2019 WL 5840845, at *2 n.3. As a result, we have before us live arguments on all prongs of Rule 24(a)(2); even with our review limited to the district court's second order, the Leaders could prevail if that order incorrectly assessed both interest and adequacy. That we choose to resolve the Leaders' claim on adequacy grounds alone makes our adequacy analysis the linchpin of this appeal, not dicta.

22

existing party adequately represents a proposed intervenor's interests. *Id.* at 350. But it also recognizes that "[q]uestions of trial management are quintessentially the province of the district courts," and that motions to intervene "can have profound implications for district courts' trial management functions": Parties added by intervention "can complicate routine scheduling orders, prolong and increase the burdens of discovery and motion practice, thwart settlement, and delay trial." *Id.* (citation omitted). So in this appeal, as in any under Rule 24, we are alert to the "boundaries of our reviewing role." *Id.*

That role is further informed by the second key feature of this case: its highly unusual posture. This is not a case like those decided by the Supreme Court and relied on by the Leaders here – *Bethune-Hill*, 139 S. Ct. 1945, *Hollingsworth v. Perry*, 570 U.S. 693 (2013), *Arizonans for Official English v. Arizona*, 520 U.S. 43 (1997), and *Karcher v. May*, 484 U.S. 72 (1987) – in which a state representative, usually a state attorney general, is *not* defending state law, or has declined to appeal an adverse ruling. As the Supreme Court's multiple encounters with this recurring fact pattern attest, such cases may present difficult questions about the standing and right of other entities to intervene to continue a case in the state attorney general's stead. But at bottom, the issue in those cases is whether *any* state representative will be permitted to defend a state's interest in the validity of its laws, once the state's "default" representative has declined to do so. *See Kaul*, 942 F.3d at 800.

Here, by contrast, the State of North Carolina's "default" representative – the Attorney General – has *not* "dropped out of the case." *Id.* The Attorney General is charged, by North Carolina statute, with representing the State's interest in cases involving challenges to state law. *See* N.C. Gen. Stat. § 114-2(1) ("[I]t shall be the duty of the

23

Attorney General . . . to appear for the State . . . in any cause or matter, civil or criminal, in which the State may be a party or interested.").  And consistent with that duty, the Attorney General is very much *in* this case, defending the constitutionality of S.B. 824, on behalf of the State Board of Elections, in state and federal courts, including our own.

As we have explained, the only interest the Leaders may now assert in support of intervention under Rule 24(a)(2) is that of the State of North Carolina in the enforcement and validity of its laws.  And indeed, that is the Leaders' primary argument on appeal:  that state law has designated them, along with the Attorney General, to represent the interests of the State itself in federal court. *See* Reply Br. of Appellants 10; *see also Bethune-Hill*, 139 S. Ct. at 1951 (where state law designates a legislative entity to "represent [the State's] interests," that entity may "stand in for the State").  But those, of course, are precisely the interests already represented by the Attorney General in this case.  So the unusual question presented here is whether a federal district court must allow not one but "two state entities . . . to speak on behalf of the State *at the same time*."  *Kaul*, 942 F.3d at 800.

The Seventh Circuit recently – only after the district court issued its decisions – became the first federal court of appeals to confront precisely this question, and it explained why, under these circumstances, we must be especially circumspect in reviewing a district court's denial of mandatory intervention.  In *Planned Parenthood of Wisconsin, Inc. v. Kaul*, just as here, a state legislative entity, relying on a purported authorization in state law, sought to intervene as of right to defend the State's interest in the constitutionality of one of its statutes. *See* 942 F.3d at 796.  According to the Wisconsin legislature, the State's Attorney General, though defending the law, was doing so only nominally, failing to

24

adequately represent Wisconsin's interests under Rule 24(a)(2). *See id.* The Seventh Circuit assumed without deciding that state law gave the legislature a Rule 24(a)(2) "interest" as a representative of the State itself. *See id.* at 797–98. But because that same interest already was represented by the Wisconsin Attorney General, the court explained, the legislature could satisfy Rule 24(a)(2)'s adequacy element only if it succeeded in the "unenviable task" of convincing a federal court that the Attorney General was inadequately representing the interests of his own State. *Id.* at 801. And that, the court concluded, would amount to an "extraordinary finding," not to be undertaken lightly and requiring something much more than a disagreement over litigation strategy. *Id.*; *see also id.* at 810 (Sykes, J., concurring).

With that as context, we turn to the district court's application of Rule 24 and, first and foremost, to its assessment of Rule 24(a)(2)'s adequacy prong.

## B.

In its opinion denying the Leaders' renewed request for intervention, the district court reviewed the proceedings to date and concluded that the State Board of Elections and Attorney General continued to "actively and adequately" defend S.B. 824 for purposes of Rule 24(a)(2). *NAACP II*, 2019 WL 5840845, at *2. It carefully reviewed what the Leaders described as new evidence of an "unwillingness to robustly defend S.B. 824" in both the federal litigation before it and the parallel state litigation in *Holmes*, and found only "strategic disagreements" over choices that "fell well within the range of reasonable litigation strategies." *Id.* at *2–3. Because the State Board and Attorney General were adequately representing the State's interest in the constitutionality of S.B. 824, and because

25

there was no reason to think they would abandon that duty in the future, the district court held, the Leaders had no entitlement to intervention as of right under Rule 24(a)(2). *See id.* at *4.

On appeal, the Leaders' primary challenge is to the legal standards employed by the district court in its Rule 24(a)(2) adequacy analysis. They also dispute the district court's application of those standards to the performance of the State Board and Attorney General in defending S.B. 824. We take the two challenges in turn.[3]

---

[3] The principal dissent raises one additional point, arguing that the district court abused its discretion when it failed to consider, as part of its adequacy analysis, the import of the relevant North Carolina statutes. *See* Diss. Op. 74–75. We disagree. Like the Seventh Circuit in *Kaul*, we think laws like N.C. Gen. Stat. § 1-72.2 bear on the interest element of Rule 24(a)(2), not the adequacy element. A state's policy judgment about the value of legislative intervention may bestow a protectable interest in certain court cases, but it does not override our normal standards for evaluating the adequacy of existing representation in those cases. And if it did – if aspiring legislative intervenors could rely on a state-law policy preference for multiple representatives to satisfy both the interest prong *and* the adequacy prong of the test for mandatory intervention – then we would risk turning over to state legislatures, rather than district courts, control over litigation involving the states. *See Kaul*, 942 F.3d at 799, 802.

The Leaders appear to disavow this approach, recognizing the problems it would create. Instead, they assure us that state laws designating legislative agents as additional representatives will *not* lead necessarily to intervention as of right – precisely because the adequacy prong will remain an independent check. Even where laws like N.C. Gen. Stat. § 1-72.2 establish a protectable interest, that is, mandatory intervention will be "foreclose[d]" if "another party adequately represents the legislature's protectable interest." Appellants' Br. 32 n.2. Indeed, the Leaders seem never to have asked the district court, either, to consider N.C. Gen. Stat. § 1-72.2 in evaluating adequacy, as opposed to interest. Even apart from the merits of the position, we would find no abuse of discretion in the district court's failure to take up an argument that was not presented to it. *See Smith v. Marsh*, 194 F.3d 1045, 1052 n.5 (9th Cir. 1999); *see also Reaching Hearts Int'l, Inc. v. Prince George's County*, 478 F. App'x 54, 63 (4th Cir. 2012).

26

1.

In assessing whether an existing party to this litigation – the State Board, through the Attorney General – adequately represented the State's interest in the validity of S.B. 824, the district court applied two distinct legal standards. First, as it explained in its initial order, it applied the long-standing presumption of adequate representation that arises when "the party seeking intervention has the same ultimate objective as a party to the suit." *NAACP I*, 332 F.R.D. at 168 (quoting *Westinghouse*, 542 F.2d at 216). Because the Leaders' ultimate objective – upholding S.B. 824 – was the same as that pursued by the State Board and Attorney General, the court continued, the *Westinghouse* presumption could be overcome only if the Leaders could "demonstrate adversity of interest, collusion, or nonfeasance." *Id.* (quoting *Westinghouse*, 542 F.2d at 216). And second, the court understood our decision in *Stuart* to require that the Leaders make an especially "strong showing of inadequacy" to rebut the *Westinghouse* presumption because their objective was shared with a governmental defendant – the State Board – rather than a private litigant. *Id.* at 168 (quoting *Stuart*, 706 F.3d at 352).[4]

On appeal, the Leaders' primary argument is that the district court erred in applying both those standards. And it is true that no matter how deferential our review, application

---

[4] The district court spelled out the challenged standards only in its first order denying intervention, which, as we have explained, falls outside the scope of our appellate jurisdiction. But the district court's second order – over which we do have jurisdiction – incorporates the same standards. *See, e.g.*, *NAACP II*, 2019 WL 5840845, at *3 (explaining that "mere strategic disagreements are not enough to rebut the presumption of adequacy" and citing *Stuart*, 706 F.3d at 353).

27

of an incorrect legal standard is an abuse of discretion that must be corrected on appeal. *See League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 235 (4th Cir. 2014). In our view, however, the district court committed no such error in applying the standards at issue here.

We begin with *Westinghouse*'s well-established presumption of adequacy, which may be overcome on a showing of adversity of interest, collusion, or malfeasance – but not by mere "disagreement over how to approach the conduct of the litigation" in question. *Stuart*, 706 F.3d at 353. According to the Leaders, that presumption – which we and virtually all our sister circuits have applied for decades[5] – is inconsistent with the Supreme Court's more generous approach to intervention, and we should take this opportunity to overrule *Westinghouse* and abandon the presumption. We have rejected that argument before. *See Stuart*, 706 F.3d at 351–52 (rejecting claim that presumption of adequacy – heightened or otherwise – is inconsistent with Supreme Court precedent). And we continue to disagree.

