UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
CIVIL ACTION NO. 1:18-cv-01034

| | |
|---|---|
| NORTH CAROLINA STATE CONFERENCE OF THE NAACP, et al., | |
| Plaintiffs, | **STATE BOARD DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT** |
| v. | |
| DAMON CIRCOSTA, in his official capacity as Chair of the North Carolina State Board of Elections, et al., | |
| Defendants. | |

# TABLE OF CONTENTS

MATTER BEFORE THE COURT .................................................................................. 1

STATEMENT OF FACTS ........................................................................................ 1

    A.     Historical Background of North Carolina's Photo ID Legislation ............... 2

    B.     Amendment to the North Carolina Constitution ........................................... 3

    C.     S.B. 824's Substantive Provisions ................................................................. 4

    D.     Differences from the Prior Voter ID Law ..................................................... 8

    E.     Procedural Background ................................................................................... 9

    F.     Implementation of S.B. 824 Prior to Injunction ......................................... 10

QUESTION PRESENTED ......................................................................................... 11

ARGUMENT .............................................................................................................. 11

I.     Plaintiffs' Claims are Suitable for Summary Judgment. ....................................... 12

II.     Plaintiffs' Evidence Does Not Show Discriminatory Intent .................................. 14

    A.     Historical Background .................................................................................. 15

    B.     Sequence of Events Leading to Enactment ................................................. 16

    C.     Legislative History ...................................................................................... 17

    D.     Impact of S.B. 824 ...................................................................................... 17

    E.     Nonracial Justifications ............................................................................... 20

    F.     Observer Provision ...................................................................................... 21

    G.     Challenge Provision ..................................................................................... 22

III.     S.B. 824 Does Not Deny An Equal Opportunity to Vote Under the VRA ........... 23

CONCLUSION .......................................................................................................... 29

CERTIFICATE OF WORD COUNT ......................................................................... 30

# TABLE OF CASES AND AUTHORITIES

**Cases:** Page(s)

*Abbott v. Perez*, 138 S. Ct. 2305 (2018) .......................................................................15-16

*Accord Quality Built Homes, Inc. v. Vill. of Pinehurst*, No: 1:06CV1028, 2008 U.S. Dist. LEXIS 61512, at *14 (M.D.N.C. Aug. 11, 2008) ............................... 13

*Brnovich v. Democratic Nat'l Comm.*, 141 S.Ct. 2321 (2021) ............................24-26, 28

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ................................................................11

*City of Mobile, Ala. v. Bolden*, 446 U.S. 55 (1980) .....................................................15-16

*Covington v. North Carolina*, 316 F.R.D. 117 (M.D.N.C. 2016), *aff'd* 137 S. Ct. 2211 (2017) ........................................................................................ 15

*Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181 (2008)................................21, 24-25

*Eastern Shore Mkt.'s Inc. v. J.D. Assoc.'s, LLP*, 213 F. 3d 175 (4th Cir. 2000) .............11

*Frank v. Walker*, 768 F.3d 744 (7th Cir. 2014) ...............................................................21

*Greater Birmingham Ministries v. Sec'y of State for State of Alabama*, 992 F.3d 1299 (11th Cir. 2021) ....................................................................................12, 21

*Harris v. McCrory*, 159 F. Supp. 3d 600 (M.D.N.C. 2016), *aff'd* 137 S. Ct. 1455 (2017) ......................................................................................... 15

*Holmes v. Moore*, No. 18-cv-15292 (N.C. Super. Ct.) ....................................................10

*Holmes v. Moore*, 840 S.E.2d 244, 270 N.C. App. 7 (2020) ...........................................10

*Hunter v. Underwood*, 471 U.S. 222 (1985) ....................................................................12

*Lee v. Va. State Bd. of Elections*, 843 F.3d 592 (4th Cir. 2016)...................... 17-19, 21, 25

*N.C. State Conf. of NAACP v. Moore*, 849 S.E.2d 87, 94, 273 N.C. App. 452, 461 (2020) .......................................................3-4

*N.C. State Conf. of NAACP v. McCrory*, 831 F.3d 204 (4th Cir. 2016).......................................................2-3, 8-9, 14-15, 20, 27

*N.C. State Conf. of the NAACP v. Raymond*, 981 F.3d 295 (4th Cir. 2020) ..............Passim

*Sabri v. United States*, 541 U.S. 600 (2004) ....................................................................12

*United States v. Raines*, 362 U.S. 17 (1960) ...................................................................12

*United States v. Salerno*, 481 U.S. 739 (1987) ...........................................................11-12

*Veasey v. Abbott*, 888 F.3d 792 (5th Cir. 2018) ..............................................................14

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252 (1977)........14, 16-17

*Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442 (2008) ...................12

*Wilkins v. Montgomery*, 751 F.3d 214 (4th Cir. 2014) ....................................................13

**Statutes & Regulations:**

N.C.G.S. § 161-10(a)(8) ......................................................................................................6

N.C.G.S. § 163-30 ...............................................................................................................7

N.C.G.S. § 163-45 ...............................................................................................................22

N.C.G.S. § 163-166.16 ........................................................................................................23

N.C.G.S. § 163-182.1B........................................................................................................9

N.C.G.S. § 163-182.5(b).......................................................................................................7

N.C.G.S. § 163-226(a) ........................................................................................................27

N.C.G.S. § 163-227.2(b) .....................................................................................................27

N.C.G.S. § 163-227.6(c) .....................................................................................................27

N.C.G.S. § 163-227.10(a) ...................................................................................................27

N.C.G.S. § 163-230.1 ...........................................................................................................7

N.C.G.S. § 163--230.3 ........................................................................................................27

N.C.G.S. § 163-231(b) ................................................................ 27

N.C.G.S. § 163A-821(a) ............................................................. 21

N.C.G.S. § 163A-911(c) ............................................................. 22

N.C.G.S. § 163A-1145.1 ..........................................................4-7

08 N.C. Admin. Code 17.0101(b) ........................................... 6, 18

08 N.C. Admin. Code 17.0107(a) ............................................... 18

08 N.C. Admin. Code 17.0109 ..................................................... 9

08 N.C.A.C. 20.0101(d) ............................................................. 22

**Constitutional Amendments:**

N.C. Const., Art. VI, §§ 2(4), 3(2) ............................................... 3

**Other Authorities:**

N.C. House Bill 351 ...................................................................... 2

N.C. House Bill 589 ........................................................ 2, 8, 9, 15

N.C. Senate Bill 824 ............................................................ Passim

UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
CIVIL ACTION NO. 1:18-cv-01034

|  |  |
|---|---|
| NORTH CAROLINA STATE CONFERENCE OF THE NAACP, et al., <br><br> Plaintiffs, <br><br> v. <br><br> DAMON CIRCOSTA, in his official capacity as Chair of the North Carolina State Board of Elections, et al., <br><br> Defendants. | **STATE BOARD DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT** |

## MATTER BEFORE THE COURT

The State Board Defendants ask that the Court enter summary judgment pursuant to Federal Rule of Civil Procedure 56 and Local Civil Rule 56.1(g).

