OCTOBER TERM, 2021     1

Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## BERGER ET AL. *v.* NORTH CAROLINA STATE CONFERENCE OF THE NAACP ET AL.

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

No. 21–248.  Argued March 21, 2022—Decided June 23, 2022

In 2018, North Carolina amended its Constitution to provide that "[v]oters offering to vote in person shall present photographic identification."  Art. VI, §2(4).  To implement the constitutional mandate, the General Assembly approved S. B. 824.  The Governor vetoed the bill, the General Assembly overrode the veto, and S. B. 824 went into effect. The state conference of the NAACP then sued the Governor and members of the State Board of Elections (collectively, Board), a state agency whose members are both appointed and removable by the Governor. The NAACP alleged that S. B. 824 offends the Federal Constitution. The Board was defended by the State's attorney general, who, like the Governor, is an independently elected official.  The attorney general at the time was a former state senator who voted against an earlier voter-ID law and filed a declaration in support of a legal challenge against it.  The speaker of the State House of Representatives and president pro tempore of the State Senate (hereinafter, legislative leaders) moved to intervene, arguing that, without their participation, important state interests would not be adequately represented in light of the Governor's opposition to S. B. 824, the Board's allegiance to the Governor and its tepid defense of S. B. 824 in parallel state-court proceedings, and the attorney general's opposition to earlier voter-ID efforts.

The District Court applied a presumption that the legislative leaders' interests would be adequately represented by the Governor, Board, and the attorney general and denied their motion to intervene.  Unsatisfied with the Board's defense following the denial of their motion, the legislative leaders sought to lodge an *amicus* brief and accompanying materials, but the District Court refused to consider them, struck them

from the record, and granted a preliminary injunction barring enforce-
ment of S. B. 824. The Fourth Circuit considered both District Court
rulings in separate appeals before separate panels. On the prelimi-
nary injunction ruling, the panel held that the District Court had
abused its discretion because the record contained insufficient evi-
dence to show that S. B. 824 violated the Federal Constitution. On the
intervention ruling, a separate panel agreed with the legislative lead-
ers and held that the District Court had erred when denying them
leave to intervene. Eventually, however, the Fourth Circuit decided to
rehear the matter en banc and ruled that the legislative leaders were
not entitled to intervene in the District Court proceedings. This Court
agreed to hear the matter to resolve disagreements among the courts
of appeals on the proper treatment of motions to intervene in cases like
this one.

*Held*: North Carolina's legislative leaders are entitled to intervene in
    this litigation. Pp. 8–19.

    (a) Federal Rule of Civil Procedure 24(a)(2) provides that a "court
must permit anyone to intervene" who, (1) "[o]n timely motion," (2)
"claims an interest relating to the property or transaction that is the
subject of the action, and is so situated that disposing the action may
as a practical matter impair or impede the movant's ability to protect
its interest," (3) "unless existing parties adequately represent that in-
terest." No one disputes the timeliness of the motion to intervene here.
The Court thus addresses the Rule's two remaining requirements.

    States possess " 'a legitimate interest in the continued enforce[ment]
of [their] own statutes,' " *Cameron* v. *EMW Women's Surgical Center,
P. S. C.*, 595 U. S. ___, ___, and States may organize themselves in a
variety of ways. When a State chooses to allocate authority among
different officials who do not answer to one another, different interests
and perspectives, all important to the administration of state govern-
ment, may emerge. See, *e.g., Brnovich* v. *Democratic National Com-
mittee*, 594 U. S. ___. Appropriate respect for these realities suggests
that federal courts should rarely question that a State's interests will
be practically impaired or impeded if its duly authorized representa-
tives are excluded from participating in federal litigation challenging
state law. Nor are state interests the only interests at stake. Permit-
ting the participation of lawfully authorized state agents promotes in-
formed federal-court decisionmaking and avoids the risk of setting
aside duly enacted state law based on an incomplete understanding of
relevant state interests. This Court's teachings on these scores have
been many, clear, and recent. See, *e.g., Virginia House of Delegates* v.
*Bethune-Hill*, 587 U. S. ___; *Hollingsworth* v. *Perry*, 570 U. S. 693.

    These precedents and the principles they represent are dispositive
here. North Carolina law explicitly provides that "[t]he Speaker of the

Syllabus

House of Representatives and the President Pro Tempore of the Senate, as agents of the State, by and through counsel of their choice," "shall jointly have standing to intervene on behalf of the General Assembly as a party in any judicial proceeding challenging a North Carolina statute or provision of the North Carolina Constitution." N. C. Gen. Stat. Ann. §1–72.2(b). And the State has made plain that it considers the leaders of the General Assembly "necessary parties" to suits like this one. §120–32.6(b).

The Board submits that North Carolina law does not afford the legislative leaders authority to represent state interests. But that argument is difficult to square with the express statutory language. Alternatively, the Board argues that the statutes authorizing the legislative leaders to participate here violate the State Constitution by usurping power vested in the executive branch alone. That logic is hard to follow, however, given the Board's concession that the legislative leaders *may* intervene permissively under Rule 24(b), and likely as a matter of right under Rule 24(a)(2) if the attorney general ceases to defend the law.

The NAACP offers a different reply, pointing out that Rule 24(a)(2) permits intervention only by "new" parties. And, it submits, the legislative leaders are already effectively "existing" parties to this suit challenging the enforcement of state law. That argument rests on a premise that is both formally and functionally mistaken. First, the NAACP has not sued the State but only certain state officers, and, so far, the legislative leaders are not among them. Functionally, however, this suit implicates North Carolina's sovereign interests regardless of the named parties. And, where a State chooses to divide its sovereign authority among different officials and authorize their participation in a suit challenging state law, a full consideration of the State's practical interests may require the involvement of different voices with different perspectives. Pp. 8–13.

(b) Concerning Rule 24(a)(2)'s third requirement, lower courts have adopted a variety of tests for evaluating whether an existing defendant already "adequately represent[s]" the same interests a proposed intervenor seeks to vindicate. Here, both the District Court and the en banc Court of Appeals improperly applied a "presumption" that the Board adequately represented the legislative leaders' interests and held that the leaders could not overcome this presumption. But Rule 24(a)(2)'s test in this regard presents proposed intervenors with only a minimal challenge: It promises intervention to those who bear an interest that may be practically impaired or impeded "unless existing parties adequately represent that [same] interest." See, *e.g., Trbovich* v. *Mine Workers,* 404 U. S. 528. Some lower courts have suggested that a presumption of adequate representation remains appropriate in certain

Syllabus

classes of cases. But even taken on their own terms, none of these presumptions applies to cases like this one. For instance, some lower courts have adopted a presumption of adequate representation in cases where a movant's interests are identical to those of an existing party. But even the Board concedes that this presumption applies only when interests fully overlap.

This litigation illustrates how divided state governments sometimes warrant participation by multiple state officials in federal court. Here, the legislative leaders seek to give voice to a perspective different from the Board's. They assert an unalloyed interest in vindicating state law from constitutional challenge, without an eye to crosscutting administrative concerns—concerns that have colored the Board's defense thus far. The NAACP worries that allowing the legislative leaders to intervene could "make trial management impossible." While a proliferation of motions to intervene may be a cause for concern in some cases, this case is not one. Federal courts routinely handle cases involving multiple officials sometimes represented by different attorneys taking different positions. See, *e.g., Whole Woman's Health* v. *Jackson*, 595 U. S. ___. Whatever additional burdens adding the legislative leaders to this case may pose, those burdens fall well within the bounds of everyday case management. Pp. 13–19.

999 F. 3d 915, reversed.

GORSUCH, J., delivered the opinion of the Court, in which ROBERTS, C. J., and THOMAS, BREYER, ALITO, KAGAN, KAVANAUGH, and BARRETT, JJ., joined. SOTOMAYOR, J., filed a dissenting opinion.

