# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

NORTH CAROLINA STATE )
CONFERENCE OF THE NAACP, *et al.*, )
)
       Plaintiffs, )
)     1:18CV1034
       v. )
)
ALAN HIRSCH, in his official capacity as )
Chair of the North Carolina State Board of )
Elections, *et al.*, )
)
       Defendants, )
)
and )
)
PHILIP E. BERGER, in his official )
capacity as President Pro Tempore of the )
North Carolina Senate, *et al.*, )
)
       Legislative Defendant Intervenors. )

## MEMORANDUM OPINION AND ORDER

LORETTA C. BIGGS, District Judge.

Before the Court is a Motion for Summary Judgment[1], (ECF No. 177), filed by

Defendants Damon Circosta, in his official capacity as Chair of the State Board of Elections;

---

[1] As a preliminary matter, this Court addresses whether it should consider State Board Defendants' Motion for Summary Judgment in light of the Magistrate Judge's finding that Defendants' motion was not timely and that there was no excusable neglect. (Text Order dated August 25, 2021.) The Parties have fully briefed the motion, and the Court has now set this case for trial on May 6, 2024, leaving the Court with adequate time to address the motion. In addition, at the November 21, 2023, hearing, when the Court said it would rule on this motion before trial, Plaintiffs were given an opportunity to respond and did not object. (Tr. 71:21–72:21.) Having weighed the circumstances above, the Court finds that consideration of Defendant's motion will not cause delay to the proceedings and elects to address Defendants' Motion for Summary Judgment. *See* L.R. 56.1.

("Tr.") refers to the Realtime Feed – Unedited/Uncertified Transcript for the November 21, 2023, Motions Hearing before this Court.

Stella Anderson, in her official capacity as Secretary of the State Board of Elections; and Jeff Carmon III, Wyatt T. Tucker Sr., and Stacy "Four" Eggers, IV, in their official capacities as Members of the State Board of Elections (collectively "State Board Defendants").[2] Plaintiffs claim the provisions of S.B. 824 that provide for voter ID requirements, the increase in the number of poll observers, and the expansion of reasons for challenging a ballot violate § 2 of the Voting Rights Act ("VRA"), 52 U.S.C. § 10301, as well as the Fourteenth and Fifteenth Amendments of the United States Constitution because they were enacted with racially discriminatory intent. (ECF No. 1 ¶¶ 105–146.) State Board Defendants now move for summary judgment and contend that no genuine issues of material fact exist which support Plaintiffs' claim of an alleged violation of constitutional rights or the VRA. (ECF No. 177 at 1.) For the reasons stated herein, State Board Defendants' motion will be denied.

## I.  BACKGROUND[3]

In 2013 the North Carolina General Assembly (the "General Assembly" or the "legislature") passed an omnibus voting law that included a photo ID requirement. *N.C. State Conf. of the NAACP v. Raymond*, 981 F.3d 295, 289 (4th Cir. 2020). The Fourth Circuit later enjoined five of its voting restrictions, including the photo ID requirement, finding that North

---

[2] On February 26, 2024, Legislative Defendants moved to join and adopt the State Board Defendants' Motion for Summary Judgment to "ensure that they have full rights to defend the judgment on appeal if this Court grants the pending summary judgment motion." (ECF No. 231 at 1.) Neither Plaintiffs nor State Board Defendants have objected. The Court grants the motion only to the extent that the Legislative Defendants join and adopt the arguments in State Board Defendants' Motion for Summary Judgment. However, the Court declines to grant any anticipatory relief with respect to appeal. Legislative Defendants may raise such arguments at the appropriate time and, if not before this Court, in the appropriate forum.

[3] Both Parties rely on the pleadings, affidavits, and exhibits previously filed in relation to Plaintiffs' motion for preliminary injunction. The Parties have not submitted undisputed facts. The Court relies on the pleadings and materials in the record in this section, however, does not represent that these facts are undisputed.

Carolina acted with racially discriminatory intent when enacting the restrictions. *N.C. State Conf. of NAACP v. McCrory*, 831 F.3d 204, 215 (4th Cir. 2016); *Raymond*, 981 F.3d at 299. In November 2018, North Carolina voters approved a ballot measure proposed by the General Assembly amending the North Carolina State Constitution to require voters to provide photographic identification before voting in person (the "voter-ID amendment").[4] (ECF No. 1 ¶¶ 62, 64.) As the voter-ID amendment is not self-executing, *see* N.C. Const. art. VI, §§ 2(4), 3(2), on December 5, 2018, the General Assembly passed S.B. 824 as implementing legislation, (*see* ECF No. 1 ¶ 1). The Governor vetoed S.B. 824 on December 14, 2018. (*Id.* ¶ 78.) Nevertheless, the General Assembly codified S.B. 824 into law—Session Law 2018-144—by an override of the Governor's veto on December 19, 2018. (*Id.* ¶¶ 1, 79); 2018 N.C. Sess. Laws 144. S.B. 824's central requirement is that every voter present a qualifying photo ID before casting a ballot. 2018 N.C. Sess. Laws 144 § 1.2.(a). The instant lawsuit was filed in this Court one day after S.B. 824 became law. (ECF No. 1 at 37.) In their Complaint, Plaintiffs challenge the provisions of S.B. 824 which "impose voter-identification requirements," as well as the provisions "that expand the number of poll observers and the number[ ] of people who can challenge ballots." (*Id.* ¶¶ 106–07.) Plaintiffs allege that "[t]hese provisions, separately and together, will have a disproportionately negative impact on minority voters," (*id.* ¶ 80), ultimately resulting in "the effective denial of the franchise and dilution of [African American and Latino] voting strength," (*id.* ¶ 7). Plaintiffs' Complaint further alleges that the challenged provisions "impose discriminatory and unlawful burdens on the right to vote that are not justified by any legitimate or compelling state interest." (*Id.* ¶ 8.)

