UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
CIVIL ACTION NO. 1:18-cv-01034

| | |
|---|---|
| NORTH CAROLINA STATE CONFERENCE OF THE NAACP, et al., | |
| Plaintiffs, | |
| v. | **STATE BOARD DEFENDANTS'** |
| ALAN HIRSCH, in his official capacity as Chairmen of the North Carolina State Board of Elections, et al., | **TRIAL BRIEF** |
| Defendants, | |
| and | |
| PHILIP BERGER, in his official capacity as President of the North Carolina Senate, et al., | |
| Intervenor-Defendants. | |

NOW COME State Board Defendants, through undersigned counsel, Special Deputy Attorneys General Terence Steed, Mary Carla Babb, and Laura McHenry, to submit this trial brief in advance of the May 6, 2024 bench trial.

## STATEMENT OF THE CASE

Plaintiffs commenced this action on December 20, 2018, challenging North Carolina's voter ID Law ("S.B. 824,") as a violation of federal statutory and constitutional law.  [D.E. 1].

In Count One, Plaintiffs allege that S.B. 824 violates section 2 of the Voting Rights Act, 42 U.S.C. § 1973 ("VRA") because the voter identification requirements, expansion of poll observers, and expansion of voter challenger eligibility will disparately impact minority voters, resulting in the denial of the right to vote and dilution of minority voting strength. *Id.*, ¶¶ 105-124.

In Count Two, Plaintiffs allege that S.B. 824 violates the Fourteenth Amendment because the same provisions were enacted with the intention to suppress the votes of minorities by imposing a substantial burden on the right to vote. *Id.*, ¶¶ 125-136.

In Count Three, Plaintiffs allege that S.B. 824 violates the Fifteenth Amendment because the same provisions will result in the denial of the right to vote to minority voters, and were enacted with intent to suppress the votes of African Americans. *Id.*, ¶¶ 137-146.

For relief, Plaintiffs seek a declaration that S.B. 824 violates the VRA, the Fourteenth Amendment, and the Fifteenth Amendment, and an injunction halting implementation by State Board Defendants. *Id.*, ¶ 147. Finally, Plaintiffs request that this Court retain jurisdiction under Section 3(c) of the VRA to review and approve any and all future voting qualifications, standards, practices, and procedures implemented in the State to preclear each as not having the purpose or effect of denying the right to vote on account of race or not being in violation of the VRA. *Id.*

On September 17, 2019, Plaintiffs moved for a preliminary injunction, which the Court granted, but was later reversed by the Fourth Circuit. [D.E. 91, 97, 120, 123, 124].

On October 2, 2021, State Board Defendants filed a motion for summary judgment, which was later joined by Legislative Defendants. [D.E. 177, 182, 183, 231]. Plaintiffs filed opposition (D.E. 187), and State Board Defendants filed a Reply. [D.E. 189]. On March 13, 2024, the Court denied the motion for summary judgment. [D.E. 234].

## STATEMENT OF THE FACTS

**A.      Historical Background of North Carolina's Photo ID Legislation.**

In 2013, the North Carolina General Assembly enacted an "omnibus" election law, H.B. 589 (D.E. 97-10; DX122), which imposed numerous new requirements for voting, including a photo ID requirement. *See N.C. State Conf. of the NAACP v. McCrory*, 831 F.3d 204, 214 (4th Cir. 2016). During the consideration of H.B. 589, "the legislature requested data on the use, by race, of a number of voting practices[,]" and with that data in hand, "eliminated or reduced registration and voting access tools that African Americans disproportionately used" and instituted a photo ID requirement that disproportionately burdened African Americans. *Id.* at 214, 216. The Fourth Circuit found that the legislature enacted the challenged provisions of the law with discriminatory intent. *Id.* at 215. Accordingly, the court enjoined H.B. 589's photo ID requirement, the shortened early voting period, and the elimination of same-day registration, out-of-precinct voting, and preregistration. *Id.* at 219.

The Fourth Circuit was clear that its decision in *McCrory* "does not freeze North Carolina election law in place," and that the North Carolina legislature has the authority

3

under the federal constitution to modify its election laws based on legitimate, nonracial motivations. *Id.* at 241.

**B.    Amendment to the North Carolina Constitution.**

In June 2018, the General Assembly approved the placement of six constitutional amendments on the November 2018 general election ballot, one of which required every voter to show photo identification when voting in person. Act of June 29, 2018, ch. 128, 2018 N.C. Sess. Laws. [D.E. 97-5]; DX189.[1] The photo ID amendment passed with 55% of the electorate voting in favor. [D.E. 97-8, p. 3]; DX188.

Pursuant to this referendum, the North Carolina Constitution was amended by adding two new subsections that both read:

> Voters offering to vote in person shall present photographic identification before voting. The General Assembly shall enact general laws governing the requirements of such photographic identification, which may include exceptions.

