# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| NORTH CAROLINA STATE CONFERENCE OF THE NAACP, *et al.*, <br><br> *Plaintiffs*, <br><br> v. <br><br> ALAN HIRSCH, in his official capacity as Chair of the North Carolina State Board of Elections, *et al.*, <br><br> *Defendants,* <br><br> and <br><br> PHILLIP E. BERGER, in his official capacity as President Pro Tempore of the Senate, *et al.*, <br><br> *Legislative Defendants-Intervenors.* | No. 1:18-cv-01034 |

## PLAINTIFFS' TRIAL BRIEF

# INTRODUCTION

"It is beyond dispute that 'voting is of the most fundamental significance under our constitutional structure'... 'Other rights, even the most basic, are illusory if the right is undermined.'" *North Carolina State Conference of the NAACP v. McCrory*, 831 F. 3d 204, 241 (4th Cir. 2016) (citations omitted), *cert denied* 137 S. Ct. 1399 (2017). It is imperative that this right is protected in North Carolina, a state where it has been under assault for decades. In fact, the Fourth Circuit held that the State's last attempt at imposing a voter identification requirement was enacted with "discriminatory intent," "target[ing] African Americans with almost surgical precision," and "impos[ing] cures for problems that did not exist." *Id*. at 214.

Plaintiffs bring this lawsuit to challenge various provisions of S.B. 824; N.C. S.L. 2018-144: (i) the provisions requiring photo-identification for voters (Sections 1.1(a)-1.5(d)); (ii) the provisions allowing any voter to challenge another voter for failing to comply with the photo ID provisions (Section 3.1(c); N.C. Gen. Stat 163-87); and (iii) the provisions expanding the use of poll observers (Section 3.3; N.C. Gen. Stat. 163-45). S.B. 824 was enacted with discriminatory intent in violation of the Fourteenth and Fifteenth Amendments of the U.S. Constitution and has already had a discriminatory impact on the right of Black and Latino citizens in North Carolina to participate in the political process, in violation of Section 2 of the Voting Rights Act, 52 U.S.C. § 10301(a). The trial will confirm the discriminatory intent

behind the passage of S.B. 824 and its discriminatory impact, in part through testimony from and about voters who encountered undue burdens and/or were prevented from voting during the Fall 2023 and March 2024 elections, the first elections where S.B. 824 was implemented. Absent relief, thousands of North Carolinians will similarly have their right to vote unconstitutionally abridged. The challenged provisions should be permanently enjoined on the basis of these constitutional and statutory violations.

## ARGUMENT

## I.  PLAINTIFFS HAVE STANDING TO BRING THIS LAWSUIT

Plaintiff North Carolina State Conference of the NAACP ("NC NAACP") is a nonpartisan, nonprofit organization composed of over 100 branches and 20,000 individual members throughout the state of North Carolina, including the six plaintiff branches in this case.[1] The NC NAACP is currently led by President Deborah Maxwell and has members who are citizens and registered voters in each of the state's 100 counties.

NC NAACP has standing to bring this lawsuit. Organizational plaintiffs have standing on a representational theory if "(1) its members would have standing if they

---

1 Collectively, Plaintiffs North Carolina State Conference of the NAACP, Stokes County Branch of the NAACP, Greensboro Branch of the NAACP, Winston Salem-Forsyth Branch of the NAACP, High Point Branch of the NAACP, Chapel Hill-Carrboro Branch of the NAACP, and Moore County Branch of the NAACP, will be referred to as "NAACP Plaintiffs."

sued individually; (2) the interests the lawsuit seeks to raise 'are germane to the organization's purpose'; and (3) the claims and type of relief asserted in the complaint do not require the individual members' participation in the lawsuit." *N.C. State Conf. of the NAACP v. Raymond*, 981 F.3d 295, 301 (4th Cir. 2020) (quoting *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977)). The Fourth Circuit has already held that NC NAACP has representational standing under *Hunt*. *See Raymond*, 981 F.3d at 301. Plaintiffs' members include Black and Latino voters in North Carolina who lack the forms of ID required under S.B. 824, and who will therefore effectively be denied the right to vote or otherwise deprived of meaningful access to the political process because of the challenged provisions of S.B. 824. The challenged provisions of S.B. 824 will impose costs and substantial and undue burdens on the right to vote for those and other members.

At trial, Plaintiffs will also set forth evidence of impacts to NAACP Plaintiffs sufficient to establish organizational standing. *See Voto Latino v. Hirsch*, No. 1:23-CV-861, 2024 WL 230931, at *9-12 (M.D.N.C. Jan. 21, 2024). Evidence will show that the NAACP Plaintiffs have diverted resources to address the changes in election law imposed by S.B. 824, including diverting resources to educate the community about obtaining the needed photo IDs and how to use the Reasonable Impediment Declaration process. Since a mission of the NC NAACP is to mobilize and

empower Black voters, the disparate racial impacts of S.B. 824 thwart the broad organizational mission of the NC NAACP and its Chapters.

