# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| NORTH CAROLINA STATE CONFERENCE OF THE NAACP; *et al.*, | |
| *Plaintiffs*, | CASE NO. 1:18-cv-1034 |
| v. | |
| ALAN HIRSCH, in his official capacity as Chair of the North Carolina State Board of Elections; *et al.*, | **LEGISLATIVE DEFENDANTS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW** |
| *Defendants*, | |
| and | |
| PHILIP E. BERGER, in his official capacity as President Pro Tempore of the North Carolina Senate, and TIMOTHY K. MOORE, in his official capacity as Speaker of the North Carolina House of Representatives, | |
| *Legislative Defendants*. | |

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........................................................................ vi

INTRODUCTION ....................................................................................... 1

    I.      Background ................................................................................. 4

        A.  North Carolina's Prior Voter-ID Law ................................ 4

        B.  S.B. 824 .......................................................................... 8

             i.      Qualifying IDs ........................................................... 9

             ii.     Provisions for Voters Without ID ............................. 11

             iii.    Education and Training ............................................. 14

             iv.    Challenge and Poll Observer Provisions .................. 16

        C.  Procedural History ....................................................... 17

    II.     Summary of the Testimony ................................................... 24

        A.  NAACP Plaintiffs ......................................................... 24

              i.      Deborah Maxwell ..................................................... 24

             ii.     Elma Hairston .......................................................... 26

             iii.    Al Jabbar .................................................................. 27

         B.  Legislative Process ....................................................... 28

              i.      Former Senator Teresa Van Duyn ........................... 28

             ii.     Representative Robert Reives ................................... 31

             iii.    Representative Marcia Morey ................................. 33

             iv.    Former Senator Floyd McKissick ........................... 36

             v.     Representative Pricey Harrison ................................ 37

C. Impact: Implementation of S.B. 824 .......................................................44

     i.    Keith Rivers ..........................................................44

     ii.   Danell Burney .........................................................45

    iii.  Cedric Baker............................................................46

    iv.  Robert Fletcher.......................................................47

     v.   Iliana Santillan ........................................................48

    vi.  Kate Fellman ..........................................................51

   vii.  Tomas Lopez ..........................................................52

  viii.  Marcus Bass ...........................................................55

    ix.  Corye Dunn ............................................................57

     x.   Courtney Patterson .................................................59

    xi.  Karen Brinson Bell...................................................62

D. Historical Background ...........................................................67

     i.    Dreama Caldwell...................................................67

    ii.   Rev. William J. Barber II.........................................68

III.    Evidence In the Preliminary Injunction Record ...........................................69

FINDINGS OF FACT...........................................................69

I.    S.B. 824 Differs in Meaningful Ways from H.B. 589........................69

II.   Experience Under H.B. 589 ...........................................................73

    A. Targeted Mailings...........................................................73

    B. Voting Under H.B. 589...........................................................75

III.   Enactment of S.B. 824 ...........................................................77

A. The General Assembly Proposes the Voter-ID Amendment .................77

B. The General Assembly Reconvenes.......................................................78

C. S.B. 824 Followed Normal Legislative Procedures ..............................79

D. Evidence of the Inclusive Process for Enacting S.B. 824 .....................80

E. No Direct Evidence of Discriminatory Intent .......................................90

F. Race-Neutral Reasons for Enacting S.B. 824 ........................................94

IV. Impact of S.B. 824 ......................................................................................98

A. S.B. 824 Allows Voters to Vote With or Without ID .............................98

    i. S.B. 824 Is One of the Most Permissive Photo Voter-ID Laws in the Country ...........................................................................98

    ii. Implementation .........................................................................99

B. The Impacts from S.B. 824's ID Requirement Are Vanishingly Small ..................................................................................................101

C. The Record Contains No Valid Evidence of Disparate Racial Impact .................................................................................................104

    i. ID Possession .........................................................................104

    ii. S.B. 824's Ameliorative Provisions Remedy Any Alleged Disparities ............................................................................. 111

D. Plaintiffs Presented No Witness Who Was Unable to Vote Due to S.B. 824 Because of His or Her Race. ........................................................113

E. S.B. 824's Challenge and Poll Observer Provisions ............................119

V. North Carolina's Entire System of Voting .................................................119

VI. Widespread Use of Voter ID Laws ............................................................120

VII. S.B. 824 Bears No Connection to Historical Discrimination ....................122

iii

CONCLUSIONS OF LAW ........................................................................127

I.      Legal Standards ....................................................................127

        A.  Constitutional Claims ...............................................127

        B.  Voting Rights Act Claim .........................................128

II.     The Legislature Is Entitled to a Presumption of Good Faith ..........................132

III.    Plaintiffs Produced No Direct Evidence of Discriminatory Intent ................133

IV.     The Circumstantial Evidence of Discriminatory Intent that the Fourth Circuit
        Located in H.B. 589 Does Not Exist in S.B. 824............................................136

V.      S.B. 824 Has Had, and Will Have, No Disparate Racial Impact ...................139

        A.  S.B. 824's Sweeping Reasonable Impediment Provision and Free ID
            Provision Remedy Any Alleged Impact...............................................141

        B.  Plaintiffs' Quantitative Analysis of ID-Possession Rates Is Flawed....143

        C.  Implementation Evidence Is Irrelevant to Plaintiffs' Constitutional
            Claims ..................................................................................144

VI.     Legislative Process....................................................................145

        A.  The Process Leading up to the Voter ID Constitutional Amendment Is
            Irrelevant ...............................................................................145

        B.  The Enactment of S.B. 824 Followed Normal Procedures .................146

        C.  The Legislative Process Was Inclusive and Bipartisan.......................150

VII.    The General Assembly Would Have Passed S.B. 824 Apart from Any Allegedly
        Discriminatory Motive ..................................................................153

VIII.   Plaintiffs Cannot Meet Their Burden Under Section 2 of the VRA ..............156

iv

A. North Carolina's System of Voting ..........................................................156

B. Voter ID Laws Are In Widespread Use ..................................................157

C. Size of Any Burden & Alleged Disparities ............................................158

D. S.B. 824 Furthers Several State Interests ...............................................160

IX. If This Court Rules for Plaintiffs, Legislative Defendants Respectfully Request a Stay of that Ruling Until After the 2024 Elections .......................................161

CONCLUSION...............................................................................................163

v

# TABLE OF AUTHORITIES

**Cases**                                                                                          **Page**

*Abbott v. Perez,*
    585 U.S. 579 (2018) ...........................................................................127, 128, 132

*Alexander v. S.C. State Conf. of NAACP,*
    144 S. Ct. 1221 (2024).....................................109, 128, 132, 134, 139, 140

*Ark. State Conf. of NAACP v. Ark. Bd. of Apportionment,*
    86 F.4th 1204 (8th Cir. 2023)...................................................................156

*Berger v. N.C. State Conf. of the NAACP,*
    597 U.S. 179 (2022) ....................................................................................21

*Brnovich v. Democratic National Comm.,*
    594 U.S. 647 (2021) ........................24, 96, 129, 140, 156, 157, 158, 159, 160, 161

*City of Boerne v. Flores,*
    521 U.S. 507 (1997) ..................................................................................156

*City of Mobile v. Bolden,*
    446 U.S. 55 (1980) ............................................................................127, 133

*Cmty. Success Initiative v. Moore,*
    886 S.E.2d 16 (N.C. 2023) .................................................................106, 107

*Crawford v. Marion Cnty. Election Bd.,*
    553 U.S. 181 (2008) ........................96, 98, 142, 154, 158, 159, 160, 161

*Farm Labor Org. Comm. v. Stein,*
    56 F.4th 339 (4th Cir. 2022)......................................................................128

*Greater Birmingham Ministries v. Sec'y of State for Ala.,*
    992 F.3d 1299 (11th Cir. 2021).........................................145, 146, 150

*Holmes v. Moore,*
    840 S.E.2d 244 (N.C. Ct. App. 2020) ......................................................20

*Holmes v. Moore,*
    886 S.E.2d 120 (N.C. 2023) ...............................................20, 142, 143

*Hunter v. Underwood,*
    471 U.S. 222 (1985) ..................................................................................127

*League of Women Voters of N.C. v. North Carolina,*
    769 F.3d 224 (4th Cir. 2014)......................................................................156

*Lee v. Va. State Bd. of Elections,*
    843 F.3d 592 (4th Cir. 2016) ....................98, 99, 141, 149, 151, 157, 159

*Merrill v. Milligan,*
    142 S. Ct. 879 (2022)................................................................................162

vi

*N.C. State Conf. of NAACP v. McCrory*,
    182 F. Supp. 3d 320 (M.D.N.C. 2016) .............................................................. 135

*N.C. State Conf. of NAACP v. McCrory*,
    831 F.3d 204 (4th Cir. 2016) .............7, 129, 133, 135, 136, 137, 138, 146, 148, 149

*N.C. State Conf. of NAACP v. Raymond*,
    981 F.3d 295 (4th Cir. 2020) ........................................21, 32, 69, 127,
    128, 132, 133, 138, 140, 141, 142, 144, 146, 148, 151, 152, 156, 157, 158, 159

*N.C. State Conf. of NAACP v. Cooper*,
    430 F. Supp. 3d 15 (M.D.N.C. 2019) ................................................................ 69

*North Carolina v. N.C. State Conf. of NAACP*,
    581 U.S. 985 (2017) ............................................................................................ 8

*Pierce v. N.C. State Bd. of Elections*,
    97 F.4th 194 (4th Cir. 2024) .......................................................... 108, 109, 162

*Purcell v. Gonzalez*,
    549 U.S. 1 (2006) ...................................................................................... 96, 161

*Republican Nat'l Comm. v. Democratic Nat'l Comm.*,
    589 U.S. 423 (2020) ........................................................................................ 161

*Robinson v. Callais*,
    144 S. Ct. 1171 (2024) .................................................................................... 162

*Robinson v. Liberty Mutual Ins. Co.*,
    958 F.3d 1137 (11th Cir. 2020) .......................................................................... 8

*South Carolina v. United States*,
    898 F. Supp. 2d 30 (D.D.C. 2012) .................................................................. 128

*United States v. Garcia*,
    855 F.3d 615 (4th Cir. 2017) .............................................................................. 8

*United States v. Sanchez-Garcia*,
    98 F.4th 90 (4th Cir. 2024) ............................................................................. 133

*Veasey v. Abbott*,
    888 F.3d 792 (5th Cir. 2018) ...................................................................... 98, 99

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*,
    429 U.S. 252 (1977) ...............24, 127, 128, 132, 139, 140, 145, 146, 148, 153, 155

## Constitutional Provisions, Statutes, Laws, and Rules

18 U.S.C. § 594.......................................................................................... 17, 118

52 U.S.C.
    § 10301 ....................................................................................................... 156
    § 10301(b).................................................................................... 128, 129, 130

§ 20511(1) ............................................................................................. 17, 118
§ 10307(b) ............................................................................................ 17, 118

N.C. GEN. STAT.
§ 163A-821(a) ..................................................................................... 16, 117
§ 163-45(a) ...................................................................................................... 16
§ 163-45.1(h) ...................................................................................... 17, 117
§ 163–47 ...................................................................................... 17, 18, 118
§ 163–48 ...................................................................................... 17, 18, 118
§ 163-55(a) .................................................................................................. 106
§ 163-85(c)(9) .................................................................................... 16, 116
§ 163-87 ............................................................................................... 16, 116
§ 163-166.4(a) ........................................................................................... 118
§ 163-273(a)(3) .................................................................................. 17, 118
§ 163-273(a)(4) .................................................................................. 17, 118
§ 163-274(a)(4) .......................................................................... 17, 117, 118
§ 163-274(a)(5) .......................................................................... 17, 117, 118
§ 163-274(a)(7) .................................................................................. 17, 118
§ 163-275(10) ............................................................................ 17, 117, 118
§ 163-275(11) ............................................................................ 17, 117, 118

N.C. CONST. art. VI,
§ 2 ................................................................................................................ 106
§ 2, cl. 4 ................................................................................................. 69, 94
§ 3, cl. 2 ................................................................................................. 69, 94

08 N.C. ADMIN. CODE 17.0101(d)(3) ................................................................ 13

15 DEL. CODE § 4937 ....................................................................................... 120

26 OKLA. STAT. 7-114 ...................................................................................... 120

AK. STAT. § 15.15.225 .............................................................................. 120, 121

ALA. CODE
§ 17-10-2 .................................................................................................... 121
§ 17-9-30 .................................................................................................... 120

ARIZ. REV. STAT. § 16-579(A) ........................................................................ 120

ARK. CODE ANN.
§ 7-1-101(40)(A) ....................................................................................... 120
§ 7-5-201 .................................................................................................... 120
§ 7-5-305 .................................................................................................... 120
§ 7-5-308 .............................................................................................. 120, 121
§ 7-5-324 .................................................................................................... 120

ARK. CONST. amend. 51 § 13 ......................................................................... 120

viii

COLO. REV. STAT.
  § 1-1-104(19.5) ............................................................... 120
  § 1-7-110 ........................................................................ 120

CONN. GEN. STATS. § 9-261 ............................................... 120

FLA. STAT. § 101.043 .................................................... 120, 121

GA. CODE § 21-2-417 ..................................................... 120, 121

IDAHO CODE
  § 34-1106(2) ................................................................... 120
  § 34-1113 ........................................................................ 120
  § 34-1114 .................................................................. 120, 121

IND. CODE
  § 3-5-2-40.5 .................................................................... 120
  § 3-10-1-7.2 .................................................................... 120
  § 3-11-8-25.1 .................................................................. 120

IOWA STAT.
  § 49.78 ........................................................................... 120
  § 48A.7A ........................................................................ 120
  § 49.81 ........................................................................... 120

KAN. STAT.
  § 25-2908 ........................................................................ 120
  § 25-2908(h)(1) ............................................................... 122
  § 25-1122 ................................................................... 120, 121
  § 25-3002 ........................................................................ 120
  § 8-1324(g)(2) ................................................................. 120

KY. STAT.
  § 117.001(15) .................................................................. 120
  § 117.227 ........................................................................ 120

LA. STAT.
  § 18:562 .......................................................................... 120
  § 40:1321 ........................................................................ 120

MICH. COMP. L. § 168.523 ............................................ 120, 121

MISS. CODE § 23-15-563 ............................................... 120, 121

MO. STAT. § 115.427 ..................................................... 120, 121

MONT. STAT.
  § 13-13-114 ..................................................................... 120
  § 13-15-107(2) ................................................................. 121

ix

N.D. CODE
§ 16.1-01-04.1 ............................................................... 121
§ 16.1-05-07 ................................................................. 120

N.H. CODE
§ 659:13 ....................................................................... 120
§ 659:13(II(a)) .............................................................. 122

NEB. REV. STAT.
§ 32-318.01 .................................................................. 120
§ 32-914 ...................................................................... 120

OHIO CODE §
§ 3501.01 ..................................................................... 120
§ 3505.181 ............................................................ 120, 121

R.I. CODE
§ 17-19-24.2 ................................................................. 120
§ 17-19-24.3 ................................................................. 121

S.C. CODE § 7-13-710 ....................................................... 120

S.D. STAT.
§ 12-18-6.1 .................................................................. 120
§ 12-18-6.2 ............................................................. 120, 121

TENN. CODE
§ 2-7-112 ..................................................................... 120
§ 2-7-112(c) ................................................................. 121

TEX. STAT. § 63.0101 .................................................. 120, 122

UTAH CODE
§ 20A-1-102(83) .......................................................... 120
§ 20A-3A-203 ............................................................. 121

VA. CODE § 24.2-643(B) .................................................... 120

W.V. CODE § 3-1-34 .................................................... 120, 121

WASH. CODE § 29A.40.160 ........................................... 120, 121

WISC. STAT.
§ 5.02(6m) ................................................................... 120
§ 6.97 .................................................................... 120, 121

WY. CODE
§ 22-1-102 ................................................................... 120
§ 22-15-105 ................................................................. 121
§ 22-2-119 ................................................................... 120

2018 N.C. Sess. Laws 96 .................................................... 77

2018 N.C. Sess. Laws 110 ...............................................................................77

2018 N.C. Sess. Laws 117 ...............................................................................77

2018 N.C. Sess. Laws 118 ...............................................................................77

2018 N.C. Sess. Laws 119 ...............................................................................77

2018 N.C. Sess. Laws 128 ...............................................................................77

FED. R. EVID. 201(a), 1972 Advisory Committee Note......................................8

**Other Authorities**

*11/06/2018 Official General Election Results – Statewide (Referenda),* N.C. STATE BD. OF ELECTIONS, https://bit.ly/3zprNnL (last visited June 24, 2024) ...............................8

*3/15/16 Official Primary Election Results—Statewide*, N.C. STATE BD. OF ELECTIONS, https://bit.ly/4bo2sb7 (last visited June 24, 2024) ..................................75

Matt A. Barreto et al., *The Disproportionate Impact of Voter-ID Requirements on the Electorate – New Evidence from Indiana*, POL. SCI. & POLS. 111 (2009), https://bit.ly/45Gq4GI..............................................................................107

Brief of Gov. Roy Cooper as *Amicus Curiae* Supporting Plaintiffs-Appellees and Affirmance, *Raymond*, 981 F.3d 295 (4th Cir. 2020) (No. 20-1092) ...........154, 155

*DPO5 ACS Demographic and Housing Estimates*, U.S. CENSUS BUREAU, https://bit.ly/45FK1h5 (last visited June 24, 2024) ............................................125

*Electoral Registry*, INSTITUTO NACIONAL ELECTORAL, https://bit.ly/3zhmYwT (last visited June 24, 2024)...............................................................................50

*Exemptions*, IND. SEC'Y OF STATE, https://bit.ly/3POoImK (last visited June 24, 2024) ..................................................................121

*Hours of Operation*, SWEET POTATOES (Feb. 24, 2024), https://bit.ly/4eA2qjn...............47

*House of Representatives, July 25, 2013 Floor Debate*, N.C. GEN. ASSEMBLY, https://bit.ly/3eJAcpl (last visited June 24, 2024) ...........................................89, 90

*Poverty in North Carolina*, N.C. OFF. OF STATE BUDGET & MGMT., https://bit.ly/3zdvGMF (last visited July 24, 2024)..........................................110

*Provisional Balloting*, ARIZ. SEC'Y OF STATE, https://bit.ly/3THWb3v (last visited June 24, 2024) ..................................................................121

*QuickFacts: North Carolina*, U.S. CENSUS BUREAU (July 1, 2023), https://bit.ly/3XEmyei ...............................................................................110

H.B. 1108, 2017-2018 Reg. Sess. (N.C. 2018), https://bit.ly/3XI3oEb...........................148

S.B. 820, 2017-2018 Reg. Sess. (N.C. 2018), https://bit.ly/45EqDkC.............................148

S.B. 823, 2017-2018 Reg. Sess. (N.C. 2018), https://bit.ly/3L1IOXK.............................148

## INTRODUCTION

In our federalist system of government, state election procedures vary. But there is one task that must be accomplished regardless of how elections are held: confirming that individuals presenting to vote are who they claim to be. Executing this task is particularly important today, because increased mobility and urbanization make it less likely that election officials will personally know voters. In 2018, the people of North Carolina accomplished that task, echoing recommendations made in 2005 by the Commission on Federal Election Reform, chaired by former President Jimmy Carter and former Secretary of State James Baker, by adopting a constitutional amendment requiring photo identification to vote and charging the General Assembly with enacting implementing legislation, which could include exceptions.

S.B. 824 is the General Assembly's response to the people of North Carolina's charge. As every voter ID law must, S.B. 824 balances competing considerations. First, it leverages the fact that most citizens possess a driver's license or other form of government-issued ID, and second, it establishes safeguards for voters who do not possess qualifying ID. S.B. 824 balances these considerations in a way that both seeks to maximize the number of individuals who possess qualifying photo ID while also ensuring that all qualified North Carolinians can cast a ballot that will count.

For the first consideration, S.B. 824 enumerates numerous types of qualifying ID, including drivers' licenses, passports, military and veterans IDs, tribal IDs, and student and government employee IDs that meet certain specifications. In addition, S.B. 824 creates an entirely new type of free voter ID that is available from county board of elections offices

1

in all 100 counties in the State. No documentation is required to obtain this type of ID, and it is available during early voting, which is disproportionately used by minority voters.

For the second consideration, S.B. 824 prescribes two options that voters who arrive at the polls without ID may use to cast a ballot and have it count. Under State Board of Elections rules, voters who fail to present ID must be offered both options. The first allows a voter to cast a provisional ballot and return within 10 days to the county board of elections with a photo ID. That ID could be an ID the voter already possesses, but it also could be a free voter ID the voter obtains from the county board of elections on the same return trip.

The second option allows a voter to cast a provisional ballot and fill out a Photo ID exception form, identifying an impediment to presenting ID such as disability, lack of transportation, or work schedule. The voter also can check "other" and write in any impediment not identified on the form. If the voter selects this option, there is no need for the voter to do anything else, and the vote will count unless a bi-partisan five-member county board of elections unanimously finds that the identified impediment is false; the board is not permitted to second-guess the claimed impediment. While the voter ID constitutional amendment makes presentation of ID the preferred method for confirming a voter's identification, and while the availability of free ID should reduce demand for the reasonable impediment process over time, the reasonable impediment process is a fixture of the law that serves as a backstop to ensure that all registered voters in the State may cast a ballot that will count.

As the foregoing description of S.B. 824 makes clear, the law ensures that elections in North Carolina are open to all individuals regardless of race. Its provisions compare

favorably to other voter ID laws that have been found lawful on which S.B. 824 was modeled. To the extent there is a present disparity in qualifying ID possession in North Carolina (a fact that Plaintiffs have not proven), the reasonable impediment provision and the creation of free, no-documentation ID means that a lack of ID does not equate with a lack of an ability to vote.

The foregoing also should make clear that S.B. 824 was not enacted with racially discriminatory intent. Plaintiffs' theory of the case is that the General Assembly used race as a proxy for party, with S.B. 824 being an effort to entrench Republicans by making it harder for African Americans and Hispanics, who typically prefer Democratic candidates, to vote. But a Republican supermajority seeking to entrench itself would not have enacted a law like S.B. 824, which provides mechanisms for all voters to vote, with or without ID. And while the terms of S.B. 824 are enough to refute charges of partisan entrenchment, the fact that S.B. 824 was not a wholly partisan effort removes any plausible doubt about the matter. From the outset, Republicans sought to involve Democrats in the legislative process. A variety of changes were made based on discussions with Democrats and others about the bill. Democratic Senator Joel Ford, who is African American, signed on as a primary sponsor. Four Democrats in the General Assembly voted for S.B. 824 in its final form—Senators Ford and Davis in the Senate and Representatives Hall and Goodman in the House. And the Republican supermajority adopted numerous amendments proposed by Democrats, including Democrats who did not support the law, such as Senator McKissick and Representative Harrison, leading to expressions of gratitude from those Democrats.

Case 1:18-cv-01034-LCB-LPA   Document 335   Filed 07/01/24   Page 15 of 177

None of this is consistent with a partisan-entrenchment theory, especially the multiple Democrats who supported S.B. 824.

Finally, while the manner in which S.B. 824 has been implemented is not particularly relevant to the facial claims Plaintiffs press in this litigation, North Carolina's experience under S.B. 824 further refutes the notion that S.B. 824 somehow presents a discriminatory burden to voting. The law has been in effect for municipal elections in the fall of 2023 and for primary elections in the spring of 2024. Approximately 2 million people went to the polls in those elections, and over 99.9% of them did so with qualifying ID. Of the minuscule portion of voters who did not bring ID to the polls, the majority had their votes count through one of S.B. 824's ameliorative provisions. While implementation of S.B. 824 has not been perfect, perfection is not possible in any human system. Regardless, Plaintiffs have not shown that any imperfection in S.B. 824's implementation has any racially discriminatory effect.

In sum, by enacting S.B. 824, the North Carolina General Assembly responded to the people's constitutional mandate by enacting a photo voter ID law that seeks to secure elections in the State, while at the same time ensuring that all registered voters can vote. Plaintiffs have failed to demonstrate any legal infirmity in S.B. 824, and their claims therefore fail.

## I. Background

### A. North Carolina's Prior Voter-ID Law

In July 2013, the North Carolina General Assembly enacted House Bill 589 ("H.B. 589"), which included a voter-ID requirement. Pls.' & Defs.' Second Amended Jt. Proposed

4

Pre-Trial Stips. ¶¶ 9–10, Doc. 299 (May 5, 2024) ("Jt. Stips."); DX131 (H.B. 589 Final Enacted Law). H.B. 589 was omnibus legislation. In addition to the voter-ID provisions, H.B. 589 included other elections provisions, eliminated preregistration for 16- and 17-year-olds, eliminated same-day voter registration, reduced the number of days for early voting, and prohibited counting provisional ballots cast outside a voter's precinct. *See generally* DX131.

H.B. 589 required North Carolinians voting in person to present photo ID before casting a ballot. DX131 at 1. The law defined "photo identification" as any of the following forms of unexpired ID with a printed expiration date, while allowing any voter 70 years old and older to present an expired form of any of the IDs so long as it was unexpired on the voter's 70th birthday:

(1) a North Carolina driver's license, learner's permit, or provisional license;

(2) a special nonoperator's identification card;

(3) a U.S. passport;

(4) a U.S. military identification card, except there was no requirement that it have a printed expiration or issuance date;

(5) a Veterans Identification Card issued by the U.S. Department of Veterans Affairs, except there was no requirement that it have a printed expiration or issuance date;

(6) a tribal enrollment card issued by a federally recognized tribe, provided that if it did not contain a printed expiration date, it had to have a printed issuance date that was not more than eight years before it was presented for voting;

5

(7) a tribal enrollment card issued by a tribe recognized by North Carolina, so long as it was signed by an elected official of the tribe and the requirements for obtaining it were equivalent to the requirements for obtaining a special identification card from the DMV; or

(8) a driver's license or nonoperator's identification card issued by another state or the District of Columbia so long as the voter registered to vote within 90 days of election day.

Jt. Stips. ¶ 10; DX131 at 2. The requirement to present one of these forms of photo ID did not apply to voters who cast absentee ballots by mail.

As originally enacted, H.B. 589 offered no voting option for voters who lacked a qualifying ID and failed to obtain one. Voters who appeared at the polls without a qualifying ID could only cast a provisional ballot and then return to a County Board of Elections with a qualifying ID to cure that ballot by noon on the day before the time set for the convening of the election canvass. DX131 at 4–5. Voters without a qualifying ID could obtain a special identification card from a DMV at no fee but had to show certain documentation. DX131 at 5–6.

The General Assembly later amended H.B. 589 by adding a reasonable-impediment exception, which allowed voters without qualifying ID to cast a provisional ballot. Jt. Stips. ¶ 16; DX185 at 7–9. To vote under that exception, a voter needed to claim a reasonable impediment to "obtaining" a photo ID. DX185 at 7. The voter also needed to present alternative identification in the form of (i) a copy of a current utility bill, bank statement, government check, paycheck, or other government document that showed the name and

6

address of the voter or the voter's voter registration card, or (ii) the last four digits of the voter's Social Security number and the voter's date of birth. DX185 at 7. County Boards of Elections could reject the voter's provisional ballot if the voter failed to provide this alternative identification; if the Board could not confirm the voter's registration from the date of birth and Social Security number provided by the voter; or if the Board had grounds to believe that the voter's reasonable-impediment declaration was factually false, merely denigrated the photo identification requirement, or made obviously nonsensical statements. DX185 at 8. Reasonable-impediment declarations were also subject to challenge: any registered voter of the county was eligible to make a challenge to the factual veracity of a voter's stated impediment. DX185 at 8–9.

H.B. 589 was challenged in Court. The Fourth Circuit enjoined several of its provisions. Jt. Stips. ¶ 17; *see also N.C. State Conf. of NAACP v. McCrory*, 831 F.3d 204 (4th Cir. 2016). Because the reasonable impediment exception was not in the original bill, the Fourth Circuit did not consider that exception when assessing the intent underlying the law. *See id.* at 239–40. Evidence about the mitigating effect of that exception in the March 2016 primary—which occurred after trial in the H.B. 589 litigation—was not part of the record before the Fourth Circuit. *See id.* at 243–44.

The State Defendants petitioned for certiorari. Before the U.S. Supreme Court ruled on the petition, the State's current Governor, Roy Cooper, assumed office. Shortly thereafter, the State's current Attorney General moved to dismiss the petition, purportedly on behalf of all defendants. The Supreme Court denied certiorari, with Chief Justice Roberts writing that "it is important to recall our frequent admonition that the denial of a

7

writ of certiorari imports no expression of opinion upon the merits of the case." *North Carolina v. N.C. State Conf. of NAACP*, 581 U.S. 985 (2017) (Roberts, C.J., statement respecting denial of certiorari) (cleaned up).

## B. S.B. 824

In the November 2018 General Election, the people of North Carolina adopted a constitutional amendment ("voter-ID amendment") that provides: "Voters offering to vote in person shall present photographic identification before voting. The General Assembly shall enact general laws governing the requirements of such photographic identification, which may include exceptions." Jt. Stips. ¶ 21; DX189 at 5. A total of 2,049,121 voters—55.49% of North Carolina voters in November 2018—voted in favor of the voter-ID amendment. *See 11/06/2018 Official General Election Results – Statewide (Referenda)*, N.C. STATE BD. OF ELECTIONS, https://bit.ly/3zprNnL (last visited June 24, 2024).[1]

On December 6, 2018, the General Assembly passed Senate Bill 824, entitled an Act To Implement the Constitutional Amendment Requiring Photographic Identification To Vote. DX001. Governor Cooper vetoed S.B. 824 on December 14, 2018. DX001. The General Assembly overrode the Governor's veto on December 19, 2018. DX001.

---

[1] The percentage of voters who supported the voter-ID amendment is a "legislative fact" and may be properly considered by this Court. Legislative facts are "established truths, facts[,] or pronouncements that do not change from case to case but apply universally." *Robinson v. Liberty Mutual Ins. Co.*, 958 F.3d 1137, 1142 (11th Cir. 2020) (cleaned up); *see also* FED. R. EVID. 201(a), 1972 Advisory Committee Note (legislative facts are those that "have relevance to legal reasoning and the lawmaking process, whether in the formulation of a legal principle or ruling by a judge or court or in the enactment of a legislative body"). Alternatively, this fact is subject to judicial notice because it appears on a government website and its accuracy cannot reasonably be questioned. *See United States v. Garcia*, 855 F.3d 615, 621 (4th Cir. 2017).

8

### i.    Qualifying IDs

As originally enacted, S.B. 824 allowed voters to show the following forms of photo ID:

(1) a North Carolina driver's license, which includes learners' permits and provisional licenses;

(2) a special non-operator's identification card or other form of non-temporary identification issued by the North Carolina DMV or Department of Transportation;

(3) a U.S. passport;

(4) a North Carolina voter photo identification card, to be issued free of charge without underlying documentation;

(5) a tribal enrollment card issued by a State or federally recognized tribe;

(6) a student identification card issued by a constituent institution of The University of North Carolina, a community college (as defined by North Carolina law), or eligible private post-secondary institution (as defined by North Carolina law), provided that the ID is issued in accordance with certain requirements also set out in the bill;

(7) an employee identification card issued by state or local government entity, including a charter school, provided that the ID is issued in accordance with certain requirements also set out in the bill;

(8) a driver's license or non-operator's identification card issued by another state or the District of Columbia so long as the voter registered to vote within 90 days of election day;

9

(9) a U.S. military identification card, regardless of whether the ID contains a printed expiration or issuance date;

(10) a Veterans Identification Card issued by the U.S. Department of Veterans Affairs, regardless of whether the ID contains a printed expiration or issuance date.

Jt. Stips. ¶¶ 135–138; DX009 at 2 (S.B. 824 Final Enacted Law); DX332 at 3 (citing N.C. GEN. STAT. § 20-4.01(17), which defines "license" expansively). A voter 65 years old or older may present any of these forms of ID, even if expired, as long as the ID was unexpired on the voter's 65th birthday. DX009 at 2. S.B. 824 also required voters requesting absentee ballots to attach a copy of qualifying photo ID. DX009 at 7–8.

On March 13, 2019, the General Assembly passed—and the Governor signed—Senate Bill 214, which amended S.B. 824 by postponing enforcement of voter ID to the 2020 elections while providing that "all implementation and educational efforts . . . shall continue." Jt. Stips. ¶¶ 122–123; DX183 at 1.

