# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| NORTH CAROLINA STATE CONFERENCE OF THE NAACP, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> ALAN HIRSCH, in his official capacity as Chair of the North Carolina State Board of Elections, *et al.*, <br><br> Defendants, <br><br> and <br><br> PHILIP E. BERGER, in his official capacity as President Pro Tempore of the North Carolina Senate, *et al.*, <br><br> Legislative Defendant Intervenors. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) )     1:18CV1034 |

## TRIAL FINDINGS OF FACT AND CONCLUSIONS OF LAW

LORETTA C. BIGGS, District Judge.

# TABLE OF CONTENTS

I. INTRODUCTION ........................................................................................................... 1

FINDINGS OF FACT ................................................................................................................ 3

II. THE PARTIES AND THEIR CONTENTIONS .......................................................... 3

III. THE PROCEDURAL HISTORY OF S.B. 824 ............................................................. 5

IV. S.B. 824'S RELEVANT SUBSTANTIVE PROVISIONS ............................................ 7

V. NORTH CAROLINA'S ENTIRE SYSTEM OF VOTING ...................................... 14

    A. General Accessibility ................................................................................................ 14

    B. Early Voting ............................................................................................................. 14

    C. Absentee Voting ...................................................................................................... 14

    D. Voters Who Require Assistance ............................................................................ 15

VI. OVERVIEW OF APPLICABLE LEGAL STANDARDS .......................................... 15

VII. MINORITY Voting rights and Suppression in North Carolina ................................... 17

    A. Reform and Retrenchment in North Carolina's Voting Regulations ......................... 17

        1. Emancipation: Voter Expansion in the Reconstruction Era ..................................... 20

        2. Retrenchment: The 1900 "Suffrage" Constitutional Amendment and the Jim Crow Regime ...................................................................................................... 21

        3. Reform: The Enactment of the Voting Rights Act of 1965 and Voter Expansion. 25

        4. Retrenchment: North Carolina's Legislative and Political Response to the Voting Rights Act of 1965 ............................................................................. 25

        5. Reform: The § 5 Voting Rights Act Pre-Clearance Regime Brings North Carolina Voting to Near Racial Parity ....................................................................... 26

        6. Retrenchment: The Introduction of Voter ID Restrictions to North Carolina and the Impact of *Shelby County v. Holder* ................................................. 28

    B. S.B. 824's Legislative and Procedural History ........................................................... 33

    C. Impact of S.B. 824: Whether the Law Bears More Heavily on One Race Than Another ......................................................................................................... 42

    D. Testimonial Evidence Regarding S.B. 824's Implementation ................................... 48

    E. Extant Conditions of Historical Racial Disparities in North Carolina ..................... 56

CONCLUSIONS OF LAW ....................................................................................................... 67

    F. Under Controlling Law, Plaintiffs Have Failed to Establish Violations of the Fourteenth and Fifteenth Amendments ......................................................................... 67

    G. S.B. 824 Under the *Arlington Heights* Factors ......................................................... 71

    1.    The Historical Background Favors a Finding of Discriminatory Intent...................71

    2.    The Sequence of Events Leading to S.B. 824's Enactment Does Not Favor a Finding of Discriminatory Intent.................................................................................76

    3.    The Legislative History of S.B. 824 Does Not Favor a Finding of Discriminatory Intent...............................................................................................................................84

    4.    The Disparate Impact of S.B. 824 Favors a Finding of Discriminatory Intent .......91

    5.    Conclusions Regarding Plaintiffs' Fourteenth and Fifteenth Amendment Claims .............................................................................................................................................108

H.    Under Controlling Law, Plaintiffs Have Failed to Show Discriminatory Results in Violation of § 2 of the Voting Rights Act .............................................................................109

    1.    Applicable Law Following Brnovich v. Democratic National Committee.............110

    2.    Plaintiffs' Guideposts Evidence is not Sufficient to Conclude that S.B. 824 Produces Discriminatory Results ...............................................................................113

    3.    *Gingles* Senate Factor Analysis ........................................................................................127

    4.    Conclusions Regarding Plaintiffs' Claim Under § 2 of the VRA .............................130

I.    Final Conclusion.........................................................................................................................131

## I.    INTRODUCTION

As so eloquently articulated by the Fourth Circuit, "[i]t is beyond dispute that 'voting is of the most fundamental significance under our constitutional structure.'  For '[n]o right is more precious in a free country than that of having a voice in the election of those who make the laws under which, as good citizens, we must live.  Other rights, even the most basic, are illusory if the right to vote is undermined.'"  *N.C. State Conf. of the NAACP v. McCrory*, 831 F.3d 204, 241 (4th Cir. 2016) (citations omitted), *cert. denied* 137 S. Ct. 1399 (2017) [hereinafter *McCrory II*].

With that said, and for clarity, it is important that this Court begins by recognizing what this case is, and what it is not.  This case is not about whether North Carolina law will require that voters show photo identification when they go to the polls.  That question was settled on November 6, 2018, when approximately 55% of North Carolina's registered voters enshrined a photo voter identification requirement in the State Constitution.  (PX1049 at 2.)  Thus, there will be photo voter ID in the State of North Carolina.  In our democratic system of government, we must accept the will of the majority of voters on this issue unless or until the people of North Carolina decide otherwise.  Instead, the central issue before this Court is whether Plaintiffs have shown that the North Carolina General Assembly, when designing the constitutional amendment's implementing legislation, North Carolina Senate Bill 824 (hereinafter "S.B. 824"), violated the Fourteenth and Fifteenth Amendments of the U.S. Constitution and § 2 of the Voting Rights Act of 1965.  In making this determination, the Court must follow the law of the United States Supreme Court and the Fourth Circuit.

1

On May 6, 2024, this matter came up for trial.[1]  The trial was preceded by, among other events, numerous motions and orders of this Court related to the evidence that could be presented and admitted at trial.  (*See, e.g.*, ECF Nos. 210 at 30–31; 228 at 1; 291 at 48–49; 297 at 2, 25; 298 at 5, 6.)  As a result of one such motion and resulting Order, this Court ruled that the evidence to be presented at trial would be limited to the preliminary injunction record, with certain limited exceptions.  (ECF No. 291 at 48–49; *see also* ECF No. 298 at 5, 6.)  One such exception was that Plaintiffs were permitted to introduce certain testimonial evidence, including testimony from members and leaders of North Carolina State Conference of the NAACP and its chapters.  (*See* ECF No. 291 at 48–49; *see also* ECF No. 298 at 6.)  Plaintiffs were further permitted to present witness testimony from North Carolina State Representatives and State Senators, representatives from voter protection organizations, and voters.  (*See* ECF No. 291 at 30, 48–49.)  In addition, after the close of trial, this Court allowed Plaintiffs to make an extensive offer of proof pursuant to Federal Rule of Civil Procedure 103(a)(2) related to evidence that had been excluded from trial due to this Court's Order, (*id.*).  (ECF No. 326 at Tr. 476:18–477:21.)  The offer of proof was allowed for the sole purpose of assisting a reviewing court in the event of appeal.  (*Id.* at Tr. 478:3–479:15.)  Altogether, the trial and Plaintiffs' offer of proof lasted nine days.

---

[1] During the trial, at the close of Plaintiffs' presentation of evidence, State Board Defendants made an oral motion for judgment as a matter of law on Plaintiffs' claims.  Minute Entry May 3, 2024.  The Court heard arguments from the Parties and reserved ruling at that time.  (*See* ECF No. 330 at Tr. 1292:10-23, 1300:24–1301:8.)  Because this case came before the Court for a bench trial, Federal Rule of Civil Procedure 52(c), gives "the district court discretion to 'decline to render any judgment until the close of the evidence.'" *Martin v. Harris*, 560 F.3d 210, 218 (4th Cir. 2009) (quoting Fed. R. Civ. P. 52(c)).  Having weighed the evidence and resolved issues of expert credibility, this Court does find that Plaintiffs only placed a scintilla of evidence, primarily anecdotal in nature, on the record in support of their claims that the ballot challenge provision or the addition of one hundred poll workers violate either the Fourteenth and Fifteenth Amendments to the U.S. Constitution or § 2 of the Voting Rights Act.  Thus, this Court now grants judgment as a matter of law in favor of the Defendants on those claims based on the arguments they put forth into the record at the close of trial. (ECF No. 330 at Tr. 1292:10-23, 1300:24–1301:8.)

Moreover, it must be recognized that this action was initiated over seven years ago. Since that time, the law of the United States Supreme Court and Fourth Circuit Court of Appeals related to the issues presented by the instant case have undergone, and continue to undergo, dramatic change. Consequently, this Court, having given careful consideration to the preliminary injunction record, the limited evidence presented at trial, and the arguments of counsel, concludes that it is compelled by controlling case law to render Judgment in favor of the Defendants on both Plaintiffs' Fourteenth and Fifteenth Amendment claim and Plaintiffs' § 2 claim under the Voting Rights Act.

Accordingly, and in support of this conclusion, the Court makes the following findings of fact and conclusions of law:

## FINDINGS OF FACT

## II. THE PARTIES AND THEIR CONTENTIONS

1. Plaintiffs are comprised of the North Carolina State Conference of the NAACP and several state chapters of this organization. (ECF No. 1 ¶¶ 14, 17.) These chapters include Chapel Hill—Carrboro NAACP, Greensboro NAACP, High Point NAACP, Moore County NAACP, Stokes County Branch of the NAACP, and Winston-Salem—Forsyth County NAACP.[2] (*Id.* ¶ 17.)

---

[2] Plaintiffs have organizational standing to bring this suit. An organization suing in this capacity may do so once demonstrating "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted, nor the relief requested requires the participation of individual members in the lawsuit." *Students for Fair Admissions*, 600 U.S. 181, 199 (2023) (quoting *Hunt v. Wash. State Advert. Comm'n*, 432 U.S. 333, 343 (1977)); *see also S. Walk at Broadlands Homeowners' Ass'n, Inc. v. OpenBand at Broadlands, LLC*, 713 F.3d 175, 184 (4th Cir. 2013) (citations omitted). Plaintiffs meet those requirements. *N.C. State Conf of the NAACP v. Raymond,* 981 F. 3d 295, 301 (4th Cir. 2020).

2.      The instant lawsuit was filed in this Court one day after S.B. 824 became law. (*Id.* at 37.)  Plaintiffs initiated this lawsuit for declaratory and injunctive relief challenging the validity of specific provisions of S.B. 824, titled "An Act to Implement the Constitutional Amendment Requiring Photographic Identification to Vote."  (*See id.* ¶ 147); 2018 N.C. Sess. Laws 2018-144 (codified as amended in scattered sections of Chapters 20, 130A, 161, and 163A of the North Carolina General Statutes).

3.      In their Complaint, Plaintiffs challenge three specific provisions of S.B. 824: (1) the provision imposing certain photo voter identification requirements; (2) the provision expanding the number of poll observers; and (3) the provision expanding who can challenge ballots at the polls.  (*Id.* ¶¶ 5, 106–08, 126–36, 138–46.)  Specifically, Plaintiffs allege that these portions of S.B. 824 violate § 2 of the Voting Rights Act of 1965 (hereinafter "Voting Rights Act"), as well as the Fourteenth and Fifteenth Amendments of the United States Constitution. (*Id.* ¶¶ 105–46.)

4.      Plaintiffs allege that "[t]hese provisions, separately and together, will have a disproportionately negative impact on minority voters," (*id.* ¶ 80), ultimately resulting in "the effective denial of the franchise and dilution of [African American and Latino] voting strength," (*id.* ¶ 7).  Plaintiffs' Complaint further alleges that the challenged provisions "impose discriminatory and unlawful burdens on the right to vote that are not justified by any legitimate or compelling state interest."  (*Id.* ¶ 8.)

5.      State Board Defendants are members of the North Carolina Board of Elections (hereinafter "SBOE"), whose primary charge is administering the local, state, and federal elections held in this state.  (*Id.* ¶¶ 21–23.)

6. Legislative Intervenor Defendants are Phillip E. Burger, President Pro Tempore of the North Carolina Senate and Timothy K. Moore, who, at the time, was Speaker of the North Carolina House of Representatives.[3] (ECF No. 8 at 7.) Both State Senator Burger and former State Representative Moore intervened in their capacities as members of the leadership of the General Assembly. (*Id.*) State Senator Burger and former State Representative Moore became Intervenor Defendants in this action following an Order of the Supreme Court. (ECF No. 198 at 2); *Berger v. N.C. State Conf. of the NAACP*, 597 U.S. 179, 200 (2022).

7. Defendants collectively contend that Plaintiffs will not be successful in this litigation for a number of reasons, including: (1) that S.B. 824 differs dramatically from prior voter ID legislation, (ECF No. 261 at 12), (2) that the General Assembly crafted S.B. 824 to fulfill a constitutional mandate while protecting voting participation, (*id.* at 10, 14), (3) that Plaintiffs cannot carry their burden to show that the law is racially discriminatory or has discriminatory impact, (*id.* at 11, 20), and (4) that Plaintiff cannot prove S.B. 824 produces discriminatory results, (*see id.* at 21).

## III. THE PROCEDURAL HISTORY OF S.B. 824

8. On November 6, 2018, North Carolina voters approved a ballot measure amending the North Carolina State Constitution to require voters to provide photographic identification before voting in person (hereinafter "the voter ID amendment"). (PX1049 at 2.) The proposed amendment presented to the voters was as follows:

> Voters offering to vote in person shall present photographic identification before voting. The General Assembly shall enact general laws governing the requirements of such photographic identification, which may include exceptions.

---

[3] Pursuant to Fed. Rule of Civil Procedure 25(d) the Court substitutes Speaker Dustin Hall for former Speaker Timothy K. Moore.

2018 N.C. Sess. Laws 128 § 1; *see also* N.C. Const. art. VI, § 2(4).

9.     Because the voter ID amendment was not self-executing, *see* N.C. Const. art. VI, § 2(4), on December 5, 2018, the North Carolina General Assembly (hereinafter the "General Assembly") passed S.B. 824 as implementing legislation.  2018 N.C. Sess. Laws 144.

10.     On December 14, 2018, Former Governor of North Carolina, Roy Cooper, vetoed S.B. 824.  (DX10 at 1.)

11.     On December 19, 2018, the General Assembly overrode the Governor's veto and codified S.B. 824 into law, becoming North Carolina Session Law 2018-144.  2018 N.C. Sess. Laws 144 § 5.

12.     S.B. 824's central requirement is that in order to cast a ballot that will be counted, a voter must present photo identification approved by its terms or by its exceptions (hereinafter "qualifying photo ID").  *Id.* § 1.2(b).

13.     On September 17, 2019, Plaintiffs filed a motion for preliminary injunction, seeking to prevent Defendants from implementing, enforcing, or giving effect to the provisions of S.B. 824 that were challenged in this action.  (*See generally* ECF No. 72.)

14.     On December 12, 2019, this Court entered an Order which granted in part and denied in part Plaintiffs' motion and entered a preliminary injunction.  (ECF No. 120.)  This Court found that Plaintiffs likely would succeed on their discriminatory intent claim, but it also found that Plaintiffs failed to establish at the preliminary injunction stage that their § 2 claims likely would succeed.  (*See generally id.*)

15.     Defendants appealed this Court's preliminary injunction Order, and on December 2, 2020, the Fourth Circuit reversed this Court and lifted the preliminary injunction.

*N.C. State Conf. of the NAACP v. Raymond*, 981 F.3d 295, 311 (4th Cir. 2020). In *Raymond*, relying on only the preliminary injunction record, the Fourth Circuit stated that it believed that Plaintiffs were unlikely to succeed on their discriminatory intent claims.[4] *See id.* at 310.

## IV. S.B. 824'S RELEVANT SUBSTANTIVE PROVISIONS

16. As amended, S.B. 824 requires that all voters, whether they are voting in person or by absentee ballot, must "produce" an acceptable form of identification which "contain[s] a photograph of the registered voter."[5] 2018 N.C. Sess. Laws 144 § 1.1(a). Currently, there are eleven different forms of qualifying photo ID:

1. A North Carolina driver's license;
2. A special identification card for nonoperators issued under G.S. 20-37.7 or other form of nontemporary identification issued by the Division of Motor Vehicles of the Department of Transportation, (hereinafter "DMV");
3. A United States passport;
4. A North Carolina voter photo ID card of the registered voter;

---

[4] It is well established that "the findings of fact and conclusions of law made by a court granting a preliminary injunction are not binding at trial on the merits." *Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981) (citations omitted); *see also Newsom ex rel. Newsom v. Albemarle Cnty. Sch. Bd.*, 354 F.3d 249, 261 (4th Cir. 2003) ("any ruling on a preliminary injunction, does not preclude a different resolution of . . . claims on a more fully developed record"). Accordingly, "it is generally inappropriate for a federal court at the preliminary-injunction stage to give a final judgment on the merits." *Camenisch*, 451 U.S. at 395 (citations omitted). The Fourth Circuit recently noted that the narrow scope of a Court of Appeals' review of a preliminary injunction motion is of particular importance given that such a case is at a "preliminary stage" and "will return to the district court for final fact finding on a more fulsome record after discovery and trial." *Pierce v. N. C. State Bd. of Elections*, 97 F.4th 194, 221 (4th Cir. 2024). This proposition was even bolstered by the Fourth Circuit in *Raymond*, 981 F.3d at 310–11 ("We do not reverse the district court because it weighed the evidence before it differently than we would. Instead, we reverse because of . . . the flipping of the burden of proof and the failure to provide the presumption of legislative good faith."). Nevertheless, in *Raymond*, the Fourth Circuit made several of its own conclusions of law on Plaintiffs' claims, going so far as to suggest they were final judgments of law. *See id.* at 310. Thus, this Court will follow the Fourth Circuit's dictates where case law and the law of the case doctrine require it. *Cf. CNF Constructors, Inc. v. Donohoe Const. Co.*, 57 F.3d 395, 398 n.1 (4th Cir. 1995); *Am. Canoe Ass'n v. Murphy Farms, Inc.*, 326 F.3d 505, 516 (4th Cir. 2003) ("If the ruling is avowedly tentative . . . it may be said that law-of-the-case principles do not apply.").

[5] On November 6, 2019, S.B. 824 was amended to include a reasonable impediment declaration form process for absentee ballots. (ECF No. 229 ¶ 129.) Voters using absentee ballots use a reasonable impediment declaration form when they are unable to include a physical copy of their qualifying photo ID in their absentee ballot envelope. N.C. Gen. Stat. § 163-230.1(g)(1)–(2).

5. A student ID issued by post-secondary institutions;

6. Certain employee IDs issued by a state or local government entity;

7. Out-of-state driver's licenses and nonoperator IDs (but only if the voter registered within 90 days of the election);

8. Military IDs;

9. Veterans IDs;

10. Tribal enrollment cards issued by state or federally recognized tribes; and,

11. Public assistance IDs issued by a department, agency, or entity of the state or federal government.

N.C. Gen. Stat. § 163-166.16(a)(1)–(2).

When S.B. 824 was originally enacted, there were only ten forms of qualifying photo ID. *See* 2018 N.C. Sess. Laws 144 § 1.2(a). The first ten forms of qualifying photo IDs listed above were authorized when S.B. 824 was originally enacted. N.C. Gen. Stat. § 163-166.16(a)(2). S.B. 824 was later amended to include the eleventh form listed above, public assistance IDs. *See* 2020 N.C. Sess. Laws 17 § 10. The first seven IDs may be used if they are "valid and unexpired, or . . . expired for one year or less,"[6] while the four remaining forms of photo ID—military IDs, veterans' IDs, tribal enrollment cards,[7] and public assistance IDs— may be used "regardless of whether the identification contains a printed expiration or issuance date."[8] N.C. Gen. Stat. § 163-166.16(a)(2).

---

[6] Under an earlier North Carolina voter identification statute, H.B. 589, *as altered by* North Carolina Session Law 2015-103, a voter could use expired photo identification to vote if it had been expired for less than four years. *See* 2015 N.C. Sess. Laws 103 § 8.(a).

[7] The SBOE must approve tribal enrollment IDs issued by state-recognized tribes under Chapter 71A of the North Carolina General Statutes. 2018 N.C. Sess. Laws 144 § 1.2.(f). Federally recognized tribes are not required to seek SBOE approval. *See id.*

[8] S.B. 824's text does not explicitly state whether military or veterans' IDs which *do* contain a printed expiration date would be considered invalid if they were expired for more than one year.

8

17. S.B. 824 makes an exception to these expiration terms for voters who are sixty-five years old or older. *Id.* § 163-166.16(a)(3). These voters may use an expired qualifying photo ID, so long as it was unexpired on their sixty-fifth birthday. *Id.*

18. Photo IDs from post-secondary educational institutions and government employee photo IDs are not automatically accepted under S.B. 824. *Id.* § 163-166.16(a)(1)(g)-(h). Rather, these entities must apply to the SBOE to have their photo IDs approved for use while voting. *See id.* §§ 163-166.16(a)(1)(g)-(h), 163-166.17(a). Once their photo IDs are approved, these IDs are only "valid for the period from January 1 of an odd-numbered year through December 31 of the next even-numbered year."[9] *Id.* § 163-166.17(b).

19. The SBOE is required to publicly produce a list of the post-secondary educational institutions and government employers whose photo IDs have been approved, along with which of their photo IDs have been approved, every two years. *Id.* § 163-166.17(c). While approximately eight-hundred and fifty colleges, universities, and government employers are potentially eligible, as of the date of this Order, the SBOE has listed that seventy-three of these entities provide approved qualifying photo ID.[10] *Student and Public Employee IDs Approved for Voting*, NORTH CAROLINA STATE BOARD OF ELECTIONS: VOTING: VOTER ID, https://www.ncsbe.gov/voting/voter-id/student-and-public-employee-ids-approved-voting

---

[9] The SBOE's current list of approved post-secondary institutions and government employee ID cards are approved through December 31, 2026. *Student and Public Employee IDs Approved for Voting*, NORTH CAROLINA STATE BOARD OF ELECTIONS: VOTING: VOTER ID, https://www.ncsbe.gov/voting/voter-id/student-and-public-employee-ids-approved-voting (last visited Aug. 15, 2025).

[10] This number currently appears to be even less than it was at the point this Court issued its order on the preliminary injunction. At that time, the number was 118. *N.C. State Conf. of NAACP v. Cooper*, 430 F. Supp. 3d 15, 36–37 (M.D.N.C. 2019), *rev'd sub nom. N.C. State Conf. of the NAACP v. Raymond*, 981 F.3d 295 (4th Cir. 2020).

(last visited Aug. 15, 2025); (PX0337 at 24 n.95). Currently, seven of the ten Historically Black Colleges and Universities in North Carolina have had their photo IDs approved for use during elections, three have both their student and employee IDs approved for use. *Student and Public Employee IDs Approved for Voting, supra.*

20. S.B. 824 further provides for the issuance of free qualifying photos IDs upon request. N.C. Gen. Stat. §§ 163-82.8A(a), 20-37.7. Voters can obtain these IDs in two ways: at a county SBOE office or at the DMV. N.C. Gen. Stat. §§ 163-82.8A(b), 20-37.7.

21. Voters can obtain qualifying photo IDs from a county board of elections office by appearing at the office in-person and providing their name, date of birth, and the last four digits of their social security number.[11] *Id.* § 163-82.8A(d)(1). No additional documentation is required. *Id.* These qualifying photo IDs "shall be issued at any time," except between "the end of one-stop voting for a primary or [general] election . . . and election day for each primary and [general] election." *Id.* § 163-82.8A(d)(2). In general, county boards of elections issue these qualifying photo IDs during their regular business hours, except for the period following the last day of early voting through Election Day. (DX401 at 2.)

22. Voters can also obtain a free nonoperator ID card from the DMV. N.C. Gen. Stat. § 20-37.7. However, this method requires voters to provide certain documentation to prove their identity, such as a birth certificate. *Id.* § 20-37.7(b). The state must supply the necessary documents free of charge if the voter does not have their own copies. *Id.* §§ 130A-

---

[11] The statute appears to authorize the SBOE to add requirements beyond those listed. *See* N.C. Gen. Stat. § 163-82.8A(d) ("The State Board shall adopt rules to ensure at a minimum but not limited to . . . ."). However, both Legislative Defendants and State Board Defendants confirm that no additional documentation is currently required to obtain a qualifying photo ID from a county board of elections office. (*See* ECF Nos. 335 ¶¶ 213, 415; 338 ¶ 7.)

93, 161-10(a)(8).  Also, if a voter's driver's "license, permit, or endorsement" has been "seized or surrendered due to cancellation, disqualification, suspension, or revocation under applicable State law," the DMV must automatically mail that voter a special replacement identification card which can be used for voting.  *Id.* § 20-37.7(d2).

23.     When a voter arrives to vote and presents identification, precinct officials must "compare the photograph contained on the required identification with the person presenting to vote." *Id.* § 163-166.16(b).  If the precinct official "disputes that the photograph contained on the required identification is the person presenting to vote," the voter will still be permitted to vote unless "the judges of election [that are] present unanimously agree that the photo . . . does not bear a reasonable resemblance to that voter." *Id.*

24.     S.B. 824 envisions three instances in which a voter who does not present qualifying photo ID may instead cast a provisional ballot: voters who (1) have religious objections to being photographed, (2) are the victims of a recent natural disaster, or (3) face a reasonable impediment to obtaining and presenting a qualifying photo ID.  *Id.* § 163-166.16(d)(1)–(3).  In all three instances, these voters must also complete an affidavit, under penalty of perjury, affirming their identities and their reasons for not presenting identification. *Id.*

25.     For voters to exercise the reasonable impediment option at the polls, they must also complete a "reasonable impediment declaration form" (hereinafter "RID form") along with the aforementioned required affidavit. *Id.* § 163-166.16(d)(2).  S.B. 824 describes the RID form in the following way:

> The State Board shall adopt a reasonable impediment declaration form that, at a minimum, includes the following as separate boxes that a registered voter may check to identify the registered voter's reasonable impediment:

11

(1) Inability to obtain photo identification due to:

      a. Lack of transportation.

      b. Disability or illness.

      c. Lack of birth certificate or other underlying documents required.

      d. Work schedule.

      e. Family responsibilities.

(2) Lost or stolen photo identification.

(3) Photo identification applied for but not yet received by the registered voter voting in person.

(4) Other reasonable impediment. If the registered voter checks the "other reasonable impediment" box, a further brief written identification of the reasonable impediment shall be required, including the option to indicate that State or federal law prohibits listing the impediment.

*Id.* § 163-166.16(e).

26. A reasonable impediment ballot "shall" be counted "unless the county board has grounds to believe the [accompanying] affidavit is *false*." *Id.* § 163-166.16(f) (emphasis added). S.B. 824 does not provide any other reason for which a reasonable impediment ballot may be denied. *See id.* Either a unanimous county board or one less than a unanimous county board must agree on the alleged falsity. 08 N.C. Admin. Code 17.0101(e)(1).

27. According to SBOE regulations, to reject a ballot as factually "false," the county board must put the alleged grounds for falsity in writing. *See id.* "Before disapproving a voter's provisional ballot . . . the county board shall provide the voter advance notice and an opportunity to address" the grounds accusation "prior to completion of the canvass." *Id.* The notice will be sent via mail. *Id.*

12

28. Alternatively, if a voter has a qualifying photo ID, but just failed to bring it to the polls, that voter may cast a provisional ballot and later return to the appropriate county board of elections office to cure that ballot. N.C. Gen. Stat. § 163-166.16(c). The voter must present themselves at the county board of elections office with their qualifying photo ID "no later than 12:00 P.M. on the third business day after the election." *Id.* Once cured, this ballot can be counted. *Id.*

29. S.B. 824 further empowers "[t]he chair of each political party in the State" to "designate up to 100 registered voters of the State" to serve as poll observers, in addition to the two observers already allotted for each individual precinct and the ten intra-county observers appointed by county party chairs. *Id.* § 163-45.1(b)(1)–(3); *see* 2018 N.C. Sess. Laws 144 § 3.3.

30. Lastly, S.B. 824 expands the grounds for ballot challenges. N.C. Gen. Stat. § 163-87; *see* 2018 N.C. Sess. Laws 144 § 3.1(c). Under North Carolina law, "any . . . registered voter of the county" may challenge another voter's registration and eligibility. N.C. Gen. Stat. § 163-87. When a challenge is entered, precinct officials must "explain to the challenged registrant the qualifications for registration and voting[,] . . . examine him or her as to his or her qualifications to be registered and to vote[,] . . .[and] tender to him or her [an] oath or affirmation" to affirm the challenged registrant's identity. *Id.* § 163-88(a). Thereafter, if the precinct officials are "satisfied that the challenged registrant is a legal voter" they "shall overrule the challenge and permit the voter to vote." *Id.*

31. The grounds for exercising challenges were formerly limited to suspicion of defective registration or duplicate voting. *See* 2018 N.C. Sess. Laws 144 § 3.1(c). However,

S.B. 824 expands the reasons for challenge to include if "[t]he registered voter does not present photo identification in accordance with [S.B. 824]." N.C. Gen. Stat. § 163-87.

## V. NORTH CAROLINA'S ENTIRE SYSTEM OF VOTING

### A. General Accessibility

32. North Carolina has approximately 2,600 polling places open from 6:30 a.m. to 7:30 p.m. on Election Day. N.C. Gen. Stat. § 163-166.25.

33. Voters may utilize the SBOE's online Voter Search to find their polling place and their sample ballot. (DX395 at 2); NORTH CAROLINA STATE BOARD OF ELECTIONS: VOTER SEARCH, https://vt.ncsbe.gov/reglkup/ (last visited Aug. 15, 2024).