The Leaders rest their argument on a footnote in *Trbovich v. United Mine Workers*, 404 U.S. 528, 538 n.10 (1972), in which the Supreme Court described the burden for

---

[5] Nearly every federal circuit has adopted some version of a presumption of adequacy when proposed intervenors share an objective or interest with existing parties. *See, e.g.*, *In re Thompson*, 965 F.2d 1136, 1142–43 (1st Cir. 1992); *Butler, Fitzgerald & Potter v. Sequa Corp.*, 250 F.3d 171, 179–80 (2d Cir. 2001); *Del. Valley Citizens' Council for Clean Air v. Pennsylvania*, 674 F.2d 970, 973 (3d Cir. 1982); *Bush v. Viterna*, 740 F.2d 350, 355 (5th Cir. 1984); *United States v. Michigan*, 424 F.3d 438, 443–44 (6th Cir. 2005); *Kaul*, 942 F.3d at 799; *FTC v. Johnson*, 800 F.3d 448, 452 (8th Cir. 2015); *Arakaki v. Cayetano*, 324 F.3d 1078, 1086 (9th Cir. 2003); *Tri-State Generation & Transmission Ass'n, Inc. v. N.M. Pub. Regul. Comm'n*, 787 F.3d 1068, 1072–73 (10th Cir. 2015); *Clark v. Putnam County*, 168 F.3d 458, 461 (11th Cir. 1999).

28

showing inadequacy as "minimal," requiring the proposed intervenor to show only "that representation of his interest 'may be' inadequate." But what *Trbovich* establishes is a "default" rule – a "liberal" one, to be sure, but one that may give way to more specific "standards for the adequacy of representation under Rule 24" based on the "context of each case." *See Kaul*, 942 F.3d at 799. In keeping with that context-specific approach, we, in the good company of our sister circuits, have determined that it is "perfectly sensible" to presume that a proposed intervenor's interests will be adequately represented by an existing party with whom it shares an objective, notwithstanding disagreements over litigation tactics. *Stuart*, 706 F.3d at 352–53.

"Nor could it be any other way," as we explained in *Stuart*. *Id.* at 354. Absent a meaningful presumption of adequacy, federal courts would be required under Rule 24(a)(2) to arbitrate, de novo, the inevitable differences over strategy that arise even among parties who share an ultimate goal, deciding which trial tactics do and do not amount to "adequate" representation. "It is not unusual for those who agree in principle to dispute the particulars." *Id.* But under the Leaders' more free-wheeling approach – which seems to have no obvious stopping point – every one of those disputes will necessitate a federal ruling as to whether the existing party's approach "may" lead to inadequate representation. As we concluded in *Stuart*, "[t]o have such unremarkable divergences of view sow the seeds for intervention as of right risks generating endless squabbles at every juncture over how best to proceed." *Id.* We see no reason to revisit that conclusion here.

Nor are we persuaded by the Leaders' back-up claim: that even if the *Westinghouse* presumption remains good law, it does not apply in this case because they seek to advance

29

an objective distinct from that of the existing party, the State Board, as represented by the Attorney General. We have covered some of this ground already. The Attorney General is charged by law with representing the interests of the State and its agencies in court, including in cases challenging state law. *See* N.C. Gen. Stat. § 114-2; *Martin v. Thornburg*, 359 S.E.2d 472, 479 (N.C. 1987). The Attorney General, on behalf of the State Board, is litigating the validity of S.B. 824 in state and federal court, seeking to uphold its legality. And as the Leaders conceded at oral argument before the en banc court, that is precisely the same objective that they would pursue if allowed to intervene.

In an effort to find some daylight between their own ultimate objective and that of the State Board and Attorney General, the Leaders suggest that the Board's institutional interest in administering elections gives it a distinct goal, not shared by the Leaders: an interest in expediently obtaining clear guidance from the courts as to what law will govern upcoming elections. And it is true that the State Board acknowledged that interest in a filing before the district court. *See* J.A. 589. But as we have explained, there is nothing unreasonable about the adoption by state defendants of a litigation strategy designed to produce an "expeditious final ruling on the constitutionality" of state law. *Stuart*, 706 F.3d at 354. And here, the specific request of the State Board to which the Leaders allude – that any temporary relief granted by the court be flexible enough to allow for prompt implementation of the law if the preliminary injunction were later vacated – is consistent, not in conflict, with its ultimate goal of defending the constitutionality of S.B. 824. *See NAACP II*, 2019 WL 5840845, at *4 (explaining that "while a 'primary objective' of the

30

State Board in opposing the preliminary injunction was to 'expediently obtain clear guidance,'" that objective did not come at the expense of a defense of S.B. 824).[6]

That brings us to the second of the standards the district court applied, requiring that the Leaders, in seeking to rebut the *Westinghouse* presumption, "mount a strong showing of inadequacy." *NAACP I*, 332 F.R.D. at 169 (quoting *Stuart*, 706 F.3d at 352). We held in *Stuart* that "a more exacting showing of inadequacy should be required where the proposed intervenor shares the same objective as a governmental party," like the State Board here, as opposed to a private litigant. 706 F.3d at 351. Governmental entities are entitled to this heightened presumption of adequacy, we reasoned, in part because they are uniquely well-situated to defend a state statute under attack, given their ability to speak in a representative capacity and their "familiarity with the matters of public concern that lead to the statute's passage in the first place." *Id.* Focusing on that reasoning, the Leaders argue that *Stuart* does not apply in a case like this one, where the proposed intervenor is not a private party, as in *Stuart*, but rather *another* governmental entity, equally well-suited to speak in defense of a state statute.

We agree with the Leaders to this extent: The better reading of *Stuart* is that it does not by its terms control this case. But "that is not, by itself, a reason to reach another

---

[6] That is enough to distinguish this case from *Northeast Ohio Coalition for the Homeless v. Blackwell*, 467 F.3d 999 (6th Cir. 2006), in which the Sixth Circuit allowed the State of Ohio and its legislature to intervene in defense of a voter-ID law. As the court explained, no presumption of adequacy applied in that case because the interest of the existing defendant, the Secretary of State, in smooth election administration meant that he did *not* share the State's objective of "defending the validity of Ohio laws." *Id.* at 1008.

31

result." *See Kaul*, 942 F.3d at 799 (addressing same question and choosing to extend prior precedent calling for heightened presumption of adequacy for governmental defendants). Rather, it leaves the question of whether *Stuart*'s heightened presumption of adequacy *should* be afforded to government defendants even when other governmental entities, like the Leaders here, seek to intervene on their side. We think it should.

Although some of *Stuart*'s reasoning does not translate to this context, one of its main pillars does: A government defendant, given its "basic duty to represent the public interest," is a presumptively adequate defender of duly enacted statutes. *Stuart*, 706 F.3d at 351. And when a "governmental official . . . is legally required to represent" the state's interest – as is the Attorney General here – then it is "reasonable, fair and consistent with the practical inquiry required by Rule 24(a)(2) to start from a presumption of adequate representation and put the intervenor to a heightened burden" to overcome it. *Kaul*, 942 F.3d at 810 (Sykes, J., concurring). Nothing about that conclusion, which reflects no more than the normal assumption that government officials properly discharge their duties, *see United States v. Chem. Found.*, 272 U.S. 1, 14–15 (1926), should change just because the proposed intervenor also is a government entity with its own public duties.

Moreover, as the Seventh Circuit explained in *Kaul*, in cases like this one, a proposed intervenor's governmental status makes a heightened presumption of adequacy more appropriate, not less. A private party seeking to intervene can argue that although it seeks the same objective as the state's representative, the state's interests – informed, as they must be, by the concerns of the general public – do not perfectly overlap with his or her more individualized interests. *See Kaul*, 942 F.3d at 801. But the Leaders – like the

32

legislature in *Kaul* – cannot make that argument, because they are seeking, as governmental parties, to represent precisely the same state interests as the state defendants already in the case. The Leaders, that is, "go[] further than sharing a *goal* with the Attorney General"; they "intend[] to represent the same *client*," the State of North Carolina. *See id.* (emphases added). Under those circumstances, the "alignment" between the Attorney General and the would-be governmental intervenors is one-for-one – closer than the alignment in *Stuart*. *Cf. Stuart*, 706 F.3d at 353. And under those circumstances, as we have emphasized, the Leaders have a right to intervene only if North Carolina's Attorney General – charged by state law with representing the same interests they seek to advance – is inadequately representing his own State. Requiring a heightened showing of inadequacy to justify such an "extraordinary finding" strikes us as entirely appropriate. *See Kaul*, 942 F.3d at 801.

Finally, the practical concerns we identified in *Stuart* about a less exacting standard for inadequacy are not abated simply because a proposed intervenor is governmental and not private. Government intervenors, no less than private ones, run the risk of rendering litigation "unmanageable" in the federal courts. *Kaul*, 942 F.3d at 802; *see Stuart*, 706 F.3d at 350 (explaining "profound implications" of intervention on district courts' trial management). Faced with the prospect of intervention based only on a minimal showing of inadequacy, the original government defendant "could be compelled to modify its litigation strategy" to suit the putative intervenor's preferences "or else suffer the consequences of a geometrically protracted, costly, and complicated litigation." *Stuart*, 706 F.3d at 351.

33

And those baseline concerns are only magnified in a case like this, in which a government entity seeks intervention to represent the *same* state interest represented already by a state attorney general. "If the [Leaders] were allowed to intervene as [of] right, then [they] and the Attorney General could take inconsistent positions on any number of issues beyond the decision whether to move to dismiss, from briefing schedules, to discovery issues, to the ultimate merits of the case." *Kaul*, 942 F.3d at 801. And at that point – a point almost certain to arise in this case, if past is prelude – a federal district court will have to "divin[e] the true position" and interests of the State of North Carolina, and which of its representatives, the Leaders or the Attorney General, better represents it. *Id.* Those are fundamentally political questions, and without a substantial presumption of adequacy, federal courts could be required to take sides in these political battles on a regular basis. *See Planned Parenthood of Wis., Inc. v. Kaul*, 384 F. Supp. 3d 982, 990 (W.D. Wis. 2019) ("[T]o allow intervention would likely infuse additional politics into an already politically-divisive area of the law and needlessly complicate this case.").