## STATEMENT OF THE FACTS

In 2018, the voters of North Carolina adopted an amendment to the state Constitution that required all voters to present photo ID when voting. In turn, the state legislature enacted the law at issue, S.B. 824, which implements the 2018 constitutional amendment, with exceptions. [D.E. 97-2[1]]. Plaintiffs' lawsuit seeks to enjoin S.B. 824.

---

[1] *See* Act of Dec. 19, 2018, ch. 144, 2018 N.C. Sess. Laws. This brief refers to this law as "S.B. 824".

## A.     Historical Background of North Carolina's Photo ID Legislation.

In March 2011, the General Assembly filed House Bill 351, which would have required in-person voters to "present a valid photo identification to a local election official at a voting place before voting."  H.B. 351, Gen. Assemb., Reg. Sess. (N.C. 2011).  Then-Governor Beverly Perdue vetoed the legislation, and the bill never became a law.  *See* Governor's Objections and Veto Message, H.B. 351 (June 31, 2011).

In 2013, the North Carolina General Assembly enacted an "omnibus" election law, H.B. 589 (D.E. 97-10[2]), which imposed numerous new requirements for voting, including a photo ID requirement.  *See N.C. State Conf. of the NAACP v. McCrory*, 831 F.3d 204, 214 (4th Cir. 2016).  During the consideration of H.B. 589, "the legislature requested data on the use, by race, of a number of voting practices[,]" and with that data in hand, "eliminated or reduced registration and voting access tools that African Americans disproportionately used" and instituted a photo ID requirement that disproportionately burdened African Americans.  *Id.* at 214, 216.  The Fourth Circuit found that the legislature enacted the challenged provisions of the law with discriminatory intent.  *Id.* at 215.  Accordingly, the court enjoined H.B. 589's photo ID requirement, the shortened early voting period, and the elimination of same-day registration, out-of-precinct voting, and preregistration.  *Id.* at 219.

The Fourth Circuit was clear that its decision in *McCrory* "does not freeze North Carolina election law in place," and that the North Carolina legislature has the authority

---

[2] *See* Act of Aug. 12, 2013, ch. 381, 2013 N.C. Sess. Laws 1505.  This brief refers to this law as "H.B. 589."

under the federal constitution to modify its election laws based on legitimate, nonracial motivations.  *Id.* at 241.

**B.     Amendment to the North Carolina Constitution.**

In June 2018, the General Assembly approved the placement of six constitutional amendments on the November 2018 general election ballot, one of which required every voter to show photo identification when voting in person.  Act of June 29, 2018, ch. 128, 2018 N.C. Sess. Laws.  [D.E. 97-5].  The photo ID amendment passed with 55% of the electorate voting in favor.  [D.E. 97-8, p. 3].

Pursuant to this referendum, the North Carolina Constitution was amended by adding two new subsections that both read:

> Voters offering to vote in person shall present photographic identification before voting.  The General Assembly shall enact general laws governing the requirements of such photographic identification, which may include exceptions.

N.C. Const. art. VI, §§ 2(4), 3(2).

The General Assembly enacted S.B. 824 to implement the constitutional amendment.

After S.B. 824's enactment, a North Carolina superior court held that the North Carolina Constitution had not been properly amended because the General Assembly that proposed the amendment had been elected from districts that had been gerrymandered in violation of the U.S. Constitution.  The North Carolina Court of Appeals reversed that decision, over a dissent, concluding that the legislature possessed the proper authority "to pass bills proposing amendments for the people's consideration."  *N.C. State Conf. of*

3

*NAACP v. Moore*, 849 S.E.2d 87, 94, 273 N.C. App. 452, 461 (2020).  That decision has been appealed to the North Carolina Supreme Court.

### C.    S.B. 824's Substantive Provisions.

S.B. 824 identifies categories of photo IDs permitted for in-person and absentee voting, authorizes the issuance of free photo IDs, provides a number of exceptions to the photo ID requirement, mandates that the State Board engage in voter outreach and education, and funds the statute's implementation.  *See* S.B. 824 found at D.E. 97-2.

Under S.B. 824, a voter may vote, in-person or by absentee ballot, if he or she presents photographic identification falling into one of the following categories:

- NC driver's license
- NC nonoperator's ID
- Passport
- NC voter ID
- Tribal ID
- Approved Student ID issued by private and public colleges, universities and community colleges
- Approved State, local government, and charter school employee ID
- Driver's license and nonoperator's ID issued by another state, for newly registered voters
- Military ID
- Veterans ID

S.B. 824, sec. 1.2(a), § 163A-1145.1(a).  While federal military IDs are accepted, S.B. 824 as written did not authorize the use of other federal employee IDs or public assistance IDs for in-person and absentee voting.  *Id.*  However, the law was later

amended to expand the categories of IDs accepted to allow "[a]n identification card issued by a department, agency, or entity of the United States government or this State for a government program of public assistance."  N.C. Sess. Law 2020-17, sec. 10.

Military, veterans, and tribal IDs will be accepted even if the card has no expiration or issuance date.  S.B. 824, sec. 1.2(a), § 163A-1145.1(a)(2).  If a voter is sixty-five years old or older, an expired ID is accepted as long as it was unexpired on the voter's sixty-fifth birthday.  *Id.*, sec. 1.2(a), § 163A-1145.1(a)(3).  The remaining qualifying IDs will be accepted if they are unexpired or have been expired for one year or less.  *Id.*

S.B. 824 was also amended to make the approval process for educational institutions and government agencies' IDs more inclusive after the State Board raised a concern about the limited number of IDs that had been approved under the bill's original application process.  *See* Affidavit of Karen Brinson Bell, [D.E. 97-9, ¶¶ 30-31; Exhibit P, pp. 191-93]; *See* N.C. Sess. Law 2019-22, secs. 4, 6(b).  Prior to the 2020 election cycle, the State Board approved 118 applications for the use of IDs issued by colleges, universities, and government employers.  [D.E. 120, p. 26].