Cite as: 597 U. S. ____ (2022)          1

Opinion of the Court

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

———————

No. 21–248

———————

## PHILIP E. BERGER, ET AL., PETITIONERS *v.* NORTH CAROLINA STATE CONFERENCE OF THE NAACP, ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

[June 23, 2022]

JUSTICE GORSUCH delivered the opinion of the Court.

At the heart of this lawsuit lies a challenge to the constitutionality of a North Carolina election law. But the merits of that dispute are not before us, only an antecedent question of civil procedure: Are two leaders of North Carolina's state legislature entitled to participate in the case under the terms of Federal Rule of Civil Procedure 24(a)(2)?

I

A

Within wide constitutional bounds, States are free to structure themselves as they wish. Often, they choose to conduct their affairs through a variety of branches, agencies, and elected and appointed officials. These constituent pieces sometimes work together to achieve shared goals; other times they reach very different judgments about important policy questions and act accordingly. This diffusion of governmental powers within and across institutions may be an everyday feature of American life. But it can also pose its difficulties when a State's laws or policies are challenged in federal court.

Suppose someone seeks to attack a state law on the ground that it is inconsistent with the Federal Constitution. Generally, States themselves are immune from suit in federal court. See *Sossamon* v. *Texas*, 563 U. S. 277, 284 (2011). So usually a plaintiff will sue the individual state officials most responsible for enforcing the law in question and seek injunctive or declaratory relief against them. See *Ex parte Young*, 209 U. S. 123, 159–160 (1908). Despite the artifice, of course, a State will as a practical matter often retain a strong interest in this kind of litigation. After all, however captioned, a suit of this sort can implicate "the continued enforceability of [the State's] own statutes." *Maine* v. *Taylor*, 477 U. S. 131, 137 (1986). To defend its practical interests, the State may choose to mount a legal defense of the named official defendants and speak with a "single voice," often through an attorney general. *Virginia House of Delegates* v. *Bethune-Hill*, 587 U. S. ___, ___ (2019) (slip op., at 5).

Still, not every State has structured itself this way. Some have chosen to authorize multiple officials to defend their practical interests in cases like these. See *ibid.* North Carolina falls into this camp. The State's attorney general wields some authority to represent individual official defendants in federal litigation. See *Martin* v. *Thornburg*, 320 N. C. 533, 545–546, 359 S. E. 2d 472, 479 (1987); N. C. Const., Art. III, §§ 7(1), (2) (establishing the office of attorney general and declaring that his "duties shall be prescribed by law"). But North Carolina's General Assembly has also empowered the leaders of its two legislative houses to participate in litigation on the State's behalf under certain circumstances and with counsel of their own choosing. See N. C. Gen. Stat. Ann. § 1–72.2 (2021).

The reasons why a State might choose to proceed this way are understandable enough. Sometimes leaders in different branches of government may see the State's interests at stake in litigation differently. Some States may judge that

Opinion of the Court

important public perspectives would be lost without a mechanism allowing multiple officials to respond. It seems North Carolina has some experience with just these sorts of issues. More than once a North Carolina attorney general has opposed laws enacted by the General Assembly and declined to defend them fully in federal litigation. See, *e.g.*, *North Carolina* v. *North Carolina State Conference of NAACP*, 581 U. S. ___, ___ (2017) (ROBERTS, C. J., statement respecting denial of certiorari) (slip op., at 2); App. 79; see also N. Devins & S. Prakash, Fifty States, Fifty Attorneys General, and Fifty Approaches to the Duty To Defend, 124 Yale L. J. 2100, 2152, n. 217, 2187 (2015).

B

The facts of this case also illustrate how divided state government can lead to disagreements over the defense of state law in federal court. In November 2018, the people of North Carolina amended the State Constitution to provide that "[v]oters offering to vote in person shall present photographic identification [(photo ID)]." Art. VI, § 2(4). The people further provided that "[t]he General Assembly shall enact general laws governing the requirements of such photographic identification, which may include exceptions." *Ibid.* Consistent with that directive, the General Assembly eventually approved Senate Bill 824 (S. B. 824). 2017 Gen. Assem., 2018 Reg. Sess. Under that law's terms, those seeking to vote must do one of three things: present an acceptable photo ID, complete a provisional ballot and later produce a photo ID, or submit a form explaining why they cannot present a photo ID. See N. C. Gen. Stat. Ann. §§ 163A–1145.1(a), (c), (d), as added by § 1.2(a), 2018 N. C. Sess. Laws 144, pp. 73–74. Photo ID cards are available free of charge in each of the State's 100 counties without the need for corroborating documentation. § 163A–869.1, as added by § 1.1(a), *id.*, at 72–73. After the law's passage, the Governor vetoed the bill, the General Assembly responded

by overriding that veto, and S. B. 824 went into effect on
December 19, 2018.

The next day, the National Association for the Advance-
ment of Colored People (NAACP) sued the Governor and the
members of the State Board of Elections (collectively,
Board). The Governor appoints the Board's members and
may remove them under certain circumstances. See N. C.
Gen. Stat. Ann. §§ 143B–16, 163–19, 163–40. In its law-
suit, the NAACP alleged that S. B. 824 offends the Federal
Constitution. The State's attorney general assumed re-
sponsibility for defending the Board. See § 114–2. Like the
Governor, the attorney general is an independently elected
official. See N. C. Const., Art. III, § 7(1). Much like the
Governor, too, while serving as a state senator the attorney
general voted against an earlier voter-ID law and filed a
declaration in support of a legal challenge against it. See
*North Carolina State Conference of NAACP* v. *McCrory*, 997
F. Supp. 2d 322, 337–338, 357–359 (MDNC 2014).

Soon, the speaker of the State House of Representatives
and president pro tempore of the State Senate (legislative
leaders) moved to intervene. App. 52. They noted that
North Carolina law expressly authorizes them "to intervene
on behalf of the General Assembly as a party in any judicial
proceeding challenging a North Carolina statute or provi-
sion of the North Carolina Constitution." N. C. Gen. Stat.
Ann. § 1–72.2(b). They observed that, in cases of this sort,
state law further provides that "both the General Assembly
and the Governor constitute the State of North Carolina."
§ 1–72.2(a). And the legislative leaders suggested that,
without their participation, important state interests would
not be adequately represented in light of the Governor's op-
position to S. B. 824, the Board's allegiance to the Governor,
and the attorney general's opposition to earlier voter-ID ef-
forts. App. 65–70. Finally, the legislative leaders pointed
to parallel state-court proceedings in which they claimed
the Board had offered only a "tepid" defense of S. B. 824.

Opinion of the Court

*Id.*, at 127, n. 1.

The District Court denied the motion to intervene. *North Carolina State Conference of NAACP* v. *Cooper*, 332 F. R. D. 161 (MDNC 2019). In doing so, the court applied a "presumption" that the legislative leaders' interests would be adequately represented by the Governor and Board and their legal representative, the attorney general. *Id.*, at 168–170. On the court's view, the legislative leaders might someday have an interest sufficient to warrant intervention if the existing parties refused to offer any defense of S. B. 824. *Id.*, at 166. But because nothing like that had yet happened, the District Court denied the motion to intervene without prejudice to renewal later. *Id.*, at 172–173.

In time, the legislative leaders took up the District Court's offer to renew their motion. They pointed to this Court's intervening decision in *Bethune-Hill*, which "clarified" that legislative leaders sometimes may be legally entitled to intervene and represent "the interest of *the State* in defending the constitutionality of" a state law. App. 159. They also updated the District Court on the Board's conduct in state-court proceedings. There, the Board had conceded that its "'primary objective'" *wasn't* defending S. B. 824, but obtaining guidance regarding which law it would need to enforce in an upcoming election (S. B. 824 or preexisting law). *Id.*, at 156. Seizing on this concession, the state-court plaintiffs argued that even the Board did not think it would ultimately prevail on the merits. *Id.*, at 157. In the end, however, the District Court was unmoved by these developments. It denied the legislative leaders' renewed motion and addressed *Bethune-Hill* only in a footnote stating that the decision did not "change the calculus." *North Carolina State Conference of NAACP* v. *Cooper*, 2019 WL 5840845, *2, n. 3 (MDNC, Nov. 7, 2019).