---

[4] As amended, the North Carolina State Constitution provides as follows: "Voters offering to vote in person shall present photographic identification before voting. The General Assembly shall enact general laws governing the requirements of such photographic identification, which may include exceptions." N.C. Const. art. VI, §§ 2(4), 3(2).

3

Plaintiffs filed a motion for preliminary injunction on September 17, 2019, seeking to prevent Defendants from implementing, enforcing, or giving effect to the challenged provisions of S.B. 824. (*See generally* ECF No. 72.) This Court did not find that Plaintiffs demonstrated a likelihood of success on the § 2 VRA results claim or discriminatory intent claims as to the provisions increasing the number of at-large poll observers appointed by each party. (ECF No. 120 at 52, 46–47.) The Court found that Plaintiffs did demonstrate a clear likelihood of success on the merits of their discriminatory intent claims for at least the voter ID and ballot-challenge provisions of S.B. 824. (*Id.* at 46.) Defendants appealed, and on December 2, 2020, the Fourth Circuit reversed this Court and lifted the preliminary injunction. (*See generally* ECF No. 153.)

State Board Defendants argue that summary judgment is appropriate because "[a]t the preliminary injunction stage, this Court concluded that Plaintiffs were unlikely to succeed on their claim under § 2 of the VRA." (ECF No. 182 at 16.) In addition, the "Fourth Circuit found that the Plaintiffs were unlikely to succeed on their discriminatory-intent claims." (*Id.*[5] (citing ECF No. 120 at 47–53; *Raymond*, 981 F.3d at 305)). State Board Defendants further contend that summary judgment is appropriate because "Plaintiffs failed to conduct discovery, there is no additional evidence in the record beyond that which Plaintiffs presented at the preliminary injunction phase." (ECF No. 182 at 16.) Plaintiffs argue that their claims are

---

[5] State Board Defendants filed a memorandum of law in support of their Motion for Summary Judgment on October 2, 2021, (ECF No. 178), and later filed an additional memorandum of law in support of the same Motion for Summary Judgment on October 8, 2021, without explanation, (ECF No. 182). The Parties appear to agree that the second memorandum of law is the operative document. The Court construes the more recent filing on October 8, 2021, (ECF No. 182), to be the operative memorandum of law in support of State Board Defendants' Motion for Summary Judgment, (ECF No. 177).

highly fact-dependent and are not amenable to disposition on summary judgment. (ECF No. 187 at 8, 18.)

## II. STANDARD OF REVIEW

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A dispute is genuine if a reasonable jury could return a verdict for the nonmoving party." *Jacobs v. N.C. Admin. Off. of the Cts.*, 780 F.3d 562, 568 (4th Cir. 2015) (citations and internal quotation marks omitted). "[I]n deciding a motion for summary judgment, a district court is required to view the evidence in the light most favorable to the nonmovant" and to "draw all reasonable inferences in his favor." *Harris v. Pittman*, 927 F.3d 266, 272 (4th Cir. 2019) (citing *Jacobs*, 780 F.3d at 568). A court "cannot weigh the evidence or make credibility determinations," *Jacobs*, 780 F.3d at 569 (citations omitted), and thus must "usually" adopt "the [nonmovant's] version of the facts," even if it seems unlikely that the nonmoving party would prevail at trial, *Witt v. W. Va. State Police, Troop 2*, 633 F.3d 272, 276 (4th Cir. 2011) (quoting *Scott v. Harris*, 550 U.S. 372, 378 (2007)).

Where the nonmovant will bear the burden of proof at trial, the party seeking summary judgment bears the initial burden of "pointing out to the district court . . . that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). If the moving party carries this burden, then the burden shifts to the nonmoving party to point out "specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). In so doing, "the nonmoving party must rely on more than conclusory allegations, mere speculation, the building of one inference upon another, or the mere existence of a scintilla of evidence." *Dash*

5

*v. Mayweather*, 731 F.3d 303, 311 (4th Cir. 2013). Instead, the nonmoving party must support its assertions by "citing to particular parts of . . . the record" or "showing that the materials cited do not establish the absence . . . of a genuine dispute." Fed. R. Civ. P. 56(c)(1); *see also Celotex*, 477 U.S. at 324.

"[W]hen the disposition of a case turns on a determination of intent, courts must be especially cautious in granting summary judgment," as "the resolution of that issue depends so much on the credibility of the witnesses, which can best be determined by the trier of facts after observation of the demeanor of the witnesses during direct and cross-examination." *Morrison v. Nissan Co.*, 601 F.2d 139, 141 (4th Cir. 1979). There are no categorical bars preventing successful summary judgment motions in vote denial claims or constitutional challenges to laws affecting voting rights; however, "summary judgment is not often granted in voter denial lawsuits." *Greater Birmingham Ministries v. Sec'y of State for State of Ala.*, 992 F.3d 1299, 1317 (11th Cir. 2021).