N.C. Const. art. VI, §§ 2(4), 3(2); DX189.

The General Assembly enacted S.B. 824 to implement the constitutional amendment. S.B. 824, DX009, p. 1 ("An Act to Implement the Constitutional Amendment Requiring Photographic Identification to Vote.").

After S.B. 824's enactment, suit was brought in North Carolina superior court alleging that the North Carolina Constitution had not been properly amended because the General Assembly that proposed the amendment had been elected from districts that had

---

[1] For ease of reference, if a document already appears in the record but has also been designated as an exhibit for trial, it will be cited by both methods.

been gerrymandered in violation of the U.S. Constitution. This litigation is ongoing. *N.C. State Conf. of NAACP v. Moore*, 382 N.C. 129, 876 S.E.2d 513 (2022) (remanding for an evidentiary hearing and additional findings of fact and conclusions of law).

### C.     S.B. 824's Substantive Provisions.

S.B. 824 identifies categories of photo IDs permitted for in-person and absentee voting, authorizes the issuance of free photo IDs, provides a number of exceptions to the photo ID requirement, mandates that the State Board engage in voter outreach and education, and funds the statute's implementation. *See* S.B. 824, DX009.

Under S.B. 824, a voter may vote in-person or by absentee ballot if he or she presents photographic identification falling into one of the following categories:

- NC driver's license
- NC nonoperator's ID
- Passport
- NC voter ID (issued by a county board of elections)
- Tribal ID
- Approved Student ID issued by private and public colleges, universities and community colleges
- Approved State, local government, and charter school employee ID
- Driver's license and nonoperator's ID issued by another state, for newly registered voters
- Military ID
- Veterans ID

5

S.B. 824, sec. 1.2(a), codified at N.C.G.S. § 163-166.16(a). The law was later amended to expand the categories of IDs accepted to allow federal employee IDs. N.C. Sess. Law 2020-17, sec. 10; § 163-166.16(a)(2)d, also at DX078.

Military, veterans, and tribal IDs are accepted even if the card has no expiration or issuance date. S.B. 824, sec. 1.2(a), codified as § 163-166.16(a)(2). If a voter is sixty-five years old or older, an expired ID is accepted as long as it was unexpired on the voter's sixty-fifth birthday. *Id.*, sec. 1.2(a), § 163-166.16(a)(3). The remaining qualifying IDs will be accepted if they are unexpired or have been expired for one year or less. *Id.*, § 163-166.16(a)(1).

S.B. 824 was also amended to make the approval process for educational institutions' and government agencies' IDs more inclusive after the State Board raised a concern about the limited number of IDs that had been approved under the bill's original application process. *See* N.C. Sess. Law 2019-22, secs. 4, 6(b), codified at § 163-166.17 and -166.18, also at DX338. Prior to the 2020 election cycle, the State Board approved 118 applications for the use of IDs issued by colleges, universities, and government employers. [D.E. 120, p. 26]. From the time when the state court injunction was lifted in April 2023 to present, the State Board has approved 95 applications for the use of IDs issued by colleges, universities, and government employers. DX342, 388, & 389.

S.B. 824 also authorized and funded the issuance of two different free voter IDs. First, S.B. 824 requires the county boards of elections to "issue without charge voter photo identification cards upon request to registered voters." S.B. 824, sec. 1.1(a), codified at § 163-82.8A(a). Voters need not present any documentation to obtain a voter

6

ID from a county board. *See id.*, sec. 1.1(a), § 163-82.8A(d)(1). Instead, they need only

provide their name, date of birth, and the last four digits of their social security number.

*Id.* As of March 4, 2024, county boards have issued 10,795 free voter IDs. DX411;

PX1189.

Second, S.B. 824 enables all eligible individuals over the age of 17 to receive a

free non-operator ID card issued by the North Carolina Division of Motor Vehicles

(DMV) that can be used for voting. *Id.*, sec. 1.3(a), § 20-37.7(d)(2). The State must also

provide, free of charge, the documents necessary to obtain an ID from the DMV, if the

voter does not have a copy of those documents. *Id.,* sec. 1.3(a), § 161-10(a)(8).

Furthermore, S.B. 824 allows otherwise eligible voters to cast provisional ballots

without photo ID in three circumstances:

- the voter has been a victim of recent natural disaster;
- the voter has religious objections to being photographed; or
- the voter has a reasonable impediment that prevents a voter from presenting a photo ID, including the inability to obtain ID due to lack of transportation, disability, illness, lack of birth certificate or other documents, work schedule or family responsibilities; lost or stolen photo identification; photo identification applied for but not yet received; or, any "other" reasonable impediment the voter lists.