## II. THE LEGISLATURE ENACTED S.B. 824 WITH RACIALLY DISCRIMINATORY INTENT IN VIOLATION OF THE FOURTEENTH AND FIFTEENTH AMENDMENTS

### A. Courts Apply *Arlington Heights* Factors in Assessing Discriminatory Intent

A facially neutral election law constitutes intentional race discrimination where "circumstantial and direct evidence of intent" shows that the law had an impermissible purpose. *N.C. State Conf. of the NAACP v. McCrory*, 831 F.3d 204, 220 (4th Cir. 2016) (quoting *Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266 (1977)).

There is a two-step process to determine whether a law was enacted with discriminatory intent. *Hunter v. Underwood*, 471 U.S. 222, 225 (1985). First, the challengers must show that racial discrimination was a "substantial" or "motivating" factor behind the enactment of the law. *Id.* at 228. Discriminatory intent is not the same thing as racial animus. *Garza v. Cnty. of Los Angeles*, 918 F.2d 763, 778–79 & n.1 (9th Cir. 1990) (Kozinski, J., concurring and dissenting in part). "[Plaintiffs] need not prove race-based hatred or outright racism, or that any particular legislator harbored racial animosity or ill-will towards minorities because of their race." *Perez v. Abbott*, 253 F. Supp. 3d 864, 948 (W.D. Tex. 2017) (citing *McCrory*, 831 F.3d at 222-23).

In assessing evidence of intent, courts apply the *Arlington Heights* standard and consider a non-exhaustive list of factors: "(1) historical background; (2) the specific sequence of events leading to the law's enactment, including any departures from the normal legislative process; (3) the law's legislative history; and (4) whether the law 'bears more heavily on one race than another.'" *Raymond*, 981 F.3d at 303 (quoting *Arlington Heights*, 429 U.S. at 265-69).

"Once racial discrimination is shown to have been a 'substantial' or 'motivating' factor, the burden shifts to the law's defenders to demonstrate that the law would have been enacted without this factor." *Hunter*, 471 U.S. at 228. "It is only then that judicial deference to the legislature 'is no longer justified.'" *Raymond*, 981 F.3d at 303 (quoting *Arlington Heights*, 429 U.S. at 265–66). Thus, the court must now "scrutinize the legislature's *actual* non-racial motivations to determine whether they *alone* can justify the legislature's choices." *McCrory*, 831 F.3d at 221.

Significantly, "acting to preserve legislative power in a partisan manner can also be impermissibly discriminatory." *Veasey,* 830 F.3d at 241. Indeed, "intentionally targeting a particular race's access to the franchise because its members vote for a particular party, in a predictable manner, constitutes discriminatory purpose." *McCrory*, 831 F.3d. at 222.

**B.    North Carolina Enacted S.B. 824 with Racially Discriminatory Intent**

Applying the *Arlington Heights* framework, Plaintiffs will establish that the North Carolina legislature acted with racially discriminatory intent in enacting S.B. 824 and did not act with a sufficient non-discriminatory purpose to justify the law.

1.    North Carolina Has A Long History of Discriminating Against Black and Latino Voters

The historic pattern of racial discrimination "provides important context for determining whether the same decision-making body has also enacted a law with discriminatory purpose." *McCrory,* 831 F.3d at 223-224.  While enactments of a state legislature are entitled to a presumption of regularity and good faith, historical background of a law is "relevant to the question of intent." *See Abbot v. Perez,* 138 S. Ct. 2305, 2324-25 (2018).

North Carolina's history of discrimination against Black voters has been well-documented.  *See McCrory,* 831 F. 3d. at 223-227; *see also ECF* No. 120 at 12 ("North Carolina has a sordid history of racial discrimination and voter suppression, stretching back to the time of slavery, through the era of Jim Crow, and crucially, continuing up to the present day.").  This history extends into the present, and includes recent actions such as the enactment of S.B. 824's predecessor (H.B. 589) in 2013, and engaging in unconstitutional race-based gerrymandering, struck down by federal courts in 2016 and 2017. *See* ECF No. 182 at 12-13.  Indeed, State Board Defendants acknowledged in their motion for summary judgment "North Carolina's

long history of racial discrimination" and "race-based vote suppression." ECF No. 178 at 15. Moreover, the Fourth Circuit has recognized that "North Carolina's historical background favors finding discriminatory intent . . . ." *Raymond*, 981 F.3d at 305.