On May 28, 2019, the General Assembly passed—and the Governor signed—House Bill 646, which increased the time during which educational institutions and government employees can have their ID approved as qualifying under S.B. 824 and relaxed the approval requirements. Jt. Stips. ¶¶ 124–126; DX118. This amendment also removed expiration-date requirements from tribal IDs; now, a tribal ID may be used even if it has been expired for over a year or lacks an expiration date. DX118 at 1.

On October 29, 2019, the General Assembly passed—and the Governor signed—Senate Bill 683, which expanded the reasonable-impediment process for absentee ballots.

10

Jt. Stips. ¶¶ 127–130; DX107. Senate Bill 683 also appropriated additional funding to the State Board of Elections to implement voter ID. DX107.

On June 11, 2020, the General Assembly passed—and the Governor signed—House Bill 1169, which amended S.B. 824 by adding to the list of qualifying voter IDs an identification card issued by a department, agency, or entity of the United States government or of North Carolina for a government program of public assistance. Jt. Stips. ¶¶ 131–133; DX086. These IDs may be used for voting even if they do not contain a printed expiration or issuance date. DX086 at 5.

### ii.    Provisions for Voters Without ID

Under S.B. 824, voters who currently lack a qualifying form of voter ID can obtain one of two forms of ID free of charge. First, anyone of voting age may obtain a special identification card from a DMV. DX009 at 9. If a voter possesses a valid form of DMV ID that is required to be seized or surrendered due to cancellation, disqualification, suspension, or revocation, S.B. 824 requires the DMV automatically to issue a special identification card to that voter via first-class mail without application and without charge. DX009 at 9. This is one way S.B. 824 differs from H.B. 589.

Second, S.B. 824 requires County Boards of Elections to issue voter photo identification cards to registered voters without charge and upon request. DX009 at 1. A voter need not provide any underlying documentation to obtain one of these IDs. The voter need only provide his name, date of birth, and the last four digits of his Social Security number. DX009 at 1. This is another way in which S.B. 824 differs from H.B. 589. The State Board of Elections has also made the free voter ID request form available in Spanish.

11

DX385. S.B. 824 provides for these IDs to be available during one-stop early voting, on election day, and after election day. Specifically, they "shall be issued at any time, except during the time period *between* the end of one-stop voting for a primary or election . . . and election day for each primary and election." DX009 at 1 (emphasis added). The text of S.B. 824 also does not limit provision of these IDs to County Board of Elections offices.

Additionally, for in-person voting, S.B. 824 requires the State Board of Elections to promulgate a reasonable-impediment declaration form (now called a "Photo ID exception form"). DX009 at 3–4. This form must "at a minimum, include[] the following as separate boxes that a registered voter may check" to explain why they cannot present qualifying ID: (1) inability to obtain photo ID due to (a) lack of transportation, (b) disability or illness, (c) lack of birth certificate or other underlying documents required, (d) work schedule, or (e) family responsibilities, (2) lost or stolen identification, (3) photo identification applied for but not yet received by the registered voter voting in person, and (4) other reasonable impediment, requiring a "brief written identification of the reasonable impediment." DX009 at 3–4. S.B. 824 also requires the form to include a checkbox for "a religious objection to being photographed," and a checkbox for individuals who were the victim of a natural disaster within 100 days of the election that resulted in a federal or North Carolina disaster declaration. DX009 at 3.

For absentee voting, S.B. 824 similarly requires the State Board of Elections to adopt rules establishing a "process for a voter without acceptable readable identification . . . to complete an alternative affidavit." DX009 at 7–8. S.B. 824 requires that the Photo ID exception form for absentee ballots "include[] lack of access to a method to attach an

12

electronic or physical copy of the identification card to the written request as a reasonable impediment." DX009 at 7–8.

As noted, S.B. 683 amended the requirements for the absentee Photo ID exception form in 2019. Jt. Stips. ¶ 129; DX107. S.B. 683 requires voters who claim an inability to attach a copy of their photo ID to include either the number of their driver's license, permit, provisional license, or non-operator's license, or the last four digits of their social security number. DX107 at 5.

S.B. 824 does not prevent the State Board of Elections from adding additional categories of reasonable impediments. The Photo ID exception form for in-person voting currently also allows voters to check "school schedule" and "[s]tate or federal law prohibits me from listing my reason," in addition to the categories that S.B. 824 requires. DX543. The Photo ID exception form for absentee voting also includes those two additional categories, plus the exception required by S.B. 824 that the person is unable to include a photocopy of their photo ID. DX526.

Voters who fill out either the in-person or absentee Photo ID exception form because they cannot present ID are permitted to vote a provisional ballot. S.B. 824 requires these provisional ballots to be counted unless the bipartisan county board of elections unanimously finds that the voter lied on the form. Jt. Stips. ¶ 145; DX009 at 4; 08 N.C. ADMIN. CODE 17.0101(d)(3). S.B. 824 does not allow voters to challenge the veracity of another voter's Photo ID exception form. This is another way in which S.B. 824 differs from H.B. 589.

13

Finally, voters who do not present photo ID may also opt to cast a provisional ballot and return to their county board of elections to show acceptable ID before 5:00 P.M. on the day before county canvass. DX009 at 3. The State Board must provide registered voters exercising this option "an information sheet on the deadline to return to the county board of elections to present photo identification, and what forms of photo identification are acceptable, in order for the voter's provisional ballot to be counted." DX009 at 3.

### iii. Education and Training

The General Assembly mandated that the State Board of Elections "establish an aggressive voter education program concerning the provisions contained in" S.B. 824. DX009 at 10. Specifically, S.B. 824 requires the State Board to:

(1) post information concerning changes contained in S.B. 824 in a conspicuous location at each County Board of Elections, the State Board's office, and their respective websites;

(2) train precinct officials at training sessions to answer questions by voters concerning the changes in S.B. 824;

(3) require documentation describing the changes in S.B. 824 to be disseminated by precinct officials at every election held following the effective date of S.B. 824;

(4) coordinate with each County Board so that at least two seminars were conducted in each county prior to September 1, 2019;

(5) coordinate with local and service organizations to provide for additional informational seminars at a local or statewide level;

14

(6) coordinate with local media outlets, County Boards of Commissions, and County Boards of Elections to disseminate information in a way that would reasonably inform the public about the changes in S.B. 824. In executing this duty, the State Board must ensure that it informs the public of S.B. 824's provisions; the requirements to vote absentee, early, or on election day; voting by provisional ballot; and the availability of a free photo voter ID. S.B. 824 specifically requires that the State Board educate "rural, military, veteran, elderly, underserved, minority, or other communities as determined by local needs";

(7) when appropriate, inform the public regarding the requirements of North Carolina residency to vote, including applicable intent requirements of North Carolina law, and the penalty for voting in multiple states;

(8) make available on the State Board's website a document that provides information regarding S.B. 824's provisions;

(9) notify each registered voter who does not have a North Carolina issued driver's license or ID card a notice of the provisions of S.B. 824 no later than September 1, 2019;

(10) mail information to all North Carolina residential addresses, twice in 2019 and twice in 2020, that, at a minimum, describes forms of photo ID acceptable when presenting to vote in person, the options for provisional voting for registered voters who do not present the required photo ID, and voting mail-in absentee; and

(11) prominently place a specific statement in all voter education materials mailed to citizens, and on informational posters displayed at one-stop voting sites and

15

precincts on election day, that "[a]ll registered voters will be allowed to vote with or without a photo ID card[,]" and explaining the reasonable impediment option. DX009 at 10–11. S.B. 824 also permits the State Board to implement additional educational programs in its discretion. DX009 at 10–11.

### iv.    Challenge and Poll Observer Provisions

Prior to S.B. 824, North Carolina permitted voters to challenge another voter's ballot based on an allegation that the voter: lacks the necessary residency, is underage, has not completed a felony sentence, is not a U.S. citizen, or is not "who he or she represents himself or herself to be." N.C. GEN. STAT. §§ 163-85(c)(9), 163-87. S.B. 824 additionally permits voters to challenge a ballot if the voter "does not present photo identification in accordance with" S.B. 824's requirements. DX009 at 13. This provision does not allow voters to challenge whether a voter qualifies for any of the exceptions to presenting photo ID.

Additionally, North Carolina has long allowed political parties to appoint poll observers at the 100 counties in the state. Prior to S.B. 824, North Carolina allowed "[n]ot more than two observers from the same political party" inside the voting enclosure, except "one of the at-large observers from each party may also be in the voting enclosure." N.C. GEN. STAT. § 163A-821(a), recodified at *id.* § 163-45(a) (2023). Additionally, North Carolina allowed each political party to designate 10 additional "at-large" poll observers for each county who are residents of that county. *Id.*

S.B. 824 allows political parties to designate 100 additional "at-large" poll observers throughout the state who could observe voting in any location in the state, regardless of

16

their county of residence. DX009 at 14. S.B. 824 in no way altered the pre-existing legal requirement that no more than three observers per party are allowed in the voting enclosure at any time. DX009 at 14; DX408. S.B. 824 also did not disturb pre-existing restrictions on poll worker conduct that prohibit them from taking photographs, recording voters, impeding voters' ingress or egress, inhibiting or interfering with any election official, engaging in electioneering, or making or receiving phone calls while in the voting enclosure. N.C. GEN. STAT. § 163-45.1(h). S.B. 824 also did not affect North Carolina laws prohibiting anyone in a voting enclosure (including poll observers) from interfering with (or attempting to interfere with), assaulting, intimidating (or attempting to intimidate), or questioning voters and election officials. *Id.* §§ 163-274(a)(4)–(5), 163-275(10)–(11).

Additionally, all persons (including poll observers) are prohibited from harassing anyone in the voting place or surrounding buffer zone. *Id.* § 163-166.4(a). Individuals who engage in these prohibited activities may be subject to criminal penalties under state or federal law. *Id.* §§ 163-273(a)(3)–(4), 163-274(a)(7); *see also* 18 U.S.C. § 594; 52 U.S.C. §§ 20511(1), 10307(b). Voter intimidation punishable by law includes any "conduct that would make a voter reasonably fearful, threatened, or coerced during the voting process" and can take many forms. DX408 at 9–11. If alerted to any prohibited activity by a poll observer, the chief judge can remove that observer. DX408 at 11–12; N.C. GEN. STAT. §§ 163-47, 163-48.

### C. Procedural History

The day after the General Assembly enacted S.B. 824 over the Governor's veto, Plaintiffs sued the Governor of North Carolina in his official capacity and the North

17

Carolina State Board of Elections members, in their official capacities. Compl., Doc. 1 (Dec. 20, 2018). Plaintiffs claim that S.B. 824 facially violates the Fourteenth Amendment, Section 2 of the Voting Rights Act, and the Fifteenth Amendment. *See generally id.*

Legislative Defendants Philip E. Berger, in his official capacity as President Pro Tempore of the North Carolina Senate, and Timothy K. Moore, in his official capacity as Speaker of the North Carolina House of Representatives, promptly moved to intervene as Defendants. Mot. to Intervene, Doc. 7 (Jan. 14, 2019). Plaintiffs opposed intervention. Opposition to Mot. to Intervene, Doc. 38 (Feb. 19, 2019). Agreeing with Plaintiffs, this Court denied the intervention motion. Order Denying Mot. to Intervene, Doc. 56 (June 3, 2019).

Plaintiffs then moved for a preliminary injunction—nine months after filing the Complaint. Prelim. Inj. Mot., Doc. 72 (Sept. 17, 2019). Plaintiffs then filed an Amended Memorandum. Am. Prelim. Inj. Memo., Doc. 91 (Oct. 9, 2019). In support of their motion for preliminary injunction, Plaintiffs filed eight fact witness declarations (from five Democratic legislators, a Plaintiff, a County Board of Election official, and an interest group leader), plus five preliminary expert reports (from Profs. Allan J. Lichtman, James L. Leloudis, Barry C. Burden, Lorraine C. Minnite, and Michael C. Herron). Docs. 91-1–91-13.

Legislative Defendants then renewed their motion to intervene and asked the Court to allow them "to fully participate as defendants in this suit during the pendency of the appeal" about their intervention. Br. Supporting Proposed Intervenors' Mot. for a Stay, Doc. 76 at 1 (Sept. 23, 2019). Legislative Defendants asked for the right "to fully engage

18

in discovery, motions practice, presentation of evidence, and briefing" and expressed their desire to present rebuttal expert reports of the sort that the State Board Defendants had declined to present in an analogous state action. *Id.* at 1, 13–15. Plaintiffs again opposed Legislative Defendants' intervention, Doc. 66 (Aug. 9, 2019), and the Court limited them to participating as amici curiae, Doc. 100 (Nov. 7, 2019).

As amici, Legislative Defendants offered five expert reports and a declaration from former Senator Joel Ford, an African American Democrat who was a primary sponsor of S.B. 824. Stricken Amicus Brief, Doc. 96 (Oct. 30, 2019); Ford Decl., Doc. 96-12. Plaintiffs moved to strike the amicus brief and the accompanying evidence. Mot. to Strike, Doc. 99 (Nov. 4, 2019). Legislative Defendants warned that the possibility of intervention weighed in favor of allowing them to participate in developing the record at the preliminary-injunction stage. Resp. in Opp'n to Pls.' Mot. to Strike, Doc. 109 at 5–6 (Nov. 19, 2019). Plaintiffs discounted this concern. Reply Supporting Mot. to Strike, Doc. 115 at 5 (Nov. 25, 2019). The Court granted Plaintiffs' motion to strike, Doc. 116 (Nov. 27, 2019), and Legislative Defendants promptly filed an amended amicus curiae brief without the stricken evidence, Doc. 117 (Dec. 2, 2019).

Even though the State Board Defendants did not submit a single expert report, Plaintiffs filed a preliminary expert report from a completely new expert with their preliminary injunction reply, Preliminary Expert Rep. of Matthew A. Barreto, Doc. 108-1 (Nov. 15, 2019), along with several "supplemental" or "rebuttal" expert reports from their original experts, Docs. 108-3, 108-5, 108-13. Plaintiffs also filed several additional fact witness declarations with their preliminary injunction reply. Docs. 108-2, 108-4, 108-6,

19

108-7, 108-8, 108-9, 108-10, 108-12. The Court held a hearing on the preliminary injunction motion but did not receive live testimony from Plaintiffs' preliminary experts. *See* Tr. of Proceedings Held on Dec. 3, 2019, Doc. 119.

This Court granted Plaintiffs' preliminary injunction motion as to their constitutional claims but denied it as to their claims under Section 2 of the Voting Rights Act. *See generally* Mem. Order & Op., Doc. 120 (Dec. 31, 2019).[2]

Plaintiffs and State Board Defendants had previously agreed to a schedule for this case such that Plaintiffs' expert reports and disclosures pursuant to Rule 26(a)(2) were due by April 15, 2020, while Defendants' expert reports and disclosures were due by May 8, 2020. Joint Rule 26(f) Report, Doc. 77 at 3–4 (Sept. 23, 2019). Plaintiffs and State Board Defendants then submitted an addendum specifically clarifying that expert discovery would close on June 1, 2020. Addendum to Joint Rule 26(f) Report, Doc. 87 at 1 (Sept. 30, 2019).

On April 14, 2020, "the evening before Plaintiffs' hand-picked, expert report/disclosure deadline," Plaintiffs asked the Court to extend that deadline. Order Denying Mot. for Reconsideration, Doc. 140 at 3 (May 4, 2020). The Magistrate Judge denied Plaintiffs' last-minute request. *Id.* at 17. Plaintiffs objected and asked this Court to

---

[2] On February 18, 2020, in a parallel state court case, the North Carolina Court of Appeals reversed and remanded the denial of a preliminary injunction of S.B. 824 with instructions to preliminarily enjoin implementation or enforcement of the law's voter-ID provisions until the case was decided on the merits. *Holmes v. Moore*, 840 S.E.2d 244, 252 (N.C. Ct. App. 2020). After the trial court in *Holmes* ruled for plaintiffs on the merits under a state-law equal protection claim analogous to the claim made by Plaintiffs here, the North Carolina Supreme Court reversed, rejecting plaintiffs' claim of racial discrimination and upholding S.B. 824. *Holmes v. Moore*, 886 S.E.2d 120 (N.C. 2023).

extend the deadline for Plaintiffs to serve expert reports and disclosures until October 9, 2020, with all expert discovery closing on December 4, 2020. Consent Objection, Doc. 143 at 2 (May 18, 2020). This Court overruled Plaintiffs' objection and maintained the discovery schedule. Order Overruling 2020 Objection at 5 (May 27, 2020).

Then, on December 2, 2020, the Fourth Circuit vacated this Court's grant of a preliminary injunction on Plaintiffs' constitutional claims and remanded for further proceedings. *N.C. State Conf. of NAACP v. Raymond*, 981 F.3d 295 (4th Cir. 2020); Judgment, Doc. 150 (Aug. 14, 2020). The Fourth Circuit held that Plaintiffs were unlikely to succeed in showing that racial discrimination was a motivating factor behind S.B. 824's enactment. *See Raymond*, 981 F.3d at 311. The Fourth Circuit's mandate issued on February 16, 2021. Doc. 157.

About a year and a half later, the Supreme Court ruled that Legislative Defendants were "entitled to intervene in this litigation." *Berger v. N.C. State Conf. of the NAACP*, 597 U.S. 179, 200 (2022); *see* Mandate, Doc. 200 (July 27, 2022). Proceedings in this case, however, remained stayed for another year until Plaintiffs filed a Motion to Lift Stay and for a Status Conference on June 9, 2023, Doc. 202.

At the status conference on July 26, 2023, "Plaintiffs requested that the Court reopen the discovery period to allow them to serve the Elections Board and the Legislative Leaders with a raft of new discovery demands, as well as to conduct depositions Plaintiffs previously had not pursued[.]" Order Denying Mot. to Reopen Disc., Doc. 210 at 11.

The Magistrate Judge credited Legislative Defendants' concern that reopening discovery would threaten to reopen expert discovery. *Id.* at 15–16, 30. As Legislative

21

Defendants pointed out, Plaintiffs had asked the Court to deny intervention to avoid delay but now sought "to reopen discovery to correct their past errors[,]" including Plaintiffs' "fail[ure] to identify experts by the April 15, 2020 deadline they agreed to[.]" Legislative Defs.' Opp'n to Pls.' Proposed Disc., Doc. 212 at 4 (Oct. 20, 2023). Legislative Defendants did not have "an equal opportunity" to engage in discovery and to develop expert witnesses. *Id.* at 4–5.

Nevertheless, to avoid the delay of reopening discovery, and in light of Plaintiffs' failure to disclose experts for trial, Legislative Defendants were "content to go forward on the record as it existed when discovery closed on June 1, 2020," and "to stand on the existing preliminary injunction record." *Id.* at 4. The Magistrate Judge agreed that Plaintiffs had strategically decided not to engage in more extensive discovery so that they could focus on "other aspects of the litigation, such as pursuing preliminary injunctive relief and contesting intervention by the Legislative Leaders." Order Denying Mot. to Reopen Disc. at 23. And Plaintiffs' conduct was not in good faith. *Id.* at 30. This Court overruled Plaintiffs' objection to the Magistrate Judge's decision not to reopen discovery. Order Overruling 2023 Objection, Doc. 228 (Feb. 12, 2024).

Despite that ruling, and nearly four years after Plaintiffs' expert disclosure deadline had passed and over three years after expert discovery had close, Plaintiffs served six purported supplemental expert disclosures on April 5, 2024, a month before trial.

The Court denied Defendants' summary judgment motions, Order Denying Summ. J. Mots., Doc. 234 (Mar. 13, 2024), and scheduled a bench trial for May 6, 2024, Not., Doc. 229 (Feb. 12, 2024). Before trial, Legislative Defendants moved the court to "exclude from

22

trial all testimony, reports, and declarations of Plaintiffs' experts beyond the admission, without live testimony at trial, of the preliminary expert reports and deposition testimony the Court received on Plaintiffs' preliminary injunction motion" given Plaintiffs' repeated failures to timely disclose their experts. Mem. in Support of Mot. to Exclude, Doc. 250 at 22 (Apr. 12, 2024). This Court granted Legislative Defendants' motion regarding Plaintiffs' experts and also granted in part Legislative Defendant's motion, Doc. 247 (Apr. 12, 2024), to exclude several late-disclosed fact witnesses. *See* Order on Mots. in Limine, Doc. 297 (May 4, 2024).

The bench trial in this case began on May 6, 2024, and concluded on May 13, 2024. Plaintiffs moved on the first day of trial to proffer their excluded expert testimony. 5/6/24 Tr. at 51:1–54:12. Legislative Defendants opposed this request on the grounds that Plaintiffs had already preserved the issue of their excluded expert testimony for appeal and that they had forfeited any proffer request by failing to request it in their Motion in Limine Response. 5/6/24 Tr. at 54:15–55:7; Leg. Defs.' Resp. in Opp'n to Pls.' Mot. to Proffer Live Test. of Experts, Doc. 302 (May 7, 2024). Following the conclusion of trial, this Court allowed Plaintiffs to present three additional days of testimony from their excluded expert witnesses as an "offer of proof." 5/7/24 Tr. at 476:18–480:5. Without seeking leave of court or conferring with Legislative Defendants, Plaintiffs also filed six additional briefs (totaling over 70 pages) elaborating on their offer of proof after the live witnesses concluded. Trial Brs., Docs. 316–321 (May 17, 2024). Legislative Defendants moved to strike these filings as procedurally improper and prejudicial. Mot. to Strike, Doc. 322 (May 21, 2024). As of this filing, that motion remains pending.

23

## II.     Summary of the Testimony

Plaintiffs presented live trial testimony from three Plaintiff representatives, four current or former Democratic members of the North Carolina General Assembly, four voters, seven representatives from voter mobilization and advocacy organizations, a County Board of Elections official, and the Director of the State Board of Elections. Prior trial testimony from a parallel case was also received in lieu of live testimony for an additional Democratic North Carolina General Assembly member. Plaintiffs declined to call any of the law's primary sponsors, including African American Democrat Joel Ford, to testify at trial.

The testimony generally fits into one of the categories of circumstantial evidence listed in *Village of Arlington Heights v. Metropolitan Housing Development Corporation*, 429 U.S. 252, 265 (1977), and the relevant considerations enumerated in *Brnovich v. Democratic National Committee*, 594 U.S. 647, 668–70 (2021): S.B. 824's historical background, legislative process (the sequence of events leading to S.B. 824 and S.B. 824's legislative history), S.B. 824's impact or burden, and the size of that burden. *See Arlington Heights*, 429 U.S. at 266–68; *Brnovich*, 594 U.S. at 668–73.

### A.  NAACP Plaintiffs

#### i.     Deborah Maxwell

1.     Ms. Maxwell is the state president of the North Carolina State Conference of the NAACP. 5/6/24 Tr. at 115:24–25. Her organization opposes voter ID in all its forms. 5/6/24 Tr. at 143:17–22.

24

2.     She testified that the North Carolina NAACP, through its subsidiary branches, engages in extensive efforts to educate voters about S.B. 824's requirements, both in-person and online. *See, e.g.*, 5/6/24 Tr. at 119:18–21, 125:9–16, 126:19–21, 135:17–20, 149:2–150:6, 154:11–15. This includes informing voters that they can obtain a free ID and pointing voters to the educational materials created by the State Board and other groups about the photo ID exception form. 5/6/24 Tr. at 155:25–156:23.

3.     Ms. Maxwell testified that she found the educational efforts of the Durham County Board of Elections helpful and shared an educational video its Director had made with others. 5/6/24 Tr. at 135:21–136:6. The North Carolina NAACP has also encouraged its branches to use the free educational presentations about voter ID offered by the State Board of Elections. 5/6/24 Tr. at 142:18–20.

4.     When the North Carolina NAACP encounters a voter who lacks qualifying ID, it explains to that voter where he or she can get ID and asks if transportation is needed to get there. 5/6/24 Tr. at 152:1–15. If that voter needs transportation to get an ID, the various branches of the North Carolina NAACP will offer transportation, or sometimes churches provide that transportation. 5/6/24 Tr. at 152:16–20, 157:1–6.

5.     The NAACP has also partnered with Lyft to provide free or heavily discounted rides to the polls during the upcoming November 2024 election, and Ms. Maxwell testified that a similar program could be used to assist individuals in obtaining ID from their DMV or County Board of Elections. 5/6/24 Tr. at 159:1–11. Ms. Maxwell also discussed the availability of "jitney[s]" in rural areas that provide rides for a small fee if no ridesharing services are available. 5/6/24 Tr. at 131:16–132:7.

25

6.     Ms. Maxwell testified that she initiated contact with three poll observers sitting by the door at her early voting site to ask them what they were doing. 5/6/24 Tr. at 136:18–22, 168:18–23. While one responded, the other reminded the worker that they are not permitted to speak to voters. 5/6/24 Tr. at 136:23–25. Ms. Maxwell did not report anything about this interaction to anyone at the polling site. 5/6/24 Tr. at 168:24–169:4.

7.     Ms. Maxwell does not personally know any individual member of the North Carolina NAACP who lacks qualifying ID under S.B. 824. 5/6/24 Tr. 157:20–24.

8.     Ms. Maxwell agreed that even for internal elections such as those for the leadership of the North Carolina NAACP, it is acceptable for concerns about election integrity to be expressed. 5/6/24 Tr. at 145:22–24, 146:6–9. She also testified that she is "concerned with anyone doing voter fraud of any type regardless of what their party affiliation may be." 5/6/24 Tr. at 168:10–12.

### ii.     Elma Hairston

9.     Ms. Hairston has been the President of the High Point branch of the North Carolina NAACP since January 2023. 5/6/24 Tr. at 203:6–8. Her branch of the NAACP also opposes all voter ID requirements. 5/6/24 Tr. at 211:2–4.

10.    Ms. Hairston's branch of the NAACP has also engaged in educational efforts about S.B. 824, including through newsletters, letters to the editor, and flyers. 5/6/24 Tr. at 205:2–4, 212:12–25, 213:7–9. She also noted that the High Point branch has solicited various groups to help with educating voters, such as sororities, fraternities, and ministers. 5/6/24 Tr. at 205:5–9. And the High Point branch has used the State Board of Elections' published educational material to inform voters about S.B. 824's requirements. 5/6/24 Tr. at 213:10–

26

16. The High Point branch specifically educates voters that the state will provide them free IDs for voting or the documentation needed to obtain a DMV-issued ID, as well as the availability of the photo ID exception form. 5/6/24 Tr. at 217:16–23, 218:15–19. Ms. Hairston believes that the High Point Branch of the NAACP is effective in its voter-education efforts. 5/6/24 at 213:1–3.

11. The High Point Branch of the NAACP routinely organizes rides to the polls during early voting. 5/6/24 Tr. at 219:15–17.

12. Ms. Hairston did not name a member of the High Point NAACP who has been harmed due to S.B. 824, and she did not have any personal experience with a member of the High Point NAACP not having their vote counted. 5/6/24 Tr. at 219:4–6.

### iii.    Al Jabbar

13. Mr. Jabbar has been the President of the Winston-Salem branch of the North Carolina NAACP for about four years. 5/10/24 Tr. at 1123:15–17.

14. The Winston-Salem branch helps educate voters on the requirements to vote and helps them obtain IDs to do so. 5/10/24 Tr. at 1125:5–9, 1133:24–1134:3. Mr. Jabbar testified that the branch also educates voters that they can submit a photo ID exception form when voting, and that they can obtain a free ID from the County Board of Elections. 5/10/24 Tr. at 1142:16–18, 1142:23–25.

15. Despite expressing concerns that voters lack transportation to obtain free IDs or DMV-issued IDs, Mr. Jabbar's branch does not educate voters that "lack of transportation" is one of the exceptions that can be selected on the photo ID exception form. 5/10/24 Tr. at 1142:19–22.

16.     While Mr. Jabbar described various perceived barriers to obtaining an ID for the elderly and the ex-offender community, the same barriers he described such as disability and access to transportation must be overcome to vote in the first place. 5/10/24 Tr. at 1140:21–1141:2.

## B. Legislative Process

17.     All of the legislator witnesses that Plaintiffs chose to call oppose voter ID and voted against S.B. 824. Plaintiffs chose not to present evidence from former Senator Joel Ford or any other Democratic legislator who voted for S.B. 824 through its enactment.

### i.     Former Senator Teresa Van Duyn

18.      Former Senator Van Duyn submitted a declaration at the preliminary-injunction stage that the Fourth Circuit found was insufficient to carry Plaintiffs' burden on their constitutional claims. Nothing in Former Senator Van Duyn's live testimony provided a basis to deviate from that conclusion.

19.     Former Senator Van Duyn was a Democratic senator in the North Carolina legislature when S.B. 824 was being enacted and served in that capacity from 2014 to 2020. 5/7/24 Tr. at 428:12–20, 428:23.

20.      Former Senator Van Duyn does not support voter ID laws, 5/7/24 Tr. at 452:17–20, but acknowledged that her constituents (45,000 of whom voted for the voter-ID constitutional amendment), could have legitimate reasons for doing so, 5/7/24 Tr. at 453:6–11.

28

21.     Now that North Carolina's Constitution requires a photo voter ID law, Former Senator Van Duyn agreed that the General Assembly is required to comply with that requirement by enacting implementing legislation. 5/7/24 Tr. at 455:3–7.

22.     While Former Senator Van Duyn testified that she did not think the process of enacting S.B. 824 was bipartisan, 5/7/24 Tr. at 450:16–23, she admitted that the Republicans had a supermajority in the Senate and in the legislature as a whole and therefore could have adopted a law without any Democratic input, 5/7/24 Tr. at 455:12–23. Instead, the Republican supermajority chose to adopt several amendments proposed by Democrats, all of which Former Senator Van Duyn voted for. 5/7/24 Tr. at 455:25–457:2, 457:16–459:3.

23.     While Former Senator Van Duyn testified about provisional ballots cast in Buncombe County during the March 2024 primary and claimed that only one provisional ballot cast with a Photo-ID exception form was counted, 5/7/24 Tr. at 461:1–13, the opposite is true. According to State Board of Elections data, 28 provisional ballots were cast with Photo ID exception forms in Buncombe County during the March 2024 primary, and 27 of those provisional ballots counted. DX324. The only uncounted ballot belonged to a non-Latino white voter. DX324.

24.     Former Senator Van Duyn offered an amendment to the bill that was tabled (with two Democrats voting to table) that would have delayed the ability of voters to obtain free ID from County Boards of Election. DX049. The amendment also would have allowed voters to write in during the 2020 election that they did not know about the ID requirement on the Photo ID exception form. 5/7/24 Tr. at 464:10–465:4; DX049; DX064. This

29

amendment was essentially incorporated into the bill through the reasonable impediment process. 5/7/24 Tr. at 465:5–12. Even if her amendment had been adopted, she still would not have voted for S.B. 824. 5/7/24 Tr. at 465:13–15.

25. Former Senator Van Duyn could not name any improvements that she would have made to S.B. 824. 5/7/24 Tr. at 462:16–20.

26. While she testified that she wanted more input from stakeholders, 5/7/24 Tr. at 462:21–463:6, Former Senator Van Duyn was campaigning for Lieutenant Governor when S.B. 824 was being debated, and she acknowledged that thinking about implementing legislation was not one of her priorities. 5/7/24 Tr. at 452:22–23, 463:10–15. Moreover, she admitted that voter ID was something that had been frequently before the North Carolina legislature since 2011. 5/7/24 Tr. at 472:11–473:6.

27. While former Senator Van Duyn stated that expert witnesses sometimes testify about bills, she acknowledged that it is the prerogative of the legislature to call such witnesses to appear during committee, 5/7/24 Tr. at 433:2–8. Similarly, she did not request that the Senate have committee meetings while in recess to hear from experts. 5/7/24 Tr. at 464:5–9.

28. While former Senator Van Duyn testified that she found the process of enacting S.B. 824 to be very fast, 5/7/24 Tr. at 436:7–8, she has not studied the amount of time that is typically dedicated to the enactment of postelection bills and her personal experience is limited to her tenure in the Senate from 2014 to 2020, 5/7/24 Tr. at 453:23–455:1.

29. Former Senator Van Duyn does not know of any individuals in North Carolina who lack qualifying ID under S.B. 824. 5/7/24 Tr. at 468:16–19.

30.     Former Senator Van Duyn is aware that Asheville, where the Buncombe County Board of Elections is located, has public transportation. 5/7/24 Tr. at 468:24–469:3. Similarly, she is aware of the Mountain Mobility Program, which allows most residents to request a ride from their home within the County, which people could use to get a free ID. 5/7/24 Tr. at 469:4–10.