### B. Early Voting

34. The early voting period lasts two-and-a-half weeks, with early voting sites open 8:00 a.m. to 7:30 p.m. on weekdays and from 8:00 a.m. to 3:00 p.m. on the Saturday before Election Day. N.C. Gen. Stat. §§ 163-166.35(d), 163-166.40(b). Counties may offer additional weekend hours for early voting. *See id.* § 163-166.40(b), (i). A voter may use any early voting location in their county. *See id* § 163-166.40(a); (DX396 at 2.)

35. "One-stop" early voting is also available to North Carolina voters. A one-stop early voting location is a polling place where voters can obtain free IDs and vote at the same time. 2019 N.C. Sess. Laws 239 § 2(a). In general, one-stop early voting locations are open from the beginning of the early voting period through the last Saturday before Election Day. *Id.*

### C. Absentee Voting

36. North Carolina law provides that "[a]ny qualified voter of the State may vote by absentee ballot in a statewide primary, general, or special election on constitutional

14

amendments, referenda or bond proposals." N.C. Gen. Stat. § 163-226(a). Further, "any qualified voter of a county is authorized to vote by absentee ballot in any primary or election conducted by the county board of elections, in the manner provided in this Article." *Id.*

37. Absentee ballots, which may be requested online, are available sixty days prior to Election Day for general elections and fifty days prior to the date of primaries and special elections. *Id.* §§ 163-227.10(a). An RID form process is also available for absentee ballots without qualifying photo ID. *Id.* § 163-230.1(g)(1)–(2).

38. Absentee ballots must be received by 7:30pm on Election Day in order to be accepted unless federal law, the State Board, or a court order extends the closing time of the polls. *Id.* § 163-231(b)(1).

### D. Voters Who Require Assistance

39. Voters who require assistance due to age or disability are allowed to vote curbside from their vehicle. *Id.* § 163-166.9(a). Voters who require assistance inside the polling place are permitted to request that a family member be allowed to help them. *Id.* § 163-166.8. Voters who are blind or visually impaired and wish to vote by absentee ballot are permitted to do so through an accessible absentee voting system. *Help for Voters with Disabilities*, NORTH CAROLINA STATE BOARD OF ELECTIONS: VOTING, https://www.ncsbe.gov/voting/help-voters-disabilities (last visited, Aug. 15, 2025).)

## VI. OVERVIEW OF APPLICABLE LEGAL STANDARDS

To provide context for the evidence in this case and how that evidence must be assessed, this Court now provides a brief overview of the applicable legal standards, which will be discussed in greater detail in the Court's later conclusions of law. As earlier stated, Plaintiffs

allege that three provisions of S.B. 824 violate the Fourteenth Amendment, Fifteenth Amendment, and § 2 of the Voting Rights Act.

Courts conduct a two-step analysis to determine whether circumstantial evidence shows that a law was enacted with discriminatory intent. At the first step, the Court evaluates whether racial discrimination served as a "'substantial' or 'motivating' factor behind" the enactment. *Raymond*, 981 F.3d at 303 (internal quotation marks omitted) (quoting *Hunter v. Underwood*, 471 U.S. 222, 228 (1985)). In the absence of facial evidence of discriminatory intent, this constitutional inquiry is guided by four factors outlined by the Supreme Court in *Village of Arlington Heights v. Metropolitan Housing Development Corp,* 429 U.S. 252 (1977): "(1) historical background; (2) the specific sequence of events leading to the law's enactment, including any departures from the normal legislative process; (3) the law's legislative history; and (4) whether the law 'bears more heavily on one race than another.'" *Id.* at 303 (quoting *Arlington Heights*, 429 U.S. at 265–69). In making this determination, the Supreme Court has held that the state legislature must be accorded with a presumption of good faith. *Id.* (quoting *Abbott v. Perez*, 585 U.S. 579, 603 (2018)).

Should the Court find that discriminatory intent has been adequately demonstrated, the Court proceeds to step two, which requires the Court to "scrutinize the legislature's *actual* nonracial motivations to determine whether they *alone* can justify the legislature's choices." *Id.* (internal quotation marks omitted) (quoting *McCrory II*, 831 F.3d at 221).

For Plaintiffs' second claim, this Court must determine whether S.B. 824 violates § 2 of the Voting Rights Act by producing discriminatory results. Section 2 subsection (a) of the Voting Rights Act prohibits any "standard, practice, or procedure . . . which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or

16

color." 52 U.S.C. § 10301(a). "[T]he language of Section 2(a) of the [Voting Rights Act] requires only proof of discriminatory 'results,' not of discriminatory intent." *Greater Birmingham Ministries v. Sec'y of State for State of Ala.*, 992 F.3d 1299, 1329 (11th Cir. 2021) (quoting *Chisom v. Roemer*, 501 U.S. 380, 403–04 (1991) (additional citations omitted)). A § 2 discriminatory results claim is assessed under "the totality of circumstances," 52 U.S.C. § 10301(b)—rather than examine the challenged government action in the abstract, courts must consider whether an "electoral law, practice, or structure interacts with social and historical conditions to cause an inequality in the opportunities enjoyed by [non-white] and white voters to elect their preferred representatives," *Thornburg v. Gingles*, 478 U.S. 30, 47 (1986).

The Supreme Court in *Brnovich* directed courts considering discriminatory results claims to evaluate plaintiffs' submitted evidence using following factors: (1) "the size of the burden imposed by a challenged voting rule," (2) "the degree to which a voting rule departs from what was standard practice when § 2 was amended in 1982," (3) "[t]he size of any disparities in a rule's impact on members of different racial or ethnic groups," (4) "the opportunities provided by a State's entire system of voting," and (5) "the strength of the state interests served by a challenged voting rule." 594 U.S. 647, 669–71 (2021). Here, this Court will evaluate Plaintiffs' § 2 discriminatory results challenge to S.B. 824 by utilizing the guideposts in *Brnovich* and additional factors relevant to its totality of the circumstances analysis.

## VII. MINORITY VOTING RIGHTS AND SUPPRESSION IN NORTH CAROLINA

### A. Reform and Retrenchment in North Carolina's Voting Regulations

40.     The parties do not dispute that North Carolina has a history of extensive official discrimination against African Americans,[12] and that this history in the area of voting is well documented.  (PX0001 at 4, 6–7.)  Over the last century-and-a-half, North Carolina legislators and private citizens have employed a variety of measures to limit the rights of racial and ethnic minorities to register to vote, to exercise the vote, and to participate in the democratic process. (PX0001 at 4, 6, 7.)

41.     State Board Defendants in this case likewise recognized this history in their filings.    In seeking summary judgment in this action, they noted:

> There is no denying North Carolina's long history of racial discrimination. . . That history contains many "shameful" chapters related to race . . . .  The State Board does not dispute this history and recognizes and accepts that another relevant part of that history is [House Bill 589], which was partially invalidated for having been enacted with the purpose of burdening African American voters.   The State Board further acknowledges that unconstitutional considerations of race have also recently predominated North Carolina's redistricting process.

(ECF No. 182 at 12–13.)

42.     In North Carolina, the *de jure* and *de facto* discrimination used to prevent African Americans' suffrage has included vigilante violence, literacy tests, poll taxes, multi-member legislative districts, and the prohibition of single shot voting.   (PX0001 at 4.)   These discriminatory measures have also included a host of other, seemingly neutral, voting regulations, such as restrictions for preparing ballots, procedures for challenging electors' right to register and vote, and the monitoring of polling sites by election judges.  (*Id.* at 6.)

---

[12] Throughout this Order, the Court uses the term "African American" to describe the group of people in the United States who are descendants of the Africans who were forcibly brought to the United States as a result of the transatlantic slave trade, but also for those who are otherwise part of the larger African diaspora in the United States.  The Court will also use the term "Black" when referencing or quoting from the evidence or other materials that use that term.

43. According to Plaintiffs' expert, Professor Leloudis, S.B. 824 represents the latest chapter in the long struggle over minority voting rights in North Carolina. (PX0001 at 4.) To Professor Leloudis, S.B. 824 is best understood in the context of cyclical periods of North Carolina's history. (*Id.*) These cycles, as described by Professor Leloudis, are marked by increased exercise of the franchise by minorities only to be followed by race-based voter suppression. (*Id.* at 6.)

44. Professor Leloudis stated that "[i]n North Carolina, battles over the franchise have played out through cycles of emancipatory politics and conservative retrenchment." (*Id.*) In a pattern repeated across this state's history, "[B]lacks and their allies have formed political movements to end racial exploitation and claim their rights as equal citizens." (*Id.*)

45. Professor Leloudis also stated that efforts to end racial exploitation in the exercise of civil rights were met with resistance from lawmakers who, in response, "erected safeguards – or what advocates of enfranchisement called barriers – around the ballot box." (*Id.*) Often, according to Professor Leloudis, when a voting restriction was struck down—whether in the courts or through protest and political mobilization—another was quickly invented to replace it by those who sought to suppress minorities' access to the vote. (*Id.*)

46. Importantly, Professor Leloudis' report reflected that while sometimes lawmakers spoke in overtly racial terms and suppressed minority voting populations through violent means, at other times, they would cast these restrictions in a neutral light by using the euphemistic language of addressing voter fraud and political corruption. (*Id.*) However, Professor Leloudis found that, across time, lawmakers were consistently presenting suppressive regulations of the right to vote as means of ensuring "good order" and "good government." (*Id.*)

19

1.      Emancipation: Voter Expansion in the Reconstruction Era

47.      Professor Leloudis' first cycle of emancipatory politics and retrenchment begins at the conclusion of the Civil War and the start of the Reconstruction Era.  (*Id.* at 7–16.) Following the passage and ratification of the Thirteenth Amendment, the 39th United States Congress passed the Fourteenth Amendment to the U.S. Constitution.  (*Id.* at 9.)  However, North Carolina, along with other former Confederate states, refused to ratify the Fourteenth Amendment.  (*Id.*)

48.      In response, the 39th United States Congress passed the Reconstruction Acts of 1867.  (*Id.*)  This statute required former Confederate states to draft new state constitutions to be approved by Congress, create universal male suffrage, and ratify the Fourteenth Amendment.  (*Id.*)  If a former Confederate state refused to comply, it would not be readmitted to the United States and instead would remain under federal military occupation.  (*Id.*)

49.      It was only then, in 1868, after congressional mandate, that the North Carolina Constitution guaranteed universal male suffrage in free and fair elections.  (*See id.*)  Plaintiffs' expert Dr. Barry Burden characterizes North Carolina's election law at the time as "probably the fairest and most democratic election law in the post-reconstruction south."  (PX0337 at 11 (internal quotation marks omitted) (citation omitted); *see also* PX0001 at 15.)

50.      Even with the Reconstruction Act of 1867, and other Reconstruction Acts, in effect, the 40th United States Congress passed and pushed ratification of the Fifteenth Amendment.  (PX0337 at 10.)  Their purpose being to enshrine universal male suffrage without racial discrimination in the Constitution, binding not just former Confederate states to this principle, but also the entire United States, forevermore.

51.     As a result, North Carolina experienced a brief period of increased African American voter participation, during which African American voters had a substantial impact on the outcomes of local and state elections.   (*Id.* at 10–11; PX0001 at 13, 15.)   During this period, African American and white Republicans, and later, white Populists, began to vote together, gaining seats in the North Carolina General Assembly, and electing African American officials.[13]  (PX0001 at 13.)

52.     As a result of the 1894 election, Populists and Republicans gained a host of seats in the North Carolina General Assembly,[14] and more than one thousand African American officials were elected statewide.  (*Id.* at 13.)  Thus, between 1895 and 1897, this new political coalition revised North Carolina's election code to remove barriers to voter registration and encouraged voter participation, with turnout among African American voters increasing from 60% to nearly 90%.  (*Id.* at 13–15, 15.)

2.     Retrenchment: The 1900 "Suffrage" Constitutional Amendment and the Jim Crow Regime

53.     The success of the biracial Reconstruction coalition was soon met with opposition by stalwarts of white supremacy.  (*Id.* at 16.)  In the days leading up to and following the 1898 election, white supremacists who sought to suppress minority voting, resorted to tactics such as vigilante violence,[15] explicit racial appeals in political campaigns,

---

[13] The record does not associate voter suppression based on race with any political party.  (*See generally* PX0001; PX0337.)  Although at this time, Democrats were the primary proponents of white supremacy, (*see, e.g.*, PX0001 at 11), throughout the history of our nation many political parties, not just Democrats or Republicans engaged in race-based voter suppression and vote dilution efforts.  (*Id.* at 11, 50–51.)

[14] Notably, "Populists and Republicans took control of seventy-four of the one hundred and twenty seats" in the North Carolina General Assembly.  (*Id.* at 12.)

[15] As one of the most shameful examples of such violence, days after the 1898 election, "armed white men . . . staged the only municipal coup d'état in the nation's history," "maraud[ing] through Wilmington's [B]lack district" and "murder[ing] as many as thirty [B]lack citizens in the streets."  (*Id.* at 17–18, 18.)  As described by

21

and open intimidation of voters at registration and polling places statewide. (*Id.* at 16–18.) Due in part to those tactics, Democrats won the majority in the General Assembly in the 1898 statewide election by a narrow margin. (*Id.* at 18.)

54. After obtaining the majority in the North Carolina General Assembly in 1898, Democrats implemented laws and policies that "aimed to end biracial politics," disenfranchise African Americans in the legislature, and roll back the electoral reforms made by the legislators who had revised North Carolina's election law to guarantee "full and fair access to the franchise." (*Id.* at 13, 19–21.)

55. In 1899, the Democrat-controlled General Assembly passed an "Act to Regulate Elections" to roll back Reconstruction Era reforms. (*Id.* at 20.) This law required every voter to re-register to vote; gave registrars the discretion to require registrants to prove their identity, age, or residence; allowed proponents to more easily challenge voter registration and votes on Election Day; and ended voting practices made to accommodate illiterate voters. (*Id.*)

56. In the same year, the Democrat-controlled North Carolina General Assembly drafted a proposed "suffrage amendment" to the North Carolina Constitution that established a poll tax for voting and adopted a literacy test for registration,[16] which required that "every person presenting himself for registration shall be able to read and write any section of the Constitution in the English language." (PX0337 at 11 (quoting N.C. Const.

---

Professor Leloudis, proponents of white rule "made white supremacy their rallying cry and vigilante violence their most potent political weapon." (*Id.* at 15.)

[16] Interestingly, though it is no longer enforced, the literacy test provision "remains on the books" and is still part of the North Carolina Constitution today, and efforts to repeal the provision have been unsuccessful. (*See* PX0337 at 11, 11 n.23; ECF No. 329 at Tr. 1238:14–1239:12.)

art. VI, §4); PX0001 at 19.)  The vagueness of the proposed amendment's literacy test was to give "Democratic registrars wide latitude to exclude [B]lack men from the polls."[17]  (*Id.*)

57.  This proposed suffrage amendment also included a "grandfather clause" that exempted from the literacy test "adult males who had been eligible to vote or were lineal descendants of men who had been eligible to vote on or before January 1, 1867," which was a date that preceded the limited right to vote granted to African American men under the Military Reconstruction Act.  (PX0001 at 19, 19–20.)

58.  In the 1899 election North Carolina voters approved the proposed suffrage amendment, thus, the proposed amendment and the General Assembly's implementing legislation were enacted in 1900 (hereinafter the "1900 Constitutional Amendment"). (PX0337 at 11.)

59.  As a result of the damaging provisions of the 1900 Constitutional Amendment and North Carolina's Jim Crow laws,[18] the period to follow was characterized by relentless political, social, and economic subjugation of African American North Carolinians.  (PX0001 at 22–24.)

60.  Due to these new suppressive laws and the state and private violence deployed to enforce them, African American voter turnout was reduced from 87% in 1896 to near nonexistence by the federal elections of 1904.  (PX0337 at 11.)

---

[17] The literacy test "was used selectively by vote registrars to discriminate against [B]lacks."  (PX0337 at 11; PX0001 at 20 ("The literacy test was . . . designed to achieve the very thing the federal Fifteenth Amendment expressly outlawed—voter exclusion based on race.").)

[18] The state legislature—during the same session in which they concocted the 1900 Constitutional Amendment—also enacted the first statewide segregation law in 1899, ushering in the beginning of the Jim Crow laws that controlled for decades in North Carolina.  (PX0001 at 22.)

61.     Relatedly, between 1900 and 1968, there were no African American members of the North Carolina General Assembly, and no African American individuals were elected to statewide office or to represent North Carolina in Congress.  (*Id.* at 20.)

62.     Moreover, during this period of retrenchment, candidates for public office again relied on racial appeals to bring "race front and center" of the election cycle.  (*See, e.g.*, PX0001 at 30–32; *see also* PX0001 at 31 (In the 1950 U.S. Senate elections, campaign materials opposing former Senator Frank Graham said "White People Wake Up Before It's Too Late" and "Frank Graham Favors Mingling of the Races," signaling the threat that Graham posed "to white privilege and the racial division of labor.").)

63.     Despite the detrimental impact of these measures, African Americans gradually achieved a limited level of success in political life, as "by the mid-1930s upwards of forty thousand [B]lack men and women had managed to pass the state's literacy test" and could then register to vote.  (PX0001 at 25.) In addition, by the early 1950s, nine African American candidates had won seats as elected officials in municipal councils.  (*Id.* at 32.)

64.     However, according to Professor Leloudis, the ensuing period was still marked by the General Assembly's approval of "a flurry of new laws" that "mandated at-large voting in a shifting mix of elections for county boards of commissioners and town councils in twenty-three eastern counties" and "prohibited single-shot voting" in each of those places.  (*Id.* at 34.)  White politicians justified these measures as safeguards against the "corrupting influence of 'bloc' interests, particularly those defined by race."  (*Id.* at 35.)

24

3.     <u>Reform: The Enactment of the Voting Rights Act of 1965 and Voter Expansion</u>

65.     After years of nationwide advocacy against voter suppression, the Voting Rights Act was signed into law on August 6, 1965. Voting Rights Act of 1965, Pub. L. No. 89-110, 79 Stat. 437 (1965) (codified as amended at 52 U.S.C. §§ 10301–10314, 10501–10508, 10701–10702).

66.     Section 2 of the Voting Rights Act outlawed voting standards, practices, or procedures that "result[] in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color." 52 U.S.C. § 10301(a).

67.     Further, § 5 of the Voting Rights Act required certain states to receive preclearance—via a favorable determination following administrative review by the United States Attorney General or following an action for declaratory judgment before the United States District Court for the District of Columbia—to implement any changes to their voting qualifications, prerequisites, standards, practices, or procedures. *Id.* at § 10304(a). Due to its undeniable history of voter suppression, North Carolina became a preclearance state. (PX 0337 at 12).

68.     While under § 5 preclearance, North Carolina was not permitted to make changes to voting procedures or qualifications without first demonstrating that the changes "neither have the purpose nor will have the effect of denying or abridging the right to vote on account of race or color." 52 U.S.C. § 10304(a); (*see also* PX0337 at 12.)

4.     <u>Retrenchment: North Carolina's Legislative and Political Response to the Voting Rights Act of 1965</u>

69.     In 1966, following the passage of the Voting Rights Act of 1965, the General Assembly created fifty-six multi-member districts—"fifteen of thirty-three in the Senate,

which previously had no multi-member districts, and forty-one of forty-nine in the House, which previously had one hundred districts, twelve of which were multi-member." (PX0001 at 51.) This created a new obstacle for African American candidates "who would now face multiple white opponents and whose supporters were legally prohibited from maximizing their voting strength by casting single-shot ballots." (*Id.*)

70. Then, in 1967, state lawmakers adopted a constitutional amendment that required that counties be kept whole in the creation of House and Senate districts and added a numbered-seat plan in select multi-member House districts and Senate districts. (*Id.* at 51–52.) This plan made it possible for election officials to put African American candidates in head-to-head competition with the strongest white contenders, thus increasing the likelihood that African American candidates would not be successful. (*Id.* at 52.)

71. This proved to be an effective tactic, for, by 1971, only two African American legislators served in the General Assembly. (*Id.*) By 1981, a total of three African Americans served in the General Assembly. (*Id.*) And no African American individuals were elected to statewide office or to the United States Congress until 1992. (PX0337 at 20.)

72. Also, during this time period, "a new conservative movement took shape" nationwide in the Republican party, which was characterized by campaigns that employed dog-whistle racial appeals. (PX0001 at 50.) This, of course, "played on racial fears that dated back to the era of Reconstruction and the white supremacy politics of the late 1890s." (*Id.*)

5. <u>Reform: The § 5 Voting Rights Act Pre-Clearance Regime Brings North Carolina Voting to Near Racial Parity</u>

73. Yet, decades of preclearance enabled slow but steady growth in minority electoral participation, and "by 2013[,] African American registration and turnout rates had

finally reached near-parity with white registration and turnout rates." *McCrory II*, 831 F.3d at 214; (PX0337 at 10 (acknowledging "the recent parity in black and white turnout" but characterizing it as "fragile" and sensitive to "new costs imposed on voters").)

74. During this period, between 1971 and 2012, "the U.S. Department of Justice . . . issued 64 objection letters to officials in the 40 North Carolina counties that had been required to get preclearance under Section 5 of the [Voting Rights Act]." (PX0337 at 12.)

75. Then, more than twenty years after the enactment of the Voting Rights Act, the United States Supreme Court considered a racial gerrymandering challenge under § 2 of the Voting Rights Act to a North Carolina redistricting plan. *Gingles*, 478 U.S. at 34–35, 42.

76. The Court found that in accordance with North Carolina's "legacy of official discrimination" and "the persistence of campaign appeals to racial prejudice [in North Carolina] acted in concert" with the use of multimember state legislative districts "to impair the ability of . . . cohesive groups of [B]lack voters to participate equally in the political process and to elect candidates of their choice." *Id.* at 80. Thus, the Supreme Court in *Gingles* found that five of the six districts that were subject to the challenge discriminated against African American voters by diluting their power to vote, rendering the redistricting plan invalid. *Id.* at 34, 80.

77. Following the *Gingles* decision, Professor Leloudis found that North Carolina state and local offices saw an increase in the number of elected African Americans. (PX0001 at 53.) By 1989, nineteen African Americans served in the General Assembly; and, by 1990, upwards of four-hundred African Americans had been elected to county and municipal offices across the state. (*Id.*)

27

78.     Between 1992 and 2009, the General Assembly enacted a series of election reforms that "expand[ed] minority citizens' access to the franchise." (*Id.* at 54.) These reforms included a mandate that the State Board of Elections initiate a statewide voter registration drive, and expanded early voting, out-of-precinct voting, same-day registration, and pre-registration for teenagers with driver's licenses. (*Id.* at 54–55.) These measures, and others, were so effective that by the federal and state elections in November of 2012, Black voter turnout was 67.8%. (PX0337 at 9 tbl.1.)

79.     These reforms made an impact on voting participation for African Americans, and also responded well to the changing demographics of North Carolina. (PX0001 at 55, 56–57.) For instance, between 1990 and 2010, the state's Hispanic[19] population grew from about 75,000 to about 800,000, and reached over 996,000 by 2018, this was nearly 10% of the state's total population at the time. (*Id.* at 56.) In turn, between 2004 and 2010, the number of Hispanic registered voters increased again from 10,000 to 79,000 and increased to 164,000 by 2016. (*Id.*) Turnout among Hispanic voters followed apace. (*See id.*) In the federal and state elections in November 2016, Hispanic voter turnout was 36.3%, when it had been 3.3% in the federal and state elections of November 2000. (PX0337 at 9 tbl.1.)

6.     <u>Retrenchment: The Introduction of Voter ID Restrictions to North Carolina and the Impact of *Shelby County v. Holder*</u>

80.     The record reflects that the increase in minority voter participation has been critically important in recent elections. (PX0001 at 55, 55–56.) For instance, in the 2008

---

[19] The Court uses the term "Hispanic," which, in general, refers to the ethnic identity of people in the United States who speak the Spanish language, only when the evidence and other materials it references uses this term. The Court does the same with the term "Latino," which is generally defined as referring to people with ties to Latin America. It is important that this Court notes that the terms "Hispanic" and "Latino" do not necessarily refer to race like the terms "white," "African American," and "Black" do. One can state they are of a "non-white Hispanic" ethnicity or be both "African American" and "Latino."

28

presidential contest, former President Barack Obama won North Carolina with a slim margin of 14,171 votes out of 4,271,125 ballots cast. (*Id.* at 55–56.) In that election year, voter turnout was a record high across multiple voter demographics: white voter turnout was 65.6%, Black voter turnout was 69.3%, and Hispanic voter turnout was 31.2%. (PX0337 at 9 tbl.1.) In fact, Black voter turnout that year was so high that it was the first time it exceeded that of white voters in North Carolina's history. (PX0001 at 55; PX0337 at 9 tbl.1.)

81. Then, in 2010, during the first federal midterm election of the Obama administration, Republicans won majorities in both chambers of the state legislature for the first time since 1896. (PX0001 at 60.) According to Plaintiffs' experts, the 2010 election campaign season was marked by candidates relying on racial appeals "to stir up white fear and animosity," and thus encourage white voter turnout. (*Id.* at 57, 57–60.) That year, white voter turnout was 42%, whereas in the previous federal midterm elections it was 35.6%.[20] (PX0337 at 9 tbl.2.)

82. In the following legislative session, Republicans "redrew North Carolina's Congressional and legislative district lines in ways that favored their partisan interests.[21]" (PX0001 at 61.) In the same session, the Republican-controlled General Assembly attempted to enact a voter photo ID law, House Bill 351 (hereinafter "H.B. 351"). (ECF Nos. 91 at 13; 97 at 20.)

---

[20] In the following two federal midterm elections white voter turnout has continued to increase. (PX0337 at 9 tbl.2 (showing turnout to be 43.1% in 2014 and 51.2% in 2018).)

[21] These district lines would eventually be found unconstitutional, and therefore, invalid. In *North Carolina v. Covington*, 581 U.S. 1015 (2017), the Supreme Court affirmed that the lower court's conclusion that twenty-eight challenged districts from this redistricting plan were racial gerrymanders in violation of the Equal Protection Clause of the United States Constitution. *Covington v. North Carolina*, 316 F.R.D. 117, 176 (M.D.N.C. 2016), *aff'd,* 581 U.S. 1015 (2017).

83.     After H.B. 351 passed both houses of the General Assembly, former North Carolina governor, Democrat Bev Perdue, vetoed the bill.  (DX276 at 2.)  The General Assembly then attempted to override Governor Perdue's veto but failed.  (*Id.*)

84.     At the time of her veto, Governor Perdue explained that H.B. 351, amounted to the "creation of new obstacles to voting . . . [that] will serve only to reduce voting in this State – particularly among elderly, poor, and African American voters."  (ECF No. 339 ¶ 43.)  Governor Perdue further stated that H.B. 351 "has nothing to do with voter fraud and everything to do with voter suppression."  (*Id.*)  She "refuse[d] to allow the General Assembly to turn back the clock to the days when the right to vote was enjoyed only by some citizens rather than all citizens."  (*Id.*)

85.     In the federal and state elections of November 2012, Republicans secured a super-majority in the General Assembly.   (PX0044 at 9.)  In addition, North Carolina voters elected a new governor, Republican Patrick McCrory.  *See McCrory II*, 831 F.3d at 228.

86.     In the spring of 2013, the General Assembly again took up voter photo ID legislation and began drafting House Bill 589 (hereinafter "H.B. 589").  *Id.* at 227.  Prior to implementation of H.B. 589's photo ID requirement, most in-person voters in North Carolina were only required to state their names and current addresses, and then sign an Authorization to Vote form, with any false signature on that form constituting a Class I felony.  *See* N.C. Gen. Stat. §§ 163-166.2, 163-82.6A (2010) (current requirements at N.C. Gen. Stat. § 163-166.16).

87.     Although certain first-time voters were required at the time to present identification at the polls—consistent with the requirements of the federal Help America Vote Act, numerous forms of photo and non-photo ID could be used.  52 U.S.C. §

30

21083(b)(2)(A). Acceptable identification included a current utility bill, a bank statement, a government check or paycheck, and other government documents. *Id.*; *see, e.g.*, *N.C. State Conf. of NAACP v. McCrory*, 997 F. Supp. 2d 322, 353 n. 36 (M.D.N.C. 2014), *aff'd in part, rev'd in part and remanded sub nom. League of Women Voters of N. Carolina v. North Carolina*, 769 F.3d 224 (4th Cir. 2014) (citations omitted) [hereinafter *McCrory I*].

88.     In its early form, the voter photo-ID requirements outlined in H.B. 589 were limited and were "much less restrictive" when compared to later iterations. *McCrory II*, 831 F.3d at 216, 227; (PX0044 at 43 tbl.8 (comparing the early version of H.B. 589, the version of H.B. 589 ultimately enacted, and S.B. 824)).

89.     Further, as stated above, North Carolina was a state bound by the preclearance measures of the Voting Rights Act of 1965. (PX 0337 at 12.) In 2013, at the time of H.B. 589's initial drafting, forty North Carolina jurisdictions were "covered jurisdictions" under § 5 of the Voting Rights Act, which required that the United States Department of Justice preclear changes in voting procedures in North Carolina to ensure that they would not disadvantage protected minorities. (PX0044 at 68.) Thus, H.B. 589, once final, would have been subjected to pre-clearance review. (*See* PX0044 at 68.)