We do not, of course, question a sovereign state's authority to designate its preferred legal representative in court proceedings. *See Bethune-Hill*, 139 S. Ct. at 1951 (citing *Hollingsworth*, 570 U.S. at 710). If North Carolina's General Assembly, in its considered judgment, believes that the Attorney General is not adequately representing the State in this or any case, then it of course is free to remove the Attorney General and substitute some other representative, including the Leaders. But what the Leaders are asking for is more than that: The right of a state to designate not one but two representatives – or three, or more, because there is no discernible limiting principle here – in a single federal case,

34

all purporting to speak for the state. *See Kaul*, 942 F.3d at 802. Under the Leaders' approach, a federal court would be required to accommodate that cacophony of parties, given the mandatory nature of Rule 24(a)(2), upon only a nominal showing of inadequacy, and regardless of the "intractable procedural mess" that could follow. *Id.* at 801–02. With full respect for the states' sovereign autonomy, we decline to read Rule 24(a)(2) to leave federal district courts effectively "powerless to control litigation involving states." *Id.* at 802.

Accordingly, we take this opportunity to clarify that *Stuart*'s heightened presumption of adequacy applies when governmental as well as private entities seek to intervene on the side of governmental defendants. The district court therefore did not err when it required the Leaders to make a "strong showing" of inadequacy to rebut the *Westinghouse* presumption. *NAACP I*, 332 F.R.D. at 169. We note, however, that this heightened presumption is not critical to the resolution of this case. As we explain below, with or without the overlay of a "strong showing" requirement, the Leaders cannot overcome the standard *Westinghouse* presumption that the State Board of Elections and Attorney General are adequately pursuing the shared objective of defending S.B. 824's validity.

2.

At this point in the analysis, we are in the heartland of the deference owed a district court's judgment under Rule 24(a)(2)'s adequacy prong. It is not for us to decide whether, in our best view, the Leaders have demonstrated that the State Board and Attorney General are inadequate representatives of the State's interest in S.B. 824's validity. That inquiry is

35

firmly committed to the discretion of the district court. *Stuart*, 706 F.3d at 349–50. The only question before us is whether it can be said that the district court abused that wide discretion when it found in its second order that the Attorney General, consistent with his statutory duties, continued to provide an adequate defense of S.B. 824. We see no such abuse of discretion here.

First, there is no ground to set aside the district court's finding – and indeed, we do not understand the Leaders to contest this point – that the State Board and Attorney General in fact continue to defend S.B. 824. At the outset of its opinion denying the Leaders' renewed motion to intervene, the district court determined that the Attorney General, on behalf of the State Board, had taken and continued to take active steps to defend S.B. 824 in court. In this federal action, the court explained, the Attorney General had "consistently denied all substantive allegations of unconstitutionality," moved to dismiss the case on federalism grounds, and recently filed an "expansive brief" opposing on the merits the plaintiffs' motion for a preliminary injunction. *NAACP II*, 2019 WL 5840845, at *3. And in state court, the Attorney General had moved to dismiss five of six counts of the *Holmes* plaintiffs' complaint and opposed a preliminary injunction. *See id.* at *3–4. This was not a case, in other words, in which the Attorney General actually had "abandoned" the defense of S.B. 824 or indicated that he would do so in the future. *Id.* at *4.

In arguing that the Attorney General nevertheless is an inadequate representative of the State's interest in S.B. 824 – and that the district court abused its discretion in finding otherwise – the Leaders consistently have advanced two central arguments. First, they object to the *way* in which the Attorney General has chosen to defend S.B. 824. According

36

to the Leaders, the Attorney General's litigation decisions in this action and in *Holmes* demonstrate an "unwillingness to *robustly* defend S.B. 824," *id.* at *2 (emphasis added), that amounts to "nonfeasance" sufficient to rebut the *Westinghouse* presumption of adequacy. The district court rejected that claim, *id.*, finding only the kind of garden-variety disagreements over litigation strategy that we and other courts consistently have deemed insufficient to overcome a presumption of adequacy, whatever the precise strength of the presumption and whether or not it includes a "strong showing" component*, see Stuart*, 706 F.3d at 349, 353; *see also Kaul*, 942 F.3d at 810–11 (Sykes, J., concurring). We think that judgment falls well within the district court's discretion.[7]

With respect to this federal court litigation, for instance, the Leaders' renewed motion focused on an alleged lack of vigor in the State Board's opposition to the NAACP's preliminary injunction request. In particular, the Leaders argued, the Board did not hire experts to submit reports in opposition to that request, nor move to stay the preliminary injunction once entered. But we confronted very similar objections in *Stuart*, in which the

---

[7] In its first order, the district court cited our longstanding rule that *Westinghouse*'s presumption of adequacy can be rebutted only by a showing of "adversity of interest, collusion, or nonfeasance." *See NAACP I*, 332 F.R.D. at 168 (quoting *Westinghouse*, 542 F.2d at 216). As the Leaders point out, there has been some criticism of courts' treatment of those factors, or factors like them, as necessary rather than sufficient to rebut the presumption of adequacy. *See* 7C Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice & Procedure Civil § 1909 (3d ed. Oct. 2020 update); *Kaul*, 942 F.3d at 807–10 (Sykes, J., concurring). We can leave that issue for another day. Here, the district court found – in a determination to which we defer – that the Leaders' *only* evidence of inadequacy amounted to no more than differences over litigation tactics. However wide the range of evidence that will rebut the presumption of adequacy, "disagreements about litigation strategy" will not do the trick. *See Kaul*, 942 F.3d at 810 (Sykes, J., concurring).

37

proposed intervenor criticized the Attorney General for presenting only legal argument and not factual evidence at the preliminary injunction stage, and for forgoing an appeal of a preliminary injunction to litigate the case to final judgment. *See Stuart*, 706 F.3d at 353. That sort of "disagreement over how to approach the conduct of the litigation," we held, is insufficient to rebut the presumption of adequacy, as evidence of either nonfeasance or adversity of interests. *Id.* at 353–54; *see also id.* at 354 ("It was eminently reasonable for the Attorney General to believe that the interests of North Carolina's citizens would best be served by an expeditious final ruling on the constitutionality of the Act, as opposed to prolonged intermediate litigation over the preliminary injunction."); *Saldano v. Roach*, 363 F.3d 545, 555 (5th Cir. 2004) ("Simply because the [intervenor] would have made a different [litigation] decision does not mean that the Attorney General is inadequately representing the State's interest . . . .").

And indeed, the course of litigation since the district court's intervention decision has only confirmed that the Attorney General's litigation approach was well within the range of acceptable strategy. After the district court issued a preliminary injunction, the State Board promptly and successfully appealed that decision, securing a reversal of the preliminary injunction. *See N.C. State Conf. of the NAACP v. Raymond*, 981 F.3d 295, 311 (4th Cir. 2020). Although we permitted the Leaders to intervene to make legal arguments in that appeal, our reversal was based on the record the Attorney General created in the district court, without the need for additional fact or expert evidence. *See id.* at 310–11.

Likewise, the district court was within its discretion in finding no new evidence of nonfeasance or inadequacy in the Attorney General's then-recent litigation choices in the

38

state-court *Holmes* case.[8]  There, the Leaders faulted the State Board for seeking dismissal of only five of the complaint's six counts, reserving a dispositive challenge to the fact-intensive claim of intentional discrimination for later in the proceedings.  But as the district court observed, the State Board's approach was vindicated when the state court agreed to dismiss all five claims it had challenged but not the intentional-discrimination claim separately challenged by the Leaders.  *NAACP II*, 2019 WL 5840845, at *3; *see Stuart*, 706 F.3d at 354 ("The reasonableness of the Attorney General's choice is particularly manifest given that it was largely successful . . . .").  The district court also addressed the Leaders' concern that the State Board had not mounted a "substantive defense" to the preliminary injunction sought by the plaintiffs:  that injunction was denied after *both* the State Board and the Leaders opposed and argued against it, and there was no evidence, the court found, that the credit for this victory should not be shared.  *See NAACP II*, 2019 WL 5840845, at *4.  Finally, though the Leaders alleged that the State Board took an insufficiently aggressive approach to discovery in *Holmes*, the district court found it "entirely reasonable" for the Board to "focus its energies elsewhere," given that the

---

[8] The district court expressed some doubt as to whether the State Board's litigation choices in *Holmes* – a case in a different forum, involving different (though overlapping) parties and claims – had any bearing at all, "predictive" or otherwise, on the adequacy of the State Board's defense of S.B. 824 in this federal action.  *NAACP II*, 2019 WL 5840845, at *3.  "Proposed Intervenors do not point to a single case suggesting that a defendant's performance . . . in one lawsuit invites intervention in another."  *Id.* at *3.  Nevertheless, the district court went on to review the conduct of the *Holmes* litigation, finding no evidence of inadequate representation.  Because we affirm that finding as within the district court's discretion, we need not decide what role, if any, inadequate representation in one case should play in the application of Rule 24(a)(2) in another.

39

Leaders, by their own account, had taken the lead on these matters. *See id.*; *see also* Appellants' Br. 45.

In short, after canvassing the recent litigation conduct cited by the Leaders in their renewed motion, the district court determined that the State Board, through the Attorney General, continued to "actively and adequately" defend S.B. 824. *See NAACP II*, 2019 WL 5840845, at *2. The Leaders' objections, the court concluded, remained "mere strategic disagreements" about the pursuit of a shared objective, insufficient to rebut the presumption of adequacy. *Id.* at *3. We owe substantial deference to that judgment, *see Stuart*, 706 F.3d at 349–50, and see no reason to disturb it here. Indeed, we are inclined to agree with the district court that the Leaders' new evidence of alleged inadequacy – coming in a case in which the Attorney General successfully moved to dismiss the Governor as a defendant, vigorously opposed a preliminary injunction, and then successfully appealed from the entry of that injunction – reflects no more than routine disagreement about litigation tactics. And if those disagreements were themselves enough to rebut the presumption of adequacy, that "would simply open the door to a complicating host of intervening parties with hardly a corresponding benefit." *Id.* at 353.