S.B. 824 also authorizes and funds the issuance of two different free voter IDs.  First, S.B. 824 requires the county boards of elections to "issue without charge voter photo identification cards upon request to registered voters."  S.B. 824, sec. 1.1(a).  Voters need not present any documentation to obtain a voter ID from a county board.  *See id.*, sec. 1.1(a), (d)(1).  Instead, they need only provide their name, date of birth, and the last four digits of their social security number.  *Id.*  Second, S.B. 824 enables all eligible

5

individuals over the age of 17 to receive a free non-operator ID card issued by the North Carolina Division of Motor Vehicles (DMV) that can be used for voting. *Id.*, sec. 1.3(a). The State must also provide, free of charge, the documents necessary to obtain an ID from the DMV, if the voter does not have a copy of those documents. *Id.,* sec. 1.3(a), § 161-10(a)(8).

Furthermore, S.B. 824 allows otherwise eligible voters to cast provisional ballots without photo ID in three circumstances:

- the voter has been a victim of recent natural disaster;
- the voter has religious objections to being photographed; or
- the voter has a reasonable impediment that prevents a voter from presenting a photo ID, including the inability to obtain ID due to lack of transportation, disability, illness, lack of birth certificate or other documents, work schedule, or family responsibilities; lost or stolen photo identification; photo identification applied for but not yet received; or, any other reasonable impediment the voter lists.

*Id.*, sec. 1.2(a), § 163A-1145.1(d). Under each of these exceptions, the voter must complete an affidavit attesting to their identity and the fact that the relevant exception applies. *Id.*, sec. 1.2(a), § 163A-1145.1(d1).

If a voter casts a provisional ballot under one of the three exceptions above, S.B. 824 requires county boards to count that voter's ballot "unless the county board has grounds to believe the affidavit is false." *Id.*, sec. 1.2(a), § 163A-1145.1(e). Under an administrative rule adopted by the State Board, a determination that an affidavit is false must be *unanimous* among the five-member, bipartisan county board. 08 N.C. Admin.

6

Code 17.0101(b), also appearing at D.E. 97-9, p 108; *see* N.C. Gen. Stat. § 163-30

(requiring bipartisan appointments to county boards).[3]

Separately, S.B. 824 also allows a registered voter without an acceptable form of

photo ID to cast a provisional ballot, and later return to the county board with an

acceptable form of ID no later than the day before the canvass of votes, which occurs ten

days after the election.  S.B. 824, sec. 1.2(a), § 163A-1145.1(c); *see* N.C. Gen. Stat. §

163-182.5(b).  The State Board is required to ensure that such a provisional ballot voter

receives written information listing the deadline to return to the county board and the list

of acceptable IDs.  S.B. 824, sec. 1.2(a), § 163A-1145.1(c).

The law applies similarly to absentee-by-mail voters.  Such voters must include a

copy of one of the acceptable forms of ID in their absentee ballot return envelope.  *Id.*,

secs. 1.2(d), (e), *as amended by* Act of Nov. 6, 2019, ch. 239, 2019 N.C. Sess. Laws,

secs. 1.2(b), 1.3(a), 1.4.  The return envelope also permits a voter to complete an affidavit

claiming one of the three exceptions to photo ID as described above.  *Id.* sec. 1.2(b), §

163-230.1(f1), (g)(2).  For absentee-by-mail voters, the list of exceptions also includes

lack of access to a method of attaching a copy of a photo ID to the absentee ballot

envelope.  *Id.*, sec. 1.2(b), § 163-230.1(g)(2).

S.B. 824 further requires the State Board to conduct "an aggressive voter

education program concerning the provisions" of the law.  *Id.*, sec. 1.5(a).  This program

---

[3] The State Board promulgated this rule pursuant to rulemaking procedures set forth in Article 2A of Chapter 150B of the North Carolina General Statutes, which is the State's Administrative Procedure Act.  The State Board can revise these rules pursuant to the same authority.

7

includes offering at least two public seminars in each county to educate voters on the requirements of the law; mailing notification of the law's requirements to all voters who do not have a DMV-issued ID; mailing multiple notifications of the voter ID requirement to all residences in the state; providing signage at early voting sites and precinct polling locations notifying voters that "[a]ll registered voters will be allowed to vote with or without a photo ID card;" and training county boards and precinct officials to ensure uniform implementation. *Id.*, sec. 1.5(a).

### D. Differences from the Prior Voter ID Law

There are several differences between S.B. 824 and the photo ID provisions that were part of the omnibus law invalidated by the Fourth Circuit in *McCrory*.

First, under H.B. 589, county boards did not issue free IDs; the DMV only issued a free ID after a voter completed a form declaring that he or she was registered to vote but had no other valid ID and the DMV confirmed voter registration. [D.E. 97-10, pp. 5-6]; H.B. 589, § 3.1 (d)(5).

Second, the prior law initially had no reasonable impediment exception, but even when it was later added, it was less permissive. Under H.B. 589, a reasonable impediment ballot would be counted only if the voter produced (1) a photo ID by noon of the day prior to the election canvass; or (2) a voter registration card; a current utility bill, bank statement, government check, paycheck, or other government document showing name and address; or providing the last four digits of the voter's social security number and date of birth. Act of June 22, 2015, *supra*, sec. 8(e).

8

Unlike S.B. 824, the prior law also permitted any county voter to challenge another voter's reasonable impediment affidavit. *Id.* § 163-182.1B(b). It further permitted a county board to reject a reasonable impediment ballot if the board "believe[d] the declaration [was] false, merely denigrated the photo identification requirement, or made obviously nonsensical statements." *Id.* § 163-182.1B(a)(1).

Third, S.B. 824 significantly expands on the prior law's list of photo IDs acceptable for voting. *See* H.B. 589, sec. 2.1.