As the federal litigation proceeded without the legislative leaders, the NAACP sought a preliminary injunction to pre-

vent the Board from enforcing S. B. 824 in upcoming elec-
tions. By this point, the District Court had dismissed the
Governor from the suit. Only the Board members, repre-
sented by the attorney general, remained as defendants. In
support of its motion for injunctive relief, the NAACP of-
fered five expert reports. In reply, the Board did not oppose
the motion on timeliness grounds even though the NAACP
had waited nine months before seeking what it described as
critical emergency relief. See App. 311–313; Memorandum
of Law in No. 1:18–cv–1034 (MDNC, Sept. 17, 2019), ECF
Doc. 73. Nor did the Board produce competing expert re-
ports. Instead, it supplied a single affidavit from its execu-
tive director and stressed again the need for clarity about
which law to apply. App. 312. Once more unsatisfied with
the vigor of the Board's response, the legislative leaders
sought to lodge an *amicus* brief, five expert reports, and sev-
eral other declarations. At the end of the day, however, the
District Court refused to consider the *amicus* brief and ac-
companying materials, struck them from the record, and
granted a preliminary injunction barring enforcement of
S. B. 824. *North Carolina State Conference of NAACP* v.
*Cooper*, 430 F. Supp. 3d 15, 54 (MDNC 2019).

C

   The Fourth Circuit took up the District Court's prelimi-
nary injunction and intervention rulings in separate ap-
peals before separate panels. While these appeals were
pending, the Board did not seek an interim stay of the Dis-
trict Court's preliminary injunction. Apparently, it chose
not to do so "due to the disruptive effect such relief would
have had on" election administration. App. 366, n. 8. As a
result, S. B. 824 was not enforced during the State's March
2020 primary election.
   In the appeal concerning the District Court's preliminary
injunction ruling, the legislative leaders sought leave to in-
tervene and the Fourth Circuit granted their motion. See

Opinion of the Court

Order in *North Carolina State Conference of NAACP* v. *Raymond*, No. 20–1092 (CA4, Mar. 27, 2020), ECF Doc. 43. Meanwhile, the Governor filed an *amicus* brief contending that the District Court had not gone far enough: "[The] preliminary injunctio[n] should be made permanent, and . . . this unconstitutional law should never go into effect." App. 844. After considering all the submissions before it, a unanimous panel of the Court of Appeals largely agreed with the legislative leaders and reversed. *North Carolina State Conference of NAACP* v. *Raymond*, 981 F. 3d 295, 298 (2020). The panel held that the District Court had abused its discretion in issuing the preliminary injunction because the record contained insufficient evidence to show that S. B. 824 violated the Federal Constitution. In particular, the panel explained that North Carolina's law "is more protective of the right to vote than other states' voter ID laws that courts have approved." *Id.*, at 310. Later, the Court of Appeals denied rehearing en banc; no judge noted a dissent. Any further District Court proceedings were thus left to unfold without a preliminary injunction in place.

Separately and hoping to participate in those future proceedings, the legislative leaders asked another panel of the Fourth Circuit to vacate the District Court's decision denying their motion to intervene. The legislative leaders stressed that state law expressly authorizes them to participate in cases like this one, and they argued that they satisfied all the requirements for intervention as a matter of right under Federal Rule of Civil Procedure 24(a)(2). For its part, the Court of Appeals again agreed with the legislative leaders, this time holding that the District Court had erred when denying them leave to intervene. 970 F. 3d 489, 503–504, 506 (2020).

Eventually, however, the Fourth Circuit decided to rehear the matter en banc and changed course. A nine-judge majority ruled that the legislative leaders were not entitled to intervene in District Court proceedings because they

could not overcome a "heightened presumption" that the
Board already "adequately represented" their interests.
999 F. 3d 915, 927, 932–934 (2021). Six judges dissented.
Among other things, the dissenters suggested that the ma-
jority had erred by "ignor[ing] North Carolina's law re-
questing two agents in cases challenging the constitution-
ality of its duly-enacted statutes" and by "setting the bar for
the Intervenors to clear too high." *Id.*, at 945 (opinion of
Quattlebaum, J.); see also *id.*, at 939 (opinion of Wilkinson,
J.); *id.*, at 941 (opinion of Niemeyer, J.).

The legislative leaders responded by petitioning this
Court to review the Fourth Circuit's en banc ruling. We
agreed to hear the matter in order to resolve disagreements
among the circuits about the proper treatment of motions
to intervene in cases like this one. 595 U. S. ___ (2021).

## II

Our starting point lies in Rule 24(a)(2) of the Federal
Rules of Civil Procedure. As relevant here, the Rule pro-
vides that a "court must permit anyone to intervene" who,
(1) "[o]n timely motion," (2) "claims an interest relating to
the property or transaction that is the subject of the action,
and is so situated that disposing of the action may as a prac-
tical matter impair or impede the movant's ability to protect
its interest," (3) "unless existing parties adequately repre-
sent that interest." Everyone before us agrees that the leg-
islative leaders' motion to intervene was timely. The only
disagreements we face concern the Rule's two remaining re-
quirements.

## A

We focus first on the question whether the legislative
leaders have claimed an interest in the resolution of this
lawsuit that may be practically impaired or impeded with-
out their participation. No one questions that States pos-
sess "'a legitimate interest in the continued enforce[ment]

of [their] own statutes.'" *Cameron* v. *EMW Women's Surgical Center, P. S. C.*, 595 U. S. ___, ___ (2022) (slip op., at 8) (quoting *Taylor*, 477 U. S., at 137). No one questions that States may organize themselves in a variety of ways. After all, the separation of government powers has long been recognized as vital to the preservation of liberty, and it is through the power to "structure . . . its government, and the character of those who exercise government authority, [that] a State defines itself as a sovereign." *Gregory* v. *Ashcroft*, 501 U. S. 452, 460 (1991). Nor does anyone question that, when a State chooses to allocate authority among different officials who do not answer to one another, different interests and perspectives, all important to the administration of state government, may emerge. See, *e.g.*, *Brnovich* v. *Democratic National Committee*, 594 U. S. ___ (2021) (Arizona's secretary of state and attorney general took opposite sides).

Appropriate respect for these realities suggests that federal courts should rarely question that a State's interests will be practically impaired or impeded if its duly authorized representatives are excluded from participating in federal litigation challenging state law. To hold otherwise would not only evince disrespect for a State's chosen means of diffusing its sovereign powers among various branches and officials. It would not only risk turning a deaf federal ear to voices the State has deemed crucial to understanding the full range of its interests. It would encourage plaintiffs to make strategic choices to control which state agents they will face across the aisle in federal court. It would tempt litigants to select as their defendants those individual officials they consider most sympathetic to their cause or most inclined to settle favorably and quickly. All of which would risk a hobbled litigation rather than a full and fair adversarial testing of the State's interests and arguments.

Nor are state interests the only interests at stake. Re-

specting the States' "plan[s] for the distribution of govern-
mental powers" also serves important national interests.
*Mayor of Philadelphia* v. *Educational Equality League*, 415
U. S. 605, 615, n. 13 (1974). It better enables the States to
serve as a "balance" to federal authority. *Bond* v. *United
States*, 564 U. S. 211, 221 (2011). It permits States to ac-
commodate government to local conditions and circum-
stances. See *ibid.* And it allows States to serve as labora-
tories of "innovation and experimentation" from which the
federal government itself may learn and from which a "mo-
bile citizenry" benefits. *Gregory*, 501 U. S., at 458. Finally,
a federal court tasked with testing the constitutionality of
state law wields weighty "authority over a State's most fun-
damental political processes." *Alden* v. *Maine*, 527 U. S.
706, 751 (1999). Permitting the participation of lawfully
authorized state agents promotes informed federal-court
decisionmaking and avoids the risk of setting aside duly en-
acted state law based on an incomplete understanding of
relevant state interests.