The preliminary injunction and summary judgment standards are "highly distinct," *Diamonds Direct USA, Inc. v. BFJ Holdings, Inc.*, 895 F. Supp. 2d 752, 755 n.1 (E.D. Va. 2012), and therefore "there is no inconsistency in the court denying . . . [a] motion for preliminary injunction and allowing the matter to proceed to trial." *Devan Designs, Inc. v. Palliser Furniture Corp.*, No. 2:91CV00512, 1993 WL 283256, at *1 n.2 (M.D.N.C. Apr. 21, 1993). "In the context of preliminary injunction, the court necessarily must weigh the evidence in order to determine the likelihood of success on the merits. In the context of summary judgment, such weighing of evidence is, of course, impermissible." *Id.* Accordingly, any ruling on a preliminary injunction, does not preclude a different resolution on a more fully developed record. *Newsom ex rel. Newsom v. Albemarle Cnty. Sch. Bd.*, 354 F.3d 249, 261 (4th Cir. 2003).

6

## III.  DISCUSSION

### A.  Fourteenth and Fifteenth Amendments

When reviewing this Court's preliminary injunction order in this case, the Fourth Circuit found that "the Challengers would [not] likely carry their burden of proving that the General Assembly acted with discriminatory intent in passing [S.B. 824]." *Raymond*, 981 F.3d at 310.  This Court must apply the law of the Fourth Circuit; however, the findings of fact and conclusions of law in deciding a motion for "preliminary injunction are not binding at trial on the merits." *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981).

Because S.B. 824 is facially race-neutral, Plaintiffs must "establish that the State . . . acted with a discriminatory purpose" in order to prevail on their constitutional claims. *Reno v. Bossier Par. Sch. Bd.*, 520 U.S. 471, 481–82 (1997) (citing *City of Mobile v. Bolden*, 446 U.S. 55, 62 (1980) (plurality opinion)) (explaining that facially neutral actions only violate the Fourteenth and Fifteenth Amendments if motivated by discriminatory purpose).  As the Fourth Circuit articulated in *Raymond*, "[d]etermining whether a statute was enacted with discriminatory intent is a factual question involving a two-step process." 981 F.3d at 303 (citing *Hunt v. Cromartie*, 526 U.S. 541, 549 (1999)).  At step one, Plaintiffs bear the burden of showing that racial discrimination was a "'substantial' or 'motivating' factor behind enactment of the law." *Id.* (internal quotation marks omitted) (quoting *Hunter v. Underwood*, 471 U.S. 222, 228 (1985)).

> Satisfying that burden requires looking at the four factors from the Supreme Court's *Arlington Heights* decision: (1) historical background; (2) the specific sequence of events leading to the law's enactment, including any departures from the normal legislative process; (3) the law's legislative history; and (4) whether the law 'bears more heavily on one race than another.'

*Id.* (quoting *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265–69).  "[T]he district court *must* afford the state legislature a 'presumption' of good faith." *Id.* (citing *Abbott v. Perez*, 138 S. Ct. 2305, 2324 (2018)).  If Plaintiffs meet their burden to show discriminatory

7

intent, then the Court turns to step two, where "the burden shifts to the law's defenders to demonstrate that the law would have been enacted without" racial discrimination. *Id.* (internal quotation marks omitted) (quoting *Hunter*, 471 U.S. at 228.) "It is only then that judicial deference to the legislature 'is no longer justified.'" *Id.* (quoting *Arlington Heights*, 429 U.S. at 265–66.) "Without deference and with the burden placed firmly on the legislature, a district court at the second step must 'scrutinize the legislature's *actual* nonracial motivations to determine whether they *alone* can justify the legislature's choices.'" *Id.* (quoting *McCrory*, 831 F.3d at 221).

State Board Defendants argue that Plaintiffs' evidence does not show discriminatory intent under the *Arlington Heights* factors. (ECF No. 182 at 17–22.) Plaintiffs argue that there is more than sufficient evidence in the record for each factor to defeat summary judgment with respect to discriminatory intent. (ECF No. 187 at 19.) Plaintiffs are correct, at least with respect to the historical background and whether S.B. 824 bears more heavily on one race than another or its impact.

With respect to the historical background, the Parties acknowledge as courts have repeatedly acknowledged, North Carolina's history of racial discrimination, including the 2013 racially discriminatory voting restrictions. (ECF Nos. 182 at 7, 17–19; 187 at 19–20.) State Board Defendants contend that nonetheless, racial discrimination has not been proven in this case, and specifically argues that "[t]he amendment to the North Carolina Constitution marks a significant intervening circumstance that breaks the link between . . . North Carolina's history of discrimination with a prior photo ID law and the present photo ID law." (ECF No. 182 at 18.) Plaintiffs contend that the process for the constitutional amendment was "rushed and irregular." (ECF No. 187 at 20 (citing ECF Nos. 91-1 at 73–79 (detailing the "rushed,"

8

"unusual," and "bizarre" process by which the North Carolina General Assembly proposed a constitutional amendment on voter ID without a study commission and without implementing legislation); 108-3 at 19–22).) It is undisputed that the North Carolina Constitution was amended to mandate a photo voter ID law. However, factual disputes remain as to the implications that arise from this fact, including whether the voter-ID amendment breaks the link between North Carolina's history of discrimination or whether S.B. 824 is an extension of North Carolina's recent history of discrimination.

With respect to whether S.B. 824 bears more heavily on one race than another, State Board Defendants argue that Plaintiffs cannot show that S.B. 824 will result in a substantial impact. (ECF No. 182 at 20.) State Board Defendants contend that registered voters can receive free voter-ID cards without any corroborating documents and that any voter may choose to vote at one-stop early voting, a time during which the county boards are required to issue free photo-ID cards allowing registered voters to make a single trip to obtain a photo ID and vote. (ECF No. 182 at 22.) State Board Defendants further contend that S.B. 824 requires no additional identification documentation once a voter fills out the reasonable impediment form, does not allow any voter to challenge another voter's reasonable impediment, and requires the voter's ballot to be counted unless the county board unanimously believes there are "grounds to believe" the voter's affidavit is false. (*Id.*) (citations and internal quotation marks omitted).