*Id.*, sec. 1.2(a), codified as § 163-166.16(d), & (e). If voters claim one of the three

above-noted exceptions, they must complete a "Photo ID Exception Form," on which

there is an affidavit for them to affirm their identity and the exception selected. *Id.*; *see*

*also* DX343 & DX377. Voters wishing to claim a reasonable impediment as an

exception can claim any one of the reasonable impediments by simply checking the

7

corresponding box on the form. *Id.,* sec. 1.2(a): *see also* DX343. If voters select "other" impediment, they must write the reason in the form. *Id.*

If a voter casts a provisional ballot under one of the three exceptions above, S.B. 824 requires county boards to count that voter's ballot "unless the county board has grounds to believe the affidavit is false." *Id.*, sec. 1.2(a), § 163-166.16(f). Under an administrative rule adopted by the State Board, a determination that an affidavit is false must be *unanimous* among the county board members. 08 N.C. Admin. Code 17.0101(e)(1), also at DX406.

Separately, S.B. 824 also allows a registered voter without an acceptable form of photo ID to cast a provisional ballot and later return to the county board with an acceptable form of ID no later than the day before the canvass of votes, which occurs ten days after the election. S.B. 824, sec. 1.2(a), codified as § 163-166.16(c); *see also* N.C.G.S. § 163-182.5(b). The State Board is required to ensure that such a provisional ballot voter receives written information listing the deadline to return to the county board and the list of acceptable IDs. S.B. 824, sec. 1.2(a), § 163-166.16(c)

The above-detailed ID requirements and exceptions apply largely the same way to absentee voters. S.B. 824 §§ 1.2(d), (e), as amended by N.C. Sess. Laws 2019-239, S.B. 683 §§ 1.2(b), 1.3(a), 1.4; see N.C.G.S. §§ 163-226(b), 230.1, -230.2, & -229(b). For absentee-by-mail voters, the list of exceptions also includes lack of access to a method of attaching a copy of a photo ID to the absentee ballot envelope. *Id.*, sec. 1.2(b), § 163-230.1(g)(2).

Case 1:18-cv-01034-LCB-LPA   Document 265   Filed 04/15/24   Page 8 of 26

S.B. 824 further requires the State Board to conduct "an aggressive voter education program concerning the provisions" of the law.  S.B.824, sec. 1.5(a).  This program includes mailing multiple notifications of the voter ID requirement to all residences in the state;" training county boards and precinct officials to ensure uniform implementation; maintaining a public website with educational material for the public regarding the voter ID requirements; placing signage at early voting sites and precinct polling locations notifying voters that "[a]ll registered voters will be allowed to vote with or without a photo ID card;" and offering free seminars about the photo ID requirement upon request to any interested organization.  *Id.*  The State Board is conducting these activities.  DX335, 381-384, 390, 395-404.

**D.     Voter ID in Practice Has Had Minimal Impact on Voters.**

During the recent March 2024 primary election, the voter ID law was in effect and did not have a substantial impact on voters.  During the March 5, 2024 primary, 1,800,118 North Carolinians cast ballots statewide.  *See* DX361, March 5, 2024 Official Primary Election Results – Statewide.  Of that number, 1,185 voters cast provisional ballots for reasons related to photo ID.  *See* DX362, p. 4, 2024 Primary Election Canvass & Certification Presentation to the State Board, (Mar. 26, 2024).  Of that number, 557 filled out the ID exception form and had their ballots counted: 550 because they claimed reasonable impediments, four because they had a religious objection to being photographed, and three based upon natural disaster.  *Id.*  Another 140 did not fill out an ID exception form, but returned later with their ID to the county board and had their ballots counted.  *Id.*  In total, 697 of the 1,185, ultimately had their ballots counted, and

9

11 were partially counted. *Id.* Of the remaining 477, the vast majority were voters who voted a provisional ballot, but then did not return with their ID to the county board. *Id.* The total that did not have their ballots counted in the recent primary was 477 out of 1,800,118 voters, or 1 in 3,774 voters, or 0.0265 percent of the voting population.

The voter ID law had a similarly minimal impact on the 2023 Municipal elections. DX410; PX0972. Of the 614,000 ballots cast in the September, October, and November 2023 municipal elections, 573 provisional ballots were cast for reasons related to photo ID. *Id.* Of this number, 304 voters completed the ID exception form, 255 of whom had their votes counted and 49 of whom did not. *Id.* Of the remaining 269 who did not fill out the ID exception form, 70 returned with their IDs and had their votes counted, while 199 did not return with IDs and did not have their votes counted. *Id.* The total that did not have their ballots counted in the 2023 municipal elections was 248 out of 614,000 voters, or 1 in 2,476 voters, or 0.04 percent of the voting population. *Id.*

**QUESTION PRESENTED**

Whether judgment should be granted in favor of Defendants.