Plaintiffs' experts Allan Lichtman and Jim Leloudis, along with fact witnesses, will testify that the enactment of S.B. 824 was merely one of a series of racially discriminatory attacks on voting by the legislature over the last decade. These attacks began with the unconstitutional gerrymandering of state and congressional districts in 2011 and continue to the present day with the passage of voter suppression bills like S.B. 747 and S.B. 749, as well as the passage of new racially gerrymandered maps in 2023.

    2.    Sequence Of Events Leading To S.B. 824's Enactment Evince Discriminatory Intent

The "specific sequence of events leading up to the challenged decision may also shed some light on the decisionmaker's purposes" or "spark suspicion" of discriminatory intent. *Arlington Heights,* 429 U.S. at 267, 269. "Departures from the normal procedural sequence also might afford evidence that improper purposes are playing a role." *Id.* at 267. Here, Plaintiffs experts Lichtman and Leloudis and numerous fact witnesses will testify about the abuses of legislative process necessary to enact S.B. 824.

First and foremost, S.B. 824 was the product of an unconstitutional racial gerrymander. On June 28, 2018, the Supreme Court issued its final decision in *Covington* and by this time it was well established that the North Carolina's General Assembly was composed of a substantial number of legislators elected from districts that utilized unconstitutional racial gerrymandering. See *North Carolina v. Covington*, 138 S. Ct. 2548 (2018) (per curiam), see also *Covington v. North Carolina*, 316 F.R.D. 117, 124 (M.D.N.C 2016), aff'd, 137 S. Ct. 2211 (2017). One day after the Supreme Court's final decision in *Covington*, the North Carolina General Assembly ratified H.B. 1092. In 2022, the North Carolina Supreme Court held that the Legislature "acting with the knowledge that twenty-eight of its districts were unconstitutionally racially gerrymandered and that more than two-thirds of all legislative districts needed to be redrawn to achieve compliance with the Equal Protection Clause, chose to initiate the process of amending the state constitution at the last possible moment prior to the first opportunity North Carolinians had to elect representatives from presumptively constitutional legislative districts." *N.C. State Conference of the NAACP v. Moore*, 382 N.C. 129,132, 876 S.E.2d 513, 518 (2022)

Further, the legislature retained its illegal supermajority only by misleading the court as to the nature of the new district lines it used for the election that created the 2017-2018 General Assembly, which then enacted S.B. 824 in a special lame

duck session, rushing to act before it lost the supermajority it needed to override the Governor's veto. The massive deception perpetrated by legislative leaders was an essential precondition to enactment of S.B. 824 and is an unprecedented "departure from the normal procedural sequence."

At trial, Plaintiffs will establish further evidence of aberrational process supporting an inference of discrimination, including: (i) the waning strength of the white electorate and the increasing racial polarization in voting in North Carolina (providing a strong incentive for North Carolina legislators to restrict the Black and Latino vote); (ii) many of the same lawmakers who led the effort to enact S.B. 824 also led the effort to enact H.B. 589; (iii) the awareness of lawmakers who led the effort to enact S.B. 824 that H.B. 589 racially discriminated in violation of the VRA and the Constitution; and (iv) the legislature undertook no meaningful process to review or evaluate voting or elections issues in North Carolina, or to revise the method of photo ID to render it non-discriminatory (a particularly glaring omission in light of the judicial decisions striking down H.B. 589 as racially discriminatory).

3.    The Legislative History Reveals Racially Discriminatory Intent Behind S.B. 824

The legislative history of the enactment of S.B. 824 is also "highly relevant" to a finding of discriminatory intent. *Arlington Heights,* 429 U.S. at 268. Here, Plaintiffs' experts Lichtman and Leloudis, as well as fact witnesses, will testify at trial that: (i) the legislature rejected amendments that would have ameliorated the

Case 1:18-cv-01034-LCB-LPA   Document 270   Filed 04/16/24   Page 10 of 30

discriminatory impact of S.B. 824, including amendments to allow non-photo IDs and amendments to allow public sector photo IDs; (ii) while the legislature made cosmetic changes to the forms of identification allowed from H.B. 589, these changes had no appreciable impact on the disparate racial impacts of the law; (iii) S.B. 824 sponsors acknowledged that their intent with respect to S.B. 824 was not to cure or resolve the impermissibly discriminatory features of H.B. 589, but to enact essentially the same provisions in a manner designed to defeat judicial challenge; (iv) the legislature followed a rushed process for enacting the statute calling for a Constitutional Amendment; (v) the legislature followed a rushed process for enacting S.B. 824 ; and (vi) S.B. 824 was enacted essentially on partisan lines.