31.     Former Senator Van Duyn believes that it's important to ensure that voters are who they say they are when voting and that safeguarding voters' confidence in the integrity of elections is an important goal. 5/7/24 Tr. at 469:11–16.

32.     Former Senator Van Duyn testified that she does not know what her colleagues' intentions were in voting for S.B. 824. 5/7/24 Tr. at 470:18–20.

### ii.     Representative Robert Reives

33.     Representative Reives submitted a declaration at the preliminary-injunction stage that the Fourth Circuit found was insufficient to carry Plaintiffs' burden on their constitutional claims. Nothing in Representative Reives' live testimony provided a basis to deviate from that conclusion.

34.     Representative Reives is an attorney who has served as a Democratic member of the North Carolina House of Representatives since 2014. 5/9/24 Tr. at 797:11–22. He has served as the House Democratic leader since 2021. 5/9/24 Tr. at 798:2–8.

35.     Representative Reives has never been a supporter of voter ID and campaigned against the voter ID amendment in 2018. 5/9/24 Tr. at 819:23–820:6. But he acknowledged that because North Carolina's constitution requires a photo voter ID law, the General Assembly must enact implementing legislation. 5/9/24 Tr. at 821:22–25.

31

36.     Representative Reives testified that there is not really an average length of time that bills take to move through the General Assembly, or an average length of time for floor debate; it depends on the bill. 5/9/24 Tr. at 801:16–21, 802:4–8.

37.     Representative Reives testified that a bill is bipartisan if both parties have a chance to have input. 5/9/24 Tr. at 802:12–14, 803:17–20. He also considers who the sponsors of the bill are, 5/9/24 Tr. at 803:11–12, and whether amendments from the other side were accepted, 5/9/24 Tr. at 808:19–21. While he also testified that a bill is not bipartisan unless it has an overwhelming majority of both caucuses voting for it, 5/9/24 Tr. at 809:12–17, that opinion contradicts his other testimony and is not grounded in evidence or controlling caselaw, *Raymond*, 981 F.3d at 306.

38.     Representative Reives acknowledged that Republicans had a supermajority during the post-election session when they considered S.B. 824, and therefore could have passed it without accepting any amendments from Democrats. 5/9/24 Tr. at 822:12–16. Instead, the House Republicans adopted four amendments sponsored by Democrats. 5/9/24 Tr. at 822:17–21.

39.     Representative Reives could not articulate any changes to S.B. 824 that he could have made to improve the bill's impact on minorities. 5/9/24 Tr. at 823:22–824:5, 824:19–20. While he testified that the bill would have been better if it accepted all forms of photo ID, he did not propose an amendment to that effect. 5/9/24 Tr. at 824:13–15, 824:22–24.

40.     Representative Reives testified that S.B. 824's provision allowing eligible voters to obtain free ID at their County Board of Elections without showing documentation would lessen any impact the bill had on minority voters. 5/9/24 Tr. at 828:2–13. He testified that

the same would be true if these IDs were available during one-stop early voting. 5/9/24 Tr. at 828:14–20.

41.    Representative Reives did not have any basis to conclude that any member of the General Assembly voted for S.B. 824, at least in part, to reduce the number of ballots cast by African Americans. 5/9/24 Tr. at 831:13–25. This includes the Democratic House members who voted for S.B. 824 at various stages of the process. 5/9/24 Tr. at 839:1–9.

42.    Representative Reives considers himself someone who is committed to free and fair elections and firmly believes that the legislature ought to try to get people's confidence back in the system. 5/9/24 Tr. at 835:18–836:3. He also testified that he thinks election security is a problem. 5/9/24 Tr. at 836:7–24.

43.    While Representative Reives testified that the process for considering S.B. 824 was rushed and irregular, 5/9/24 Tr. at 812:21–22, he only has personal knowledge about bills enacted in the House from 2014 to the present, 5/9/24 Tr. at 837:3–15.

### iii.    Representative Marcia Morey

44.    Representative Morey submitted a declaration at the preliminary-injunction stage that the Fourth Circuit found was insufficient to carry Plaintiffs' burden on their constitutional claims. Nothing in Representative Morey's live testimony provided a basis to deviate from that conclusion.

45.    Representative Morey is a lawyer who has served as a member of the North Carolina House of Representatives since 2017. 5/9/24 Tr. at 848:25–849:13.

46.     Representative Morey opposes voter ID and campaigned against the voter ID constitutional amendment. 5/9/24 Tr. at 906:7–15. But she acknowledged that because

33

voter ID is now required by the North Carolina constitution, the General Assembly is duty-bound to pass a form of voter ID. 5/9/24 Tr. at 906:20–23.

47. Representative Morey acknowledged that the Republican supermajority adopted several amendments proposed by Democrats, all of which she supported. 5/9/24 Tr. at 907:11–908:10. One of those amendments extended S.B. 824's requirements to absentee ballots. 5/9/24 Tr. at 907:16–20. Representative Morey voted for this amendment to expand the voter ID requirement to more voters because she though it had nothing to do with race. 5/9/24 Tr. at 909:9–10. She could not credibly explain why requiring someone to present photo ID in person (or to use the exception form) would be motivated by racial concerns while requiring someone to submit a copy of their ID while voting absentee (or to use the exception form) would not be.

48. Representative Morey testified that while she thought there were additional types of IDs that could have been added to S.B. 824, she did not propose any amendments adding those IDs. 5/9/24 Tr. at 910:18–911:17.

49. Representative Morey also testified that it would mitigate any effects of S.B. 824 if the law provided voters the option to get a free ID without presenting documentation. 5/9/24 Tr. at 914:7–10. And she noted that there is public transportation near the Durham County Board of Elections, as well as a service called Durham Access providing transportation to eligible riders for $2. 5/9/24 Tr. at 914:12–23.

50. Representative Morey testified extensively about the General Assembly's consideration of the bill adding a photo ID amendment to the North Carolina constitution,

*e.g.*, 5/9/24 Tr. at 854:2–857:11, 867:16–871:2, 875:10–877:15, but all of this testimony is irrelevant to the question of whether S.B. 824 was enacted with discriminatory intent.

51.     While Representative Morey testified that S.B. 824's enactment went through the legislative process more quickly than any other legislation she had seen, 5/9/24 Tr. at 880:23–881:2, she only has personal knowledge of bills that moved through the House since 2017.

52.     While Representative Morey testified that she found it unusual how S.B. 824 progressed to third reading and noted that Representative Harrison objected to third reading, 5/9/24 Tr. at 883:5–16, the legislative history reveals that Representative Harrison had objected too late, after the Chair had already announced the vote. DX074 at 170–171.

53.     Representative Morey testified about the amendment that she introduced to S.B. 824, which would have reinstituted the last Saturday of early voting. 5/9/24 Tr. at 889:8–12. This amendment was ruled out of order because it was not germane to voter ID. DX074 at 48. Representative Morey was able to appeal the Speaker's ruling and the body upheld the Speaker's decision. 5/9/24 Tr. at 890:6–10.

54.     Representative Morey confirmed that complying with the North Carolina constitution is a legitimate government interest. 5/9/24 Tr. at 915:4–7. She also testified that the General Assembly should do everything to make sure that voting is legitimate and not fraudulent. 5/9/24 Tr. at 915:22–23.

55.     Representative Morey does not have personal knowledge than any member of the General Assembly voted for S.B. 824 in part because of a racially discriminatory motive. 5/9/24 Tr. at 916:25–917:4.

### iv. Former Senator Floyd McKissick

56.     Former Senator McKissick submitted a declaration at the preliminary-injunction stage that the Fourth Circuit found was insufficient to carry Plaintiffs' burden on their constitutional claims. Nothing in Former Senator McKissick's live testimony provided a basis to deviate from that conclusion.

57.     Former Senator McKissick is an attorney who served as a Senator in the North Carolina General Assembly from 2007 to 2020. 5/9/24 Tr. at 924:22, 926:8–11.

58.     He is opposed to all forms of voter photo ID requirements. 5/9/24 Tr. at 998:3–6.

59.     Former Senator McKissick testified about the General Assembly's consideration of the bill adding a photo ID amendment to the North Carolina constitution, *e.g.*, 5/9/24 Tr. at 941:18–25, 946:2–948:22, 951:8–954:18, 962:2–964:12, 967:23–969:8, 971:17–972:24, but all of this testimony is irrelevant to the question of whether S.B. 824 was enacted with discriminatory intent.

60.     Former Senator McKissick testified that he proposed one amendment to S.B. 824 that would extend the expiration date on free IDs from eight years to ten years and require the County Board of Elections to notify individuals 90 days before their IDs are going to expire. 5/9/24 Tr. at 988:12–22, 989:1–6.

61.     Former Senator McKissick did not propose any other amendments to S.B. 824 even though he thought there might be opportunities to mitigate damage or get ameliorative provisions accepted. 5/9/24 Tr. at 990:8–19. And while he thought during debates over S.B. 824 that including HAVA documents as qualifying IDs would help ameliorate any effects of the bill, he did not introduce an amendment to add these documents. 5/9/24 Tr. at 999:5–

36

13. Former Senator McKissick also knew at the time that there was a high probability that S.B. 824 would be challenged in Court. 5/9/24 Tr. at 1000:4–8, 1000:20–21.

62.    Former Senator McKissick acknowledged that he had raised some concerns with Senator Daniel, who is a Republican, and Senator Daniel incorporated these concerns into an amendment he proposed about the reasonable impediment process. 5/9/24 Tr. at 1002:22–1003:13.

63.    Former Senator McKissick acknowledged that his campaign website discussed that the amendment to S.B. 824 requiring photo ID for absentee ballots was enacted as a result of the compelling evidence of rampant voter fraud in North Carolina's Ninth Congressional District. 5/9/24 Tr. at 1004:14–1005:11, 1006:20–24, 1016:22–1017:9.

### v.    Representative Pricey Harrison

64.    Plaintiffs also submitted the prior state court trial testimony of Pricey Harrison, a Democratic Representative in the North Carolina General Assembly. PX1877.

65.    Pricey Harrison represents Guilford County in the House of Representatives. PX1877 at 6:6–12.

66.    An opponent of voter-ID laws, Representative Harrison campaigned against the voter-ID amendment and encouraged voters to vote against it while running for reelection in 2018. PX1877 at 49:6–16, 49:20–22. Now that the amendment has been adopted, she agrees that it is important for the General Assembly to comply with the constitution by passing a voter-ID law. PX1877 at 50:1–5. She also agrees that ensuring that only individuals who are actually eligible to vote are allowed to vote is an important goal,

PX1877 at 107:22–108:1, and acknowledges that people can support voter-ID laws to prevent voter-impersonation fraud, PX1877 at 108:14–21.

67. Representative Harrison disclaimed that any legislator voted for S.B. 824 with discriminatory intent. She testified: "I cannot say that racial bias entered into it and I would not say that racial bias entered into it." PX1877 at 118:21–119:2.

68. Specifically, based on her experience serving with Democratic Representative Hall—who voted to override the Governor's veto of S.B. 824 but did not vote for H.B. 589—Representative Harrison could not say that he would ever vote for a bill that targeted African American access to the franchise because African Americans vote for Democrats in a predictable manner. PX1877 at 116:12–117:5. She likewise offered no evidence that Representative Goodman, who voted to pass S.B. 824 out of the House but did not vote for H.B. 589, voted for S.B. 824 for that reason. PX1877 at 117:15–118:12.

69. The only intent Representative Harrison attributed to the majority of the General Assembly for passing S.B. 824 during the time frame that it did was to ensure that it could override Governor Cooper's veto. PX1877 at 93:1–11.

70. Throughout the process of enacting S.B. 824, Representative Harrison repeatedly thanked Republican leadership for their work on the bill and inclusion of Democrats. DX071 at 27:5–8; DX072 at 98:16–20; DX074 at 116:18–117:2.

    o   Representative Harrison confirmed that she meant all these statements and also noted that Chairman Lewis was "always one of the kindest and most gracious legislators to work with and [she] had always appreciated his willingness to listen to [her] concerns." PX1877 at 44:8–10, 69:3–6, 69:17–19, 70:12–14.

38

71.     Representative Harrison also detailed Democratic legislators' involvement. A draft of the bill that became S.B. 824 was made available to her as a member of the House Elections Committee on November 20, 2018 and was released publicly the same day. PX1877 at 52:7–53:11. She called a meeting for Democratic caucus members interested in S.B. 824. The ultimate goal of the meeting was to improve the bill so that everyone who deserved access to the polls had access to the polls. PX1877 at 50:24–51:8. There were no changes to the bill that Democratic members thought at the time would serve that goal that Democrats did not propose. PX1877 at 51:9–24.

72.     Once introduced, S.B. 824 went through the normal committee process. PX1877 at 54:7–17. Even before the bill reached the House floor, amendments were proposed, debated, and some were adopted in committee. PX1877 at 54:22–24. These included an amendment that Representative Harrison proposed to make S.B. 824 more protective of voters, requiring that challenges to a voters' ID be decided unanimously. PX1877 at 83:22–84:14.

73.     On the House floor, Representative Harrison voted for every amendment proposed by other Democrats, which she believes were designed to improve the bill. PX1877 at 56:2–7; DX031 (A13); DX040 (A11); DX036 (A4); DX027 (A3); DX035 (A2). She herself proposed an amendment that was accepted and that liberalized the exception to presenting photo ID after natural disasters. PX1877 at 55:18–22; DX013; DX034.

74.     Although two of the six amendments proposed by Democrats on the floor of the House were rejected, it is typical—indeed standard—with legislation that not every amendment that is offered is accepted. PX1877 at 58:19–23. Moreover, the Republican

39

supermajority could have enacted S.B. 824 without accepting any amendments proposed by Democrats, without a Democratic primary sponsor, and without any votes from Democrats. PX1877 at 56:22–25, 57:17–25.

75.     Representative Harrison discussed the two Democratic amendments the House rejected—neither of which, according to her testimony, would have made S.B. 824 more generous than it is today.

76.     First is House Amendment A3, which would have added high-school IDs to S.B. 824's list of approved voter IDs. DX021. Representative Harrison does not know how many high schools in North Carolina issue photo IDs, how many of those IDs would meet S.B. 824's approval standards for school IDs, how many North Carolina high schoolers are registered voters and have a high-school ID as their only form of ID, how many of those voters are African American, or how many registered voters would have been able to vote under S.B. 824 only because of the inclusion of high-school IDs. PX1877 at 63:20–23, 64:6–17, 65:8–19. She acknowledges that voters who might have only a high-school ID can obtain a free ID from a County Board of Elections and that, if they could not do so because of school schedule, they could write "school schedule" in the "other" box of the reasonable-impediment form and their ballot could be rejected only if the County Board had grounds to believe that declaration false. PX1877 at 67:4–8. Moreover, the reasonable-impediment boxes listed in S.B. 824 are minimum requirements, meaning that the State Board of Elections may include "school schedule" on the reasonable-impediment form under S.B. 824. PX1877 at 65:20–67:8, 82:11–17.

77. Second was House Amendment A13, which would have added public-assistance IDs to S.B. 824's list of approved voter IDs. DX025. But according to Representative Harrison, all forms of ID that would have been permitted by that amendment are now permitted under S.B. 824 as amended by H.B. 1169. PX1877 at 59:16–19.

78. Representative Harrison is not aware of any other House amendments that were proposed by Democrats, voted on, and rejected. PX1877 at 62:9–20. Although Democrats' objection to proceeding with the third reading of S.B. 824 was ruled out of time, Representative Harrison confirmed that this has happened before and did not identify a House rule that was violated. PX1877 at 95:19–23, 96:24–97:3. Moreover, amendments that Democrats did not offer before third reading were offered in technical corrections, and Representative Harrison did not identify any amendment that Democrats had wanted to offer that was not offered in that process. PX1877 at 97:4–12.

79. Representative Harrison disagreed with the Speaker's ruling that amendments proposed by Representative Morey, which related to early-voting availability, were out of order as not germane to implementing the voter-ID amendment. PX1877 at 93:12–94:4. But she confirmed that amendments are frequently ruled out of order, PX1877 at 94:16–20, and that normal procedures were followed in this case: Representative Morey was permitted to appeal, and the House as a whole voted on the appeal, PX1877 at 93:12–94:15.

80. Representative Harrison also confirmed what the General Assembly knew—and did not know—about S.B. 824's potential impact. Representative Harrison does not know how the expansion of approved IDs will impact the percentage of registered voters that might have an acceptable voter ID. PX1877 at 76:7–11. Instead, her concerns about S.B. 824's

41

potential impact have to do with her concerns about how its provisions will be implemented. PX1877 at 80:1–5. She did not personally request data from the State Board of Elections about the implementation of H.B. 589 and does not recall requesting any other information from the State Board. PX1877 at 100:19–101:7. Rather, her understanding is based on the presentation that Kim Strach, then the Executive Director of the State Board of Elections, gave to the Joint Elections Oversight Committee at its hearing on November 26, 2018, the day before S.B. 824 was formally introduced. PX1877 at 70:23–71:7.

81. Chairman Lewis invited all House members to that hearing, and a number of House members who were not on that committee attended. PX1877 at 73:16–23. According to Representative Harrison, they learned the following:

> o The State Board of Elections could not match 254,391 voters to a North Carolina DMV ID in February 2015. This slide of Ms. Strach's presentation did not account for voters who might have lacked one of these IDs but possessed one of the other types of IDs that qualify under S.B. 824. PX1877 at 74:8–76:2.
>
> o The State Board sent mailers to those it could not match. Of the 20,580 responders, 91% indicated that they possessed acceptable ID under H.B. 589. Another 633 voters requested assistance, but the presentation did not indicate whether they in fact lacked qualifying ID. PX1877 at 76:12–77:3.
>
> o In the March 2016 primary election, when H.B. 589 was in effect, 1,048 voters cast reasonable-impediment ballots. Of those, 864 were counted. PX1877 at 77:7–15. The presentation does not indicate why any of the 184 other ballots were rejected. PX1877 at 81:1–3. (Representative Harrison admitted that she

42

misspoke on the House floor when she said that a "quarter" of reasonable-impediment ballots were rejected in this election. PX1877 at 71:8–21.)

o In the same election, another 1,248 voters neither presented ID, cast a reasonable-impediment ballot, nor returned to a county board of elections to cure a provisional ballot. Ms. Strach's presentation did not indicate why any of these voters did not cast a reasonable-impediment ballot. As far as can be told from the presentation, they might all have had qualifying ID but simply failed to return to a county board to cure their ballots in time. PX1877 at 78:15–79:16. Representative Harrison also does not know how many of these 1,248 voters had a form of ID that qualifies under S.B. 824 but did not qualify under H.B. 589. PX1877 at 79:17–21.

82. Against the above testimony about the inclusivity of the S.B. 824 process, the Court cannot credit Representative Harrison's opinion that the process deviated from any legislative norms. Her testimony that the process "seemed rushed," PX1877 at 91:2–5, has no objective basis:

o Representative Harrison offers this opinion based on her experience as a legislator, which began in 2005 and is limited to the House. She has no insight to the Senate's process. PX1877 at 86:21–23, 87:8–11, 100:12–18.

o This opinion is not based on the legislative history of any other bills. Representative Harrison did not look at any other pieces of legislation to confirm that the S.B. 824 process in fact deviated from the norm, and she has not studied

43

how much time for public comment for floor debate allocated for any other bills. PX1877 at 91:6–20.

o Representative Harrison recalled that many of the public commenters on S.B. 824 argued about the merits of voter-ID laws in general or advocated for a very restrictive law, which she acknowledges is not what the General Assembly passed. PX1877 at 98:15–99:7.

o Representative Harrison also does not know the average time for a bill cosponsored by a Democrat and Republicans to go through the legislative process, and she does not know whether bills passed in the same timeframe when Democrats in control of the General Assembly. PX1877 at 92:8–18.

### C. Impact: Implementation of S.B. 824

#### i. Keith Rivers

83. Mr. Rivers is a voter who testified about voting in the 2024 primary elections with his mother, Ms. Myrtle Rivers. 5/7/24 Tr. at 273:16–24.

84. As President of the Pasquotank branch of the NAACP, Mr. Rivers was involved with educating the community and encouraging people to get photo ID. 5/7/24 Tr. at 274:22–24. He had also received communications from the NAACP informing him that free ID is available to voters and that certain organizations are offering rides to people to help them get free IDs for voting. 5/7/24 Tr. at 288:22–289:7, 293:20–24.

85. Mr. Rivers was aware of North Carolina's voter-ID law when he went to vote in the March 2024 primary, including the ID requirement and the two options for casting a ballot without ID. 5/7/24 Tr. at 274:17–20, 275:15–17. Mr. Rivers has successfully voted in three

44

elections where he was required to show photo ID, and the photo ID requirement in no way dissuaded him from voting. 5/7/24 Tr. at 289:12–14, 290:12–15. Ms. Rivers similarly voted during early in-person (non-curbside) voting in the October 2023 municipal election and presented her driver's license. 5/7/24 Tr. at 292:20–293:4.

86.     In the March 2024 primary, Mr. Rivers presented ID and was able to vote. His mother planned to use, and did use, a photo ID exception form to vote because she could not find her ID. 5/7/24 Tr. at 275:18–20; 284:19–285:3. Mr. Rivers took his mother to obtain a free ID from her County Board of Elections the day after she voted provisionally. 5/7/24 Tr. at 282:15–18. Mr. Rivers testified that there was no reason why he could not have first taken his mother to get an ID card before taking her to vote. 5/7/24 Tr. at 285:20–24. If Mr. Rivers had taken his mother to get an ID before taking her to vote, she would not have had to vote provisionally. DX009.

87.     While Mr. Rivers testified that the poll worker at curbside voting gave his mother a voter registration form when she stated that she was going to vote provisionally and curbside, 5/7/24 Tr. at 276:21–277:15, Ms. Brinson Bell testified that this is standard procedure so that the County Board can contact the voter if necessary and immediately register them if they are not registered, 5/8/24 Tr. at 726:13–25, 727:15–25.

88.     Ms. Rivers' provisional ballot was counted. 5/7/24 Tr. at 287:2–4.

### ii.    Danell Burney

89.     Ms. Burney is a voter who testified about her experiences voting in the 2020 general election in Guilford County and during the March 2024 primary. 5/7/24 Tr. at 300:8–12, 306:10–19.

45

90.     S.B. 824 was not in effect during the 2020 general election, so Ms. Burney did not have to show ID to vote.

91.     While waiting in line at the polling site, Ms. Burney described a Republican poll observer who walked down the line of voters, looking at each person in line. 5/7/24 Tr. at 301:21–302:2. Though Ms. Burney found this man intimidating, 5/7/24 Tr. at 303:1–3, she did not report his conduct to anyone at the voting site, 5/7/24 Tr. at 308:10–15. Ms. Burney cast her ballot despite her feelings about this poll observer. PX1881.

92.     Ms. Burney provided no testimony suggesting that this man was one of the 100 additional at-large poll observers that S.B. 824 permits, as opposed to one of the 6,200 poll observers already permitted prior to S.B. 824.

93.     Ms. Burney presented ID to vote at a different voting site in the March 2024 primary election and voted without issue. 5/7/24 Tr. at 306:10–16.

### iii.    Cedric Baker

94.     Mr. Baker attempted to vote in the March 2024 primary election, 5/9/24 Tr. at 1020:12–13, and claimed that he voted on election day, 5/9/24 Tr. at 1021:3–5.

95.     Mr. Baker testified that he presented an expired ID that was partially broken, which the poll worker said was insufficient. 5/9/24 Tr. at 1021:14–16.

96.     Mr. Baker testified that the poll worker offered him a provisional ballot, which he completed. 5/9/24 Tr. at 1021:18–21. Mr. Baker also testified that the poll worker told him that he had to return to his County Board of Elections to present ID in three or four days. 5/9/24 Tr. at 1022:14–19.

97. Mr. Baker claims that the poll worker did not offer him a Photo ID exception form. 5/9/24 Tr. at 1022:1–2.

98. Mr. Baker testified that he could not bring his photo ID back to the County Board of Elections due to working double shifts at a restaurant called Sweet Potatoes in downtown Winston-Salem. 5/9/24 Tr. at 1023:3–4, 1023:13–17.

99. Mr. Baker's testimony is not credible for a few reasons. First, State Board of Elections records show that Mr. Baker voted on Monday, February 26, 2024, DX324, not on election day as he testified. Second, the restaurant where Mr. Baker works is closed Sundays through Tuesdays.[3] Therefore, the Court cannot credit his testimony that his double shifts prevented him from procuring a free ID or DMV-issued ID on the day he voted or the day after he voted.

100. Even if the Court were to find Mr. Baker's testimony credible, his testimony only establishes anecdotal poll worker error in implementing S.B. 824 as any instruction that he had only three or four days to return to the County Board of Elections with acceptable ID would be contrary to the express terms of the law. DX009.

### iv.    Robert Fletcher

101. Mr. Fletcher testified about his experience feeling uncomfortable while voting during the 2020 general election, when S.B. 824's voter ID requirements were not in place,

---

[3] This is a legislative fact, or alternatively the Court can take judicial notice of this fact based on a screen capture of the restaurant's website from February 24, 2024, which is not subject to reasonable dispute. *See Hours of Operation*, SWEET POTATOES (Feb. 24, 2024), https://bit.ly/4eA2qjn.

and his experience voting in the March 2024 primary election. 5/10/24 Tr. at 1116:7–11, 1117:2–3.

102.     When Mr. Fletcher arrived to vote in March 2024, he presented a temporary driver's license that was expired. 5/10/24 Tr. at 1117:10–16, 1120:10–12. He was told that he needed to have current ID and was offered a provisional ballot, which he used to vote. 5/10/24 Tr. at 1117:4–21.

103.     Mr. Fletcher testified that the poll worker told him that he had three days to return to present ID. 5/10/24 Tr. at 1119:2–5. Mr. Fletcher did not return to present ID because he was busy with other obligations and family matters. 5/10/24 Tr. at 1120:7–9.

104.     Mr. Fletcher testified that he was not offered a Photo ID exception form when he did not present ID during the March 2024 primary. 5/10/24 Tr. at 1119:16–19. Mr. Fletcher now knows about the existence of this form and would request it in the future if he did not present ID. 5/10/24 Tr. at 1121:13–16.

### v.     Iliana Santillan

105.     Ms. Santillan is the executive director of El Pueblo, an advocacy organization that primarily serves the Latino community in North Carolina. 5/6/24 Tr. at 175:18–19, 176:9–13. Her organization opposes all forms of voter ID. 5/6/24 Tr. at 194:4–15. El Pueblo has called recent voting bills in North Carolina "Jim Crow 2.0" and believes that S.B. 824 falls within that category. 5/6/24 Tr. at 194:17–24.

106.     El Pueblo works to educate voters through bilingual publications such as voter guides and a website. 5/6/24 Tr. at 177:9–16. El Pueblo disseminates information about

48

voting through nonprofits and grassroots groups who attend festivals and community events statewide. 5/6/24 Tr. at 179:6–11.

107.    El Pueblo informs voters about North Carolina's voter-ID requirement. 5/6/24 Tr. at 177:24–25, 188:6–9.

108.    But El Pueblo does not inform voters that they can obtain a free ID from their County Board of Elections or that the DMV is required to provide them the documents needed to obtain a DMV-issued ID for free. 5/6/24 Tr. at 195:18–21. El Pueblo also does not help voters obtain qualifying ID under S.B. 824. 5/6/24 Tr. at 196:9–11.

109.    El Pueblo does help Latinos in North Carolina obtain "Community Action IDs" which cost $10, require documentation to obtain, and expire after one year. 5/6/24 Tr. at 196:12–197:9.

110.    To the extent Ms. Santillan testified about burdens associated with obtaining a free ID from the County Board of Elections, *e.g.*, 5/6/24 Tr. at 189:3–10, such statements are not credible given that El Pueblo requires voters to do much more to obtain a Community Action ID, which are not free, require documentation, and expire much faster than the free state-issued ID cards.

111.    While Ms. Santillan testified that she believes there is a lack of resources for Latinos who only speak Spanish and that the translations on the State Board of Elections website are poor, *e.g.*, 5/6/24 Tr. at 179:1–5, 198:12–14, she admitted that the photo ID request form to obtain a free ID is available in Spanish, 5/6/24 Tr. at 198:19–21; DX385, and she did not reach out to the State Board or anyone else to complain about the translation, 5/6/24 Tr. at 198:15–18.

49

112. While Ms. Santillan testified to the presence of Confederate and Trump flags outside of a polling site that made Latino voters uncomfortable, 5/6/24 Tr. at 182:6–10, she did not testify that poll observers were holding these flags, or that they were within the voting enclosure.

113. Ms. Santillan testified that, based on her experience, Latinos in households where some family members are not citizens decline to engage in the voting process or fill out any government documents out of fear that the government will learn information about them or their family. 5/6/24 Tr. at 181:4–10, 187:14–188:2.

114. To the extent Ms. Santillan testified about barriers that Latino voters face, *e.g.*, 5/6/24 Tr. at 184:23–185:5, 185:13–21, 190:19–24, such barriers stem from the fact that some do not speak English or from their general distrust of government, not from any of S.B. 824's requirements.

115. While Ms. Santillan also testified that Latino voters face barriers because voting in the United States is different from voting in Mexico, 5/6/24 Tr. at 186:14–18, Mexico requires voters to show photo ID to vote, so Latino voters from Mexico could be *more* accustomed to such requirements than other populations of voters, *Electoral Registry*, INSTITUTO NACIONAL ELECTORAL, https://bit.ly/3zhmYwT (last visited June 24, 2024).[4]

116. Ms. Santillan testified that she believes non-citizens should be allowed to vote in U.S. elections, but that they currently face barriers to doing so because they cannot obtain a state-issued ID. 5/6/24 Tr. at 193:5–13.

---

[4] This a legislative fact or, alternatively, a judicially-noticeable fact. *See supra* n.1.

### vi.    Kate Fellman

117.    Ms. Fellman submitted a declaration at the preliminary-injunction stage that the Fourth Circuit found was insufficient to carry Plaintiffs' burden on their constitutional claims. Nothing in Ms. Fellman's live testimony provided a basis to deviate from that conclusion.

118.    Ms. Fellman is the Executive Director of You Can Vote, a voter-education and empowerment nonprofit. 5/6/24 Tr. at 222:16–223:2.

119.    You Can Vote conducts extensive voter education efforts at thousands of community events and locations such as schools, jails, hospitals, libraries, and more throughout North Carolina. 5/6/24 Tr. at 224:12–17, 226:20–227:18. The organization has trained over 6,000 volunteers that help voters participate in the political process and is on its way to training 2,500 volunteers just this year. 5/6/24 Tr. at 225:13–18. You Can Vote also disseminates flyers and printed educational materials targeted to specific groups of voters. 5/6/24 Tr. at 243:8–244:24, 247:16–248:9.

120.    You Can Vote targets certain populations with its education efforts, including young voters, low-income individuals, the disabled, seniors, and the incarcerated, because these populations are often new to voting or have recently moved. 5/6/24 Tr. at 228:11–20.

121.    You Can Vote has educated, face-to-face, about 900,000 voters, and expects to surpass 1 million voters educated this year. 5/6/24 Tr. at 228:23–229:1.

122.    The changing nature of election laws, including the voter-ID requirement, has forced You Can Vote to retrain its volunteer staff multiple times. 5/6/24 Tr. at 231:6–7, 231:17.

123. To the extent Ms. Fellman testified that mailers from the State Board of Elections are confusing or misleading, *e.g.*, 5/6/24 Tr. at 239:8–240:18, 241:10–16, such testimony is not credible because she also admitted that the State Board's mailer is "inherently . . . less confusing" than her organization's flyer, 5/6/24 Tr. at 254:1–5; *compare* PX1001 *with* DX353.

### vii. Tomas Lopez

124. Mr. Lopez submitted a declaration at the preliminary-injunction stage that the Fourth Circuit found was insufficient to carry Plaintiffs' burden on their constitutional claims. Nothing in Mr. Lopez's live testimony provided a basis to deviate from that conclusion.

125. Mr. Lopez was the executive director of Democracy North Carolina from January 2018 to August 2018. 5/8/24 Tr. at 499:10–11. Mr. Lopez did not live or vote in North Carolina during any election when S.B. 824 was in effect. 5/8/24 Tr. at 530:8–24.

126. Democracy North Carolina opposes voter-ID laws generally and has engaged in advocacy efforts to lobby against such laws. 5/8/24 Tr. at 518:21–519:15.