90.     The last draft-version of H.B. 589 on the General Assembly's floor before the Supreme Court's decision in *Shelby Cnty., Ala. v. Holder*, 570 U.S. 529 (2013), permitted voters to use a much wider array of photo identification. This identification included but was not limited to: (a) community college IDs, (b) public-assistance IDs, and (c) federal, state, and local government IDs. *See* 2013 H.B. 589 (fifth ed.) § 4; (PX0044 at 43 tbl.8).

91.     After the Supreme Court issued its opinion in *Shelby County*, on June 25, 2013, invalidating the coverage formula under § 5 of the Voting Rights Act, 570 U.S. at 556–57, H.B.

589 was re-drafted. *McCrory II*, 831 F.3d at 216. North Carolina was no longer subject to the preclearance regime. *See Shelby Cnty*, 570 U.S. at 556–57; (PX0337 at 12.)

92. Following the *Shelby County* decision, the legislature "requested and received racial data" on the use of various voting practices in the state before "swiftly expand[ing]" H.B. 589 from what was formerly single-issue legislation into "omnibus legislation." *McCrory II*, 831 F.3d at 216.

93. The newly expanded H.B. 589 now included "a number of voting restrictions" that would fall most heavily on minority voters, including stringent voter ID requirements that excluded "many of the alternative photo IDs used by African Americans." *Id.* at 216.

94. H.B. 589 was passed along party lines—Republicans in favor, Democrats against—and signed into law on August 12, 2013. *Id.* at 218. Legal challenges soon followed, and in 2016, the Fourth Circuit struck down H.B. 589 as unconstitutional in *McCrory II*, because it was "enacted with racially discriminatory intent in violation of the Equal Protection Clause of the Fourteenth Amendment and § 2 of the Voting Rights Act." 831 F.3d at 219.

95. According to the Fourth Circuit, [t]he legislature enacted H.B. 589 with "almost surgical precision", taken together with North Carolina's history of state-sponsored discrimination, and the recent rise in minority voting power, H.B. 589 "unmistakably" reflected the legislature's motivation to "entrench itself . . . by targeting voters who, based on race, were unlikely to vote for the majority party." *Id.* at 214, 233.

96. Following the Fourth Circuit's decision in *McCrory II*, H.B. 589's proponents sought Supreme Court review, but were denied certiorari. *See North Carolina v. N.C. State Conf. of NAACP*, 137 S. Ct. 1399 (2017). It was only hours after this denial from the Supreme Court

32

that legislative leaders began "calling for a new law that would incorporate some of the same ideas in a manner that they thought could withstand judicial review."[22] (PX0044 at 14.)

### B. S.B. 824's Legislative and Procedural History

97. Following the November 2016 federal and state elections in North Carolina, Republicans retained their supermajorities in both chambers of the General Assembly.[23] (*See* ECF No. 339 ¶ 7b.-c.; PX0044 at 21.) This result was due, in part, to the gerrymandered legislative maps that were later found unconstitutional in the Supreme Court's 2017 decision in *Covington.* (PX0044 at 21.) Revised and approved North Carolina legislative maps addressing the racial gerrymander would not be in effect until the November 2018 elections. (*Id.*)

98. The North Carolina Constitution permits the General Assembly, by three-fifths vote in each chamber, to propose constitutional amendments for popular approval, N.C. Const. art. XIII, § 4. Thus, in North Carolina it is possible for one party's super-majority in both chambers to, alone, propose and place a constitutional amendment on the ballot. *See id.*

99. In June 2018, during the final days of the short regular session, the Republican leadership of the General Assembly sought to place six constitutional amendments on the ballot, to be considered by the voters in the November 2018 federal and state elections. (PX0044 at 74.)

---

[22] One of Plaintiffs' witnesses, Reverend William J. Barber II, former president of the North Carolina State Conference of the NAACP, testified to this "piecemeal" legislative approach. (ECF No. 329 at Tr. 1195:16-17.) Rev. Barber testified that he warned incoming leaders of the NAACP, that the fight against H.B. 589 was "far from over" because it appeared that the legislature was "going to break this thing up into pieces" and pass H.B. 589 that way. (*Id.* at Tr. 1224:7-18.)

[23] Plaintiffs' witness, North Carolina State Representative Marcia Morey testified that at the time there was not "an African American or person of color in the majority [or] supermajority in the Republican Party," and this did not change until the 2023-2024 legislative session, where one African American representative joined the Republican caucus. (ECF No. 328 at Tr. 904:23–905:9.)

100. The Court heard testimony that this was abnormal. (ECF No. 328 at Tr. 848:25–849:1, 849:11-13, 856:4-24 (Representative Morey testifying that during a short session it was unusual for constitutional amendments to be filed, introduced, voted on, passed and placed on the upcoming ballot); *see also* ECF No. 328 at Tr. 926:8-11, 944:18-946:1 (Former Senator McKissick testifying that in "[s]hort session year[s], . . . you are tweaking the budget, primarily."); *id.* at Tr. 850:10-22 (Representative Morey testifying to the same).)

101. In addition, the General Assembly's proposal of six constitutional amendments to the voters at one time was the third largest in its history. (PX0044 at 74.) This Court heard testimony that this was not the General Assembly's usual practice. (ECF No. 328 at Tr. 946:2-11 (Former Senator McKissick testifying: "It was unprecedented during the [thirteen] years that I served in the North Carolina Senate. There was never a time in a short session, or a long session . . . where there [were] six constitutional amendments . . . that went to the public in a general election or a vote."); PX1877 at 1017:8-25 (Representative Harrison testifying that in her sixteen years in the legislature, it was not "standard practice" to approve six constitutional amendments at once for voters).)

102. One of the six proposed amendments was House Bill 1092 (hereinafter "H.B. 1092"), which sought a constitutional requirement that North Carolina voters provide photo identification to vote in-person. 2018 N.C. Sess. Laws 128 § 1.

103. On June 7, 2018, Representative Lewis, Chair of the Committee on Rules, Calendar and Operations of the House and Co-Chair of the House Committee on Elections and Ethics Law, introduced H.B. 1092 in the House. (PX0044 at 69.) Representative Lewis and Legislative Defendant Moore were primary sponsors for H.B. 1092. (PX560 at 1; PX0044 at 15.) Representative Lewis was also a primary sponsor for H.B. 589, serving as the Chair of

the House Elections Committee at the time H.B. 589 was passed.  (PX0044 at 15; DX0123 at 1.)

104.    H.B. 1092 was proposed without implementing legislation, which violated the General Assembly's decades-long norm for constitutional amendments.  (PX0044 at 74.)  The record reflects that for the last fourteen amendments to the North Carolina Constitution, thirteen of them had proposed implementing legislation attached.  (*Id.*)

105.    On June 11, 2018, H.B. 1092, because it was election legislation, was initially referred to the House Committee on Elections and Ethics Law, which, as stated above, was co-chaired by Representative Lewis.  (PX0044 at 69.)  However, H.B. 1092 was then abruptly withdrawn from this committee and immediately re-referred to the House Committee on Rules, Calendar and Operations of the House, which Representative Lewis chaired alone. (ECF No. 328 at Tr. 854:6-20; PX1877 at 1014:16–1015:9.)

106.    On June 21, 2018, the Committee held a hearing on H.B. 1092, where a number of speakers, including members of the public, made comments and presented evidence to show that adopting a photo ID requirement would disenfranchise voters on a racially discriminatory basis.  (PX241A at 10:9-22, 12:7–14:5, 18:16–19:6, 20:16-23, 27:22–28:1, 50:1-10, 52:10-13, 56: 11-19.)

107.    Nevertheless, the General Assembly passed H.B. 1092 on June 29, 2018, less than a month after it was initially proposed.  2018 N.C. Sess. Laws § 6.  In contrast, this Court heard testimony that normally the process from proposal to passage of a proposed constitutional amendment takes months.  (PX0044 at 73; *see also* PX1877 at 1016:2-11 (Representative Harrison testifying that the timing for House consideration of H.B. 1092 was

"fairly rushed" and that twenty-two days is "a pretty short time frame for a piece of legislation with this magnitude. . . especially in the House . . . [without] really any real public input").)

108. H.B. 1092 was passed along party lines, with Republican legislators voting in favor and Democratic legislators voting against it. (PX574, PX568.)

109. On June 29, 2018, the day H.B. 1092 was passed, the General Assembly adjourned the short regular legislative session. (ECF No. 299 ¶ 22.) Typically, a short session of the General Assembly is adjourned to some concrete date in the future. (ECF No. 328 at Tr. 849:18-850:4 (testimony of Representative Morey); 944:23–946:1 (testimony of former Senator McKissick).) For the 2018 short regular session, the General Assembly was adjourned indefinitely. (ECF No. 326 at Tr. 437:14-15.)

110. Later, when North Carolina held its federal and state elections on November 6, 2018, voters passed four referenda to amend the Constitution of North Carolina, including H.B. 1092. (PX1049 at 1–2.) H.B. 1092 was passed by voters with a margin of 55.49% to 44.51%. (PX1049 at 2.)

111. In addition, the November 2018 election used the remedial district maps that were adopted to cure the unconstitutional racial gerrymander. (PX0044 at 17.) Under the new maps, Republicans lost their supermajority but retained a majority in the General Assembly. (*See* ECF No. 339 ¶ 230.)

112. Following Election Day, the General Assembly reconvened the short regular session on November 27, 2018. (ECF No. 299 ¶ 22.) Though this was a continuation of the short regular session, it was a lame duck session of the General Assembly. This Court heard testimony that this process seemed like a rush and was better suited for the next legislative session. (PX1877 at 1040:2-20 (Representative Harrison testifying that the push to enact S.B.

36

824 "seemed rushed" and that "it wasn't clear that we should even be [implementing the constitutional amendment] in the . . . two weeks . . . between Thanksgiving and Christmas after the voters had voted [that] we were going to have a brand-new legislature in January."); ECF No. 328 at Tr. 877:25-879:16, 976:5-19 (Former Senator McKissick and Representative Morey both testifying that they believed the lame duck session was convened to override potential vetoes by former Governor Roy Cooper).)

113. This Court notes that there were also no upcoming elections that necessitated the constitutional amendment's implementing legislation that could not have been addressed in January 2019 with the new General Assembly. (ECF No. 328 at Tr. 969:24-971:2.)

114. Regular legislative procedure was also changed for the lame duck session. Ordinarily, the North Carolina Constitution requires that, "all bills shall be read three times in each house[.]" N.C. Const. art. II, § 22(1). Before the start of the session, House Joint Resolution 1101 was adopted, which provided that, "[d]uring the regular session that convenes on Tuesday, November 27, 2018, the restrictions contained in Section 3.2 of Resolution 2017-12 and the request and filing deadlines in the Permanent Rules of the Senate and the House of Representatives do not apply." (ECF No. 299 ¶ 23.) Thus, bills on the floor of the General Assembly during the lame duck session were able to quickly pass through the legislative process.

115. In addition, it is the usual practice of the General Assembly to convene a commission to study a constitutional amendment's issue and have that commission recommend proposed implementing language prior to the release of the official draft of the amendment's implementing language. (PX0001 at 71; *see also* PX0044 at 78.) However, before

the short regular session reconvened, no commission to study the issue of the amendment and to recommend proposed implementing language was convened for S.B. 824. (PX0044 at 78.)

116. Instead, before the short session began, a draft of S.B. 824 was released publicly on November 20, 2018. (DX069 at 3:4-12.) While there were three other amendments that passed in the November 2018 elections, the General Assembly did not bring implementing legislation to the General Assembly floor for any of these other amendments during the short regular session; S.B. 824—the implementing legislation for H.B. 1092—was the only one. (ECF No. 328 at Tr. 895:25–897:4; *see also* ECF No. 328 at 969:24–970:5, 971:3-16.)

117. On November 26, 2018, before S.B. 824 was even filed in the Senate, the Joint Elections Oversight Committee received public comment on the draft of S.B. 824 that was released publicly on November 20, 2018. (PX0044 at 76.) Thirty people offered to make a public comment at the hearing and two minutes were allocated for each individual to speak about the bill. (*Id.* at 77.) The Committee also accepted written statements and other documents from the speakers and other members of the public on the draft. (DX068 116:11-16.)

118. Plaintiffs' witness, Tomas Lopez, former executive director of Democracy North Carolina, a nonpartisan voting rights organization, spoke at length about the debate and public comment procedures of S.B. 824. (ECF No. 327 at Tr. 498:25, 499:10-11.)

119. Mr. Lopez testified that while S.B. 824 was being debated, Democracy North Carolina participated in public comment and activated individuals on their email list to contact lawmakers about the bill. (*Id.* at Tr. 519:16-23.) During its public comments, Democracy North Carolina informed the General Assembly of what the organization learned during the 2016 primary—when H.B. 589 was in effect—and publicized the "issues that voters

38

encounter[ed] as put forward in the [Democracy North Carolina's] 2016 report," (*id.* at Tr. 519:16–520:9), including that "Black voters made up large portion of rejected ballots," (*id.* at Tr. 523:14–524:4-17).

120. In addition to the public comments, this Court heard testimony that while the General Assembly considered S.B. 824, "the NAACP[,] and many other groups had protests calling for them to just stand down." (ECF No. 329 at Tr. 1242:9-10 (Testimony of Reverend Barber).) Reverend Barber testified that the NAACP and other organizations urged the legislature to "let the people who just got elected with the constitutional districts implement any change to the Constitution. You shouldn't be doing it as a lame-duck group of folks who were unconstitutionally constituted as a legislature." (*Id.* at Tr. 1242:9-15.)

121. Irrespective of this public feedback, on November 27, 2018, S.B. 824 passed its first reading in the Senate and received a favorable report in the Senate Select Committee on Elections. (PX0546 at 4.) Between the first draft's release—November 20, 2018, and when it was ultimately filed in the Senate—November 27, 2018, S.B. 824 underwent twenty-four changes. (DX069 at 3:10-12.)

122. On November 27, 2018, the day it was released, S.B. 824 passed through the Senate Rules Committee once and received a favorable report. (PX0546 at 3; PX0044 at 75.)

123. On the same day, the Senate held floor debate, during which eleven amendments to the bill were proposed and six were adopted. (ECF No. 299 ¶ 33.) All three amendments offered by Democrats in the Senate were tabled.[24] (*Id.* ¶¶ 38–40.)

---

[24] These three tabled amendments were Senate Amendment 9, Senate Amendment 7, and Senate Amendment 8. (PX632; PX634; PX633.) Senate Amendment 9 would have allowed any federal or state employee ID to serve as an acceptable ID, (PX632 at 1–2), Senate Amendment 7 would have allowed for unawareness of a law to serve as a reasonable impediment for an extended period of time, (PX634 at 1), and Senate Amendment 8 would have restored "last Saturday" voting and extended the time to issue free IDs, (PX633 at 1–2).

124. S.B. 824 passed in the Senate on its second reading on November 28, 2018, by a vote of thirty-two to eleven, with twenty-nine Republicans and three Democrats voting aye, and eleven Democrats voting no. (*Id.* ¶ 43.) It passed in the Senate on its third reading on November 29, 2018, by a vote of thirty to ten, with twenty-eight Republicans and two Democrats voting aye, and 10 Democrats voting no. (*Id.* ¶ 44.)

125. S.B. 824 was then placed on the calendar to be considered by the House on December 4, 2018. (*Id.* ¶ 45.) Representative Morey testified that S.B. 824's enactment went through the legislative process more quickly than any other legislation she had seen in the House. (ECF No. 328 at Tr. 880:23–881:2.)

126. Similar to its consideration in the Senate, an opportunity for public comment on S.B. 824 was made available in the House, with five members of the public being permitted to speak at the Elections and Ethics Law Committee hearing. (JX692 at 66:22–72:22.) Each speaker was limited to one minute each. Only four of the five people spoke at the hearing. (*see, e.g.*, *id.* at 67:2-3.)

127. Later in the House, two amendments to S.B. 824 proposed by Democrats failed. (PX627; PX617.) The first of these amendments, House Amendment A3, would have added high school IDs to S.B. 824's list of approved voter IDs. (PX627 at 1–2.) The second of these amendments, House Amendment A13, would have added public-assistance IDs to S.B. 824's list of approved voter IDs. (PX617 at 1.)

128. Representative Harrison also re-introduced an amendment to allow for a student's school schedule to be listed as a reasonable impediment to obtaining a voter ID, and the amendment passed with bipartisan support in the House. (PX0044 at 75.) However, that amendment was removed from the Conference Report. (*Id.*)

129. On December 5, 2018, S.B. 824 passed both its second and third readings in the House as Legislative Defendant Moore called for a third reading immediately after the vote on the second reading was complete. (ECF No. 299 ¶¶46–47; PX693 at 170:18-22 (Legislative Defendant Moore stating that S.B. 824 would proceed to the third reading "without objection".)

130. Representative Harrison testified that she objected to the third reading occurring immediately after the second reading "because we knew that there were amendments. We had an agreement with Representative Lewis to run some amendments on the third reading, and then my objection to the third reading was ignored." (PX1877 at 1040:21-25.) Representative Harrison made her objection with the hope to give Democrats the opportunity to propose additional amendments as they had planned. (*Id.* at 1040:21–1041:2.)

131. Legislative Defendant Moore did not acknowledge Representative Harrison's objection. (*Id.*) At trial, Representative Harrison testified that this had not happened before and Legislative Defendant Moore did not explain why he ignored her objection, (*Id.*), however, she testified that "normally [the third reading] would have gone over to another day so that we could consider more amendments." (*Id.* at 1040:25–1041:3.)

132. Ultimately, S.B. 824 passed both readings by a vote of sixty-seven to forty, with sixty-five Republicans and two Democrats voting aye, and thirty-nine Democrats and one Republican voted no at each reading. (ECF No. 299 ¶¶46–47.)

133. Once S.B. 824 passed both chambers of the General Assembly, on December 6, 2018, (*id.* ¶ 49), it was presented to former Governor Cooper the same day. (*Id.* ¶ 54.)

134. Former Governor Cooper vetoed S.B. 824 on December 14, 2018. (*Id.* ¶ 55.) The Senate subsequently overrode former Governor Cooper's veto on December 18, 2018, (*Id.* ¶¶ 56–58), and the next day, the House also voted in favor of overriding his veto. (*Id.* ¶¶ 59–61.) These actions finalized S.B. 824 as law. 2018 N.C. Sess. Laws 144 § 5.

135. After this Court's preliminary injunction was lifted, S.B. 824 was implemented in three sets of municipal elections which were conducted on September 12, 2023, October 10, 2023, and November 7, 2023 (the "2023 Municipal Elections"). (*See* ECF No. 299 ¶¶ 161–64.) It was also used in a statewide primary election that was conducted on March 5, 2024 (the "2024 Primary Election"). (*See id.* ¶ 171.)

136. Later, S.B. 824's photo ID restrictions were used in the federal and state elections of November 2024, but the bench trial and offer of proof in the instant case concluded before that time. Accordingly, the only data available to this Court about S.B. 824's implementation comes from the aforementioned 2023 and 2024 elections.

**C. Impact of S.B. 824: Whether the Law Bears More Heavily on One Race Than Another**

137. Republican legislators in the General Assembly stated that the constitutional mandate was the primary reason for enacting S.B. 824. (*See, e.g.,* DX068 at 2:13–3:1; DX069 at 2:16-20, 38:8–10; DX074 at 50:16-21.) They also stated that S.B. 824 served the purpose of protecting election integrity and public confidence in elections.[25] (*See, e.g.,* DX069 at 2:20–3:3, 16:21–17:4.)

---

[25] There was limited evidence of voter fraud when H.B. 1092 was originally brought to the General Assembly. (PX241A at 17:9-11.)

138. Republican legislators emphasized that thirty-four other states in the United States already had some form of voter ID during the time leading up to the enactment of S.B. 824. (*See, e.g.*, DX074 at 108:19-22; DX069 at 2:12-15, 3:18–4:1.)

139. As reported by Plaintiffs' expert, Dr. Lichtman, as of 2018 half of the thirty-four states that required identification also allowed non-photo forms of ID, including such readily available documents as a utility bill, paycheck or bank statement. (PX0044 at 118; *id.* at 18.) According to Plaintiffs' expert Dr. Burden, in 2019, fifteen states and the District of Columbia, did not require voter identification to vote at all, and of the states with voter identification laws, many did not require photographic identification. (PX0444 at 2–3.) In enacting S.B. 824, North Carolina joined the minority of states that exclusively required photo ID to exercise the right to vote. (PX0219 at 17–18.)

140. Moreover, many states with photo ID requirements allow voters using alternative procedures to cast a provisional ballot, while authorizing immediate validation of these ballots without photo ID (*e.g.*, by checking the voter's registration and voting history, or the voter's signature). This is unlike S.B. 824 where use of the reasonable impediment process only allows for *casting* a provisional ballot. (PX0219 at 18; *see also Id.*)

141. Furthermore, S.B. 824 is almost unique among other photo ID laws in its requirement that many of its qualifying photo IDs can only be used if they are expired for less than a year, except for voters sixty-five and older who can provide expired identification if it was unexpired on the registered voter's sixty-fifth birthday. N.C. Gen. Stat. § 163-166.16(a)(3).

142. As evidence of disparate impact, Plaintiffs' expert Dr. Michael Herron conducted an analysis of the SBOE's 2019 "no-match" list.[26] The list cross-referenced DMV records with state voter registration lists to determine the percentage of registered voters without a DMV-issued ID, and the overall "no-match" rate was 8.1%. (PX280 ¶¶ 9, 28, 43.)

143. According to Dr. Michael Herron's findings, when sorted by race and ethnicity, it is revealed that 10.6% of African American voters are unmatched, compared to just 6.5% of white voters, and 11.1% of Hispanic voters are unmatched, compared to just 5.7% of non-Hispanics. (PX280 ¶¶ 21 tbl.3, 57 tbl.5.) Thus, African American and Hispanic voters are less likely than white voters to have driver's licenses and other DMV-issued IDs.

144. Plaintiffs' expert Dr. Matthew Barreto conducted a public opinion survey in August and September 2019 that surveyed 1,642 North Carolinians who were eligible to vote on rates of possession of qualifying ID. (PX0316 ¶¶ 11, 13–14, 18–24, 31 tbl.A.)

145. Dr. Barreto's survey found that for unexpired IDs issued by the North Carolina DMV, 6.7% of eligible white voters lacked such an ID, while 11.4% of eligible Black voters—a 4.7% difference from white eligible voters, and 22.9% of Hispanic voters—a 16.2% difference from white eligible voters, lacked valid DMV-issued ID. (*Id.* at 51 tbl.1B.) Thus, according to Dr. Barreto's conclusions, "[a]s compared to eligible non-Hispanic-whites, Black and Latino eligible voters in North Carolina are less likely to possess a photo ID acceptable under [S.B. 824]." (*Id.* ¶ 42.)

---

[26] The Court notes that Legislative Defendants contest the Court's consideration of Dr. Herron's analysis of the no-match list and Dr. Barreto's 2019 public opinion survey. The Court resolves these contentions below, concluding that the Court may appropriately consider the statistics and data in each of these experts' findings in the record.

146. With respect to registered voters, Dr. Barreto's survey found that for unexpired IDs issued by the North Carolina DMV, 5.8% of registered white voters lacked such an ID, while 10.6% of registered Black voters—a 4.8% difference from white registered voters, and 19.2% of registered Hispanic voters—a 13.4% difference from white registered voters, lacked valid DMV-issued ID. (*Id.* at 53 tbl.4B.)

147. With respect to registered voters with any kind of qualifying identification, Dr. Barreto's survey found 4.5% of white registered voters, 12.2% of Black registered voters—a 7.7% difference from white registered voters, and 14.4% of Latino registered voters—a 9.9% difference from white registered voters, lack any valid identification with a qualifying photo. (*Id.*)

148. Therefore, according to Dr. Barreto's survey, "among registered voters, large and statistically significant differences in possession rates are found by race with white voters consistently [being] more likely to have access to a qualifying ID than Black or Latino voters." (*Id.* ¶ 52.)

149. Dr. Barreto's survey revealed similar disparities between white persons and members of minority groups concerning whether survey respondents resembled the photo in their ID and whether, beyond DMV-issued licenses, respondents possessed other types of qualifying IDs. (*See id.* ¶¶ 43–44, 52.)

150. African Americans are more likely than white people to possess government employee IDs. (PX0044 at 49.) Yet, with the exception of military IDs, federal employee IDs are not included as qualifying photo IDs under S.B. 824. (*Id.* at 43 tbl.8); *see also* N.C. § 163-166.16(a)(1).

151.     As for the age cutoff for use of expired qualifying photo IDs, under S.B. 824 this age is sixty-five, under H.B. 589, before it was struck down, the cut-off was age seventy. (PX0044 at 44.)  Interestingly, according to Plaintiffs' expert Dr. Lichtman, S.B. 824's lowering of the cutoff age for expired ID "*widens* the gap between African Americans and whites because of the age structure of the North Carolina population[]." (*Id.* (emphasis added).)

152.     With respect to the burden of voting and the burdens disproportionately experienced by minorities, Plaintiffs' expert Professor Barry Burden states that "[b]oth options for acquiring ID make demands on a person's time and impose transportation costs because the individual must present themselves in person to apply." (PX0337 at 32.)  Because African Americans and Hispanics are "less likely than whites to live in households where a vehicle is readily available," accessing state-issued ID can be challenging.  (*Id.*).

153.     Also, Plaintiffs pointed to a 2014 study conducted through Harvard Law School which found that "the expenses for documentation, travel, and waiting time" associated with obtaining free ID "are significant—especially for minority group and low-income voters— typically ranging from about \$75 to \$175."  Richard Sobel, *The High Cost of 'Free' Photo Voter Identification Cards* 2 (2014) (PX0337 at 32).

154.     Before S.B. 824 went into effect, North Carolina's March 2016 primary election was previously the only election in the state's history that was conducted under a voter-ID law featuring a reasonable impediment provision—H.B. 589.  (*See* PX0044 at 34.)  In that primary, 2,327 aspiring voters cast provisional ballots, 1,353 (58%) of which ultimately went uncounted. (PX0044 at 34.)  Of the 1,353 people who traveled to the polls on Election Day only to have their vote uncounted, a disproportionate number were African American.  (*Id.* at 34, 37.)

155. Importantly, under H.B. 589, as amended, an RID form could be rejected for being "factually false," but also for being "nonsensical" or "merely denigrat[ing]" the identification requirement. *See* 2015 N.C. Sess. Laws 103 § 8(e). Whereas under S.B. 824, any RID form can be rejected for falsity. N.C. Gen. Stat. § 163-166.16(f).

156. Between its enactment in December 2018 and the bench trial in this case, S.B. 824 has been amended multiple times. One amendment to S.B. 824, Senate Bill 214, postponed enforcement of voter ID to the 2020 elections, while mandating that "all implementation and education efforts shall continue." (ECF No. 299 ¶¶ 122–23); 2019 N.C. Sess. Laws 4 § 1.)

157. Another amendment, House Bill 646, increased the time during which educational institutions and government employers can have their ID approved as qualifying under S.B. 824 and relaxed the approval requirements, while also removing certain expiration requirements from tribal IDs. (ECF No. 299 ¶¶ 124–26; DX118 at 1–5.)

158. In addition, Senate Bill 683 (hereinafter "S.B. 683") was an amendment that expanded the reasonable-impediment process for absentee ballots and appropriated additional funding to the SBOE to implement voter ID. (ECF No. 299 ¶¶ 127–30); 2019 N.C. Sess. Laws 239.)

159. Further, the General Assembly passed, and former Governor Cooper signed, House Bill 1169 (hereinafter "H.B. 1169"), which amended S.B. 824 by adding to the list of qualifying voter IDs an ID card "issued by a department, agency, or entity of the United States government or of North Carolina for a government program of public assistance," which may be used for voting even if it does not contain a printed expiration or issue date. (ECF No. 299 ¶¶ 131–133; DX086 at 5.)

47

160.     Thus, as amended by H.B. 1169, the public-assistance IDs that would have been permitted by House Amendment A13—which was proposed before S.B. 824's enactment—are now permitted under S.B. 824.   According to Dr. Lichtman, "adding public assistance IDs makes a major difference" in possession rates: when public-assistance IDs are included, "the percentage of African Americans lacking photo IDs drops . . . from 15.1% to 8.4%," whereas the percentage of white voters lacking photo ID drops from 4.1% to 3.2%.  (PX0044 at 26; *compare* PX0044 at 26 tbl.2 *with* PX0044 at 28 tbl.3.)

**D.     Testimonial Evidence Regarding S.B. 824's Implementation**

161.     The Director of the North Carolina State Board of Elections, Karen Brinson Bell, (ECF No. 327 at Tr. 590:23–783:23), testified to the training and implementation of S.B. 824 since its passage.

162.     Ms. Brinson Bell testified that the SBOE is required to hold training conferences before every municipal, primary, and general election for County Board of Elections directors, Board members, and staff.  (ECF No. 327 at Tr. 693:4-13.)

163.     Ms. Brinson Bell stated that County Boards also have access to online resources about election requirements published by the State Board.  (*Id.* at Tr. 697:7-20.)  Ms. Brinson Bell also testified about the ways the SBOE supports counties on Election Day to ensure that elections are administered successfully and according to current laws.  (*Id.* at Tr.703:16–705:10.)

164.     In addition, Ms. Brinson Bell testified that all new County Board directors are required to attend training within three years of starting that role.  (*Id.* at Tr. 706:17-23.)  Ms. Brinson Bell testified that if County Boards are not following the SBOE's procedures, the

SBOE steps in to tell them how the election should be conducted and sometimes removes County Board members if they do not comply. (*Id.* at Tr. 756:23–757:11.)