That leaves the Leaders' second central argument: the suggestion that the Attorney General is not mounting an even more aggressive defense of S.B. 824 because he, like the Governor, is opposed to voter-ID laws as a matter of public policy. The Leaders point us to past statements by both the Attorney General and the Governor opposing a prior voter-ID law, arguing that it curtailed the right of North Carolina citizens to vote. And after he assumed his current position, the Leaders emphasize, the Attorney General, acting on

40

behalf of the then-incoming Governor, moved to dismiss a petition for certiorari review of a decision holding that same voter-ID law unconstitutional. *See North Carolina v. N.C. State Conf. of the NAACP*, 137 S. Ct. 1399, 1399 (2017) (mem.). Whether framed as an argument for collusion or for adversity of interests, the import of the Leaders' claim is the same: This Attorney General – as well as the State Board he represents, consisting of members appointed by the Governor – cannot be trusted to defend S.B. 824.[9]

That is a startling accusation. The Attorney General has a statutory duty to represent and defend the State and its interests in this litigation. *See* N.C. Gen. Stat. § 114-2. And that is to say nothing of his ethical obligations, which require zealous representation of his client, *see* Revised Rules of Professional Conduct of the North Carolina State Bar, Rule 0.1[2] (preamble), and prohibit him from falsely assuring the district court that he is "meeting [his] duty to defend this action," J.A. 662; *see* Revised Rules of Professional Conduct of the North Carolina State Bar, Rule 3.3 (candor to court). That the Attorney General may have expressed policy views at odds with S.B. 824 in the past is no ground for a federal court to infer that he would abdicate his official duty to the State by subterfuge, mounting a sham defense of the statute. To suggest otherwise is a disservice to the dignified work of government lawyers who each day put aside their own policy and political preferences to advocate dutifully on behalf of their governments and the general

---

[9] The district court expressly addressed this claim in its initial order denying intervention, *see NAACP I*, 332 F.R.D. at 169–71, over which we lack jurisdiction. But because the challenge here goes to the very probity of the lawyers before the district court, we think it necessarily merges into the district court's second assessment of the adequacy of representation, before us now on appeal.

public. *See Kaul*, 942 F.3d at 810–11 (Sykes, J., concurring) (concluding that "political and policy differences" between proposed legislative intervenor and state attorney general regarding challenged law are not evidence of inadequate representation).

In any event, the district court found there was no evidence in the record indicating that the Attorney General's policy preferences left him without the proper "level of interest" or "incentive" to robustly litigate on behalf of S.B. 824. *NAACP I*, 332 F.R.D. at 170. Nor, the court determined, has the Governor's control of appointments to the State Board caused the Board to fall short in its defense of that law. *See id.* at 171. Any suggestion that the Governor might use his appointment power to direct the State Board or Attorney General to slow-walk the State's defense of S.B. 824, the court held, was no more than "conclusory speculation," insufficient on the current record to rebut the presumption of adequate representation. *Id.* at 170, 171. We see no abuse of discretion in that considered judgment.[10]

---

[10] On this en banc appeal, the Leaders point us to one new litigation development: In the State Board's successful appeal from the district court's preliminary injunction, the Governor filed an amicus brief urging us to affirm entry of the injunction to avoid confusion during the 2020 election cycle. *See* Brief of Roy Cooper as Amicus Curiae, *N.C. State Conf. of the NAACP v. Raymond*, No. 20-1092 (4th Cir. July 20, 2020). The Governor's brief, filed by private counsel, focused narrowly on the practicalities of lifting the preliminary injunction right before an election and during a pandemic, and by itself does not indicate that either the State Board or the Attorney General – who sought and won a reversal of the preliminary injunction – had failed or would fail to adequately defend the law on the merits. Given the limited nature of our review in this posture, we think it appropriate for the district court to consider in the first instance what bearing this brief might have on the adequacy of the State Board's defense of S.B. 824 going forward, should the Leaders again seek intervention.

42

That is not to say, of course, that there never could be a case in which a state attorney general's political opposition to a statute – or the opposition of some other state legal representative – might cause an abdication of the duty to defend that law in court. Should the Attorney General or State Board in fact abandon their defense of S.B. 824 in the future, failing to file an appeal or petition for certiorari in the appropriate circumstance or otherwise to litigate on the law's behalf, then we would have the changed circumstance the district court hypothesized in its first order denying intervention. At that point, the Leaders would be free to seek intervention once again, and the district court free to reconsider the Rule 24(a)(2) factors – and in particular, whether state law authorized the Leaders to step into this newly created breach to represent the State's interest in the validity of its statute. But on the present record, we defer to the district court's judgment that the Leaders' renewed request for intervention as of right was premature and without support.

## C.

Finally, we turn to the district court's reevaluation and reaffirmation, in its second order, of its denial of permissive intervention under Rule 24(b). This is not the focus of the Leaders' appeal, and for good reason. Here, the deference accorded the district court is at its zenith: The discretion Rule 24(b) affords the district court is "even broader" than that under Rule 24(a)(2), *R&G Mortg. Corp. v. Fed. Home Loan Mortg. Corp.*, 584 F.3d 1, 11 (1st Cir. 2009), and "a challenge to the court's discretionary decision to deny leave to intervene must demonstrate a *clear* abuse of discretion in denying the motion," *McHenry v. Comm'r*, 677 F.3d 214, 219 (4th Cir. 2012) (internal quotation marks omitted). The Leaders cannot meet that high standard.

43

The district court's original decision to deny permissive intervention – while allowing amicus participation – rested on its finding that the addition of the Leaders as parties would result in unnecessary complications and delay, jeopardizing the court's ability to reach final judgment in a timely manner and likely prejudicing the plaintiffs, who would be required to address "dueling defendants" with multiple litigation strategies all purporting to represent the same state interest. *NAACP I*, 332 F.R.D. at 172. In its decision reviewing the Leaders' renewed motion – the decision on appeal – the district court expressly reaffirmed that finding. *NAACP II*, 2019 WL 5840845, at *4. And indeed, the court found, the Leaders' litigation conduct in the intervening months – appealing a purported "de facto" denial of their motion before the court had ruled on it, and seeking the extraordinary remedy of mandamus – had only "further convinced" it that intervention would "distract from the pressing issues in this case." *Id.*

The Leaders disagree, as is their right, insisting that their presence as parties, rather than amici, would facilitate and not hinder the prompt and equitable resolution of this litigation. But the district court's contrary conclusion is a factual judgment, informed by its "on the scene presence" and going directly to its trial management prerogatives, to which we owe the most substantial deference. *See Stuart*, 706 F.3d at 350 (internal citation omitted). We have no grounds for setting aside the court's finding as a "clear abuse of discretion." *McHenry*, 677 F.3d at 219. Moreover, that finding is sufficient by itself to justify the denial of permissive intervention under Rule 24(b)(3), which mandates the consideration of two – and only two – factors: undue delay and prejudice to existing parties. *See* Fed. R. Civ. P. 24(b)(3); *McHenry*, 677 F.3d at 225 (describing undue delay

44

and prejudice as the "core considerations" under Rule 24(b)(3)). Whatever other discretionary factors the court might have taken into account under Rule 24(b) – that is, once it found that the Leaders' intervention was likely to cause undue delay and prejudice to the plaintiffs – it did not abuse its discretion, let alone "clearly" so, by denying permissive intervention on that basis alone.

## IV.

For the reasons given above, the judgment of the district court is affirmed.

*AFFIRMED*

45

WILKINSON, Circuit Judge, dissenting:

Every attorney general who looks in the mirror sees a governor.  Or so it is said.  Therein lies a temptation.  When a challenge is brought to an unpopular or controversial state law, an attorney general's defense of the law may be less than wholehearted.  If the plaintiffs in the case are politically influential, the temptation to pull punches becomes even stronger.  It casts no aspersions on anyone to note the obvious: North Carolina's voter photo ID law is a very controversial statute.  *See* 2018 N.C. Sess. Laws 144.

The attorney general's office exists at the crossroads of law and politics.  Electoral ambitions frequently collide with an AG's obligations both to his client and to the court.  But this fact alone does not allow courts to be cynical.  Perhaps I am naïve in not taking a darker view of human nature, but I believe that when a state statute is under challenge, an AG's professional and ethical obligations—and certainly those of the Department of Justice which he leads—will most often prevail over the political itch.  The AG, after all, is the state's chief <u>legal</u> officer, and that should mean a lot.

How to disentangle the legal from the political?  Trial courts are best equipped to do so.  The district court is best situated to assess the "adequacy" of an existing party's representation of a proposed intervenor's interest.  *See* Fed. R. Civ. Pro. 24.  The parties are right there in front of it.  Adequacy moreover is a judgment call.  The court of appeals thus has a duty to respect the abuse of discretion standard under which a district court operates and, beyond that, not to gratuitously make the administration of the trial court's docket an unmanageable task.

46

Open-ended intervention greatly complicates the trial court's duty to have the trains run on time. More coordination of such mundane matters as continuances, status conferences, and discovery deadlines is required. Scheduling preferences are not the only snag. The more parties to a litigation, the more inevitable divergences in strategy arise, and the more complex the suit becomes. Intervenors are no aid to simplicity. *Cf.* Fed. R. Civ. Pro. 24(b)(3) (recognizing the risk of delay in the context of permissive intervention). Multi-party litigation tends to take longer to resolve and tends, as well, to run up attorneys' fees. Incurring all these costs seems especially unnecessary where, for many a would-be intervenor, amicus status is quite sufficient. In other cases, intervenors are best diverted from litigation to the legislative realm. When appeals—like this one—are taken on preliminary questions only tangentially related to the actual merits of the suit, the danger of intervention interminability is compounded.

I find much to commend in Judge Harris's opinion, which underscores these points well. And here we face the added fact that the Attorney General has both taken an appeal from the preliminary injunction entered against the state statute and prevailed before this court in having the statute upheld. *See NC State Conf. of the NAACP v. Raymond*, 981 F.3d 295 (4th Cir. 2020).