Fourth, S.B. 824's photo ID requirement extends to absentee-by-mail voting (a form of voting access exempted by the photo ID requirement under the prior law) which the Fourth Circuit found, according to the data considered by the legislature in passing the prior law, was disproportionately utilized by white voters. *Compare McCrory*, 831 F.3d at 230 *with* S.B. 824, secs. 1.2.(d), (e); 08 N.C. Admin. Code 17.0109.

Fifth, unlike the prior law, S.B. 824 is not an "omnibus" election law, but only focused on implementing a photo ID requirement. *McCrory*, 831 F.3d at 215, 231.

### E. Procedural Background

On December 20, 2018, Plaintiffs sued the North Carolina Governor and members of the State Board, alleging that the law was enacted with discriminatory intent against African-American and Latino voters in violation of the Fourteenth and Fifteenth Amendments to the U.S. Constitution. [D.E. 1, Counts II and III, ¶¶ 125-146]. Plaintiffs also alleged that S.B. 824 disparately burdens African-American and Latino voters, in violation of Section 2 of the Voting Rights Act of 1965 ("VRA"). *Id.*, Count I, ¶¶ 105-124. The Governor was dismissed. [D.E. 57].

9

Plaintiffs moved for a preliminary injunction, which the Court granted, barring the State Board from enforcing the photo ID requirement pending a trial in this matter. [D.E. 91, 97, 120]. Although the Court agreed with Defendants that Plaintiffs were not likely to succeed on the merits of their VRA claim (*Id*., pp. 52-53), the Court found that Plaintiffs were likely to prove that S.B. 824's photo ID and ballot-challenge provisions (but not the poll observer provisions) were enacted with discriminatory intent. *Id.*, pp. 46-47.

The State Board Defendants appealed and the Fourth Circuit reversed. *N.C. State Conf. of the NAACP v. Raymond*, 981 F.3d 295, 298 (4th Cir. 2020).

Meanwhile, another group of plaintiffs challenged S.B. 824 in state court alleging that the law violates the North Carolina Constitution. *See Holmes v. Moore*, No. 18-cv-15292 (N.C. Super. Ct.). The trial court denied a motion for preliminary injunction, but the North Carolina Court of Appeals reversed. *See Holmes v. Moore*, 840 S.E.2d 244, 266, 270 N.C. App. 7, 36 (2020). That case proceeded to trial, and on September 17, 2021, the trial court issued its decision and judgment. [D.E. 174-1]. The majority of a 2-1 divided panel found that S.B. 824 was enacted in part for a discriminatory purpose, thus violating the Equal Protection Clause of the North Carolina Constitution. *Id.*, ¶¶ 1, 205-2066, 271-273. The trial court permanently enjoined S.B. 824 in its entirety. *Id*., ¶¶ 264-270. Both State and Legislative Defendants have noticed appeals.

**F.      Implementation of S.B. 824 Prior to the Injunction.**

Before this Court entered its preliminary injunction on December 31, 2019, the State Board had undertaken a series of actions to implement S.B. 824, and was set to

10

finalize its preparations to enforce the law in the March 2020 primary. See Bell Aff., [D.E. 97-9, ¶¶ 6, 8-37].

In compliance with this court's injunction, the State Board ceased all implementation activities, took steps to inform voters that no photo ID was required in the March primary, and informed county boards to follow suit. *See* State Board Numbered Memo 2020-01 re. Preliminary Injunction of Photo ID (Jan. 3, 2020). No photo ID was required during North Carolina's primary or general elections for 2020, nor will it be required during the municipal elections in fall 2021.

## QUESTION PRESENTED

Whether summary judgment should be granted in favor of Defendants?

## ARGUMENT

*Standard for Summary Judgment*

The movant has "the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting former Rule 56(c)). While the court must construe all facts in a light most favorable to the nonmoving party, courts "need not accept as true unwarranted inferences, unreasonable conclusions, or arguments." *Eastern Shore Mkt.'s Inc. v. J.D. Assoc.'s, LLP*, 213 F. 3d 175, 180 (4th Cir. 2000).

In this matter, Plaintiffs' claims are a facial challenge to the statute, which imposes an exceptionally high burden. "A facial challenge to a legislative Act is, of

11

course, the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid." *United States v. Salerno*, 481 U.S. 739, 745 (1987). In reaching that determination, the reviewing court "must be careful not to go beyond the statute's facial requirements and speculate about 'hypothetical' or 'imaginary' cases." *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 450 (2008) (citing *United States v. Raines*, 362 U.S. 17, 22 (1960)). For that reason, facial challenges are disfavored because they rely on speculation raising the risk of "premature interpretation of statutes on the basis of factually barebones records." *Id.* (quoting *Sabri v. United States*, 541 U.S. 600, 609 (2004)).

## I. Plaintiffs' Claims are Suitable for Summary Judgment.

It is appropriate for this Court to grant summary judgment before this matter proceeds to trial. Recently, the Eleventh Circuit affirmed summary judgment dismissing claims alleging that Alabama's voter ID law, which is stricter than North Carolina's, was enacted with racially discriminatory intent and violated §2 of the VRA due to its racially disparate impact. *Greater Birmingham Ministries v. Sec'y of State for State of Alabama*, 992 F.3d 1299, 1304 (11th Cir. 2021)[4]; in comparison see Plaintiffs' Complaint [D.E. 1, Counts I, II, and III, ¶¶ 105-146].

---

[4] The plaintiffs in that case petitioned for en banc rehearing, and the Eleventh Circuit denied that petition on June 1, 2021. *Greater Birmingham Ministries v. Sec'y of State for the State of Alabama*, 997 F.3d 1363, 1364 (11th Cir. 2021). Plaintiffs did not seek further review.

12

A dispositive ruling at this juncture is also appropriate because this Court and the Fourth Circuit have already analyzed the merits of Plaintiffs' case on the same record and found them unlikely to succeed. At the preliminary injunction stage, this Court concluded that Plaintiffs were unlikely to succeed on their claim under §2 of the VRA. [D.E. 120, pp. 47-53]. Then the Fourth Circuit found that the Plaintiffs were unlikely to succeed on their discriminatory-intent claims. *Raymond*, 981 F.3d at 305.