This Court's teachings on these scores have been many,
clear, and recent. Earlier this Term in *Cameron*, we ex-
plained that a State is free to "empowe[r] multiple officials
to defend its sovereign interests in federal court." 595 U. S.,
at ___ (slip op., at 8). Three Terms ago in *Bethune-Hill*, we
observed that "'a State must be able to designate agents to
represent it in federal court'" and may authorize its legisla-
ture "to litigate on the State's behalf, either generally or in
a defined set of cases." 587 U. S., at ___–___ (slip op., at 4–
5). "[T]he choice belongs to" the sovereign State. *Id.*, at ___
(slip op., at 5). In *Hollingsworth* v. *Perry*, this Court
stressed that "state law may provide for other officials," be-
sides an attorney general, "to speak for the State in federal
court" as some States have done for their "presiding legis-
lative officers." 570 U. S. 693, 710 (2013). And in *Karcher*
v. *May*, this Court held that two state legislative leaders

Opinion of the Court

"authori[zed] under state law to represent the State's interests" in federal court could defend state laws there as parties. 484 U. S. 72, 75, 81–82 (1987).

These principles and precedents are dispositive here. North Carolina has expressly authorized the legislative leaders to defend the State's practical interests in litigation of this sort. State law provides that "[t]he Speaker of the House of Representatives and the President Pro Tempore of the Senate, as agents of the State, by and through counsel of their choice," "shall jointly have standing to intervene on behalf of the General Assembly as a party in any judicial proceeding challenging a North Carolina statute or provision of the North Carolina Constitution." N. C. Gen. Stat. Ann. § 1–72.2(b). Even beyond these instructions, the State has made plain that it considers the leaders of the General Assembly "necessary parties" to suits like this one. § 120–32.6(b).

Tellingly, the Board seems to agree that, if North Carolina law authorizes participation by the legislative leaders on behalf of the State, a federal court should find the interest requirement of Rule 24(a)(2) satisfied. Brief for State Respondents 20, 28. The Board submits only that, in fact, North Carolina law does not afford the legislative leaders that authority. *Id.*, at 49–50. But while we are hardly the final arbiters of North Carolina law, the Board's argument seems more than a little difficult to square with the express statutory language above. One of these provisions is even entitled, "General Assembly Acting on Behalf of the State of North Carolina in Certain Actions." § 120–32.6(b). It provides that the legislative leaders may defend state laws "as agents of the State." *Ibid.*

Retreating, the Board argues alternatively that the statutes authorizing the legislative leaders to participate here violate the State Constitution by usurping authority vested in the executive branch. Brief for State Respondents 50–55; N. C. Const., Art. I, § 6. But the Board's logic is hard to

follow given its concession that the legislative leaders *may*
intervene permissively under Rule 24(b), and likely as a
matter of right under Rule 24(a)(2) if the attorney general
ceases to represent the Board. Brief for State Respondents
2, 48, 55. Nor, for that matter, does the Board identify an-
ything to support its suggestion that the State's executive
branch holds a constitutional monopoly on representing
North Carolina's practical interests in court. Instead, the
parties direct us to a provision stating that the General As-
sembly may determine the scope of the attorney general's
powers. See N. C. Const., Art. III, § 7(2); *Bailey* v. *State*,
353 N. C. 142, 152–153, 540 S. E. 2d 313, 320 (2000). And,
as we have seen, while the General Assembly has afforded
the attorney general considerable authority, it has also re-
served to itself some authority to defend state law on behalf
of the State. See N. C. Gen. Stat. Ann. § 120–32.6(b). In
fact, it seems the General Assembly has sometimes even
entrusted the defense of state interests to private persons.
See § 1–608(b) (permitting private citizens to bring false-
claims actions "for the State").

The NAACP offers a different reply. It points out that
Rule 24(a)(2) permits intervention only by "new" parties.
And, it submits, the legislative leaders are already effec-
tively "existing" parties to this suit challenging the enforce-
ment of state law. Brief for NAACP Respondents 12–14.
But whatever other problems may attend this argument, it
rests on a premise that is both formally and functionally
mistaken. As a formal matter and consistent with princi-
ples of sovereign immunity, the NAACP has not sued the
State. Only state officers are or may be "parties" here—
and, so far, the legislative leaders are not among them. See
*Young*, 209 U. S., at 159–160. Functionally, of course, this
suit implicates North Carolina's sovereign interests regard-
less of the named parties. See Part I–A, *supra*. Yet, con-
trary to the premise implicit in the NAACP's argument, a
plaintiff who chooses to name this or that official defendant

Opinion of the Court

does not necessarily and always capture all relevant state interests. Instead and as we have seen, where a State chooses to divide its sovereign authority among different officials and authorize their participation in a suit challenging state law, a full consideration of the State's practical interests may require the involvement of different voices with different perspectives. To hold otherwise would risk allowing a private plaintiff to pick its preferred defendants and potentially silence those whom the State deems essential to a fair understanding of its interests.

## B

The only remaining question we face concerns adequacy of representation. Interpreting Rule 24(a)(2), lower courts have adopted a variety of tests for evaluating whether an existing defendant already "adequately represent[s]" the same interests a proposed intervenor seeks to vindicate. In this case, both the District Court and the en banc Court of Appeals applied a "presumption" that the Board adequately represented the legislative leaders' interests and held that the leaders could not overcome this presumption. 999 F. 3d, at 934; *Cooper*, 332 F. R. D., at 171.

Once more, we cannot agree. As an initial matter, Rule 24(a)(2) promises intervention to those who bear an interest that may be practically impaired or impeded "unless existing parties adequately represent that interest." In some cases, too, this Court has described the Rule's test as presenting proposed intervenors with only a minimal challenge.

Take *Trbovich* v. *Mine Workers*, in which this Court addressed a request to intervene by a private party who asserted a related interest to that of an existing government party. 404 U. S. 528 (1972). There, the Secretary of Labor sued to set aside a union election. The same union member who filed the administrative complaint that triggered the Secretary's suit sought to intervene under Rule 24(a). *Id.*,

14          BERGER *v.* NORTH CAROLINA STATE
                CONFERENCE OF THE NAACP
                      Opinion of the Court

at 529–530. At a high level of abstraction, the union member's interest and the Secretary's might have seemed closely aligned. Even so, this Court rejected the Secretary's suggestion that he should be presumed an adequate representative of the union member's interests "unless the court . . . find[s] that the Secretary has failed to perform his statutory duty." *Id.*, at 538. The Court acknowledged that the Secretary's and the union member's interests were "related," but it emphasized that the interests were not "identical"—the union member sought relief against his union, full stop; meanwhile, the Secretary also had to bear in mind broader public-policy implications. *Id.*, at 538–539. Rather than endorse a presumption of adequacy, the Court held that a movant's burden in circumstances like these "should be treated as minimal." *Id.*, at 538, n. 10.

To be sure, some lower courts have suggested that a presumption of adequate representation remains appropriate in certain classes of cases. But even taken on their own terms, none of these presumptions applies to cases like ours. For example, the Fourth Circuit has endorsed a presumption of adequate representation where a member of the public seeks to intervene to defend a law alongside the government. See 999 F. 3d, at 932–933. There, the Fourth Circuit has reasoned, a court may presume that legally authorized government agents will adequately represent the public's interest in its chosen laws. Here, by contrast, the legislative leaders are *among* those North Carolina has expressly authorized to participate in litigation to protect the State's interests in its duly enacted laws. *Id.*, at 951 (Quattlebaum, J., dissenting).