Plaintiffs argue that State Board Defendants only speculate that the free voter IDs and the reasonable impediment declarations "will entirely mitigate the impacts on the hundreds of thousands of voters who lack valid forms of ID." (ECF 187 at 9.) Specifically, Plaintiffs dispute State Board Defendants' assertion that under the reasonable impediment declaration's

"other" category, any reason a voter offers will be accepted, provided it is not found to be false, because this language "does not appear in the statute." (*Id.* at 10) (internal quotation marks omitted). Plaintiffs also dispute that S.B. 824 requires a unanimous finding of falseness by the county board, arguing that the language does not appear in the statute or the North Carolina Administrative Regulation that State Board Defendants cite for support. (*Id.* at 11 (citing 08 N.C. Admin. Code 17.0101(b)).) Similarly, Plaintiffs highlight that the administrative rule that State Board Defendants use to support their position that county boards may issue voter IDs at locations other than the county board of election office is expired and not in effect. (*Id.* at 12 n.5 (citing 08 N.C. Admin. Code 17.0107(a)).) Plaintiffs further contend that the reasonable impediment declaration is of little use to voters who are deterred from coming to the polls at all because they lack valid forms of photo ID or believe they lack valid photo ID. (*Id.* at 11 (citing ECF Nos. 91-1 at 41–42; 108-3 at 12–14; 91-4 at 35–38).) The Court finds that there are genuine factual disputes as to the existence and applicability of certain S.B. 824 provisions affecting the ultimate impact of S.B. 824 on African American and Hispanic voters.

Assessing whether Plaintiffs have shown that racial discrimination was a substantial or motivating factor behind enactment of S.B. 824 is fact-intensive, and at this stage, the Court cannot weigh the evidence or make credibility determinations. Even after affording the state legislature a presumption of good faith, in light of the evidence in the record on the historical background and impact of S.B. 824, State Board Defendants have failed to show that there is an absence of evidence to support that racial discrimination was a "substantial" or "motivating" factor behind the enactment of S.B. 824.

10

Should Plaintiffs succeed in showing discriminatory intent, the burden would then shift to State Board Defendants to show that S.B. 824 would have been enacted without racial discrimination.

State Board Defendants assert that there are nonracial motivations for the enactment of S.B. 824, highlighting that legislators from both parties recognized S.B. 824 was required to implement the state constitution's new mandate that voters present a photographic ID to vote. (ECF No. 182 at 22–23.) State Board Defendants also assert that proponents of S.B. 824 believed that the legislation would promote voter confidence in elections. (*Id.* at 23.) Plaintiffs claim that the sponsors of S.B. 824 made "statements regarding the purpose of SB 824, including their interest in continuing the policies embodied in HB 589, which had been found to be in violation of the Constitution and the Voting Rights Act." (ECF No. 187 at 16 (citing ECF No. 91-1 at 14–16).) Plaintiffs contend that whether State Board Defendants' "evidence is sufficient to justify the state's interest in enacting a racially discriminatory photo ID law is necessarily an issue for trial." (*Id.* at 17.) At the second step of this factual analysis, the burden is placed firmly on the legislature, and the Court must scrutinize the legislature's actual nonracial motivations, without deference, to determine whether they alone can justify the legislature's choices.

The resolution of this issue depends on the credibility of the witnesses, and therefore, is best determined after observation of the demeanor of the witnesses during direct and cross-examination. The Court at this time, cannot scrutinize the legislature's actual nonracial motivations and cannot rule as a matter of law on whether S.B. 824 would have been enacted without racial discrimination.

11

Considering the information before the Court, State Board Defendants have not shown that there is an absence of evidence to support the nonmoving party's case nor provided sufficient evidence for the Court to rule on the nonracial motivations for S.B. 824 as a matter of law. The record reflects that there are genuine disputes about the implications of the historical background, the impact of S.B. 824, and the sufficiency of the nonracial motivations for S.B. 824. Disputes as to these material facts prohibit the Court from deciding in State Board Defendants' favor at this stage of the case. Therefore, with respect to Plaintiffs' constitutional claims, State Board Defendants are not entitled to summary judgment.

### B. Section 2 of the Voting Rights Act

Plaintiffs also argue that the provisions of S.B. 824 that provide for voter-ID requirements, the increase in the number of poll observers, and the expansion of reasons for challenging a ballot violate the VRA's § 2 "results" standard because "[t]hese provisions, separately and together, will have a disproportionately negative impact on minority voters," (ECF No. 1 ¶ 80), ultimately resulting in "the effective denial of the franchise and dilution of [African American and Latino] voting strength," (*id.* ¶ 7). At the preliminary injunction stage, when addressing the likelihood of success on the merits with respect to Plaintiffs' § 2 VRA claim, this Court held that "the bill's anticipated impact, on its own, is not enough to invalidate S.B. 824—at least not according to the evidence currently in the record." (ECF No. 120 at 52–53.) This Court acknowledged, however, that "[t]his is not to say, of course, that Plaintiffs will not be able to succeed on their § 2 results claim at trial." (*Id.* at 53.) The question before the Court now on State Board Defendants' motion for summary judgment, is whether there is a genuine dispute as to any of the facts material to this claim.