**ARGUMENT**

I.     **Plaintiffs' Evidence Does Not Show Discriminatory Intent.**

Under the *Arlington Heights* framework, the Court must first determine whether a statute that is facially neutral regarding race or ethnicity was enacted with discriminatory intent. *N.C. State Conf. of the NAACP v. Raymond*, 981 F.3d 295, 303 (4th Cir. 2020). At this first stage, a defendant is not required to prove that a new law "cleanse[d] the discriminatory taint" of a different, prior law that was invalidated. *Id.* at 304. A "new

10

voter-ID law" is not presumed "'fatally infected' by the unconstitutional discrimination of a past voter-ID law that has been struck down." *Id.* (quoting *Veasey v. Abbott*, 888 F.3d 792, 801 (5th Cir. 2018)). For that reason, the Fourth Circuit explicitly acknowledged that its decision invalidating a previous voter ID law did not "freeze North Carolina election law in place," and that the North Carolina legislature has the authority under the federal constitution to modify its election laws based on legitimate, nonracial motivations. *McCrory*, 831 F.3d at 241.

Only after a plaintiff proves that a law was enacted with a discriminatory purpose does the Court proceed to the second step, where the burden shifts to the defendant to prove that "'the law would have been enacted without' racial discrimination." *Raymond*, 981 F.3d at 303 (quoting *Hunter v. Underwood*, 471 U.S. 222, 228 (1985)). "It is only then that judicial deference to the legislature 'is no longer justified.'" *Id.* (quoting *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 265-66 (1977)).

### A. Impact of S.B. 824

Any voter ID law will have some impact when it is implemented. However, Plaintiffs cannot show that S.B. 824 has a substantial enough impact to support this claim. That is because the ameliorative provisions found in S.B. 824 allow any voter to cast a ballot, with or without a photo ID, such that the burdens imposed by the law on voters who lack identification are minimal at best.

In *Lee v. State Board of Elections*, the Fourth Circuit acknowledged that while white Virginians possess IDs that could be used for voting at higher rates than black

Virginians, and that obtaining an ID requires some amount of effort from voters. Nevertheless, to assess whether Virginia's law was enacted with discriminatory intent, the court explained that the focus should be on the provisions of the law that minimized the burden imposed on voters *without an ID*. 843 F.3d 592, at 597–98, 600-01, 03 (4th Cir. 2016). In light of these provisions, the *Lee* court concluded that "the Virginia legislature went out of its way to make its impact as burden-free as possible." *Id.* at 603. S.B. 824 similarly contains a range of ameliorative provisions.

First, as pointed out by the Fourth Circuit when dissolving the preliminary injunction, registered voters can receive free voter-ID cards without any corroborating documents. *Raymond*, 981 F.3d at 309. If a registered voter arrives without an ID, they may vote provisionally, and their vote will count if they return later with their qualifying ID. *Id.* Voters with religious objections, victims of recent natural disasters, and those with a reasonable impediment may cast a provisional ballot after affirming their identity and attesting to their reason for not producing ID. *Id.*

Second, any voter may choose to vote early during which the county boards are required to issue free photo-ID cards. Accordingly, for a voter who lacks qualifying ID, it is possible to obtain an ID and vote during the same day. *Id.* at 309.

Finally, the all-encompassing nature of the reasonable impediment provisions significantly reduces any burdens imposed on voters. S.B. 824 requires no additional identification documentation once a voter fills out the reasonable impediment form, does not allow any voter to challenge another voter's reasonable impediment, and the corresponding rule requires the voter's ballot to be counted unless the county board

12

unanimously believes there are "grounds to believe" the voter's affidavit is false. S.B. 824, sec. 1.2(a), § 163-166.16(d)(2), (e); 08 N.C.A.C 17.0101(e)(1), also at DX406. These are all meaningful distinctions from the prior law, H.B. 859, and demonstrate that S.B. 824 imposes a minimal impact.

When put into practice, as the law was for the March 2024 primary, the ameliorative provisions predictably led to only a minimal impact on voters' ability to cast a ballot. As detailed above, only 1,185 out of approximately 1.8 million voters cast a provisional ballot for reasons related to photo ID, less than 6.6 ballots out of every 10,000 cast. DX362. Of those, 697 were counted, and for the 477 that were not counted, the vast majority failed to return later with ID. *Id.* Thus, the total ballots not counted in the recent primary was 477 out of 1.8 million, or 1 in 3,774 voters, or 0.0265 percent of the entire electorate. *Id.* Similar numbers were found for the 2023 municipal elections in which 1 in 2,476 voters or 0.04 percent of the voting population was not counted. DX410.