    4.    S.B. 824 Has Had and Will Continue to Have a Discriminatory Impact On Black and Latino Voters

Courts also look to the impact of a law -- "whether it bears more heavily on one race or another" -- to assess discriminatory intent. *Arlington Heights,* 429 U.S. at 266. Here, the evidence to be presented at trial is incontrovertible that the photo ID provisions of S.B. 824 have already, and will continue to, have a significant disparate impact on Black and Latino voters. The evidence of disparate impact, and the failure of the Free ID and reasonable impediment provisions to address these disparities, is addressed below in Section III.

## III. S.B. 824'S PHOTO ID REQUIREMENTS WILL PRODUCE DISCRIMINATORY RESULTS IN VIOLATION OF SECTION 2 OF THE VOTING RIGHTS ACT

Section 2 of the Voting Rights Act ("VRA") prohibits a state from imposing any voting practice that "results in a denial or abridgment of the right of any citizen of the United States to vote on account of race or color[.]" 52 U.S.C. § 10301(a). Unlike claims under the Fourteenth and Fifteenth Amendments, plaintiffs are not required to prove discriminatory intent when claiming a violation of Section 2 of the VRA. *Chisom v. Romer*, 501 U.S. 380, 403 (1991). "Congress [has] made it clear that a violation of § 2 c[an] be established by proof of discriminatory results alone." *Chisom*, 501 U.S. at 404; *see also* 52 U.S.C. § 10301(a), (b); *Allen v. Milligan*, 143 S. Ct. 1487 ("[Section] 2 turns on the presence of discriminatory effects, not discriminatory intent...Congress has used the words 'on account of race and color' in the Act to mean 'with respect to race or color' and not to connote any required purpose of racial discrimination").

The Fourth Circuit applies a two-prong approach when analyzing vote denial claims under Section 2:

(i) The challenged law "imposes a discriminatory burden on members of a protected class" such that "members of the protected class 'have less opportunity than other members of the electorate to participate in the political process . . .'"; and

(ii) The discriminatory burden is in part "caused by or linked to 'historical conditions' that have or currently produce discrimination against members of the protected class."

*League of Women Voters v. North Carolina*, 769 F.3d 224, 240 (4th Cir. 2014) (citations omitted).

Analysis of a vote denial claim under Section 2 requires consideration of "the totality of circumstances." *Brnovich v. Democratic Nat'l Comm.*, 141 S. Ct. 2321, 2341 (2021). The Supreme Court in *Brnovich* set forth "certain guideposts" appropriate for assessing whether, based on the "totality of circumstances," a state election law violated Section 2. *Id*. at 2336. These include: (i) "the size of the burden imposed by a challenged voting rule"; (ii) "the degree to which a voting rule departs from what was standard practice when [Section] 2 was amended in 1982"; (iii) "the size of any disparities in a rule's impact on members of different racial or ethnic groups"; (iv) "the opportunities provided by a [s]tate's entire system of voting when assessing the burden imposed by a challenged provision"; and (v) "the strength of the state interests served by a challenged voting rule." *Id*. at 2339–40.

The Court in *Brnovich* emphasized that these "guideposts" are not an exhaustive list. *Id*. at 2338. In fact, "any circumstance that has a logical bearing on whether voting is 'equally open' and affords equal 'opportunity' may be considered." *Id; see also* ECF No. 234, at 15. The objective factors set forth in the 1982 Senate Judiciary Committee Report (the "Senate Factors") remain relevant to the overall analysis of a neutral time, place and manner voting restriction, including: (i) whether minority groups suffered discrimination in the past; and (ii) whether such

discrimination persists. *Id*. at 2340; *see Thornburg v. Gingles*, 478 U.S. 30, 36–37. Additionally, underlying evidence of racially polarized voting, racially tinged campaign appeals, and the election of minority-group candidates is relevant in determining whether minority group members suffered discrimination and whether such discrimination persists. *Brnovich*, 141 S. Ct. at 2340; see *Gingles*, 478 U.S. at 37.

### A. The senate factors support finding that S.B. 824's Photo ID Requirement Violates The VRA Results standard

#### 1. Past History of Official, Voting-related Racial Discrimination (S.F. #1)

The history of voting-related racial discrimination is summarized in Section II. B. 1.

#### 2. Minority Group Members Continue to Bear the Burden of Past Discrimination (S.F. #5)

The effects of this history of past discrimination continue to impact Black and Latino voters into the present. Section 2 of the VRA is violated when a voting practice "interacts with social and historical conditions to cause an inequality in the opportunities enjoyed by black and white voters to elect their preferred representatives." *Thornburg*, 478 U.S. at 47. Plaintiffs' experts Burden, Leloudis, and Lichtman and fact witnesses will present evidence that Black and Latino voters in North Carolina are disproportionately low income, have less education, suffer

greater incidences of poverty, have less adequate health care, and are treated unequally in the criminal justice system.