127. Mr. Lopez testified that Democracy North Carolina exists to increase voter access and participation in North Carolina through direct advocacy, assistance to voters, research, and education. 5/8/24 Tr. at 499:14–19. The organization also provides direct assistance to voters to ensure that all eligible North Carolinians have access to the ballot. 5/8/24 Tr. at 500:9–19. The organization planned to educate voters about the free IDs available and the Photo ID exception process when Mr. Lopez worked at Democracy North Carolina but did not when the law was enjoined. 5/8/24 Tr. at 531:11–532:6.

52

128.    While S.B. 824 was being debated, Democracy North Carolina participated in public comment and activated individuals on their email list to contact lawmakers about the bill. 5/8/24 Tr. at 519:18–23.

129.    While Mr. Lopez generally testified about some personal experiences in which he heard about poll workers not following the election laws and regulations, he did not testify that they were not following S.B. 824's requirements. 5/8/24 Tr. at 506:13–18.

130.    To the extent Mr. Lopez testified about his experience interacting with voters and alleged barriers they face to voting, some of which were reproduced in reports by his organization, that testimony and any reports are admissible only for the non-hearsay purpose of showing how Democracy North Carolina responded to that information. 5/8/24 Tr. at 516:18–22; 529:4–9.

131.    While Mr. Lopez mentioned in his preliminary-injunction declaration that S.B. 824 decreases public confidence in elections, he admitted that he is not an expert in public confidence and has not done any empirical research on that topic. 5/8/24 Tr. at 534:6–8, 535:21–23. Similarly, he has not done empirical research on the number of voters in North Carolina who might find S.B. 824's requirements confusing. 5/8/24 Tr. at 537:18–538:6.

132.    Mr. Lopez agreed that confidence in the integrity of elections is essential and that preventing fraud in elections is a strong and entirely legitimate state interest. 5/8/24 Tr. at 534:9–16. He also agreed that fraud can affect the outcome of a close election and that fraudulent votes dilute the right of citizens to cast ballots that carry appropriate weight. 5/8/24 Tr. at 535:4–9. Mr. Lopez also testified that the state has a legitimate interest in counting only the votes of eligible voters and confirming that the person presenting to vote

53

is who they say they are. 5/8/24 Tr. at 535:14–20. Similarly, Mr. Lopez testified that the state had a legitimate interest in preventing noncitizens from voting, and that roughly one-third of the Latino community in North Carolina are noncitizens. 5/8/24 Tr. at 549:21–550:11. He also noted that undocumented individuals have a difficult time obtaining qualifying ID. 5/8/24 Tr. at 550:12–15.

133.    Mr. Lopez stated in his preliminary-injunction declaration that S.B. 824 has complicated requirements. 5/8/24 Tr. at 536:3–5. But he admitted that S.B. 824 would be less complicated to implement if the legislature had drafted it so only DMV-issued IDs qualify, did not provide for free IDs, and if it did not have a reasonable impediment provision. 5/8/24 Tr. at 536:18–537:5. He noted that the inclusion of these provisions that complicate the law would have to be weighed against the priority of ensuring voter access. 5/8/24 Tr. at 537:6–8.

134.    Mr. Lopez also testified to his review of a spreadsheet reporting ID possession rates that was posted on the State Board of Elections' website. 5/8/24 Tr. at 525:19–23. But he has not personally studied the impact of S.B. 824 on any subset of voters, or the number of voters with qualifying IDs. 5/8/24 Tr. at 545:4–7, 548:6–9. In fact, the sources on which he relied to draw conclusions about disparate impact are largely those that Democracy North Carolina compiled based on anecdotal reports that voters provided to volunteers when they had problems voting. 5/8/24 Tr. at 545:8–547:11. Mr. Lopez admitted that the sources on which he relied to draw conclusions about disparate impact are not representative. 5/8/24 Tr. at 547:15–20. In fact, his organization did not talk to voters who went through the voting process without issues. 5/8/24 Tr. at 547:8–11.

54

135. Mr. Lopez expressed concerns that provisions for Spanish-language documents didn't make it into the final version of S.B. 824, 5/8/24 Tr. at 526:16–19, but he admitted that the final enacted law requires the State Board to specifically inform underserved and minority communities (among other groups) about the photo ID requirement, as determined by local needs, 5/8/24 Tr. at 540:2–15.

136. While Mr. Lopez expressed concern in his preliminary-injunction declaration that some school IDs had not been approved as qualifying under S.B. 824, he does not know how many colleges or universities have had their IDs approved to date and therefore can no longer express those concerns until analyzing the current data. 5/8/24 Tr. at 552:6–9, 553:12–16.

137. While Mr. Lopez noted in his preliminary-injunction declaration that people may have been turned away from the polls or deterred from voting due to S.B. 824, he confirmed that he has no personal knowledge of any such voter and that his testimony is based on what he learned from others. 5/8/24 Tr. at 555:22–556:2.

### viii.    Marcus Bass

138. Mr. Bass currently serves as the executive director of Advance Carolina and the deputy director of the North Carolina Black Alliance. 5/9/24 Tr. at 1031:10–11.

139. Through his organizations, he runs a youth voter engagement program that targets young voters, largely at Historically Black Colleges and Universities (HBCUs). 5/9/24 Tr. at 1033:11–17. The North Carolina Black Alliance also works to engage community leaders and elected leaders to assist people living in majority/minority districts. 5/9/24 Tr. at 1035:25–1036:8.

55

140. Part of the North Carolina Black Alliance's education efforts include linking to information from the State Board of Elections on a website. 5/9/24 Tr. at 1066:14–17. Additionally, the Alliance directs students to polling sites on or close to HBCU campuses. 5/9/24 Tr. at 1078:1–4. The Alliance also educates voters about whether they can obtain free IDs and the Photo ID exception form process. 5/9/24 Tr. at 1081:1–23.

141. One of the issues that the North Carolina Black Alliance focuses on is education and mobilization for elections. 5/9/24 Tr. at 1039:23–1040:3. The Alliance also works with a network of Black attorneys who assist people at the polls. 5/9/24 Tr. at 1043:16–1044:5.

142. Mr. Bass testified about assisting voters who were intimidated by "aggressive electioneering" at polling sites. 5/9/24 Tr. at 1049:3–6. In particular, he recalled a situation in Alamance County where a Souls to the Polls March was interrupted by a confrontation between protestors and law enforcement surrounding a Confederate monument. 5/9/24 Tr. at 1049:13–24. This testimony is irrelevant to S.B. 824's provisions because Mr. Bass did not testify that any of the intimidating or otherwise disruptive behavior he observed occurred in (or even near) a polling place, or that the 100 additional poll observers that S.B. 824 permits throughout the state were engaging in such conduct. 5/9/24 Tr. at 1078:14–1079:13. Mr. Bass's remaining testimony about concerns regarding the poll observer provision in S.B. 824 were wholly speculative. 5/9/24 Tr. at 1062:14–1063:9.

143. Mr. Bass also testified that his organization fights back against misinformation and disinformation about elections. 5/9/24 Tr. at 1045:15–1046:19. His organization reports instances of disinformation and misinformation to the State Board of Elections. 5/9/24 Tr.

56

at 1067:15–18. Mr. Bass understands that it is a crime in North Carolina for any person to misrepresent the law regarding elections. 5/9/24 Tr. at 1067:20–23.

144. To the extent Mr. Bass provided some testimony about things he heard from students and others at polling sites, that testimony is hearsay and was only admitted for the limited purpose of showing how his organization responded. *E.g.*, 5/9/24 Tr. at 1057:24–1058:13, 1080:7–15.

145. Mr. Bass testified that he believes swift changes in election policy hinder voter engagement. 5/9/24 Tr. at 1043:12–13, 1058:22–24, 1059:24–1060:4, 1083:2–11.

146. Mr. Bass testified that he was concerned about the absentee ballot theft that occurred in 2018 in North Carolina's Ninth Congressional District. 5/9/24 Tr. at 1073:19–21.

147. Mr. Bass voted in the March 2024 primary and showed his photo ID to do so. 5/9/24 Tr. at 1075:1–5. While Mr. Bass expressed concerns that his 89-year-old grandmother would not be able to vote because she did not have ID, Mr. Bass testified that she is aware of the Photo ID Exception Form process. 5/9/24 Tr. at 1082:15–23.

### ix. Corye Dunn

148. Ms. Dunn is the Director of Public Policy at Disability Rights North Carolina. 5/10/24 Tr. at 1146:21–23.

149. Disability Rights North Carolina engages in educational efforts, including by publishing voter guides in accessible formats both online and in print. 5/10/24 Tr. at 1153:16–1154:17, 1167:6–14, 1184:10–12. The organization specifically seeks to target marginalized communities, including communities of color, throughout North Carolina for educational efforts. 5/10/24 Tr. at 1184:22–25. And it maintains a hotline that voters can

call to obtain information about voting requirements, including ID requirements. 5/10 Tr. at 1159:23–1160:21. Ms. Dunn testified that she believes her organization is effective in educating voters. 5/10/24 at 1184:13–17.

150. Disability Rights North Carolina has helped individuals obtain free IDs, including by providing transportation to the County Boards of Elections. 5/10/24 Tr. at 1151:11–13, 1168:15–1169:22, 1170:4–7. The organization has also obtained private funding to connect people with disabilities with rides. 5/10/24 Tr. at 1171:13–15. Ms. Dunn also testified about the availability of paratransit—public transportation dedicated to people with disabilities that can be booked in advance. 5/10/24 Tr. at 1172:12–19.

151. Ms. Dunn testified that the "County Board free ID was a really important provision to" her organization and that "some of our counties have been fantastic partners in" administering the free ID provision. 5/10/24 Tr. at 1169:22–1170:3.

152. Disability Rights North Carolina works to monitor canvass to ensure that provisional ballots cast without ID are counted. 5/10/24 Tr. at 1162:1–3. In particular, the organization ensures that anyone who lists disability as the basis for their impediment has their ballots counted. 5/10/24 Tr. at 1162:13–17.

153. Disability Rights North Carolina asked to be named as a partner to state and local boards as they develop their implementation plans for S.B. 824 and was so included in the bill. 5/10/24 Tr. at 1166:4–12. The organization was also able to get the disability box on the photo ID exception form added after discussions with lawmakers. 5/10/24 Tr. at 1187:12–21.

58

154.    Ms. Dunn testified that some County Board of Elections do not have polling sites adjacent to them where individuals can obtain a free ID and vote in the same trip, but she could not say how many of those locations exist in the state. 5/10/24 at 1183:19–25. Regardless, Disability Rights North Carolina has been able to help people vote the same day at polling sites adjacent to County Boards of Elections. 5/10/24 Tr. at 1185:1–4.

### x.    Courtney Patterson

155.    Mr. Patterson submitted a declaration at the preliminary-injunction stage that the Fourth Circuit found was insufficient to carry Plaintiffs' burden on their constitutional claims. Nothing in Mr. Patterson's live testimony provided a basis to deviate from that conclusion.

156.    Mr. Patterson works for a non-profit called Blueprint North Carolina and has served as chair of the Lenoir County Board of Elections for eleven years. 5/7/24 Tr. at 309:23–24, 311:18–25.

157.    Mr. Patterson testified that the bi-yearly training the State Board of Elections provides to County Board members and their staff is "great" and that the State Board does a "great job" given the resources they have. 5/7/24 Tr. at 320:4–9. County Board staff also has access to regional training with the directors of elections and access to webinars. 5/7/24 Tr. at 323:18–21. At the most recent training Mr. Patterson attended, a session dedicated to implementing the photo ID requirement ran for two hours. 5/7/24 Tr. at 324:16–23, 370:15–371:2.

158.    He testified that the approximately 60 paid poll workers in Lenoir County received full training about administering the photo ID requirement from his County Board staff,

59

and that they were required to attend two hours of training before each election. 5/7/24 Tr. at 326:12–17, 362:2–3, 369:8–13.

159. Mr. Patterson's testimony that training for the 60 paid poll workers in Lenoir County has not been sufficient, 5/7/24 Tr. at 330:11–16, and that he has not witnessed people being trained that they are supposed to offer Photo ID exception forms, 5/7/24 Tr. at 342:3–8, is not credible considering his admission that he has not attended a full poll worker training session since before 2023, 5/7/24 Tr. at 365:20–366:7; 395:10–16. Moreover, his County Board conducts the training for these poll workers, 5/7/24 Tr. at 366:9–21, and they receive Numbered Memos from the State Board providing instructions and guidance about the Photo ID requirement, including the fact that poll workers are required to offer both a provisional ballot with the option to return with ID, and the Photo ID exception form, 5/7/24 Tr. at 373:21–374:12; DX332 at 2.

160. While Mr. Patterson testified that there is no testing administered after poll worker trainings, 5/7/24 Tr. at 325:7–14, 327:5–13, the County's elections director could choose to institute one if she wanted to, 5/7/24 Tr. at 396:4–8.

161. While Mr. Patterson testified that public transportation in Lenoir County is expensive and that people may face barriers getting to their County Board of Elections to obtain a free ID, 5/7/24 Tr. at 315:9–11, he has not conducted studies about how far registered voters live from the County Board of Elections, 5/7/24 Tr. at 399:19–400:13. Moreover, he testified that the county seat of Kinston is disproportionately African American, and that is where the County Board of Elections is located. 5/7/24 Tr. at 401:2–16.

162.    Mr. Patterson testified that in his eleven years of serving as chair of the Lenoir County Board of Elections, he cannot remember a time when his County Board rejected a Photo ID exception form because of the information on the form. 5/7/24 Tr. at 344:3–8.

163.    While Mr. Patterson expressed concerns that poll workers sometimes do not follow instructions, he was unable to name a specific example of a voter not being offered both a Photo ID exception form and a provisional ballot with the option to return with ID when voting in person. 5/7/24 Tr. at 405:9–406:3, 407:3–6.

> o   In the March 2024 primary election, only 1 Lenoir County voter cast a provisional ballot for reasons related to the State's photo identification requirements. That voter (who was non-Latino white) filled out a Photo ID exception form, and the ballot was counted. DX324.

164.    Lenoir County has had no issues keeping up with demand for free IDs. 5/7/24 Tr. at 403:11–15.

165.    Mr. Patterson testified about a circumstance during the municipal election involving two Hispanic voters in Pink Hill, for whom he said the poll workers didn't properly take down their information. 5/7/24 Tr. at 330:17–25, 331:21–24, 345:4–9. Mr. Patterson never personally spoke to these voters, and his understanding of what happened to them is based on a conversation with a third-party that occurred three weeks after the election. 5/7/24 Tr. at 407:22–408:8. He did not conduct any investigation after the fact as to whether these voters were even registered or eligible to vote. 5/7/24 Tr. at 409:12–410:6.

166.    To the extent Mr. Patterson testified about barriers that Spanish-speaking Hispanic individuals face when voting in Lenoir County (who comprise approximately 10% of the

61

population), 5/7/24 Tr. at 351:4–352:3, 362:20–22, such barriers are attributable to those individuals' inability to speak English, not to any of S.B. 824's requirements.

167.  To the extent Mr. Patterson testified about a lack of Spanish-speaking poll workers impacting voters, 5/7/24 Tr. at 351:4–352:3, his Board is responsible for hiring those individuals and has had trouble hiring them due to lack of availability, 5/7/24 Tr. at 364:3–8.

168.  When Mr. Patterson discovers or observes an issue at one of the polling sites in his county, he immediately works to resolve that issue. 5/7/24 Tr. at 381:22–25.

169.  Mr. Patterson takes seriously his obligations as Director of the Lenoir County Board of Elections and believes his Board and his staff is committed to implementing S.B. 824 in a non-discriminatory manner. 5/7/24 Tr. at 416:9–23.

### xi.    Karen Brinson Bell

170.  Ms. Brinson Bell is the Director of the North Carolina State Board of Elections and was called as an adverse witness by Plaintiffs. 5/8/24 Tr. at 592:6–10.

171.  The State Board of Elections is required to hold training conferences before every municipal, primary, and general election for election directors, staff, and Board members. 5/8/24 Tr. at 693:4–13. County Boards also have access to online resources about election requirements published by the State Board. 5/8/24 Tr. at 697:7–20. All new County Board directors are also required to attend training within three years of starting that role. 5/8/24 Tr. at 706:17–23.

172.  Implementation of the Photo ID requirements is discussed at these conferences and trainings. 5/8/24 Tr. at 694:6–18. When the Board is made aware of issues related to

62

implementation of the Photo ID requirement, it incorporates discussions about them in its training to mitigate future issues. 5/8/24 Tr. at 684:19–695:14.

173. The State Board also offers free public seminars to civic organizations with funding it received for implementing S.B. 824's Photo-ID requirement. 5/8/24 Tr. at 707:24–708:12. State chapters of the NAACP have requested about 70 such seminars. 5/8/24 Tr. at 708:19–23.

174. The State Board has been conducting educational efforts in earnest—including in-person seminars, press releases, and other presentations—since August 2023. 5/8/24 Tr. at 711:20–712:3. Ms. Brinson Bell also gives press conferences and does media appearances to inform voters about the voter-ID requirement. 5/8/24 Tr. at 713:4–10.

175. The State Board also leverages social media platforms to educate voters about election requirements, including the photo-ID requirement. 5/8/24 Tr. at 713:15–19.

176. The State Board creates materials for polling sites that poll workers can use, including station guides, templates for precinct manuals, and posters. 5/8/24 Tr. at 699:1–25. The guides and posters are updated to include information about voter ID when S.B. 824 is in effect. 5/8/24 Tr. at 700:3–7.

177. The State Board also provides direct support to the County Boards of Elections during elections, including by fielding calls and deploying field specialists. 5/8/24 Tr. at 701:17–703:13, 703:22–704:25. The State Board also maintains a heat map that they track to look for problems during voting. 5/8/24 Tr. at 705:7–10.

178. After elections conclude, the State Board conducts a review process to see how the election was conducted and whether anything could have been done better based on a

63

review of incident reports it receives. 5/8/24 Tr. at 705:15–25. The State Board also debriefs with external groups to learn about issues they experienced and check whether any issues were isolated or more systemic to appropriately address them. 5/8/24 Tr. at 706:1–9. If County Boards are not following the State Board's procedures, the State Board steps in to tell them how the election should be conducted, and sometimes removes County Board members if they do not comply. 5/8/24 Tr. at 756:23–757:5.

179. Ms. Brinson Bell testified about some issues involving the evaluation of Photo ID exception forms in Guilford County and Mecklenburg County during a municipal election. 5/8/24 Tr. at 675:16–676:23. The State Board took several actions in response to those issues and the two counties modified their procedures appropriately in the next election. 5/8/24 Tr. at 773:6–774:5.

- o In the March 2024 primary election, 16 Guilford County voters filled out the Photo ID exception form. Of those 16 voters, 15 had their votes counted, and 1 did not. The 1 voter whose vote was not counted was non-Latino white. DX324.

- o In the March 2024 primary election, 57 Mecklenburg County voters filled out the Photo ID exception form. Of those 57 voters, 54 had their votes counted, and 3 did not. Of those 3 voters whose votes were not counted, 1 did not complete the provisional application completely or legibly; 2 of those 3 voters were white, and 1 was of unknown race and ethnicity. DX324.

180. The State Board sent mailings to all households in North Carolina to inform them about S.B. 824's voter-ID requirement. 5/8/24 Tr. at 709:4–16, 710:3–6. The State Board

sends these mailers when they think they will have the most impact near the early voting period for the general election. 5/8/24 Tr. at 710:11–14.

181.    The State Board's website can be translated into different languages, and there are instructions and signs at polling sites in Spanish, including posters about the voter-ID requirement. 5/8/24 Tr. at 713:22–714:8, 714:15–715:7. Voters can also request a free photo ID using a form in Spanish and there are instructions in Spanish for people voting provisionally. 5/8/24 Tr. at 715:8–15.

182.    Ms. Brinson Bell described in detail what happens when a voter votes provisionally using a Photo ID exception form or the process through which they return to present ID before canvass. 5/8/24 Tr. at 715:21–726:9. When a voter is voting provisionally, he or she is also handed a voter registration form so that County Board staff will be able to find them, or alternatively, register them immediately if they are not registered. 5/8/24 Tr. at 726:13–25, 727:15–25.

183.    The State Board of Elections has distributed two printers for printing free photo IDs to each County Board of Election. 5/8/24 Tr. at 729:20–23. The County Board can take one of those printers to another site within the county if desired. 5/8/24 Tr. at 729:24–730:1.

184.    Numerous colleges, including the entire UNC system, have had their student IDs approved for voting, as have public employers. 5/8/24 Tr. at 730:4–5, 730:25–731:2; DX336. Colleges and universities who do not have their IDs approved yet can continue to get their IDs approved. 5/8/24 Tr. at 765:7–766:2.

185.    Ms. Brinson Bell testified that the State Board has updated its rules and guidance for observers requiring them to have a badge or name tag clearly identifying them as an

65

observer. 5/8/24 Tr. at 743:7–18. She also discussed what observers are permitted to do, and what they are not permitted to do in the voting enclosure. 5/8/24 Tr. at 743:19–744:1. She believes that the State Board's current guidance would prohibit a poll observer from walking down the line of voters and looking them in the eye, but such a problem would need to be reported for it to be addressed. 5/8/24 Tr. at 744:7–25; 748:6–9. In fact, the Chief Judge at the voting place has authority to remove a poll observer acting improperly, or even call in law enforcement to remove that individual. 5/8/24 Tr. at 748:19–749:5.

186.    Ms. Brinson Bell testified that S.B. 824's challenge process allows another voter to challenge whether poll workers are following the law. 5/8/24 Tr. at 751:23–752:9. It does not allow a voter to challenge another voter's reasonable impediment to presenting ID. 5/8/24 Tr. at 752:10–18.

187.    When the State Board receives complaints from voter integrity groups it sometimes takes steps to intervene immediately before the election is certified. 5/8/24 Tr. at 754:2–16. The State Board is focused on "continuous improvement" and will also make changes to its procedures based on feedback received after elections. 5/8/24 Tr. at 755:8–12.

188.    Based on her years of experience as the executive director of the State Board of Elections, Ms. Brinson Bell believes that the State Board has administered elections in a non-discriminatory manner. 5/8/24 Tr. at 763:2–6. All eligible, registered voters have the opportunity to vote in North Carolina. 5/8/24 Tr. at 763:7–11.

189.    Ms. Brinson Bell testified that if the Photo ID requirement were to be enjoined again after it has been in place for three different municipal elections and the March primary election, the State Board would need to surmount several administrative and advertising

66

hurdles, including changing the State Election Information Management System, redesigning absentee ballot envelopes, finding the budget to reeducate the public, and more. 5/8/24 Tr. at 769:10–770:3. Because North Carolina has been "on again, off again, on again, off again" with election laws, the State Board is concerned that it is providing information to voters so they are clear about what the process will be. 5/8/24 Tr. at 770:24–771:5.

### D. Historical Background

#### i. Dreama Caldwell

190. Ms. Caldwell is the Executive co-Director of Down Home North Carolina. 5/8/24 Tr. at 580:15–16.

191. Ms. Caldwell testified about feeling intimidated when she was a child who went with her grandmother to vote, 5/8/24 Tr. at 568:7–14, but this testimony is not relevant to S.B. 824.

192. Ms. Caldwell also described a march to the polls in 2020 during early voting during which marchers were pepper sprayed. 5/8/24 Tr. at 570:8–20. But this incident did not involve poll observers and occurred outside the voting enclosure. 5/8/24 Tr. at 585:17–586:6. In fact, she testified that during this time the poll observers were in the voting enclosure, not in the area where police clashed with protestors. 5/8/24 Tr. at 576:17–24, 577:6–8.

193. She also testified about her experience handing out her own campaign literature in the 2020 election, but she did not testify that the people she found intimidating were poll

67

observers, let alone one of the 100 extra at-large poll observers that S.B. 824 allows throughout the state. 5/8/24 Tr. at 569:15–20.

194.    Ms. Caldwell voted in the March 2024 primary and presented ID to do so. 5/8/24 Tr. at 578:4–12.

### ii.    Rev. William J. Barber II

195.    Rev. William J. Barber II serves in various roles, including as president and senior lecturer of Repairers of the Breach, a "nonprofit movement building organization." 5/10/24 Tr. at 1189:14–17. Rev. Barber and his organizations are opposed to voter-ID laws and believe that they are unnecessary. 5/10/24 Tr. at 1230:17–1231:14, 1243:11–14.

196.    He testified about his efforts to expand access to voting throughout North Carolina's recent history. *See, e.g.*, 5/10/24 Tr. at 1197:12–1199:9. For example, while Rev. Barber was President of the North Carolina State Conference of the NAACP, the organization conducted voter education, mobilization, and protection efforts. 5/10/24 Tr. at 1198:12–18, 1198:25–1199:4. Repairers of the Breach conducts similar voter education and mobilization efforts today, with a particular goal of reaching poor, low-wage, and infrequent voters. 5/10/24 Tr. at 1199:19–1200:3, 1246:22–1247:7.

197.    While Rev. Barber read from a news article in which Representative David Lewis was quoted, 5/10/24 Tr. at 1223:2–16, these statements were admitted only for the limited purpose of showing the effect they had on Rev. Barber's advocacy work, 5/13/24 Tr. at 1285:15–19; 5/10/24 Tr. at 1219:18–21, 1222:18–22.

198.    While Rev. Barber stated that he knew of S.B. 824's poll observer provisions, he did not testify about any concrete experiences that he personally had with any observers, let

68

alone the small number of additional poll observers that S.B. 824 permits. 5/10/24 Tr. at 1247:9–1248:25.

### III. Evidence In the Preliminary Injunction Record

Per Court order, all materials received in conjunction with Plaintiffs' motion for preliminary injunction, including Plaintiffs' preliminary expert reports, fact witness declarations, and exhibits attached to the State Board's Opposition, are also part of the record. Order Denying Summ. J. Mots. at 24 n.7. The Fourth Circuit has already held that Plaintiffs were unlikely to succeed in showing that racial discrimination was a motivating factor behind S.B. 824's enactment based on this record. *See Raymond*, 981 F.3d at 311. Similarly, this Court held that Plaintiffs were unlikely to succeed on their claim that S.B. 824 violated Section 2 of the Voting Rights Act based on this record. *N.C. State Conf. of NAACP v. Cooper*, 430 F. Supp. 3d 15 (M.D.N.C. 2019).

### FINDINGS OF FACT

### I. S.B. 824 Differs in Meaningful Ways from H.B. 589

199. H.B. 589 was not constitutionally required. S.B. 824 was enacted as implementing legislation after North Carolinians amended the North Carolina Constitution—by a vote of 55.49% in favor—to require "[v]oters offering to vote in person" to "present photographic identification before voting." Jt. Stips. ¶¶ 66–68; DX189; N.C. CONST. art. VI, § 2, cl. 4; *id.* art. VI, § 3, cl. 2.

200. H.B. 589 was omnibus legislation that included numerous provisions unrelated to voter ID. DX122. S.B. 824 focused exclusively on voter ID and related election integrity measures. DX009.

69

201. Under H.B. 589, student IDs, government employee IDs, and public assistance IDs were not included in the list of qualifying IDs. DX122 at 2. Tribal IDs were accepted so long as they met certain criteria, such as having a printed expiration date. DX122 at 2. Under S.B. 824, student IDs and government employee IDs approved by the State Board, public assistance IDs, and tribal IDs without a printed expiration date (the latter two as a result of amendments to S.B. 824) are acceptable. DX009 at 2; DX086 at 5.

202. H.B. 589's voter ID requirements did not apply to absentee ballots, but S.B. 824's voter ID requirements do apply to absentee ballots. DX009 at 6–8.

203. Unlike H.B. 589, S.B. 824 requires the State Board to implement "an aggressive voter education program," by prominently posting information about the requirements at each county board of elections, the State Board's office, and on their respective websites; training precinct officials; requiring precinct officials to disseminate materials at elections; coordinating and conducting seminars for the county boards of elections; coordinating with media outlets to inform the public generally and minority communities in particular; and mail information to all North Carolina residential addresses at least four times explaining the voter ID requirements and informing residents that they can vote with or without ID. DX009 at 10–11.

204. S.B. 824's education and training provisions incorporated measures that General Assembly Members learned about in the November 26, 2018, Joint Elections Oversight Committee meeting, during which former State Board of Elections Director Kimberly

Strach presented. DX068 (Transcript of Meeting); DX214 (Presentation).[5] Ms. Strach's presentation mentioned working with local organizations to disseminate information to their communities, DX214 at 12–13, and including information on the State Board's website, DX214 at 6—but expanded on them as well, such as by mandating that the State Board have prominent signage displayed at all one-stop voting sites and precincts on election day and sending out four mailers to all residential addresses in the State, DX214 at 9–11.

205. The State Board is fulfilling the educational and training obligations that S.B. 824 requires. 5/8/24 Tr. at 693:4–13, 694:6–18, 697:7–20, 706:17–23, 707:24–708:12, 711:20–712:3; DX335; DX381–384; DX395–404.

206. S.B. 824 also requires the DMV to issue a free special ID card to individuals without application if their DMV-issued ID is canceled, disqualified, or suspended, DX009 at 9–10, a situation H.B. 589 did not address.

207. As compared to H.B. 589, S.B. 824 lowered the age for any person to obtain a free ID from the DMV from 70 to 17, *compare* DX009 at 9, *with* DX122 at 5, lowered the age for voters to be able to use an expired form of ID from 70 to 65, *compare* DX009 at 2, *with* DX122 at 2, and allowed more types of IDs to be used without printed issuance dates, *compare* DX086 at 5, *with* DX122 at 2.

---

[5] Citations to this presentation refer to the PDF page numbers.

208.     Under H.B. 589 as originally enacted, a voter who appeared at the polls without ID would have to return to the County Board of Elections before canvass to show qualifying ID in order for their ballot to be counted. DX122 at 4.

209.     As amended, H.B. 589 allowed voters without qualifying photo ID to cast a provisional ballot accompanied by a reasonable impediment form only if they had an impediment to *obtaining* qualifying ID. DX185 at 7. S.B. 824, by contrast, allows voters to cast a provisional ballot accompanied by a reasonable impediment form if they have an impediment to *presenting* qualifying ID. DX009 at 3. In other words, S.B. 824 expanded the reasonable impediment provision to voters who may have qualifying ID but did not bring it with them to the polls.

210.     H.B. 589's reasonable impediment process required the voter to present alternative identification in the form of (i) a copy of a current utility bill, bank statement, government check, paycheck, or other government document that showed the name and address of the voter or the voter's voter registration card, or (ii) the last four digits of the voter's Social Security number and the voter's date of birth. DX185 at 7. S.B. 824's reasonable impediment process does not require alternative ID. DX009 at 3–4.

211.     Under H.B. 589, any registered voter of the county could make a challenge to a reasonable impediment declaration by submitting clear and convincing evidence against the factual veracity of a voter's stated impediment. DX185 at 8–9. S.B. 824 does not provide for challenges to reasonable impediment declarations. DX009 at 3–4.

212.     Under H.B. 589, a County Board could reject a provisional ballot accompanied by a reasonable impediment declaration if the Board had grounds to believe that the

72

declaration was "factually false, merely denigrated the photo identification requirement, or made obviously nonsensical statements." DX185 at 8. Under S.B. 824, by contrast, a County Board may reject a provisional ballot accompanied by a reasonable impediment declaration only if the Board has grounds to believe that the declaration "is false." DX009 at 4. Furthermore, per the State Board's rules, the County Boards may reject a provisional ballot accompanied by a reasonable impediment declaration only if the County Board *unanimously* determines that the declaration is false. DX406.

213.    To obtain a free photo voter ID from the DMV under H.B. 589, a voter needed to provide supporting documentation. DX122 at 5–6. Under S.B. 824, in addition to this free DMV ID, which is still available, voters are also able to obtain a free photo voter ID from the County Boards—including during the early voting period—without needing to show any documentation. DX009 at 1–2.

## II.    Experience Under H.B. 589

Although the General Assembly made significant changes to S.B. 824, the experience under H.B. 589 displays that the General Assembly knew that this more restrictive voter-ID law had little impact on voters' ability to cast a ballot successfully.

### A.  Targeted Mailings

214.    For H.B. 589, the State Board did a number of targeted mailings to registered voters that the State Board believed might not have acceptable photo ID. The State Board's Voter Outreach Team then worked with those voters who responded requesting assistance to fulfill their needs. DX214 at 9, 15–20.