165. The SBOE's initial training for County Board members on the RID form was delayed. (*See* PX0337 at 37, 38.) However, Ms. Brinson Bell reported that during its 2024 trainings, the SBOE emphasized that voters without qualifying photo ID must be offered the option to cast a provisional ballot with a RID form and the option to cast a provisional ballot and return to cure with qualifying photo ID. (ECF No. 327 at Tr. 685:17–686:10; *see also* PX950; PX835 at 2.) Ms. Brinson Bell testified that SBOE staff are also trained to hand a voter registration form to voters using provisional ballots so that County Board staff will be able to find them, if necessary for ballot curing, or alternatively, to immediately register them to vote. (*Id.* at Tr. 726:13-25, 727:15-25.)

166. Ms. Brinson Bell testified that implementation of the photo ID requirements is discussed at these conferences and trainings, (*id.* at Tr. 694:6-18), and when the Board is made aware of issues related to implementation of the photo ID requirement, it incorporates discussions about them in its training to mitigate future issues, (*id.* at Tr. 684:19–695:14).

167. Plaintiffs' witness, Courtney Patterson, Chair of the Lenoir County Board of Elections, also testified to the training and implementation procedures related to S.B. 824. (ECF No. 326 at Tr. 311:18-19.) Additionally, Mr. Patterson, is an organizer for Blueprint North Carolina and the First Vice President of the North Carolina Conference of the NAACP. (*Id.* at Tr. 309:23-24, 310:16-17.)

168. Mr. Patterson testified to the training for paid Lenoir County Board staff as well as the two-hour training for volunteer poll workers, which he testified is not sufficient to

49

adequately train poll workers to properly conduct elections with the added procedures required by S.B. 824. (*Id.* at Tr. 323:23–324:5, 368:10-18.)

169. The SBOE also provided general data regarding the 2023 Municipal Elections, when S.B. 824 was in effect. According to State Board Elections data, 613,835 voters casted ballots across all three election dates in the 2023 Municipal Elections. (*See* ECF No. 299, ¶ 165.) 573 provisional ballots were cast in-person at early voting or on Election Day for reasons related to the State's photo ID requirements. (*Id.* ¶ 165.) Of these 573 provisional ballots, 305 were voters who filled out a Photo ID exception form; of those 305 voters, 256 had their votes counted, and 49 did not.[27] (*Id.* ¶ 166.)

170. With respect to the remaining 268 voters who cast provisional ballots due to the State's photo ID requirements but did not fill out a RID form, 49 later provided photo identification to the county board by the day before the canvass and had their provisional ballots counted. The remaining 219 of those 268 voters who cast provisional ballots did not have their votes counted.[28] (*Id.* ¶ 168.)

171. In all, 305 of the 573 voters who cast a provisional ballot for reasons related to the State's photo ID requirements, had their ballots counted and 268 were not counted. (*Id.* ¶ 170.)

---

[27] Of the 49 voters whose votes did not count, for 42 the data shows it was because "ID was not provided," for 2 it was because they were not registered, for 4 the reason was listed as "other," and for 1, he had already voted. (ECF No. 299 ¶ 167.)

[28] Of the 219 voters who did not fill out a RID form and did not have their votes counted, for 207 the data indicates it was because "ID was not provided;" for 3 voters, the reason was "not registered;" for 7 voters, the reason the vote was not counted is identified as "other;" for 1 voter, the reason listed for the vote not counting is "already voted;" and for 1 voter, the reason listed for the vote not counting is listed as "removed." (*Id.* ¶ 169.)

172. The SBOE also provided general data regarding the March 2024 Primary Election. 1,800,118 North Carolinians cast ballots in the 2024 Primary Election. (*Id.* ¶ 172.)

173. Of the 1,800,118 votes cast in that election, 1,185 provisional ballots were cast in person at early voting or on Election Day for reasons related to the state's photo ID requirements. (*Id.* ¶ 173.)

174. Of those 1,185 provisional ballots cast, 627 voters filled out the RID form; of those 627 voters, 566 had their ballots counted,[29] and 61 voters did not.[30] (*Id.* ¶¶ 174–75.) The remaining 558 voters who cast provisional ballots for reasons related to photo ID but did not submit a RID form, 142 had their ballots counted in full or in part, and 416 did not have their ballots counted.[31] (*Id.* ¶¶ 176–77.)

175. In total, 708 of the 1,185 voters who cast a provisional ballot for reasons related to the State's photo ID requirements had their ballots counted and 477 were not counted. (*Id.* ¶ 179.)

---

[29] Of these 566 ballots, 557 were counted in whole and 9 were counted in part due to voting outside the correct precinct. (*Id.* ¶ 174.)

[30] Of the 61 voters whose votes did not count, 43 voters' ballots were not counted for the reason "ID not provided;" 1 voter's ballot was not counted because he was not registered; 7 voters' ballots were not counted for a reason listed as "other;" 4 voters' ballots were not counted because their provisional application was incomplete or illegible; 3 voters' ballots were not counted because they registered after the deadline; 1 voter's ballot was not counted because the transaction was canceled; and 2 voters' ballots were not counted because they had the wrong party ballot. (*Id.* ¶ 175.)

[31] Of those 416 voters who did not complete a Photo ID exception form and did not have their ballots counted, 393 were not counted for the reason identified as "ID not provided"; 3 because they were not registered; 1 because the ballot was missing from the envelope; 3 because their provisional application was incomplete or illegible; 1 because of registration after the deadline; 1 because the transaction was canceled; 3 because they had the wrong party ballot; and 11 for reason listed as "other." (*Id.* ¶ 178.)

176. Ms. Brinson Bell reported that she testified before the General Assembly after the March 2024 statewide primary elections about the low turnout as compared to the 2020 Primary Election in North Carolina. (ECF No. 327 at Tr. 609:14-17.)

177. Specifically, Ms. Brinson Bell testified that the March 2024 primary had a 24% turnout, (*id.* at Tr. 608:19–609:3), and warned the General Assembly, that she was concerned about "how many people decided they weren't going to come and vote because they knew they didn't have voter ID." (*Id.* at Tr. 649:9-12.)

178. She further testified before the General Assembly that the people who do vote in municipal and primary elections generally are "more civically engaged, so "their awareness [about photo voter ID] is probably higher as well." (*Id.*) Yet, she stated that for both municipal and primary voters in the March 2024 statewide elections the SBOE saw low turnout.[32] (*Id.* at Tr. 612:19–613:5.)

179. Mr. Patterson also testified about a specific incident that exemplified the consequences of poor implementation of S.B. 824. In this instance, poll workers provided incorrect information to two Hispanic voters who appeared at the Pink Hill polling site during Lenoir County's November 2023 Municipal Election. (ECF No. 326 at Tr. 330:17–333:3.) Mr. Patterson testified that the two voters did not have qualifying photo IDs and thus voted provisionally. (*Id.*) The two voters were directed to return with qualifying photo ID. (*Id.*)

---

[32] Plaintiffs provided a recent Texas study showing that "confusion about [that state's voter-ID] law, due in part to insufficient public education, deterred participation more than the actual law did." (PX0337 at 36.) There was also support in the record before this Court of North Carolina voters experiencing the same apprehension. Plaintiffs' witness, Dr. Hairston testified that she was personally aware of individuals who had been deterred from voting as a result of S.B. 824. (ECF No. 325 at Tr. 206:5-8, 214:22–215:11.) Dr. Barreto's public opinion survey in August and September 2019 which found North Carolinians "who currently lack a qualifying ID . . . overwhelmingly" said they would not "try to vote on election day if they learned they lacked a qualifying photo ID." (PX0316 ¶ 62.)

180. However, Mr. Patterson stated that a poll worker failed to properly record the two Hispanic voters' names. (*Id.* at Tr. 332:3-13.) Mr. Patterson testified that due to these errors, when those two Hispanic voters returned to the Lenoir County Board of Elections to present their qualifying photo IDs, the Director of the Lenoir County Board of Elections was unable to match them to their provisional ballots. (*Id.*) These two provisional ballots were, therefore, neither cured nor counted.[33] (*Id.* at Tr. 332:15-20.)

181. Mr. Patterson testified that this issue should have been raised to the Board by his director, but it was not. (*Id.* at Tr. 331:18–332:1.) In addition, he claimed that the missing two votes might have changed the outcome for a municipal race that cycle because of the closeness of the vote count. (*Id.* at Tr. 332:2-5.)

182. Plaintiffs' witness, Corey Dunn is the Director of Public Policy at Disability Rights North Carolina. (ECF No. 329 at Tr. 1146:11, 21-23.) Ms. Dunn explained that her African American and Latino constituents have difficulty trusting government agencies and her organization assists with helping them "navigate government systems without having to engage in a way that feels unsafe or . . . threatens their . . . well-being." (*Id.* at Tr. 1151:2-9.) Ms. Dunn testified that her African American and Hispanic constituents face an additional barrier of being "afraid to ask for what they actually need and are entitled to." (ECF No. 329 at Tr. 1152:15-24.)

183. Plaintiffs' witness, Deborah Maxwell, President of the North Carolina NAACP, also testified to this point. Ms. Maxwell noted that some County Board of Elections offices

---

[33] In general, the witness testimony on counting provisional ballots was mixed. While some witnesses were able to testify to others not having their ballots counted, other of Plaintiffs' witnesses could not testify to having personal experience of their ballots not being counted or the ballots of their membership not being counted. (*See, e.g.*, ECF No. 328 at Tr. 219:4-11 (testimony of Dr. Hairston).)

are in government centers with sheriff's or police departments, which dissuades certain people of color; she testified that she has felt this way despite never being in trouble with law enforcement and being retired military police. (ECF No. 325 at Tr. 132:16–133:2.)

184. Ms. Dunn also testified to the increased burdens of S.B. 824's implementation on disabled voters. With respect to the locations where voters can obtain free photo IDs, Ms. Dunn testified that the County Board free ID provision was very important because "the DMV is not . . . a natural nexus for a lot of [Disability Rights North Carolina's] clients. It's not an agency that they're already familiar with. They aren't drivers in a lot of cases." (ECF No. 329 at Tr. 1169:17-25.)

185. Ms. Dunn further testified, "I think it's common knowledge that North Carolina DMV offices have, in recent years, had reduced hours . . . and some locations have [been] closed. Some counties only have one office, typically located in places that are really convenient for drivers but maybe not for folks who rely on public transit." (*Id.* at Tr. 1176:15-24.) Plaintiffs' witness, Dr. Elma Hairston also testified that members of the High Point branch have faced challenges as a result of S.B. 824, including having to get an ID if they did not already have one, which she described as "laborious" and specifically mentioned members in nursing homes and those who are disabled experiencing challenges as a result of S.B. 824. (ECF No. 325 at Tr. 205:23–206:4.)

186. However, Ms. Dunn also testified that individuals with disabilities would face barriers in obtaining IDs from the County Board of Elections because "any additional stop is . . . a potential burden" for constituents, who may be facing barriers such as mobility impairments and fatigue due to their disabilities. (ECF No. 329 at Tr. 1173:25–1174:23.)

187.     In addition, Ms. Dunn testified that getting transportation to a County Board of Elections office can be particularly difficult for individuals living in group homes or residential facilities, because "[n]ot every service provider understands that facilitating voting is part of their obligation to support people living in the community."  (*Id.* at Tr. 1174:24–1175:16-18.)

188.     Ms. Dunn testified that Disability Rights North Carolina has also obtained private funding to connect people with disabilities with rides to the polls.  (*Id.* at Tr. 1171:10-15.)  Ms. Dunn testified that ride share apps, like Uber, are not available statewide, and they have only been able to utilize these resources to assist voters in metro areas.  (*Id.* at Tr. 1173:5-12.)

189.     Ms. Dunn also testified that paratransit—public transportation dedicated to people with disabilities—can be booked in advance; however, it is substantially more expensive than public transit.  (*Id.* at Tr. 1172:12-21.)  Ms. Dunn further testified that "not every County Board of Elections uses their County Board office as an early voting site . . . . that means that we then have to arrange for two rides.  We have to arrange for a ride to the County Board for the ID and then a ride . . . to the polling place, wherever that may be."  (*Id.* at Tr. 1170:15–1170:23.)  Ms. Dunn could not say how many of these locations exist in the state. (*Id.* at Tr. 1183:19-25.)

190.     Outside of ineffective training, one of the foremost concerns of Plaintiffs' witnesses' testimony was the increased hostility and danger at voting precincts following S.B. 824's enactment and in its implementation.  Plaintiffs presented several individuals who provided testimony about their experiences while voting, including Marcus Bass, Dreama Caldwell, Keith Rivers, Danell Burney, Cedric Baker.  The Court generally does not find this

evidence persuasive as it is anecdotal, and Plaintiffs did not present evidence to support finding that the witnesses' testimony was representative of the experiences of other North Carolina voters.

**E.        Extant Conditions of Historical Racial Disparities in North Carolina**

191.    Given the ensuing totality of the circumstances analysis for Plaintiffs' discriminatory results claim, this Court now outlines the relevant evidence offered regarding minorities in North Carolina suffering *de jure*, and *de facto*, discrimination in the past, and the continuing effects of that discrimination that persist today.  *Brnovich*, 594 U.S. at 673.

192.    As a result of the history of discrimination and other voting barriers linked to socioeconomic disparities, voter registration and participation rates remained low in North Carolina until very recently, particularly among African Americans.  (*See* PX0337 at 10–12, 16–20.)

193.    "These glaring disparities in outcomes have a direct bearing on the impact of state election laws on minority voting rates."  (*Id.* at 20.)  "The ongoing history of racial discrimination in North Carolina has a direct effect on the opportunities for African Americans to participate fully in the political process."  (PX0044 at 87.)  Education, income, employment, criminal justice, and health are "strongly associated with the likelihood of an individual being deterred from voting."  (PX0337 at 20.)

194.    As the Fourth Circuit recognized in *McCrory II*, and as experts in that case confirmed, in North Carolina, a person's race, if they are African American, is a better predictor for whether they will vote for a Democrat in an election than their party registration. *McCrory II*, 831 F.3d at 225 (citing a plaintiffs' expert report); (*see also* PX0044 at 56).  In North Carolina, the racial gap in voting patterns far exceeds other demographic comparisons

including income, education, and sex.  (PX0337 at 12.)  This dynamic, according to the Fourth Circuit, presents a "political payoff for legislators who seek to dilute or limit the minority vote."  *McCrory II*, 831 F.3d at 222.

          i.     <u>Relevant Racial Disparities in Voting Patterns</u>

195.  Plaintiffs' experts also provided statistics around racial polarization, both nationally and specific to North Carolina.  Nationally, in 2012, 89% of the Republican Party's registered voters were white, compared to 60% of registered Democratic voters; and only 2% of registered Republican voters were Black and 6% were Hispanic.  (PX0001 at 57.)  This stands in contrast with the 22% of Democratic voters being Black and 13% being Hispanic. (*Id.*)

196.  Exit polls in North Carolina from the 2012 election showed that 96% of Black voters voted for the Democratic presidential candidate compared to 31% of white voters, a gap of 65 percentage points.  (PX0337 at 12.)  The gap was "60 percentage points in 2008, 58 points in 2004, and 59 points in 2000."  (*Id.*)

197.  In the 2016 State gubernatorial, senate, and presidential races, nearly two thirds (63%) of white voters supported Republican candidates, while only 41% of Hispanic and only 10% of Black voters did so; and for Democratic candidates, white support in North Carolina was only 34%, while 56% of Hispanic and 89% of Black voters supported Democratic candidates.  (PX0044 at 57 tbl.13.)  In the 2016 presidential election, exit poll data suggests that 89% of Black voters and 57% of Hispanic voters selected the Democratic candidate, as compared to only 32% of white people.  (PX0337 at 13.)  Notably, in that election, there was a 57-point gap between Black and white support for the Presidential candidate.  (PX0044 at 57 tbl.13.)  Similar gaps were evident in the 2000 (59 points), 2004 (58

57

points), 2008 (60 points), 2012 (65 points), and 2014 (63 points) federal elections.  (PX0337 at 12.)

198.    Moreover, after examining two sets of election exit polls from the 2012, 2014, and 2016 election cycles, Plaintiffs' expert, Dr. Barreto similarly concluded that "Latino and Black voters have strongly supported Democratic candidates for both Presidential and U.S. Senate races while white voters have strongly supported Republicans." (PX0316 ¶ 70.)  In reaching this conclusion, Dr. Barreto noted that "82% of Latino voters and 89% of Black voters supported Democrat Hillary Clinton compared to only 32% of white voters in North Carolina" and "77% of Latinos and 90% of Blacks voted for Democrat Deborah Ross, while 64% of white voters supported Republican Richard Burr." (*Id.*)

ii.    Relevant Racial Disparities in Education and Literacy

199.    Historical and current racial disparities in educational attainment and achievement bear directly on how S.B. 824 impairs the ability of minority voters to participate equally in the political process.  Numerous studies have shown that educational attainment is often the single best predictor of whether an individual votes.  (PX0337 at 17 (citing studies).) "This is largely because education lowers the 'costs' of voting by providing language skills, direct information about the electoral process, access to mobilizing social networks, and a sense of confidence [or] efficacy that facilitate participation even when the rules are changed." (*Id.*; *see also* PX0044 at 92 tbl.22, 93 chart 21, 94 chart 22.)

200.    For much of its history, North Carolina engaged in official, state sanctioned discrimination in education.  (ECF No 91-2; *see* PX0001 at 23–24, 40.)  Well into the middle of the twentieth century, North Carolina had an explicit policy of racially segregating its educational institutions and providing African Americans with significantly inferior

58

educational resources and opportunities.  (PX0001 at 22–23, 41–43.)  Following the Supreme

Court's decision in *Brown v. Board of Education*, 347 U.S. 483 (1954), North Carolina and its

school boards routinely circumvented the mandate to desegregate by adopting facially neutral

plans that kept intact *de facto* segregation.  (*See, e.g.*, PX0001 at 42–43 (discussion of the Pearsall

Committees).)  As late as 1971, the Supreme Court found that one of North Carolina's largest

school districts was operating in a way that would not effectively dismantle the system of

school segregation established in the record.  *See Swann v. Bd. of Education*, 402 U.S. 1, 31

(1971).

201.    *De facto* segregation persists in North Carolina schools in the present day.

From 1998 to 2016, elementary and secondary school segregation has increased by more than

a third in urban, mostly African American areas.  (PX0044 at 91; *see also* PX0337 at 16.)  Based

on 2015-2016 data, major metropolitan areas in North Carolina remain highly segregated,

with "dissimilarity" indices, which measure "the percentage of Black students that would

have to relocate to become fully integrated with white residents," ranging from 39% to 60%.

(PX0044 at 103 tbl.25.)  The racial imbalances in North Carolina's schools lead to concrete

disparities in educational results.  (PX0337 at 16.)  As compared to 82% of white North

Carolinians, only 60% of Black North Carolinians have basic reading proficiency at or above

an eighth grade reading level.  (PX0044 at 92 tbl.22.)

      iii.    Relevant Racial Disparities in Housing and Transportation

202.    North Carolina's racial disparities in home and vehicle ownership continue to

negatively impact African Americans and Hispanics today and undercut minority participation

in civic activities such as voting.  (PX0337 at 31–32.)  This is especially true with voter ID; for

example, although documentary requirements to obtain photo voter ID may be minimal,

"travel to a board of elections office will be challenging for many voters . . . [and] [t]he burden of this travel requirement will be greater for minority residents than whites because they are less likely to have access to a vehicle."  (*Id.*)

203.    "Blacks and Hispanics are less likely than whites to live in households where a vehicle is readily available."  (*Id.* at 32; *see also* PX044 at 91 tbl. 23.)  For example, in 2005, 3.8% of white households in North Carolina lacked a motor vehicle, compared to nearly twice as many (6.6%) of Hispanic households and over four times as many (15.5%) Black households.  (PX0337 at 32 n.118.)  Similar disparities existed when S.B. 824 was enacted, with only 3.7% of white households lacking a vehicle as compared to 12.2% of Black households.  (PX0044 at 98 chart 25.)

204.    To this point, Plaintiffs presented testimony from leaders and members of North Carolina State Conference of the NAACP including Deborah Maxwell, (ECF No. 325 at Tr. 115:11–172:13), who is the State President of the North Carolina Conference of the NAACP, (*id.* at Tr. 115:11–116:11). Ms. Maxwell also testified that transportation in rural areas and obtaining a photo ID were major concerns for the North Carolina NAACP branches, (ECF No. 325 at Tr. 120:20–121:2), because there is not a DMV in every county, (*id.* at Tr. 130:5-19).  She estimated that there are 17 out of 100 counties in North Carolina that do not have a DMV office.  (*Id.* at Tr. 130:5-19.)

205.    Indeed, in North Carolina, "The average county has a land area of 486 square miles and could thus require lengthy, inconvenient, costly, or difficult travel to acquire an ID."  (PX0337 at 31.)  Accordingly, "[b]oth options for acquiring ID [county board of elections office and DMV] make demands on a person's time and impose transportation costs because the individual must present themselves in person to apply."  (PX0337 at 32.)

206. In 2017, nearly three quarters (73.4%) of whites owned their home, while the rate for Black North Carolinians was less than half (46.1%). (PX0044 at 95 tbl.23.) The homes owned by Black North Carolinians are also worth less, with the median Black home value being $124,500 and the median white home value being $187,100. (*Id.*)

207. Ms. Maxwell further testified that the County Board of Elections Office is not always close to marginalized communities and that neither the DMV nor the County Board of Elections Offices are open after 5 p.m. or on the weekends. (ECF No. 325 at Tr. 130:9-19.) Ms. Maxwell emphasized that transportation in rural areas is an issue because people do not always have vehicles and must pay to get to the DMV or County Board of Elections to obtain an ID, so the ID "is not free." (*Id.* at Tr. 131:12-25.)

208. Plaintiffs solicited the testimony of Dr. Elma Hairston, (*id.* at Tr. 202:4–221:10), who is the President of the High Point branch of the NAACP, (*id.* at Tr. 202:4; 203:5); and Al Wadood Salaam Jabbar, (ECF No. 329 at Tr. 1122:15–1145:11), who is the President of the Winston-Salem Branch of the NAACP, (*id.* at Tr. 1125:24-25, 1132:11-14). These witnesses testified that S.B. 824's photo voter ID requirement added another layer to the NAACP's voter outreach, that they had to divert resources to educate voters about S.B. 824, and about the burdens their members have obtaining a free ID in light of their members being unable to take off from work to obtain a free photo-ID from the DMV or the County Board of Elections Office, residents of rural areas with limited access to transportation, elderly with some living in nursing homes, disabled, and being deterred by the cost of transportation or the confusing nature of the process to vote without a photo-ID both in person and absentee.

    iv.    <u>Relevant Racial Disparities in Employment and Income</u>

61

209. Furthermore, the disproportionate poverty and disparities in employment and income that minority North Carolinians confront undermines their ability to participate in the political process. "Individuals with lower household incomes are significantly less likely to vote because it is comparably more burdensome for them to make time to do so." (PX0337 at 18.) In fact, unlike most states, North Carolina does not require that employers give employees time off from work to vote, nor does it require that an employee be paid for any time off taken to vote. (*Id.*) "This places a burden on employees who would suffer financial loss if they missed work to participate in an election," who are disproportionately Black and Hispanic in North Carolina. (*Id.*; *cf.* PX0044 at 85–86, 91.)

210. North Carolina's discriminatory policies have led to disparities in employment and income between Black, Hispanic, and white people that continue to the present day. (PX0044, at 85–86, 91; PX0337 at 16.) U.S. Census Bureau data from 2017 shows that 8% of whites in North Carolina were living below the federal poverty level, as compared to 19% of African Americans and 22% of Hispanics. (PX0337 at 16.) The median household income of white families in North Carolina today is over 1.5 times that of African Americans, with the median white family earning $60,263 compared to only $38,451 earned by the median Black family. (PX0044 at 87 tbl.21.) Similar disparities exist at the individual level, with white per capita income at $35,114 compared to only $20,382 for Black North Carolinian per capita income. (*Id.*) Census data also "indicates that racial and ethnic disparities in unemployment are sizable in North Carolina." (PX0337 at 16.) Specifically, for the first quarter of 2019, 2.7% of white North Carolinians were unemployed as compared to 6.7% of Black North Carolinians and 5.0% of Hispanic North Carolinians. (*Id.*; *see also* PX0044 at 87 tbl.21 (noting, in 2017, 7.7% of Black people and 4.1% of white people as unemployed). "Compared to whites,

62

unemployment is thus 2.5 times as common among blacks and almost twice as common among Hispanics." (PX0337 at 16.)

        v.      <u>Relevant Racial Disparities in Health Outcomes</u>

211. Mental and physical health also "influence whether a person votes. For example, a disability makes the average person approximately 20 points less likely to vote, mostly because it increases the burdens and costs associated with voting." (PX0337 at 18; *cf.* PX0044 at 86, 99 tbl.24.)

212. The legacy of racial discrimination in North Carolina also disproportionately impacts the health outcomes of African Americans and Hispanics. In particular, "by determining access to education and employment opportunities," segregation is "a primary cause of racial differences in socioeconomic status," which "in turn remains a fundamental cause of racial differences in health." (PX0044 at 86; *see also id.*) There are "widespread disparities between whites and Blacks and Hispanics in terms of health outcomes." (PX0337 at 18.) Black and Hispanic people "routinely fare worse than whites" across specific measures such "as infant deaths, heart disease, and homicides." (PX0337 at 18; *see also* PX0044 at 99 tbl.24.)

213. There are also racial disparities across more "general" measures of health in North Carolina. In 2017, only 17% of white North Carolinians reported having "fair" or "poor" health, as compared to 24% of Black North Carolinians and 29% of Hispanic North Carolinians. (PX0337 at 18.) Black people are also less likely than white people to have health insurance in North Carolina; 10.7% of Black people lack health insurance compared to only 7.8% of white people. (PX0044 at 99 tbl.24.)

        vi.     <u>Racial Disparities in Criminal Justice</u>

214. Importantly, criminal justice is also "an area where discrimination has . . . immediate effects on political participation." (PX0337 at 19.) In North Carolina, African Americans and Hispanics suffer from unequal treatment by the criminal justice system. This is true today according to a variety of measures. (*Id.* at 18.) Between 2000 and 2011, Black and Hispanic people were "far more likely to be searched and arrested" for traffic stops than white people; Black motorists were 77% more likely to be searched than white motorists, and Hispanic motorists were 96% more likely to be searched. (*Id.*)

215. Disparities are also evident in incarceration rates. As of late 2017, white people accounted for only 39% of those in custody in state or federal prison in North Carolina, while Black people comprised 52% of inmates and Hispanic people were 5%. (PX0337 at 19.) When compared to the makeup of the North Carolina population, which is 22% Black and 10% Hispanic, respectively, this means that "North Carolina Hispanics are incarcerated at a rate similar to that of whites, [whereas] Blacks are incarcerated at a rate of 4.3 times that of whites." (*Id.*)

216. One obvious example of disparate treatment in the criminal justice system can be seen in North Carolina's felony disenfranchisement laws, which by prohibiting voting by inmates, parolees, and probationers, had "disenfranchise[d] approximately 43,000 Black residents, or 2.63% of the Black voting age population" as of 2016. (*Id.*) Moreover, "[t]raffic citations, arrest, and incarceration … can result in revocation of a driver's license, the most likely form of ID that will be used by voters to comply with S.B. 824." (*Id.*)

vii. <u>Lack of Responsiveness by Elected Officials</u>

217. In addition to enduring disparities in the socioeconomic factors described above, "[r]ecent years have seen the legislature roll back legal provisions and funding designed

to alleviate racial and ethnic disparities." (*Id.* at 22.) This includes the repeal of the Racial Justice Act, which had "provided inmates on death row an opportunity to challenge their sentences based on evidence showing that race was a factor in their sentences." (*Id.*) Around the same time the Racial Justice Act was repealed (and H.B. 589 was enacted), the General Assembly also cut unemployment benefits, declined federally-funded expansion of Medicaid that would have extended health insurance to 500,000 North Carolinians, ended the state Earned Income Tax Credit that provided tax benefits to the working poor, and reduced public school funding "that had been particularly beneficial to black North Carolinians." (PX0001 at 65–66.)

218. Furthermore, the lack of responsiveness to Hispanic residents can also be seen in the lack of Spanish-language resources provided by the State Board of Elections or County Boards of Election. Dr. Burden found that "Spanish language materials are not routinely available in parts of the state with large Hispanic populations," such as on the Wake and Mecklenburg County Boards of Election websites. (PX0337 at 23.)

219. Plaintiffs' witness, Iliana Santillan, spoke to the lack of voting resources for Spanish-speaking North Carolinians. Ms. Santillan is the Executive Director of a voter outreach organization called El Pueblo. (ECF No. 325 at Tr. 175:3, 19.) Ms. Santillan testified that El Pueblo's mission is to work with the Latino community in North Carolina in the areas of health, civil engagement, and advocacy. (*Id.* at Tr. 176:9-13.) El Pueblo provides voter education resources in English and Spanish including a non-partisan voter guide and has a bilingual website. (*Id.* at Tr. 177:9-13.) Ms. Santillan testified that voter ID adds an extra layer of challenges for El Pueblo to deal with in helping their constituents access the polls. (*Id.* at Tr. 190:10-18.) Ms. Santillan does not believe there was sufficient information available to

members of the Latino community including Spanish-speakers about obtaining a free ID, and even if members of the Latino community are aware, there are barriers, including that getting a free ID is time-consuming and would require people to miss work. (*Id.* at Tr. 188:16–189:1.) Ms. Santillan testified that El Pueblo does not currently inform their constituents about the availability of free IDs from the County Board of Elections or DMV or help voters obtain qualifying ID under S.B. 824. (*Id.* at Tr. 195:18-21; 196:9-11.)