So why then allow intervention? And here Judge Quattlebaum has ably presented the argument. This case may present just that narrow set of circumstances in which intervention should be permitted. For one, the prospective intervenor is not a private party as in *Stuart v. Huff*, 706 F.3d 345 (4th Cir. 2013), but a coordinate branch of state government. State law envisions a role for the General Assembly when a state statute is

47

under challenge. North Carolina has enacted statutes that ask federal courts to allow both the executive and legislative branches of the state government to participate in actions challenging the constitutionality of its laws. *See* N.C. Gen. Stat. § 1-72.2(a); *see also id.* §§ 114-2, 120-32.6. As for the executive, the Attorney General of North Carolina has a general statutory duty to represent the state, its agencies, and its officers in any court proceedings. *See id.* § 114-2(1), (2). That is a common responsibility of attorneys general across the nation. North Carolina, however, has seen fit to supplement the Attorney General's representation of the state when there are challenges to the constitutionality of state statutes. North Carolina law allows for the General Assembly, through its two houses' presiding officers, to represent the interests of the state. *See id.* §§ 1-72.2, 120-32.6.

While it is by no means clear that state law can mandate that federal courts allow a single state to speak with dual voices in federal proceedings, it is altogether clear that federal law itself has an especially important role to play in election law cases. No less an authority than our Constitution leaves the legislatures of the states the power to "prescribe[]" the "Times, Places and Manner of holding Elections." U.S. Const. art. I, § 4, cl. 1. This important task was not delegated to state government in general but to state legislatures in particular. *See id.* The North Carolina photo ID law provides a clear example of prescribing the "Manner of holding Elections." Thus the "interests" of the proposed intervenors in this case could hardly be more apparent. And in "divided government" states like North Carolina, the danger that the executive or judicial branches may seek to override the constitutionally prescribed legislative role is more than theoretical.

48

As a result, given the confluence of factors before the court, I would recognize a right to intervention in these narrowest of circumstances.  I would not under any circumstances let intervention loose as a contagious legal principle.

49

NIEMEYER, Circuit Judge, dissenting:

While I compliment Judge Harris' craftsmanship in discussing Federal Rule of Civil Procedure 24, I concur in Judge Quattlebaum's fine opinion and request that he show me as joining it. I write separately only to emphasize that the issue is, I believe, more than a procedural one under Rule 24.

While intervention under Rule 24 is, to be sure, the relevant *procedural* question — one of federal law — the relevant parties and their interests are substantive issues that are to be determined by state law, and this aspect is mostly finessed by the majority's ruling. To accomplish its result, the majority collapses, for purposes of its discussion, the North Carolina parties into the singular "State of North Carolina" and their interests into the singular "State's interest." It then concludes that under Rule 24 the Attorney General is adequately representing North Carolina and North Carolina's interests and therefore no other party having an interest in a North Carolina statute may intervene. I think this is more than a convenient formulation, as it fails to address the inherent underlying issues necessary in deciding the Rule 24 motion.

The plaintiffs in this case seek a declaration that a North Carolina election law is invalid, and they named as defendants the Governor and the North Carolina State Board of Elections. Yet, state law anticipates that the State will be sued when the validity or constitutionality of an act of the General Assembly is challenged. *See* N.C. Gen. Stat. § 1-72.2(a). Section 1-72.2(a) provides that the "General Assembly and the Governor constitute the State of North Carolina" in such a suit, and therefore, a court should allow the General Assembly and the Governor "to participate in" "any action in any federal court

50

in which the validity or constitutionality of an act of the General Assembly . . . is challenged." *Id*. That is declared to be the "public policy of the State." *Id*. And state law further authorizes the General Assembly to retain counsel of its own choosing and not necessarily the Attorney General, thus contemplating that the General Assembly might find the Attorney General's counsel inadequate or otherwise undesirable. *See* N.C. Gen. Stat. § 1-72.2(b). The majority opinion fails to take proper account of this state law, which I suggest lies at the substantive root of this case.

To be sure, the procedural principles of Rule 24 intervention must be applied in this case to ensure that the proper parties are before the court. But underlying that application are questions of substantive state law regarding who the relevant parties are and who defends the state's interest. The majority opinion does not, except most obliquely, address these questions. And its failure to recognize these aspects is especially significant in view of the history of S.B. 824, which entails a story of political conflicts and differences between the branches of North Carolina government. Indeed, giving homage to state law in these circumstances seems to be explicitly mandated, as the Supreme Court noted when it stated, "If the State had designated the House to represent its interests, and if the House had in fact carried out that mission, we would agree that the House could stand for the State." *Virginia House of Delegates v. Bethune-Hill*, 139 S. Ct. 1945, 1951 (2019).

Here, the State of North Carolina, as sovereign, did designate the General Assembly to represent its interests. And if we give its choice effect, then the analysis conducted by the majority in concluding that the General Assembly may not be allowed to intervene

51

under Federal Rule 24 because the Attorney General is doing a good job is substantively

flawed.

52

QUATTLEBAUM, Circuit Judge, with whom Judges NIEMEYER, AGEE, RICHARDSON, and RUSHING join, dissenting:

North Carolina recognized a potential problem. It anticipated that there could be times when its executive branch would not vigorously enforce the state's duly-enacted legislation. To address that concern, North Carolina passed a law that requests the North Carolina General Assembly be permitted, alongside the executive branch, to defend any federal action challenging a North Carolina statute.

More specifically, North Carolina enacted N.C. Gen. Stat. § 1-72.2, first passed in 2013 and modified in 2017, which provides that for any action challenging an act of the General Assembly, "[i]t is the public policy of the State of North Carolina that . . . the General Assembly, jointly through the Speaker of the House of Representatives and the President Pro Tempore of the Senate, constitutes the legislative branch of the State of North Carolina; the Governor constitutes the executive branch of the State of North Carolina; [and] that, when the State of North Carolina is named as a defendant in such cases, *both* the General Assembly and the Governor constitute the State of North Carolina . . . ." N.C. Gen. Stat. § 1-72.2(a) (emphasis added). It then requests that a federal court presiding over an action where the State of North Carolina is a named party allow both the legislative branch and the executive branch of the State of North Carolina to participate as a party in such an action.[1] *Id.*

---

[1] North Carolina passed other laws to address this same concern. For example, N.C. Gen. Stat. § 120-32.6 provides "[w]henever the validity or constitutionality of an act of the General Assembly or a provision of the Constitution of North Carolina is the subject of an

53

Subsequently, North Carolina passed its current voter identification bill. In response, the state chapter of the NAACP and several county branches (collectively the "NAACP") sued North Carolina's Governor—who, like the NAACP, opposed the bill—and the members of the State Board of Elections that the Governor appointed, claiming the law was unconstitutional.

North Carolina's Attorney General, who also publicly opposed the law, was tasked with defending it on behalf of the Governor and the State Board of Elections. The authority for the Attorney General to defend the law was grounded in North Carolina law. N.C. Gen. Stat. Ann. § 114-2 provides that "[p]ursuant to Section 7(2) of Article III of the North Carolina Constitution, it shall be the duty of the Attorney General: (1) To defend all actions in the appellate division in which the State shall be interested, or a party, and to appear for the State in any other court or tribunal in any cause or matter, civil or criminal, in which the State may be a party or interested."

However, North Carolina's Speaker of the House of Representatives and President Pro Tempore of the Senate (the "Leaders") believed that the NAACP's challenge to the voter identification law involved the exact situation contemplated by N.C. Gen. Stat. § 1-72.2. As a result, they moved to intervene to defend the law. They claimed a significantly protectable interest in the litigation that, without intervention, would practically be

---

action in any State or federal court, the Speaker of the House of Representatives and the President Pro Tempore of the Senate, as agents of the State through the General Assembly, shall be necessary parties and shall be deemed to be a client of the Attorney General for purposes of that action as a matter of law and pursuant to Section 7(2) of Article III of the North Carolina Constitution."

54

impaired. And they claimed that their interest was not being adequately represented by the Governor and the State Board of Elections due both to the public opposition to the bill expressed by the Governor and the Attorney General and to what they described as the half-hearted way the Attorney General was defending the law in this case and in a parallel case in state court—*Holmes v. Moore*, No. 18-cv-15292 (N.C. Super. Ct.). The district court denied the Leaders' motion to intervene, prompting this appeal.

For good reason, district courts are afforded discretion in resolving motions to intervene. Appellate courts should generally avoid micromanaging district courts in such matters. But this is not your run of the mill intervention case. Here, the district court excluded from its analysis the express policy of North Carolina as reflected in its democratically-enacted statutes. Although federal courts need not completely defer to that public policy decision, the district court cannot fail to give the State's choice any weight.

The district court also applied the incorrect legal standard, extending the heightened burden of a "strong showing" of inadequacy to circumstances where, until today, it did not apply. For both of these reasons, I would vacate the district court's order denying intervention and remand so that the district court can consider the requested intervention, evaluating all relevant factors, under the proper legal standard.

I.

In 2018, the North Carolina General Assembly ratified Senate Bill 824, titled "An Act to Implement the Constitutional Amendment Requiring Photographic Identification to Vote" ("S.B. 824"), which established, among other things, photographic voter

55

identification requirements for elections in North Carolina. Governor Roy Asberry Cooper, III, vetoed the bill, explaining that requiring "photo IDs for in-person voting is a solution in search of a problem." J.A. 128. Governor Cooper went on to state that "the fundamental flaw in the bill is its sinister and cynical origins: It was designed to suppress the rights of minority, poor and elderly voters. The cost of disenfranchising those voters or any citizens is too high, and the risk of taking away the fundamental right to vote is too great, for this law to take effect." J.A. 128.