In the interim, Plaintiffs did not issue any discovery requests, did not disclose experts, and did not serve expert reports.[5] Plaintiffs failed to meet the mandatory disclosure requirements of Rules 26(a)(2) and 37(c), and are barred from use of expert witness testimony at trial. *See, e.g., Wilkins v. Montgomery*, 751 F.3d 214, 221 (4th Cir. 2014) (finding no abuse of discretion in excluding expert testimony because failure to disclose an expert by the agreed-upon deadline "violated the Pre-Trial Order and Rule 26(a)(2)"); Fed. R. Civ. P. 37(c)(1)). *Accord Quality Built Homes, Inc. v. Vill. of Pinehurst*, No: 1:06CV1028, 2008 U.S. Dist. LEXIS 61512, at *14 (M.D.N.C. Aug. 11, 2008) (excluding testimony where plaintiff's expert report was never submitted but an affidavit was supplied in response to defendants' motion for summary judgment "long after Defendants had lost their opportunity to depose [expert], thus clearly prejudicing Defendants.").

---

[5] This Court denied all requests for extensions of time to conduct discovery. *See* the Court's April 15, 2020 Text-Only Order, followed by denial of a motion for reconsideration of that order [D.E. 140], and affirmation of the ruling on the motion for reconsideration. [D.E. 148].

13

Because Plaintiffs failed to conduct discovery, there is no additional evidence in the record beyond that which Plaintiffs presented at the preliminary injunction phase. Accordingly, summary judgment is appropriate.

## II.     Plaintiffs' Evidence Does Not Show Discriminatory Intent.

Under the *Arlington Heights* framework, the Court must first determine whether a statute that is facially neutral regarding race or ethnicity was enacted with discriminatory intent. *N.C. State Conf. of the NAACP v. Raymond*, 981 F.3d 295, 303 (4th Cir. 2020). At this first stage, a defendant is not required to prove that a new law "cleanse[d] the discriminatory taint" of a different, prior law that was invalidated. *Id.* at 304. A "new voter-ID law" is not presumed "'fatally infected' by the unconstitutional discrimination of a past voter-ID law that has been struck down." *Id.* (quoting *Veasey v. Abbott*, 888 F.3d 792, 801 (5th Cir. 2018)). In fact, the Fourth Circuit explicitly acknowledged that its decision invalidating a previous voter ID law did not "freeze North Carolina election law in place," and that the North Carolina legislature has the authority under the federal constitution to modify its election laws based on legitimate, nonracial motivations. *McCrory*, 831 F.3d at 241.

Only after a plaintiff proves that a law was enacted with a discriminatory purpose does the Court proceed to the second step, where the burden shifts to the defendant to prove that "'the law would have been enacted without' racial discrimination." *Raymond*, 981 F.3d at 303 (quoting *Hunter v. Underwood*, 471 U.S. 222, 228 (1985)). "It is only then that judicial deference to the legislature 'is no longer justified.'" *Id.* (quoting *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265-66 (1977).

14

## A. Historical Background

There is no denying North Carolina's long history of racial discrimination, some of which was recounted by the Fourth Circuit in *McCrory*. 831 F.3d at 223. In *McCrory*, the Fourth Circuit correctly observed that "North Carolina has a long history of race discrimination generally and race-based vote suppression in particular." *Id*. That history contains many "shameful" chapters related to race, such as North Carolina's enactment of Jim Crow laws, which remained in force into the 1960s. *Id. McCrory* also correctly observed that there have even been many "instances since the 1980s in which the North Carolina legislature has attempted to suppress and dilute the voting rights of African Americans." *Id*.

The State Board does not dispute this history, and recognizes and accepts that another relevant part of that history is H.B. 589, which was partially invalidated for having been enacted with the purpose of burdening African American voters. The State Board acknowledges that unconstitutional considerations of race have also recently predominated North Carolina's redistricting process. *Harris v. McCrory*, 159 F. Supp. 3d 600 (M.D.N.C. 2016), *aff'd* 137 S. Ct. 1455 (2017); *Covington v. North Carolina*, 316 F.R.D. 117 (M.D.N.C. 2016), *aff'd* 137 S. Ct. 2211 (2017).

Yet this factor must be weighed in its proper context, including the fact that S.B. 824 was enacted pursuant to the passage of a constitutional amendment that required photo ID. Without overlooking the State's troubled history of racial discrimination, the "ultimate question remains whether a discriminatory intent has been proved in a given

15

case." *Abbott v. Perez*, 138 S. Ct. 2305, 2324-25 (2018) (quoting *City of Mobile, Ala. v. Bolden*, 446 U.S. 55, 74 (1980)).

The amendment to the North Carolina Constitution marks a significant intervening circumstance that breaks the link between the North Carolina's history of discrimination with a prior photo ID law and the present photo ID law. In *Raymond*, the Fourth Circuit recognized the interceding constitutional amendment alters the analysis significantly. *Raymond*, 981 F.3d at 305 ("For after the constitutional amendment, the people of North Carolina had interjected their voice into the process, mandating that the General Assembly pass a voter-ID law."). That is not to say that this history is not relevant, only that it is but one portion of the historical background factor and not dispositive on its own. *Id.*; *See also Bolden*, 446 U.S. at 74 ("[P]ast discrimination cannot, in the manner of original sin, condemn governmental action that is not itself unlawful"); *Abbott*, 138 S. Ct. at 2324 ("[T]he presumption of legislative good faith [is] not changed by a finding of past discrimination").

## B. Sequence of Events Leading to Enactment

An unusual sequence of events may reveal a discriminatory purpose when unprecedented procedures are used, or there is a reversal in a specific course of events in a manner that suggests invidious discrimination. *E.g., Arlington Heights*, 429 U.S. at 267. However, in this case, the Fourth Circuit found that nothing regarding the sequence of events leading to the enactment of S.B. 824 supports the conclusion that the law was enacted with discriminatory intent. *Raymond*, 981 F.3d at 305. This Court acknowledged, and the Fourth Circuit agreed, that "there were no procedural

16

irregularities in the sequence of events leading to the enactment of the 2018 Voter-ID Law." *Id*. The Fourth Circuit added, "the remaining evidence of the legislative process otherwise fails to 'spark suspicion' of impropriety in the 2018 Voter-ID Law's passage." *Id.* (quoting *Arlington Heights*, 429 U.S. at 269). As the record in this matter has not changed, this conclusion still stands.