Similarly, some lower courts have adopted a presumption of adequate representation in cases where a movant's interests are identical to those of an existing party. See 7C C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure § 1909 (3d ed. Supp. 2022) (Wright & Miller). But even the Board concedes that this presumption applies only

Opinion of the Court

when interests "overla[p] fully." Brief for State Respond-
ents 26. Where "the absentee's interest is similar to, but
not identical with, that of one of the parties," that normally
is not enough to trigger a presumption of adequate repre-
sentation. 7C Wright & Miller § 1909. And again, a pre-
sumption like that holds no purchase here. North Carolina
has authorized different agents to defend its practical inter-
ests precisely because, thanks to how it has structured its
government, each may be expected to vindicate different
points of view on the State's behalf. For a federal court to
presume a full overlap of interests when state law more
nearly presumes the opposite would make little sense and
do much violence to our system of cooperative federalism.
In cases like ours, state agents may pursue "related" state
interests, but they cannot be fairly presumed to bear "iden-
tical" ones. *Trbovich*, 404 U. S., at 538.

In the end, to resolve this case we need not decide
whether a presumption of adequate representation might
sometimes be appropriate when a private litigant seeks to
defend a law alongside the government or in any other cir-
cumstance. We need only acknowledge that a presumption
of adequate representation is inappropriate when a duly
authorized state agent seeks to intervene to defend a state
law. In its en banc decision, the Fourth Circuit reasoned
that "a proposed intervenor's governmental status makes a
heightened presumption of adequacy more appropriate, not
less." 999 F. 3d, at 933; accord, *Planned Parenthood of Wis.,
Inc.* v. *Kaul*, 942 F. 3d 793, 801 (CA7 2019). But, respect-
fully, that gets things backward. Any presumption against
intervention is *especially* inappropriate when wielded to
displace a State's prerogative to select which agents may
defend its laws and protect its interests. Normally, a
State's chosen representatives should be greeted in federal
court with respect, not adverse presumptions. If the inter-
venor in *Trbovich* faced only a "minimal" burden, it cannot
be that duly designated state agents seeking to vindicate

state law should have to clear some higher hurdle.

Setting aside the lower courts' erroneous presumptions, the proper resolution of today's case follows quickly. Casting aspersions on no one, this litigation illustrates how divided state governments sometimes warrant participation by multiple state officials in federal court. See 999 F. 3d, at 939–941 (Wilkinson, J., dissenting). Recall just some of the facts of this case. See Parts I–B and I–C, *supra*. When confronted with a motion for a preliminary injunction, the Board declined to offer expert-witness affidavits in support of S. B. 824, even though its opponent offered many and the legislative leaders sought to supplement the record with their own. After the District Court issued its (ultimately overturned) injunction, the Board declined to seek a stay. That tactical choice, motivated by the Board's overriding concern for stability and certainty, meant that the State could not enforce its new law during a statewide election. Throughout, Board members have been appointed and potentially removable by a Governor who vetoed S. B. 824 and who filed his own briefs in this litigation calling the law "unconstitutional" and arguing that it "should never go into effect." See *supra*, at 6. And at all times, the Board has been represented by an attorney general who, though no doubt a vigorous advocate for his clients' interests, is also an elected official who may feel allegiance to the voting public or share the Board's administrative concerns.

The legislative leaders seek to give voice to a different perspective. Their "primary objective" is not clarifying which law applies. See *supra*, at 5. They are not burdened by misgivings about the law's wisdom. If allowed to intervene, the legislative leaders say, they will focus on defending the law vigorously on the merits without an eye to cross-cutting administrative concerns. And, they add, the differences between their interest and the Board's in this case demonstrate *why* state law empowers them to participate in litigation over the validity of state legislation—alive

Cite as: 597 U. S. ____ (2022)          17

Opinion of the Court

as it is to the possibility that different branches of govern-
ment may seek to vindicate different and valuable state in-
terests. Perhaps recognizing all this, the Fourth Circuit it-
self allowed the legislative leaders to intervene in the
appeal from the District Court's preliminary injunction rul-
ing. The same result should follow here.

By way of reply, the NAACP—but not the Board—worries
that allowing the legislative leaders to intervene could
"make trial management impossible." Brief for NAACP Re-
spondents 26; but see Tr. of Oral Arg. 64 (noting that the
Board has "no problem litigating alongside" the legislative
leaders). We are not insensitive to the concern. In some
other case, a proliferation of motions to intervene may be a
cause for caution. At some point, too, it may be that the
interests of existing parties will come to overlap fully with
the interests of any remaining proposed intervenor.

But that case is not this case. Not only do the legislative
leaders bring a distinct state interest to bear on this litiga-
tion. No one has suggested that a cascade of motions lies
on the horizon here. Recall that the NAACP initially
named the Governor as a defendant. Absent his eventual
dismissal from this litigation, the Governor might have
been able to hire his own outside counsel while the attorney
general continued to represent the Board. See *Martin*, 320
N. C., at 547–548, 359 S. E. 2d, at 480. Introducing the leg-
islative leaders and their counsel after the Governor's de-
parture may not represent a neat one-for-one swap. But
litigation on this scale is hardly inconsistent with what the
Board and the NAACP originally anticipated.

Nor is it unusual. In matters ranging from civil-rights
actions to suits testing the constitutionality of state or fed-
eral legislation, federal courts routinely handle cases in-
volving multiple officials sometimes represented by differ-
ent attorneys taking different positions. See, *e.g.*, *Whole
Woman's Health* v. *Jackson*, 595 U. S. ___ (2021); *Brnovich*,
594 U. S. ___; *United States* v. *Windsor*, 570 U. S. 744

(2013); *Metro Broadcasting, Inc.* v. *FCC*, 497 U. S. 547 (1990); *Buckley* v. *Valeo*, 424 U. S. 1 (1976) (*per curiam*). This Court even hears cases in which officials from a single State have sued each other in federal court. See, *e.g.*, *Virginia Office for Protection and Advocacy* v. *Stewart*, 563 U. S. 247 (2011). Whatever additional burdens adding the legislative leaders to this case may pose, those burdens fall well within the bounds of everyday case management.*

                            *

   Through the General Assembly, the people of North Carolina have authorized the leaders of their legislature to defend duly enacted state statutes against constitutional challenge. Ordinarily, a federal court must respect that kind of sovereign choice, not assemble presumptions against it. Having satisfied the terms of Federal Rule of Civil Procedure 24(a)(2), North Carolina's legislative leaders are entitled to intervene in this litigation. The judgment of the Court of Appeals for the Fourth Circuit is

                                                    *Reversed.*

———————
   *The parties disagree whether our review of this case should be governed by a *de novo* or abuse-of-discretion standard. We find it unnecessary to resolve that question because, even under the latter and more forgiving standard, a misunderstanding of applicable law generally constitutes reversible error. See *Cooter & Gell* v. *Hartmarx Corp.*, 496 U. S. 384, 405 (1990). And here the lower courts erred as a matter of law at both relevant steps of the Rule 24(a)(2) analysis, first by failing to afford due respect to North Carolina's law designating the legislative leaders as its agents in litigation of this sort, and then by "setting the [intervention] bar . . . too high." 999 F. 3d 915, 945 (CA4 2021) (Quattlebaum, J., dissenting). Likewise, because we hold that the legislative leaders are entitled to intervene as a matter of right under Rule 24(a)(2), we need not decide their alternative request for permissive intervention under Rule 24(b).

Cite as: 597 U. S. ____ (2022)          1

SOTOMAYOR, J., dissenting

# SUPREME COURT OF THE UNITED STATES

_____

No. 21–248

_____

## PHILIP E. BERGER, ET AL., PETITIONERS *v.* NORTH CAROLINA STATE CONFERENCE OF THE NAACP, ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE FOURTH CIRCUIT

[June 23, 2022]

JUSTICE SOTOMAYOR, dissenting.