Section 2 of the Voting Rights Act provides the following:

12

(a) No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color, or in contravention of the guarantees set forth in section 10303(f)(2) of this title, as provided in subsection (b).

(b) A violation of subsection (a) is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered: *Provided*, That nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population.

52 U.S.C.A. § 10301.

"Unlike discrimination claims brought pursuant to the Fourteenth and Fifteenth Amendments, which require proof of both discriminatory intent and actual discriminatory effect, the language of Section 2(a) of the VRA requires only proof of discriminatory 'results,' not of discriminatory intent." *Greater Birmingham Ministries*, 992 F.3d at 1328–29 (quoting *Chisom v. Roemer*, 501 U.S. 380, 403–04 (1991)). "[A] violation [of § 2 of the VRA] c[an] be proved by showing discriminatory effect alone," without having to show a discriminatory purpose. *Thornburg v. Gingles*, 478 U.S. 30, 35 (1986); *see also Lee v. Va. State Bd. of Elections*, 843 F.3d 592, 599 (4th Cir. 2016). To succeed on a § 2 results-only claim, a plaintiff must "make a greater showing of disproportionate impact" than is required to evidence discriminatory intent under an *Arlington Heights* analysis. *McCrory*, 831 F.3d at 231 n.8. "Otherwise, plaintiffs could prevail in any and every case in which they proved any impact." *Id.*

Section 2 results analysis requires "an intensely local appraisal." *See Gingles*, 478 U.S. at 79 (1986) (internal quotation marks omitted); *League of Women Voters of N.C. v. North Carolina*,

769 F.3d 224, 243–44 (4th Cir. 2014) [hereinafter "*LWV*"] (concluding that the district court's failure to "understand the local nature of Section 2" amounted to error). As with discriminatory intent claims, a § 2 results claim is assessed under "the totality of circumstances," 52 U.S.C. § 10301(b)—rather than examine the challenged government action in the abstract, courts must consider whether an "electoral law, practice, or structure interacts with social and historical conditions to cause an inequality in the opportunities enjoyed by [non-white] and white voters to elect their preferred representatives," *Gingles*, 478 U.S. at 47. The Fourth Circuit has divided this holistic inquiry into a two-part test:

> First, the challenged standard, practice, or procedure must impose a discriminatory burden on members of a protected class, meaning that members of the protected class have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.

> Second, that burden must in part be caused by or linked to social and historical conditions that have or currently produce discrimination against members of the protected class.

*LWV*, 769 F.3d at 240 (internal quotation marks and citations omitted). The Court's determination under this test is guided by certain factors, detailed in the VRA's legislative history, "which typically may be relevant" (the "Senate Factors").[6] *Gingles*, 478 U.S. at 44.

---

[6] In *Thornburg v. Gingles*, the Supreme Court listed a non-comprehensive set of factors to consider: "[(1)] the history of voting-related discrimination in the State or political subdivision; [(2)] the extent to which voting in the elections of the State or political subdivision is racially polarized; [(3)] the extent to which the State or political subdivision has used voting practices or procedures that tend to enhance the opportunity for discrimination against the minority group, such as unusually large election districts, majority vote requirements, and prohibitions against bullet voting; [(4)] the exclusion of members of the minority group from candidate slating processes; [(5)] the extent to which minority group members bear the effects of past discrimination in areas such as education, employment, and health, which hinder their ability to participate effectively in the political process; [(6)] the use of overt or subtle racial appeals in political campaigns; and [(7)] the extent to which members of the minority group have been elected to public office in the jurisdiction."

14

However, "there is no requirement that any particular number of factors be proved, or that a majority of them point one way or the other." *Id.* at 45 (internal quotation marks and citations omitted).

Since this Court's order on Plaintiffs' motion for preliminary injunction and the Fourth Circuit's subsequent review, the Supreme Court decided *Brnovich v. Democratic Nat'l Comm.*, 141 S. Ct. 2321 (2021). Although not a voter denial case, when analyzing the totality of the circumstances under Section 2(b), the Supreme Court considered (1) "the size of the burden imposed by a challenged voting rule," (2) "the degree to which a voting rule departs from what was standard practice when § 2 was amended in 1982," (3) "[t]he size of any disparities in a rule's impact on members of different racial or ethnic groups," (4) "the opportunities provided by a State's entire system of voting," and (5) "the strength of the state interests served by a challenged voting rule." *Brnovich*, 141 S. Ct. at 2338–39. However, the Supreme Court specified that it was not attempting "to compile an exhaustive list" and held that because § 2(b) requires consideration of the totality of the circumstances, "any circumstance that has a logical bearing on whether voting is 'equally open' and affords equal 'opportunity' may be considered." *Id.* at 2338.

With respect to the two-part test under *LWV* using the Senate Factors, the record reflects that a no-match rate in DMV-issued ID possession of 10.6% for Black voters and of 6.5% for white voters, (ECF No. 91-11 at 22), and a no-match rate of 11.1% for Hispanic voters and of 5.7% for non-Hispanic voters, (ECF No. 91-11 at 26). This disparity could

---

478 U.S. 30, 44–45 (1986). Other relevant considerations which may have probative value include "[(8)] evidence demonstrating that elected officials are unresponsive to the particularized needs of the members of the minority group and [(9)] that the policy underlying the State's or the political subdivision's use of the contested practice or structure is tenuous." *Id.* at 45.

suggest an unlawful discriminatory burden. The record also includes evidence of Senate Factor 1, a history of voting-related discrimination in the State, and Senate Factor 5, that minority group members bear the effects of past discrimination in areas such as education, employment, and health, which hinder their ability to participate effectively in the political process. (ECF No. 187 at 17–18); *see supra* Section I (discussing the North Carolina's recent history of voting-related discrimination with respect to the 2013 omnibus voting law); ECF No. 91-2 at 19–22, 64–65 (detailing North Carolina's history of voting-related racial discrimination dating back at least to 1899 and current disadvantages for African Americans and Hispanics, including poverty, lack of access to quality education and health care, which contribute to decreased voter participation and inadequate representation.) The Court finds that under this framework, there is sufficient evidence in the record to suggest an inequality in the opportunities enjoyed by non-white and white voters to elect their preferred representatives.