State Board Defendants are not suggesting, and would never suggest, that *any* number of uncounted votes, no matter how small, should be taken lightly. However, comparisons between counted and uncounted votes are necessary to evaluate S.B. 824's impact. And, here, even assuming that each of the 477 ballots not counted out of the 1.8 million cast (approximately 0.0265 %) resulted solely from voter ID's operation, this amounts to a minimal impact on the right to vote. Considering that the vast majority of this number were not counted because the voter did not have their ID at the time and later failed to return to the county board with it, this impact is even further minimalized .

13

To support their claims, Plaintiffs have relied on speculative, theoretical harms, based upon scant evidence and a different prior law, H.B. 859, to argue that S.B. 824 will have a disparate impact. [*See, e.g.*, D.E. 91 at 21-25]. But now that the voter ID requirement has been implemented in two elections, no speculation is necessary. The actual statistical evidence noted above establishes that S.B. 824's ameliorative provisions in practice actually do minimize the impact on voters. *See Raymond*, 981 F.3d at 309 ("[T]he 2018 Voter-ID Law contains three provisions that go 'out of [their] way to make its impact as burden-free as possible.'")(quoting *Lee*, 843 F.3d at 603). The resulting minimal impact of S.B. 824 reflects a level of burden that is in line with the "usual burdens of voting." *Id.* ("For most voters who need them, the inconvenience of making a trip to the [DMV], gathering the required documents, and posing for a photograph surely does not qualify as a substantial burden on the right to vote, or even represent a significant increase over the usual burdens of voting" (quoting *Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181, 198 (2008)). Such minimal impact is insufficient to support a facial challenge alleging disparate impact, even considering the unfortunate reality that "minority voters disproportionately lack the types of ID required by [S.B. 824]." *Id.*

**B. Historical Background**

State Defendants do not dispute North Carolina's long history of racial discrimination. *See McCrory*, 831 F.3d at 223. They recognize that a relevant part of that history is a prior law that included a voter ID requirement among others, H.B. 589, which the Fourth Circuit partially invalidated as racially discriminatory. S*ee id.* They also recognize that, in the last ten years, courts have concluded that considerations of race

14

have predominated in North Carolina's redistricting process. *See, e.g., Harris v. McCrory*, 159 F. Supp. 3d 600 (M.D.N.C. 2016), aff'd, 137 S. Ct. 1455 (2017); *Covington v. North Carolina*, 316 F.R.D. 117 (M.D.N.C. 2016), *aff'd*, 137 S. Ct. 2211 (2017).

Nevertheless, the Court must weigh this factor in its proper context, including the fact that S.B. 824 was enacted pursuant to the passage of a constitutional amendment that required photo ID. This electoral decision marked a significant intervening circumstance. *See Raymond*, 981 F.3d at 305. That is not to say that North Carolina's shameful racial history is not relevant, but rather that it is but one portion of the historical background factor and not dispositive on its own. *Id.*; *see also Mobile v. Bolden*, 446 U.S. 55, 74 (1980) ("[P]ast discrimination cannot, in the manner of original sin, condemn governmental action that is not itself unlawful").

## C. Sequence of Events and Legislative History

In this case, the Fourth Circuit previously found that nothing in the record regarding the sequence of events leading to the enactment of S.B. 824 supports the conclusion that the law was enacted with discriminatory intent. *Raymond*, 981 F.3d at 305. This Court acknowledged, and the Fourth Circuit agreed, that "there were no procedural irregularities in the sequence of events leading to the enactment of the 2018 Voter-ID Law." *Id*. The Fourth Circuit added, "the remaining evidence of the legislative process otherwise fails to 'spark suspicion' of impropriety in the 2018 Voter-ID Law's passage." *Id.* (quoting *Arlington Heights*, 429 U.S. at 269). The Fourth Circuit reached similar conclusions about the legislative history. *See id.* at 308-09.

15

Nothing about the sequence of S.B. 824's passage or legislative history has changed since the preliminary injunction phase, and the Fourth Circuit's conclusions regarding these factors should therefore control.

### D. Nonracial Justifications

If discriminatory intent has been shown under the *Arlington Heights* factors, the court "must 'scrutinize the legislature's *actual* nonracial motivations to determine whether they *alone* can justify the legislature's choices.'" *Raymond*, 981 F.3d at 303 (quoting *McCrory*, 831 F.3d at 221).

Here, the record contains evidence of non-racial motivations for the enactment of S.B. 824. Most obviously, legislators from both parties recognized S.B. 824 was required to implement the state constitution's new mandate that voters present a photographic ID to vote. *See* November 26, 2018 Transcript of the Joint Legislative Elections Oversight Committee (D.E. 97-16, pp. 5-6; DX068 at 5-6); November 28, 2018 Transcript from the Second Reading on the Senate Floor, Second Reading (*Id.*, p. 170; also DX069 at 48); December 4, 2018 Transcript of the House Elections and Ethics Committee. *Id.*, p. 345; also DX072 at 105.