These disparities are directly related to unequal impacts in voting and electoral participation. Plaintiffs' experts will testify that socioeconomic status impacts the ability of Black and Latino voters to participate fully in the political process and obtain acceptable forms of photo identification; that educational attainment and income correlate directly with whether an individual votes; ; and that significant disparities in license revocation and suspension contribute to much higher rates of DMV ID non-possession among Black voters.

### 3. Other Senate Factors

The Supreme Court in *Brnovich* acknowledged that other Gingles factors remain relevant as part of a totality of circumstances analysis. *Brnovich*, 141 S. Ct. at 2340. Plaintiffs will set forth evidence at trial that voting in North Carolina continues to be racially polarized, that election officials continue to use voting procedures that enhance the opportunity for discrimination, that there is a lack of responsiveness on the part of elected officials to the needs of minority group members, and that minority voters continue to face obstacles in being elected to office.

**A. S.B. 824's Photo ID Requirement Violates The *Brnovich* Guideposts**

**1. Size Of the Burden & Disparities in Impacts on Black and Latino Voters (Guideposts 1 And 3)**

S.B. 824 imposes significant and disparate burdens on Black and Latino voters in several distinct ways, including the disparity in ID possession by minority voters; the deterrent effect of non-possession of IDs; the failure of the "ameliorative" provisions of SB 824 to resolve the disparate impacts of the ID requirements; and the impact of the actual costs of obtaining a photo ID for Black and Latino voters.

i.      Racial Disparities in ID Possession

The disparities in ID possession among Black and Latino voters in North Carolina is well documented, and numerous lines of evidence will be presented at trial to support this conclusion, including:

- Professor Michael Herron's analysis of a no-match list developed by the SBOE in 2019, showing that 8.1% of NC voters lack a valid form of DMV issued photo ID, that Black voters are 63% more likely than white voters to lack a form of ID, and that Latino voters are 95% more likely than White voters to lack a valid form of ID.

- Herron's analysis of DMV and SBOE databases as of September 2021, showing that 9.34% of NC voters lack a valid form of DMV-issued ID, that Black voters are 258% more likely than white voters to lack a valid form of ID, and that Latino voters are 69% more likely than White voters to lack a valid form of ID.

- Herron's analysis of DMV and SBOE databases as of November 2023, showing that at least 6.6% and possibly as many as 8.84% of NC voters lack a valid form of DMV-issued ID, that Black voters are 2.84 times more likely than white voters to lack a valid form of ID, and that Latino voters are 1.5 times more likely than White voters to lack a valid form of ID.

- A survey conducted by Matthew Barreto in 2019 of North Carolina's eligible voters that concluded that whereas 93.9% of white voters in North Carolina possessed qualifying identification with a photograph that still resembles them, only 87.6% of Blacks and 83.3% of Latinos possess such identification, making Blacks more than twice as likely as whites to lack qualifying identification and Latinos more than 2.7 times as likely as whites to lack qualifying identification.

- A survey conducted by Matthew Barreto in 2024 of North Carolina's eligible voters that concluded that whereas 92.1% of white voters in North Carolina possessed qualifying identification with a photograph that still resembles them, only 84.1% of Blacks and 83.6% of Latinos possess such identification, making both Blacks and Latinos more than twice as likely as whites to lack qualifying identification.

This evidence shows that hundreds of thousands of North Carolina voters lack the forms of ID required by S.B. 824, and of these Black voters are more than twice as likely as White voters to lack a valid form of identification, while Latino voters are typically fifty percent (or more) more likely than white voters to lack ID.

     ii.    Deterrent effect of ID Non-Possession

Plaintiffs' expert and fact witnesses will testify at trial that the photo ID requirements of S.B. 824 have disproportionately impacted Black and Latino voters through its deterrent effect, in at least two different ways. First, voters who lack a valid form of identification will leave the polls rather than complete the burdensome steps required to vote without one. Second, the photo ID requirement will keep voters who lack ID or who believe they lack ID from coming to the polls to vote. In the 2016 primary election Plaintiffs' expert

estimates that over 100,000 voters were deterred from voting due to the photo ID requirement.

          iii.    Failure of Ameliorative Provisions to Counteract the Disparate Impact of Non-Possession

S.B. 824 provides for exceptions to the ID requirement for voters who either do not possess a valid ID for purposes of voting, or who do not have an ID on their person when voting. Voters may either cast a provisional ballot that will be counted if they return to the County Board of Elections with an ID by the day before canvass, or they may file a provisional ballot alongside filling out a Reasonable Impediment Declaration, now called an "ID Exception Form." While the State Board of Elections' guidance clearly says that every voter must be presented with both options, Plaintiffs will also present evidence at trial that many voters were only offered the option to return with their ID to the County Board of Elections – unfortunately, the majority of these voters who cast this type of provisional were ultimately disenfranchised.