73

215.   The first two targeted mailings resulted from H.B. 589's requirement that at any primary or election between May 1, 2014 and January 1, 2016, poll workers were required to ask voters presenting to vote in person whether they possessed one of the forms of photo ID acceptable under H.B. 589. DX131 at 13. If the voter indicated he or she did not have an acceptable photo ID, the poll worker was required to ask the voter to sign an acknowledgment of the photo ID requirement form and be given a list of types of qualifying photo ID and information on how to obtain those IDs. DX131 at 13. In accordance with this provision, the State Board collected these forms during each election in 2014 and 2015. DX214 at 16–17.

216.   In 2014, 10,743 voters signed the acknowledgment form. DX214 at 16.

217.   The State Board sent a targeted mailing to these voters to ascertain whether they did not in fact have an acceptable ID and whether they needed the State Board's assistance. DX214 at 17. 2,353 voters responded. DX214 at 17. Of these responders, 95% indicated that they did in fact possess acceptable photo ID. 51 voters requested assistance from the State Board. DX214 at 17.

218.   The State Board repeated this process with the 823 voters who signed an acknowledgment form during the 2015 elections. DX214 at 16.

219.   The State Board also performed two targeted mailings based on no-match analyses. The first mailing resulted from a no-match analysis the State Board did itself. The Board compared a DMV database and the voter registration list to identify voters who could not be matched with a DMV-issued ID card. DX214 at 18. The State Board then sent a mailing to the 254,391 individuals the no-match analysis identified, and 20,580 voters responded.

74

DX214 at 18–19. Of these responders, 91% indicated that they possessed acceptable photo ID. DX214 at 19. 633 voters requested assistance, which the Voter Outreach Team provided. DX214 at 19.

220.    The second mailing resulted from a no-match analysis that Dr. Charles Stewart had performed as part of the *McCrory* litigation. DX214 at 20. The State Board sent a mailing to 209,253 voters that the State Board's no-match analysis had not identified and received 8,440 responses. DX214 at 20. Of these responders, 76% indicated that they possessed acceptable photo ID, and 782 voters requested assistance, which the Voter Outreach Team provided. DX214 at 20.

### B. Voting Under H.B. 589

221.    H.B. 589 was in effect for the March 2016 primary election. About 2.3 million people voted in that election. *See 3/15/16 Official Primary Election Results—Statewide*, N.C. STATE BD. OF ELECTIONS, https://bit.ly/4bo2sb7 (last visited June 24, 2024).[6] Ms. Strach's presentation to the General Assembly on November 26, 2018 mistakenly indicated that 2.7 million people voted. DX214 at 31.

222.    In Ms. Strach's presentation, the General Assembly learned that 1,048 voters cast a provisional ballot accompanied by a reasonable impediment declaration in the March 2016 primary and that of those 864 (82%) counted. DX214 at 30.

---

[6] This a legislative fact or, alternatively, a judicially-noticeable fact. *See supra* n.1.

75

223. The General Assembly also learned that 1,248 voters did not present acceptable photo ID, did not fill out a reasonable impediment declaration, and did not return to their County Board to cure their provisional ballot by the deadline. DX214 at 31.

224. Ms. Strach's presentation, however, did not say whether any of these voters cast a provisional ballot for reasons in addition to lacking acceptable photo ID, why any voters did not fill out a reasonable impediment declaration, why any reasonable impediment declaration was rejected, or whether the voters whose ballots were not counted had an ID that was acceptable under H.B. 589, or whether they had an ID that would be acceptable under S.B. 824. DX214 at 31.

225. In total, these 2,296 voters represented approximately 0.1% of all ballots cast in that election. Therefore, approximately 99.9% of voters were not required to cast a provisional ballot because they lacked voter ID under the more restrictive provisions of H.B. 589.

226. Of the voters who cast a provisional ballot accompanied by a reasonable impediment declaration, Ms. Strach's presentation indicated that 184 ballots were not counted. DX214 at 30.

227. Thus, the ballots rejected from voters who claimed a reasonable impediment to obtaining a form of ID acceptable under H.B. 589 represented less than 0.01% of all ballots cast in that primary election.

228. Ms. Strach's presentation did not discuss any racial data for provisional ballots cast or rejected, or otherwise. DX214.

76

### III.  Enactment of S.B. 824

229.  The record shows that S.B. 824 was the result of an effort to implement the voter-ID constitutional amendment that took input from and had support from legislators from both the Republican and Democratic parties.

### A.  The General Assembly Proposes the Voter-ID Amendment

230.  The General Assembly placed six amendments on the 2018 ballot, one of which would add a voter-ID requirement to the North Carolina Constitution. *See* 2018 N.C. Sess. Laws 96; 2018 N.C. Sess. Laws 110; 2018 N.C. Sess. Laws 117; 2018 N.C. Sess. Laws 118; 2018 N.C. Sess. Laws 119; 2018 N.C. Sess. Laws 128. *See also* DX189.

231.  The voter-ID amendment required implementing legislation. DX189. One of the other amendments, known as Marsy's Law, also required implementing legislation. DX189 at 2–3.

232.  Both amendments' official explanations noted that legislation would be needed and were included in the judicial voter guide that was sent to the address of every registered voter in the state. DX188.

233.  North Carolina voters adopted four of the six amendments, including the voter-ID amendment. Jt. Stips. ¶ 21; DX190.

234.  The voter-ID amendment was approved with 55.49%, or 2,049,121 voters, approving it. Jt. Stips. ¶¶ 67–68; DX187. In a poll that one of Plaintiffs' preliminary experts relied on, 58% of Hispanics supported the constitutional amendment. PX0044 at 61.

235.  Plaintiffs chose not to challenge the validity of the voter-ID amendment. *See generally* Compl.

## B. The General Assembly Reconvenes

236.    The General Assembly adjourned its regular session on June 29, 2018 and reconvened the regular session on November 27, 2018. Jt. Stips. ¶ 22.

237.    Between 1986 and 2016, the General Assembly convened a session in the fall following a general election on three occasions, holding one such session in 2002, one in 2004, and three in 2016. Jt. Stips. ¶ 24.

238.    In 2016, the North Carolina General Assembly held three extra sessions during the post-election period. DX204; DX205; DX206.

239.    According to former North Carolina Senator and primary sponsor of S.B. 824 Joel Ford, it is not unusual or a departure from the normal political process for the General Assembly to reconvene its Regular Session to consider additional legislation. Affidavit of Joel Ford, Doc. 97-19 ¶ 9 (Oct. 30, 2019) ("Ford Decl.").[7]

240.    During the 2016 sessions, the North Carolina General Assembly passed House Bill 2, which provided disaster relief following Hurricane Matthew and wildfires, Senate Bill 4, which created a bi-partisan state board of elections and ethics enforcement, and House Bill 17, which changed the appointment mechanisms for several state offices and established a task force for school safety. DX207; DX209; DX211.

241.    Each of Senate Bill 4, House Bill 17, and House Bill 2 was passed two to four days after they were filed. DX208; DX210; DX212.

---

[7] This Affidavit is part of the preliminary-injunction record, which is part of the trial record per this Court's order. Order Denying Summ. J. Mots. at 24 n.7.

78

242. The North Carolina General Assembly did not enact SB824 by convening a special session, but rather after reconvening the 2017-2018 Regular Session. DX191.

243. The North Carolina General Assembly acted on 36 different bills and resolutions between November 27, 2018 and December 27, 2018. DX201.

244. The North Carolina General Assembly enacted ten laws between November 27, 2018, and December 27, 2018. DX009; DX192; DX193; DX194; DX195; DX196; DX197; DX198; DX199; DX200.

### C. S.B. 824 Followed Normal Legislative Procedures

245. There is no evidence in the record that the process of enacting S.B. 824 deviated from normal procedures.

  o In fact, Plaintiffs' witnesses did not name any deviation from normal procedures, and Representative Harrison expressly disclaimed such a deviation. PX1877 at 88:25–89:2 ("Q: You're not aware that [S.B. 824] deviated from any rules or requirements of the General Assembly? Rep. Harrison: Off the top of my head, I'm not aware specifically").

  o Senator Joel Ford stated that S.B. 824 followed a normal legislative process. Ford Decl. ¶¶ 10–11, 13–16. Specifically, "[d]rafts were circulated with plenty of time for legislators to review and consider them. And there was opportunity for extensive debate in both houses[.]" Ford Decl. ¶ 10. Similarly, the length of time the legislation was pending was appropriate and normal for a bill of this type. Ford Decl. ¶ 10.

79

246. Republican leadership assured their Democratic colleagues that the process would not be rushed. DX068 at 118:5–8 (Chairman Lewis: "The instructions we've received from Speaker Moore and Senator Berger is that this process not be rushed in any way."); DX071 at 46:14–15 (Chairman Jones: "We'll go as long as we need to go[.]").

247. While Former Senator Van Duyn testified that she wanted more input from stakeholders, 5/7/24 Tr. at 462:21–463:6, she was campaigning for Lieutenant Governor when S.B. 824 was being debated and acknowledged that thinking about implementing legislation was not one of her priorities. 5/7/24 Tr. at 452:22–23, 463:10–15.

   o Moreover, it is clear that lawmakers received public comment and consulted with stakeholders. One of Plaintiffs' other witnesses, Corye Dunn from Disability Rights North Carolina, testified that her organization was able to consult with lawmakers to get the disability check box added to the Photo ID exception form. 5/10/24 Tr. at 1187:12–21.

### D. Evidence of the Inclusive Process for Enacting S.B. 824

248. The initial draft of the bill was publicly released on November 20, 2018. PX1877 at 52:7–53:11 (Harrison Test.); DX069 at 3.

249. The draft language of S.B. 824 was first filed with the Senate Principal Clerk on November 27, 2018. Jt. Stips. ¶ 27.

250. Twenty-four changes were made to S.B. 824 based on Democrats' feedback, discussions with the Joint Legislative Oversight Committee, the Elections Committee, and the Rules Committee before a draft of S.B. 824 was formally introduced in the Senate. DX069 at 3 (Statement of Sen. Krawiec); *compare* DX485 (Draft S.B. 824), *with* DX002

80

(S.B. 824 Version 0). That collaborative process continued for the entire time the bill was being considered. DX069 at 55:7–10 (Statement of Senator Van Duyn) ("I would like to point out that with just a couple of days of committee meetings and public comment, we've made almost 30 modifications to the base legislation."); DX069 at 37:16–20 (Statement of Sen. Krawiec) ("We've had public comment at every single committee meeting that I've been in and we've had lots of public input, lots of public comments were given in those meetings, and many of it has [sic] been incorporated into this bill.")

251.    S.B. 824 was introduced in the Senate on November 27, 2018. Jt. Stips. ¶ 28.

252.    S.B. 824 was enacted with input and support from members of both parties.

253.    Joel Ford, an African American Democrat and then-Senator, was one of the three primary sponsors of S.B. 824. Jt. Stips. ¶ 29.

254.    Before S.B. 824 was formally introduced, Republicans reached out to Democrats—including African American Democratic Senators Ford and Clark—to ask them for input. Ford Decl. ¶ 12.

255.    The Joint Elections Oversight Committee received public comment on S.B. 824 at the November 26, 2018 hearing from the 30 people who offered to make public comment at the hearing. Jt. Stips. ¶ 30.

256.    The Senate considered 11 amendments during debate on S.B. 824. Jt. Stips. ¶ 33.

257.    Though the General Assembly had a Republican supermajority at the time, Republicans adopted 6 amendments, 3 of which were offered by African American Democrats, namely Senators Ford, McKissick, and Clark. The Senate adopted:

81

- o Senator Ford's amendment, which provided that free photo voter ID cards shall be issued by the County Boards "at any time, except during the time period between the end of one-stop voting for a primary or election . . . and election day for each primary and election," Jt. Stips. ¶¶ 70–71; DX042;

- o Senator McKissick's amendment, which required the County Boards to notify voters with a County Board-issued photo ID that the ID was going to expire 90 days before its expiration date, extended the expiration date of those free photo voter ID cards from 8 to 10 years, and extended the exception to the photo ID requirement when a natural disaster occurs from 60 to 100 days of an election, Jt. Stips. ¶¶ 72–73; DX046; and

- o Senator Clark's amendment, which required the placement of a statement in all voter educational materials and informational posters reassuring voters that "[a]ll registered voters will be allowed to vote with or without a photo ID card" and explaining the reasonable impediment option, Jt. Stips. ¶¶ 74–75; DX047.

- o The Senate also adopted an amendment by Senator Daniel, a Republican, that provided greater specificity regarding the circumstances and standards under which a voter without an acceptable photo ID could sign a reasonable impediment declaration. DX043. Senator Daniel offered this amendment to address concerns as a result of discussions with his Democratic colleague, Senator McKissick. DX069 at 53–54.

258. The House considered 13 amendments during debate over S.B. 824. DX013–DX025.

259. The House adopted 7 of those amendments, including substantive Democratic amendments. The House adopted:

- o African American Democratic Representative Beasley's amendment, which required that the expiration of a free photo voter ID card would not create a presumption that a voter's voter registration had expired and mandated the placement of a disclaimer to that effect on the ID cards. Jt. Stips. ¶¶ 84–85; DX014. This amendment was adopted by a 102-4 vote. DX035;

- o African American Democratic Representative Floyd's amendment, which made applicable S.B. 824's photo ID requirements to absentee ballot requests and absentee ballots. Jt. Stips. ¶¶ 86–87; DX015. This amendment was adopted by a 106-1 vote. DX036;

- o Native American Democratic Representative Charles Graham's amendment, which added to the list of acceptable photo IDs a tribal enrollment card issued by a state or federal recognized tribe. Jt. Stips. ¶¶ 94–95; DX019. This amendment was adopted by a 106-0 vote. DX040; and

- o Representative Harrison's amendment, which altered the natural disaster exception from requiring a disaster declaration from both the U.S. President and the Governor of North Carolina to requiring a disaster declaration from either the President or the Governor. Jt. Stips. ¶¶ 82–83; DX013. This amendment was adopted by a 86-14 vote. DX034.

260.    Less than half of the non-withdrawn amendments offered by Democrats were tabled or rejected, and the record reveals that the General Assembly had reasonable, nondiscriminatory reasons to have done so:

o Senator Van Duyn offered an amendment that would have *delayed* the date by which the County Boards were required to make free photo voter IDs available from May 1, 2019 to July 1, 2019. Jt. Stips. ¶ 101; DX049. The Senate tabled the amendment, with even African American Democratic Senator McKissick voting to table it. DX064.

o Senator Lowe offered an amendment that would have provided an extra day of early voting, which the Senate voted to table. DX050. Whatever the policy benefits or detriments of such a change, it is not directly relevant to voter ID.

▪ In 2019, the General Assembly adopted an extra day of early voting in S.B. 683. DX107.

o Senator Clark offered another amendment that would have allowed the free photo voter ID cards to be used for purposes other than voting, which the Senate voted to table. DX048. Whatever the benefits or detriments of such a policy, even if adopted it would not have affected voters' ability to comply with the voter ID law to vote.

o Senator Woodard offered an amendment that would have allowed all types of state and federal government-issued IDs to be used as voter IDs, provided they were approved by the State Board of Elections after an approval process like the one in S.B. 824 for school and government-employee IDs. DX051.The Senate

84

voted to table this amendment. DX066. Plaintiffs presented no evidence that the General Assembly knew how many IDs it would have been adding to the pool of qualifying IDs, or of any administration or implementation issues that could have been caused by the amendment. Plaintiffs also did not present any evidence about how many voters would have one of these types of IDs but not any other, nor the racial breakdown of any such voters. These are nonracial reasons to have rejected the amendment.

o Representative Richardson offered an amendment that would have added state and federal public assistance IDs to the list of qualifying photo IDs, DX025, and Representative Fisher offered an amendment that would have added high school IDs, DX021. The House rejected both amendments. Representative Lewis spoke against Representative Richardson's amendment, explaining that North Carolina could not impose requirements on how the federal government issued IDs. DX074 at 101:15–102:12. Even Representative Richardson herself stated that she understood and accepted Representative Lewis's justifications for urging his fellow members to vote against the amendment. DX074 at 102:22–103:2. Plaintiffs did not present evidence that the General Assembly knew how many IDs it would have been adding to the pool of qualifying IDs or how many voters would have one of these types of IDs but not any other (nor the racial breakdown of such voters) for these amendments either.

   ▪ The General Assembly also later added public assistance IDs to the list of acceptable IDs in S.B. 824. DX086. All forms of ID that would have

85

been permitted by Representative Richardson's amendment are now permitted under S.B. 824 as amended by H.B. 1169.

261. The House also rejected several amendments offered by Republicans. The House rejected:

o Two amendments by Representative Pittman. One amendment would have allowed the County Boards to issue free photo voter IDs only to registered voters who did not have a different qualifying form of photo ID. DX024. The other amendment would have removed college and university approved student IDs from the list of qualifying photo IDs. DX023.

o One amendment by Representative Warren that would have required voters casting a provisional ballot with a reasonable impediment declaration to include their date of birth and Social Security number or driver's license and allowed County Boards to reject provisional ballots accompanied by reasonable impediment declarations if the Boards had reason to believe the declaration was factually false, merely denigrated the photo ID requirement, or made obviously nonsensical statements. DX022.

262. In total, Democrats sponsored thirteen non-withdrawn amendments to S.B. 824. Jt. Stips. ¶ 98. Seven of those Democratic-sponsored amendments were adopted. Jt. Stips. ¶ 99.

263. In both the Senate and the House, Democrats offered all the amendments that they wanted to offer to S.B. 824 while it was under debate and could name no ameliorative amendments that they were unable to propose. 5/7/24 Tr. at 462:16–20 (Van Duyn Test.);

86

5/9/24 Tr. at 823:22–824:5, 824:13–15, 824:19–24 (Reives Test.); PX1877 at 51:20–24 (Harrison Test.); 5/9/24 Tr. at 910:18–911:17 (Morey Test.); 5/9/24 Tr. at 990:8–19 (McKissick Test.). While several lawmakers named changes that they thought would have lessened the bill's discriminatory impact, and that they knew of while S.B. 824 was under consideration, these lawmakers did not offer those amendments. 5/9/24 Tr. at 999:5–13 (McKissick Test.); 5/9/24 Tr. at 910:18–911:17 (Morey Test.).

264. Republicans had a supermajority in the General Assembly at the time and did not have to accept any amendments from Democrats.

265. As the bill worked its way through the General Assembly, Democratic members thanked the Republican supermajority for how they handled the bill, expressing gratitude that the majority was open, inclusive, and listened to Democrats.

- o African American Democratic Senator McKissick stated during Second Reading: "I think the effort made to bring forth legislation that I see here today is an earnest effort to try to expand it significantly beyond what it was when the last voter ID bill came before us which was actually stricken down by the courts as being unconstitutional. So I appreciate the fact that this bill is far more broad and far more expansive." DX069 at 48:12–18.

- o Senator McKissick also spoke during S.B. 824's third reading, saying "I'd just like to say thank you to Senator Daniel and Senator Krawiec for their work on the bill and for being open and inclusive in listening to us on the other side of the aisle in trying to come up with something that is reasonable in terms of its approach. So I want to thank you for that effort." DX070 at 3:3–8. By contrast,

87

during H.B. 589's third reading, Senator McKissick had no kind words for the Republican majority or the bill, saying "This bill greatly, greatly concerns and disappoints me. This bill basically reverses decades of progressive legislation that we've had here in North Carolina that have increased voter participation." DX184 at 39.

o African American Democrat Representative Floyd stated during a Committee Hearing: "I want to also thank the committee for expanding the list of those persons that can participate in our political process." DX068 at 44:13–15.

o Senator Smith said during the second reading in the Senate, "I want to thank the bill sponsors for the hard work that you have done in negotiating and accepting many of the amendments that have been placed before you." DX069 at 44:16–19.

o Senator Van Duyn said during the second reading in the Senate, "I want to very sincerely acknowledge the work that Senator Daniel and Senator Krawiec did, particularly around amendments that have been brought to you by my colleagues, my Democratic colleagues. I'm very grateful for every one that you've incorporated." DX069 at 55:1–6. She also recognized during the Senate Floor Veto Override that "ideas offered by Democrats were integrated into" S.B. 824. DX076 at 7:12–13.

o Senator Woodard also had appreciative words during the second reading in the Senate, saying "we appreciate the Republican Caucus amending the bill to allow

issuance of voter IDs during early voting, . . . and we appreciate the dialogue and the 34 [sic] changes that Senator Krawiec cited." DX069 at 17:16–20.

o During debate on S.B. 824 in the House, Representative Harrison had similar words of praise, stating "I did want to start by thanking Chairman Lewis because I think he's done a really terrific job working with us to help improve the bill. And this bill is a much better bill than the bill that left this chamber in 2013. So I want to thank him for that." DX074 at 116:20–117:2.

o During a House Elections and Ethics Committee meeting, Representative Harrison said, "I wanted to thank Chair Lewis and the rest of the committee for working with us as we tried to improve this bill." DX072 at 98:17–19. Like Senator McKissick, Representative Harrison had nothing of the sort to say during debate on H.B. 589: "I can not re – I can't really – it's difficult to follow up Representative Michaux and Bell and others about what they've had to go through for protecting voting rights, and I'm not even going to try. But we are getting ready to enact the most restrictive voter ID law in the country. We said it was going to be modeled on Georgia and Indiana, but at least they allow for college ID's, and we've taken that out in this conference report. We're going to be limiting access in early voting and we have this record turnout of 2-½ million voters, I think, in 2012, and that's just wrong." *House of Representatives, July 25, 2013 Floor Debate*, N.C. GEN. ASSEMBLY, https://bit.ly/3eJAcpl (last visited

June 24, 2024) [hereinafter "Representative Harrison's H.B. 589 Floor Statement"].[8]

266. Democrats voted for S.B. 824 as it moved through the General Assembly.

o Senator Joel Ford, Senator Don Davis, and Senator Ben Clark—who are all African American—voted for S.B. 824 on its second reading in the Senate. DX055.

o Senator Ford and Senator Davis voted for the bill on its third reading in the Senate. DX056. Senator Clark was absent from the vote, DX056, but there was no substantive change in the bill between second and third reading.

o Senator Ford voted to override Governor Cooper's veto. DX067. Although Senator Clark and Senator Davis voted to sustain the veto, this was the first time that either of them voted against the bill.

o Representative Duane Hall and Representative Ken Goodman voted for the bill on its second and third readings in the House. DX032; DX033.

o Representative Hall voted to override Governor Cooper's veto and Representative Goodman did not vote because he was absent. DX041.

**E. No Direct Evidence of Discriminatory Intent**

267. The record is devoid of direct evidence that any member of the General Assembly voted for S.B. 824 with the intent to discriminate against African Americans or Hispanics or to prevent members of these groups from voting.

---

[8] This a legislative fact or, alternatively, a judicially-noticeable fact. *See supra* n.1.

268. As explained above, Democratic legislators, including several African American Democrats and members of other racial minorities, supported and actively participated in crafting S.B. 824. Jt. Stips. ¶ 99; DX013; DX014; DX015; DX019; DX042; DX046; DX047.

269. No witness, including witnesses who were members of the General Assembly when S.B. 824 was under consideration, testified that any member of the General Assembly voted for S.B. 824 for discriminatory reasons.

270. In fact, several of the legislators who testified at trial refused to name any of their colleagues who acted with racially discriminatory intent in enacting S.B. 824.

o Representative Morey does not have personal knowledge than any member of the General Assembly voted for S.B. 824 in part because of a racially discriminatory motive. 5/9/24 Tr. at 916:25–917:4.

o Representative Reives did not have any basis to conclude that any member of the General Assembly voted for S.B. 824, at least in part, to reduce the number of ballots cast by African Americans. 5/9/24 Tr. at 831:13–25. This includes the Democratic House members who voted for S.B. 824 at various stages of the process. 5/9/24 Tr. at 839:1–9.

o Former Senator Van Duyn testified that she does not know what her colleagues' intentions were in voting for S.B. 824. 5/7/24 Tr. at 470:18–20.

o Representative Harrison similarly stated in prior testimony that she "cannot say that racial bias entered into it and [she] would not say that racial bias entered into it." PX1877 at 118:25–119:2. The only intent Representative Harrison

91

ascribes to the General Assembly was to pass the bill with the supermajority necessary to override the veto of Governor Cooper, who had made clear that he was not a supporter of voter ID. PX1877 at 93:1–11.

271.    There is no evidence in the record that members of the General Assembly had racial data before them when crafting S.B. 824. While Plaintiffs cite various emails between a staffer for Former Representative David Lewis and the State Board, these emails are of limited relevance and carry no weight.

    o  First consider PX0197, which was admitted only for the limited purpose of showing that a Mr. Coggins (a staffer to Former Representative Lewis) requested and received election data. 5/13/24 Tr. at 1283:25–1284:3. There is no evidence that this data was shared with Representative Lewis, let alone the members of the General Assembly more broadly. As this Court has already held, this email cannot be used to conclude that the legislature as a whole had this information or that it contributed to their intent. 5/13/24 Tr. at 1284:3–5. Moreover, this data only included DMV-issued ID, not other forms of ID that ultimately were included in S.B. 824. PX0197 at 1–2.

    o  Next consider PX0198, which was admitted for the limited purpose that communications between the former Director of the State Board of Elections Kim Strach, Representative George Cleveland, and a member of the public occurred but not for anything else. 5/13/24 Tr. at 1284:8–11. The relevance of this email string is unclear because Plaintiffs did not admit it through a witness and it involves a discussion about voter fraud from a member of the public.

92

PX0198. If this exhibit had been admitted for its substance, it proves only that members of the public were concerned about voter fraud and expressed those concerns to lawmakers.

o Finally, consider PX0785, which was admitted for the limited purpose of demonstrating the intent and motivation of Former Representative Lewis. 5/13/24 Tr. at 1284:20–23. This email chain between Representative Lewis's staffer, Mark Coggins, and individuals at the State Board of Elections discusses how many free IDs have been issued to date and how many individuals used the reasonable impediment process during the 2016 election. PX0785 at 1–2.

o Plaintiffs did not call any of the individuals involved in these communications to testify at trial, so it is difficult to contextualize these exhibits, and for that reason the Court should give them little to no weight.

o Regardless, the data discussed in these emails was not secret data but rather data that had been publicly filed in the *McCrory* litigation. Any legislator could have asked for the same data. Additionally, Democratic legislators repeatedly referred to the *McCrory* litigation data during the debate on S.B. 824. *E.g.*, DX074 at 118–119, 128–129

o Moreover, the data in PX0785 on the number of reasonable impediment ballots cast in 2016 was presented during a committee's consideration of S.B. 824 by the Former State Board of Elections Director, Kim Strach. DX068 (Transcript of Meeting); DX214 (Presentation).

272. While Plaintiffs' witnesses suggested that it was improper for lawmakers to publicly state that they were drafting a voter-ID bill that would be upheld in court, *see, e.g.*, 5/10/24 Tr. at 1223:12–16 (Rev. Barber), such statements reveal only that lawmakers intended to pass constitutional legislation along the lines of what courts had already approved. Public statements that lawmakers are seeking to adhere to their oath are hardly probative evidence of discriminatory intent. If anything, they bolster a finding of legislative good faith.

**F.  Race-Neutral Reasons for Enacting S.B. 824**

273. While the record is devoid of any direct evidence of discriminatory intent, it reveals multiple race-neutral justifications for enacting S.B. 824.

274. First, the North Carolina constitution requires the General Assembly to enact a voter-ID law. N.C. CONST. art VI, § 2, cl. 4; *id.*, art. VI, § 3, cl. 2. If S.B. 824 is struck down, the General Assembly is bound to enact a replacement.

   o Several legislators, including those who voted for S.B. 824 and those who voted against it, cited this requirement throughout the legislative process as the reason for proceeding with S.B. 824. *See* DX068 at 3:9–11 (Representative Lewis: "We are here to do the people's business, which is to adopt a law implementing the constitutional amendment that requires a photo ID to vote."); DX069 at 2:16–19 (Senator Krawiec: "On Election Day, voters made it clear that they had decided that we needed to add a voter ID to our Constitution. So we're following through on that decision."); DX069 at 16:17–20 (Senator Woodard: "[W]e are here this week to honor the majority of North Carolina's voters and work to craft enabling legislation"); DX069 at 38:8–10 (Senator Tillman: "November 6th, the people

of this state voted rather strongly that they wanted a voter ID, photo voter ID.");
DX070 at 3:9–12 (Senator McKissick: "While I prefer the bill were it not
necessary, we have a constitutional amendment, so it is. So I think it's best that
we try to move forward with it the best we can."); DX074 at 50:16–19 (Speaker
Moore: "The chair would point to—would state that, number one, this bill is to
implement a constitutional amendment that was passed by the people of the State
at the ballot box.").

275. Fulfilling a constitutional mandate was a legitimate, race-neutral motivation for
enacting S.B. 824.

276. Second, voter ID laws like S.B. 824 protect the integrity of elections.

277. Third, voter ID laws like S.B. 824 increase public confidence in elections.

   o Several legislators, including those who voted for S.B. 824 and those who voted
     against it, cited the interests of preserving election integrity and public
     confidence in elections. *See, e.g.*, DX069 at 2:20–3:3 (Senator Krawiec: "And
     our goal has been to defend against potential voter fraud, restore faith to over
     voter system, while not making it difficult for those eligible to vote, and this bill
     secures our elections process and makes it easy and free for everyone to obtain
     their ID and cast their ballot."); DX069 at 16:21–17:4 (Senator Woodard: "As
     we approached this week, we set a goal of having a voter ID that would be
     secure, simple, and easy, without disenfranchising voters and potential voters.
     Secure and correctly identifying the voter who presents to cast his or her ballot,
     not restore but maintain the integrity and faith in our current system."); DX072

95

at 96:16–18 (Representative Warren: "I support this, and I really encourage everybody who really is conscientious about protecting the integrity of the vote, vote for the bill as well."); DX077 at 14:16–15:1 (Representative Lewis: "It is impossible to catch fraud if you aren't looking for it, and it's clear that our current system of in-person voting does not allow us to even track these problems, much less prosecute offenders. And that's the reason that voter ID has been adopted in 36 states and around the world.").

278.  Preserving election integrity was a legitimate, race-neutral motivation for enacting S.B. 824.

279.  Safeguarding public confidence in elections was a legitimate, race-neutral motivation for enacting S.B. 824.

280.  The United States Supreme Court has stated on multiple occasions that preserving election integrity and safeguarding public confidence are independent, legitimate state interests. *See Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 197 (2008); *Brnovich,* 594 U.S. at 671–72; *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006) (per curiam). Fraud-prevention remains a compelling state interest even when the legislature has before it no evidence of past fraud. *Crawford*, 553 U.S. at 194.

> o   In making these observations, the Supreme Court relied on the bi-partisan report entitled "Building Confidence in U.S. Elections" by former President Jimmy Carter and James A. Baker. *Brnovich*, 594 U.S. at 685; *Crawford*, 553 U.S. at 193–94. That report found that fraud and multiple voting "both occur" and "could affect the outcome of a close election. The electoral system cannot inspire

public confidence if no safeguards exist to deter or detect fraud or to confirm the identity of voters." DX320 at 18; *see also id.* ("The problem, however, is not the magnitude of the fraud. In close or disputed elections, and there are many, a small amount of fraud could make the margin of difference . . . the perception of possible fraud contributes to low confidence in the system.").

281.    North Carolina has recently experienced election fraud that voter-ID laws can prevent or deter.

    o   In the 2018 election—the election just before the General Assembly enacted S.B. 824—North Carolina experienced serious election fraud in the form of a ballot-harvesting scheme in the race for the Ninth Congressional District seat. *See* Order, Doc. 97-17 (Oct. 30, 2019).[9] The State Board found that this scheme affected the outcome of three races such that new elections had to be held. *See id.* During debates on S.B. 824, this incident was in the minds of lawmakers and motivated the amendment extending S.B. 824's requirements to absentee ballots. DX072 at 77:19–22 (Statement of Rep. Jackson) ("We know, as we sit here today, that election fraud may have changed the outcome in both the Republican primary and in the general election in the congressional seat in North Carolina[.]"); DX072 at 92:12–14 (Statement of Rep. Blust) ("[G]iven 2018, there is obviously some incentive out there that people try to do things

_____

    [9] This Order is part of the preliminary-injunction record, which is part of the trial record per this Court's order. Order Denying Summ. J. Mots. at 24 n.7.