220. Although Ms. Santillan testified that she was aware that the Photo ID Identification Request Form is available in Spanish, (*Id.* at 198:19-21,) she also testified that there were translation errors on the State Board of Election's website when viewed in Spanish, (*id.* at Tr. 198:10-21); however, she has not reported these issues to the State Board of Elections, (*id.* at Tr.198:15-18). Ms. Santillan testified that El Pueblo opposed placing the voter ID constitutional amendment on the ballot and was opposed to S.B. 824. (*Id.* at Tr. 194:10-15.)

221. Another of Plaintiffs' witnesses, Katherine Fellman, testified to the lack of resources for young voters. Ms. Fellman is the Founder and Executive Director of You Can Vote. (*Id.* at Tr. 222:15, 17-18.) Ms. Fellman testified that You Can Vote is a nonpartisan 501(c)(3) nonprofit in North Carolina, and its mission is to educate voters on their right to vote, to register people at their current address, and to empower people to make their vote count either by mail, on Election Day, or during early voting. (*Id.* at Tr. 222:20-24.)

222. Ms. Fellman further testified that the organization also trains and mobilizes volunteers and community partners across the state to share fact-based messages to empower voters. (*Id.* at Tr. 222:25–223:2.) Ms. Fellman testified that the organization was formed to be a nonpartisan campaign to help North Carolina voters know their rights and be able to cast

their ballot after House Bill 589 passed the State legislature in 2013, following the *Shelby v. Holder* Supreme Court decision that rolled back key provisions of the Voting Rights Act. (*Id.* at Tr. 223:13-18.)

223. Like many other witnesses, Ms. Fellman testified that there is only one County Board of Elections office in every county, and not everyone, especially people who do not have ID, has transportation to that site during the operating hours, which are Monday through Friday, and she provided high school seniors as an example. (*Id.* at Tr. 236:1-13.) Ms. Fellman testified that according to her recollection of the State Board website, around 11,000 free IDs have been issued by the State Board across North Carolina. (*Id.* at Tr. 256:11-16.) Ms. Fellman testified that the reasonable impediment is just one more step in the voting process that is burdensome, confusing, and complicated. (*Id.* at Tr. 237:7–238:5.)

## CONCLUSIONS OF LAW

### F. Under Controlling Law, Plaintiffs Have Failed to Establish Violations of the Fourteenth and Fifteenth Amendments

Section 1 of the Fourteenth Amendment of the United States Constitution declares the following:

> No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

U.S. Const. amend. XIV § 1.

Section 1 of the Fifteenth Amendment of the U.S. Constitution states that "[t]he right of citizens of the United States to vote shall not be denied or abridged by the United States or by any State on account of race, color, or previous condition of servitude." U.S. Const. amend. XV § 1.

67

As this Court stated above, to evaluate whether S.B. 824 violates the Fourteenth and Fifteenth Amendments, this Court must examine Plaintiffs' evidence to determine whether they have carried their burden to show that S.B. 824 was passed with discriminatory intent and has an actual discriminatory impact. *Raymond*, 981 F.3d at 302 (citations omitted).

It is undisputed that the text of S.B. 824 is facially race-neutral; however, that does not end this Court's inquiry into discriminatory intent; rather, this begins it. *Arlington Heights*, 429 U.S. at 266; *see also McCrory II*, 831 F. 3d at 220 (citations omitted) (noting that invidious intent in a facially neutral law is "just as abhorrent…[and] unconstitutional" as it is in expressly discriminatory ones). A facially neutral law draws suspicion of unconstitutionality when plaintiffs establish that the law was infected with discriminatory purpose, *Reno v. Bossier Par. Sch. Bd.*, 520 U.S. 471, 481–82 (1997) (citing *City of Mobile v. Bolden*, 446 U.S. 55, 62 (1980) (plurality opinion)), or when the discriminatory impact is so severe that a "clear pattern, unexplainable on grounds other than race, emerges from the effect of the state action." *Arlington Heights*, 429 U.S. at 266 (citing *Yick Wo v. Hopkins,* 118 U.S 356 (1886); *Gomillion v. Lightfoot*, 364 U.S. 339 (1960)) (additional citations omitted).

Because "[o]utright admissions of impermissible racial motivation are infrequent," *Hunt*, 526 U.S. at 553, this Court must carefully evaluate a discriminatory intent claim by conducting "a sensitive inquiry into such circumstantial and direct evidence of intent as may be available," guided by relevant case law and the Constitution. *Arlington Heights*, 429 U.S. at 266; *see also Abbott*, 585 U.S. at 607–13 (using a fact-specific analysis to determine what inferences could be made about the legislature's alleged discriminatory intent from the direct and circumstantial evidence).

As the Fourth Circuit has articulated, "determining whether a statute was enacted with discriminatory intent is a factual question involving a two-step process." *Raymond*, 981 F.3d at 303 (citing *Hunt v. Cromartie*, 526 U.S. 541, 549 (1999)).  At step one, Plaintiffs bear the burden of showing that racial discrimination was a "'substantial' or 'motivating' factor behind enactment of the law."  *Id.* (internal quotation marks omitted) (quoting *Hunter*, 471 U.S. at 228).  However, Plaintiffs are not required to prove "that discriminatory purpose was the sole[] or even a primary motive for the legislation, just *a* motivating factor."  *McCrory II*, 831 F. 3d at 220 (emphasis in original) (internal quotation marks omitted) (quoting *Arlington Heights*, 429 U.S. at 265–66).

The Supreme Court in *Arlington Heights* enumerated a set of factors to guide a court in this inquiry: (1) the historical background; (2) the specific sequence of events leading to the law's enactment, including any departures from the normal procedural sequence of the legislative process; (3) the law's legislative history; and (4) whether the law bears more heavily on one race than another. 429 U.S. at 265–69.  From the direct and circumstantial evidence gleaned during this inquiry, a court may infer there was a discriminatory purpose based on "the totality of the relevant facts, including the fact, if it is true, that the law bears more heavily on one race than another." *McCrory II*, 831 F.3d at 220 (quoting *Washington v. Davis*, 426 U.S. 229, 242 (1976) (internal quotation marks omitted)).  Nevertheless, "the ultimate question remains: did the legislature enact a law 'because of,' and not 'in spite of,' its discriminatory effect." *Id.* (quoting *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979)).

In considering the *Arlington Heights* factors, "the district court *must* afford the state legislature a 'presumption' of good faith." *Raymond*, 981 F.3d at 303 (citing *Abbott*, 585 U.S. at 603).  According to the Supreme Court, the "presumption of legislative good faith directs

district courts to draw [an] inference that cuts in the legislature's favor when confronted with evidence that could plausibly support multiple conclusions." *Alexander v. S.C. State Conf. of the NAACP*, 602 U.S. 1, 11 (2024) (citing *Abbott*, 585 U.S. at 610–12). Further, although the Supreme Court has not yet spoken on claims of discriminatory intent in voter ID regulations, *see Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 185, 187 (2008) (plurality opinion); *accord Raymond*, 981 F.3d at 302–03, the Fourth Circuit has crafted principles to guide this Court's analysis of the *Arlington Heights* factors. *See Raymond,* 981 F.3d at 303–05 (citing *Abbott*, 585 U.S. at 603–04) (additional citations omitted); *see also Raymond*, 981F.3d at 303 (citations omitted); *Lee v. Virginia State Bd. Of Election*, 843 F. 3d 592, 603–04 (4th Cir. 2016) (citing *Arlington Heights,* 429 U.S. at 269; *McCrory II*, 831 F.3d at 214–16, 228).

Thus, according to the case law on-point, it is only when Plaintiffs meet their burden and show that discriminatory intent was a substantial or motivating factor in enacting the challenged legislation in step one, that the reviewing court proceeds to the second step. At step two, "the burden shifts to the law's defenders to demonstrate that the law would have been enacted without" this discriminatory purpose. *Hunter*, 471 U.S. at 228 (citation omitted); *accord Raymond*, 981 F.3d at 303 (citing *Hunter*, 471 U.S. at 228). Only then does the presumption of good faith become unwarranted, and further, its accompanying judicial deference, which the legislature has thus far been afforded, is "no longer justified." *Raymond*, 981 F.3d at 303 (citing *Arlington Heights*, 429 U.S. at 265–66). Therefore, a district court at the second step must rigorously "scrutinize the legislature's *actual* non-racial motivations to determine whether they *alone* can justify the legislature's choices." *McCrory II*, 831 F.3d at 221 (emphasis in original) (citations omitted).

Utilizing this framework, this Court now determines whether Plaintiffs have satisfied their burden of showing that racial discrimination was a substantial or motivating factor behind the enactment of S.B. 824. Plaintiffs argue that, even after affording the General Assembly the presumption of legislative good faith, the evidence demonstrates that the challenged provisions of S.B. 824 were enacted, at least in part, for a discriminatory purpose. (ECF No. 339 ¶ 554.) Legislative Defendants argue that because Plaintiffs cannot overcome the presumption of good faith, their constitutional challenge fails.[34] (ECF No. 335 ¶¶ 380, 383–84.)

### G. S.B. 824 Under the *Arlington Heights* Factors

#### 1. The Historical Background Favors a Finding of Discriminatory Intent

This Court begins its *Arlington Heights* inquiry by examining North Carolina's long history of race-based discrimination, generally, and its history of race-based voter suppression, in particular. *McCrory II*, 831 F.3d at 223. While recognizing its limited weight, *see id.* (citing *Shelby Cnty.*, 570 U.S. at 553), the Fourth Circuit found in *McCrory II* that the district court in

---

[34] Relying on *Alexander v. South Carolina State Conference of the NAACP*, 602 U.S. 1 (2024), Legislative Defendants also argue that because Plaintiffs did not show that the General Assembly could have created an alternative, less burdensome law, Plaintiffs have also failed to meet their burden on this issue. (ECF No. 335 ¶ 380.) The underlying facts in *Alexander* related to racial gerrymandering, and in that case the Supreme Court held that the plaintiffs there "failed to meet the high bar for a *racial-gerrymandering claim* by failing to produce, among other things, an alternative map showing that a rational legislature sincerely driven by its professed partisan goals would have drawn a different map with greater racial balance." *Alexander*, 601 U.S. at 10 (emphasis added). This holding is drawn from a similar finding the Court made in an earlier case, *Easley v. Cromartie*, 532 U.S. 234 (2001), which also concerned racial gerrymandering. *Alexander*, 601 U.S. at 10 (citing *id.* at 258). It was in this context that the Supreme Court in *Alexander* stated that "[w]ithout an alternative map, it is difficult for plaintiffs to defeat our starting presumption that the legislature acted in good faith." *Id.* While offering an alternative map appears to be a near-requirement for a plaintiff to defeat the presumption in a racial gerrymandering case, it is not so in this context. Accordingly, while this Court has acknowledged that both the Supreme Court and the Fourth Circuit have adopted certain rules or principles from racial gerrymandering cases and applied them in the voter ID context, it finds no case in either court adopting the principle advanced by Legislative Defendants here. Nor do Legislative Defendants provide such support for this argument. Thus, this Court declines to consider this argument further.

that case erred in ignoring and minimizing the examination of such history. In *McCrory II*, the Fourth Circuit also found error in the district court declining to consider recent patterns of official discrimination combined with the racial polarization of politics in the state. *Id.* Thus, in *McCrory II*, failure to recognize history allows "that troubled history to 'pick[] up where it left off'" to the detriment of African American voters. *Id.* at 223 (citing *League of Women Voters of N. Carolina v. North Carolina*, 769 F.3d 224, 242 (4th Cir. 2014) [hereinafter *LWV*]). This Court agrees.

More recently, the Fourth Circuit has emphasized that the "broader history" of legislation is always relevant to this factor in the analysis, *Farm Labor Organizing Committee v. Stein*, 56 F.4th 339, 353 (4th Cir. 2022) (citation omitted) [hereinafter *FLOC*], including the entire historical context, consistent with *Arlington Heights. See, e.g.*, *Unted States v. Sanchez-Garcia*, 98 F.4th 90, 96, 96–97 (4th Cir. 2024) (citing favorably the district court's review of the historical context). This Court may consider this nation's "sordid history of racial discrimination," as is relevant to the challenged enactment, *FLOC*, 56 F.4th at 353, as well as "North Carolina's recent discriminatory efforts in the voting rights context." *Id.* (citing *Raymond*, 981 F.3d at 305). Further, "a prior legislature's discriminatory intent" is appropriately considered as part of the *Arlington Heights* "historical background" factor. *Sanchez-Garcia*, 98 F.4th at 99 (citing *Raymond*, 981 F.3d at 305; *McCrory II*, 831 F.3d at 215, 223–27).

However, this Court must strictly observe the presumption of legislative good faith, as directed by the Supreme Court. *See Raymond*, 981 F. 3d at 305 (citing *Abbott*, 585 U.S. at 603). Meaning, that this Court may not find discriminatory intent based solely on a "finding of past discrimination." *Abbott*, 585 U.S. at 603. The Supreme Court and Fourth Circuit have both held that past discrimination does not relieve Plaintiffs of their burden and does not "remove[]

the 'presumption of legislative good faith'" to which the enacting legislature is entitled. *Raymond*, 981 F.3d at 303 (quoting *id.*).  This remains true even when discrimination is part of *the law's* historical background, not just the surrounding historical context.  *See Abbott*, 585 U.S. at 603–04; *see also Sanchez-Garcia*, 98 F.4th at 99–100.  Accordingly, a history of *de jure* discrimination is merely one relevant evidentiary source in a discriminatory intent challenge; and further, this Court is cautioned against making this history into an indictment of the current legislature, even when nearly the same group of legislators pass the challenged legislation.  *See Abbott*, 585 U.S. at 603 (citation omitted).

Thus, taking care not to place an "outsized weight on historical background," *FLOC*, 56 F.4th at 353 (citing *Abbott*, 585 U.S. at 603), the Court concludes that this factor weighs decidedly in favor of a finding of discriminatory intent.  North Carolina's history of race discrimination and voter suppression is undisputed and extensive, which is reflected in this Court's Findings of Fact in significant detail.  *See supra* § VII.A.  It is also worthy of serious consideration here that there is a recurring cyclical theme of advancement and retrenchment that emerges in North Carolina's history leading to the present.  *See supra* § VII.A.  For nearly one hundred and fifty years, history has shown that when there is an increase in minority political participation, it is met with harsh push back.  *See supra* § VII.A.  This retrenchment cycle is characterized by invidious political activism that stokes racial animosity and thus foments the electoral support state actors need to claim or retain power.  *See supra* § VII.A.  Moreover, the constitutional amendments, laws, and policies that result from negative racial appeals are done *in response* to burgeoning political participation from racial and ethnic minorities.  *See supra* § VII.A.

For instance, according to Plaintiffs' expert, Professor Leloudis, "S.B. 824, like its predecessor H.B. 589, represents the latest chapter in the long struggle over minority voting rights in North Carolina," (PX0001 at 4), and is best understood in cyclical periods of history which are marked by increased exercise of the franchise by minorities only to be followed by race-based voter suppression. (*See id.* at 6.) This history is marked by tactics and tools to control election results, several of which are still in use today. *See supra* § VII.A. The record reflects that these tactics and tools included the poll tax, literacy tests, intimidation of voters at registration and polling locations, intentionally discriminatory districting changes made via constitutional amendments, and the implementation of other laws and policies for the purpose of disenfranchising African Americans. *See supra* § VII.A.

Further, in considering more recent history, the Fourth Circuit in *McCrory II* observed that the historical record in that case was "replete with evidence of instances since the 1980s in which the North Carolina legislature has attempted to suppress and dilute the voting rights of African Americans . . . 'reveal[ing] a series of official actions taken for invidious purposes.'" 831 F.3d at 223 (alteration in original) (quoting *Arlington Heights*, 429 U.S. at 267); *see also id.* (citation omitted) (finding that the record revealed that, from 1980 to 2013, "the Department of Justice issued over fifty objection letters to proposed election law changes in North Carolina—including several since 2000—because the State had failed to prove the proposed changes would have no discriminatory purpose or effect"). In the instant case, this Court reaches a similar conclusion regarding North Carolina's history of discrimination, and not just because the instant record includes evidence that was also presented in *McCrory II*. *Id.* at 223–24. This Court makes this finding based upon the record evidence that shows not only has

"discriminatory racial intent motivated" the enactment of voting legislation in North Carolina, the legislature has done so "with surgical precision." *Id.* at 215, 233.

Legislative Defendants would have this Court to conclude that "historical efforts to disenfranchise African Americans stand in stark contrast to S.B. 824." (ECF No. 335 ¶ 356.) Even if taken as true, such a perspective does not mean that the history of discrimination should not be recognized and considered. A state actor's history of discrimination is an established factor in the *Arlington Heights* analysis and, though it is one of four factors, it should never be so attenuated and minimized that it is, in essence, dismissed from consideration. Moreover, when this factor was considered in *Raymond*, the Fourth Circuit, considering the specific facts of this case, held that "North Carolina's historical background favors finding discriminatory intent." 981 F.3d at 305 (citing *N.C. State Conf. of NAACP v. Cooper*, 430 F. Supp. 3d 15, 25 (M.D.N.C. 2019)). And this Court so finds.

The Supreme Court in *Arlington Heights* next directs this Court to examine the "specific sequence of events leading up to the challenged [law's enactment]." 429 U.S. at 267. Evidence in the legislative process demonstrating departures from normal procedure, may both "'spark suspicion' of impropriety," *Raymond*, 981 F.3d at 305 (quoting *id.* at 269) and provide circumstantial "evidence that improper purposes [played] a role" in the challenged law's enactment. *Arlington Heights*, 429 U.S. at 267; *accord McCrory II*, 831 F.3d at 227 (citing *id.*). In addition, "substantive departures" from the normal procedural sequence "may be relevant, particularly if the factors usually considered important by the decisionmaker strongly favor a decision contrary to the one reached." *Arlington Heights*, 429 U.S. at 267. Further, while it is not necessary for a legislature to break its own rules in order to provide probative evidence of it engaging in "unusual procedures," *McCrory II*, 831 F.3d at 228, a court may consider evidence that the legislature did in fact act contrary to its formal rules or "legislative norms" as evidence of improper discriminatory purpose. *See FLOC*, 56 F.4th at 353; *cf. Lee,* 843 F.3d at 604.

For example, the Fourth Circuit has found that a "rush" to push an enactment through the legislature is an act in the sequence of events that may draw suspicion of discriminatory intent. 843 F.3d at 604 (quoting *McCrory II*, 831 F.3d at 228) (internal quotation marks omitted). According to the court in *Lee,* rushed procedures are relevant because they stand in contrast with laws passed by the legislature "following full and open debate." 843 F.3d at 604. However, in *Raymond* the Fourth Circuit outlined acts in a sequence of events that may weigh against a finding of discriminatory intent. 981 F.3d at 306 (collecting cases). These included

the enactment having bipartisan support and the legislation being a result of a state constitutional mandate. *Id.*

Lastly, as with each of the factors under *Arlington Heights,* the acts in the sequence of events must be strong enough to overcome the presumption of legislative good faith. *Id.* at 305 (citing *Abbott*, 585 U.S. at 610). Consistent with this principle, the Supreme Court in *Abbott* stated, "we do not see how the brevity of the legislative process can give rise to an inference of bad faith—and certainly not an inference that is strong enough to overcome the presumption of legislative good faith." 585 U.S. at 610 (finding no suspicion of discriminatory intent from the use of a legislative special session, which eliminated the need to comply with certain legislative rules).

This Court now addresses the parties' arguments as to the sequence of events factor in turn. For this factor, Defendants assert, and Plaintiffs do not dispute, that "the process of S.B. 824's enactment complied with [state] constitutional and parliamentary requirements" (ECF Nos. 97 at 22; 97-18 at 10; 91 at 26–27.) Nonetheless, Plaintiffs insist that the events leading to S.B. 824's passage were abnormal. (ECF No. 339 ¶¶ 193–231.)

To begin, the Fourth Circuit has held that the state "constitutional amendment served as an independent intervening event between the General Assembly's passage of [H.B. 589] and its enactment of [S.B. 824]." *Raymond*, 981 F.3d at 305 (citing *Abbott*, 585 U.S. at 604). Hence, this Court starts its analysis of the sequence of events leading to S.B. 824 with the enactment of H.B. 1092.

On this point, Legislative Defendants argue—in reliance on *Greater Birmingham Ministries v. Secretary of State for the State of Alabama*—that H.B. 1092 is not the focus of this lawsuit and that H.B. 1092's legislative process is "largely unconnected to the passage of the

77

actual law in question." (ECF No. 335 ¶¶ 427–30 (quoting *Greater Birmingham Ministries*, 992 F.3d at 1324).) However, this Court simply cannot conclude that H.B. 1092 is "largely unconnected" to S.B. 824. *Greater Birmingham Ministries*, 992 F.3d at 1324, 1324–25 (finding evidence of one representative's discriminatory remarks during the legislative debate for a law to be ultimately unrelated to the law). In stark contrast to the facts of *Greater Birmingham Ministries*, H.B. 1092 is factually tethered to S.B. 824. *See supra* §§ III, VII.B. Indeed, H.B. 1092 was the proposed constitutional amendment that made it possible for S.B. 824 to be implemented. *See supra* §§ III, VII.B. Moreover, while Legislative Defendants most often wish to rely here on the passage of the constitutional amendment to justify S.B. 824, (ECF No. 335 ¶¶ 427–30), here, they wish to use H.B. 1092 for the purpose of showing that it and S.B. 824 are *unconnected* from each other, (*id.*). Legislative Defendants cannot have their cake and eat it too. This Court finds that it is not only appropriate, but necessary, to consider the relevant unique circumstances under which H.B. 1092 was enacted, for such circumstances pertain to S.B. 824. *See Raymond*, 981 F.3d at 306 (finding that the H.B. 1092 is part of the sequence of events leading to S.B. 824).

The method by which H.B. 1092 was enacted is distinct from how the General Assembly has previously passed proposed amendments to the State constitution. First, H.B. 1092 was one of six proposed constitutional amendments passed at the same time, which is the third greatest number of amendments proposed at one time in the history of the General Assembly. *See supra* § VII.B. H.B. 1092 was also passed along partisan lines. *See supra* § VII.B. In addition, the time it took to enact H.B. 1092, from its initial filing to its ultimate passage, was twenty-two days; and normally, this process is months long. *See supra* § VII.B. The unusual pace of H.B. 1092 is amplified by the peculiar committee route that H.B. 1092

followed. *See supra* § VII.B.  Most notably, H.B. 1092 was withdrawn from the Elections and Ethics Law Committee and immediately re-referred to the Committee on Rules, Calendar and Operations of the House, a committee not normally entrusted with the review of such proposed legislation. *See supra* § VII.B.

Further, the trial record reveals that not only was the process rushed, but this was also the first time in several years that a constitutional amendment was submitted to voters without proposed implementing legislation. *See supra* § VII.B. (noting that in the last fourteen constitutional amendments, thirteen were passed with implementing legislation attached).  As proposed to the voters, H.B. 1092 simply stated that the constitution would be amended to require photo identification for voting in person, that the General Assembly would enact laws to govern photo identification requirements, and that these requirements "may include exceptions." *See supra* § III.  This Court finds that the record demonstrates that both the simplicity of the text of H.B. 1092 combined with the lack of draft implementing legislation for voters' consideration was unprecedented.  Furthermore, this combination of factors gave the General Assembly extraordinary leeway in creating implementing legislation.

Thus, the trial record reveals that the procedural irregularities of S.B. 824 began with H.B. 1092, the proposed constitutional amendment that spurred it.  Although H.B 1092's passage during the November 2018 election created an indisputable constitutional mandate for photo voter ID regulation, the legislative procedures that followed were almost immediately unusual. *See supra* § VII.B.; *cf. McCrory II*, 831 F.3d at 228–29 (comparing the speed of voting regulation's passage before and after a Supreme Court decision)).[35]  First, the

---

[35] One reason for this may be the results of the November 2018 election, which significantly changed the partisan balance of the General Assembly for the next legislative session.  *See supra* § VII.B.

2018 short session was paused until an unspecified time in the future.  *See supra* § VII.B.  Yet, a short session of the General Assembly is usually adjourned until some specific future date.  *See supra* § VII.B.  Then, on November 20, 2018—the Tuesday before Thanksgiving Day—S.B. 824's proposed text was released publicly and opened for comment, amendment, and debate.  *See supra* § VII.B.  Thereafter, the short session was suddenly announced to resume on November 27, only one business day after the Thanksgiving holiday.  *See supra* § VII.B.  On November 29, 2018, S.B. 824 was passed in the Senate and sent to the House.  *See supra* § VII.B.

Importantly, this apparent urgency to enact implementing legislation for S.B. 824 was not present for the other three constitutional amendments the voters ratified that November.  *See supra* § VII.B.  Implementing legislation for those three other amendments were not passed in that short session at all.  *See supra* § VII.B.  In addition, S.B. 824 was brought before the lame-duck North Carolina General Assembly with limited external and internal study.  *See supra* § VII.B.  For example, normally, when implementing a constitutional amendment, the General Assembly convenes a commission to study the amendment's issue and then recommend proposed implementing language for the amendment.  *See supra* § VII.B.  No such commission was convened, or study performed, for S.B. 824.  *See supra* § VII.B.

Next, there were irregularities in the limited debate and public comment permitted for S.B. 824.  *See supra* § VII.B.  Although, as acknowledged by the Fourth Circuit, S.B. 824 "underwent five days of legislative debate and . . . permitted time for public comment," *Raymond*, 981 F.3d at 305 (citation omitted), a thorough review of the record reveals that there were still irregularities present in the process.  *See supra* § VII.B. (noting that multiple legislators testified about how rushed the enactment of S.B. 824 was).  Once S.B. 824 was formally

80

introduced, the public comment permitted in the Senate was limited to less than an hour. *See supra* § VII.B. Further, the public comment took place the Monday after Thanksgiving, less than a week after the draft was released. *See supra* § VII.B. The time allotted for public comment in the House was even shorter. *See supra* § VII.B. In the House, five members of the public were granted permission to speak at the Elections and Ethics Law Committee hearing—only four of those people ultimately spoke—and each speaker was limited to one minute each. *See supra* § VII.B.

Additionally, this Court notes that the five days of "readings" of S.B. 824 in both chambers of the General Assembly were abnormally fast. *See supra* § VII.B. To explain this rapidity, the record evidence reflected that a House rule was changed, specifically for the purpose of the legislation of the lame-duck session, which allowed the Speaker to expedite the time to pass between readings of proposed legislation such as S.B. 824. *See supra* § VII.B. Due to that change, there was an immediate transition from the second reading of S.B. 824 in the House to the third reading. *See supra* § VII.B. Under normal circumstances, the third reading is required to be on a day subsequent to the prior reading unless approved by two-thirds of the members of the chamber. *See supra* § VII.B. In addition, because of this change in the House rules, the Speaker of the General Assembly fielded and overruled objections from House Representatives about the third reading being immediately after the second. *See supra* § VII.B.

Importantly, this Court finds that irrespective of the fact that a shortened timeline was agreed upon by joint resolution, S.B. 824's quickened five-day procedure, left no opportunity for the minority caucus—or really, any other representative, to make substantial amendments to the text before the successive readings. *See supra* § VII.B. Further, most of the proposed

amendments to S.B. 824 were defeated as a result of veto, lack of time, and denial of debate. *See supra* § VII.B.  Thus, S.B. 824's text passed both chambers of the General Assembly on December 5, 2018, with minimal material modifications, not necessarily because of clear consensus, but likely because of the limited opportunities for change.  *See supra* § VII.B.

However, the Fourth Circuit and the Supreme Court have ruled that many of the irregularities identified by Plaintiffs do not evoke a finding of discriminatory intent.  For instance, the Fourth Circuit has held that circumstantial evidence of discriminatory intent in a law's sequence of events must be characterized as more than the enactment simply happening "near the end of the legislative session" or "that it prompted minimal floor debate."  *FLOC*, 56 F.4th at 353.  Similarly, the Supreme Court has noted that there must be more than a shortened period of legislative debate and public comment to draw scrutiny.  *See Abbott*, 585 U.S. at 610 (noting that the presumption of good faith cannot be overcome solely based on "the brevity of the legislative process" nor does it necessarily lead to an inference of bad faith); *accord Raymond*, 981 F.3d at 305–06 (citing *Abbott*, 585 U.S. at 610–11).  Further, the Supreme Court has enunciated that discriminatory intent cannot be found only because an enactment occurred during a special session.  *See Abbott*, 585 U.S. at 610–11.  Instead, the Supreme Court in *Abbott* requires that the presumption of good faith only be disturbed by findings of truly peculiar, and otherwise inexplicable, legislative circumstances.  *See id.*  In this vein, the Fourth Circuit has held that the short amount of time it took to pass S.B. 824 does not weigh in favor of finding discriminatory intent.  *See Raymond*, 981 F.3d at 305-06 (finding that S.B. 824's "enactment was not the 'abrupt' or 'hurried' process that characterized the passage of [H.B. 589]" in part because S.B. 824 "underwent five days of legislative debate" [citation modified].

But see *McCrory II*, 831 F.3d at 228-29)) (finding the fact that H.B. 589 passed both chambers of the general assembly in just three days to be compelling evidence of discriminatory intent).