The Senate and House voted to override the veto. Thus, S.B. 824 was enacted as North Carolina Session Law 2018-144. The day after it was passed, the NAACP sued Governor Cooper; the Chair of the North Carolina Board of Elections; the Secretary of the North Carolina State Board of Elections; and seven other members of the North Carolina State Board of Elections[2] (the "State Defendants") challenging the validity of S.B. 824. In its complaint, the NAACP contends that S.B. 824 has a disparate impact on African American and Latino citizens of North Carolina in violation of Section 2 of the Voting Rights Act of 1965, 42 U.S.C. § 1973, as well as the Fourteenth and Fifteenth Amendments to the United States Constitution.

Relevant here, in challenging S.B. 824, the NAACP sued the Governor—who publicly and aggressively opposed the bill—and the State Board of Elections—which is made up of members appointed by the Governor. As a result, the parties defending S.B.

---

[2] Because the State Board was reconstituted to consist of five governor-appointed members after the complaint was filed, those members were substituted as parties to the action in the district court as reflected in the district court's order.

56

824 were parties with a historical opposition to the law or entities under the indirect control of such parties. Further, the Attorney General tasked to represent the State Defendants has a similar history of opposing North Carolina's voter ID laws. For example, in early 2017, Attorney General Josh Stein moved to dismiss a petition to the United States Supreme Court in *North Carolina v. North Carolina State Conference of NAACP*, a suit regarding the North Carolina voting law passed in 2013. *See North Carolina v. N.C. State Conf. of NAACP*, 137 S. Ct. 1399 (2017). He also issued a press release that same day stating that he supported "efforts to guarantee fair and honest elections, but those efforts should not be used as an excuse to make it harder for people to vote." J.A. 142. From a perception standpoint, the action bore the hallmarks of a friendly suit.

In January 2019, the Leaders moved under Federal Rule of Civil Procedure 24 to intervene on behalf of the North Carolina General Assembly to oppose the NAACP's challenges to S.B. 824. Seeking to intervene as a matter of right under Rule 24(a) and, alternatively, permissively under Rule 24(b), the Leaders argued that state law, specifically N.C. Gen. Stat. § 1-72.2(a) and (b), expresses the public policy of the State of North Carolina that the President Pro Tempore of the Senate and the Speaker of the House represent the State of North Carolina in defense of its statutes. They further argued that N.C. Gen. Stat. § 1-72.2 requests that federal courts permit their intervention to adequately represent the State and General Assembly's interests where the constitutionality of statutes, like S.B. 824, is challenged. The State Defendants neither consented nor objected to the motion to intervene, while the NAACP opposed the requested intervention.

57

In June 2019, the district court denied the motion to intervene, largely concluding that the State Defendants were represented by the Attorney General, who under North Carolina law, is charged with representing the State in defense of its existing laws, that the State Defendants had not abdicated their responsibility to defend S.B 824, and that, accordingly, the Leaders failed to make the requisite "strong showing of inadequacy" to overcome the presumption of adequate representation. The district court's denial was without prejudice and invited a renewed motion if the Leaders could show that the State Defendants no longer intended to defend the lawsuit and the requirements for intervention were otherwise satisfied. While denying the motion to intervene, the district court allowed the Leaders to participate in the action by filing amicus curiae briefs.

Six weeks later, in July, the Leaders filed a renewed motion to intervene, arguing that it was apparent that the State Defendants would not fully defend S.B. 824. In November, the district court denied the renewed motion. The court concluded that its previous Rule 24 analysis, as set forth in its initial order, remained "the law of this case," focusing on whether the Leaders presented newly available evidence demonstrating that the State Defendants declined to defend this lawsuit. J.A. 3239, 3241. It then evaluated the Leaders' new allegations, determining they did not involve any new evidence. The district court thus denied the renewed motion to intervene, this time with prejudice, and reiterated that the Leaders could participate in the action by filing amicus curiae briefs.

On November 11, 2019, the Leaders filed a notice of appeal from the order denying their renewed motion to intervene.

58

II.

We review the denial of a motion to intervene for abuse of discretion. *In re Sierra Club*, 945 F.2d 776, 779 (4th Cir. 1991). But while our review is deferential, we still must ensure that the district court included the relevant factors in its intervention analysis. *See Hill v. W. Elec. Co. Inc.*, 672 F.2d 381, 387 (4th Cir. 1982) ("[W]e think the court failed to consider or gave insufficient weight to another factor possibly militating in favor of intervention."). Another of our responsibilities is to ensure that intervention decisions are not based on incorrect legal principles. *See Stuart v. Huff*, 706 F.3d 345, 349–50 (4th Cir. 2013); *see also Feller v. Brock*, 802 F.2d 722, 729–30 (4th Cir. 1986) (finding that denial of intervention as of right to apple pickers was reversible error and admitting intervenors as parties-defendant); *Hill*, 672 F.2d at 385–86, 392 (remanding action for proper consideration of the motion for permissive intervention because the district court did not properly apply legal standards). Here, the district court erred in both respects. It first ignored North Carolina's law requesting two agents in cases challenging the constitutionality of its duly-enacted statutes. And then it compounded the error by setting the bar for the Intervenors to clear too high.

III.

Federal Rule of Civil Procedure 24 permits two types of intervention: intervention as a matter of right under subsection (a) and permissive intervention under subsection (b). The Leaders first claim that they are entitled to intervene as a matter of right. They alternatively claim they should be able to intervene permissively.

59

A.

Rule 24(a)(2) allows intervention as of right when the movant claims an interest "relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest," unless the movant's interest is adequately represented by existing parties. Fed. R. Civ. P. 24(a)(2). There are three requirements for intervention as of right. "[T]he moving party must show that (1) it has an interest in the subject matter of the action, (2) disposition of the action may practically impair or impede the movant's ability to protect that interest, and (3) that interest is not adequately represented by the existing parties." *Newport News Shipbuilding and Drydock Co. v. Peninsula Shipbuilders' Ass'n*, 646 F.2d 117, 120 (4th Cir. 1981). Although the Majority's decision is limited to the adequacy requirement, I will consider all three.[3]

---

[3] The Majority concludes that our jurisdiction over this appeal is limited to the district court's narrow focus in its second order denying intervention on the application of Rule 24(a)(2)'s adequacy prong to the Attorney General's defense of S.B. 824. Maj. Op. at 20. I do not find our jurisdictional focus to be as narrow as the Majority. The district court's June 2019 order, which denied the initial motion to intervene without prejudice, should not be regarded as an appealable final order. In addition to being issued without prejudice, the order did not outright deny the motion to intervene and invited the Leaders to file a renewed motion. Thus, in my view, it was not sufficiently final to trigger immediate review. In contrast, the second order was a final order. Importantly, the second order relied on the reasoning from the first order and, in doing so, signified that the first order "should continue to govern the same issues in subsequent stages in the same case." *See Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 816 (1988) (quoting *Arizona v. California*, 460 U.S. 605, 618 (1983)). The court then denied the Leaders' motion with prejudice. For those reasons, I would find that the second order, including its analysis and reference to the earlier order, was sufficiently conclusive for appellate review. *See Hodgson v. United Mine Workers of Am.*, 473 F.2d 118, 126–27 (D.C. Cir. 1972) ("We are satisfied that the June 20 order . . . constituted a fresh evaluation of the intervention application, well within

60

1.

A party seeking to intervene must have "an interest relating to the property or

transaction that is the subject of the action . . . ." Fed. R. Civ. P. 24(a)(2). The district court

found that the Leaders lacked a sufficient interest because the Executive State Defendants

had not completely abdicated their responsibility to defend S.B. 824. J.A. 378 (holding that

"because State Defendants in this action are presently defending the challenged legislation

and have expressed no intention to do otherwise, [the Leaders] have failed to demonstrate

that they have a significantly protectable interest in likewise defending the constitutionality

of S.B. 824 sufficient to warrant a right to intervene under Rule 24(a)(2)"). This analysis

disregards the North Carolina law requesting federal courts permit the General Assembly

to defend state statutes in federal court.

Rather than look to the North Carolina law, the district court relied on cases finding

that individual legislators lack a sufficient protectable interest to intervene in litigation over

statutes for which they voted. As a general principle, I agree. But that is not what we have

the discretionary power of the District Court to make, and amenable to review on the merits
by this court.").

Additionally, the Majority's view of our jurisdiction has a decided impact on what
part of its opinion constitutes binding precedent going forward. The Majority's decision
concerning jurisdiction effectively resolves the first two requirements against the Leaders.
Consequently, while its jurisdictional analysis is binding precedent of this Circuit, the
Majority's subsequent discussion of the adequacy issue, properly construed, is dicta and
not binding in future cases. *See Pittston Co. v. United States*, 199 F.3d 694, 703 (4th Cir.
1999) ("Dictum is [a] 'statement in a judicial opinion that could have been deleted without
seriously impairing the analytical foundations of the holding—that, being peripheral, may
not have received the full and careful consideration of the court that uttered it.'" (quoting
*United States v. Crawley*, 837 F.2d 291, 292 (7th Cir. 1988)).

61

here. The Leaders rely not only on their general position as legislators, but also on N.C. Gen. Stat. § 1-72.2. Under the statute, in any action in federal court challenging the validity or constitutionality of an act of the General Assembly or a provision of the North Carolina Constitution, "[i]t is the public policy of the State of North Carolina that . . . the General Assembly, jointly through the Speaker of the House of Representatives and the President Pro Tempore of the Senate, constitutes the legislative branch of the State of North Carolina; the Governor constitutes the executive branch of the State of North Carolina; [and] that, when the State of North Carolina is named as a defendant in such cases, *both* the General Assembly and the Governor constitute the State of North Carolina . . . ." N.C. Gen. Stat. § 1-72.2(a) (emphasis added). It goes on to request that a federal court presiding over an action where the State of North Carolina is a named party allow both the legislative branch and the executive branch of the State of North Carolina to participate as a party in such an action. *Id.*

Importantly, this statute does not limit the role of the General Assembly to instances in which the executive branch declines to defend or participate in the action. Of course, as the district court noted in its initial order, § 1-72.2 only requests that a federal court allow the legislative branch to participate. The requirements of Rule 24(a)(2) must still be satisfied. But statutes of a separate sovereign that express the state's interest and role in the litigation cannot be cast aside and excluded from the merits of the intervention decision. In other words, while this North Carolina statute does not mandate federal intervention, it sets forth the nature of the state's interests.