### C. Legislative History

Similarly, the Fourth Circuit found that nothing in this record regarding the legislative history reveals discriminatory intent: "The 2018 Voter-ID Law's legislative history is otherwise unremarkable. Nothing here suggests that the General Assembly used racial voting data to disproportionately target minority voters 'with surgical precision.' And neither party nor the district court has brought to our attention any discriminatory remarks made by legislators during or about the legislation's passage." *Raymond*, 981 F.3d at 308-09. Reviewing the same record, this Court should reach the same conclusion.

### D. Impact of S.B. 824

Any voter ID law will have some impact when it is implemented. However, Plaintiffs cannot show that S.B. 824 will result a substantial impact. This comes down to one simple fact: S.B. 824 allows any voter to cast a ballot, with or without a photo ID, such that the burdens imposed by the law on voters without identification are extremely limited.

Indeed, the Fourth Circuit upheld a finding that the burdens imposed by Virginia's similar photo-ID law were not suggestive of discriminatory intent. *See Lee v. State Bd. of Elections*, 843 F.3d 592, 603 (4th Cir. 2016). Under Virginia's law, like North

17

Carolina's, local elections officials were required to issue free voter ID cards to registered voters with no showing of documentation required. *Compare id.* at 595 *with* S.B. 824, sec. 1.1(a). Local officials could also provide such cards at "mobile voter-ID stations." *Lee*, 843 F.3d at 595. In North Carolina, the State Board has similarly promulgated an administrative rule that permits county boards to issue voter IDs not simply at their own offices, but at other locations as well. *See* 08 N.C. Admin. Code 17.0107(a). S.B. 824 permits this.

Virginia's list of permissible IDs was admittedly larger than North Carolina's. However, S.B. 824's exceptions to the photo ID requirement exceed those of Virginia. Under the Virginia law, voters who failed to bring ID to the polls could only "cure" their provisional ballots by presenting ID to the local elections office within three days of the election. *Lee*, 843 F.3d at 594. North Carolina's similar "cure" provision provides the voter a longer time period—ten days after the election—to show their ID to the county board. S.B. 824, sec. 1.2(a), § 163A-1145.1(c); *see* N.C. Gen. Stat. § 163-182.5(b).

Most significantly, North Carolina's reasonable impediment provision has no counterpart in Virginia's law. Under this provision, a voter may cast a provisional ballot without an approved photo ID by signing an affidavit identifying their reason for lacking ID. S.B. 824, sec. 1.2(a), §§ 163A-1145.1(d), (d1). The county board of elections must count that voter's ballot unless the five-member bipartisan county board unanimously determines that there are grounds to believe the affidavit is false. *Id.* § 163A-1145.1(e); *see* 08 N.C. Admin. Code 17.0101(b).

S.B. 824's ameliorative provisions ensure minimal burdens are imposed on voters without ID and evince a lack of discriminatory intent. In *Lee*, the Fourth Circuit acknowledged that white Virginians possess IDs that could be used for voting at higher rates than black Virginians, and that obtaining an ID requires some amount of effort from voters. 843 F.3d at 597–98, 600. But to assess whether Virginia's law was enacted with discriminatory intent, the Fourth Circuit focused on the provisions of the law that minimized the burden imposed on voters *without an ID*. *Id.* at 600–01, 03. In light of these provisions, the *Lee* Court concluded that "the Virginia legislature went out of its way to make its impact as burden-free as possible." *Id.* at 603. Thus, direct comparison with *Lee* suggests that the relative burden S.B. 824 imposes on North Carolina voters without an ID does not support a finding of discriminatory intent.

First, registered voters can receive free voter-ID cards without any corroborating documents. *Raymond*, 981 F.3d at 309. If a registered voter arrives without an ID, they may vote provisionally, and their vote will count if they return later with their qualifying ID. *Id.* Voters with religious objections, victims of recent natural disasters, and those with a reasonable impediment may cast a provisional ballot after affirming their identity and reason for not producing ID. *Id.*

Second, any voter may choose to vote at one-stop early voting, a time during which the county boards are required to issue free photo-ID cards, thus making it possible in most instances to make a single trip to obtain an ID and vote. *Id.* at 309.

Finally, the all-encompassing nature of the reasonable impediment provisions significantly reduces any burdens imposed. S.B. 824 requires no additional identification

19

documentation once a voter fills out the reasonable impediment form, does not allow any voter to challenge another voter's reasonable impediment, and requires the voter's ballot to be counted unless the county board unanimously believes there are "grounds to believe" the voter's affidavit is false. S.B. 824, sec. 1.2(a), §§ 163A-1145.1(d)(2), (e). These are all meaningful distinctions from the prior law and demonstrate that S.B. 824 presents a minimal burden irrespective of the impact.

### E. Nonracial Justifications

At the second step of the discriminatory-intent analysis, the court "must 'scrutinize the legislature's *actual* nonracial motivations to determine whether they *alone* can justify the legislature's choices.'" *Raymond*, 981 F.3d at 303 (quoting *McCrory*, 831 F.3d at 221).

Here, the record contains evidence of non-racial motivations for the enactment of S.B. 824. Most obviously, legislators from both parties recognized S.B. 824 was required to implement the state constitution's new mandate that voters present a photographic ID to vote. *See* November 26, 2018 Transcript of the Joint Legislative Elections Oversight Committee [D.E. 97-16, pp. 5-6]; November 26, 2018 Transcript from the Second Reading on the Senate Floor, Second Reading [*Id.,* p. 170]; December 4, 2018 Transcript of the House Elections and Ethics Committee. [*Id.*, p. 345].

Likewise, the proponents of S.B. 824 believed that the legislation was needed to ensure voter confidence in elections. December 4, 2018 Transcript of the House Elections and Ethics Committee [*Id.*, pp. 313, 334-38, 342-44, 354-56, 492-93]; December 5, 2018 Transcript of the House Floor Second and Third Reading [*Id.*, pp. 522-

20

23, 527, 532]. The Fourth Circuit, and other courts, including the Supreme Court in *Crawford*, have repeatedly held that safeguarding voter confidence is a valid justification for a voter ID requirement. *See Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181, 197, 204 (2008) (op. of Stevens, J.); *see also Lee*, 843 F.3d at 602, 606–07; *Frank v. Walker*, 768 F.3d 744, 750 (7th Cir. 2014); *Greater Birmingham*, 992 F.3d at 1326-27.