When an individual or entity moves to intervene in a pending lawsuit under Federal Rule of Civil Procedure 24(a)(2), a federal court is not authorized to grant the motion if an existing party to the case adequately represents the movant's interests. Today, however, the Court holds that two leaders of the North Carolina General Assembly are entitled to intervene as a matter of right to represent the State's interest in defending the constitutionality of North Carolina law, even though that interest is already being ably pursued on the State's behalf by an existing state party to the litigation. The Court's decision is wrong for two reasons. First, the Court goes astray by creating a presumption that a State is inadequately represented in federal court unless whomever state law designates as a State's representative is allowed to intervene, even where the interests that the intervenors seek to represent are identical to those of an existing party. That presumption of inadequacy improperly permits state law, as opposed to federal law, to determine whether an existing party adequately represents a particular interest. Second, the Court errs by implying that the attorney general's defense of the constitutionality of the voting law at issue here fell below a minimal standard of adequacy. I respectfully dissent.

I

The underlying dispute in this case concerns the constitutionality of North Carolina's voter-identification law, Senate Bill 824 (S. B. 824), enacted in 2018. The North Carolina State Conference of the NAACP (NAACP respondents) sued members of the North Carolina State Board of Elections (state respondents) and the Governor in Federal District Court, alleging that the law violated the Fourteenth and Fifteenth Amendments and §2 of the Voting Rights Act by, among other things, discriminating against Black and Latino voters. The state attorney general appeared as counsel to represent the Governor and state respondents. See N. C. Gen. Stat. Ann. §114–2 (2021) (providing that the attorney general has a "duty" "to appear for the State" in any matter "in which the State may be a party or interested" and to "represent all State departments, agencies, institutions, commissions, bureaus or other organized activities of the State"). NAACP respondents also filed a parallel challenge to S. B. 824 in state court. See *Holmes* v. *Moore*, No. 18–CV–15292 (Super. Ct. Wake Cty., N. C.).

Shortly after the federal suit was filed, Philip E. Berger, the president *pro tempore* of the North Carolina Senate, and Timothy K. Moore, the speaker of the North Carolina House of Representatives (petitioners here), filed a motion to intervene "on behalf of the General Assembly." App. 55. They sought to intervene as of right under Federal Rule of Civil Procedure 24(a)(2), claiming a "significantly protectable interest in the validity of S.B. 824." App. 61. Petitioners cited, among other things, a state statute conferring upon them standing to intervene on behalf of the General Assembly in cases challenging state law. *Id.,* at 61–62 (citing N. C. Gen. Stat. Ann. §1–72.2). In the alternative, petitioners sought permissive intervention under Federal Rule of Civil Procedure 24(b).

The District Court denied the motion without prejudice,

explaining that petitioners lacked "a significantly protectable interest in . . . defending the constitutionality of S.B. 824 sufficient to warrant a right to intervene under Rule 24(a)(2)" because the Governor and state respondents remained in the suit and were adequately defending the challenged law. App. to Pet. for Cert. 168. The court also reasoned that allowing petitioners to intervene would "'hinder, rather than enhance, judicial economy'" and would "'unnecessarily complicate and delay' the various stages of this case," including discovery, dispositive motions, and trial. *Id.,* at 180. The court granted petitioners' motion to participate in the suit as *amici,* however, and assured petitioners that they could renew their motion to intervene if the attorney general, as counsel for the existing state parties, "declined to defend the lawsuit." *Id.,* at 157.[1] Petitioners did not appeal. Shortly thereafter, the District Court granted the Governor's motion to dismiss him from the suit. The attorney general continued representing state respondents in the litigation.

Six weeks after the District Court denied their original intervention motion, petitioners filed a renewed motion, again seeking both to intervene as a matter of right and permissively. Petitioners primarily reiterated arguments made in their first motion for intervention, adding that this Court's decision in *Virginia House of Delegates* v. *Bethune-Hill*, 587 U. S. ___ (2019), "clarified" the interests they sought to represent. App. 159. They also asserted that the attorney general's conduct in the parallel state-court litigation, in which petitioners were codefendants, supported petitioners' argument for intervention. Specifically, petitioners argued that the attorney general moved to dismiss five of six claims in the state-court litigation, but not the sixth; failed to defend against NAACP respondents' motion for a

─────────

[1] Petitioners submitted an *amicus* brief supporting state respondents' opposition to NAACP respondents' motion for a preliminary injunction.

preliminary injunction; and "did not seriously engage" in discovery. *Id.,* at 164.

The District Court again denied the motion, explaining that it was "abundantly clear that [state respondents are] actively and adequately defending this lawsuit." App. to Pet. for Cert. 189. The court recounted that state respondents had "consistently 'denied all substantive allegations of unconstitutionality' in this case" and had filed an "expansive" brief opposing NAACP respondents' motion for a preliminary injunction on the merits. *Ibid.* The court also rejected petitioners' argument that the attorney general's conduct in the pending state-court litigation was inadequate. The court explained that the attorney general's decision not to move to dismiss the sixth state-court claim in that separate litigation "fell well within the range of reasonable litigation strategies"; that the attorney general secured reversal of the state-court preliminary injunction on appeal; and that the attorney general "'participated in extensive fact discovery'" in the state-court litigation. *Id.,* at 191, 192. The court therefore found "no sound basis on which to speculate . . . that [state respondents] and [the] Attorney General w[ould] abandon their duty to defend S.B. 824 in this case," given that, by all appearances, they had fully executed that duty in both the federal- and state-court litigation thus far. *Id.,* at 193.

The District Court also rejected petitioners' request for permissive intervention. In the court's view, petitioners' contentions in the federal litigation, including their repeated skepticism of state respondents' ability to defend state law vigorously, demonstrated that intervention "would only distract from the pressing issues in this case." *Id.,* at 193–194.

Over a dissent by Judge Harris, the Court of Appeals vacated the District Court's order and remanded for reconsideration of petitioners' request to intervene. The Court of

SOTOMAYOR, J., dissenting

Appeals voted to take the case en banc, however, and affirmed the District Court's denial of intervention.

The en banc court began by stressing that its jurisdiction was limited to reviewing the order from which petitioners had chosen to appeal. Because petitioners had not appealed the District Court's denial of their first intervention motion seeking to "represen[t] the General Assembly's 'institutional interest' in enforcement of S.B. 824," the Court of Appeals determined it could not review petitioners' claim that they were representing that particular institutional interest. 999 F. 3d 915, 926 (CA4 2021). The en banc court instead addressed petitioners' argument that they were mandatorily entitled to represent the interest of the State in defending the constitutionality of S. B. 824.

In its merits analysis, the en banc court observed that Rule 24(a)(2) contains several requirements, including that a proposed intervenor demonstrate both "'an interest in the subject matter of the action'" and "'that the [proposed intervenor's] interest is not adequately represented by existing parties to the litigation.'" *Id.*, at 927 (quoting Fed. Rule Civ. Proc. 24(a)(2)). The court noted that petitioners had not asked the District Court and the Court of Appeals to consider whether state law was relevant to Rule 24(a)(2)'s adequacy requirement, as opposed to its interest requirement. See 999 F. 3d, at 930, n. 3. The court concluded that N. C. Gen. Stat. Ann. §1–72.2, the state statute authorizing petitioners to intervene in cases challenging state law, bore on only the interest requirement. The court explained that "[a] state's policy judgment about the value of legislative intervention may bestow a protectable *interest* in certain court cases, but it does not override [a federal court's] normal standards for evaluating the *adequacy* of existing representation in those cases." 999 F. 3d, at 929, n. 3 (emphasis added).

The court assumed (as to the former requirement) that petitioners had established a protectable interest in the

subject matter of the litigation, but held (as to the latter requirement) that this "purported interest in defending S.B. 824 on behalf of the State of North Carolina" was "adequately represented by existing parties to the litigation." *Id.*, at 927. Accordingly, the court concluded that petitioners had "no right to intervene in federal court under Rule 24(a)(2)." *Ibid.*

This Court granted certiorari. 595 U. S. ___ (2021).