The Court will also consider the factors outlined in *Brnovich*.

### 1. The size of the burden

"Voting takes time and, for almost everyone, some travel, even if only to a nearby mailbox. Casting a vote, whether by following the directions for using a voting machine or completing a paper ballot, requires compliance with certain rules." *Brnovich*, 141 S. Ct. at 2338. Therefore, "because voting necessarily requires some effort and compliance with some rules, the concept of a voting system that is 'equally open' and that furnishes an equal 'opportunity' to cast a ballot must tolerate the 'usual burdens of voting.'" *Id.* (citations omitted). State Board Defendants argue that "Plaintiffs cannot show that S.B. 824 will result in a substantial impact because of one simple fact: S.B. 824 allows any voter to cast a ballot, with or without a photo

ID, such that any burdens imposed on voters without identification are extremely limited." (ECF No. 182 at 20.) Furthermore, State Board Defendants argue that North Carolina's reasonable impediment provision allows a voter to "cast a provisional ballot without an approved photo ID by signing an affidavit identifying their reason for lacking ID," and that "[t]he county board of elections must count that voter's ballot unless the five-member bipartisan county board *unanimously* determines that there are grounds to believe the affidavit is false." (*Id.* at 21 (citing S.B. 824 § 1.2(a), §§ 163A-1145.1(d), (d1); § 163A-1145.1(e); 08 N.C.A.C. 17.0101(b)).) State Board Defendants contend that these provisions "establish[ ] that the impact imposed upon voters by S.B. 824 will be small." (*Id.* at 27.)

Plaintiffs argue that State Board Defendants' arguments that the impacts of S.B. 824 will be limited rest on "speculation." (ECF No. 187 at 9.) Specifically, Plaintiffs contend that the reasonable impediment declaration is of little use to voters who are deterred from coming to the polls at all. (*Id.* at 11.) Further, Plaintiffs argue that because the reasonable impediment declaration provision requires a declaration that a false statement on the form is a felony, the reasonable impediment declaration is likely to deter voters from using the form. (*Id.* at 10.) As discussed above, Plaintiffs also argue that S.B. 824 does not include provisions stating: (1) that that county boards of elections may issue voter IDs at locations other than the county board; (2) that under the reasonable impediment declaration's "other" category, any reason a voter offers will be accepted provided it is not found to be false; or (3) that a unanimous finding of falseness of the reasonable impediment by the county board is required to exclude the voter's provisional ballot. (*Id.* at 10–12.)

The record reflects that over 617,000 North Carolina voters did not possess a valid form of photo ID issued by the N.C. Department of Motor Vehicles in 2019. (ECF No. 91-

11 ¶ 28.)  Moreover, Plaintiffs have pointed to factual inconsistencies in Defendants'
interpretation of S.B. 824 and what the law actually provides such that the size of the burden
on voters in light of S.B. 824's "provisions, exceptions, and other ameliorative elements,"
(ECF No. 182 at 29), remains disputed.

      2.    <u>The degree to which a voting rule departs from what was standard
practice when § 2 was amended in 1982</u>

"[T]he degree to which a challenged rule has a long pedigree or is in widespread use in
the United States is a circumstance that must be taken into account." *Brnovich*, 141 S. Ct. at
2339.  State Board Defendants argue that the "implementation of voter identification laws in
35 States patently constitutes 'widespread use in the United States.'"  (ECF No. 182 at 27
(quoting *Brnovich*, 141 S. Ct. at 2339.))  Plaintiffs argue that photo ID was only used in North
Carolina for a single primary election in 2016, therefore, the voting rule does not have a "long
pedigree" in North Carolina and separately was not in widespread use in 1982.  (ECF No. 187
at 14.)  The record reflects that in 2019, 35 states in the United States had some form of
identification at the polls, (ECF No. 97-15 at 2); however, as was indicated by the Fourth
Circuit, photo IDs were not required in North Carolina before a period in 2016, *see McCrory*,
831 F.3d at 216, therefore, the voting requirement does not have a long pedigree in North
Carolina.