Likewise, the legislative record shows proponents of S.B. 824 asserted that the legislation would help bolster voter confidence in elections. December 4, 2018 Transcript of the House Elections and Ethics Committee (*Id.*, pp. 313, 334-38, 342-44, 354-56, 492-93; DX072); December 5, 2018 Transcript of the House Floor Second and Third Reading (*Id.*, pp. 522-23, 527, 532; DX074). The Fourth Circuit and other courts, including the Supreme Court in *Crawford*, have repeatedly held that safeguarding voter

16

confidence is a valid justification for a voter ID requirement. *See Crawford*, 553 U.S. at 197, 204 (op. of Stevens, J.); *see also Lee*, 843 F.3d at 602, 606–07; *Frank v. Walker*, 768 F.3d 744, 750 (7th Cir. 2014).

### E. Observer Provision

There is no evidence to prove that S.B. 824's expansion of the eligibility criteria for poll observers will somehow burden any particular group of voters, nor that this expansion was enacted for the purpose of burdening any particular group.

Importantly, the law *does not* increase the number of poll observers that can appear at any particular voting location. Before S.B. 824 was enacted, the law limited each voting location to "[n]ot more than two observers from the same political party," except "one of the at-large observers from each party may also be in the voting enclosure." N.C.G.S. § 163A-821(a) (2017). Also before S.B. 824 was enacted, each political party was permitted to designate 10 additional "at-large" poll observers for each county, as long as they were residents of the county. *Id.* S.B. 824 added a provision allowing political parties to designate 100 additional "at-large" poll observers throughout the state who could observe voting in any location in the state, regardless of their county of residence. S.B. 824, sec. 3.3, codified as § 163-45.1 (2023). However, nothing about this provision altered the preexisting limit of three observers per party allowed in the voting enclosure at any time. *See* N.C.G.S. § 163-45.1(e); DX408.

Allowing parties to designate additional at-large poll observer also has no effect on other statutes regulating observer behavior.

For instance, poll observers are prohibited from:

17

(1)     Look[ing] at, photograph[ing], videotap[ing], or otherwise
        record[ing] the image of any voter's marked ballot.
(2)     Imped[ing] the ingress or egress of any voter into the voting place.
(3)     Inhibit[ing] or interfer[ing] with any election official in the
        performance of his or her duties, including interfering with the
        transport of sealed ballot boxes, election equipment, or election
        results to the county board of elections.
(4)     Engag[ing] in electioneering.
(5)     Mak[ing] or receiv[ing] phone calls while in the voting place.

N.C.G.S. § 163-45.1(h) (2023).

In addition to these laws, which expressly apply to observers, other laws regulate the conduct of *all* individuals, including observers, in and around voting places and enclosures. No one is allowed to "photograph, videotape, or otherwise record the image of any voter within the voting enclosure, except with the permission of both the voter and the chief judge of the precinct." N.C.G.S. § 163-166.3(c). Individuals can be criminally prosecuted if they interfere with the duties of, assault, intimidate, or attempt to intimidate election officials. N.C.G.S. §§ 163-274(a)(4), (5), -275(10), and (11). Similarly, persons who "interfere with, or attempt to interfere with, any voter when inside the voting enclosure" or "when marking his ballots" can be criminally prosecuted. *Id.*, § 163-273(a)(3) and (4). Interference with voters includes questioning them in the voting place. [*See* D.E. 74-1, p. 8]; DX408.

Individuals are prohibited from harassing anyone in the voting place or surrounding buffer zone. N.C.G.S. § 163-166.4(a). Conduct considered voter intimidation is a crime under both state and federal law. S*ee id.,* § 163-274(a)(7); *see also* 18 U.S.C. § 594; 52 U.S.C. § 20511(1); 52 U.S.C. § 10307(b). Voter intimidation punishable by law includes any "conduct that would make a voter reasonably fearful, threatened, or coerced

during the voting process" and can take many forms. [D.E. 74-1 pp. 8-10 (providing examples)]; DX408.

Finally, the precinct judges at the polling sites are granted broad authority to "conduct [elections] fairly and impartially, and they *shall* enforce peace and good order in and about the place of registration and voting." N.C.G.S. § 163-47(a) (emphasis added). They are required to keep voting places "open and unobstructed;" "prevent and stop improper practices and attempts to obstruct, intimidate, or interfere with any person in registering or voting;" and "prevent riots, violence, tumult, or disorder." *Id.,* § 163-48. Precinct judges have the authority to call upon law enforcement to assist them and to order the arrest of any person violating these laws. *See id.,* § 163-48.