A voter using the "reasonable impediment" option must sign an affidavit attesting that they were unable to acquire acceptable ID, had their ID lost or stolen, have not yet received the ID for which they applied, or provide another reason. S.L. 2018-144 Section 1.2(a); N. C. Gen. Stat. § 163-166.16(e). Under S.B. 824, if a voter selects this option , the County Board of Elections shall find that the

provisional ballot is valid unless the County Board has grounds to believe the affidavit is false."

However, the "reasonable impediment" provision does not alleviate the disparities in ID possession. *First*, the RID process is more likely to impact minority voters because they are more likely to lack IDs. *Second*, the evidence will establish that completing a reasonable impediment declaration can be complex and intimidating. Voters are segregated to a separate line, required to declare the nature of their "impediment" in a public setting, under penalty of perjury, before a poll worker . The reasonable impediment declaration form must include a "prominent statement" stating that "submitting fraudulently or falsely completed declarations is a Class I felony." *Third*, after submitting the affidavit, they are also subject to being called in by the County Board of Elections to a public hearing to be questioned on the veracity of the "reasonable impediment" they listed on their form. These additional costs and burdens will be disproportionately borne by Blacks and Latinos who have fewer resources to overcome them.

At trial, Plaintiffs will present expert testimony on the failure of the RID process to fill the significant and racially disparate gap in ID possession created by S.B. 824. Plaintiffs will further provide fact and expert testimony on the failure of the State Board to properly and consistently implement the RID process in the 2023 municipal elections and the 2024 primary election. Despite the State Board's

assertion in this case that "it's hard to conceive of how a County Board member would come up with grounds to believe what the person said was false," much less convince four other board members to share that belief (ECF No. 119, at 112) Plaintiffs will demonstrate at trial that in fact numerous County Boards of Elections did just that.

The court must reject the notion advanced by Defendants that the existence of a reasonable impediment provision *per se* ameliorates any burden imposed by a photo ID requirement. As with all Section 2 inquiries, the court must conduct an intensely local appraisal of the impact of S.B. 824 in the light of past and present reality for voters in North Carolina. *League of Women Voters,* 769 F.3d at 240; *Gingles,* 478 U.S. at 44-45.

iv. Actual Costs of Obtaining Photo ID

The evidence will demonstrate that obtaining ID for voting under S.B. 824 can be burdensome due to a variety of factors, including underlying documentation requirements, fees, travel to CBOE or DMV offices due to in-person application requirements, limited business hours or availability of these offices, and a lack of voter education. As Plaintiffs' experts and fact witnesses will describe, these burdens are disproportionately borne by minority voters, who also lack the resources to overcome them. These cumulative costs of obtaining an ID solely for the purpose

of voting are far more than the "usual burdens of voting" and would thus constitute a cognizable obstacle to voting. *See Brnovich,* 141 S. Ct. at 2338.

### i. Departures From Practices In 1982

The degree to which a voting law departs from "standard practice" or "in widespread use" in 1982 when Section 2 was adopted provides a useful gauge in determining whether burdens imposed by a challenged law violate Section 2. *Brnovich*, 141 U.S. at 2338. This factor favors finding S.B. 824 in violation of Section 2, since North Carolina (and other states) did not have photo ID requirements in place in 1982. Photographic identification requirements were the law in North Carolina for a single primary election in 2016, before being struck down by the Fourth Circuit. *See McCrory,* 831 F. 3d 204 (4th Cir. 2016). Thus, photo ID requirements for voting were not "standard practice" or in "widespread use" in North Carolina or elsewhere in 1982.

### ii. Opportunities Provided By The State's Entire System Of Voting

The "opportunities provided by [North Carolina's] entire system of voting" do not reduce the burdens imposed by S.B. 824. *Brnovich*, 141 U.S. at 2339. Unlike the Arizona voting practices reviewed in *Brnovich*, there are no alternative methods of voting that somehow escape the burdens imposed by S.B. 824's photo ID requirements. In *Brnovich,* the court found the requirement to vote in the assigned precinct to be mitigated in part by the fact that individuals could still vote by mail or

drop off their early ballots at any polling place or vote early at an early voting location. *Id.* at 2344. By contrast, S.B. 824's photo ID requirements apply to all methods of voting in North Carolina.