97

unlawfully on Election Day."); DX072 at 13–14 (discussion of absentee ballot amendment); DX074 at 57–61 (similar). *See also* DX288 at 5–6, 21–23.

o   The evidence also shows thousands of non-citizens of voting age living in North Carolina in recent years. DX226. As Plaintiffs' witness Iliana Santillan testified, it is difficult for non-citizens to obtain forms of state-issued ID. 5/6/24 Tr. at 193:5–13.

282.   A fourth race-neutral rationale for S.B. 824 was to "bring[] [North Carolina] in line with the 34 other States that already have some form of ID" required for voting. DX074 at 108:19–20 (Statement of Rep. Lewis); *see also* DX069 at 2:12–15 (Statement of Sen. Krawiec) ("Senate Bill 824, I want to make you aware that 34 states are in this nation have some form of voter ID, all in the Southeast. North Carolina is the last to join the Southeast."). *See also* DX068 at 5; DX069 at 3–4; DX069 at 3:18–20.

**IV.   Impact of S.B. 824**

   **A.  S.B. 824 Allows Voters to Vote With or Without ID**

   **i.    S.B. 824 Is One of the Most Permissive Photo Voter-ID Laws in the Country**

283.   S.B. 824 is as, or more, permissive than several photo-ID laws that courts have upheld.

284.   Indiana's voter-ID law, upheld by the U.S. Supreme Court in *Crawford*, did not provide for voter IDs to be issued for free and without underlying documentation, and allowed only a limited set of voters without ID to cast a provisional ballot, which voters needed to return to a county office to cure. *Crawford*, 553 U.S. at 186. Many other states'

98

voter ID laws have been upheld against challenge. *See, e.g.*, *Veasey v. Abbott*, 888 F.3d 792 (5th Cir. 2018); *Lee v. Virginia State Board of Elections*, 843 F.3d 592 (4th Cir. 2016).

### ii. Implementation

285. State Board rules and guidance indicate that it is implementing, and will continue to implement, S.B. 824 in a way that protects voters.

- o Under S.B. 824's text and State Board rules, County Boards must find that provisional ballots cast in conjunction with Photo ID exception forms are valid unless the County Board unanimously finds that the voter's statement on the Photo ID exception form is "false." DX009 at 4; DX406 at 2. Any finding of falsity "shall be based only on facts and not speculation[,]" and the County Board must substantiate those findings in a written decision. DX406 at 2. Before a voter's provisional ballot is disapproved for a finding of falsity, the Board must provide the voter advance notice and an opportunity to be heard. DX406 at 2.[10]

- o State Board rules require that every voter who presents without acceptable photo ID "must be offered both" a Photo ID exception form *and* the option to vote a provisional ballot and return to their county board to present qualifying ID before canvass. Jt. Stips. ¶ 147; DX406 at 2; *see also* DX332 at 2 (State Board guidance sent to County Boards of Elections).

---

[10] County Boards are currently composed of 5 members and are bipartisan. Even if their membership were decreased to four members, they would continue to be bipartisan.

o While suspended or revoked licenses are not considered valid ID under S.B. 824, guidance from the State Board explains that: "In practice, however, election officials are typically not going to know whether a person's license has been suspended or revoked, since that information does not appear on the face of an ID, and election officials should not do independent research to determine the license status. Without having a reason to believe a voter's license has been revoked or suspended, election officials must assume that the license remains valid." Jt. Stips. ¶ 148; DX332 at 3–4.

286.    According to the election officials who testified, the State Board and County Boards work to ensure that S.B. 824 is implemented correctly, and in a non-discriminatory manner. 5/8/24 Tr. at 763:2–6 (Brinson Bell Test.); 5/7/24 Tr. at 416:9–23 (Patterson Test.). To the extent these election officials hear of implementation issues, they work to resolve them immediately. 5/7/24 Tr. at 381:22–25 (Patterson Test.); 5/8/24 Tr. at 675:16–676:23 (Brinson Bell Test.). The State Board of Elections also conducts comprehensive review processes of elections, which include debriefs with external groups, to address any issues for upcoming elections. 5/8/24 Tr. at 705:15–706:9.

287.    County boards of elections are issuing free photo voter IDs to North Carolinians who request them, and they have consistently done so when S.B. 824 has not been enjoined. DX363. As of March 4, 2024, the County Boards of Election have issued 10,795 free IDs throughout North Carolina. DX363. 5,011 of these IDs have been issued to African Americans. DX363.

100

288.    The record contains no evidence that county boards of elections are having difficulty issuing free IDs to North Carolinians who request them. In fact, Mr. Patterson testified that his County Board has had no problem meeting the demand for free IDs. 5/7/24 Tr. at 403:11–15.

### B.  The Impacts from S.B. 824's ID Requirement Are Vanishingly Small

289.    Data from the North Carolina State Board of Elections reveals that S.B. 824's ID requirements have had minuscule real-world impacts.

290.    North Carolina conducted municipal elections on September 12, 2023, October 10, 2023, and November 7, 2023. Jt. Stips. ¶ 161.

291.    According to the North Carolina State Board of Elections' Results Dashboard, 23,951 ballots were cast in the September 12, 2023 elections, 74,824 votes were cast in the October 10, 2023 elections, and 515,060 votes were cast in the November 7, 2023 elections. Jt. Stips. ¶¶ 162–164.

292.    According to State Board of Elections data, of the 613,835 votes cast across these three municipal elections, 573 provisional ballots were cast in person at early voting or on election day for reasons related to the State's photo identification requirements. Jt. Stips. ¶ 165; DX327; DX328; DX330.

293.    According to State Board of Elections data, of the 573 provisional ballots cast for reasons related to the State's photo identification requirements, 305 were for voters who filled out a Photo ID exception form. Of those 305 voters, 256 had their votes counted and 49 did not. Jt. Stips. ¶ 166; DX327; DX328; DX330.

101

294.    According to the State Board of Elections data, of the 49 voters whose votes did not count, for 42 the data shows it was because "ID was not provided," for 2 it was because they were not registered, for 4 the reason was listed as "other," and for 1, he had already voted. Jt. Stips. ¶ 167; DX327; DX328; DX330.

295.    According to State Board of Elections data, of the remaining 268 voters who cast provisional ballots related to the State's photo identification requirements, but who did not fill out a Photo ID exception form, 49 subsequently provided photo identification to the county board by the day before the canvass and had their provisional ballots counted. 219 of those 268 voters did not have their votes counted. Jt. Stips. ¶ 168.

296.    According to State Board of Elections data, of the 219 voters who did not fill out a Photo ID exception form and did not have their votes counted, for 207 the data indicates it was for the reason "ID was not provided." For 3 the reason was "not registered." For 7 the reason the vote was not counted is identified as "other." For 1 the reason listed for the vote not counting is "already voted," and for 1 the reason listed for the vote not counting is listed as "removed." Jt.. Stips. ¶ 169; DX327; DX328; DX330.

297.    Plaintiffs offered no evidence proving that the 207 voters whose ballots were not counted for the reason "ID was not provided" failed to return to present ID because of S.B. 824's photo-ID requirement, rather than for some other reason.

298.    In total, 305 of the 573 voters who cast a provisional ballot for reasons related to the State's photo identification requirements, had their ballots counted and 268 were not counted. Jt. Stips. ¶ 170.

299. North Carolina also conducted a statewide primary election on March 5, 2024 when S.B. 824 was in effect. Jt. Stips. ¶ 171.

300. According to the North Carolina State Board of Elections' Results Dashboard, 1,800,118 North Carolinians cast ballots in the March 5, 2024 primary election. Jt. Stips. ¶ 172; DX361.

301. According to the State Board of Elections data, of the 1,800,118 votes cast in the March 2024 primary election, 1,185 provisional ballots were cast in person at early voting or on election day for reasons related to the State's photo identification requirements. Jt. Stips. ¶ 173; DX362 at 4; DX324.

302. Of those 1,185 provisional ballots cast, 627 voters filled out the Photo ID exception form. Of those 627 voters, 566 had their ballots counted—557 in whole and 9 in part due to voting outside the correct precinct. Jt. Stips. ¶ 174; DX324.

303. All of the provisional ballots for which disability was listed as one of the impediments on the Photo ID exception form were counted except two. These ballots were discounted for non-ID related reasons (wrong party and provisional ballot incomplete). DX324.

304. Of the 627 voters who filled out the Photo ID exception form, 61 voters' ballots were not counted. Of those 61 voters, 43 voters' ballots were not counted for the reason "ID not provided;" 1 voter's ballot was not counted because he was not registered; 7 voters' ballots were not counted for a reason listed as "other;" 4 voters' ballots were not counted because their provisional application was incomplete or illegible; 3 voters' ballots were not counted because they registered after the deadline; 1 voter's ballot was not

103

counted because the transaction was canceled; and 2 voters' ballots were not counted because they had the wrong party ballot. Jt. Stips. ¶ 175; DX324.

305.    There was no disparate impact in the 43 ballots associated with an ID Exception Form that were not counted in the March 2024 primary election. DX324.

306.    Of the 1,185 provisional ballots cast, 558 voters did not fill out a Photo ID exception form. Of those 558 voters, 142 had their ballots counted in full or in part, and 416 did not have their ballots counted. Jt. Stips. ¶¶ 176–177.

307.    Of those 416 voters who did not have their ballots counted, 393 were not counted for the reason identified as "ID not provided" (i.e., they did not return to their County Board of elections with ID before canvass); 3 because they were not registered; 1 because the ballot was missing from the envelope; 3 because their provisional application was incomplete or illegible; 1 because of registration after the deadline; 1 because the transaction was canceled; 3 because they had the wrong party ballot; and 11 for reason listed as "other." Jt. Stips. ¶ 178.

308.    There was no disparate impact in the 393 ballots that were not counted for the reason identified as "ID not provided" in the March 2024 primary election. DX324.

309.    In total, 708 of the 1185 voters who cast a provisional ballot for reasons related to the State's photo identification requirements had their ballots counted and 477 were not counted. Jt. Stips. ¶ 179.

### C. The Record Contains No Valid Evidence of Disparate Racial Impact

#### i.    ID Possession

310.    Plaintiffs have failed to produce probative evidence of disparate impact.

311. Plaintiffs' expert Professor Herron relied on an analysis of ID-possession rates that was purposefully over-inclusive, only included a subset of the IDs that S.B. 824 allows for voting, and did not consider the impact of the reasonable-impediment provision.

o Professor Herron relied on the August 2019 no-match list created by the State Board of Elections. This list considered only two forms of identification ("drivers licenses and non-operator identification cards, both of which are in the purview of the North Carolina Division of Motor Vehicles") and did not consider whether individuals possessed any other form of qualifying photo identification. PX280 at 2.

o The 2019 no-match list was created after the enactment of S.B. 824 and is irrelevant to the General Assembly's intent when enacting S.B. 824.

o Mr. Neesby was the Chief Information Officer for the State Board of Elections when S.B. 824 was enacted. 5/8/24 Tr. at 598:23–599:4. As Mr. Neesby explained in his affidavit, the no-match list "was designed to be overinclusive. In other words, it is not a definitive list of the number of North Carolina voters who lack DMV-issued ID that can be used for voting. The actual number of North Carolina voters who lack DMV-issued ID is likely smaller than the" no-match list. Aff. of Brian Neesby, Doc. 97-29 ¶ 10 (Oct. 30, 2019) ("Neesby Decl.").[11]

---

[11] This affidavit is part of the preliminary-injunction record, which is part of the trial record per this Court's order. Order Denying Summ. J. Mots. at 24 n.7.

- o Mr. Neesby further explained that North Carolina voter roll numbers were "'inflated' with registrants who are no longer eligible to vote due to death, felony conviction, or movements across county or state boundaries." Neesby Decl. ¶ 18. And a "voter may get registered multiple times within the state's registration database." Neesby Decl. ¶ 19.

312.  Plaintiffs' expert Professor Barreto relied on a survey from August 2019 to September 2019 that was flawed for several reasons.

- o First, his question to determine whether someone is an eligible voter does not accurately track North Carolina's eligibility requirements. The survey determined eligibility to vote by asking participants to "confirm that you are 18 or over, and currently a U.S. citizen, and have lived here in North Carolina for more than 30 days[.]" PX316 at 34. Several classes of people could answer that question affirmatively while being ineligible to vote in North Carolina, such as military personnel stationed in North Carolina who maintain domicile in another state, spouses of military personnel stationed in North Carolina who maintain domicile in another state, out-of-state students in North Carolina who maintain domicile in their home states, and felony offenders who have not had their rights restored. *See* N.C. CONST. art. VI, § 2; N.C. GEN. STAT. § 163-55(a). The racial and ethnic composition of these groups may be different than the overall racial and ethnic composition of North Carolina. *See, e.g.*, *Cmty. Success Initiative v. Moore*, 886 S.E.2d 16, 35 (N.C. 2023) ("At the statewide level, 'African Americans comprise 21% of the North Carolina voting-age population, but over

106

42% of those denied the franchise due to felony . . . supervision from a North Carolina State court conviction alone. . . . In comparison, White people comprise 72% of the voting-age population, but only 52% of those denied the franchise.'" (alterations in original)).

o Second, he relied on self-reports of voter registration while knowing that people are not reliable sources of whether they are actually registered to vote. *Compare* PX316 at 24, 34 (determining voter registration by asking each survey participant if he or she is "currently registered to vote, or not registered"); *with* Matt A. Barreto et al., *The Disproportionate Impact of Voter-ID Requirements on the Electorate – New Evidence from Indiana*, POL. SCI. & POLS. 111, 115 n.6 (2009), https://bit.ly/45Gq4GI ("[N]umerous scholarly publications have demonstrated self-reported voter registration to be inaccurate.").[12]

o Third, several of his questions about eligible IDs do not accurately track North Carolina law. For example, he asks about expiration dates on military IDs, while these cards can be used regardless of expiration date. *Compare* PX316 at 37 (question 9C); *with* DX009 at 2.

313.   Neither Professors Barreto nor Herron sought to measure the impact of S.B. 824 on likely voters. Not everyone in the voter database is equally likely to vote, and to accurately

---

[12] That Professor Barreto expressed this opinion in his 2009 article is a legislative fact, or alternatively the Court can take judicial notice of this fact based on the article itself or the version of the article Professor Barreto has made available on his website, which is not subject to reasonable dispute. *See* Barreto, *supra*.

107

quantify the burden of S.B. 824, these experts must control for the likelihood of people on the no-match list to vote in the future.

- o For example, Professor Herron's preliminary report included inactive, denied, removed, and temporary voters in his count of registered voters. PX0280 at 21, 35–42. Inactive registered voters alone comprised 232,840 of the registered voters that were not matched, compared to the 382,180 active registered voters who were not matched. PX0280 at 37.

- o Professor Herron acknowledged in his rebuttal preliminary report that focusing only on active registered voters reduced the no-match rate for Black voters to 9.4% (down from 10.6%), PX0281 at 10, and reduced the no-match rate for Hispanic voters to 8.4% (down from 11.1%), PX0281 at 11.

- o Professor Barreto's survey results were inconsistent with Professor Herron's analysis using the over-inclusive no-match list. For example, even compared to Professor Herron's analysis, Professor Barreto's survey overestimated that 17.5% of Latinos lacked a driver's license (expired or unexpired) and that 19.2% of Latinos lacked unexpired DMV ID. PX0316 at 51.

- o Professor Barreto's survey asked whether participants voted in the 2016 presidential election or in the November 2018 election for U.S. Congress, PX0316 at 43 (questions 24 and 25), but notably did not analyze whether participants who voted in those elections were more or less likely to have qualifying photo identification and did not provide any data about how participants answered those questions. Professor Barreto's conspicuous failure

108

to provide or analyze such data renders Professor "Barreto's report unreliable [and] incomplete[.]" *Pierce v. N.C. State Bd. of Elections*, 97 F.4th 194, 212–13 (4th Cir. 2024) (affirming district court opinion that found Professor Barreto's testimony against North Carolina in that case "unreliable, incomplete, and contradicted by other evidence," including because Professor Barreto had not provided "complete data files").

314.    The preliminary reports of Professors Barreto and Herron did not analyze data on the issuance of free IDs throughout North Carolina.

   o   Professor Barreto nevertheless opined that the "availability of free voter IDs is . . . unlikely to reduce the disparities in qualifying ID possession rates . . . or to assure that voters who lack qualifying ID, who are disproportionately Black and Latino, obtain it[,]" PX0316 at 27, which is contrary to the data on the numbers of free IDs issued in North Carolina, *see* DX363 (as of March 4, 2024, 5,011 of the 10,795 free IDs have been issued to African Americans).

315.    There is no evidence in the record that adding any additional types of IDs would affect the racial disparity that Plaintiffs claim exists. Indeed, Plaintiffs have offered no alternative voter-ID law with a slate of different IDs that the General Assembly could have passed with a lesser racial impact, which undermines their arguments. *Alexander v. S.C. State Conf. of NAACP*, 144 S. Ct. 1221, 1249 (2024).

316.    Plaintiffs' expert Alan Lichtman's contention that learners' permits and provisional licenses are not accepted under S.B. 824, PX0044 at 39, is incorrect. DX332 (citing N.C. GEN. STAT. § 20-4.01(17), which defines "license" expansively).

317.    To the extent poverty affects whether a voter possess either a qualifying ID or the ability to obtain a free ID from a county board of elections, the record indicates that poverty will affect more white voters than African American or Hispanic voters.

318.    North Carolina's Office of State Management and Budget reports about a 12% poverty rate among whites, a 28% poverty rate among African Americans, and a 24% poverty rate among Hispanics in North Carolina. *Poverty in North Carolina*, N.C. OFF. OF STATE BUDGET & MGMT., https://bit.ly/3zdvGMF (last visited July 24, 2024).[13] Whites comprise approximately 70%, African Americans approximately 22%, and Hispanics 10.5% of the North Carolina population. *QuickFacts: North Carolina*, U.S. CENSUS BUREAU (July 1, 2023), https://bit.ly/3XEmyei.[14]

> o   Accordingly, for every 100 people in the State, approximately 8.4 are whites in poverty (12% of 70%), approximately 6.2 are African Americans in poverty (28% of 22%), and approximately 2.5 are Hispanics in poverty (24% of 10.5%). To the extent poverty affects whether a voter has a qualifying ID or the ability to obtain a free ID from a county board of elections, poverty will affect more white voters.

---

[13] This a legislative fact or, alternatively, a judicially-noticeable fact. *See supra* n.1.

[14] This a legislative fact or, alternatively, a judicially-noticeable fact. *See supra* n.1.

110

## ii. S.B. 824's Ameliorative Provisions Remedy Any Alleged Disparities

319. Any voter that might currently lack qualifying ID still has multiple ways to cast a ballot that will be counted.

320. S.B. 824 requires that free, no-documentation voter IDs be issued "at any time, except during the time period between the end of one-stop voting for a primary or election . . . and election day for each primary and election[,]" and counties may issue these IDs at multiple sites. DX009 at 1; DX333 at 2–3.

321. The State Board has provided every county two printers to print these photo IDs and the supplies for those printers. 5/6/24 Tr. at 251:17–20.

322. There is no evidence in the record that obtaining these IDs entails significant cost.

    o The record lacks any evidence about how far any voter who might need one of these IDs must travel to get one.

    o The record lacks any evidence that any alleged costs associated with the free IDs fall more heavily on African American voters.

323. Thus, under S.B. 824's plain terms, a voter without ID may obtain an ID and cast a ballot in the same trip during one-stop early voting.

    o African Americans disproportionately use one-stop early voting. *McCrory*, 831 F.3d at 230.

324. Under S.B. 824's plain terms, a voter also should be able to obtain a free, no-documentation ID and cast a ballot on election day.

111

325. If a voter does not obtain one of these IDs during one-stop voting or on election day, the voter can still cast a provisional ballot, return to a county board during the cure period, obtain a free ID, and cure the ballot at the same time.

326. Voters who are unable to present one of these IDs have still another way to vote: by checking one of the boxes on the Photo ID exception form and submitting a provisional ballot, which can be rejected only if the county board of elections has grounds to believe that the voter's claimed impediment is false. DX009 at 4. This option reduces or eliminates any alleged disparate impact. *Cf.* M.V. Hood III & Scott E. Buchanan, *Palmetto Postmortem: Examining the Effects of the South Carolina Voter Identification Statute*, Pol. Rsch. Q. (2019), Doc. 97-29 at 9–22 (Oct. 30, 2019).[15]

327. In addition to the impediments specified in the statute—which the State Board of Elections is permitted to supplement in promulgating the form, DX009 at 3—the form must include a box for "other" impediment, permitting the voter to list an impediment not specified. DX009 at 4.

328. The record contains no evidence that any voter, in particular any African American or Hispanic voter, would be dissuaded from using a Photo ID exception form.

> o No evidence suggests that this process stigmatizes poverty. Voters of all income brackets can have an impediment to presenting ID that causes them to complete a Photo ID exception form.

---

[15] This study is part of the preliminary-injunction record, which is part of the trial record per this Court's order. Order Denying Summ. J. Mots. at 24 n.7.

### D. Plaintiffs Presented No Witness Who Was Unable to Vote Due to S.B. 824 Because of His or Her Race.

329. There is no evidence in the record that any Plaintiff, member of a Plaintiff organization, or individual voter was unable to vote under S.B. 824 due to his or her race.

- o Keith Rivers voted in multiple elections where he had to present ID and did so. 5/7/24 Tr. at 289:12–14, 290:12–15.

- o Myrtle Rivers voted in the October 2023 municipal elections where she had to present ID and did so. 5/7/24 Tr. at 292:20–293:4. Ms. Rivers then voted provisionally a few months later using a Photo ID exception form when she could not find her driver's license. 5/7/24 Tr. at 275:18–20; 284:19–285:3. After voting provisionally, Ms. Rivers obtained a free voter photo ID card. 5/7/24 Tr. at 282:15–18. While Mr. Rivers expressed concerns that his mother was given a voter registration form, Ms. Brinson Bell testified that this is normal practice when a voter is voting provisionally so that the County Board can contact or immediately register the voter if necessary. 5/8/24 Tr. at 726:13–25, 727:15–25.

- o Danell Burney voted during the 2020 election despite feeling intimidated by one Republican poll observer. She also presented ID and was able to vote in the March 2024 primary election. 5/7/24 Tr. at 306:10–16.

- o Cedric Baker and Robert Fletcher both did not present qualifying ID under S.B. 824, voted provisionally, and did not return with ID prior to canvass. DX324; 5/9/24 Tr. at 1021:14–16; 5/10/24 Tr. at 1117:10–16, 1120:10–12. Plaintiffs presented no evidence that their inability to present qualifying ID in the first

113

instance, or return with it, was due to their race. Instead, Mr. Baker claimed that he could not obtain ID and return to his County Board due to his work schedule—an assertion that this Court should not credit given that his restaurant was closed when he voted, *see supra* Part II.C.iii. Similarly, Mr. Fletcher testified that he could not return to present qualifying ID because he had other obligations. *See supra* Part II.C.iv.

- While Mr. Baker and Mr. Fletcher testified that they were not offered Photo ID exception forms, State Board rules require that every voter who presents without acceptable photo ID "must be offered both" a Photo ID exception form *and* the option to vote a provisional ballot and return to the county board to present qualifying ID before canvass. Jt. Stips. ¶ 147; DX406 at 2; *see also* DX332 at 2 (State Board guidance sent to County Boards of Elections). Moreover, other individuals were able to vote using Photo ID exception forms during the March 2024 primary in both Forsyth and Franklin counties, where Mr. Baker and Mr. Fletcher voted. DX324. The isolated implementation errors that affected Mr. Baker and Mr. Fletcher—while unfortunate—are irrelevant to a facial challenge to S.B. 824.

330. While Mr. Patterson testified about two voters who attempted to vote provisionally in the November 2023 municipal elections in Pink Hill but could not, his testimony about these individuals is not credible because it is based on hearsay. 5/7/24 Tr. at 407:22–408:8. Additionally, Mr. Patterson did not conduct any investigation after the fact as to whether

114

these voters were even registered or eligible to vote. 5/7/24 Tr. at 409:12–410:6. In fact, he admitted that the reason the Board was unable to count these voters' provisional ballots was because they could not determine whether these individuals were eligible to vote at all, not anything related to the Photo-ID requirement. 5/7/24 Tr. at 390:16–19, 411:18–20.

- o As Ms. Brinson Bell testified, if these two voters in Pink Hill were registered voters they should appear in the poll book. 5/8/24 Tr. at 735:23–24. Moreover, if these voters provided enough identifying information when voting provisionally so the poll workers can confirm who they are, the Board could consider that provisional ballot. 5/8/24 Tr. at 738:2–9.

- o Finally, any assertion that these ballots were not counted for an ID-related reason as opposed to these voters not providing enough information to determine who they were and if they were even registered is contradicted by State Board of Elections data. In the 2023 November municipal election, one voter from Pink Hill voted provisionally using a Photo ID exception form (citing lack of transportation), and that vote was counted. DX327. The second voter from Pink Hill who cast a provisional ballot had that ballot discounted because there is no record of the individual's registration, which is wholly unrelated to S.B. 824's photo-ID requirement. DX327. If Mr. Patterson was referring to two different voters who do not appear in the State Board of Elections data files, he did not provide enough information to draw any nonspeculative conclusions about why their ballots were allegedly not counted.

115

331.    Any assertion that the NAACP chapter Plaintiffs have members who were unable, or will be unable, to vote due to S.B. 824's voter-ID requirements is speculative.

### E.  S.B. 824's Challenge and Poll Observer Provisions

332.    Before S.B. 824 was enacted, North Carolina permitted registered voters in a county to challenge another voter's ballot based on an allegation that the voter: lacks the necessary residency, is underage, has not completed a felony sentence, is not a U.S. citizen, or is not "who he or she represents himself or herself to be." N.C. GEN. STAT. §§ 163-85(c)(9), 163-87.

333.    S.B. 824 added one additional category to that list. Voters can challenge the ballot of a voter who "does not present photo identification in accordance with" S.B. 824's requirements. DX009 at 13.

334.    S.B. 824 does not allow voters to challenge whether a voter qualifies for any of the exceptions to presenting photo ID, or the truthfulness of any statements on their photo ID exception form. 5/8/24 Tr. at 752:10–18.

335.    S.B. 824 neither increases the number of people who can bring challenges, nor loosens the requirements for challenges.

336.    Plaintiffs presented no evidence at trial proving that S.B. 824's minor alteration to the challenge provisions impacts voters generally, let alone minority voters specifically.

337.    Before S.B. 824 was enacted, North Carolina allowed each political party to appoint roughly 6,200 poll observers for election day.

116

- o Each recognized political party may appoint two observers for every precinct in the state, totaling roughly 5,200 observers. N.C. GEN. STAT. § 163A-821(a), recodified by Sess. Laws 2018-146 §§ 3.1(a), (b).

- o Each recognized political party may designate 10 additional "at-large" poll observers who are residents of that county for each county, or 1,000 observers for each party. N.C. GEN. STAT. § 163A-821(a), recodified by Sess. Laws 2018-146 §§ 3.1(a), (b).

- o North Carolina allows "[n]ot more than two observers from the same political party" inside the voting enclosure, except "one of the at-large observers from each party may also be in the voting enclosure." N.C. GEN. STAT. § 163A-821(a), recodified by Sess. Laws 2018-146 §§ 3.1(a), (b).

338. S.B. 824 did not change the appointment of those roughly 6,200 poll observers, or the fact that only three observers from each party are allowed inside the polling place. DX009; DX408.

339. S.B. 824 also did not disturb preexisting restrictions on poll worker conduct.

- o Poll workers cannot take photographs, record voters, impede voters' ingress or egress, inhibit or interfere with any election official, engage in electioneering, or make or receive phone calls while in the voting enclosure. N.C. GEN. STAT. § 163-45.1(h).

- o Anyone in a polling place (including poll observers) cannot interfere with (or attempt to interfere with), assault, intimidate (or attempt to intimidate), or

117

question voters and election officials. *Id.* §§ 163-274(a)(4)–(5), 163-275(10)–(11).

- o Additionally, all persons (including poll observers) are prohibited from harassing anyone in the voting place or surrounding buffer zone. *Id.* § 163-166.4(a). Individuals who engage in these prohibited activities may be subject to criminal penalties under state or federal law. *Id.* §§ 163-273(a)(3)–(4), 163-274(a)(7); *see also* 18 U.S.C. § 594; 52 U.S.C. §§ 20511(1), 10307(b).

- o All persons (including poll observers) are also prohibited from engaging in any "conduct that would make a voter reasonably fearful, threatened, or coerced during the voting process." DX408 at 9–11. If alerted to any prohibited activity by a poll observer, the chief judge can remove that observer. DX408 at 11–12; N.C. GEN. STAT. §§ 163-47, 163-48.

340. S.B. 824 allowed political parties to appoint 100 additional at-large state observers who can observe voting in any location in the state, DX009 at 14, raising the total number of poll observers slightly (to about 6,300). S.B. 824 did not change the number of observers who can be present in any polling location at one time.

341. Plaintiffs' argument that the 100 additional poll observers permitted by S.B. 824 will lead to voter intimidation is speculative and unsupported by record evidence.

342. Plaintiffs presented only one witness, Ms. Burney, who testified that she felt intimidated by an observer in a polling place. 5/7/24 Tr. at 301:21–302:2, 303:1–3.

118

- o There is no evidence in the record suggesting that this poll observer was one of the 100 additional at-large poll observers that S.B. 824 added, as opposed to one of the 6,200 poll observers who would have been present despite the law.

- o There is no evidence in the record that Ms. Burney's interaction with this poll observer was anything more than an isolated incident.

- o Ms. Burney did not report the actions of this observer to any election officials. 5/7/24 Tr. at 308:10–15. Had she reported this incident, the election officials are trained to take prompt action and could have removed the poll observer for improper conduct. 5/8/24 Tr. at 744:7–25, 748:6–10, 748:19–749:5; DX408.

## V.    North Carolina's Entire System of Voting

343.    North Carolina generally makes it very easy for all eligible voters to vote.

344.    North Carolina has two-and-a-half weeks of early voting, allows for voting on the Saturday before Election Day, and permits counties to offer additional weekend hours. Jt. Stips. ¶ 151. A voter may vote at any early voting location in their county. Jt. Stips. ¶ 152.

345.    North Carolina has around 2,600 polling places open from 6:30 a.m. to 7:30 p.m. on election day. Jt. Stips. ¶ 159. Voters may use the State Board's online Voter Search to find their polling place and sample ballot. Jt. Stips. ¶ 160.

346.    Any qualified North Carolina voter may also vote by absentee ballots under N.C. GEN. STAT. § 163-226(a). Jt. Stips. ¶ 153. Absentee ballots can be requested online and are available 60 days before Election Day in general elections and 50 days before primaries and special elections. Jt. Stips. ¶ 154.

347.   Voters who require assistance due to age or disability have the option to vote curbside from their vehicle. Jt. Stips. ¶ 156. Voters who require assistance inside the polling place can also ask for help. Jt. Stips. ¶ 157.

### VI.   Widespread Use of Voter ID Laws

348.   35 states (plus North Carolina) have laws requesting or requiring voters to show some form of identification at the polls. *See* ALA. CODE § 17-9-30; AK. STAT. § 15.15.225; ARIZ. REV. STAT. § 16-579(A); ARK. CONST. amend. 51 § 13; ARK. CODE ANN. §§ 7-1-101(40)(A), 7-5-201, 7-5-305, 7-5-308, 7-5-324; COLO. REV. STAT. §§ 1-1-104(19.5), 1-7-110; CONN. GEN. STATS. § 9-261; 15 DEL. CODE § 4937; FLA. STAT. § 101.043; GA. CODE § 21-2-417; IDAHO CODE §§ 34-1106(2), 34-1113, 34-1114; IND. CODE §§ 3-5-2-40.5, 3-10-1-7.2, 3-11-8-25.1; IOWA STAT. §§ 49.78, 48A.7A, 49.81; KAN. STAT. §§ 25-2908, 25-1122, 25-3002, 8-1324(g)(2); KY. STAT. §§ 117.001(15), 117.227; LA. STAT. §§ 18:562, 40:1321; MICH. COMP. L. § 168.523; MISS. CODE § 23-15-563; MO. STAT. § 115.427; MONT. STAT. § 13-13-114; NEB. REV. STAT. §§ 32-318.01, 32-914; N.H. CODE § 659:13; N.D. CODE § 16.1-05-07; OHIO CODE §§ 3501.01, 3505.181; 26 OKLA. STAT. 7-114; R.I. CODE § 17-19-24.2; S.C. CODE § 7-13-710; S.D. STAT. §§ 12-18-6.1, 12-18-6.2; TENN. CODE § 2-7-112; TEX. STAT. § 63.0101; UTAH CODE §§ 20A-1-102(83), 20A-3A-203; VA. CODE § 24.2-643(B); WASH. CODE § 29A.40.160; W.V. CODE § 3-1-34; WISC. STAT. §§ 5.02(6m), 6.97; WY. CODE §§ 22-1-102, 22-2-119.