In addition, this Court does recognize that the trial record revealed that this legislative process does reflect a degree of bipartisanship. Such a fact is noteworthy because the Fourth Circuit has consistently deemed even the most minimal degree of bipartisanship to cut against a finding of discriminatory intent. *See Raymond* at 306 (concluding that S.B. 824 "enjoyed bipartisan support" because "four Democratic legislators joined their Republican colleagues in voting for [S.B. 824]" and "[o]ne of those legislators—Senator Joel Ford, an African American Democrat—sponsored the bill"); *see also Lee*, 843 F.3d at 603 (considering favorable the fact that the challenged voter-ID law that was enacted by a Republican-controlled Virginia legislature was supported by one Democrat and one Independent).

Therefore, though only one member of the minority caucus sponsored the passage of S.B. 824, and less than a handful voted for its passage, the law of this Circuit and the Supreme Court declares that even minimal evidence of bipartisanship can cut against a claim of discriminatory intent. *Raymond*, 981 F. 3d at 306 (noting that one Democrat's sponsorship was evidence of bipartisanship); *see Lee*, 843 F.3d at 603 (pointing to the vote of a Democrat and an Independent in favor of the challenged law); *cf. Brnovich*, 594 U.S. at 689 (suggesting that the lower court appropriately deemed partisanship as not suspect *per se* in an *Arlington Heights* analysis). *But see McCrory*, 831 F.3d at 233 (concluding the challenged law targeted voters who "were unlikely to vote for the majority party" in the legislature). Thus, the law compels a finding that the degree of participation of both the minority and majority caucus in S.B. 824, as reflected in the record, cuts against a finding of discriminatory intent.

Consequently, though it is true, as Plaintiffs argue, that hurried legislative procedures and limited bipartisanship can in some circumstances lead to a finding of discriminatory intent, now, this evidence does not appear to carry the day. *See id.* at 228, 229, 233. Indeed, in the past in this Circuit, a finding of discriminatory intent can even be substantiated when events, like those evident in the record before this Court, occur in the lead up to an enactment. *Compare id.* at 228 (noting a bill was enacted after only one day for public hearing and two days of consideration total in the Senate, among other things) *with supra* § VII.B.

However, the strength of the presumption legislative good faith, as described by the Fourth Circuit and the Supreme Court, *see Raymond*, 981 F.3d at 305–06 (citing *Abbott*, 585 U.S. at 610–11), requires this Court to find on this record that there are not sufficient indicia of discriminatory intent in this factor. The presumption of legislative good faith requires this Court to seriously consider how each alleged legislative irregularity could be explained by an alternative race-neutral reason. *See Abbott*, 585 U.S. at 610–11 (noting that the use of special sessions and resulting lack of normal legislative rules does not necessarily spark suspicion of discriminatory intent). Plaintiffs have not presented sufficient evidence for the Court to engage in the level of analysis that is required to overcome the presumption of good faith. Therefore, without more direct evidence of discriminatory intent, the Supreme Court and Fourth Circuit have made clear that the preliminary injunction record of the procedural irregularities before this Court cannot justify a finding of discriminatory intent. *See Raymond*, 981 F.3d at 306; *see also FLOC*, 56 F.4th at 353.

3. The Legislative History of S.B. 824 Does Not Favor a Finding of

<u>Discriminatory Intent</u>

The Supreme Court in *Arlington Heights* recognized the relevance of the legislative history of an enactment, "especially where there are contemporary statements by members of the decisionmaking body, minutes of its meetings, or reports." *Arlington Heights*, 429 U.S. at 268; *see also McCrory II*, 833 F.3d at 230 (analyzing the legislature's request and use of racial data for an enactment); *Sanchez-Garcia*, 98 F.4th at 101 (analyzing whether a legislature considered the effects a law would have on a population based on their national origin). While this Court has discussed the timing of many of the events in the legislative history of S.B. 824 in the preceding section, here, the Court pays special attention to whether legislators' comments, considerations, and drafting decisions spark suspicion of discriminatory intent.

To be probative of discriminatory intent, the legislative history evidence must demonstrate that members of the legislature voted to support the law with the intent to suppress the votes of minorities. *See Lee*, 843 F.3d at 601–02; *see also Sanchez-Garcia*, 98 F.4th at 101 (noting that the legislative history in that case did not include evidence of "any discussion evincing a racially discriminatory purpose"). As the Fourth Circuit found in *McCrory II,* clearly a legislature's request and use of racial data as part of an enactment's legislative history may spark suspicion of discriminatory intent. 831 F.3d at 230. However, a *previous* legislature's request and use of racial data is not indicative of discriminatory intent, even as in this case, where both the previous legislature and the enacting legislature are comprised of many, if not most, of the same members, including its leadership. *Raymond*, 981 F.3d at 304–05 (citing *Abbott*, 585 U.S. at 605). Rather, it is when the enacting legislators are shown to have used "racial voting data to disproportionately target minority voters," as was

done in *McCrory II*, that the inference of discriminatory intent arises. *Id.* at 308–09 (citing *McCrory II*, 831 F.3d at 216–17).

Also, whether discriminatory remarks are made by legislators during the law's passage or about the legislation's passage may be relevant to this Court's inquiry. *See Raymond*, 981 F.3d at 309. However, a legislator's use of derogatory terms in the legislative history alone may not be dispositive. The Fourth Circuit has held "that statements from only a few legislators, or those made by legislators after the fact are of limited value." *McCrory II*, 831 F.3d at 229 (citing *Barber v. Thomas*, 560 U.S. 474, 485–86 (2010) (additional citations omitted)). Similarly, the use of derogatory terms that the same legislature used to describe a previous bill, rather than the enactment in question, would not likely be evidence of discriminatory intent. *See Sanchez-Garcia*, 98 F.4th at 101, 101–02 (citing *Brnovich*, 594 U.S. at 689) (noting that legislators' previous use of the terms "Wetback Bill" and "wetback" was just "a disturbing reflection on the kind of language that was tolerated in [the legislature] at the time" and irrelevant to discriminatory intent of the legislature for a related statute).

In support of their argument that this factor weighs in favor of discriminatory intent, Plaintiffs assert: (1) that both houses of the General Assembly "rejected amendments that would have ameliorated S.B. 824's discriminatory impact," (2) that the proponents of S.B. 824 confirmed that "the intent of S.B. 824 was to enact H.B. 589's provisions in a way to defeat any legal challenges," and (3) that the record now shows that "numerous legislators during . . . debate warned of the discriminatory effects" of S.B. 824. (ECF No. 339 ¶ 567.) Indeed, the legislative history reveals that Republican lawmakers remained committed to voter ID after *McCrory II* and set out to craft a new bill which would prevent future court challenges. *See supra* § VII.B. Thus, the choice to put a voter-ID amendment before the public appears to

have been motivated, at least in part, by a desire to insulate the future S.B. 824 from partisan legal challenges.  *See supra* §§ IV.

The record also shows that supporters of the bill were adamant, as they had been in 2013, that voter fraud was a pressing issue in North Carolina.  *See supra* §§ IV, VII.C. In addition, it is likewise true that some Democratic legislators continued to voice their concern that, like H.B. 589, the new bill could cause specific populations' voter participation to go down because of additional administrative burdens.  (ECF No. 97-16 at 663 (statement of Rep. Meyer), 673 (statement of Rep. Michaux) ("[T]he only reason that you can give is to suppress the vote.").  Further, of note, legislators of both parties expressed fear that S.B. 824 would be considered by the public to be voter suppression, with some expressing fears of being accused of the same.  *See supra* § VII.B.

However, despite the truth of Plaintiffs' assertions, this evidence is not sufficient to support an inference of discriminatory intent when viewed through the lens of the presumption of good faith accorded to the legislators.  *See Sanchez-Garcia*, 98 F.4th at 97 (quoting *Abbott*, 585 U.S. at 604–05) (additional citation omitted); *see also Raymond*, 981 F.3d at 307.  Adhering to the dictates of this Circuit and the Supreme Court, which includes the presumption of good faith, this Court is compelled to conclude that Plaintiffs have presented insufficient evidence that S.B. 824's legislative history sparked suspicion of discriminatory intent.

This Court has not been presented with evidence of legislative remarks that suggest an interest in passing S.B. 824 *in order to* discriminate against minorities, which would be the most probative for the purpose of the *Arlington Heights* analysis.  *See Sanchez-Garcia*, 98 F.4th at 101–02.  Further, according to *Raymond*, the mere expression of opinions by legislators that H.B.

87

589 was a good bill, that the judges that stuck down that bill were liberal and partisan Democrats, and other advocacy of legislators in the General Assembly, alone do not go towards proving the racially discriminatory intent of S.B. 824. *See Raymond*, 981 F.3d at 302–03 (citing *Crawford*, 553 U.S. at 194–97). This is especially true when those comments could be construed as spurred by partisan motivations or what the Fourth Circuit has characterized as legitimate state interests. *Id.* (citing *Crawford*, 553 U.S. at 194–97); *Alexander*, 602 U.S. at 24 (citing *Allen v. Milligan*, 599 U.S. 1, 34 (2023)).

Plaintiffs assert that though "the preliminary injunction record did not contain direct, contemporaneous statements by the legislators from legislative transcripts, the trial record now shows that numerous legislators during the debate warned of the discriminatory effects the bill would have." (ECF No. 339 at 274.) Plaintiffs also provided evidence of comments about the racial makeup of voters potentially burdened by S.B. 824 across the aisle. *See supra* § VII.B. Some of the comments were made by legislators suggesting that voters of certain races would be burdened. *See supra* § VII.B. In sum, legislators were on notice about the difficulties that voters in minority groups would have in trying to comply with S.B. 824's photo identification requirements. *See supra* § VII.B. However, the Fourth Circuit has held that this Court must avoid "relying too heavily on comments made by the bill's opponents." *Raymond*, 981 F.3d at 307.

Plaintiffs also assert that both chambers of the General Assembly "rejected amendments that would have ameliorated S.B. 824's discriminatory impact." (ECF No. 339 ¶ 567.) For example, Plaintiffs argue that House Amendment A13 would have added public-assistance IDs to S.B. 824's list of qualifying photo IDs. Still, the Supreme Court and the Fourth Circuit direct this Court to examine this evidence with an eye towards discriminatory

intent. *See Raymond*, 981 F.3d at 307, 307–08 (citing *Abbott*, 585 U.S. at 608) (additional citations omitted). Indeed, the Fourth Circuit noted that "the removal of public assistance IDs in particular was suspect" in *McCrory II*, yet, in the instant case, the context in which House Amendment A13 failed "[did] nothing to suggest that the amendment failed due to discriminatory intent," *Raymond*, 981 F.3d at 308. The record before this Court does not show additional evidence to support that the motivation for defeating House Amendment A13 was discriminatory intent.

This Court has reviewed the other amendments Plaintiffs assert draw suspicion and finds that some draw special attention because of their tendency to limit eligible voters.

First, Plaintiffs point to the failure of House Amendment 3, which would have permitted certain high school IDs as acceptable identification. *See supra* § VII.B. Also, Senate Amendment 9, which would have allowed federal or state employee IDs to be accepted, was tabled; yet, federally issued military identification (some of which never expire) was included in S.B. 824. *See supra* § VII.B Notably, Senate Amendment 8—which would have enshrined "last Saturday voting" before Election Day, was not permitted to be debated. *See supra* § VII.B. This amendment would have extended the time a voter could engage in one-stop early voting where they are issued a voter ID and able to vote the same day. *See Id.*

Finally, House Amendment 7 was passed, which *eliminated* an ameliorative provision that allowed a voter without ID to have their identity verified by two witnesses, in accordance with absentee ballot verification. (PX0623.) Again, while these events in the legislative history appear suspect, according to the Fourth Circuit, the record of S.B. 824's passage does not suggest that these highlighted amendments passed or failed due to discriminatory intent, which lead to them having limited weight in this analysis. *Raymond*, 981 F.3d at 307–08.

89

Plaintiffs also argue that the trial record had "borne out that key legislators not only had racial data in mind; they in fact had racial data in hand, including the 'raw data' on the numbers of registered voters who lacked approved DOT identification, when drafting and debating S.B. 824." (ECF No. 339 ¶ 560.)  In *McCrory II*, the Fourth Circuit "[found] worthy of discussion . . . the General Assembly's requests for and use of race data in connection with [H.B. 589]."  831 F.3d at 230.  However, there is no evidence before this Court that conclusively demonstrates that the General Assembly requested racial data before or during their consideration of S.B. 824.  The record reflects that this data was requested for the purposes of H.B. 589 and was received before the legislature considered H.B. 1092.  *See supra* § VII.B.  The other potential evidentiary exhibits that could lead to such a conclusion were admitted for limited purposes, (*see* ECF No. 330 at Tr. 1282:15–1286:1), and this Court cannot conduct any evaluation beyond those limited purposes.  Therefore, as instructed by the Fourth Circuit, this Court cannot conclude that the General Assembly had racial data, even though the makeup of the legislature's membership was substantially similar to those who passed H.B. 589.  *Raymond*, 981 F. 3d at 304–05.

Finally, Plaintiffs allege that the proponents of S.B. 824 confirmed that "the intent of S.B. 824 was to enact H.B. 589's provisions in a way to defeat any legal challenges." (ECF No. 339 ¶ 567.)  However, the precedent of the Fourth Circuit and Supreme Court suggest this claim is insufficient for a finding of discriminatory intent.  *Abbott*, 585 U.S. at 608*; see also Raymond*, 981 F.3d at 307 (citing *Abbott*, 585 U.S. at 608).  In *Raymond*, the Fourth Circuit concluded that Republican leaders' interest in passing a law that could withstand future legal challenges, and even their opposition to court precedent, does not support a finding of discriminatory intent.  *Id.* (citing *Abbott*, 585 U.S. at 608).  The Supreme Court noted in *Abbott*

that the interest of a legislature in creating a plan that would end ongoing redistricting litigation "is entirely reasonable and certainly legitimate." *Abbott*, 585 U.S. at 608. In *Raymond*, the Fourth Circuit also concluded that if a court made the finding that Plaintiffs have requested, such finding would not conform with "inferring 'good faith' on the part of the legislature." 981 F. 3d at 307 (citing *id.*). Therefore, under controlling Supreme Court and Fourth Circuit precedent, this Court is compelled to conclude that Plaintiffs have failed to provide sufficient direct evidence of discriminatory intent in S.B. 824's legislative history.

4. The Disparate Impact of S.B. 824 Favors a Finding of Discriminatory Intent

The last factor the Court considers in its *Arlington Heights* analysis is the "impact of the official action"—that is, whether the challenged law "bears more heavily on one race than another." *Arlington Heights*, 429 U.S. at 266 (quoting *Washington v. Davis*, 426 U.S. 229, 242 (1976)). "Showing disproportionate impact, even if not overwhelming impact" is required to establish this factor. *McCrory II*, 831 F.3d at 231. However, "proof of disproportionate impact is not 'the sole touchstone'" of a discriminatory intent claim; it is relevant to the inquiry, but not dispositive. *Id.* (quoting *Washington*, 426 U.S. at 242); *see also Arlington Heights*, 429 U.S. at 266; *Raymond*, 981 F.3d at 309. Further, when evaluating a law's disparate impact, this Court must consider any mitigating provisions in the legislation that remedy or lessen its disparate impact. *Raymond*, 981 F.3d at 309–10; *see also Lee*, 843 F.3d at 607–08.

For this factor, Plaintiffs are not required to prove that the overall effect of the challenged legislation completely bars minority voters from being able to exercise their right to vote. *McCrory II*, 831 F.3d at 231. Instead, this factor may support a finding of discriminatory intent when "the cumulative impact of the challenged provisions" bear more

91

heavily on one race over another. *Id.* (citing *Clingman v. Beaver*, 544 U.S. 581, 607–08 (2005) (O'Connor, J. concurring) ("A panoply of regulations, each apparently defensible when considered alone, may nevertheless have the combined effect of severely restricting participation and competition."). Disparate impact can also be found when voting mechanisms used disproportionately by one race are removed or when one race disproportionately lacks what is required to vote. *See id.*

### a. The Admissibility and Weight of Voter Data

At the outset, according to *Raymond*, this Court notes that certain evidence presented to it, including some survey data, voter-witness allegations of burdens at the polls, and faulty enforcement, will have limited weight when assessing disparate impact. *Raymond*, 981 F.3d at 310 (citing *United States v. Chem. Found.*, 272 U.S. 1, 14–15 (1926)). The parties also disagree about the admissibility of certain evidence submitted to this Court in the trial record. (ECF Nos. 335 ¶¶ 311–14, 420–21; 339 ¶ 259.) Legislative Defendants argue two expert analyses submitted by Plaintiffs are unsuitable for this Court's consideration. Legislative Defendants point to Dr. Michael Herron's analysis of the SBOE's 2019 "no-match" list[36] and Dr. Matthew Barreto's public opinion survey conducted in August and September 2019. (*Id.*) Plaintiffs rely on both Dr. Barreto and Dr. Herron's surveys in their proposed findings of fact and argue they are uncontested in the record and should therefore be considered. (ECF No. 339 ¶¶ 259–61; *see e.g.*, ECF No. 339 ¶¶ 267–69; *see also* ECF Nos. 116 at 3; 250 at 1.) The Court will address these arguments in turn.

---

[36] The "no-match list" cross-references DMV records with state voter registration lists to determine the percentage of registered voters without a DMV-issued ID. (PX0280 ¶ 1.)

Legislative Defendants argue that the Court should not consider Dr. Barreto's survey for several reasons, including its reliance on "inaccurate understandings of S.B. 824," also its inclusion of respondents (1) who had self-reported their voter registration status and (2) who reported they were not yet registered to vote in North Carolina. (*See* ECF No. 335 ¶ 421.) As for Dr. Herron's analysis, Defendants argue his data set was purposefully over-inclusive, did not include all the IDs permitted by S.B. 824, and "did not consider the impact of the reasonable-impediment provision." (*Id.* ¶ 420.) In support of their arguments, Legislative Defendants point to the October 2019 affidavit of Brian Neesby, then Chief Information Officer of the SBOE. (*See id.*; ECF No. 97-28 ¶ 2.) Mr. Neesby's affidavit described the no-match list as "designed to be overinclusive" and noted there was "a high likelihood" that there would be "false negatives" in the no-match list. (ECF No. 97-28 ¶¶ 2, 10.)

In response, Plaintiffs argue that, while Mr. Neesby stated that the 2019 no-match list could likely contain false negatives, he did not estimate or quantify the number of false negatives, "nor did he address, contest, [or] refute Dr. Herron's conclusions regarding the racial and ethnic composition of the SBOE 2019 no-match list." (ECF No. 339 ¶ 260 (citing ECF No. 97-28 ¶ 10).) Plaintiffs also contend that the declaration of Director Karen Brinson Bell, submitted by State Board Defendants, indicates that the number of false negatives on the no-match list is "minimal." (*Id.* n.10 (citing ECF No. 97-8 ¶ 22.)

This Court seriously considers Legislative Defendants' arguments regarding the potential flaws in Dr. Herron and Dr. Barreto's reports and their underlying data. This Court also notes that there is no contrary expert analysis in the record. Legislative Defendants' preliminary injunction expert reports in opposition were stricken from the record before the close of discovery. (*See* ECF No. 116 at 3.) Legislative Defendants never sought to

reintroduce their expert reports and repeatedly declared they were "willing to proceed to trial on the evidentiary record that existed at the close of discovery." (ECF No. 250 at 5.) Without contrary evidence in the record, Defendants' cumulative arguments go to the weight of Plaintiffs' expert evidence rather than its admissibility. Therefore, the Court concludes it may appropriately consider the findings of Dr. Herron and Dr. Barreto. However, this Court will do so while granting their reports, given the stated limitations, the weight they deserve.

b.    Disparate Impact of S.B. 824's Photo ID Requirements

Dr. Michael Herron's analysis of the SBOE's 2019 "no-match list" found an overall "no-match rate" of 8.1%, meaning this percentage of the list of registered voters did not appear to have a DMV-issued ID. (PX0280 ¶ 43.) When the no-match list is sorted by race, it is revealed that the "no-match" rate for white voters is 6.5%. (PX0280 ¶ 49 tbl.3.) For Black voters the "no-match rate" is 10.6%, 4 percentage points greater than the rate for white voters. (*Id.*) When the no-match list is sorted by ethnicity, Hispanic registered voters' "no-match rate" is 11.1%, 4.6 points greater than the rate of non-Hispanic voters. (*Id.* ¶ 57 tbl.5.) Dr. Herron's findings were that Black and Hispanic registered voters found on this list are less likely than white voters to have DMV-issued ID. (PX0280 ¶ 66.) Thus, these voters are more likely to need alternate, non-DMV issued, photo ID than white voters.

Dr. Matthew Barreto's report was based on the results of a 2019 public opinion survey of 1,642 eligible North Carolina voters regarding rates of possession of qualifying photo ID. *See supra* § VII.C. Dr. Barreto's survey found that for unexpired IDs issued by the North Carolina DMV, 6.7% of eligible white voters lacked such an ID. *See supra* § VII.C. Comparatively, 11.4% of eligible Black voters lacked qualifying ID, nearly 5 percentage points more than white voters. In addition, 22.9% of Hispanic voters surveyed did not possess

qualifying DMV-issued ID, over 16 percentage points higher than white respondents. *See supra* § VII.C. These findings supported Dr. Barreto's conclusion that "[a]s compared to eligible non-Hispanic-whites, Black and Latino eligible voters in North Carolina are less likely to possess a photo ID acceptable under SB 824." (PX0316 ¶ 42.)

Dr. Barreto's survey also demonstrated statistically significant disparities among surveyed registered voters. Dr. Barreto's survey found that only 5.8% of registered white respondents lacked unexpired DMV IDs. *See supra* § VII.C. Whereas 10.6% of the surveyed registered Black voters lacked these IDs, almost 5% more than white respondents. *See supra* § VII.C. Of non-Hispanic registered voters surveyed, 19.2% lacked unexpired IDs, over 13 percentage points more than white respondents. *See supra* § VII.C. Dr. Barreto's findings also showed discrepancies between white and minority voters' resemblance to their photo IDs, which can subject a voter to an identity challenge at the polls. *See supra* §§ IV, VII.C.

In addition to this racial differentiation of ID possession, S.B. 824 does not include forms of IDs that minority voters are more likely to possess, and the enacting legislature was on notice of those statistics. *See supra* § VII.C. To its credit, S.B. 824 contains provisions that address the IDs African Americans are more likely than white voters to possess, like government employee IDs, though, non-military federal employee IDs are completely excluded. *See supra* §§ IV, VII.C. However, only seventy-three state and local government employee IDs have been approved for the current two-year approval period. *See supra* § IV. The evidence suggests under S.B. 824, minority voters still are much less likely to have an acceptable form of ID. *See supra* § VII.C. Further, the IDs that are excluded could have greatly reduced that discrepancy. *See supra* §§ IV, VII.C.

Taken together, the evidence in the trial record suggests that the burden to obtain an ID does fall disproportionately on Black and Hispanic voters because they are less likely to have the forms of qualifying photo ID allowed under S.B. 824 to vote.

c.     S.B. 824's Mitigating Factors

The  Court next considers the mitigating provisions of S.B. 824 as part of its disparate impact analysis.  *Raymond*, 981 F.3d at 309–10.  The Court will analyze the provisions identified by the Fourth Circuit to assess the degree to which they mitigate the disparate impact of S.B. 824.  Further, the Court will address, as the parties have argued, whether S.B. 824 is more lenient than its predecessor, H.B. 589.  Finally, the Court will also consider the additional mitigating provisions of S.B. 824 made by post-enactment amendments.  *Raymond*, 981 F.3d at 310.

(i)     S.B. 824's Mitigating Provisions When Enacted

In *Raymond*, the Fourth Circuit discusses three mitigating provisions: (1) the availability of free photo IDs, (2) the opportunity to vote by provisional ballot without ID and cure it, and (3) the opportunity to vote by provisional ballot without ID and use the RID form. *Raymond*, 981 F.3d at 309–10.  The trial record reveals that while these provisions appear to alleviate the disparate impact of S.B. 824's restrictions, there are limits to that relief for many North Carolina voters.

First, free voter photo IDs are available at the one-stop voting centers throughout the early voting period.  *Raymond*, 981 F.3d at 309.  In addition, the hours of the one-stop locations are flexible during the early voting period, extending past business hours to even include Saturdays in the early voting period.  *See supra* § V.B.  Legislative Defendants argue that Black voters  disproportionately  use  one-stop  voting,  therefore  the  free  qualifying  photo  IDs

available at the County Board of Elections disproportionately benefit them. (ECF No. 335 ¶ 415.) However, the record reflects that only one polling place per county—the SBOE office— is designated to provide one-stop early voting. Moreover, the evidence shows that not all county offices of the SBOE are equipped to provide IDs. *See supra* § IV. Further, S.B. 824, as amended, does not require each county Board of Elections office to offer one-stop early voting. *See supra* §§ V.B., VII.C. Of importance, the opportunity to obtain a free qualifying photo ID is not available on Election Day, when most North Carolinians cast their vote. *See supra* §§ IV, V.

In addition, according to Plaintiffs' expert, Dr. Barry Burden, S.B. 824's mitigating provisions "make demands on a person's time and impose transportation costs because the individual must present themselves in person to apply." (PX0337 at 34.) Black and Hispanic voters are "less likely than whites to live in households where a vehicle is readily available." (*Id.*) Further, the expenses related to procuring a free ID are significant and are not associated with the usual burdens of voting.[37] Additionally, inability to pay for transportation or documentation is not a declared reasonable impediment under S.B. 824, and thus may not justify lack of qualifying ID on Election Day. *See supra* § IV. Therefore, the alleviation of S.B. 824's disparate impact by one-stop early voting appears effective only for some voters by chance, simply based on their county of residence and wealth.

On Election Day, as the Defendants assert, while a registered voter without a qualifying ID cannot obtain a free photo ID or provide alternative documentation to verify their identity,

---

[37] A 2014 study conducted through Harvard Law School, cited by Dr. Burden, found that "the expenses for documentation, travel, and waiting time" associated with obtaining free ID "are significant—especially for minority and low-income voters—typically ranging from about $75 to $175." *See* Richard Sobel, *The High Cost of 'Free' Photo Voter Identification Cards* 2 (2014) (cited in PX0337 at 32).

97

*see supra* § V; these voters would be able to obtain a provisional ballot. However, as Plaintiffs point out these provisional ballots must be cured to count. *See supra* § IV. By one method, S.B. 824 requires these voters to go to their County Board of Elections office during business hours, after Election Day, to have a qualifying photo ID printed for them for verification. *See supra* § IV. By the second method, the RID form, the voter may use this declaration to state under the penalty of perjury why they were unable to provide qualifying photo ID. *See supra* § IV. S.B. 824 outlines several possible impediments and requires the inclusion of an "other" box for voters to explain other impediments that prevented them from arriving to the polling place with a qualifying photo ID. *See supra* § IV. The provisional ballots are not counted if the county board of elections has grounds to believe that the affidavit, or if relevant, the RID form, is "false," which is undefined by statute. *See supra* § IV.

Overall, based on *Raymond*, this Court must give limited weight to the fact that these mitigating provisions may be poorly enforced. *Raymond*, 981 F.3d at 310. Therefore, this Court is compelled to find that these mitigating factors may lessen the disparate impact of S.B. 824's photo ID requirements. *Id.* at 309–10.

(ii)    S.B. 824 as Compared to H.B. 589

Defendants also argue that a finding of discriminatory intent is unwarranted because S.B. 824, when compared to its unconstitutional predecessor, H.B. 589, is a more permissive voting regulation and includes more mitigating provisions. For instance, unlike H.B. 589, S.B. 824 provides free photo IDs and one-stop early voting. (PX0044 at 43 tbl.8.) On the other hand, while Plaintiffs acknowledge that some provisions of H.B. 589 may be stricter than S.B. 824, Plaintiffs also counter that there are also aspects of S.B. 824 that are *stricter* than H.B. 589. (*Id.*) For instance, the implementation time allowed for S.B. 824 was initially set to be less

98

than five months.  *See* N.C. Sess. Laws § 1.5.(c).  H.B. 589, when passed had a three-year implementation plan, giving voters significantly more time to prepare to comply with the ID requirements.  H.B. 589 § 6.2 (invalidated 2016).  In addition, the curing process for provisional ballots cast under S.B. 824 is also stricter; under H.B. 589, a provisional ballot could be cured by returning with current and valid photo identification *or* with "a current utility bill, bank statement, government check, paycheck, or other government document" with the voter's name and address.  (PX0044 at 43 tbl.8.)

This Court does find that S.B. 824, in some ways, appears to be more permissive than its predecessor, H.B. 589.  Taken together, however, this Court cannot conclude that S.B. 824 has a lessened impact than H.B. 589.