62

Neither the Supreme Court nor this Court has imposed the standard followed by the district court—that the Attorney General must decline to defend the lawsuit in order to trigger a protectable interest on the part of the Leaders. In fact, Supreme Court jurisprudence, while perhaps not squarely on point, suggests the opposite.

In *Virginia House of Delegates v. Bethune-Hill*, 139 S. Ct. 1945 (2019), the Supreme Court addressed whether the Virginia House of Delegates and its Speaker had, as intervenors, standing to appeal to defend Virginia's redistricting plan after the Commonwealth of Virginia announced it would not file an appeal to the Supreme Court. *Bethune-Hill*, 139 S. Ct. at 1950. The Commonwealth moved to dismiss the House's appeal for lack of standing. The Supreme Court granted that motion and dismissed the appeal. The Court held that the "House, as a single chamber of a bicameral legislature, has no standing to appeal the invalidation of the redistricting plan separately from the State of which it is a part." *Id*. But while holding that the House lacked standing there, *Bethune-Hill* also emphasized "a State has standing to defend the constitutionality of its statute." *Id.* at 1951 (citation omitted). "[A] State must be able to designate agents to represent it in federal court," and "if the State had designated [a legislative branch] to represent its interests . . . the [legislative branch] could stand in for the State." *Id.* (citation omitted). That choice, the Court explained, "belongs to Virginia." *Id*. at 1952. While in that case, Virginia had chosen to speak only with "a single voice," that of the executive, nothing in the opinion suggested it could not have dual agents. *Id.* Indeed, the main point from *Bethune-Hill* is that states have great deference in deciding who represents their interests. *Id.* at 1952.

63

The Supreme Court's guidance in *Bethune-Hill* is consistent with its earlier decision in *Hollingsworth v. Perry*, 570 U.S. 693 (2013). There, the Court held that "the Speaker and the President, in their official capacities, could vindicate that interest in federal court on the legislature's behalf," noting that "a State has a cognizable interest 'in the continued enforceability' of its laws that is harmed by a judicial decision declaring a state law unconstitutional." *Hollingsworth*, 570 U.S. at 709–10 (citations omitted). And the Court further provided that "[t]o vindicate that interest or any other, a State must be able to designate agents to represent it in federal court," because a state is a political corporate body that can only act through its agents. *Id.* at 710 (citing *Poindexter v. Greenhow*, 114 U.S. 270, 288 (1885)). "That agent is typically the State's attorney general. But state law may provide for other officials to speak for the State in federal court . . . ." *Id*.

And here the Leaders represent the entire bicameral legislative branch in North Carolina, making this matter comparable to *Arizona State Legislature v. Arizona Independent Redistricting Commission*, 135 S.Ct. 2652 (2015). In that case, the Court recognized the Arizona legislature's standing to challenge a ballot initiative threatening its authority over redistricting. *See also Arizonans for Official English v. Arizona*, 520 U.S. 43, 65 (1997) ("We have recognized that state legislators have standing to contest a decision holding a state statute unconstitutional if state law authorizes legislators to represent the State's interests.").

As the Majority points out, in *Bethune-Hill*, *Hollingsworth* and *Arizonans for Official English*, the state representative was no longer defending the state or declined to appeal an adverse ruling. That distinction, to the Majority, means those decisions have little

64

bearing here. I disagree. In emphasizing the principle that a state must be able to designate its agents to represent it in federal court, none of those decisions limited that principle to situations where the initial agent was no longer participating in the defense or declined to appeal an adverse ruling. For example, and most recently, the Supreme Court, in *Bethune-Hill,* reiterated the Court's earlier holding that "a State must be able to designate agents" for representation in federal court. *Bethune-Hill*, 139 S. Ct. at 1951 (quoting *Hollingsworth*, 570 U.S. at 710)*.* Relevant here, the Court referenced "agents"—plural not singular, without further limitation. *See id.* Thus, I would not impose on these Supreme Court decisions a limitation not imposed by the Court itself.

Finally, in determining that the Leaders lacked a sufficient interest in the S.B. 824 litigation, the district court also found the Leaders' reliance on the Supreme Court case *Karcher v. May*, 484 U.S. 72 (1987), misplaced. The district court reasoned that the issue before the Supreme Court there was whether public officials, who participated as intervenors in their official capacities, could continue to appeal an adverse judgment after leaving office—an issue that the district court indicated is not present here. Respectfully, the district court reads *Karcher* too narrowly. *Karcher* also confirmed that "[t]he authority to pursue the lawsuit on behalf of the legislature belongs to those who succeeded [the legislators] in office." *Id.* at 77. Although the issues presented here may not be identical to those presented there, *Karcher* reiterates the role that active legislators play in defending a lawsuit depends on a particular state's law, which is an issue relevant to the interests asserted by the Leaders.

65

*Bethune-Hill*, *Hollingsworth*, *Arizona State Legislature* and *Karcher*[4] indicate that the determination of the sufficiency of the interests of the Leaders in this litigation requires a careful consideration of N.C. Gen. Stat. §1-72.2(a). In my view, the district court failed to do this. Although it cited the statute in full in its first order, its only discussion of the statute in relation to the question of the Leaders' interests was mentioning how the statute only requested that a federal court allow intervention. That is, of course, true as far as it goes. But that brief discussion does not go to the merits of the Leaders' interest in the case. Even though the North Carolina statute does not require that the Leaders' motion be granted, that statute bears on the merits of the intervention decision.

And this is the case even if you follow the Majority's view that we may only review the second order. When the district court issued its initial order, it lacked the benefit of *Bethune-Hill.* But its second order addresses *Bethune-Hill*, even if only in a footnote, stating, without analysis, that *Bethune-Hill* does not "change the calculus." J.A. 3241. The second order also cites N.C. Gen. Stat. §1-72.2(a). Despite *Bethune-Hill*'s guidance, however, the district court only refers to the statute a single time, stating that it is "far from clear whether [the Leaders] are authorized to intervene when the State Board and Attorney General are already defending a suit in federal court." *Id.* Importantly, just as it failed to analyze *Bethune-Hill*, the district court failed to analyze the North Carolina statutes,

---

[4] Although these decisions primarily focus on standing, the issues presented overlap with the question of the movant's interests in the litigation under Rule 24(a)(2). *See generally Hollingsworth*, 570 U.S. at 710 (noting the legislature's authority to represent the state's interests).

66

concluding that it did not have to do so as long as the State Board and Attorney General were defending the suit. Once again, it is not our job to micromanage how the district court weighs the relevant factors in the intervention analysis. But it is our job to ensure that relevant factors, one of which here is §1-72.2(a), are not excluded from the analysis. I would remand the case to the district court to consider the North Carolina statute in the analysis of the Leaders' interest in the litigation—with particular attention to the Supreme Court's instructions that the state may choose its agents to defend its statutes in federal court and that the North Carolina statute does so here.

### 2.

Having found no protectable interest, the district court predictably found the Leaders failed to satisfy Rule 24(a)'s second requirement—whether the disposition of this case would practically impair or impede their ability to protect their interest absent intervention. As a remand is needed to address the Leaders' alleged protectable interest, remand is also necessary to address this second requirement.

### 3.

Finally, I turn to adequate representation—the third requirement for intervention as of right. On this issue, the Leaders complain the State Defendants have consistently failed to adequately defend North Carolina's voter identification legislation. They argue that the State Defendants' efforts have been less than rigorous in *Holmes*, the parallel state court case, which, according to Leaders, is consistent with the State Defendants' withdrawal of a viable petition for certiorari to the Supreme Court in litigation over North Carolina's prior voter identification law. Further, the Leaders argue the State Defendants have continued

67

this pattern since the order denying intervention. Specifically, the State Defendants elected not to call expert witnesses at the hearing on the preliminary injunction over the implementation of S.B. 824 and have represented that they will not call experts at the trial. In addition, the Governor has filed an amicus brief in support of the NAACP regarding the appeal of the preliminary injunction issued by the district court. Finally, the Leaders point to the public comments of the Governor and Attorney General described above. They claim this record reveals an adversity of interest with the State Defendants which satisfies Rule 24(a)'s inadequacy requirement.

The district court, as noted above, determined that the Leaders had not made a sufficient showing of inadequacy. While we afford district courts discretion in resolving motions to intervene, a court necessarily abuses its discretion when it applies the wrong legal standard to evaluate adequacy and when it excludes pertinent factors from consideration. Here, the district court did both.

a.

Beginning with the legal standard for adequacy, the district court initially acknowledged that a would-be intervenor generally bears a minimal burden of showing inadequacy of representation by an existing party. *See Trbovich v. United Mine Workers*, 404 U.S. 528 (1972). But it also applied a presumption of adequacy from our *Commonwealth of Virginia v. Westinghouse Electric Corporation*, 542 F.2d 214, 216 (4th Cir. 1976) decision that arises when a party seeking intervention has the same ultimate objective as a party to the suit. Under that presumption, the proposed intervenor must establish one of three factors—adversity of interest, collusion or nonfeasance—to

68

overcome this presumption and meet the inadequacy requirement. The district court identified those three factors and attempted to apply them in its order.

The district court then concluded its adequacy analysis by holding "[the Leaders] have failed to sustain their burden of demonstrating the requisite '*strong showing of inadequacy*' to overcome the presumption of adequate representation by State Defendants and their counsel, the Attorney General." J.A. 386 (emphasis added). In using the phrase "strong showing of inadequacy," the district court added a heightened burden to overcome the *Westinghouse* presumption. In imposing that heightened burden, it cited our decision in *Stuart v. Huff*, 706 F.3d 345 (4th Cir. 2013), which requires intervenors to "mount a strong showing of inadequacy" where defendants are represented by a government agency. *Stuart*, 706 F.3d at 352.