Thus, there is sufficient evidence of the legislature's non-racial motivations for enacting S.B. 824.

## F. Observer Provision

Plaintiffs cannot forecast evidence sufficient to prove that S.B. 824's expansion of the eligibility criteria for poll observers will somehow burden any particular group of voters, much less that this expansion was enacted for the purpose of burdening any particular group of voters.

The law *does not* increase the number of poll observers that can appear at any particular voting location. Before S.B. 824 was enacted, the law limited each voting location to "[n]ot more than two observers from the same political party," except "one of the at-large observers from each party may also be in the voting enclosure." N.C. Gen. Stat. § 163A-821(a) (2017). Before S.B. 824 was enacted, each political party was permitted to designate 10 additional "at-large" poll observers for each county, as long as they were residents of the county. *Id.* S.B. 824 added a provision allowing political parties to designate 100 additional "at-large" poll observers throughout the state who could observe voting in any location in the state, regardless of their county of residence. S.B. 824, sec. 3.3. Accordingly, this change merely broadened the geographic pool of

21

potential poll observers that the political parties could recruit. It did not change the preexisting limits on poll observers at each voting location.

The expansion of poll observer eligibility in S.B. 824 also *does not* change the preexisting restrictions on what poll observers are allowed (and not allowed) to do. Poll observers in North Carolina are strictly regulated by statute and administrative rule. All observers "must have good moral character," must have their names submitted to the county board in advance of serving, and are subject to rejection "for good cause" by the county board or precinct officials. N.C. Gen. Stat. § 163-45(a)-(b). Poll observers are forbidden from engaging in any electioneering, impeding the voting process, or interfering, communicating with, or observing a voter casting a ballot. *Id*., -45(c); see also 08 N.C.A.C. 20.0101(d) (listing several additional specific prohibited actions).

Because Plaintiffs can offer no evidence, beyond mere speculation, that the expansion of the geographic eligibility for a party's appointment of poll observers will have any disparate impact on any group of voters, this claim should be rejected.

### G. Challenge Provision

Likewise, Plaintiffs offer no reason to conclude that the voter challenge provision of S.B. 824 target any particular group of voters.

Under North Carolina law, as it has existed before S.B. 824 was enacted, voters could challenge another voter's ballot based on that voter's lack of residency, being underage, not having completed a felony sentence, not being a U.S. citizen, and not being "who he or she represents himself or herself to be." *See* N.C. Gen. Stat. § 163A-911(c) (2017). S.B. 824 adds to these grounds that the "voter does not present photo

identification in accordance with G.S. 163A-1145.1." S.B. 824, sec. 3.1(c). Section

163A-1145.1 (now recodified at section 163-166.16) includes the basic photo

identification requirements, *and* it includes the exceptions for presenting photo ID:

reasonable impediments, natural disaster displacement, religious objection to

photographs, and the opportunity to cast a provisional ballot and return to the county

board later with an ID. *See* N.C. Gen. Stat. § 163-166.16(c), (d), (e).

By its text, the additional challenge provision regarding photo ID merely allows a

voter to object if poll workers are not following the law requiring voters to "present photo

identification" according to section 163-166.16. S.B. 824, sec. 3.1(c). It does not apply

to *exceptions* to presenting photo identification, also found in §163-166.16, contrary to

Plaintiffs' suggestions in earlier phases of this litigation. In other words, this challenge

provision does not apply to reasonable impediment affidavits or the provisional ballot

cure process.

Apart from the lack of any evidence proving any disparate impact from the poll

observer or challenge provisions, Plaintiffs have nothing to point to regarding the

legislative history or sequence of events regarding these provisions that demonstrate they

were targeted at any particular racial group. Inclusion of these provisions therefore has no

impact on the broader analysis and summary judgment is appropriate.

### III.    S.B. 824 Does Not Deny an Equal Opportunity to Vote Under the VRA.

This Court previously concluded that S.B. 824's "anticipated impact, on its own, is

not enough to invalidate S.B. 824 [under the VRA] – at least not according to the

evidence currently in the record." [D.E. 120, pp. 52-53]. The record has not changed since the Court's prior ruling; neither, then, should the Court's ruling.

Moreover, Plaintiffs' VRA §2 claims do not meet the requirements set forth in the Supreme Court's recent decision in *Brnovich v. Democratic Nat'l Comm.*, 141 S.Ct. 2321 (2021), which heightens the standard Plaintiffs must meet. *Brnovich* determined that when analyzing rules pertaining to time, place, and manner of voting like S.B. 824, a court must consider "several important circumstances" when determining "whether voting is 'equally open' and affords equal 'opportunity.'" *Id.* at 2338. Once each of these factors is considered in turn, it is clear that Plaintiffs' VRA claim cannot succeed.

First, reviewing courts must consider the size of the burden imposed by the challenged voting rule. *Id.* In undertaking this consideration, the Court acknowledged that "every voting rule imposes a burden of some sort." *Id.* For instance, "[v]oting takes time and, for almost everyone, some travel, even if only to a nearby mailbox. Casting a vote, whether by following the directions for using a voting machine or completing a paper ballot, requires compliance with certain rules." *Id.* The mere inconvenience of the usual burdens of voting is not enough to demonstrate a violation of §2. *Id.* (citing *Crawford*, 553 U. S. at 198). It is telling that the Supreme Court cited *Crawford* to refer to the usual burdens of voting, a case that examined and upheld a photo ID law from Indiana that was stricter than S.B. 824.

Here, State Board Defendants incorporate by reference the arguments contained in Part II-D, which establishes that the impact imposed upon voters by S.B. 824 will be small, especially considering the reasonable impediment provisions allow any voter to

24

vote without a qualifying photo ID and without having to take any further action. This tracks the Fourth Circuit's conclusion that the Legislature went "out of their way to make its impact as burden-free as possible." *Raymond,* 981 F.3d at 309 (quoting *Lee*, 843 F.2d at 603) (internal brackets omitted).

Second, "the degree to which a challenged rule has a long pedigree or is in widespread use in the United States is a circumstance that must be taken into account." *Brnovich,* 141 S.Ct. at 2338-9.