## II

At the heart of this case is Rule 24(a)(2), which governs intervention as of right. As relevant here, Rule 24(a)(2) provides that a court "must permit anyone to intervene" who, (1) "[o]n timely motion," (2) "claims an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest," (3) "unless existing parties adequately represent that interest." This case requires the Court to address how state laws affect mandatory intervention under Rule 24(a)(2).

I begin with points of agreement: The Court and I agree that "States may organize themselves in a variety of ways." *Ante,* at 9; see *Bethune-Hill,* 587 U. S., at ___–___ (slip op., at 4–5) (contrasting Virginia's choice to vest "[a]uthority and responsibility for representing the State's interests in civil litigation . . . exclusively with the State's Attorney General" with other States' decisions to authorize other agents "to litigate on the State's behalf"). We agree that a State is free to designate who will represent it in federal court. See *Hollingsworth* v. *Perry,* 570 U. S. 693, 710 (2013) (observing that although "[t]hat agent is typically the State's attorney general," States may make a different choice); see also *Planned Parenthood of Wis., Inc.* v. *Kaul,* 942 F. 3d 793, 802 (CA7 2019) ("[W]e can see no reason why

Cite as: 597 U. S. ____ (2022)       7

SOTOMAYOR, J., dissenting

a federal court would bat an eye if a state required its at-
torney general to withdraw from his representation and al-
low another entity, including a legislature, to take over a
case"). We also agree that state law can create a protectable
interest in the resolution of a federal lawsuit. See *Maine* v.
*Taylor*, 477 U. S. 131, 137 (1986) ("[A] State clearly has a
legitimate interest in the continued enforceability of its own
statutes").[2]

I part ways with the Court because it is clear that Rule
24(a)(2) does not give a State the right to have multiple par-
ties represent the same interest. Rather, Rule 24(a)(2) ex-
plicitly authorizes additional parties to intervene in pend-
ing litigation only if their interests are not adequately
represented by an existing party.

The Court instead concludes that the undisputed princi-
ples discussed above establish a presumption that a State's
interests are not adequately represented "if [any of] its duly
authorized representatives are excluded from participating
in federal litigation challenging state law." *Ante,* at 9 (stat-
ing that "federal courts should rarely question that a State's
interests will be practically impaired or impeded" in these
circumstances). In the Court's view, because North Caro-
lina law provides that "[t]he Speaker of the House of Rep-
resentatives and the President Pro Tempore of the Senate"
"shall jointly have standing to intervene on behalf of the
General Assembly as a party in any judicial proceeding
challenging a North Carolina statute or provision of the
North Carolina Constitution," N. C. Gen. Stat. Ann. §1–
72.2(b), "a federal court should find the interest require-
ment of Rule 24(a)(2) satisfied," *ante,* at 11. The Court so

—————

[2]We also agree that there is no need to decide whether a presumption
of adequate representation is sometimes appropriate, *ante,* at 15, or what
standard of review governs our analysis, *ante,* at 18, n. I disagree, how-
ever, with the Court's conclusion that the courts below erred under any
standard and that reversal is required.

holds despite the fact that state respondents already represent the State's interests in this litigation in a manner that the District Court found adequate, and where the attorney general's defense of the constitutionality of the voter-identification law has thus far proved successful.

The Court's presumption of inadequacy is novel. Neither petitioners nor the Court identify a single precedent in which a state actor was entitled to intervene as of right to defend a statute that another state actor already was defending. Rather, the issue in all cases the Court cites was whether *any* state official would be allowed to defend a State's interest when an official charged with doing so declined to do so. Cf. *Cameron* v. *EMW Women's Surgical Center, P. S. C.*, 595 U. S. ___, ___, n. 5 (2022) (slip op., at 10, n. 5) (allowing Kentucky attorney general to intervene in federal appellate proceeding "to defend Kentucky's interests" once "no other official [was] willing to do so"); *Karcher* v. *May*, 484 U. S. 72, 75, 81–82 (1987) (holding that two state legislators could intervene to defend the constitutionality of state law after the attorney general declined to do so); *Bethune-Hill*, 587 U. S., at ___ (slip op., at 4) (rejecting argument that the Virginia House of Delegates and its Speaker, who intervened specifically to represent their "own" interests rather than those of the State as a whole, could displace the attorney general as representative of the State); see also *Hollingsworth*, 570 U. S., at 707, 713 (holding that proponents of a ballot initiative who "ha[d] no role . . . in the enforcement of" the initiative and were not "agents of the State" lacked standing to defend it on appeal).

None of these precedents establish that state law can require a federal court to allow additional state actors to intervene when another state actor is already ably and fully representing the State's interests in the litigation. To the contrary, it is well settled that the question whether an interest is being "adequately represented" is one of federal

Cite as: 597 U. S. ____ (2022)     9

SOTOMAYOR, J., dissenting

law, not state law. See 7C C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure §1905 (3d ed. Supp. 2022) (Wright, Miller, & Kane) (citing cases and observing that "[i]t is wholly clear that the right to intervene in a civil action pending in a United States District Court is governed by Rule 24 and not by state law"). Petitioners themselves, until they arrived at this Court, never adopted the view that state law can supplant a federal court's responsibility to decide adequacy of representation in an individual case.

The Court's conclusion that state law can dictate what counts as "adequate" representation also suffers from practical infirmities. If state law can require a federal court to allow a second state actor to intervene to represent a different "perspective," *ante,* at 16, what is to stop a State from designating 3, 4, or 10 or more officials as necessary parties to suits challenging state law? The Court acknowledges this concern but offers no limiting principle grounded in Rule 24(a)(2). *Ante,* at 17. That is because it cannot: Under the Court's logic, a federal court would have no choice but to allow all 10 or more state officials to intervene.

This result contravenes Rule 24(a)(2) and the practical realities of litigation that it reflects. Federal law gives district courts responsibility to assess, in the first instance, the adequacy of a party's representation because those courts are most familiar with that representation and are responsible for managing their dockets and streamlining proceedings. Rule 24(a)(2) thus does not require district courts to allow intervention where interests are adequately represented because such intervention would be duplicative and inefficient. This Rule accounts for the fact that mandatory intervention imposes costs on the original parties, on the court, and on all others whose interests depend on timely resolution of a given case. Forcing federal courts "to accommodate [a] cacophony of parties," 999 F. 3d, at 934, as the Court's logic today requires, will result in an "intractable procedural mess," leaving district courts with "no basis for

divining the true position of the [State] on issues like the meaning of state law, or even for purposes of doctrines like judicial estoppel." *Kaul*, 942 F. 3d, at 801–802; see *New Jersey* v. *New York*, 345 U. S. 369, 373 (1953) (*per curiam*) (declining to be drawn into "intramural dispute" within a State).

It is difficult to overstate the burden the Court's holding will foist on district courts. Each intervenor will be entitled to file its own brief concerning every motion and will be entitled to its own discovery. Even when state agents' positions align, this multitude of parties will clog federal courts and delay the administration of justice.[3]  When state agents' positions diverge, courts will also be put in the unenviable position of determining "which of [a State's] representatives . . . better represents it." 999 F. 3d, at 934. Out of respect for federalism, if nothing else, we should not interpret state law to hijack federal courts' ability to manage litigation involving States. See *Virginia Office for Protection and Advocacy* v. *Stewart*, 563 U. S. 247, 272 (2011) (ROBERTS, C. J., dissenting) (noting the "indignity" suffered by a State when "a federal judge . . . decide[s] an internal state dispute").