      3.    <u>The size of any disparities in a rule's impact on members of different
racial or ethnic groups</u>

"Small disparities are less likely than large ones to indicate that a system is not equally
open." *Brnovich*, 141 S. Ct. at 2339.  To the "extent that minority and non-minority groups
differ with respect to employment, wealth, and education, even neutral regulations, no matter
how crafted, may well result in some predictable disparities in rates of voting and
noncompliance with voting rules." *Id.*  State Board Defendants, relying on the findings in

18

*Raymond*, argue that "even if Plaintiffs can demonstrate that minority voters disproportionately lack qualifying IDs, the ameliorative provisions within S.B. 824 that lessen the impact overcome this disparity." (ECF No. 182 at 28 (citing *Raymond*, 981 F.3d at 309–11).)  Plaintiffs contend that "[State Board] Defendants' sole response to these significant disparities is that they will somehow be cured by SB 824's [reasonable impediment declaration] and Free ID provisions." (ECF No. 187 at 15.)  However, Plaintiffs reiterate that "the efficacy of these measures in reducing the disparate impacts of ID possession is highly disputed between the parties and cannot be resolved at the summary judgment stage." (*Id.*)

Here, the record reflects that a no-match rate in DMV-issued ID possession of 10.6% for Black voters and of 6.5% for white voters, (ECF No. 91-11 at 22), and a no-match rate of 11.1% for Hispanic voters and of 5.7% for non-Hispanic voters, (*id.* at 26).  The Supreme Court found that racial disparity in burdens for Arizona's out-of-precinct policy were small when "a little over 1% of Hispanic voters, 1% of African-American voters, and 1% of Native American voters who voted on election day cast an out-of-precinct ballot.  For non-minority voters, the rate was around 0.5%." *Brnovich*, 141 S. Ct. at 2345 (internal citation omitted).  In *Lee,* the Fourth Circuit found that "African Americans, as a demographic block, are by a slim statistical margin less likely to have a form of valid identification" where 96.8% of Caucasians and 94.6% of African Americans had appropriate IDs.  843 F.3d at 600, 597.  In this case, the disparities are greater than those around .5%. and 2.2%, which courts have considered small.

### 4.  The opportunities provided by a State's entire system of voting

"[W]here a State provides multiple ways to vote, any burden imposed on voters who choose one of the available options cannot be evaluated without also taking into account the other available means." *Brnovich*, 141 S. Ct. at 2339.  State Board Defendants argue that under

S.B. 824, registered voters can receive free voter-ID cards without any corroborating documents, any voter may choose to vote at one-stop early voting, a time during which the county boards are required to issue free photo-ID cards allowing registered voters to make a single trip to obtain a photo ID and vote, and that S.B. 824 requires no additional identification documentation once a voter fills out the reasonable impediment form. (ECF No. 182 at 22.) Furthermore, State Board Defendants argue that S.B. 824 does not allow any voter to challenge another voter's reasonable impediment, and requires the voter's ballot to be counted unless the county board unanimously believes there are "grounds to believe" the voter's affidavit is false. (*Id.*) State Board Defendants argue that "North Carolina's entire voting system provides numerous opportunities and ample time for the public to vote." (*Id.* at 28–29.) Plaintiffs, in response, dispute State Board Defendants' interpretation of S.B. 824 with respect to the reasonable impediment declaration provisions, and Plaintiffs claim that "there are no alternative methods of voting that escape the burdens imposed by SB 824's photo ID requirements." (ECF No. 187 at 15.) The record reflects that under S.B. 824, all methods of voting in North Carolina have a photo ID requirement. *See* S.B. 824 § 1.2(e), § 163A-1309(a)(4) (applying photo ID requirements to request for an absentee ballot in addition to in person voting).

5.    <u>The strength of the state interests served by a challenged voting rule</u>

"[E]very voting rule imposes a burden of some sort, and therefore, in determining 'based on the totality of circumstances' whether a rule goes too far, it is important to consider the reason for the rule." *Brnovich*, 141 S. Ct. at 2339–40. Rules that are "supported by strong state interests are less likely to violate § 2." *Id.* at 2340. State Board Defendants argue that "there is evidence of an interest in maintaining public confidence in elections, and evidence of

20

their intention to implement the newly ratified constitutional amendment adopted requiring photo ID." (ECF No. 182 at 29.) Plaintiffs contend that "[w]here there is demonstrably little risk of the kind of fraud photo ID would be designed to prevent, and where—as here—the legislature was fully aware of the data showing an absence of voter impersonation, the rationale offered by the state provides little weight to the state's interest." (ECF No. 187 at 16.) The Fourth Circuit has noted that preventing voter fraud, even where there is no evidence of any in-person voter impersonation, and an independent interest in protecting voter confidence in the integrity of its elections can be valid state interests. *Lee*, 843 F.3d at 606. Furthermore, Plaintiffs argue that "the sponsors of SB 824 made numerous other statements regarding the purpose of SB 824, including their interest in continuing the policies embodied in HB 589, which had been found to be in violation of the Constitution and the Voting Rights Act." (ECF No. 187 at 16 (citing ECF No. 91-1 at 14–16).)

There are factual disputes in the record with respect to each of the *Brnovich* factors. As required, the Court adopts Plaintiffs' version of the facts and construes all reasonable inferences in their favor. In assessing the totality of the circumstances, the factual disputes could reasonably be resolved to show that voting is not "equally open" to African-American and Hispanic voters. The threat that Plaintiffs may not ultimately prevail at trial, *see Lee*, 843 F.3d at 600 ("Because, under Virginia's election laws, every registered voter in Virginia has the full ability to vote when election day arrives, SB 1256 does not diminish the right of any member of the protected class to have an equal opportunity to participate in the political process and thus does not violate § 2."), does not affect the Court's determination at summary judgment. In light of the factual disputes, the Court cannot rule as a matter of law that S.B.

824 merely poses disparate inconveniences as opposed to an outright denial or abridgement of the right to vote. *See id.* at 600–01.