Plaintiffs have no evidence, beyond mere speculation, that the expansion of the total number of people who can serve as poll observers will have any impact, much less any legally significant impact, on any particular group of voters. As a result, their poll observer claim should be rejected.

### F. Voter Challenge Provision

Likewise, Plaintiffs offer no reason to conclude that the voter challenge provision of S.B. 824 targets any particular group of voters.

Under North Carolina law, as it has existed before S.B. 824 was enacted, voters can challenge another voter's ballot based on an allegation that the voter: lacks the necessary residency, is underage, has not completed a felony sentence, is not a U.S. citizen, or is not "who he or she represents himself or herself to be." *See* N.C.G.S. §§ 163-85(c), -87. S.B. 824 adds an authorization to challenge voters based on an allegation

19

that a voter did not present "photo identification in accordance with G.S. 163A-1145.1." S.B. 824, sec. 3.1(c), codified as § 163-87(5). Section 163A-1145.1 (now recodified at section 163-166.16) includes the basic photo identification requirements, *and* it includes the exceptions for presenting photo ID: reasonable impediments, natural disaster displacement, religious objection to photographs. *See* N.C.G.S. § 163-166.16(d), (e). It also includes the opportunity for a voter to comply with the photo ID requirement by casting a provisional ballot and returning to the county board of elections later with an ID. *Id.* § 163-166.16(c).

By its text, the additional challenge provision regarding photo ID merely allows a voter to object if poll workers are not following the law requiring voters to "present photo identification" according to section 163-166.16. S.B. 824, sec. 3.1(c). It does not allow a challenge based on whether a voter qualifies for the *exceptions* to presenting photo identification, also found in §163-166.16, contrary to Plaintiffs' suggestions in earlier phases of this litigation. In other words, the challenge provision added by S.B. 824 does not apply to Photo ID exception forms, the veracity of any given voter's reasonable impediment, or the provisional ballot cure process.

Apart from the lack of any evidence proving the poll observer or challenge provisions will have a disparate impact on any particular group, Plaintiffs have nothing to point to in the legislative history or sequence of events related to these provisions' passage that demonstrates they were targeted at any particular racial group. Accordingly, inclusion of these provisions in S.B. 824 has no impact on the broader analysis.

## II.   S.B. 824 Does Not Deny an Equal Opportunity to Vote Under the VRA.

Plaintiffs' VRA §2 claims do not meet the requirements set forth in the Supreme Court's recent decision in *Brnovich v. Democratic Nat'l Comm.*, 141 S. Ct. 2321 (2021), which heightens the standard Plaintiffs must meet.  *Brnovich* held that when analyzing rules pertaining to the time, place, and manner of voting, like S.B. 824, a court must consider "several important circumstances" when determining "whether voting is 'equally open' and affords equal 'opportunity.'"  *Id.* at 2338.  Here, once each of those factors is considered in turn, it is clear that Plaintiffs' VRA claim cannot succeed.

First, reviewing courts must consider the size of the burden imposed by the challenged voting rule.  *Id.*  In undertaking this consideration, the Supreme Court acknowledged that "every voting rule imposes a burden of some sort."  *Id.*  For instance, "[v]oting takes time and, for almost everyone, some travel, even if only to a nearby mailbox. Casting a vote, whether by following the directions for using a voting machine or completing a paper ballot, requires compliance with certain rules."  *Id.*  The mere inconvenience of the usual burdens of voting is not enough to demonstrate a violation of §2.  *Id.* (citing *Crawford*, 553 U. S. at 198).

Here, State Board Defendants incorporate by reference the arguments contained in Part I-A, which establish that the impact imposed upon voters by S.B. 824 will be small, especially considering the reasonable impediment provisions allow any voter to vote without a qualifying photo ID simply by filling out a form without further action required.  This tracks the Fourth Circuit's conclusion that S.B. 824's ameliorative provisions "make its impact as burden-free as possible."  *Raymond,* 981 F.3d at 309

21

(quoting *Lee*, 843 F.2d at 603) (internal brackets omitted). Parts I-E and I-F above addressing observers and challenges similarly demonstrate that those provisions present no burden to voters.

Second, "the degree to which a challenged rule has a long pedigree or is in widespread use in the United States is a circumstance that must be taken into account." *Brnovich,* 141 S. Ct. at 2338-39. Voter ID laws became prevalent after the Carter-Baker Commission issued its report in 2005 recommending their adoption. *See* Report of the Comm'n on Fed. Election Reform, "Building Confidence in U. S. Elections," pp. 18-21 (Sept. 2005), *at* DX320. Following the commission's recommendation, and the Supreme Court's ruling in *Crawford*, implementation nationwide surged. As of 2019, 35 states have laws requesting or requiring voters to show some form of identification at the polls. [D.E. 97-15, p. 2]. The implementation of voter identification laws in the majority of States undoubtedly constitutes "widespread use in the United States." *Brnovich,* 141 S. Ct. at 2339. For these reasons, this consideration points toward a determination that S.B. 824 does not violate §2.