Thus, the only other provisions of the state voting system that might alleviate the impacts of S.B. 824 are the measures included in S.B. 824: the reasonable impediment declaration process and the provision of cost-free IDs. As described above, the evidence at trial will show that these provisions fail to accomplish this.

### iii. Strength Of the State Interest

The state interest in photo identification for voting is demonstrably weak and pretextual. Defendants have asserted, variously, that the state interest in S.B. 824 is to prevent voter fraud or to enhance public confidence in the election system. *See* Defendants MSJ at 17-18. Plaintiffs witnesses, including experts Lori Minnite and Allan Lichtman, will provide extensive evidence that the kind of in-person voter fraud that could be addressed by photo identification is exceedingly rare in North Carolina; that the legislature was fully aware of the very low incidence of in-person voter fraud when it enacted SB 824; that enactment of photo ID laws makes no appreciable difference in enhancing voter integrity in state election systems; that voters in states with photo ID laws show no greater public confidence in elections than in states without; and voters in states that enact photo ID laws show no appreciable increase in voter confidence once these laws are enacted. While

prevention of voter fraud and instilling voter confidence can be a valid state interest, *see Brnovich*, 141 S. Ct. at 2340, the mere recitation of the words "voter fraud" or "election integrity" are not sufficient to automatically overcome a Section 2 analysis. *See id*. Furthermore, a finding of a state interest must always be weighed against the other factors, as all Section 2 inquiries require consideration of "the totality of the circumstances." *Brnovich*, 141 S. Ct. at 2341.

Defendants also assert that S.B. 824 was enacted to implement the Constitutional amendment requiring photo voter ID. But the record at trial will show that the enactment of the Constitutional Amendment was a component of the overall effort to enact S.B. 824, and that many leading sponsors of S.B. 824 were explicit in their desire to use the Constitutional Amendment to deflect further legal challenges to a photo ID law. This is a meager state interest indeed.

## IV. THE CHALLENGE PROVISION AND THE POLL WATCHER PROVISION OF S.B. 824 ARE UNCONSTITUTIONAL AND VIOLATE SECTION 2 OF THE VRA

In addition to the photo ID requirements, S.B. 824 contains two additional provisions that impermissibly restrict the voting rights of minority voters.

First, Section 3.1(c) of S.B. 824 expands the grounds for "ballot challenges" to include lack of proper photo ID. North Carolina law permits "any . . . registered voter of the county" to challenge another voter's registration and eligibility in certain circumstances. *See* N.C. Gen. Stat. 164-87. When a challenge is entered, precinct

officials must "explain to the challenged registrant the qualifications for registration and voting[,] . . . examine him as to his qualifications to be registered and to vote[,] . . .[and] tender to him [an] oath or affirmation" which affirms his identity. *Id.* 163-88. Thereafter, if the precinct officials are "satisfied that he is a legal voter" they "shall overrule the challenge and permit him to vote." *Id.* The grounds for exercising challenges were formerly limited to residency, duplicate voting, voting in the wrong primary, not a qualified voter, or "that the person is not who he or she represents himself or herself to be." *See* N.C. Gen. Stat. § 163-87(1)-(3); *see also* N.C. Gen. Stat. § 163-65(c). However, S.B. 824 expands the reasons for challenge to include "[t]he registered voter does not present photo identification in accordance with [S.B. 824]." *Id.* at 163-87(5); 2018 N.C. Sess. Laws 144 3.1(c). S.B. 824 invites *any voter* of the county to "enter the voting enclosure" and proclaim that another voter "[did] not present photo identification in accordance with [S.B. 824]." Voters exercising the reasonable impediment exception, who, by definition, do not present ID, could be exposed to, at best, disruption and, at worst, intimidation due to the challenge provision.

Second, Section 3.3(a) of S.B. 824 (N.C. Gen. Stat. § 163-45(a)) allows the Chair of each political party to appoint an additional 100 at-large poll observers who may be present at any polling location in the State to challenge the rights of voters who enter the precinct.

These provisions (referred to herein as "the Challenge Provisions") impermissibly burden the rights of Black and Latino voters to vote and have their votes count, in violation of the Voting Rights Act and the Constitution.

At trial, Plaintiffs will show that the Challenge Provisions, like the Photo ID provisions of S.B. 824, were enacted with discriminatory intent. The legislature's discriminatory intent in implementing the photo ID provisions of S.B. 824 cannot be surgically separated from the expansion of poll observers and the scope of challenges.

The Challenge Provisions also violate Section 2 of the Voting Rights Act because they will have disparate impact on Black and Latino citizens of North Carolina. Plaintiffs will demonstrate that regulations on the activities of poll observers have not prevented a slew of reports of intimidation; either because these regulations are inadequate or because they are not being followed. These reports are consistent with both historic and more recent efforts to intimidate Black voters in particular.