349.   Of those 35 states, 14 will not count ballots cast by voters without the required identification at the polls unless those voters return to produce ID, transmit a copy of their identification by mail or fax, or execute an affidavit stating that they cannot obtain

120

identification because they are indigent or have a religious objection to being photographed. ALA. CODE § 17-10-2; *Provisional Balloting*, ARIZ. SEC'Y OF STATE, https://bit.ly/3THWb3v (last visited June 24, 2024); ARK. CODE ANN. § 7-5-308; GA. CODE § 21-2-417; *Exemptions*, IND. SEC'Y OF STATE, https://bit.ly/3POoImK (last visited June 24, 2024); KAN. STAT. § 25-1122; MISS. CODE § 23-15-563; MO. STAT. § 115.427; N.D. CODE § 16.1-01-04.1; OHIO CODE § 3505.181; TENN. CODE § 2-7-112(c); UTAH CODE § 20A-3a-203; WISC. STAT. § 6.97; WY. CODE § 22-15-105.

350. Of those 35 states, four (plus North Carolina) allow voters without compliant ID to vote after completing an affidavit without requiring the voter to return to the polls or provide any further identity verification. AK. STAT. § 15.15.225; IDAHO CODE § 34-1114; MICH. COMP. L. § 168.523; S.D. STAT. § 12-18-6.2.

351. Of those 35 states, six will disqualify a ballot cast by a voter without ID if the signature does not match the signature on the voter registration rolls or on the voter identification provided. FLA. STAT. § 101.043; MO. STAT. § 115.427; MONT. STAT. § 13-15-107(2); R.I. CODE § 17-19-24.3; WASH. CODE § 29A.40.160; W.V. CODE § 3-1-34.

352. Of those 35 states, 14—Alabama, Alaska, Arkansas, Florida, Georgia, Indiana, Iowa, Kansas, Mississippi, Missouri, Ohio, Tennessee, Utah, and Wisconsin—do not have a process for submitting a reasonable impediment declaration or its equivalent for voters who do not present qualifying IDs at the polls.

353. Of those 35 states, 10—Alaska, Arizona, Colorado, Connecticut, Delaware, Florida, Montana, South Dakota, Utah, and Washington—do not offer any form of free ID that can be used for voting.

354.　Of those 35 states, two in addition to North Carolina—Kansas and New Hampshire—allow voters over 65 to use an expired ID, and Texas allows voters over 70 to use an expired ID. KAN. STAT. § 25-2908(h)(1); N.H. CODE § 659:13(II(a)); TEX. STAT. § 63.0101.

355.　Indiana, Mississippi, and Tennessee only recognize indigence, religious objections, and confinement to state-licensed facilities as exemptions to presenting qualifying ID. *Exemptions*, IND. SEC'Y OF STATE, *supra*; MISS. CODE § 23-15-563; TENN. CODE § 2-7-112(c).

### VII.　S.B. 824 Bears No Connection to Historical Discrimination

356.　North Carolina history has been one of increasing racial parity, especially in voting. Meanwhile, historical efforts to disenfranchise African Americans stand in stark contrast to S.B. 824.

357.　North Carolina stood apart from other Southern states in its efforts toward racial inclusivity after the Civil War.

- o In the 1868 elections, "the percentage of whites who crossed the color line and made common cause with former bondsmen was larger than in any other southern state[,]" resulting in a victory for the biracial Republican party. PX0001 at 9.

- o A biracial political partnership, "under the banner of 'Fusion,'" again won over half the seats in the General Assembly in 1894. PX0001 at 11.

- o These lawmakers "revised state election law with the aim of guaranteeing full and fair access to the franchise[.]" PX0001 at 12.

122

358. By the late 19th century, North Carolina had "the most democratic political system" in the South. PX0001 at 15.

359. The response from those North Carolina residents who still did not support racial integration, generally represented by the Democratic party, was explicit and violent.

- o "Democratic newspapers took the lead in whipping up race hatred." PX0001 at 16.

- o In 1898, the city of Wilmington experienced "the only municipal coup d'état in the nation's history," as armed whites "marauded through Wilmington's Black district" and "murdered as many as thirty black citizens in the streets." PX0001 at 18.

- o Democrats identified openly as white supremacists when taking violent action against African Americans. PX0001 at 15.

360. In 1899, with Democrats in control, the General Assembly proposed a constitutional amendment requiring that voters pass a literacy test and pay a poll tax before they would be allowed to vote. PX0001 at 19.

- o Few, if any, African Americans could satisfy the criterion for the literacy test. PX001 at 19.

- o The vagueness of the literacy test also "gave Democratic registrars wide latitude to exclude black men from the polls." PX0001 at 18.

- o The poll tax came due at a time of year—the first of May, before the fall harvest—when "black sharecroppers were unlikely to have cash on hand for such a payment." PX0001 at 19.

123

o The General Assembly also passed legislation, the 1899 Act to Regulate Elections, to remove as many African Americans from the voter rolls as possible, including by ordering an entirely new voter registration and by undoing Fusion lawmakers' reforms. PX0001 at 18–21.

361. Even in the Jim Crow era, North Carolina distinguished itself from Southern States with its more moderate and inclusive politics.

o "In large part, that was because of a critical gubernatorial election in 1960, won by moderate Democrat Terry Sanford," who "preached a message of opportunity for all and used the police power of the state to surveil and restrain the Klan." PX0001 at 44. In the Democratic primary, voters had chosen Sanford over Beverly Lake, a defender of Jim Crow. PX0001 at 45.

362. More recently, the North Carolina General Assembly has also passed several measures to "expan[d] minority citizens' access to the franchise." PX0001 at 53–54.

o Many of these reforms "echoed the Fusion election law of 1895," and S.B. 824 leaves them in place. PX0001 at 53–54.

363. Unlike other states in the South, North Carolina was not subject to the preclearance process of the Voting Rights Act of 1965.[16]

364. In modern times, African Americans have made significant headway in political strength in North Carolina.

---

[16] This a legislative fact or, alternatively, a judicially-noticeable fact. *See supra* n.1.

124

o "By 1989, nineteen blacks served in the General Assembly, more than were elected during either Reconstruction or the Fusion era." PX0001 at 52.

o In 1990, North Carolina had an African American running for Senator, whose "very presence in the race testified to the gains that black North Carolinians had made in access to the ballot box and political influence." PX0001 at 52.

o In 1991, the General Assembly elected an African American Representative, Dan Blue, as Speaker of the House. PX0001 at 52.

o When S.B. 824 was enacted, eleven of fifty (22%) of Senators in the North Carolina General Assembly were African American.

o When S.B. 824 was enacted, 24 of 120 (20%) Representatives in the North Carolina General Assembly were African American.

o In 2018, North Carolina was about 21% African American. *See DPO5 ACS Demographic and Housing Estimates*, U.S. CENSUS BUREAU, https://bit.ly/45FK1h5 (last visited June 24, 2024). Representation in both the House and the Senate for African American voters therefore mirrored the state's demographics in 2018.

o North Carolina has had an African American Lieutenant Governor, Mark Robinson, since 2021.[17]

---

[17] These are legislative facts or, alternatively, judicially-noticeable facts. *See supra* n.1.

125

- Mark Robinson is the North Carolina Republican Party's gubernatorial nominee for 2024. He won the 2024 Republican primary when S.B. 824 was in place.

365.  In recent elections, African American voting strength has equaled and even surpassed that of whites.

- Most of the increase in voter turnout in North Carolina between 1996 and 2012 "was driven by higher rates of black political participation. Between 2000 and 2012, black voter registration surged by 51.1 percent, as compared to 15.8 percent among whites." PX0001 at 54.

- "Black turnout followed apace. Between 2000 and 2008, it jumped from 41.9 to 71.5 percent. In the 2008 and 2012 elections, blacks registered and voted at higher rates than whites for the first time in North Carolina's history." PX0001 at 54.

- Barack Obama won North Carolina's presidential election in 2008—an unlikely feat for an African American candidate in 1900—even though he lost in Mississippi, Alabama, and Georgia.[18]

- Governor Roy Cooper won North Carolina in 2016 with crossover support. PX0044 at 52–55.

366.  While Plaintiffs' expert Alan Lichtman argues that reducing the age for which one can use an expired ID from 70 to 65 widens racial disparities and resembles the

---

[18] The states that Barack Obama won and lost in 2008 are legislative facts or, alternatively, judicially-noticeable facts. *See supra* n.1.

"grandfather clause" of the past, *e.g.*, PX0044 at 40, the State Board has never analyzed the race or ethnicity of voters over 65, 5/8/24 Tr. at 603:21–604:20, and Plaintiffs presented no evidence that the General Assembly had racial data broken down by age before it when it was considering S.B. 824. The most reasonable interpretation of the General Assembly's actions was that in lowering the age from 70 to 65 for expired IDs, the General Assembly was permitting more seniors to use expired ID.

367.    Plaintiffs' anticipated argument that S.B. 824—a bill supported by several African American Democratic Senators during and through its enactment—forms part of the legacy of Jim Crow has no basis in fact.

## CONCLUSIONS OF LAW

### I.    Legal Standards

#### A.  Constitutional Claims

368.    Because S.B. 824 is race-neutral, Plaintiffs must prove that it was passed with discriminatory intent and has an actual discriminatory impact to succeed on their Fourteenth Amendment claim. *Abbott v. Perez*, 585 U.S. 579, 603 (2018); *Raymond*, 981 F.3d at 302. A Fifteenth Amendment claim also requires Plaintiffs to prove both racially discriminatory impact and intent. *City of Mobile v. Bolden*, 446 U.S. 55, 62, 65 (1980).

369.    Determining whether a statute was enacted with discriminatory intent involves a two-step process. First, Plaintiffs bear the burden of showing that racial discrimination was a "'substantial' or 'motivating' factor behind enactment of the law[.]" *Hunter v. Underwood*, 471 U.S. 222, 228 (1985). Satisfying that burden requires analysis of the four *Arlington Heights* factors: (1) the historical background of S.B. 824; (2) the specific

sequence of events leading to the law's enactment, including any departures from the normal legislative process; (3) the law's legislative history; and (4) whether the law "'bears more heavily on one race than another.'" 429 U.S. at 265–69 (quoting *Washington v. Davis*, 426 U.S. 229, 242 (1976)).

370.     Any disparate impact resulting from poor enforcement of the law is legally irrelevant. *Raymond*, 931 F.3d at 310. The legislature is entitled to anticipate effective enforcement of its laws. *South Carolina v. United States*, 898 F. Supp. 2d 30, 44 (D.D.C. 2012).

371.     In evaluating discriminatory intent, this Court must afford the North Carolina Legislature a presumption of good faith. *Raymond*, 981 F.3d at 303; *Alexander*, 144 S. Ct. at 1233. "The allocation of the burden of proof and the presumption of legislative good faith are not changed by a finding of past discrimination[.]" *Perez*, 585 U.S. at 581; *see also Raymond*, 981 F.3d at 303.

372.     Plaintiffs cannot carry their burden or overcome the presumption of good faith by establishing only disparate impact and a discriminatory historical background. *Farm Labor Org. Comm. v. Stein*, 56 F.4th 339, 353 (4th Cir. 2022).

373.     Second, if Plaintiffs can somehow overcome the presumption of legislative good faith, the burden then shifts to Defendants to demonstrate that the law would have been enacted without racial discrimination. *Raymond*, 981 F.3d at 303.

### B.  Voting Rights Act Claim

374.     Under Section 2 of the VRA, Plaintiffs must prove that that "based on the totality of circumstances," the political processes of North Carolina "are not equally open to

participation by members of a class of citizens . . . in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." 52 U.S.C. § 10301(b); *Brnovich*, 594 U.S. at 657–59.

375.   Plaintiffs must make an even "greater showing of disproportionate impact" to prevail on their VRA Section 2 claim than on their constitutional claims. *McCrory*, 831 F.3d at 231 n.8.

376.   The Supreme Court recently provided a list of "important circumstances" to consider when conducting the "totality of circumstances" analysis under Section 2 in in cases evaluating "generally applicable time, place, or manner voting rules[,]" such as voter-identification statutes. *Brnovich*, 594 U.S. at 661, 668–69.

     o   These include "the size of the burden imposed by a challenged voting rule," "the opportunities provided by a State's entire system of voting," the "degree to which a challenged rule has a long pedigree or is in widespread use in the United States," a "meaningful comparison" of "any disparities in a rule's impact on members of different racial or ethnic groups," and finally "the strength of the state interests served by a challenged voting rule." *Id.* at 669–71.

377.   While the Supreme Court did not overrule its prior use of the so-called "Senate Factors" in *Gingles* (a vote dilution case), it strongly suggested that the above factors are those that matter in a case where, as here, Plaintiffs challenge a generally applicable time, place, or manner restriction on voting. *See id*. at 666–68.

o Even if the so-called "Senate Factors" were relevant to Plaintiffs' challenge of S.B. 824, which they are not, Plaintiffs have failed to establish that the factors support their claim.

o For example, Plaintiffs' expert Professor Burden opined that African Americans had "recently approached parity with their prevalence in the electorate." PX0337 at 18. He noted that by 2019, among North Carolina's "nine statewide constitutional officers," "only one has been black in the 225-year history of the state." PX0337 at 18. Now, 2 of the 9 statewide constitutional officers (or 22.2%) are African American: Lieutenant Governor Mark Robinson and Auditor Jessica Holmes.[19]

o Even so, Section 2 of the VRA does not require parity in representation. *See* 52 U.S.C. § 10301(b). Otherwise, such a requirement would cast suspicion on any voting regulation, so long as every race is not proportionally represented in public office. Professor Burden himself admitted that academic literature is ambiguous on whether disparities in ID possession rates lead to disparate results in voter participation. Burden Dep. Tr., Doc. 97-30 at 39:2–18, 57:21–58:19, 64:21–65:10 (Oct. 30, 2019).[20]

o Further, Plaintiffs have failed to establish legally significant racial polarization. *Pierce*, 97 F.4th at 212. Legally significant white bloc voting does not exist

---

[19] This a legislative fact or, alternatively, a judicially-noticeable fact. *See supra* n.1.

[20] This deposition transcript is part of the preliminary-injunction record, which is part of the trial record per this Court's order. Order Denying Summ. J. Mots. at 24 n.7.

where crossover white voting enables Black- or Hispanic-preferred candidates to succeed. *Id.* at 213.

o Plaintiffs' expert Professor Lichtman presented poll results that showed Republican Senator Burr, who won the 2016 U.S. Senate election in North Carolina, was Hispanic voters' candidate of choice. PX0044 at 53. Professor Lichtman also presented poll results that showed Democrat Governor Cooper, who won both the 2016 and 2020 gubernatorial elections in North Carolina, was the candidate of choice for both Black and Hispanic voters in the 2016 gubernatorial election. PX0044 at 53.

o Thus, according to Professor Lichtman's analysis, Hispanic voters' preferred candidate won two of the three 2016 elections that he analyzed while Black voters' preferred candidates won one of the three 2016 elections that Professor Lichtman analyzed. PX0044 at 53. At least 32% of white voters voted for Black voters' preferred candidate in each of those three 2016 elections. PX0044 at 53.

o Professor Barreto claimed that the CNN exit poll data that both Professor Lichtman and Professor Barreto used had "been heavily criticized for having unreliable Latino samples." PX316 at 32 n.20. Professor Barreto combined the CNN exit poll data with pre-election polling data from his own organization to provide consistently lower estimates of Latino support for Republican candidates than Professor Lichtman. *Compare* PX316 at 32–33, *with* PX0044 at 53.

o The unreliable and contradictory analyses of Professors Lichtman and Professor Barreto are insufficient to establish legally significant racial polarization.

## II. The Legislature Is Entitled to a Presumption of Good Faith

378. The Supreme Court and the Fourth Circuit have repeatedly explained that state legislatures are entitled to a "starting presumption" that they acted in good faith, which is not altered by a finding of past discrimination. *Alexander*, 144 S. Ct. at 1235; *see also Perez*, 585 U.S. at 603; *Raymond*, 981 F.3d at 303.

379. Because legislators "are properly concerned with balancing numerous competing considerations," they deserve the presumption that they sought to advance the public interest while adhering to their oath to respect constitutional rights. *Arlington Heights*, 429 U.S. at 265; *Raymond*, 981 F.3d at 303.

380. It is difficult to overcome the presumption of good faith if, as here, Plaintiffs fail to show that the legislature could have come up with a voter-ID law that would have allegedly been less burdensome. *Alexander*, 144 S. Ct. at 1235.

381. The presumption of legislative good faith directs district courts to draw inferences in the legislature's favor when confronted with evidence that could plausibly support multiple conclusions. *See id.* at 1235–36.

382. The presumption of good faith reflects the judiciary's due respect for the judgment of state legislators, who are similarly bound by an oath to follow the Constitution. *See id.* at 1236.

383. Courts should not be quick to accuse the political branches of engaging in the offensive and demeaning conduct of discriminating based on race. *See id.*

132

384.    The North Carolina legislature is entitled to a presumption of good faith related to its enactment of S.B. 824, and Plaintiffs have not produced sufficient evidence to overcome that presumption.

### III.    Plaintiffs Produced No Direct Evidence of Discriminatory Intent

385.    S.B. 824's historical background begins with the 2018 constitutional amendment adopted by the People of North Carolina. That "independent intervening event" severs any link to past racial discrimination. *Raymond*, 981 F.3d at 305. Any history of discrimination regarding other legislation is of limited probative force. *United States v. Sanchez-Garcia*, 98 F.4th 90, 99–100 (4th Cir. 2024). In other words, Plaintiffs cannot use past discrimination, "in the manner of original sin," to "condemn governmental action that is not itself unlawful." *City of Mobile*, 446 U.S. at 74.

386.    Even if this were not the case, the plain terms of S.B. 824 belie any link with previous legislation. Many provisions of H.B. 589 central to the Fourth Circuit's reasoning in *McCrory*—the law's reduction of the early voting period, elimination of same-day registration and voting, prohibition of out-of-precinct voting, and repeal of provision allowing 16- and 17-year-olds to preregister if they would not be eighteen by election day—are not present in S.B. 824. *Compare* DX122 *with* DX009; *McCrory*, 831 F.3d at 232.

387.    Plaintiffs' expert Lichtman focuses on the overlap in legislators who voted for both H.B. 589 and S.B. 824. PX0044 at 11–12. But as the Fourth Circuit has explained, it would be a "mistake" to "penalize[e] the General Assembly because of who they were, instead of what they did." *Raymond*, 981 F.3d at 304.

133

388. Whether or not the North Carolina legislature that adopted S.B. 824 was elected under racially-gerrymandered maps is legally irrelevant.

389. Plaintiffs have produced no other direct evidence that the legislature acted with discriminatory intent in enacting S.B. 824.

390. Plaintiffs' own witnesses, including members of the General Assembly, were unable to name a single member of the North Carolina General Assembly who voted for S.B. 824 out of racial animus. *See, e.g.*, PX1877 at 118:25–119:2 (Harrison Test.); 5/9/24 Tr. at 916:25–917:4 (Morey Test.); 5/9/24 Tr. at 831:13–25 (Reives Test.); 5/7/24 Tr. at 470:21–471:10 (Van Duyn Test.).

391. There is no evidence in the record showing that the General Assembly was aware of data showing ID possession rates based on race when crafting S.B. 824.

392. There is evidence that the General Assembly was aware from Ms. Strach's November 26, 2018, presentation that 99.9% of voters had voted successfully under H.B. 589. DX213; DX068.

   o It is implausible that after learning 99.9% of voters could vote successfully under the prior regime, a legislature supposedly bent on entrenching itself by preventing minorities from voting would have passed a law making it even easier to vote.

393. Even if legislators or staffers had viewed racial data at some point in the process of crafting S.B. 824 (there is no evidence that they did so), this fact carries little weight. *Alexander*, 144 S. Ct. at 1242. Even if legislators had this data, that fact cuts in favor of finding no discriminatory intent. For starters, the legislators would have only had racial

134

disparities in DMV-ID possession before them. A legislature bent on discriminating to entrench its political power would presumably seek to limit voter ID to DMV IDs, not expand upon them to add other categories of IDs. Moreover, the categories of IDs that the legislature expanded S.B. 824 to accept included those claimed to be disproportionately used by African Americans in *McCrory*. *N.C. State Conf. of NAACP v. McCrory*, 182 F. Supp. 3d at 320, 496–97 (M.D.N.C. 2016), *rev'd and remanded*, 831 F.3d 204 (4th Cir. 2016).

394.    If S.B. 824 were motivated by an intent to make it harder for African Americans and Hispanics to vote, it is implausible that any African American legislator would have voted for S.B. 824 at any stage of the legislative process. Yet three African American legislators did. If S.B. 824 were motivated by an intent to make it harder for Democrats to get elected, on the theory that African Americans and Hispanics predictably vote for Democrats, it is implausible that any Democratic legislator would have voted for S.B. 824 at any stage of the legislative process. Yet S.B. 824 had a primary sponsor, Senator Joel Ford, who is a registered Democrat. It received votes from two other Democratic Senators—combining for over 20% of the Senate Democratic caucus—and two Democratic representatives. The salient fact, therefore, is not that Republicans supported both H.B. 589 and S.B. 824, but that H.B. 589 received *zero* votes from Democrats and S.B. 824 received votes from five—four of whom voted for the bill in its final form.

395.    Moreover, to the extent Republican overlap from H.B. 589 to S.B. 824 is relevant, it is also relevant what else a similar group of legislators did. We cannot arbitrarily stop our review on the day that S.B. 824 took effect. While Republicans still controlled the General

Assembly, it passed Senate Bill 214, delaying S.B. 824's implementation date until after the 2020 elections; House Bill 646, relaxing requirements for student, government-employee, and tribal IDs; Senate Bill 683, expanding the reasonable-impediment provision and appropriating additional funds to implement voter ID; and House Bill 1169, approving public-assistance IDs for voting use. All these measures—which are now included in the law that Plaintiffs seek to enjoin—provided further assistance for voting under S.B. 824, and all received votes from many of the same Republican legislators who supported H.B. 589 and S.B. 824.

## IV. The Circumstantial Evidence of Discriminatory Intent that the Fourth Circuit Located in H.B. 589 Does Not Exist in S.B. 824

396. For the many reasons already discussed, S.B. 824 shares none of the characteristics that the Fourth Circuit relied upon when enjoining H.B. 589.

397. First, the omnibus nature of H.B. 589 was critical to the Fourth Circuit's analysis. "[T]he sheer number of restrictive provisions," the court said, "distinguishes this case from others[,]" because "cumulatively, the panoply of restrictions results in greater disenfranchisement than any of the law's provisions individually." *McCrory*, 831 F.3d. at 231–32. "[A] rational justification can be imagined for many election laws, including some of the challenged provisions here. But a court must be mindful of the number, character, and scope of the modifications enacted together in a single challenged law." *Id.* at 234. These statements do not apply to S.B. 824, which is not an omnibus bill.

398. Second, the Fourth Circuit observed that the initial draft of H.B. 589, introduced before the U.S. Supreme Court invalidated the preclearance process in *Shelby County v.*

136

*Holder*, 133 S. Ct. 2612 (2013), included "a much less restrictive photo ID requirement" than the final bill and none of the other omnibus provisions. *McCrory*, 831 F.3d. at 227. After *Shelby County*, the General Assembly replaced that draft with a much more expansive bill, which it proceeded to pass in three days and "on strict party lines." *Id.* at 228.

399.    The sequence of S.B. 824 is entirely different. The bill was introduced not after a judicial decision removing restrictions on states' ability to make voting changes, but after a constitutional amendment requiring the General Assembly to pass a law implementing a specific change. The initial draft of the bill included a free-ID provision and sweeping reasonable-impediment process. It became only more lenient during the legislative process, which the direct statements of multiple Democratic legislators confirm was thorough and inclusive. *See* DX070 at 3 (Senator McKissick); DX069 at 44 (Senator Smith); DX069 at 55 (Senator Van Duyn); DX069 at 17 (Senator Woodard); DX074 at 116–117 (Representative Harrison). It has become even more lenient since with the inclusion of public assistance IDs. DX086. And far from being passed on strict party lines, S.B. 824 had an African American Democrat as one of its primary sponsors.

400.    Third, the Fourth Circuit determined that "findings that African Americans disproportionately used each of the removed mechanisms" of H.B. 589—preregistration, same-day registration, early voting, and out-of-precinct voting—"as well as disproportionately lacked the photo ID required by [H.B. 589] . . . establishes sufficient disproportionate impact." *McCrory*, 831 F.3d at 231.

401.    S.B. 824 cannot have the same impact; again, it is not omnibus legislation, and it leaves in place the voting mechanisms that H.B. 589 had removed. Moreover, even if

137

Plaintiffs had established that African Americans or Hispanics disproportionately lack the forms of ID approved by S.B. 824 (and they have not), that fact alone could not establish disparate impact because S.B. 824's reasonable impediment provision allows all voters to vote.

402.    While H.B. 589 was later amended to include a reasonable impediment process, the Fourth Circuit in *McCrory* did not consider that process in its impact analysis because it was not part of the original bill. *Id.* at 230–33.

403.    Finally, though North Carolina's history has not changed since *McCrory*, North Carolina's constitution has. Especially considering the intervening voter-ID amendment, this Court cannot simply transfer the intent of any prior General Assembly to the one that passed S.B. 824. The intent of that General Assembly is what matters. And the evidence shows that this General Assembly's intent is not what the Fourth Circuit had found in the passage of H.B. 589.

404.    The clearest sign that the Fourth Circuit's opinion in *McCrory* does not apply to S.B. 824 comes from the Fourth Circuit itself. Bound by *McCrory*, the Fourth Circuit nevertheless held that S.B. 824's federal challengers were unlikely to succeed in showing that S.B. 824 was passed with discriminatory intent. In doing so, the court recognized the many differences between S.B. 824 and H.B. 589, including that "[n]othing here suggests that the General Assembly used racial voting data to disproportionately target minority voters with surgical precision." *Raymond*, 981 F.3d at 308–09 (internal quotation marks omitted). Simply put, the Fourth Circuit recognized that S.B. 824 is not H.B. 589.

## V. S.B. 824 Has Had, and Will Have, No Disparate Racial Impact

405. Under *Arlington Heights*, the Court considers "[t]he impact of the official action" in dispute and "whether it 'bears more heavily on one race than another[.]'" 429 U.S. at 266 (quoting *Washington*, 426 U.S. at 242).

406. In assessing impact, however, it is important to underscore the nature of this Court's inquiry.

o First, Plaintiffs' theory of the case is that the General Assembly enacted S.B. 824 to entrench Republican interests by disenfranchising African American or Hispanic voters, *i.e.*, preventing these groups from voting Democratic. Therefore, the circumstantial evidence under *Arlington Heights* must support that theory. In other words, the impact Plaintiffs must show is that S.B. 824 will lead to fewer African Americans and Hispanics voting. Otherwise, Plaintiffs' race-as-proxy-for-party theory does not work.

o Second, the North Carolina Constitution requires that voters present photographic identification. Plaintiffs have not challenged that constitutional requirement here. Accordingly, impact is only relevant to the extent it shows that this law—S.B. 824—has more additional disparate impact than any other voter-ID law that the General Assembly could have passed. Only then can Plaintiffs disaggregate impact attributable to voter ID generally from any alleged disparate impact attributable to S.B. 824 specifically. *Arlington Heights*, 429 U.S. at 266 n.15. Plaintiffs have not even attempted to make such a showing. As already noted, Plaintiffs have offered no other alternative voter-ID law that the General

139

Assembly could have passed with a lesser racial impact, which undermines their arguments. *Alexander*, 144 S. Ct. at 1249. Plaintiffs and their witnesses simply oppose any voter-ID requirement.

407. After a survey of the evidence, Plaintiffs have failed to prove any disparate impact. Plaintiffs have not identified a single voter who is not legally permitted to vote, so as a matter of law S.B. 824 has zero disparate impact.

408. Plaintiffs' evidence of ID possession is not only incomplete and unreliable but cannot show disparate impact because it fails to address the sweeping ameliorative provisions of S.B. 824 that allow *anyone* to vote, ID or no ID. In fact, Plaintiffs have failed to identify a single North Carolina voter who cannot vote under S.B. 824. Similarly, Plaintiffs have failed to identify *any* array of IDs that would produce a lesser alleged disparate impact of possession. *See id.*

409. Moreover, the Court must be mindful that differences in employment, wealth, and education may make it virtually impossible for a State to devise rules that do not have some disparate impact. *Brnovich*, 594 U.S. at 677–78.

410. Plaintiffs' evidence about any problems with S.B. 824's implementation are irrelevant to show impact. *Raymond*, 981 F.3d at 310.

411. In short, Plaintiffs have failed to show that S.B. 824 bears more heavily on African Americans or Hispanics. *Arlington Heights*, 429 U.S. at 266.

### A. S.B. 824's Sweeping Reasonable Impediment Provision and Free ID Provision Remedy Any Alleged Impact

412. S.B. 824's reasonable-impediment and free-ID provisions remedy any alleged disparate impact.

413. Plaintiffs have not attempted to quantify the ameliorative effect of S.B. 824's reasonable-impediment provision or free-ID provision on voters generally, or minority voters specifically.

414. Even accepting Plaintiffs' unsupported premise that minority voters disproportionately lack qualifying ID under S.B. 824, the law does not disparately impact them because of its sweeping reasonable impediment provision. *Raymond*, 981 F.3d at 309. This is one of several provisions that shows that the General Assembly went "'out of [their] way to make'" the impact of S.B. 824 "'as burden-free as possible.'" *Id.* (quoting *Lee*, 843 F.3d at 603).

415. S.B. 824's provision of free IDs also remedies any disproportionate effect. Similar to Virginia's law that the Fourth Circuit upheld in *Lee*, S.B. 824 "provide[s] free IDs to those who [do] not have qualifying ID," issued "without any requirement of presenting documentation," and there are "numerous locations throughout the State where free IDs" can be obtained. 843 F.3d at 603. Yet Plaintiffs have not even tried to quantify the impact of these free IDs, which have been disproportionately issued to African Americans. Because African Americans also disproportionately use one-stop voting—a time in which free IDs can be obtained and votes cast in a single trip to a county board of elections—it

stands to reason that African Americans will disproportionately benefit from the free IDs offered there.

416.    To the extent Plaintiffs' experts discuss alleged burdens associated with obtaining a free ID such as transportation or taking time off work, such inconveniences do not qualify as a substantial burden on the right to vote, or even represent a significant increase over the usual burdens of voting. *Raymond*, 981 F.3d at 309; *Crawford*, 553 U.S. at 198. This is especially true given that for those voting early at their county board of elections, "the marginal cost of obtaining a qualifying ID is negligible because they can obtain a free voter ID and vote in a single trip." *Raymond*, 981 F.3d at 309.

417.    As the Fourth Circuit has previously held, "the 2018 Voter-ID Law is more protective of the right to vote than other states' voter-ID laws that courts have approved." *Id.* at 310 (collecting authorities); *see also supra* Part VI.

418.    In *Lee*, for example, the Fourth Circuit rejected an identical challenge under Section 2 of the VRA to Virginia's voter ID law because voters without an ID could cast a provisional ballot and were given three days to obtain a free ID that could be used to make it count. 843 F.3d at 600. In North Carolina, voters without an ID are given *three times longer* to obtain a free ID to cure their ballot. Alternatively, they may complete a reasonable impediment declaration and not have to show ID at all, an option that *was not available* in Virginia.

419.    The North Carolina Supreme Court has also recognized that S.B. 824 "is one of the least restrictive voter identification laws in the United States." *Holmes*, 886 S.E.2d at 126. This is why that court held that S.B. 824 does not violate the North Carolina Constitution's

Equal Protection Clause, under either the federal standard or the North Carolina standard. *Id.* at 139–40.

### B. Plaintiffs' Quantitative Analysis of ID-Possession Rates Is Flawed

420. As explained above, Plaintiffs' expert Professor Herron relied on an analysis of ID-possession rates that was purposefully over-inclusive, only included a subset of the IDs that S.B. 824 allows for voting, and did not consider the impact of the reasonable-impediment provision. The August 2019 no-match list and Professor Herron's analysis of that list were not before the General Assembly when it enacted S.B. 824. The no-match list was purposefully overinclusive and considered only the two forms of DMV-issued ID, not the numerous other types of qualifying photo identification. Neesby Decl. at 3–4.