(iii)      S.B. 824's Post-Enactment Amendments

Some amendments to S.B. 824 by their text suggest that they can alleviate aspects of the impact of the law.  For instance, Senate Bill 214 (hereinafter "S.B. 214"), postponed the enforcement of voter ID to the 2020 elections, which primarily allowed the SBOE additional time to implement S.B. 824 and for voters to collect qualifying photo ID to vote.  *See supra* § VII.C.  Similarly, S.B. 683 allowed absentee voters to submit RID forms.  *See supra* § VII.C.  S.B. 683 also enshrined into law "last Saturday" early voting, ensuring that the early voting period, and with it one-stop early voting, would always end on the last Saturday before the election.  2019 N.C. Sess. Laws 239 § 2(a).  H.B. 646 granted educational and government entities additional time to have their IDs approved for use at the polls and also relaxed the approval requirements.  *See supra* § VII.C.  Further, H.B. 646 removed certain expiration requirements from qualifying tribal, student, and state and local government IDs.  *See supra* § VII.C

99

Other amendments appear to have little mitigating effect on the evident racial disparities between ID possession. H.B. 1169 amended S.B. 824 to allow qualifying photo ID cards "issued by a department, agency, or entity of the United States government or of North Carolina for a government program of public assistance," regardless of a printed expiration or issue date.[38] *See supra* §§ IV, VII.C. (finding this to be a form of ID Black and Hispanic voters are more likely to possess). Plaintiffs' expert Dr. Lichtman, suggested permitting public-assistance IDs would increase the possession rate of qualifying photo ID for Black voters. (*See* PX0044 at 28 tbl.3, 44.) However, H.B. 1169 is not the mitigating measure that it is purported to be.

First, H.B. 1169 did not amend S.B. 824 such that public assistance IDs were *an exception* to the photo identification requirement to vote in North Carolina elections. *See supra* § VII.C. Instead, only public assistance IDs that *contain a photo* are what H.B. 1169 allows. *See supra* §§ IV, VII.C. As the SBOE acknowledges on its website, no North Carolina or federal public assistance IDs contain photos. *Overview*, NORTH CAROLINA STATE BOARD OF ELECTIONS: VOTING: VOTER ID, https://www.ncsbe.gov/voting/voter-id ; *see also Raymond*, 981 F.3d at 308. The ameliorative measures of H.B. 1169 are negligible at best and does not mitigate the disparate impact of S.B. 824.

On balance, this Court finds that the mitigating provisions of S.B. 824 made through post-enactment amendments do ameliorate aspects of the disparate impact of S.B. 824's photo ID requirements. By expanding early voting, qualifying IDs, and the scope of the reasonable

---

[38] As this Court found, failed House Amendment A13 sought to add public-assistance IDs to S.B. 824's list of approved voter IDs. *See supra* § VII.B. Because of H.B. 1169, S.B. 824 now allows the IDs that House Amendment A13 identified. *See supra* § VII.C.

impediment declaration, these amendments have addressed some of the primary concerns raised by the disparate impact data and the Plaintiffs' witness testimony. *See supra* § VII.C.

d.     S.B. 824 as Compared to its Contemporaries

The Fourth Circuit on the preliminary injunction record also analyzed whether S.B. 824's provisions were out of step with other voter identification laws it and other courts have previously analyzed. *Raymond*, 981 F.3d at 309, 310 (comparing statutes as analyzed by the Fourth Circuit, the District Court of the District of Columbia, the Eleventh Circuit, and the Supreme Court). The Defendants also argue that S.B. 824 is not out of step with voter ID regulation in the United States and is akin to laws validated by the Fourth Circuit and sister circuits. Accordingly, this Court will also, as part of its disparate impact analysis, analyze whether S.B. 824, as amended, is out of step with voter ID regulations in the United States.

First, on the preliminary injunction record, the Fourth Circuit suggested that the law found constitutional in *Crawford*, was less lenient than S.B. 824. *Raymond*, 981 F.3d at 309 (citing *Crawford*, 553 U.S. at 198 (plurality opinion)). In *Crawford*, Indiana's voter ID law was found to impose a minimal burden for most voters who need free voter ID cards from the Indiana DMV because the burden of obtaining one did "not qualify as a substantial burden on the right to vote or even represent a significant increase over the usual burdens of voting." *Crawford*, 553 U.S. at 198 (plurality opinion). In addition, the law in *Crawford* required documentation to obtain a voter ID and did not include a reasonable impediment provision. *Id.* at 185–86.

However, *Crawford* presented a legal challenge that is both analytically and factually distinct from what is before this Court. *Id.* at 185. The Supreme Court in *Crawford* did not engage in an analysis of the *disparate* burdens of the Indiana law. *Id.* at 185, 187. There, unlike

101

here, the Plaintiffs alleged no discriminatory intent claim. *Id.* at 185, 187. Rather the Supreme Court undertook a different constitutional inquiry, the *Anderson-Burdick* balancing test, to examine whether the Indiana law placed unconstitutional burdens on the right to vote, and did so, namely without a focus on disparately impact or discriminatory intent.[39] *See id.* at 189–91 (citing *Anderson v. Celebrezze*, 460 U.S. 780 (1983); *Burdick v. Takushi*, 504 U.S. 428 (1992)). Thus, a voter ID law deemed constitutional per an *Anderson-Burdick* analysis, may yet be unconstitutionally discriminatory because of its racially disproportionate impact or intent. *See id.* Therefore, this Court does not find *Crawford* controlling in determining whether S.B. 824 imposes an unconstitutional burden on voters because of its racially disparate impact.

Furthermore, the disparate burdens of S.B. 824 result from restrictions which are among the strictest in the United States and within this Circuit. Initially, upon review of the preliminary injunction record, the Fourth Circuit concluded that S.B. 824 "is more protective of the right to vote than other states' voter-ID laws that courts have approved." *Raymond*, 981 F.3d at 310 (referencing as support *Lee*, 843 F.3d at 594; *South Carolina*, 898 F. Supp. 2d at 32; *Greater Birmingham Ministries v. Sec'y of State for the State of Alabama*, 966 F.3d 1202, 1213–14 (11th Cir. 2020), *vacated and superseded sub nom. Greater Birmingham Ministries v. Sec'y of State for the State of Ala.*, 992 F.3d 1299 (11th Cir. 2021). Yet, the record before this Court does not support that factual conclusion.

It is true, as Legislative Defendants argue, that most states (thirty-six) require some form of identification to vote on Election Day. (ECF No. 335 ¶ 348.) Of those thirty-six

---

[39] The *Anderson-Burdick* balancing test is derived from *Anderson v. Celebrezze*, 460 U.S. 780 (1983), and *Burdick v. Takushi*, 504 U.S. 428 (1992). The *Anderson-Burdick* balancing test is "the default 'all-purpose' test" for constitutional challenges to elections. Rodney A. Smolla, 1 *Federal Civil Rights Acts* § 2:87 (3d ed. 2025). It "may apply to First Amendment claims as well as to Equal Protection claims." *Id.*

states, twenty-six require that photo identification is provided on Election Day.  Of the twenty-six that require photo ID, seven of those states have election-day measures that allow for a vote to be cast on Election Day without photo ID.  Ala. Code § 17-9-30(f),  17-9-30(a) (also allowing state and federal IDs); Idaho Code §§ 34-1113, 34-1114; La. Stat. Ann. § 18:562(2)(b); Mich. Comp. Laws § 168.523(2)(1); Neb. Rev. Stat. § 32-915; S.D. Codified Laws § 12-18-6.2; Tex. Elec. Code Ann. § 63.001; *see also* Tex. Elec. Code Ann. § 63.001(b)-(c)(also allowing combinations of photo and non-photo ID).  Of those seven states, six allow voters to complete affidavits and are subject to no further action, Idaho Code §§ 34-1113; La. Stat. Ann. § 18:562(2)(b); Mich. Comp. Laws § 168.523(2)(1); Neb. Rev. Stat. § 32-915; S.D. Codified Laws § 12-18-6.2; Tex. Elec. Code Ann. §§ 63.001 (b)(2), and one allows for a witness to serve as alternate proof of identity, Ala. Code § 17-9-30(a).  As Legislative Defendants note, North Carolina, unlike its photo ID contemporaries, does not allow signature matching to cure provisional ballots, which as they argued, may produce discriminatory results in ballot counting.[40]  (ECF No. 335 ¶ 351.)

It is true, however, as the Legislative Defendants note, that fourteen states requiring Voter ID do not have a reasonable impediment process at all for those who do not present qualifying IDs to vote.  (ECF No. 335 ¶ 352.)  Though four of these fourteen states allow for non-photo identification to be used on Election Day to cast a ballot that will be counted on Election Day, unlike S.B. 824.  Alaska Stat. § 15.15.225(a)(1)–(2); Iowa Code § 49.78.2–3; Utah

---

[40] However, nearly every state that conducts signature matching allows for voters to fix or be heard regarding whether their signature on file matches their ballot signature.  Very few states do not guarantee an opportunity to be heard before a ballot is rejected for a failed signature match, and if they do not do so, this occurs in limited circumstances.  S.D. Codified Laws § 12-19-10.1(1)-(2) (absentee ballot signature matching); Ill. Comp. Stat. § 5/19-8(g-5) (absentee ballot signature matching); *see* Mo. Rev. Stat. § 115.655.5; Mo. Code Ann. tit. 15, § 30-5.020(2)(I); Mich. Comp. Laws § 168.523(2).

Code Ann. § 20A-1-102(79); *see* Ala. Code § 17-9-30(a) (allows voters to have two election officials sign sworn statements saying they know the voter) (a similar provision was rejected by the General Assembly); *see also* Iowa Code § 49.78.4 (allowing for a provision similar to Alabama's); *see also* S.D. Codified Laws § 12-18-6.3. Additionally, only four of the remaining fourteen states, like S.B. 824, require a photo ID to be presented in person to completely cure a provisional ballot. Ark. Code Ann. § 7-5-308(f)(1)–(2); Ga. Code Ann. §§ 21-2-417(b), 21-2-419(c); Ohio Rev. Code Ann. § 3501.181(7)(b); Wis. Stat. § 6.97(3)(a)-(b); *see also* Kan. Stat. Ann. § 25-2908(d), 25-2908 (h)(1)(allowing email or mailed proof as well as in-person curing). Yet, S.B. 824 could be considered more permissive because its RID form process could be used instead. *See supra* § IV. However, in states that require provisional ballots to be cured as S.B. 824 does, two allow indigency to be a sufficient reason for inability to attain ID. Ind. Code § 3-11.7.-5-2.5; Tenn. Code Ann. § 2-7-112(f).

Legislative Defendants support their claim of S.B. 824's leniency by noting ten states with voter ID laws that require identification without offering any form of free voter ID. (ECF No. 335 ¶ 353.) Again, while it is noteworthy that North Carolina provides such an ID, there are still costs associated with procuring these free IDs. *See supra* § VII.C. As for the ten states Legislative Defendants point to, only three of those states require photo ID at the polls. Fla. Stat. § 101.043(1) (requiring voter's signature on photo ID); Mont. Code Ann. § 13-13-114(1)(a) (allowing a combination of photo and non-photo ID for voting); S.D. Codified Laws § 12-18-6.1 (statute's terms allowing expired photo IDs to be used). Thus, after a thorough review of the voting regulations of North Carolina's contemporaries, this Court finds S.B. 824 to be one of the most severe.

The Legislative Defendants and the Fourth Circuit have also compared S.B. 824 to the voter ID laws of South Carolina and Virginia, which have survived constitutional challenge. *Raymond*, 981 F.3d at 310 (citing *Lee*, 843 F.3d at 594; *South Carolina*, 898 F. Supp. 2d at 32). In some ways S.B. 824 is more permissive than Virginia and South Carolina's systems of voter ID. *See, e.g.*, Va. Code Ann. § 24.2-653 (shorter provisional curing period); S.C. Code Ann. § 7-13-710(A) (accepting fewer forms of photo ID). Yet, this Court finds that S.B. 824's terms are in some ways stricter than requirements under Virginia and South Carolina law, which may have a greater impact on minority voters.

Defendants argue that Virginia's voter ID law shares mitigating features with S.B. 824, including the option for a reasonable impediment declaration. (ECF Nos. 335 ¶¶ 418, 458; 338 ¶ 106.) Legislative Defendants also argue that similar to Virginia's law, S.B. 824's provisions for free IDs for registered voters remedy some of the disproportionate effects it may have on minority voters. (ECF No. 335 ¶ 415.) Legislative Defendants also note that in *Lee*, the Fourth Circuit looked favorably upon Virginia's voter ID law because it allowed voters to cast a provisional ballot and gave three days to obtain an ID to cure the ballot. (ECF No. 335 ¶ 418.) Plaintiffs do not contest these similarities between the statutes.

However, it would not be fair to say the *Lee* decision did not rely on other substantial ameliorative provisions in the Virginia law. Virginia does not require photographic identification to vote on Election Day. Va. Code Ann. §24.2-643.B. In fact, Virginia accepts current and expired photo and non-photo IDs on Election Day. *Id.* Accepted alternate ID include recent utility bills, affidavits, voter registration documents, and any current government document containing the voter's name and address. *Id.* A provisional ballot is only cast in Virgina if a voter (1) does not have any form of acceptable identification, and (2)

refuses to sign an affidavit attesting to their identity. *Id.* Only *at that point* is a voter required to submit a copy of their identification and affidavit, which can be done in-person, via fax, or email. Va. Code Ann. §24.2-653.A.–B. Therefore, this Court cannot conclude based on the facts before it that S.B. 824 is substantially like the statute at issue in *Lee* such that S.B. 824's terms likewise ameliorate its disparate impact.

Defendants also argue South Carolina's mitigating provisions are substantially similar to S.B. 824's. (ECF Nos. 335 ¶ 451; 338 ¶ 107.) The South Carolina law, upheld by a 3-judge panel in the District Court for the District of Columbia, *South Carolina*, 898 F. Supp. 2d at 32, includes provisions for free IDs and a reasonable impediment procedure. *Compare* S.C. Code ann. § 7-13-13-71 (D)(1)(b) *with* S.B. 824. Legislative Defendants also note that S.B. 824's text was based on South Carolina's law. (ECF No. 335 ¶ 451 (citing DX068 at 5; DX069 at 3–4; DX069 at 3:18–20).) Thus, Defendants also argue that the constitutionality of South Carolina's voter ID law is instructive for this Court. (*See* ECF Nos. 335 ¶ 451; 338 ¶ 107.) As with the Virginia law, Plaintiffs do not contest that there are similar provisions in South Carolina's voter ID provisions and S.B. 824, and its exhibits also reflect that South Carolina's law was the blueprint for S.B. 824.

This Court first finds sufficient evidence to conclude that S.B. 824 was modeled on the South Carolina voter ID law declared constitutional by the District Court for the District of Columbia. This Court also notes that S.B. 824 is certainly more permissive than the South Carolina voter ID regime in the amount of photo IDs it accepts for voters on Election Day. Where the similarities between the states end, however, on Election Day.

A voter in South Carolina only submits a provisional ballot in one of three scenarios: (1) when they do not have a photo ID and are alleging a reasonable impediment; (2) the voter

has neither a photo ID nor a reasonable impediment for not obtaining one; and (3) the voter forgot their qualifying ID at home. S.C. Code Ann. § 7-13-710(C)–(D). In the first scenario, like in North Carolina, a provisional ballot is not counted if the election commission believes the affidavit to be false. *Id.* § 7-13-710(D)(2). In the second and third scenario, the voter completes a provisional ballot and must return with ID prior to the election's certification to have their ballot cured. *Id.* § 7-13-710(D)(1)(b). South Carolina's qualifying reasons for a reasonable impediment are also broadly construed. SOUTH CAROLINA ELECTION COMMISSION: VOTERS: PHOTO ID REQUIREMENTS, https://scvotes.gov/voters/photo-id-requirements/ (last visited Aug. 15, 2025). However, a voter may obtain a free South Carolina Election Commission photo ID on Election Day and use it to cast a ballot. SOUTH CAROLINA ELECTION COMMISSION: VOTERS: FAQS FOR THE 2025 LOCAL ELECTIONS, https://scvotes.gov/voters/voter-faq/ (last visited Aug. 15, 2025). In addition, on Election Day, a voter claiming a reasonable impediment may also obtain a non-photo voter registration card to submit to support their affidavit and reasonable impediment declaration, bolstering their likelihood of their provisional ballot being counted. *Id.* § 7-5-675. This more complete picture of South Carolina's voter ID law sheds light on its constitutionality and the factors that weigh in favor of it having a lessened impact on minority voters.

e.     Conclusions Regarding Disparate Impact

Considering the information before the Court, the evidence submitted in the record supports a conclusion that a racially disparate impact exists in the possession of the qualifying photo IDs required by S.B. 824. Not all IDs including a photo are permitted by S.B. 824, even when the information required to procure such a photo ID is the same as what is required to obtain a SBOE voter ID. Critically, in North Carolina, there is no form of voting that escapes

107

this strict photo ID requirement and the only way a voter can be sure their ballot is counted is by procuring and presenting a qualifying photo ID. These findings suggest a disparate impact that supports a finding of discriminatory intent.[41]

It does not escape this Court that there are several mitigating provisions of S.B. 824's amendments, including allowing more photo IDs, changing photo ID expiration requirements, and providing free IDs. And of course, S.B. 824 allows a vote by provisional ballot. Yet, voting provisionally does not guarantee the exercise of an individual's right to vote as it does not guarantee that such vote will be counted. It is of no comfort to a voter that their provisional ballot *may* be counted, as long as their affidavit and RID form are not false. The fact of the matter is that on Election Day thousands of voters—and a disparate number of them being racial minorities—will not possess the required ID to vote despite being validly registered North Carolina voters, and for many their vote will not count when the election is certified.

> 5. Conclusions Regarding Plaintiffs' Fourteenth and Fifteenth Amendment Claims

This Court concludes that there is significant and compelling evidence to support a finding of discriminatory intent under two of the *Arlington Heights* factors. The historical background of North Carolina—up to and including *the last twenty years*—has been marked by intentional race-based voter suppression. In addition, Plaintiffs have presented significant evidence of the disparate impact that S.B. 824 has inflicted and continues to inflict on minority

---

[41] In addition, this Court notes that at the preliminary injunction stage, it determined that minority voters disproportionately lacked the types of ID required by S.B. 824, and this finding was not disturbed by the Fourth Circuit in *Raymond*, but the court asked this Court to more closely examine S.B. 824's mitigating provisions. *See Raymond*, 981 F.3d at 309.

voters in North Carolina.  The record before this Court makes clear that it is simply much more difficult for racial minorities to vote and to have their vote counted.  However, this Court must review this evidence presented in light of the binding Supreme Court and Fourth Circuit rule-based case law that controls the *Arlington Heights* inquiry.  This case law requires this Court to assign less weight to the historical background.  It further requires almost impenetrable deference to the presumption of legislative good faith.  And finally, even in the shadow of significant evidence of disparate impact, the law of the case doctrine compels the conclusion that the record before this Court does not establish discriminatory intent.

Accordingly, this Court must conclude that under controlling law Plaintiffs have fallen short of meeting their burden of establishing that S.B. 824 violates the Fourteenth and Fifteenth Amendments.

### H.     Under Controlling Law, Plaintiffs Have Failed to Show Discriminatory Results in Violation of § 2 of the Voting Rights Act

Plaintiffs argue that S.B. 824's challenged provisions produce discriminatory results under § 2 of the Voting Rights Act (hereinafter "VRA").  Plaintiffs contend that S.B. 824's provisions "separately and together, will have a disproportionately negative impact on minority voters," (ECF No. 1 ¶¶ 5, 80), and ultimately result in "the effective denial of the franchise and dilution of [African American and Latino] voting strength."  (*Id.* ¶ 7).  Defendants argue that given the Supreme Court's decision in *Brnovich*, 594 U.S. 647, Plaintiffs submitted insufficient evidence for this Court to conclude that S.B. 824's challenged provisions violate § 2 of the VRA.  (ECF Nos. 335 ¶¶ 147–49, 228 ¶ 455.)  The Court will address the parties' arguments in turn.

1.    Applicable Law Following Brnovich v. Democratic National
      Committee

The controlling case law for discriminatory results claims under § 2 of the VRA has

changed significantly in recent years.  Accordingly, this Court begins its analysis of Plaintiffs'

claim by following the Supreme Court's most recent directives in *Brnovich*, with an examination

of the applicable text of the VRA.  Section 2 of the Voting Rights Act provides the following:

> (a) No voting qualification or prerequisite to voting or standard, practice, or
> procedure shall be imposed or applied by any State or political subdivision in a
> manner which results in a denial or abridgement of the right of any citizen of
> the United States to vote on account of race or color, or in contravention of the
> guarantees set forth in section 10303(f)(2) of this title, as provided in subsection
> (b).

> (b) A violation of subsection (a) is established if, based on the totality of
> circumstances, it is shown that the political processes leading to nomination or
> election in the State or political subdivision are not equally open to participation
> by members of a class of citizens protected by subsection (a) in that its members
> have less opportunity than other members of the electorate to participate in the
> political process and to elect representatives of their choice. The extent to which
> members of a protected class have been elected to office in the State or political
> subdivision is one circumstance which may be considered: *Provided*, that nothing
> in this section establishes a right to have members of a protected class elected
> in numbers equal to their proportion in the population.

52 U.S.C. § 10301.

Unlike constitutional discrimination claims, "which require proof of both

discriminatory intent and actual discriminatory effect, the language of Section 2(a) of the VRA

requires only proof of discriminatory 'results,' not of discriminatory intent." *Greater Birmingham*

*Ministries*, 992 F.3d at 1328–29 (quoting *Chisom*, 501 U.S. at 403–04); *see also Lee*, 843 F.3d at

599.

As reflected in the statute, to prove that a voting regulation produces discriminatory

results under § 2, a trial court must assess "the totality of circumstances," 52 U.S.C. § 10301(b),

which requires "an intensely local appraisal, *see Gingles*, 478 U.S. at 79 (internal quotation marks omitted); *LWV*, 769 F.3d at 243 (concluding that the district court's failure to "understand the local nature of Section 2" amounted to grave error). Therefore, rather than examine the challenged government action in the abstract, this Court must consider whether an "electoral law, practice, or structure interacts with social and historical conditions to cause an inequality in the opportunities enjoyed by [non-white] and white voters to elect their preferred representatives." *Gingles*, 478 U.S. at 47. The totality of the circumstances analysis for § 2 "results" claims have historically been guided by certain "factors" drawn from the VRA's legislative history: the "Senate Factors."[42] The Supreme Court relied on these factors in *Gingles* when evaluating a vote dilution claim, and subsequent courts have used these factors where applicable in other § 2 results cases. 478 U.S. 30, 44–45; *LWV*, 769 F.3d at 240 (saying same).

In *Brnovich*, the Supreme Court evaluated for the first time a § 2 discriminatory results claim that challenged a facially neutral "time, place, and manner" voting regulation. *Brnovich*, 594 U.S. at 653–54, 660. While it was a case of first impression, the Supreme Court in *Brnovich* declined to announce a controlling test for this kind of discriminatory results claim. *Id.* at 669. Instead, the Court erected five nonexclusive "Guideposts" for courts to analyze and consider.

---

[42] In *Thornburg v. Gingles*, the Supreme Court listed a non-comprehensive set of factors to consider: "[(1)] the history of voting-related discrimination in the State or political subdivision; [(2)] the extent to which voting in the elections of the State or political subdivision is racially polarized; [(3)] the extent to which the State or political subdivision has used voting practices or procedures that tend to enhance the opportunity for discrimination against the minority group, such as unusually large election districts, majority vote requirements, and prohibitions against bullet voting; [(4)] the exclusion of members of the minority group from candidate slating processes; [(5)] the extent to which minority group members bear the effects of past discrimination in areas such as education, employment, and health, which hinder their ability to participate effectively in the political process; [(6)] the use of overt or subtle racial appeals in political campaigns; and [(7)] the extent to which members of the minority group have been elected to public office in the jurisdiction." 478 U.S. 30, 44–45 (1986). Other relevant considerations which may have probative value include "[(8)] evidence demonstrating that elected officials are unresponsive to the particularized needs of the members of the minority group and [(9)] that the policy underlying the State's or the political subdivision's use of the contested practice or structure is tenuous." *Id.* at 45.

*Id.* at 666, 669. The Guideposts the Supreme Court directed courts to consider are: (1) "the size of the burden imposed by a challenged voting rule," (2) "the degree to which a voting rule departs from what was standard practice when § 2 was amended in 1982," (3) "[t]he size of any disparities in a rule's impact on members of different racial or ethnic groups," (4) "the opportunities provided by a State's entire system of voting," and (5) "the strength of the state interests served by a challenged voting rule." *Id.* at 669–72. Again, the Supreme Court was clear that these Guideposts are not "an exhaustive list" of factors for courts to consider for § 2 results challenges, *id.* at 669, because § 2(b)'s text directs courts to consider "any circumstance that has a logical bearing on whether voting is 'equally open' and affords equal 'opportunity.'" *Id.* at 668–69.

However, the Supreme Court in *Brnovich* declined to apply the *Gingles* approach,[43] *id.* at 672, 673, which until then had been the predominant method in this Circuit to analyze discriminatory results claims, *see id.* at 672. Yet, the Supreme Court acknowledged that certain of the "Senate Factors" the Supreme Court had previously relied on in *Gingles* could be relevant to a time placed and manner claim, but only to the extent they "show[ed] that minority group members suffered discrimination in the past … and that [the] effects of that discrimination persist." *See id.* at 673 (citing *Gingles*, 478 U.S. at 36–37). Although the Court also did not "suggest that [the Senate factors] should be disregarded"—because a § 2 results claim must be evaluated under the totality of circumstances, *id.* at 673—it cautioned lower courts from relying on Senate Factors that were more appropriate for vote dilution claims, *see id.* at 672.

---

[43] In *Brnovich*, the Ninth Circuit relied on *Gingles* and the "Senate Factors" for its § 2 results claim analysis. 594 U.S. at 664. The Supreme Court declined to adopt the Ninth Circuit's approach, noting that the "Senate" Factors were developed and designed for vote-dilution cases. *Id.* 594 U.S. at 672.

Accordingly, this Court will first evaluate Plaintiffs' claims applying the Guideposts outlined by the Supreme Court in *Brnovich* and it will then consider the relevant Senate Factors.

> 2. <u>Plaintiffs' Guideposts Evidence is not Sufficient to Conclude that S.B. 824 Produces Discriminatory Results</u>
>
> a. The Size of The Burden Imposed by S.B. 824 Does Not Support a Violation of § 2

The first *Brnovich* Guidepost this Court considers is "the size of the burden imposed by [the] challenged voting rule." 594 U.S. at 669. This Court must analyze "the size of the burden imposed" by S.B. 824 to determine its impact on the totality of North Carolina's system of voting. *Id.* Accordingly, this Court must evaluate whether the challenged voting rule creates a system that goes beyond the "usual burdens" of voting. *Id.* (quoting *Crawford*, 553 U.S. at 198 (plurality opinion)) (internal quotation marks omitted). However, the Supreme Court has cautioned that the question is not whether there is an absence of inconvenience in a system of voting at all, but rather whether it is unusually burdensome. *Id.*

Plaintiffs argue S.B. 824's burden on voters is "significant and well-documented." (ECF No. 339 ¶ 592.) To support its argument, Plaintiffs points to its experts' reports which demonstrate disparity in possessing qualifying photo IDs, the deterrent effect of S.B. 824, and the failure of S.B. 824's ameliorative provisions to address these disparities. (ECF No. 339 ¶¶ 591, 592 c.-d., 593, 595.) Legislative Defendants argue that S.B. 824's photo ID requirement is a "negligible burden" because of the availability of provisional ballots and the reasonable impediment declaration. (ECF No. 335 ¶¶ 456–58.)

Similarly, State Board Defendants argue that S.B. 824 imposes minimal burdens that are "in line with or not significantly greater than the usual burdens associated with voting" when considering its mitigating provisions. (ECF No. 338 at ¶¶ 113, 100, 152.) State Board

Defendants highlight the facts stipulated to by the Parties that reflect that in the March 2024 primary 1.8 million voters cast a provisional ballot for reasons related to photo ID, and of those, only 477 were not ultimately counted, and thus conclude that the photo ID requirement did not stop 99.97% of voters who appeared from voting. *See supra* § VII.D; (ECF Nos. 299 ¶¶ 173, 179; 338 ¶ 109.) State Board Defendants also highlight that similar numbers were observed in the 2023 municipal elections, where 99.96% of voters who appeared were able to have their vote counted, *See supra* § VII.D; (ECF No. 299 ¶¶ 162–70), as only "one in 2,476 ballots or 0.04% of in-person voters did not have their ballots counted by reason of the photo ID requirement." (ECF No. 338 ¶ 111.)

First, this Court finds that for voters who already *do* possess qualifying ID, S.B. 824's requirements impose a minimal burden. For those persons, the steps they must take to vote do not exceed the "usual burdens of voting." *Brnovich*, 594 U.S. at 678 (quoting *Crawford*, 553 U.S. at 198 (plurality opinion)). Those voters must simply present themselves and their qualifying identification at the polls to vote. Even for the absentee voter who possesses qualifying photo ID, S.B. 824 imposes only a modest burden, because they must only provide a photocopy of their qualifying ID to have their vote counted. *See supra* §§ IV, V.C. Further, this Court does find that S.B. 824's mitigating provisions do expand the number of voters who will possess qualifying ID on Election Day. *See supra* §§ IV, VII.C. (*e.g.*, lowering the expired ID exception for the elderly to 65, approving educational and government employment photo IDs for use at the polls, approving tribal photo IDs for use at the polls, offering free qualifying photo ID at early voting locations).

However, for voters who *do not* possess qualifying photo ID, S.B. 824 imposes distinct and difficult burdens for voting.[44]  Plaintiffs argue that the size of the burden imposed by S.B. 824 on such persons is "massive."  (ECF No. 339 at 244.)  To support their argument, Plaintiffs point to 2019 data from the SBOE that shows 8.1% registered voters may lack qualifying photo ID issued by the North Carolina DMV.  (PX0280 ¶¶ 42, 43.)  Although Defendants characterize this burden as "small," (ECF No. 338 ¶ 152), this Court has found that for indigent voters and voters lacking transportation, acquiring the qualifying photo ID required to exercise the vote can be arduous.  For instance, as Plaintiffs' expert Dr. Burden explained, "[t]he average county has a land area of 486 square miles and could thus require lengthy, inconvenient, costly, or difficult travel to acquire an ID."  *See supra* § VII.C.