I disagree that the Leaders needed to overcome that presumption by the heightened standard of a "strong showing." *See Trbovich*, 404 U.S. at 538 n.10. That heightened standard from *Stuart* does not, and should not, apply here.

In *Stuart*, abortion-services providers sued state officials over a North Carolina statute restricting abortions. 706 F.3d at 347. A group of pro-life medical professionals and others sought to intervene claiming the state defendants would not adequately protect their interests. Thus, we addressed whether "to permit *private* persons and entities to intervene in the government's defense of a statute . . . ." *Id.* at 351 (emphasis added). We held that, in such a situation, "the putative intervenor must mount a strong showing of inadequacy" in the context of those private persons and entities on the basis of government entities' duty to represent the people in public litigation matters. *Id.* at 352.

69

We explained two primary reasons for requiring a "strong showing" of inadequacy. First, we noted that in the face of a constitutional challenge to its statute, "the government is simply the most natural party to shoulder the responsibility of defending the fruits of the democratic process." *Id.* at 351. We added "[i]t is after all the government that, through the democratic process, gains familiarity with the matters of public concern that lead to the statute's passage in the first place." *Id.* Our discussion distinguished between the government and private citizens. And it is eminently reasonable to make that distinction. But in *Stuart*, we did not distinguish between different officials or branches of the government, and to do so now would not be reasonable. With no intent to disparage the Attorney General, I see no reason he is either the "most natural" agent to defend S.B. 824— a law that he has *publicly opposed*— or is more familiar with the matters of public concern that led to its passage in the first place as opposed to the Leaders. If anything, it would be more natural for the agents of the government that supported passage of the statute to defend its constitutionality than those who openly opposed it. That, of course, is a judgment best left to states. And when, like here, the state makes such a judgment, it must be considered when determining whether to permit intervention in a federal lawsuit challenging a state statute like S.B. 824.

Second, we noted that "to permit private persons and entities to intervene in the government's defense of a statute upon only a nominal showing would greatly complicate the government's job." *Id.* That makes sense. Allowing private citizens party status in a state's defense of its laws raises a host of concerns ably identified in *Stuart*. But this, of course, is not a case where a member of the public is seeking to intervene in the

70

government's defense. The Leaders here, like the State Defendants, are representatives of the State of North Carolina. In fact, they have been designated by that State as its agents for defending the constitutionality of North Carolina's laws. And while one might argue that allowing a second governmental entity to intervene to represent North Carolina complicates the government's job, any such complication is its own doing. When, as here, a state passes a statute designating its agents for defending the constitutionality of its laws, it is not for us to second guess that decision.

*Stuart* was, and remains, an important decision. Nothing I say here is intended to suggest otherwise or to in any way carve back its application. But the "strong showing" standard it imposed was for situations in which private litigants seek to intervene in the government's defense. The reasons set forth in *Stuart* for requiring a "strong showing" of inadequacy simply are not present here. Thus, *Stuart* does not govern and should not be expanded. That does not mean the Leaders' motion should be granted. It just means it should not be saddled with the heightened burden of making a "strong showing."

The Majority, in concluding that *Stuart* should be extended, relies in part on the Seventh Circuit's decision in *Planned Parenthood of Wisconsin, Inc. v. Kaul*, 942 F.3d 793 (7th Cir. 2019). And *Kaul* does, in fact, impose a heightened burden—one requiring a proposed intervenor to establish gross negligence or bad faith—to overcome the presumption of adequacy that circuit applied when a state attorney general was defending the constitutionality of a law. *Id.* at 801. In fact, the burden it imposes is more onerous than that required under *Stuart*. But with respect to the Majority and our sister circuit, I find the burden *Kaul* applied is too far removed from the text of Rule 24 to be persuasive. After all,

71

the Rule itself imposes no presumption. In my view, any judicially created presumption should be undertaken with care. And I respectfully disagree with the Majority's suggestion that *Kaul* aligns with our *Stuart* decision. Following *Kaul* would extend *Stuart* beyond its context of a private citizen seeking to intervene to defend the constitutionality of a state law and impose, without justification, a heightened burden not found in Rule 24.

Further, I find the reasoning of *Kaul* puzzling. There, the Seventh Circuit left no doubt that it would defer to the Legislature if it were to designate one agent to represent the state regardless of which entity it was. In fact, the Seventh Circuit said it could "see no reason why a federal court would bat an eye if a state required its attorney general to withdraw from his representation and allow another entity, including a legislature, to take over a case." *Kaul*, 942 F.3d at 802. It would not, however, defer to a statute that called for the Legislature to litigate alongside the Attorney General. But in *Bethune-Hill, Hollingsworth, Arizona State Legislature* and *Karcher*, the Supreme Court has made clear that states should be able to select their agents to defend the constitutionality of their laws and here we have statutory language that gives the North Carolina General Assembly final decision-making authority with respect to the defense of a challenged act. *See* N.C. Gen. Stat. Ann. § 120-32.6. That said, I see no reason we should have any more of a problem with a state selecting two representatives than with it selecting one. The key point is that it is the state's choice.

*Kaul* also contends a heightened burden is needed to avoid drawing the district courts into an "intractable procedural mess that would result from the extraordinary step of allowing a single entity, even a state, to have two independent parties simultaneously

72

representing it." *Id*. at 801. I agree that having two independent parties representing a state is unusual. But in my view, it is going too far to impose a heightened burden based on that risk. After all, district courts are afforded broad discretion to utilize the many options available to it to handle complex procedural matters. And they do this all the time with situations no less complex than what we have here. I am convinced that district courts possess the necessary tools to address any complexities arising from the state's decision to have more than one representative defending the constitutionality of its laws.[5]

For all of these reasons, I would not extend *Stuart*'s heightened burden of a strong showing of inadequacy to the situation presented here.

b.

But if the Leaders need not satisfy the heightened standard of a strong showing, what is the proper standard? To answer that question, I return to *Westinghouse*. There, we indicated the standard for establishing inadequacy generally was the minimal burden set forth by the Supreme Court in *Trbovich*. *Westinghouse*, 542 F.2d at 216. As already noted, we then held that if the proposed intervenor seeks the same ultimate relief as an existing party, the proposed intervenor must show either adversity of interest, collusion or malfeasance. *Id.* But while our *Westinghouse* decision concludes that a proposed intervenor seeking the same ultimate relief as an existing party must show one of those three factors, it does not hold or even suggest any change from the minimal burden of establishing those

---

[5] Consistent with my view, after the panel granted the Leaders' motion to intervene in the appeal, North Carolina's two representatives divided oral argument time and allocated the various positions in a way that created no undue burden on us.

73

factors. Thus, in my view a remand is needed so that the district court can evaluate whether the Leaders have established adversity of interest, collusion or malfeasance using the "minimal" burden standard of *Trbovich*. *Trbovich*, 404 U.S. at 538 n.10 (noting that the requirement of Rule 24 is satisfied if the applicant shows that representation of his interest may be inadequate and noting that the burden of making that showing is minimal); *Westinghouse*, 542 F.2d at 216 ("[A]ppellant's burden of showing an inadequacy of representation is minimal.").

c.

Having described the proper standard for evaluating adequacy, I turn to the pertinent factors the district court should consider in applying this standard. Using the standard outlined above, the district court should consider the evidence presented by the parties, as well as N.C. Gen. Stat. § 1-72.2.

The district court did not consider §1-72.2 in its adequacy analysis. But in enacting that statute, North Carolina has expressed its desire for the Leaders to represent it in litigation like the case before us. Implicit in that expression is the state's belief that, without the involvement of the Leaders, it will not be adequately represented. North Carolina, in enacting the statute, made the predictive judgment that there will be cases where the Executive Branch will not adequately represent its interests. And without stating one way or the other as to whether the Leaders should prevail, the public comments of the Governor and the Attorney General, and the other information they allege, are sufficient to require the statute to be considered. To be clear, this statute should not and does not automatically

74

satisfy the Rule 24(a) intervention requirements. But it does bear on the adequacy analysis and, thus, must be considered.

B.

Last, the district court also denied the Leaders' alternative request for permissive intervention. But it erred in doing so without even considering the North Carolina statute requesting that the General Assembly be permitted to intervene.

Permissive intervention contemplates intervention upon timely application "when an applicant's claim or defense and the main action have a question of law or fact in common." *See Newport News Shipbuilding & Drydock Co.*, 646 F.2d at 118 n.1. "If intervention of right is not warranted, a court may still allow an applicant to intervene permissively under Rule 24(b), although in that case the court must consider 'whether the intervention will unduly delay or prejudice the adjudication of the original parties' rights.'" *Stuart*, 706 F.3d at 349 (quoting Fed. R. Civ. P. 24(b)(3)).

Of note, the district court expressed concern with the potential for delays, which could result from adding the Leaders as parties, and with the additional burdens on the court and potential prejudice to the NAACP. And our appellate review of those concerns is deferential because "Rule 24's requirements are based on dynamics that develop in the trial court . . . ." *Id.* at 350. The trial court, in its broad discretion, is thus well positioned to evaluate those requirements. But "[w]hile the efficient administration of justice is always an important consideration, fundamental fairness to every litigant is an even greater concern." *Columbus-Am. Discovery Grp. v. Atl. Mut. Ins. Co.*, 974 F.2d 450, 470 (4th Cir. 1992). And "liberal intervention is desirable to dispose of as much of a controversy

75

'involving as many apparently concerned persons as is compatible with efficiency and due process.'" *Feller*, 802 F.2d at 729 (quoting *Nuesse v. Camp*, 385 F.2d 694, 700 (D.C. Cir. 1967)).

In denying permissive intervention, the district court failed to even consider N.C. Gen. Stat. § 1-72.2. Given the import of that statute as discussed above, it should have done so in deciding how to exercise its discretion. Rule 24(b)(3) does not impose a limitation on what may be considered. Again, without suggesting an outcome or the weight the statute or other factors should be afforded, I would remand the case for consideration of the permissive intervention request.

## IV.

For the above-stated reasons, I respectfully dissent.

76