Here, the State Board acknowledges that voter ID laws were not prevalent until the Carter-Baker Commission issued its report in 2005 recommending their adoption. *See* Report of the Comm'n on Fed. Election Reform, "Building Confidence in U. S. Elections", pp. 18-21 (Sept. 2005).[6] Following the commission's recommendation, and the Supreme Court's ruling in *Crawford*, implementation nationwide surged. As of 2019, 35 states have laws requesting or requiring voters to show some form of identification at the polls, 17 of which require photo ID while another 17 require some other form of identification. [D.E. 97-15, p. 2]. North Carolina is not included in the number of states requiring photo IDs. Rather it is considered a "non-strict," "non-photo ID" voter identification law, as is South Carolina's law, because it offers "an alternative for people with a 'reasonable impediment' to obtaining a photo ID." *Id.*, pp. 4-5, n.5. It is "non-strict" because it allows voters without a photo ID the option to cast a ballot that will be counted without further action on the part of the voter. *Id.* Thus, should S.B. 824 be

_____

[6] The Commission Report was included in the Joint Appendix on appeal at JA 1127-30.

permitted to be implemented in North Carolina, it would join the 35 other states in doing so, and would be considered non-strict in comparison. The implementation of voter identification laws in 35 States patently constitutes "widespread use in the United States." *Brnovich,* 141 S.Ct. at 2339. For these reasons, this consideration points toward a determination that S.B. 824 does not violate §2.

Third, "[t]he size of any disparities in a rule's impact on members of different racial or ethnic groups is also an important factor to consider." *Id*. at 2339. However, intrinsic societal differences in employment, wealth, and education can mean that "even neutral regulations, no matter how crafted, may well result in some predictable disparities in rates of voting and noncompliance with voting rules." *Id.* "[T]he mere fact that there is some disparity in impact does not necessarily mean that a system is not equally open or that it does not give everyone an equal opportunity to vote." *Id.*

Regarding any disparity, State Board Defendants incorporate the arguments in Part II-D above. As the Fourth Circuit found in *Raymond*, even if Plaintiffs can demonstrate that minority voters disproportionately lack qualifying IDs, the ameliorative provisions within S.B. 824 that lessen the impact overcome this disparity. *Raymond*, 981 F.3d 295, 309-11.

Fourth, "courts must consider the opportunities provided by a State's entire system of voting when assessing the burden imposed by a challenged provision." *Brnovich*, 141 S.Ct. at 2339. The Court found Arizona's opportunities to vote by mail and early vote for nearly a month before the election to be especially persuasive in showing that the burdens imposed on Election Day voters by the laws in question were modest. *Id.* at 2344.

26

By comparison, North Carolina's entire voting system provides numerous opportunities and ample time for the public to vote. For example, the early voting period lasts two–and-a-half weeks, includes expansive weekday hours (8:00 a.m. to 7:30 p.m.), and guarantees voting on the Saturday before Election Day, with allowance for counties to offer additional weekend hours. N.C. Gen. Stat. §§ 163-227.2(b), -227.6(c). A voter may vote at any early voting location in their county. *Id.* § 163-227.2. During the early voting period, voters without an ID can also obtain a free voter ID from the county board of elections. *Raymond,* 981, F.3d at 300 (citing H.B. 824, sec. 1.1; and N.C. Gen. Stat. §§ 163-227.2(b), 163-227.6(a)). In contrast to the prior voter ID law rejected in *McCrory*, nothing in S.B. 824 reduces early voting opportunities in any way.

North Carolina also makes available no-excuse absentee vote by mail to all voters. N.C. Gen. Stat. § 163-226(a). Absentee ballots, which may be requested online, are available 60 days prior to Election Day in federal election years and 50 days prior to the date of primaries and special elections. *Id.* §§ 163-227.10(a); -230.3. Completed absentee ballots are accepted when delivered to the county board as long as they are received by 5:00 p.m. on Election Day, or three day after Election Day when bearing a postmark showing the ballot was mailed by Election Day. *Id.* § 163-231(b).

In addition, Parts C and D of the Statement of Facts above set forth the numerous provisions, exceptions, and other ameliorative elements of S.B. 824 that establish that North Carolina's photo identification requirement, in totality, imposes a minimal burden on voters.

27

Fifth, "the strength of the state interests served by a challenged voting rule is also an important factor that must be taken into account." *Id*. The Supreme Court recognized that preventing voter fraud is a "strong and entirely legitimate state interest." *Id.* at 2340. The Court reasoned that such "[f]raud can undermine public confidence in the fairness of elections and the perceived legitimacy of the announced outcome." *Id.*

Here, State Board Defendants incorporate the arguments made in Part II-E above establishing that the Legislature had a legitimate interest in the need to ensure public confidence in elections, and their obligation to implement a constitutional amendment adopted by the public.

The *Brnovich* Court made clear that it did not intend to announce a test to govern all §2 claims involving rules for the time, place, or manner of casting ballots. *Id.* at 2336. Rather, it defined these considerations above as guideposts for reviewing courts to follow when analyzing claims such as the one before this Court. *Id.* Nonetheless, these five considerations are appropriate factors for this Court to apply in its analysis. Plaintiffs cannot present sufficient evidence to support a §2 claim under the *Brnovich* factors, this Court should grant summary judgment in favor of the defense.

28

## CONCLUSION

For the foregoing reasons, State Board Defendants respectfully request that the Court grant summary judgment for the defense in this case.


Respectfully submitted this 2nd day of October 2021.


JOSHUA H. STEIN
Attorney General

/s/ Terence Steed
Terence Steed
Special Deputy Attorney General
N.C. State Bar No. 52809
Email: tsteed@ncdoj.gov

Laura McHenry
Special Deputy Attorney General
N.C. State Bar No. 45005
E-Mail: lmchenry@ncdoj.gov

N.C. Department of Justice
Post Office Box 629
Raleigh, NC 27602
Telephone: (919) 716-6567
Facsimile: (919) 716-6763

*Counsel for the State Board Defendants*

## CERTIFICATE OF WORD COUNT

I hereby certify that pursuant to Local Rule 7.3(d)(1), and State Board Defendants' pending motion to exceed the word limit [D.E. 176], the foregoing has a word count of less than 7,500 words not including the caption, signature block, and certification of word count. This document was prepared in Microsoft Word, from which the word count is generated.

Dated this 2nd day of October, 2021.

/s/ Terence Steed
Terence Steed
Special Deputy Attorney General