### III

Aided by its new presumption of inadequacy, the Court concludes that state respondents inadequately represented petitioners' stated interests. The Court states that in so holding, it "[c]ast[s] aspersions on no one." *Ante,* at 16. In the Court's view, however, petitioners (unlike state respondents and their counsel, the attorney general) "are not

---

[3]This case is the perfect example. The District Court scheduled trial for January 2021, but postponed it to January 2022 pending resolution of petitioners' appeal of their second motion for intervention. See 999 F. 3d, at 923. After certiorari was granted, the District Court stayed trial pending this Court's disposition of the case. Now that the District Court will be obligated to allow petitioners to intervene, trial inevitably will be delayed much further.

burdened by misgivings about the law's wisdom," and therefore should be allowed to intervene to "give voice to a different perspective." *Ibid.* The implication of the Court's holding is clear: The attorney general's performance fell short of representing adequately the State's interests in the constitutionality of its law, and for that reason, petitioners should be allowed to intervene.

This is simply wrong. As a preliminary matter, petitioners and state respondents share the same interest: ensuring the validity and enforcement of S. B. 824. Cf. *Trbovich* v. *Mine Workers*, 404 U. S. 528, 538–539 (1972) (allowing intervention as of right where an intervenor's interests as an individual union member were "not identical" to those of the existing party in the suit, the Secretary of Labor, who sought to represent the public interest). Here, state respondents explain that they "represen[t] . . . the State's interest in defending its laws." Brief for State Respondents 18. Their counsel, the attorney general, is required to do the same under North Carolina law. See N. C. Gen. Stat. Ann. §114–2. Identically, petitioners represent that they seek to defend "the State's vital interest in defending the constitutionality of North Carolina's election laws." Brief for Petitioners 15–16. Indeed, petitioners cannot now seek to represent any unique interest of the General Assembly in the litigation because they abandoned that argument by failing to appeal the District Court's original order denying intervention on that basis. By their own admission, then, petitioners seek only to represent the State's interest in defending state law, an interest that state respondents already represent.

The Court insists that petitioners' "perspective" nevertheless differs from that of state respondents, by focusing on "defending the law vigorously on the merits without an eye to crosscutting administrative concerns" such as obtaining guidance for the administration of upcoming elections.

12        BERGER *v.* NORTH CAROLINA STATE
               CONFERENCE OF THE NAACP
               SOTOMAYOR, J., dissenting

*Ante,* at 16; see Brief for Petitioners 48 ("The differing per-
spectives of Petitioners and State Board Respondents are a
product of their different relationships to the State"). The
Court's position rests in part on the assumption that lead-
ers of the General Assembly have a unique interest that
should be represented in the litigation. As noted, however,
the case's procedural posture forecloses that argument be-
cause petitioners forfeited it.[4]

In any event, the difference in perspective the Court per-
ceives boils down only to a disagreement over trial strategy.
As the Court rightly concedes, the State has a strong inter-
est in the orderly administration of its elections. See *ante,*
at 16 (acknowledging state respondents' interest in "stabil-
ity and certainty" in an upcoming election). That is not,
however, the only state interest that state respondents, rep-
resented by the attorney general, sought to defend. The at-
torney general has insisted all along that the interests he
seeks to represent, and indeed is required to represent un-
der state law, include defending the constitutionality of
North Carolina laws like the voter-identification law at is-
sue here. See N. C. Gen. Stat. Ann. §114–2. These state
interests are not mutually exclusive. The attorney gen-
eral's choice to emphasize the State's interest in election ad-
ministration at a particular stage of the litigation, while
simultaneously maintaining a firm position on the consti-
tutionality of S. B. 824, was merely a choice about litigation
strategy. It is a choice with which petitioners might disa-
gree, but it does not render state respondents' representa-
tion inadequate. See 7C Wright, Miller, & Kane §1909 ("A
mere difference of opinion concerning the tactics with which

——————
    [4] The argument that petitioners may intervene to represent a different
"perspective" might have been a better fit for permissive intervention
under Rule 24(b), rather than intervention as a matter of right under
Rule 24(a)(2). Petitioners, however, did not ask this Court to review the
District Court's conclusion that they were not entitled to permissive in-
tervention.

SOTOMAYOR, J., dissenting

the litigation should be handled does not make inadequate the representation of those whose interests are identical with that of an existing party"); accord, *Kaul*, 942 F. 3d, at 810–811 (Sykes, J., concurring); *Daggett* v. *Commission on Governmental Ethics and Election Practices*, 172 F. 3d 104, 112 (CA1 1999).

Properly understood, the attorney general's representation of state respondents satisfies any standard of adequacy. As the District Court explained, the attorney general "actively and adequately defend[ed] this lawsuit." App. to Pet. for Cert. 189. He "consistently denied all substantive allegations of unconstitutionality in this case." *Ibid.* (internal quotation marks omitted). And he moved to dismiss the suit on federalism grounds, filed an "expansive brief" opposing NAACP respondents' motion for a preliminary injunction on the merits, and has moved for summary judgment on all claims. *Ibid.*

The Court faults the attorney general for emphasizing "administrative concerns" in his brief on the merits and for not offering expert reports to support his opposition to a preliminary injunction. See *ante,* at 16. Petitioners also take issue with the attorney general's decision not to seek a stay of the District Court's preliminary injunction pending appeal. Brief for Petitioners 12, 50. But these are precisely the sort of strategic decisions that government attorneys make every day; in fact, petitioners themselves declined to seek a stay in the parallel litigation in state court. The Court's retrospective criticism of the attorney general's litigation strategy is insufficient to establish that state respondents inadequately represented the State's interests. See *Saldano* v. *Roach*, 363 F. 3d 545, 555 (CA5 2004) ("Simply because the [intervenor] would have made a different decision does not mean that the Attorney General is inadequately representing the State's interest—and hence, the [intervenor's] claimed interest—especially since

state law specifically gives the Attorney General the discre-
tion to make these kinds of decisions").

If any doubt remains, the results delivered by the attor-
ney general's representation should eliminate it. The attor-
ney general sought and secured on appeal a reversal of the
District Court's preliminary injunction. He also won the
Governor's dismissal from the suit. It is hardly persuasive
to flyspeck the attorney general's litigation approach when
that very approach has vindicated the State's interests.

Finally, the Court alludes to petitioners' argument that
state respondents' representation of petitioners' interests
was inadequate because the Governor (who vetoed S. B. 824
and personally opposed the law) exercised appointment au-
thority over state respondents. *Ante,* at 16. The Court is
right not to fully embrace this argument, which implies
that the attorney general and the career professionals in his
office are incapable of executing their statutory duty to rep-
resent North Carolina in litigation and defend its interests.
See N. C. Gen. Stat. Ann. §114–2. Petitioners' "startling
accusation" flies in the face of the presumption that public
officials can be trusted to exercise their official duties and
overlooks the attorney general's vigorous advocacy to date.
999 F. 3d, at 937; see *United States* v. *Chemical Founda-
tion, Inc.,* 272 U. S. 1, 15 (1926) (courts should "presume
that [public officials] have properly discharged their official
duties"). As the Court of Appeals explained, that the Gov-
ernor or the attorney general "may have expressed policy
views at odds with S.B. 824 in the past is no ground for a
federal court to infer that [the attorney general] would ab-
dicate his official duty to the State by subterfuge, mounting
a sham defense of the statute." 999 F. 3d, at 937. To sug-
gest otherwise does a grave "disservice to the dignified work
of government lawyers who each day put aside their own
policy and political preferences to advocate dutifully on be-
half of their governments and the general public." *Ibid.*

Cite as: 597 U. S. ____ (2022)           15

Sotomayor, J., dissenting

In short, the Court's conclusion that state respondents inadequately represented petitioners' interests is a fiction that the record does not support. In addition, the Court's armchair hypothesizing improperly displaces the District Court's firsthand experience in managing this litigation.

*    *    *

States are entitled to structure themselves as they wish and to decide who should represent their interests in federal litigation. State law may not, however, override the Federal Rules of Civil Procedure by requiring federal courts to allow intervention by multiple state representatives who all seek to represent the same state interest that an existing state party is already capably defending. Because the Court concludes otherwise, I respectfully dissent.