## C.    Poll Observer and Challenge Provisions

With respect to the poll observer provision, State Board Defendants argue that S.B. 824 "*does not* increase the number of poll observers that can appear at any particular voting location" but rather allows "political parties to designate 100 additional 'at-large' poll observers throughout the state who could observe voting in any location in the state, regardless of their county of residence." (ECF No. 182 at 23–24.)  Therefore, State Board Defendants contend that "this change did not alter the preexisting limits on poll observers at each voting location" or "change the preexisting restrictions on what poll observers are allowed (and not allowed) to do," and that accordingly, "the expansion of the geographic eligibility for a party's appointment of poll observers will have no disparate impact on any group of voters." (*Id.* at 24.)  Plaintiffs argue that State Board Defendants' position is "inconsistent with the plain language of the text of SB 824, which authorizes 100 poll watchers in addition to the ten at-large observers who must be residents of the County where they seek to observe voting," and that "even under [State Board] Defendants' reading of the statute, there is no question that SB 824 allows political parties to increase the presence of poll-watchers at locations throughout the state." (ECF No. 187 at 21–22.)

With respect to the challenge provisions, State Board Defendants argue that the challenge provision has existed under North Carolina law, thus "the additional challenge provision regarding photo ID merely allows a voter to object if poll workers are not following the law requiring voters to 'present photo identification' according to section 163-166.16." (ECF No. 182 at 25 (citing S.B. 824, § 3.1(c)).)  State Board Defendants specifically contend

that the challenge provision "does not apply to *exceptions* to presenting photo identification, also found in §163-166.16" and "does not apply to reasonable impediment affidavits or the provisional ballot cure process." (*Id.*) According to State Board Defendants, "Plaintiffs have nothing to point to regarding the legislative history or sequence of events regarding the[ ] [challenge] provisions that demonstrate[s] they were targeted at any particular racial group" and therefore, "[i]nclusion of these provisions . . . has no impact on the broader analysis and summary judgment is appropriate." (*Id.*)

Although Plaintiffs agree that S.B. 824 "expands the scope of the grounds for challenging voters to encompass photo ID requirements," they contend that cumulatively the photo ID requirement, the increase in the presence of poll watchers, and the expansion of the scope of challenges authorized in S.B. 824 will disparately impact Black and Latino voters, in violation of Section 2 of the Voting Rights Act. (ECF No. 187 at 22.) Plaintiffs also contend that "[t]he legislature's discriminatory intent in implementing the photo ID provisions of SB 824 cannot be surgically separated from the expansion of poll observers and the scope of challenges, particularly in light of the long history of voter intimidation in North Carolina." (*Id.* at 22–23 (citing ECF No. 91-2 at 18–19, 63–64).)

With respect to Plaintiffs' constitutional challenges, in light of the unsettled question of discriminatory intent, the Court cannot separate the analysis of these provisions from the rest of S.B. 824. Although Plaintiffs do not point to evidence in the record to support how these provisions implicate their § 2 VRA claim, the Court declines at this time to separate the analysis in light of Plaintiffs' contention that the cumulative effect of these provisions violates § 2 of the VRA.

Contrary to their assertion, State Board Defendants are not entitled to summary judgment simply because of a favorable ruling at the preliminary injunction stage and because the factual record is largely unchanged.[7] At the preliminary injunction stage, this Court and the Fourth Circuit made initial determinations on the likelihood of success on the merits. At the summary judgment stage, the Court's determination turns on whether a genuine dispute of any material fact exists. As discussed herein, such genuine disputes are present. Moreover, even where facts in the record are undisputed, the Parties dispute the inferences which may reasonably be drawn from key undisputed facts. *See Morrison v. Nissan Co., Ltd.*, 601 F.2d 139, 141 (4th Cir. 1979) ("[E]ven though there may be no dispute about the basic facts, still summary judgment w[ould] be inappropriate if the parties disagree on the inferences which may reasonably be drawn from those undisputed facts."). For all of these reasons, summary judgment is inappropriate and, therefore, State Board Defendants' motion is denied.

---

[7] State Board Defendants also argue that "Plaintiffs failed to meet the mandatory disclosure requirements of Rules 26(a)(2) and 37(c), and are barred from use of expert witness testimony at trial." (ECF No. 182 at 16 (citations omitted).) In their Reply brief, State Board Defendants reiterate their position that "Plaintiffs failed to properly designate and serve expert discovery during the discovery period. Therefore, Plaintiffs are neither entitled to rely on the expert reports from the preliminary injunction stage nor new reports served last month, more than a year after the close of discovery." (ECF No. 189 at 2.) Also, though State Board Defendants expressed their intention "to present this argument more comprehensively at the appropriate time," they argued that "this Court need not determine now whether those reports should be stricken." (*Id.* at 3.) The Court declines to address this issue until it is properly raised and briefed by the Parties.

The preliminary injunction materials relied on by Plaintiffs are properly a part of the record. *See* Fed. R. Civ. P 65(a)(2) ("Even when consolidation is not ordered, evidence that is received on the motion and that would be admissible at trial becomes part of the trial record and need not be repeated at trial."). The entire record may be properly considered in determining the motion for summary judgment. *See Raitport v. Nat'l Bureau of Standards*, 385 F. Supp. 1221, 1222 (E.D. Pa. 1974) ("The record in this action includes the pleadings, affidavits, a partial transcript of the hearing on Raitport's motion for preliminary injunction, and a certified copy of the administrative record. This entire record may properly be considered in determining whether to grant a motion for summary judgment.").

For the reasons stated herein, the Court enters the following:

**ORDER**

**IT IS THEREFORE ORDERED** that State Board Defendants' Motion for Summary Judgment, (ECF No. 177), is **DENIED**.

This, the 13th day of March 2024.

/s/ Loretta C. Biggs
United States District Judge