Third, "[t]he size of any disparities in a rule's impact on members of different racial or ethnic groups is also an important factor to consider." *Id*. at 2339. However, intrinsic societal differences in employment, wealth, and education can mean that "even neutral regulations, no matter how crafted, may well result in some predictable disparities in rates of voting and noncompliance with voting rules." *Id.* "[T]he mere fact that there is some disparity in impact does not necessarily mean that a system is not equally open or

22

that it does not give everyone an equal opportunity to vote." *Id.* Regarding any disparity, State Board Defendants incorporate the arguments in Part I-A above.

Fourth, "courts must consider the opportunities provided by a State's entire system of voting when assessing the burden imposed by a challenged provision." *Brnovich*, 141 S. Ct. at 2339. In *Brnovich*, the Court found Arizona's opportunities to vote by mail and early vote for nearly a month before the election to be especially persuasive in showing that the burdens imposed on Election Day voters by the laws in question were modest. *Id.* at 2344.

By comparison, North Carolina's entire voting system provides numerous opportunities and ample time for the public to vote. For example, the early voting period lasts two-and-a-half weeks, includes expansive weekday hours (8:00 a.m. to 7:30 p.m.), and guarantees voting on the Saturday before Election Day, with allowance for counties to offer additional weekend hours. N.C.G.S. §§ 163-166.35(d), -166.40(b). A voter may vote at any early voting location in their county. *Id.*, § 163-227.2. During the early voting period (and any time before), voters without an ID can also obtain a free voter ID from the county board of elections. *Raymond,* 981, F.3d at 300 (citing H.B. 824, sec. 1.1; and N.C.G.S. §§ 163-227.2(b), 163-227.6(a)).

North Carolina also makes available no-excuse absentee vote by mail to all voters. N.C.G.S. § 163-226(a). Absentee ballots, which may be requested online, are available 60 days prior to Election Day in general elections and 50 days prior to the date of primaries and special elections. *Id.,* §§ 163-227.10(a) & -230.3. Completed domestic

absentee ballots are accepted when delivered to the county board as long as they are received by 7:30 p.m. on Election Day. *Id.*, § 163-231(b)(1).

In addition, Part C of the Statement of Facts above sets forth the numerous provisions, exceptions, and other ameliorative elements of S.B. 824 that establish that North Carolina's photo identification requirement, in totality, imposes a minimal burden on voters.

Fifth, "the strength of the state interests served by a challenged voting rule is also an important factor that must be taken into account." *Id.* The Supreme Court recognized that preventing voter fraud is a "strong and entirely legitimate state interest," because perceived fraud "can undermine public confidence in the fairness of elections and the perceived legitimacy of the announced outcome." *Id.* at 2340.

In addition, North Carolina voters believed a voter ID law was a necessary addition to North Carolina's election laws, as reflected in their approval of its addition to the state Constitution. The Legislature had a legitimate interest, indeed an obligation, to implement the amendment.

The five considerations put forward by the *Brnovich* Court are appropriate factors for this Court to apply in this case. Because Plaintiffs cannot present sufficient evidence to support a §2 claim under the *Brnovich* factors, the Court should deny this claim.

## <u>CONCLUSION</u>

For these reasons, State Board Defendants respectfully request that the Court grant judgment for the defense in this case.

24

Respectfully submitted this 15th day of April 2024.

JOSHUA H. STEIN
Attorney General

/s/ Terence Steed
Terence Steed
Special Deputy Attorney General
N.C. State Bar No. 52809
Email: tsteed@ncdoj.gov

Mary Carla Babb
Special Deputy Attorney General
N.C. State Bar No. 25731
Email: mcbabb@ncdoj.gov

Laura McHenry
Special Deputy Attorney General
N.C. State Bar No. 45005
E-Mail: lmchenry@ncdoj.gov

N.C. Department of Justice
Post Office Box 629
Raleigh, NC 27602
Telephone: (919) 716-6567
Facsimile: (919) 716-6763

*Counsel for the State Board Defendants*

## <u>CERTIFICATE OF WORD COUNT</u>

I hereby certify that pursuant to Local Rules 7.3(d)(1) and 40.1(c) the foregoing has a word count of less than 6,250 words not including the caption, signature block, and certification of word count.  This document was prepared in Microsoft Word, from which the word count is generated.

Dated this 15th day of April, 2024.

 /s/ Terence Steed_____
Terence Steed
Special Deputy Attorney General