Plaintiffs will present evidence at trial demonstrating that, cumulatively with the photo ID requirements of S.B. 824, the Challenge Provisions have had and will continue to have a disparate impact on Black and Latino voters, in violation of Section 2 of the Voting Rights Act.

## V.    THE COURT SHOULD RETAIN JURISDICTION UNDER SECTION 3(C) OF THE VRA

Section 3(c) of the Voting Rights Act, 52 U.S.C. §10302(c), authorizes courts to retain jurisdiction "to prevent commencement of new devices to deny or abridge the right to vote." *Perez v. Abbot,* 390 F.3d 803, 807 (W.D. Texas, 2019).  In effect, Section 3(c) authorizes a court "to impose a preclearance remedy on states." *Id.* Under Section 3(c), a court may retain jurisdiction over a state "for such period as it may deem appropriate," and during that period no restriction or limitation on the right to vote shall be enforced "unless and until the court finds" that the restriction or limitation "does not have the purpose and will not have the effect of denying or abridging the right to vote on account of race or color, or in contravention of the voting guarantees set forth in section 10303(f)(2) of this title." *Id.* at 807-808.

Section 3 bail-in is an appropriate remedy where there are (i) "violations of the Fourteenth or Fifteenth Amendments justifying equitable relief" in the state; and (ii) whether "the remedy of pre-clearance should be imposed." *Perez,* 390 F.3d at 813. In determining whether bail-in relief should be imposed, Courts apply  several, non-exhaustive factors, including: (i) whether the violations are "persistent and repeated"; (ii) whether the violations are "recent or distant in time"; (iii) whether the violations "would likely be prevented, in the future, by preclearance"; (iv) whether the violations have "already been remedied by judicial decree or otherwise"; (v) the likeliness of the violations to recur; and (vi) whether "political developments,

independent of this litigation, make recurrence more or less likely." *Id.* at 818 (citing *Jeffers v. Clinton,* 740 F. Supp. 585, 601 (E.D. Ark. 1990).

While the Section 3 bail-in remedy is "rarely used," North Carolina's repeated and consistent attempts to restrict the right of minority citizens to vote presents the quintessential case for application of the bail-in remedy.

## <u>CONCLUSION</u>

The photo Voter ID provisions and the Challenge Provisions of S.B. 824 violate the 14th and 15th Amendments and Section 2 of the Voting Rights Act. Plaintiffs will demonstrate at trial that S.B. 824 was enacted with discriminatory intent in violation of the Constitution and constitutes an impermissible infringement on the right to vote under the totality of the circumstances, in violation of Section 2. This Court should issue an injunction striking S.B. 824 and should retain jurisdiction over North Carolina's future efforts to regulate elections under Section 3(c) of the VRA.

Dated: April 15, 2024                    Respectfully submitted,

*By: /s/ Preston Smith*
Preston Smith
D.C. Bar No. 1002179
Jeremy C. Karpatkin
D.C. Bar No. 980263
John Freedman
D.C. Bar No. 453075
**ARNOLD & PORTER KAYE SCHOLER LLP**
601 Massachusetts Avenue, NW

Washington, DC 20001-3743
Phone: (202) 942-6544
Preston.Smith@arnoldporter.com

*By:/s/ Kathleen E. Roblez*
Caitlin A. Swain
NC Bar No. 57042
Kathleen E. Roblez
NC Bar No. 57039
Ashley Mitchell
NC Bar No. 56889
**FORWARD JUSTICE**
P.O. Box 1932
Durham, NC 27721
Phone: (919) 323-3889
cswain@forwardjustice.org
kroblez@forwardjustice.org
amitchell@forwardjustice.org

*By: /s/ Penda D. Hair*
Penda D. Hair
DC Bar No. 335133
**FORWARD JUSTICE**
P.O. Box 42521
Washington, DC 20015
Phone: (202) 256-1976
phair@forwardjustice.org

*By: /s/ Irving Joyner*
Irving Joyner
NC State Bar No. 7830
P.O. Box 374
Cary, NC 27512
Phone: (919) 319-8353
ijoyner@nccu.edu

*Counsel for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this date I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will send notification of such to all counsel of record in this matter.

This, the 15th day of April 2024.

*/s/ Preston Smith*
Preston Smith

## <u>CERTIFICATE OF WORD COUNT</u>

The undersigned counsel hereby certifies that pursuant to Local Rule 7.3(d)(1), the foregoing has a word count of less than 6,250 words not including the caption, signature block and certification of word count. This document was prepared in Microsoft Word, from which the word count is generated.

Dated: April 15, 2024

*/s/ Preston Smith*

Preston Smith