421. As explained above, Plaintiffs' expert Professor Barreto relied on a flawed 2019 survey that counted as eligible voters classes of individuals ineligible to vote in North Carolina, used unreliable self-reporting of registration status, and relied on inaccurate understandings of S.B. 824. The survey produced overestimated voters' lack of possession of qualifying photo identification, even compared to Professor Herron's overinclusive analysis, and inaccurately predicted that Black voters would benefit less than white voters from the free voter IDs. Professor Barreto's survey was not before the General Assembly when it enacted S.B. 824.

422. In all events, what the General Assembly knew in November and December 2018 is most important. And they knew that the vast majority of North Carolina's registered voters have Qualifying ID. According to Ms. Strach's November 2018 presentation to the General Assembly, the State Board sent a mailing to 254,391 voters, whom the State Board had

143

identified as lacking DMV-issued ID. DX214 at 18–19. Of those who responded, 91% told the State Board that they possessed acceptable photo ID. *Id.* at 19. In the March 2016 primary, 99.9% of those who voted—during the record high turnout—were not required to cast a provisional ballot because they lacked voter ID under H.B. 589.

### C. Implementation Evidence Is Irrelevant to Plaintiffs' Constitutional Claims

423.    The majority of Plaintiffs' witnesses were offered to testify about alleged problems with S.B. 824's implementation. Implementation errors are, by definition, departures from a statute's design and are thus irrelevant to determining the legislature's intent in passing a law. *Raymond*, 981 F.3d at 310. For implementation errors to be relevant, the General Assembly would had to have somehow intended for implementation errors to disproportionately affect African Americans and Hispanics, but there is no evidence supporting that notion, particularly with the numerous mandatory education and training steps the General Assembly required, *see* DX009, and that the State Board has been conducting, 5/8/24 Tr. at 693:4–13, 694:6–18, 697:7–20, 706:17–23, 707:24–708:12, 711:20–712:3; DX335, DX381–384, DX395–404.

424.    Many of the concerns voiced about implementation would be resolved if the General Assembly had approved as qualifying ID only driver's licenses and not allowed *any* process for people lacking a driver's license to vote. The General Assembly could have done so, as it was not required by the text of the constitutional amendment to provide for *any* exceptions. Such a law could be straightforward to implement, as several of Plaintiffs' witnesses conceded. *E.g.*, 5/8/24 Tr. at 536:18–537:5 (Lopez Test.); 5/7/24 Tr. at 397:2–

144

398:20 (Patterson Test.). But according to Plaintiffs' logic, a stricter law would also prevent people from voting. Plaintiffs cannot have it both ways. When evaluating the competing considerations of implementing a law with many exceptions versus passing a simpler law that would be more restrictive, the General Assembly chose to pass a law that was more permissive and voter-protective.

425.    If voter confusion about voter ID requirements engendered by new laws and court injunctions were a concern, this Court would only worsen that confusion by declaring S.B. 824 unconstitutional.

## VI.    Legislative Process

426.    Under *Arlington Heights*, "[t]he specific sequence of events leading up to the challenged decision also may shed some light on the decisionmaker's purposes." 429 U.S. at 267. For instance, "[d]epartures from the normal procedural sequence also might afford evidence that improper purposes are playing a role." *Id.*

### A. The Process Leading up to the Voter ID Constitutional Amendment Is Irrelevant

427.    Plaintiffs' witnesses testified at length about the process leading up to the Voter-ID Constitutional Amendment, also known as H.B. 1092. But Plaintiffs are not challenging H.B 1092 and they are not challenging the constitutional amendment itself. *See generally* Compl.

428.    The legislative process surrounding H.B. 1092 is simply not relevant because that process was "largely unconnected to the passage of the actual law in question." *Greater*

145

*Birmingham Ministries v. Sec'y of State for Ala.*, 992 F.3d 1299, 1324 (11th Cir. 2021) (en banc).

429.    Moreover, the voters' approval of the constitutional amendment stands as a significant "intervening event" that "constitutionally mandated that the legislature enact a voter-ID law." *Raymond*, 981 F.3d at 306. The specific legislative steps giving rise to the constitutional amendment—that has been ratified by the voters and is the supreme law of the state—are beside the point.

430.    This Court must take the constitutional amendment as a given and confine its analysis to "the actual law in question": S.B. 824. *Greater Birmingham Ministries*, 992 F.3d at 1324.

### B.  The Enactment of S.B. 824 Followed Normal Procedures

431.    "[T]here were no procedural irregularities in the sequence of events leading to the enactment of 2018 Voter-ID law." *Raymond*, 981 F.3d at 305. Plaintiffs have simply provided no evidence of any departure of legislative process that resulted in any rules being broken or called into question the General Assembly's authority to pass S.B. 824. Although "a legislature need not break its own rules to engage in unusual procedures[,]" *McCrory*, 831 F.3d at 228, the evidence about the legislative process that Plaintiffs do cite, fails to spark even the slightest suspicion, *Arlington Heights*, 429 U.S. at 269.

432.    First, Plaintiffs argue that convening the General Assembly in a post-election session after the 2018 elections was an aberrational procedure. But the General Assembly's conduct was perfectly rational considering Governor Cooper's vehement opposition to

voter ID—the record does not reflect any voter-ID law that Governor Cooper would have signed. His opposition is a critical piece of context.

433.    Additionally, the legislature's actions in the 2018 post-election session are consistent with its activities in other post-election sessions. For example, in the 2016 post-election session, the General Assembly enacted three substantive bills, each of which were passed two to four days after which they were filed. DX207; DX208; DX209; DX210; DX211; DX212. And the General Assembly considered numerous other bills in its 2016 post-election sessions. DX204; DX205; DX206.

434.    As the Supreme Court found in *Abbott*, the fact the General Assembly convened another session does not give rise to an inference of bad faith. *Abbott*, 585 U.S. at 610–11. In fact, given the impending opportunity for the Governor to veto any voter ID bill without fear of override in 2019, had the General Assembly *not acted* it would have been an aberrational and unusual legislative practice.

435.    Second, Plaintiffs argue that S.B. 824 was pushed through at a rapid pace. But the brevity of a legislative process does not give rise to an inference of bad faith. *Id.* And, as noted, the pace of other post-election sessions has been far more rapid than the process S.B. 824 enjoyed. As discussed, a draft of S.B. 824 was released publicly on November 20th, 2018, underwent twenty-four changes before being officially filed in the Senate, DX069 at 3:10–12, was officially filed in the Senate on November 27th, passed the Senate on November 29th, passed the House on December 5th, was sent to the Governor on December 6th, and then the Governor's veto was overridden on December 19, 2018. However, one counts the days—from public release, from consideration before filing, from

147

the date of filing, including the five days of legislative floor debate—this was a far more fulsome process than the most recent post-election session in 2016. Further, "the enactment was not the 'abrupt' or 'hurried' process that characterized the passage of the [H.B. 589]." *Raymond*, 981 F.3d at 306 (quoting *McCrory*, 831 F.3d at 228–29). And this timing does not even account for the fact that voter ID has been debated within the state and the General Assembly since at least 2011—an undoubtedly familiar topic with which many are well-aware.

436.   S.B. 824's pace of enactment resembled the pace of other bills enacted during the 2018 post-election session, specifically H.B. 1108, S.B. 820, and S.B. 823, each of which was ratified in under 10 days from their filing date.[21] *See* H.B. 1108, 2017-2018 Reg. Sess. (N.C. 2018), https://bit.ly/3XI3oEb; S.B. 820, 2017-2018 Reg. Sess. (N.C. 2018), https://bit.ly/45EqDkC; S.B. 823, 2017-2018 Reg. Sess. (N.C. 2018), https://bit.ly/3L1IOXK. Plaintiffs do not contend that these laws were enacted with a racially discriminatory purpose and have not proven that S.B. 824 was treated any differently than other bills passed during the 2018 post-election session. Accordingly, S.B. 824 did not depart from the normal procedural sequence of post-election procedures. *Arlington Heights*, 429 U.S. at 267. Indeed, the legislation could have moved even more quickly. DX074 at 140:17–20.

437.   When considering the specific sequence of events under *Arlington Heights*, the Court may consider, in addition to the specific procedures, whether the substance of the

---

[21] This is a legislative fact or, alternatively, a judicially-noticeable fact. *See supra* n.1.

events leading up to the enactment of a law lead to "evidence that improper purposes are playing a role." *Id*. For instance, courts have looked at what information a legislature sought and obtained prior to enactment of a law and evaluated whether that information shows a racially discriminatory purpose. In *McCrory*, the Fourth Circuit found it significant that the General Assembly requested data "on the use, *by race*, of a number of voting practices." 831 F.3d at 214 (emphasis added). By contrast, in *Lee*, the Fourth Circuit found Virginia to have lacked a racially discriminatory purpose, in part because "the legislature did not call for, nor did it have, the racial data" akin to the data found relevant in *McCrory*. *Lee*, 843 F.3d at 604.

438.   Plaintiffs have not proven that the General Assembly requested any racial data before, or during, their evaluation of S.B. 824. And it is undisputed that the data the General Assembly did have was that presented by Former Director Strach. In Strach's presentation, the General Assembly was told that 2.7 million people voted in the March 2016 primary, when H.B. 589's ID requirements were in place. DX068 at 37–38; DX213. Of those who voted, Strach's presentation reported that 1,048 cast a reasonable impediment ballot and 1,248 people did not present acceptable photo ID, cast a reasonable impediment ballot, or return to their county board to cure a provisional ballot by deadline. DX068 at 37; DX213 at 31. In total, those 2,296 voters represented approximately 0.1% of all ballots cast in that election. Therefore, approximately 99.9% of voters were not required to cast a provisional ballot because they lacked voter ID under HB 589.

439.   With this data in hand that 99.9% of voters had been able to vote under H.B. 589, the General Assembly did not seek to include *fewer* types of ID. To the contrary, the

149

General Assembly crafted S.B. 824 to ensure that more voters could vote under the new constitutionally required ID requirement. S.B. 824 provided for (1) more ID options, including a Free ID at all county boards of elections, and (2) a more expansive reasonable impediment provision. With the data the General Assembly had, the General Assembly "specifically included a wide variety of photo IDs and offer[ed] free photo IDs to [North Carolina] citizens who wish to obtain one, which raises the question: 'Indeed, why would a racially biased legislature have provided for a cost-free election ID card to assist poor registered voters—of all races—who might not have drivers' licenses?'" *Greater Birmingham Ministries*, 992 F.3d at 1324 (quoting *Veasey v. Abbott*, 830 F.3d 216, 281 (5th Cir. 2016) (Jones, J., dissenting)). The only plausible inference is they would not.

440.   Ultimately, all the Court has before it is testimony from some Democratic legislators—all vehemently opposed to voter ID—who do not support voter ID, about how they would have preferred the process to have gone. But Plaintiffs have not identified an amendment that is not in the current law and that would have made a material difference to S.B. 824's voter ID provisions. Indeed, Plaintiffs' legislator witnesses themselves could not come up with any such amendment and certainly did not offer any such amendment. 5/7/24 Tr. at 462:16–20 (Van Duyn Test.); 5/9/24 Tr. at 823:22–824:5, 824:13–15, 824:19–24 (Reives Test.); PX1877 at 51:20–24 (Harrison Test.); 5/9/24 Tr. at 910:18–911:17 (Morey Test.); 5/9/24 Tr. at 990:8–19 (McKissick Test.).

### C. The Legislative Process Was Inclusive and Bipartisan

441.   The process by which the General Assembly enacted S.B. 824 further confirms that the General Assembly's goal was what legislators said it was: implementing the voter-ID

150

amendment and ensuring election integrity and voter confidence, not political entrenchment through racial discrimination. First, in stark contrast to the historical African American voter suppression measures in North Carolina, such as the poll tax and the literacy test, the legislative record on S.B. 824 is devoid of racial appeals. *See Raymond*, 981 F.3d at 309.

442. Second, even though voter ID is a contentious issue between Republicans and Democrats, and even though the Republican supermajority did not need to include any Democrats in the process, the process included Democrats at every step. Republican leadership assured their Democratic colleagues that the process would not be rushed. *See* DX068 at 118:5–8 (Chairman Lewis: "The instructions we've received from Speaker Moore and Senator Berger is that this process not be rushed in any way."); DX071 at 46:14–15 (Chairman Jones: "We'll go as long as we need to go[.]"). The level of Democratic and stakeholder involvement shows that it was not. Republicans took input from Democrats; Democrats proposed the amendments that they intended to propose; and most were accepted. Moreover, the General Assembly accepted input from stakeholders and modified the bill accordingly. *See, e.g.*, 5/10/24 Tr. at 1187:12–21; DX013; DX014; DX015; DX019; DX045; DX046; DX047; DX043; DX069 at 12:9–15.

443. Third, Democrats voted for S.B. 824 at various points as it worked its way through the General Assembly. When the Fourth Circuit upheld Virginia's voter ID law, it noted that, "[w]hile there was a substantial party split on the vote enacting the law, two non-Republicans (one Democrat and one Independent) voted for the measure as well." *Lee*, 843 F.3d at 603. Here, five Democrats across the Senate and the House voted for S.B. 824 at

151

different points, with four of them voting for the bill in its final form. DX032; DX033; DX041; DX055; DX056; DX067. This fact is particularly salient in this context, where Plaintiffs' theory of the case is that the General Assembly discriminated against African Americans and Hispanics to entrench Republicans. Plaintiffs have not offered a convincing explanation why *any* Democrat would vote for such a bill.

444.    Consider also that while the Fourth Circuit in *McCrory* found it significant that H.B. 589 had no Democratic support, 831 F.3d at 227, it repeatedly characterized S.B. 824 as "bipartisan," *Raymond*, 981 F.3d at 306. The Fourth Circuit's finding carries far more weight than the stilted definition of Plaintiffs' legislator witnesses, who arbitrarily defined the term "bipartisan" to mean only bills that have majority support from both parties, 5/9/24 Tr. at 995:12–14 (McKissick Test.); 5/9/24 Tr. at 809:14–17 (Reives Test.), or bills that "moved too quickly," 5/7/24 Tr. at 450:20–23 (Van Duyn Test.).

445.    And fourth, legislators' statements reflect a thorough, inclusive, deliberative process. *See* DX076 at 2:16–3:8 (Senator Krawiec: "From the time this bill was introduced, we made 30 something changes. We listened to everybody. There's not anyone who can say that all sides didn't participate. We took guidance, suggestions, amendments from colleagues on the other side of the aisle, from stakeholders, from our colleges, universities, community colleges. We listened to everyone. We tried to incorporate the changes they recommended, that they asked for, because we don't want anyone to be disenfranchised. We don't want anyone to not be able to vote. So I think we've covered just about everything that we could have covered, and I believe that it's a good bill. I thank my colleagues, particularly on the other side of the aisle, for their input[.]").

446. Democratic General Assembly members who are generally opposed to voter ID laws confirmed that S.B. 824's process was inclusive. Both Senator McKissick and Representative Harrison thanked the Republican majority for being open and inclusive and for working with Democrats to improve the bill, statements that they did not offer while H.B. 589 was being considered in the General Assembly. *Compare* DX070 at 3:3–8, DX074 at 116:20–117:2, *and* DX072 at 98:17–19, *with* DX184 at 39:19–23, *and* Representative Harrison's H.B. 589 Floor Statement. These members had a demonstrated history of offering vocal criticism to voter ID bills and giving no words of thanks to the Republican majority that offered the bills, so the inclusion of these words of thanks from these same members is striking here.

447. This inclusive process is inconsistent with Plaintiffs' attribution of bad faith to the legislators' who enacted S.B. 824. And regardless, as discussed *supra*, this Court must afford the General Assembly a presumption of good faith.

## VII. The General Assembly Would Have Passed S.B. 824 Apart from Any Allegedly Discriminatory Motive

448. If Plaintiffs had proved discriminatory intent, which they have not, the question would then become whether "the same decision would have resulted even had the impermissible purpose not been considered." *Arlington Heights*, 429 U.S. at 270 n.21. The evidence shows it would have.

449. First, the General Assembly would have enacted some form of voter-ID law. The constitution commands it, and several legislators—including those who voted for and those who voted against S.B. 824—cited that command during S.B. 824's legislative process.

*See* DX068 at 3 (Representative Lewis); DX069 at 2 (Senator Krawiec); DX069 at 16 (Senator Woodard); DX069 at 38 (Senator Tillman); DX070 at 3 (Senator McKissick); DX074 at 50 (Speaker Moore). The goal of preserving election integrity is an independent reason voiced by legislators during the process and likewise confirmed by the evidence. And though the extent of voter-impersonation fraud in North Carolina is not known, because not all instances are likely discovered, it is rational to expect a legislature to take precautionary steps against an unquantified but potentially serious threat. *Crawford*, 553 U.S. at 194.

450. Second, the General Assembly would have convened to enact a voter-ID law during a post-election, lame-duck session. Republican legislators had every reason to suspect that, once they lost their supermajority in the 2019 session, their desires to implement the constitutional amendment and to preserve election integrity would be blocked by Governor Cooper, who would have gained an effective veto pen. Plaintiffs' own witnesses admitted as much. The suggestion that waiting to pass a voter-ID law in the next session with the Governor's consent would have been anything but a hopeless enterprise is contradicted by the Governor's veto message about S.B. 824 itself. DX010 ("Requiring photo IDs for in-person voting is a solution in search of a problem. . . . Finally, the fundamental flaw in the bill is its sinister and cynical origins: It was designed to suppress the rights of minority, poor and elderly voters. The cost of disenfranchising those voters or any citizens is too high, and the risk of taking away the fundamental right to vote is too great, for this law to take effect."). He reiterated these sentiments in an amicus brief asking the Fourth Circuit to uphold an injunction against S.B. 824. *See* Br. of Gov. Roy Cooper as *Amicus Curiae*

154

Supp. Plaintiffs-Appellees & Affirmance at 2, *Raymond*, 981 F.3d 295 (4th Cir. 2020) (No. 20-1092) ("[T]he photo ID requirement in S.B. 824 is a solution in search of a problem, erects barriers that will confuse citizens and discourage them from voting, and was enacted with discriminatory intent."). That a majority of the General Assembly's intent in convening a post-election session was to enact a voter-ID law before the Governor could veto it is again fully consistent with legislators' testimony in this case. *See* PX1877 93:1–11 (Harrison Test.); 5/9/24 Tr. at 879:3–11 (Morey Test.); 5/9/24 Tr. at 974:1–4 (McKissick Test.).

451.   Third, the General Assembly would have enacted the same voter-ID law in that session. S.B. 824 was based on South Carolina's voter-ID law, which had already been upheld in court. DX068 at 5; DX069 at 3–4; DX069 at 3:18–20. Plaintiffs have not identified a single change to the bill that would have meaningfully improved voters' access to the polls. They have identified no array of qualifying IDs that would result in a narrower gap of ID-possession rates than they alleged. They have not attempted to quantify the effect of S.B. 824's free-ID provision or reasonable-impediment process. Nor have they identified any additional ameliorative provision that would have measurably improved voter access beyond these existing ones.

452.   Thus, even assuming a counterfactual, discriminatory motivation behind S.B. 824, there is still "no justification for judicial interference with the challenged decision." *Arlington Heights*, 429 U.S. at 270 n.21. Nothing in the record indicates that a legislature, scrubbed of that assumed motive, would have done anything differently in the unique situation that the General Assembly found itself in. And even if the General Assembly were

155

required to begin the process of enacting another voter-ID law tomorrow, not even Plaintiffs—after nearly six years of litigation—have explained what other voter-ID law the General Assembly should pass, because S.B. 824 is one of the most generous in the country.

## VIII. Plaintiffs Cannot Meet Their Burden Under Section 2 of the VRA

453.    Congress did not create a private right of action to enforce Section 2 of the Voting Rights Act. *See* 52 U.S.C. § 10301; *Ark. State Conf. of NAACP v. Ark. Bd. of Apportionment*, 86 F.4th 1204 (8th Cir. 2023). Legislative Defendants reserve the right to argue before the appropriate court that the contrary holding of *League of Women Voters of North Carolina v. North Carolina*, 769 F.3d 224, 238 (4th Cir. 2014), was error.

454.    To the extent Plaintiffs argue that a violation of Section 2 of the Voting Rights Act can be premised on pure disparate impact untethered from any showing of intentional discrimination, Section 2 exceeds Congress's power to enforce the Equal Protection Clause. *See City of Boerne v. Flores*, 521 U.S. 507 (1997).

455.    As this Court held at the preliminary-injunction stage, Plaintiffs' evidence under Section 2 of the Voting Rights Act "falls short." Prelim. Inj. Op., Doc. 120 at 52–53 (Dec. 31, 2019). This conclusion is even clearer post-trial when assessing the considerations enumerated in *Brnovich*.

### A. North Carolina's System of Voting

456.    North Carolina "generally makes it very easy to vote" with or without photo ID. *Brnovich*. 594 U.S. at 654.

457.    For example, voters may participate in one-stop early voting (where they can obtain free IDs). As the Fourth Circuit recognized, the cost to obtaining an ID has a "negligible"

156

"marginal cost" in this circumstance because "voters must do no more than they did previously—show up to vote." *Raymond*, 981 F.3d at 309.

458.    Additionally, the small number of voters who lack qualifying ID may nonetheless cast a provisional ballot using the reasonable impediment declaration if they offer any number of qualifying reasons including lack of access to transportation, disability, illness, lack of birth certificate or other documents, work schedule, family responsibilities, lost or stolen photo identification, or any other reasonable impediment the voter lists. The existence of the reasonable impediment provision effectively eliminates any burden and renders S.B. 824 "more protective of the right to vote than other states' voter-ID laws that courts have approved." *Id.* at 310; *see also Lee*, 843 F.3d at 594 (upholding Virginia's voter ID law only including a subset of S.B. 824's mitigating features).

459.    Because S.B. 824 allows all eligible voters to vote, with or without ID, North Carolina's voting processes are equally open. *Brnovich*, 594 U.S. at 654.

## B.  Voter ID Laws Are In Widespread Use

460.    Another consideration under *Brnovich* is whether laws like S.B. 824 "have a long pedigree or are in widespread use in the United States." *Id.* at 670; *see also id.* at 681–82 (citing favorably *Democratic Nat'l Comm. v. Hobbs*, 948 F.3d 989, 1073 (9th Cir. 2020), which compiled similar laws to the one challenged that are currently in effect).

461.    Voter ID laws are plainly in widespread use in the United States and have been for years. As of this writing, 35 states (plus North Carolina) have laws requesting or requiring voters to show some form of identification at the polls. *See supra* Part VI. Many of these states require a photo ID and others accept non-photo IDs. *See id.* No other law that

157

provides free IDs that require no corroborating documents or that has a reasonable impediment process has been invalidated.

462.    Whether or not the law has a long pedigree in North Carolina is beside the point. If that were the test, this consideration would automatically cut against states any time they attempted to enact a new voting law, effectively freezing state policy in place.

### C. Size of Any Burden & Alleged Disparities

463.    The Supreme Court has repeatedly explained that because casting a vote requires "compliance with certain rules[,]" voting systems "must tolerate the 'usual burdens of voting.'" *Brnovich*, 594 U.S. at 669 (quoting *Crawford*, 553 U.S. at 198). And it has distinguished between "openness and opportunity, on the one hand, and the absence of inconvenience, on the other." *Id.* at 669 n.11. Openness and opportunity require a state's voting system to be free "of obstacles and burdens that block or seriously hinder voting[.]" *Id.* at 669. Additionally, even if impact disparities exist, that "does not necessarily mean that a system is not equally open or that it does not give everyone an equal opportunity to vote. The size of any disparity matters." *Id.* at 671.

464.    As discussed at length above, S.B. 824 imposes only a minimal burden on voters because voters who lack ID only need to seek out free IDs (without providing any supporting documentation) at either the county board of elections or the DMV, which is not "'a significant increase over the usual burdens of voting.'" *Raymond*, 981 F.3d at 309 (quoting *Crawford*, 553 U.S. at 198). Moreover, S.B. 824—through its reasonable impediment provision—allows any voter to cast a ballot, with or without a photo ID when they arrive to vote on election day. These safeguards ensure that any burden on voters is

158

vanishingly small or simply forms part of the "usual burdens" of voting. As such, any disparate impact is necessarily minimal. For all the reasons already discussed, North Carolina has "made extensive efforts to reduce [S.B. 824's] impact on the number of valid votes ultimately cast." *Brnovich*, 594 U.S. at 678–79.

465. To the extent Plaintiffs point to alleged burdens on voters to obtain a free ID, such burdens both do not affect many voters and fall within "'the usual burdens of voting[,]'" *Raymond*, 981 F.3d at 309 (quoting *Crawford*, 553 U.S. at 198). This Court must carefully guard against "mak[ing] the unjustified leap from *the disparate inconveniences* that voters face when voting to the *denial or abridgment of the right to vote*." *Lee*, 843 F.3d at 600–01.

466. To the extent Plaintiffs argue that S.B. 824 deters voters, that argument is speculative and cannot inform an analysis about the burdens of the law. A voter's choice to vote (or not), or a voter's choice to return to cure a provisional ballot if he or she did not fill out a Photo ID exception form (or not) can be attributed to myriad other factors such as dislike of the candidates, hearing that one's preferred candidate already prevailed or lost, or far more banal considerations such as the weather.

467. Nor can Plaintiffs rest the burden or disparities aspects of their Section 2 showing on implementation evidence. Plaintiffs did not properly plead that S.B. 824's implementation violates Section 2 in any election where the law has been in place. *See generally* Compl. Additionally, because Plaintiffs bring a *facial* challenge under the Voting Rights Act, implementation evidence is irrelevant. Rather, Plaintiffs would have to show

that S.B. 824 cannot *possibly* be implemented in a way that complies with Section 2, which Plaintiffs have failed to do.

468.    Additionally, data from the State Board of Elections for elections where S.B. 824 has been in place reveal that any racial or ethnic differences in the absolute numbers of voters who cast provisional ballots or whose provisional ballots ultimately are not counted due to a failure to cure or to state a reasonable impediment are too "small in absolute terms" compared to the total number of voters. *Brnovich*, 594 U.S. at 678–80.

469.    For all the same reasons that Plaintiffs failed to meet their burden to show disparate impact under *Arlington Heights*, they have necessarily failed to meet the more stringent standard under Section 2 of the VRA.

### D.  S.B. 824 Furthers Several State Interests

470.    It is vital to recall that the people of North Carolina voted to add a photo voter ID requirement to the State Constitution. S.B. 824 represents the General Assembly's effort to implement their stated policy preference—an unavoidable interest in enacting photo voter ID in North Carolina.

471.    Additionally, the Supreme Court has recognized two other independent state interests: "protecting public confidence" in elections, *Crawford*, 553 U.S. at 197, and "the prevention of fraud[,]" *Brnovich,* 594 U.S. at 672. These state interests are related because fraud can "undermine public confidence in the fairness of elections[.]" *Id.*; *see also Purcell*, 549 U.S. at 4; DX320 at 18 ("The electoral system cannot inspire public confidence if no safeguards exist to deter or detect fraud or to confirm the identity of voters"). Indeed, fraud-prevention is a compelling state interest even where the record contains no evidence of any

160

fraud, *Crawford*, 553 U.S. at 194, which is not the case in North Carolina. *See also Brnovich*, 594 U.S. at 686 ("[A] State may take action to prevent election fraud without waiting for it to occur and be detected within its own borders.").

472.    An additional state interest is bringing North Carolina's election laws into alignment with the majority of other states who require voters to present ID to vote.

473.    Even if the Court ultimately rules that the General Assembly violated the U.S. Constitution or the VRA, which it should not, there is no need for the Court to impose the extreme remedy of retaining jurisdiction under Section 3 of the VRA.

     o   Plaintiffs themselves acknowledge that this bail-in remedy is rarely used. And the People of North Carolina have the right to govern themselves and to have their democratically elected legislature enact a voter-ID law.

     o   As the foregoing recitation of the legislative history makes clear, S.B. 824 was a product of parties crossing the aisle to work together. That is not the behavior of a legislature in need of the extreme preclearance remedy Plaintiffs request.

## IX.    If This Court Rules for Plaintiffs, Legislative Defendants Respectfully Request a Stay of that Ruling Until After the 2024 Elections

474.    The Supreme Court has repeatedly emphasized that lower federal courts should ordinarily not alter the election rules on the eve of an election. *Purcell*, 549 U.S. at 1; *Republican Nat'l Comm. v. Democratic Nat'l Comm.*, 589 U.S. 423, 424 (2020) (per curiam).

475.    This case went to trial a mere six months before the 2024 election because Plaintiffs declined to move to lift the stay that was in place in this case for over a year. Any decision

will necessarily issue even closer to the election.

476. S.B. 824 applies to absentee ballots, which must be ready to be mailed out by September 6, 2024. 5/10/24 Tr. at 1112:3–5. State Board Defendants represented that the largest counties "need to know that they need to alter their absentee ballots by, essentially, July 1st." 5/9/24 Tr. at 1087:22–1088:2.

477. The work of the hardworking public servants at the State Board of Elections and County Boards of Elections will be thrown into chaos if S.B. 824 is enjoined yet again this close to the 2024 election. Any injunction would not be the end of the story, as further appellate proceedings are inevitable.

478. The Supreme Court recently stayed a district court's ruling in a case involving a constitutional challenge to Louisiana's congressional maps as of May 15, 2024, citing *Purcell*. *Robinson v. Callais*, 144 S. Ct. 1171 (Mem.) (2024). If the Supreme Court is invoking *Purcell* in May 2024 for elections in November 2024, it surely would do so in late summer or early fall.

479. Additionally, Plaintiffs cannot even establish all of the following: (1) the underlying merits are entirely clearcut in their favor; (2) Plaintiffs would suffer irreparable harm absent an injunction; (3) Plaintiffs have not unduly delayed in pursuing their claims; and (4) the changes in question are at least feasible before the election without significant cost, confusion, or hardship. *Merrill v. Milligan*, 142 S. Ct. 879, 881 (Mem.) (2022) (Kavanaugh, J., concurring in grant of applications for stays).

480. North Carolina voters are entitled to the stability and sense of repose that engender trust and confidence in the State's elections. *Pierce*, 97 F.4th at 229. Enjoining use of S.B.

824 shortly before the 2024 general election would undermine trust and confidence in the State's elections.

## CONCLUSION

481.  The record is clear: S.B. 824 was not passed with a racially discriminatory motive. S.B. 824 is among the most generous and accommodating voter ID laws in the country. Given its sweeping reasonable impediment provision and accommodating free ID program, Plaintiffs have not shown any racially discriminatory impact. The legislative process, far from sparking suspicion, confirms that the General Assembly engaged in an open and inclusive process, which included accepting amendments from Democrats, and garnering the support of five Democrats during the process, including three African Americans. The Court does not ignore this State's shameful past, but that past was not repeated with S.B. 824. To the contrary, S.B. 824 affirmatively ensures all North Carolinians can vote in a state where photo ID is constitutionally mandated.

482.  The Court finds that S.B. 824 does not violate the Fourteenth or Fifteenth Amendments to the United States Constitution or Section 2 of the Voting Rights Act.

Dated: July 1, 2024

/s/ Nicole J. Moss
Nicole J. Moss (State Bar No. 31958)
COOPER AND KIRK, PLLC
1523 New Hampshire Avenue, N.W.
Washington, D.C. 20036
Telephone: (202) 220-9600
Fax: (202) 220-9601
nmoss@cooperkirk.com

*Local Civil Rule 83.1 Counsel*
*for Legislative Defendants*

/s/ David H. Thompson
Peter A. Patterson
Clark L. Hildabrand
Kate Hardiman Rhodes
COOPER AND KIRK, PLLC
1523 New Hampshire Avenue, N.W.
Washington, D.C. 20036
Telephone: (202) 220-9600
Fax: (202) 220-9601
dthompson@cooperkirk.com

*Counsel for Legislative*
*Defendants*

164

**CERTIFICATE OF SERVICE**

The undersigned counsel hereby certifies that, on July 1, 2024, I electronically filed the foregoing Proposed Findings of Fact and Conclusions of Law with the Clerk of the Court using the CM/ECF system which will send notification of such to all counsel of record in this matter.

/s/ Nicole J. Moss
Nicole J. Moss
*Counsel for Legislative Defendants*