When burdens such as these are presented, the Supreme Court in *Brnovich* suggests courts examine whether the challenged regulation also reflects "extensive efforts to reduce [its] impact on the number of valid votes ultimately cast."  594 U.S at 678–79.  On this point, Legislative Defendants note the fact that voters can obtain free IDs without providing any supporting documentation at either the county board of elections or the DMV.  (ECF No. 335 ¶ 464 (quoting *Raymond*, 981 F.3d 309)).  Legislative Defendants further argue that S.B. 824's "safeguards" ensure that the any burden is "vanishingly small or simply forms part of the usual burdens of voting."  (*Id.* (internal quotations marks omitted)).

---

[44] Plaintiffs presented evidence that some voters will be deterred from even attempting to vote because they lack, or believe they lack, acceptable identification.  (*See supra* § VII.C.; PX0337 at 36–38) (Dr. Barreto's public opinion survey conducted in August and September 2019 found North Carolinians "who currently lack a qualifying ID . . . overwhelmingly" said they would not "try to vote on election day if they learned they lacked a qualifying photo ID.")

Ultimately, the record before this Court does not allow it to conclude that the size of the burden imposed by S.B. 824 is greater than the usual burdens of voting.[45] First, the Supreme Court in *Brnovich* made clear that this Court's analysis of this first Guidepost should not be disaggregated by race or any other group classification; instead, it must reflect the size of the burden on the system as a whole. *See* 594 U.S. at 669. Further, there is limited evidence before this Court about the number in absolute terms of persons unable to vote because they lacked qualifying ID. *See supra* § VII.D. The Supreme Court in *Brnovich* also made clear that when evaluating the size of the burden imposed by a voting regulation, this Court must consider the regulation's mitigating provisions. 594 U.S at 678–79. Although the burdens faced by some voters are by no means a "mere inconvenience" as described by the Supreme Court, *id.* at 669, without more in the record, this Court cannot find that S.B. 824's photo ID requirements present "obstacles and burdens that block or seriously hinder voting," *id.* Thus, considering the evidence before it, this Court finds that the evidence Plaintiffs provided in support of this Guidepost weighs against finding a violation of § 2 of the VRA.

  b.  S.B. 824's Departure from the Standard Practice in Voting Regulations in 1982 Weighs In Favor of Finding a Violation of § 2

The second *Brnovich* Guidepost is "[t]he degree to which a challenged rule has a long pedigree or is in widespread use in the United States." *Id.* at 670. In *Brnovich*, the Supreme Court reasoned that because Congress did not intend to attack harmless time, place, and

---

[45] Although the Fourth Circuit in *Raymond* reviewed only the preliminary injunction record in this case, in light of early rulings by this Court, the Parties have been largely limited to the preliminary injunction record. *See Raymond*, 981 F.3d at 298; (ECF No. 298 48–49.) Therefore, the evidence that Plaintiffs were able to present at trial remains largely the same. While the witnesses who testified at trial elucidated the evidence in the preliminary injunction record about the burdens imposed by S.B. 824, there was not sufficient evidence to get around the Fourth Circuit's conclusion that "the minimal burden associated with obtaining a voter ID" is insufficient to sustain a facial challenge. *Raymond*, 981 F.3d at 309.

manner voting regulations, it is useful to have benchmarks—in this case the voting regulations that existed in 1982—as a comparison for a challenged rule. *Id.* Regarding this Guidepost, Plaintiffs argue that photo ID requirements for voting were not "standard practice" in 1982 and are not in widespread use. (ECF No. 337 ¶ 597.) The Defendants do not contest that photo ID requirements were not standard practice in 1982. (*See* ECF Nos. 335 ¶¶ 460–62; 337 ¶¶ 157–58.) However, Defendants argue Guidepost Two weighs against finding a violation of § 2 because voter identification requirements are now in widespread use in the United States.[46] (ECF Nos. 335 ¶ 461; 337 ¶ 158.)

This Court begins by reiterating its finding that photo ID voting requirements are inventions of the twenty-first century, so they are inevitably a substantial departure from what was "standard practice" in the United States when § 2 of the VRA was amended in 1982. *Brnovich*, 594 U.S. at 669, 669–70. As a result, there is no "long pedigree" of requiring photo ID at the polls in the United States and North Carolina, for either voting in-person or by absentee ballot. N.C. Gen. Stat. 1982 Volume 3d §163-54, 163-55, 163-226. Moreover, in North Carolina in 1982, all that was required to vote in-person was a valid voting registration, and for absentee ballots, a valid voting registration and an accepted reason to vote by absentee ballot. *Id.*

However, the Court in *Brnovich* also suggested that a law's widespread use may support finding against a violation of § 2 of the VRA. 594 U.S. at 671. To that end, Defendants argue

---

[46] Legislative Defendants further argue that "[w]hether or not the law has a long pedigree in North Carolina is beside the point" because "[i]f that were the test, this consideration would automatically cut against states any time they attempted to enact a new voting law, effectively freezing state policy." (ECF No. 335 ¶ 462.) Given that the Supreme Court explicitly calls for an examination of a law's "long pedigree" as part of its analysis of voting regulation tradition in the United States, this Court rejects this argument from Legislative Defendants. *Brnovich*, 594 U.S. at 670–71.

the majority of the states require voters to present some form of identification at the polls. (ECF Nos. 338 ¶ 165; 335 ¶ 461.) Yet, as Legislative Defendants concede, many of those states allow voters to present non-photo ID. (ECF No. 335 ¶ 461.) Indeed, the expert evidence suggests that S.B. 824 is also an outlier compared to other states with voter identification laws. In 2019, sixteen states did not require voter identification to vote at all, and of the states with voter identification laws, many did not require photographic identification. *See supra* § VII.C. (PX044 at 6–7; *see also* PX0219 at 17.) As reported by Dr. Lichtman, as of 2018 half of the thirty-four states that required identification also allow non-photo forms of ID, including such readily available documents as a utility bill, paycheck or bank statement. *See supra* § VII.C.; (PX044 at 119.) Combined with states that do not require photo ID at all, North Carolina as of 2018, was among the minority of states requiring a photo ID. *See supra* § VII.C.; (PX044 at 22.)

Placing the mitigating factors of S.B. 824 to one side,[47] the type of voter ID law before this Court, where a person must present a *photo* ID for in-person and absentee voting, is unique in the United States. *See supra* § VII.C. Furthermore, S.B. 824 is almost unique among other photo ID laws in its requirement that IDs can only be used if they are expired for less than a year, except for voters sixty-five years and older who can provide expired identification if it was unexpired on the registered voter's sixty-fifth birthday. *See supra* § IV.

Nevertheless, even when considering S.B. 824's mitigating factors, the law is unique in its severity, granting only one exception to presenting qualifying photo ID to vote. The majority of states with photo ID voting requirements allow voters to cast a regular ballot with

---

[47] In *Brnovich*, the Supreme Court notably does not include or suggest a discussion of mitigating factors for its analysis of this Guidepost. *Id.* at 669–71.

some form of identification that is not a qualifying photo ID. *See supra* § VII.C. In addition, many states authorize voters to also cure their provisional ballots with alternative identification, unlike S.B. 824. *See supra* § VII.C. Given S.B. 824's unique restrictions, this Court concludes that the evidence Plaintiffs provided that is relevant to this Guidepost weighs in favor of a finding of a violation of § 2.

c. The Size of S.B. 824's Disparate Impact Weighs In Favor of Finding a Violation of § 2

The third *Brnovich* Guidepost this Court considers is "[t]he size of any disparities in a rule's impact on members of different racial or ethnic groups." *Brnovich*, 594 U.S. at 671. The Supreme Court found in *Brnovich* that "small disparities are less likely than large ones to indicate that a system is not equally open." *Id.* Thus, this Court may consider the "extent that minority and non-minority groups differ with respect to employment, wealth, and education, even neutral regulations, no matter how crafted, may well result in some predictable disparities in rates of voting and noncompliance with voting rules." *Id.* The Supreme Court in *Brnovich* explained that the racial disparities should be significant in absolute terms.[48] *See id.* at 680.

Plaintiffs argue that under S.B. 824 the racial disparities in the rates of possessing qualifying ID "are large in absolute terms and dwarf the disparities at issue in *Brnovich*." (ECF No. 339 ¶ 519 (citing *Brnovich*, 594 U.S. at 671).) State Board Defendants and Legislative Defendants, while acknowledging the racial disparities, argue that these disparities do not necessarily mean that North Carolina's system is not equally open or that S.B. 824 violates §

---

[48] The Supreme Court extensively discussed why "a meaningful comparison is essential" to assess disparities in "a rule's impact on members of different racial or ethnic groups." *Id.* at 671, 680–81. The Court cautioned that "small differences should not be artificially magnified." *Id.* at 671. This Court will only use statistics in the Guidepost with an eye to the Supreme Court's guidance for relying on statistics for the disparate burdens analysis. *See id.* at 680–81.

2.  (*See* ECF Nos. 338 ¶¶ 160–62; 335 ¶ 465.)  State Board Defendants further argue that there are no significant racial disparities caused by the burdens of S.B. 824.  (ECF No. 338 ¶ 162.)  Legislative Defendants additionally argue that the disparities are small in absolute terms.  (ECF No. 335 ¶¶ 468–69.)

This Court finds that the disparate burdens caused by S.B. 824 are significant.  As reported by Dr. Herron, in 2019, the number of registered voters who appeared to not have a DMV-issued ID ("unmatched") was 617,029 of the 7,646,171 registered North Carolina voters in 2019.  *See supra* § VII.C.; (PX0280 at 12–13, 18–19.)  When sorted by race and ethnicity, approximately 10.6% of African American voters were unmatched, whereas 6.5% of white voters were unmatched.  *See supra* § VII.C.; (PX0280 at 22, tbl. 3.)  Similarly, 11.1% of Hispanic voters were unmatched, compared to 5.7% of non-Hispanics.  *See supra* § VII.C.; (PX0280 at 26 tbl.5.)  This analysis suggests that in this 2019 list, Black and Hispanic registered voters are less likely than registered white voters to have some of the most common forms of identification that can be used to vote under S.B. 824—driver's licenses and other DMV-issued IDs.

As discussed in the constitutional inquiry, Plaintiffs' expert, Dr. Barreto found in his survey "large and statistically significant differences in possession rates" for unexpired identification issued by the North Carolina DMV, 5.8% of registered white voters lacked such an identification, while 10.6% of Black voters and 19.2% of registered Hispanic voters lacked valid-DMV issued identification.  *See supra* § VII.C.; (PX0316 at 53 tbl.4B.)

For registered voters with any kind of qualifying identification, Dr. Barreto's survey found 4.5% of white registered voters, 12.2% of Black registered voters, and 14.4% of Latino registered voters lack any valid identification with a qualifying photo ID.  *See supra* §§ VII.C,

VII.E.; (PX0316 at 53 tbl.4B.) Thus, Dr. Barreto concludes that "large and statistically significant differences in possession rates are found by race, with white voters being consistently more likely to have access to a qualifying ID than Black or Latino voters." *See supra* §§ VII.C, VII.E.; (PX0316 ¶ 52.)

By contrast, in *Brnovich*, the Supreme Court found that the racial disparity in the burdens imposed by the underlying Arizona regulation were small: "a little over 1% of Hispanic voters, 1% of African American voters, and 1% of Native American voters who voted on election day cast an out-of-precinct ballot" and "[f]or non-minority voters, the rate was around 0.5." *Brnovich*, 594 U.S. at 680 (internal citation omitted). Similarly, in *Lee,* the Fourth Circuit found that "African Americans, as a demographic block, are by a slim statistical margin less likely to have a form of valid identification" where "96.8% of Caucasians and 94.6% of African Americans had appropriate IDs." 843 F.3d at 597, 600 (citation omitted).

While the racial differences associated with the challenged voting procedures in *Brnovich* and *Lee* were not significant enough to sustain a violation of § 2 of the VRA, that is not the case for the racial disparities before this Court. The differences Plaintiffs identified in rates of possession of qualifying photo ID are much greater than the small disparities identified for the laws at issue in *Brnovich* and *Lee*, which were .5% and 2.2% respectively. Instead, the racial differences before this Court instead support that S.B. 824 does not similarly burden populations of voters when disaggregated by race rather there is a significant disparate burden imposed on Black and Hispanic voters. This Court therefore concludes that the evidence Plaintiffs provided in support of this Guidepost weighs in favor of finding a violation of § 2.

d. The Opportunities Provided by North Carolina's Entire System of Voting Weighs in Favor of Finding a Violation of § 2

For the fourth *Brnovich* Guidepost this Court must consider "the opportunities provided by a State's entire system of voting." *Brnovich*, 594 U.S. at 671. In *Brnovich*, the Supreme Court concluded, given § 2(b)'s reference to a state's "political processes" as a whole, courts should also consider voting opportunities available irrespective of the restrictions of the challenged voting regulation. *Id.* The Supreme Court held that the burden imposed on voters by one method of voting "cannot be evaluated without also taking into account the other available means" of voting. *Id.*

Plaintiffs argue this Guidepost weighs in favor of a violation of § 2 because "there are no alternative methods of voting that… escape[] the burdens imposed by S.B. 824's photo ID requirements." (ECF No. 339 ¶¶ 597, 598.) Defendants argue that the entire system of voting in North Carolina provides voters multiple opportunities and methods of voting, which support finding against a violation of § 2. (*See* ECF Nos. 338 ¶ 165; 335 ¶ 456.) Legislative Defendants further argue that North Carolina "'generally makes it very easy to vote' with or without photo ID" because of S.B. 824's mitigating provisions. (ECF No. 335 ¶ 456 (quoting *Brnovich*, 594 U.S. 654).)

Given the evidence before it, this Court concludes that S.B. 824's qualifying photo ID requirements apply to North Carolina's entire system of voting. In North Carolina, with one limited exception, there is no "other available means of voting." *See supra* § IV, V. (applying photo ID requirements to request an absentee ballot in addition to in person voting). Although North Carolina's system of voting includes opportunities to vote with lessened

122

administrative burdens associated with procuring a qualifying photo ID, there is only one *alternative* to these requirements. *Cf. Brnovich*, 594 U.S. at 671.

The only *alternative* form of voting is to complete a provisional ballot, whether in person or absentee, and to provide a reasonable impediment declaration. *See supra* § IV. Defendants argue that voting by provisional ballot writ large is an alternative method of voting, but this is not necessarily true. The availability of voting by provisional ballot alone is not a true alternative to S.B. 824's qualifying photo ID requirement because the only way to ensure a ballot will be cured, and then counted, is by presenting qualifying photo ID. *See supra* § IV. For some voters, those who do not have and cannot procure qualifying photo ID, their only alternative is to complete a reasonable impediment declaration and hope their ballot is counted because the Board of Elections has not found their declaration to be "false." *See supra* § IV. This Court therefore concludes that the evidence Plaintiffs provided in support of this Guidepost weighs in favor of finding a violation of § 2.

e.      The Strength of the State Interests Served by S.B. 824 Weighs Against Finding a Violation of § 2

For the fifth *Brnovich* Guidepost this Court considers the strength of the state interests served by S.B. 824. 594 U.S. at 671. In *Brnovich*, the Supreme Court concluded that because "every voting rule imposes a burden of some sort… [when] determining 'based on the totality of circumstances' whether a rule goes too far, it is important to consider the reason for the rule." *See id.* at 670. Thus, the Court determined that rules that are "supported by strong state interests are less likely to violate § 2." *Id.* at 672. In *Brnovich*, the Supreme Court clearly stated that preventing fraud is a "strong and entirely legitimate state interest" because of its potential to affect the fairness of an election, the election's outcome, and the public's perception of an

outcome's legitimacy. 594 U.S. at 672. The Supreme Court also noted lower courts must accord appropriate weight to the interest in an "orderly administration" of an election, which it believes tends to "decrease voter confusion and increase voter confidence in elections." *Id.* at 681.

Defendants collectively argue that the North Carolina constitutional amendment requiring that the General Assembly implement a voter ID law, along with its goals of protecting voter confidence and preventing voter fraud, are the state interests furthered by S.B. 824. (*See* ECF Nos. 338 ¶¶ 168–70; 335 ¶¶ 470–471.) Legislative Defendants further argue there is an additional state interest in "bringing North Carolina's election laws into alignment with the majority of other states who require voters to present ID to vote." (ECF No. 335 ¶ 472.) Plaintiffs argue that the Defendants' asserted "state interest in photo identification for voting is demonstrably weak and pretextual." (ECF No. 339 ¶ 599.) Instead, Plaintiffs argue, the enactment of the constitutional amendment was "a component of the overall effort to enact S.B. 824, and that many leading sponsors of S.B. 824 were explicit in their desire to use the constitutional amendment to deflect further legal challenges to a photo ID law." (ECF No. 339 ¶ 601.)

As an initial matter, because North Carolina voters amended the State constitution to include a photo voter ID provision, there is no denying that the State had a duty to respond to this electoral and constitutional mandate. *See supra* § III. Thus, Plaintiffs' arguments do not lessen the strength of the state's interest in passing S.B. 824 once the constitutional amendment was passed. With the passage of H.B. 1092, the State constitution next demanded that the General Assembly pass enacting legislation and that the SBOE enforce it. *See supra* § III. Though this Court recognizes the long history, both in and outside of North Carolina, of

using constitutional amendments to suppress Black and minority voters, *see supra* § VII.A., the fact remains that the reason for S.B. 824's passage lies at the heart of a state's police powers.

Outside of the constitutional amendment, Defendants also point to additional state interests in preventing voter fraud and protecting voter confidence in the integrity of elections. (*See* ECF Nos. 338 ¶¶ 168–70; 335 ¶¶ 470–471.)  In response, Plaintiffs contend that "Defendants must demonstrate that the bills' proponents were sincere in their belief that the law they were passing would reduce voter fraud, and that this was a necessary prophylactic measure."  (ECF No. 339 ¶ 600 (internal quotation marks and citation omitted)).  Plaintiffs argue that the "mere recitation of the words 'voter fraud' or 'election integrity' are not sufficient to automatically overcome a Section 2 analysis." (*Id.*)  In support of their argument, Plaintiffs claim that the purported state interests were tainted by the goals of the controlling political party of the General Assembly at the time, namely their pursuit to preserve their political power.  (*See id.* ¶¶ 600–01.)

Irrespective of Plaintiffs' arguments, the Supreme Court appears to have set minimal evidentiary standards for states to support their claimed state interests.  *Brnovich*, 594 U.S. at 682.  In *Brnovich*, the Supreme Court explicitly rejected the argument that the state needs "to show that its chosen policy is absolutely necessary or that a less restrictive means would not adequately serve the State's objectives."  *Id.*  The Supreme Court also remarked that "a State may take action to prevent election fraud without waiting for it to occur."  *Id.* at 686; *see also Munro v. Socialist Workers Party*, 479 U.S. 189, 195–96 (1986).  Further, the plurality in the Supreme Court's decision in *Crawford* also indicated that preventing voter fraud and protecting voter confidence in the integrity of elections are valid state interests even when there is no evidence of voter fraud.  *Crawford,* 553 U.S. at 194–97 (plurality opinion).  This rationale has

also been affirmed in the Fourth Circuit. *See also Lee*, 843 F.3d at 606. Thus, Supreme Court and Fourth Circuit precedent establishes that proof of the sincerity or necessity of a voting regulation is not required or relevant for this Guidepost.

Accordingly, given the case law on-point, this Court must find that S.B. 824 has been shown to be supported by strong state interests, therefore, the fifth *Brnovich* Guidepost weighs against finding a violation of § 2.

Having considered the *Brnovich* Guideposts, this Court has found that two Guideposts weigh against finding a violation of § 2 of the VRA, Guidepost One—the size of the burden, and Guidepost Five—the strength of the state interests. *Brnovich* identifies Guidepost One as "highly relevant" explaining that the concepts of "openness and opportunity connote the absence of obstacles and burdens that block and seriously hinder voting." 594 U.S. at 669. Further, the Supreme Court characterizes Guidepost 5—the strength of the state interest served by the challenged rule—as "an important factor that must be taken into account." *Id.* This Court has also found that three of the Guideposts weigh in favor of finding a violation, Guidepost Two—the degree to which the rule departs from standard practice in 1982, Guidepost Three—the size of the disparities of the rule's impact on different racial and ethnic groups, and Guidepost Four—the opportunities provided by a State's entire system of voting. While the Court has found the three latter Guideposts discussed here relevant, the weight and significance of Guideposts One and Five, according to language used in *Bronovich* to describe their significance in a § 2 time, place and manner claim leads this Court to conclude that the Guideposts do not support Plaintiffs' argument that § 2 of the VRA has been violated.

### 3. *Gingles* Senate Factor Analysis

As stated above, the Supreme Court concluded in *Brnovich* that even though the Senate Factors grew out of and were designed for use in a vote dilution case, they may still be used in a § 2 challenge to a time, place, and manner voting rule because "§ 2(b) requires consideration of 'the totality of the circumstances.'" 594 U.S at 673 (quoting 52 U.S.C. § 10301(b). However, the Court held that at least two of the Senate Factors—Factors Three and Four, "are plainly inapplicable in a case involving a challenge to a facially neutral time, place, or manner voting rule." *Id.* at 272. In addition, the Court stated that for the remaining Senate Factors—Factors One, Two, Five, Six, Seven, Eight, and Nine, their "only relevance . . . is to show that minority group members suffered discrimination in the past… and that [the] effects of that discrimination persist." *Id.* (citing *Gingles*, 478 U.S. at 36–37). Consequently, their relevance, according to *Bronivich*, is much less direct. *Id.*

Plaintiffs presented evidence with respect to the Senate Factors, arguing that these factors support this Court's finding a violation of § 2.[49] (ECF No. 339 ¶¶ 584–90.) Defendants neither made arguments related to *Gingles* nor did they argue that the Senate factors were inapplicable in this challenge. (*See generally* ECF Nos. 335; 338.) Accordingly, this Court will discuss only the Senate Factors the Supreme Court has deemed may have some relevance for the instant challenge—Factors One, Two, Five, Six, Seven, Eight, and Nine. These Senate Factors will only be discussed to the extent that there is evidence to support the

---

[49] Plaintiffs provided limited relevant evidence for Senate Factor Three—the extent to which states have voting practices or procedures that "may enhance the opportunity for discrimination against the minority group." *Gingles*, 478 U.S. at 37. Plaintiffs do not discuss or provide evidence for Senate Factor Four— the exclusion of members of the minority group from candidate slating processes. *Id.* Regardless of the evidence offered in the record, in accordance with the Supreme Court's directive in *Brnovich*, this Court finds that these factors are irrelevant to the instant challenge. 594 U.S. at 672.

conclusion that they "show that minority group members suffered discrimination in the past…

and that [the] effects of that discrimination persist." *Brnovich*, 594 U.S at 673.

Senate Factor One considers the history of official discrimination in North Carolina

which affects minority participation in the democratic process. *Gingles*, 478 U.S. at 36–37. As

the Fourth Circuit has held, as well as has been documented throughout these proceedings,

North Carolina has an extensive history of employing discriminatory policies to suppress

minority voting. *See, e.g.*, *McCrory*, 831 F.3d at 223–24; *Raymond*, 981 F.3d at 299, 305. This

Court has also found that North Carolina has a "cyclical history" of using constitutional

provisions, statutes, and other voting regulations to suppress minority voters. *See supra* §

VII.A. (documenting historical discrimination from the Reconstruction era until 2018).

Therefore, with respect to Factor One there is ample evidence that minorities in North

Carolina have suffered from discrimination in voting policies. *Brnovich*, 594 U.S. at 673 (citing

*Gingles*, 478 U.S. at 36–37). Therefore, Senate Factor One supports that the effects of historical

discrimination persist in North Carolina, which weighs in favor of this Court finding a that §

2 violation of the VRA.

Senate Factor Two concerns the racial polarization of elections and political parties in

North Carolina. *Gingles*, 478 U.S. at 37. Plaintiffs provided evidence of racially polarized

voting. (ECF No. 339 ¶¶ 443–48, 586.) However, under *Brnovich*, the relevance of this factor

is limited, although it supplies additional evidence of present discrimination generally. *See supra*

§ VII.A. Accordingly, this Court finds Plaintiffs' evidence supports Senate Factor Two, weighs

in favor of finding S.B. 824 violates § 2 of the VRA.

Senate Factor Five considers the extent to which minority group members bear the

effects of past discrimination. *Gingles*, 478 U.S. at 37. In both expert reports and in trial

128

testimony, Plaintiffs demonstrated that Black and Hispanic voters in North Carolina are disproportionately low income, have less education, suffer greater incidences of poverty, have less adequate health care, and are treated unequally in the criminal justice system. *See supra* § VII.E. These disparities are correlated with unequal impacts in voting and electoral participation because they hinder the minority groups' ability to participate in the political process, in large part due to the administrative burdens associated voting in general, and in obtaining qualifying photo ID to vote in accordance with S.B. 824. *See supra* § VII.E. Further, educational attainment and income correlate directly with whether an individual votes. *See supra* § VII.E.; *see also McCrory*, 831 F.3d at 225 (citing *Gingles*, 478 U.S. at 80). Therefore, Senate Factor Five likewise supports finding a violation of § 2 of the VRA.

Senate Factor Six, the use of overt or subtle racial appeals in political campaigns, is supported by Plaintiffs' historical evidence. *See supra* § VII.A. However, following *Brnovich*, this evidence also seems to fall short of being relevant in this case. *See* 594 U.S. at 672–73. This evidence, while suggesting problematic practices in the past, does not effectively connect this historical evidence to voters continuing to suffer the effects of this discrimination in general, or in relation to S.B. 824. *See id.* Thus, Senate Factor Six does not support a finding that S.B. 824 violates § 2 of the VRA.

Senate Factor Seven, the extent to which members of the minority group have been elected to public office in the jurisdiction, is also supported by this Court's factual findings previously discussed. North Carolina has a long history of excluding racial minorities from public office. *See supra* § VII.A. Further, as the Supreme Court directed trial courts to consider in *Brnovich*, the evidence Plaintiffs used for this factor exemplifies how minority group members in North Carolina have "suffered discrimination in the past… and that [the] effects

129

of that discrimination persist." *Brnovich*, 594 U.S. at 673. Thus, this Court finds that Senate Factor Seven also supports finding a violation of § 2 of the VRA.

For Senate Factor Eight—the responsiveness of elected officials to the particularized needs of minorities—record evidence shows that representatives whose success does not depend on minority voters have consistently not been responsive to the concerns of these voters. *See supra* § VII.E. However, Plaintiffs do not suggest this resulted in racially discriminatory voting policies or stems from the effects of past discrimination. (ECF No. 339 ¶ 588.) Similarly, Plaintiffs' evidence to support Senate Factor Nine—whether the policy underlying North Carolina's use of the contested practice or structure is tenuous—also did not address the past discrimination or its persistent effects. *See Brnovich*, 594 U.S. at 673. Therefore, neither Senate Factor Eight nor Senate Factor Nine support a finding that S.B. 824 violates § 2 of the VRA.

This Court finds that Plaintiffs' evidence demonstrates support under four of the remaining seven Senate Factors—Factors One, Two, Five, and Seven, for a finding of a § 2 violation. Nevertheless, in light of the limited weight afforded these factors in *Brnovich,* and the Court's conclusion that the relevance of these factors is much less direct, they do not alter this Court's conclusion that the Guideposts do not support a § 2 violation.

4.    Conclusions Regarding Plaintiffs' Claim Under § 2 of the VRA

The heightened burdens of proof under *Brnovich* and the lessened relevance of the *Gingles* factors leads this Court to conclude that Plaintiffs' evidence is not sufficient to support its claim that S.B. 824 violates § 2 of the VRA. Although *Brnovich* declined to "announce a test to govern all VRA § 2 claims involving rules…that specify the time, place, or manner for casting ballots," 141 S. Ct. 2336, the Supreme Court's holdings in *Brnovich* appear to entrench

130

a significant shift away from the "vital" and robust protections afforded under the VRA. The Supreme Court's approach to defining appropriate challenges under § 2 of the VRA has evolved and continues to evolve. Although § 2 still remains as a mode of review for claims against facially neutral time, place, and manner voting rules, it has become increasingly clear that the intended force of § 2 of the VRA has been lessened. This is true even though § 2 of the VRA was initially imagined as a tool to challenge and defeat more subtle, yet still unlawful, voting restrictions that produced race-based disparities.

## I.     Final Conclusion

This Court's consideration of the preliminary injunction record, the limited evidence Plaintiffs presented at trial, (excluding the evidence offered in Plaintiffs' Offer of Proof for appeal), and the arguments of counsel, the controlling case law of the United States Supreme Court and the Fourth Circuit requires Judgment to be rendered in favor of the Defendants on all claims.

Based on the foregoing Findings of Fact and Conclusions of Law, the Court enters the following:

**ORDER**

**IT IS THEREFORE ORDERED AND ADJUDGED** that Judgment shall be entered in favor of Defendants on both Plaintiffs' claim under the Fourteenth and Fifteenth Amendments and Plaintiffs' claim under § 2 of the Voting Rights Act.

This, the 26th day of March 2026.

/s/ Loretta C. Biggs
Senior United States District Judge